**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana; MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION,<br><br>                              Plaintiffs,<br><br>                    vs.<br><br>BUREAU OF LAND MANAGEMENT; WILLIAM PENDLEY, in his official capacity as the person exercising the authority of the Director of the Bureau of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Department of the Interior,<br><br>                              Defendants. | Case No.: ___CV-20-62-GF-BMM<br><br><br><br>**COMPLAINT** |

The framers of the United States Constitution understood the menace of unchecked power. To prevent its accumulation and consolidation, they deliberately distributed and balanced power among three branches of government. Consistent with that norm, the Constitution's Appointments Clause requires that the President nominate and the Senate confirm the heads of significant federal agencies—a process the Supreme Court has referred to as a "critical structural safeguard" of our democracy. In defiance of this critical safeguard, the Bureau of Land Management has been run by unconfirmed acting directors for three years—that is, for the entire

1

duration of the Trump Administration. Over the last year, William Perry Pendley has unlawfully directed the Bureau via a long-running series of "temporary" orders.

Pendley's position has recently become illegal in a new way. On June 30, 2020, President Trump finally nominated Pendley to lead the Bureau, officially putting him up for Senate consideration. But Pendley continues to serve as the Bureau's acting director while his nomination is pending. This directly contravenes the Federal Vacancies Reform Act, which prohibits acting officers from running agencies while their nominations are pending before the Senate.

Governor Bullock and the Montana Department of Natural Resources and Conservation bring this suit for declaratory and injunctive relief because Pendley lacks legal authority to direct the Bureau of Land Management and because Pendley's conduct as acting director harms the State and the people of Montana. The Bureau wields broad federal power. It oversees the use and maintenance of about 245 million acres of public lands across the United States—around one eighth of the country's landmass—and that land is heavily concentrated in western states. Nearly a third of the land in Montana is federally owned, making the Bureau one of the most important stewards of land in the State.

Under Pendley and his predecessors, the Bureau has violated agreements made with Montana and other western states and has adopted policies and practices that threaten Montana's environment and economy. Pendley himself holds extreme,

unpopular views on public lands and has acted in accordance with those views during his tenure as acting director. His nomination, therefore, is likely to languish in the Senate for months and extend his unlawful tenure as acting director through the remainder of this presidential term. The Federal Vacancies Reform Act bars Presidents from circumventing the Constitution by putting people in charge of federal agencies before they are Senate-confirmed. But that is precisely what has happened here. Pendley's tenure—and the actions the Bureau has taken, and continues to take during that tenure—violate the law.

## PARTIES

1.     The Montana Department of Natural Resources and Conservation (DNRC) is an executive agency of the State of Montana. DNRC resides within and throughout Montana, with offices in the Great Falls Division of this Court, including in Lewistown and Havre.

2.     Steve Bullock is the Governor of Montana. He is the State's chief executive and exercises supervisory authority over DNRC pursuant to the Montana Constitution and state statute. He sues in his official capacity.

3.     Defendant William Perry Pendley is the Deputy Director of the Bureau of Land Management, and currently exercises the authority of the Director of the Bureau of Land Management. He is sued in his official capacity.

4.     Defendant David Bernhardt is the Secretary of the Department of the

Interior. He is sued in his official capacity.

5.     Defendant Bureau of Land Management is an agency of the United States within the meaning of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

6.     Defendant United States Department of the Interior is an agency of the United States within the meaning of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

## JURISDICTION & VENUE

7.     Because this action arises under the Administrative Procedure Act and the United States Constitution, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because the DNRC, an executive agency of the State of Montana, is a resident of this judicial district. Divisional venue is proper in the Great Falls Division under L.R. 3.2(b) and Mont. Code. Ann. §§ 25-2-118, 25-2-125 because the Bureau of Land Management and Department of Interior are found throughout the state, a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this Division, and a substantial part of the property that is the subject of the action is situated in this Division.

## CONSTITUTIONAL & STATUTORY BACKGROUND

9.     The United States Constitution provides "the exclusive means" for

appointing officers of the United States. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018). Under Article II, officers must first be nominated by the President and then confirmed to their positions "by and with the Advice and Consent of the Senate." U.S. Const. Art. II, § 2, cl. 2. "The Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'" *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (quoting *Edmond v. U.S.*, 520 U.S. 651, 659 (1997)).

10. Because the process of nomination and confirmation can take time, Congress has granted the President "limited authority to appoint acting officials to temporarily perform the functions" of a vacant position. *Id.* That authority has been granted by several different statutes over time, and is currently governed by the Federal Vacancies Reform Act, or FVRA. *Id.*; *see also* 5 U.S.C. §§ 3341–49.

11. The FVRA provides that when an office that must be filled via the Senate confirmation process lies vacant, the President may appoint an acting officer to perform the functions and duties of that office. 5 U.S.C. § 3345. That acting official may serve for 210 days, a time period that may temporarily be extended once a nomination to the position has been submitted to the Senate. 5 U.S.C. § 3346.

12. But the FVRA also specifically "prohibits certain persons from serving as acting officers if the President has nominated them to fill the vacant office permanently." *N.L.R.B.*, 137 S. Ct. at 935. In particular, the FVRA creates a broad prohibition on individuals serving in an acting capacity in an office while their own

nomination for that office is pending in the Senate. *See* 5 U.S.C. § 3345(b). There are two narrow exceptions to this rule. *See id.* First, if the nominee for an office served as first assistant to that office for more than 90 days before the vacancy at issue arose, then the nominee may continue serving in an acting capacity for that office while their nomination is pending. *Id.* Second, if the first-assistant position itself requires Senate confirmation, and the Senate has already confirmed the official to that first-assistant role, the official may serve in an acting capacity for the office in question. *Id.* Otherwise, they may not serve as an acting officer for that office. *Id.*

13.     The office of the Director of the Bureau of Land Management is one that must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a). The appointment of acting officers to discharge the duties of the Director is therefore governed by the FVRA. 5 U.S.C. § 3345(a).

## FACTUAL ALLEGATIONS

## I.     William Perry Pendley serves as the head of an agency that has had no Senate-confirmed official in charge for more than three years.

14.     President Donald Trump took office at noon on January 20, 2017. At or around that time, the last Senate-confirmed Director of the Bureau of Land Management, Neil Kornze, vacated the office.

15.     Over the three years that followed, President Trump never submitted a nomination to the Senate for a new Director of the Bureau. Steven Mufson, *Interior*

*secretary extends the tenure of federal lands chief—without a presidential nomination*, Wash. Post (Jan. 2, 2020), https://perma.cc/W2V7-GX5A.

16.     Instead of nominating a Bureau Director, President Trump chose a series of acting directors to run the agency—none of whom had been confirmed by the Senate for that position.

17.     The current acting director of the Bureau is William Perry Pendley, who was appointed to the position via a series of temporary orders.

18.     On July 29, 2019, Secretary of Interior David Bernhardt first issued an order "to temporarily redelegate [the] authority" of the position of Bureau Director to William Perry Pendley. *See* David Bernhardt, Order No. 3345 Amendment No. 28 (July 29, 2019) (Ex. A).

19.     The order delegated the "functions, duties, and responsibilities of" the "Director, Bureau of Land Management" to Pendley. It was scheduled to expire on September 30, 2019. *Id.*

20.     On September 30, 2019, Secretary Bernhardt amended the order to provide that William Perry Pendley would continue serving as acting director of the Bureau until January 3, 2020. *See* David Bernhardt, Order No. 3345 Amendment No. 29 (Sept. 30, 2019) (Ex. B).

21.     On January 2, 2020, Secretary Bernhardt again amended the order to provide that William Perry Pendley would continue to serve as acting director of the

Bureau until April 3, 2020. *See* David Bernhardt, Order No. 3345, Amendment No. 30 (Jan. 2, 2020) (Ex. C).

22.     On April 3, 2020, Secretary Bernhardt amended the order yet again, continuing Pendley's leadership until May 5, 2020. *See* David Bernhardt, Order No. 3345, Amendment No. 31 (April 3, 2020) (Ex. D).

23.     On May 5, 2020, Secretary Bernhardt amended the order again, providing for Pendley's continued leadership until June 5, 2020. *See* David Bernhardt, Order No. 3345, Amendment No. 32 (May 5, 2020) (Ex. E).

24.     On June 5, 2020, the Interior Department made a statement to the press announcing that Pendley would be continuing in his role based on updated succession orders. *See BLM acting director stays at post despite lawsuit*, The Salt Lake Tribune (June 9, 2020), https://bit.ly/3g698hR. According to press accounts, Secretary Bernhardt did not issue this order in writing, and no expiration date applies to Pendley's purported authority. *Id.* This order does not appear to have been made public in any form other than the June 5 statement to the press.

25.     On June 30, 2020, the President submitted Pendley's nomination for the position of Director of the Bureau of Land Management to the United States Senate. *See* "PN2076—William Perry Pendley—Department of the Interior: 116th Congress (2019–2020)," Congress.gov, https://perma.cc/5CBJ-K7GY (accessed July 20, 2020).

26. Pendley's nomination is currently pending in the Senate.

27. Although Pendley and the Bureau have avoided using the title of "Acting Director," Pendley is in fact serving as the acting director of the Bureau of Land Management within the meaning of the Federal Vacancies Reform Act and for purposes of the Appointments Clause of the United States Constitution.

28. The Bureau has held Pendley out to the public as "Exercising Authority of the Director" in official communications and on the Bureau's website. *See* "Leadership," Bureau of Land Management, https://perma.cc/8KUR-3VGN (accessed July 20, 2020) (listing "William Perry Pendley" as "Exercising Authority of the Director"); "Organizational Chart," Bureau of Land Management, https://perma.cc/B8QV-LJ45 (accessed July 20, 2020) (same); "William Perry Pendley," Bureau of Land Management, https://perma.cc/TR68-ZZDY (accessed July 20, 2020) (same).

29. Pendley has also identified himself as an acting agency head. In an editorial in the *Billings Gazette*, for example, Pendley defended his record and his leadership and argued that "Senate confirmation is not required for acting heads of agencies." William Perry Pendley, *Guest opinion: BLM serves public interest in multiple use*, Billings Gazette (Feb. 6, 2020), https://perma.cc/G9BH-QPXD. Pendley is regularly understood by members of the public and the news media to be heading

the Bureau of Land Management.[1]

30.    Pendley directs the administration of the Bureau's regulations regarding the exploration, development, and production of oil, coal, and other minerals under the Bureau's leases. 43 C.F.R. §§ 3160.0-2; 3480.0-6; 3590.0-2. He also exercises significant authority over day-to-day functions and decision-making in the Bureau, such as supervising and directing the relocation of the Bureau's headquarters from Washington, D.C., to Grand Junction, Colorado.

## II.   The Bureau of Land Management's actions under Pendley threaten Montana's economic and environmental interests.

31.    The State of Montana has long worked closely with the Bureau of Land Management to develop and implement plans regarding the use of public lands that fulfill the economic, environmental, and legal obligations of the state and federal governments.

32.    In the last three years, and only under the stewardship of acting, non-senate-confirmed directors, the Bureau has departed from obligations and commitments made under recent, binding land-use plans. These departures are ongoing and currently superintended by William Perry Pendley.

---

[1] *See, e.g.*, Kirk Siegler, *BLM Acting Director Defends Agency's Controversial Move to Colorado*, NPR (Feb. 18, 2020), https://perma.cc/TW32-64AS; Timothy Puko, *The Environmental Battle Over the Mexican Border Wall*, Wall St. Journal (Feb. 15, 2020), https://perma.cc/E9V8-F4JB; Rebecca Beitsch, *Advocate for selling off public lands will remain BLM's acting director*, The Hill (Sept. 30, 2019), https://perma.cc/9PAG-T697; Mark Jaffe, *Scattering BLM will be good for policy, boss William Pendley says. Not with him at the helm, advocacy groups argue*, The Colorado Sun (Oct. 14, 2019), https://perma.cc/V7X7-CB9P.

33.     The Bureau's departures from its obligations and commitments under these plans threaten Montana's economic and environmental interests. The Bureau's actions have caused the State of Montana to divert its own resources and staff time to address and compensate for the Bureau's decreased commitment to environmental conservation in violation of its agreements with Montana.

34.     In particular, the Bureau has developed a pattern and practice in the last three years of actions and omissions that threaten sagebrush habitat that was previously identified by Bureau as a conservation priority. These actions and omissions threaten the long-term viability of the sage grouse and create a significant risk that the sage grouse will be listed for protection under the Endangered Species Act.

35.     The Bureau has likewise developed a pattern and practice in the last three years of actions and omissions that break with its own requirements to manage for multiple uses and give due consideration to preserve and protect certain lands, prioritizing access to extractive industries over all other land use and conservation goals. These departures from previously-developed resource management plans undercut the State's ability to preserve and protect areas that have special fish and wildlife, archaeological, and recreational values.

**A.      In 2015, the Bureau committed to a series of comprehensive environmental protections to conserve critical sagebrush habitat in and around Montana.**

36.     In 2015, the Bureau, Montana, and several other western states entered into a complex and comprehensive plan for managing the environmental effects of public land use on animal habitat across the western United States.[2] The plans focused on the habitat of the Greater Sage Grouse, an "umbrella species" whose welfare can be indicative of the health of hundreds of other species that share the same habitat.

37.     This plan was developed in response to urgent environmental and economic concerns. In 2010, the U.S. Fish and Wildlife Service determined that "loss and fragmentation" of sage-grouse habitat, which was "exacerbated by a lack of adequate regulatory mechanisms," meant that the sage grouse was "at risk of extinction in the foreseeable future." 80 Fed. Reg. 59858, 59871 (Oct. 2, 2015). The agency therefore concluded that the sage grouse warranted protection under the Endangered Species Act. *Id.* But the agency did not immediately list the sage grouse as endangered. *Id.* This temporary abeyance provided the United States government, Montana, and other states with a unique opportunity to develop plans and other regulatory mechanisms to adequately address known threats such as habitat loss from oil and gas development—which could potentially prevent the sage

---

[2] *See* Bureau of Land Management, *Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Including the Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, Worland,* Sept. 2015, https://perma.cc/HY89-GWYV ("2015 Plan").

grouse's eventual listing under the Act.

38.     Because of the significant amount of sage-grouse habitat in Montana, a listing under the Endangered Species Act would have profound implications for public and private land use in the State. About 75 percent of Montana's sage grouse population lives on state lands or private lands. If the sage grouse were listed as endangered, the Montana government as well as citizens and businesses throughout Montana would be required to adopt costly measures to protect the sage grouse from risks arising during the routine development and use of state and private property.

39.     Plaintiff DNRC manages the bulk of the state lands that are home to Montana's sage grouse population.

40.     Governor Bullock is the state officer responsible for Montana's administration of these plans, by and through DNRC. Their administration of these plans is directly impacted by the Bureau's failure to adhere to the 2015 plans.

41.     Although most of the sage grouse population in Montana is on state and private land, the majority of the sage grouse's habitat in the region as a whole is on federal land. Because of the interconnected nature of the region's ecosystem, the management of sage grouse habitat on federal land has a significant effect on the sage grouse population as a whole and on the likelihood that the sage grouse will be listed as an endangered species.

42.     To address these concerns, the State of Montana coordinated with the

Bureau and other states to develop a plan in response to the Fish and Wildlife Service's 2010 determination. The process, which took several years, involved what the Bureau itself described as an "unprecedented effort" to make a plan based on the "best available science" that coordinated many different stakeholders. 2015 Plan at S-1. The Bureau received more than 45,000 letters and more than 10,000 comments; prepared 15 environmental impact statements; received gubernatorial reviews from several states (including Montana); and ultimately amended 98 existing land or resource management plans. *Id.* at 1−1-40. All told, the process represented what the Department of Interior termed "the largest single planning effort in BLM history." *Greater Sage-Grouse Conservation and the Sagebrush Ecosystem*: *Collaborative Conservation at Work* (2016), https://perma.cc/B7TD-HHDG.

43.     Governor Bullock led and directed the State of Montana's involvement in this planning effort.

44.     The result of the process was a final decision that adopted a detailed set of plans and requirements to protect the sage grouse habitat. *See* 2015 Plan. The plans implemented a "layered management approach," in which different habitat areas were designated as different priority levels for protection, and more stringent protections were applied to higher priority habitat. *Id.* at I-22. For the Rocky Mountain Region, which includes Montana, the "primary threat" to the sage grouse habitat was identified as "disturbance associated with energy development and

infrastructure." *Id.* The plans for the region thus contained several habitat designations to use when formulating restrictions on such disturbances, such as "priority habitat" and "general habitat." *Id.* at I-22–I-25.

45. The Bureau's plans adopted in 2015 limited leasing and development in priority habitat and general habitat areas. In particular, the plans require that "[w]hen analyzing leasing and authorizing development of fluid mineral resources . . . priority will be given to development in non-habitat areas first and then in the least suitable habitat for Greater Sage Grouse." 2015 Plan, Attachment 5, at 2-24 (Billings Field Office Plan), available at https://perma.cc/W9T6-DDNU. The final decision noted that these protections would benefit the sage grouse "and more than 350 other species of wildlife that depend on healthy sagebrush-steppe landscapes." 2015 Plan at 2. Neil Kornze, the last Senate-confirmed Bureau Director, approved the 2015 Bureau Decision.

**B.    Over the last three years, a series of non-Senate-confirmed acting directors have presided over significant violations of the Bureau's sage-grouse related commitments.**

46. The plans initiated in 2015 have, so far, been successful at avoiding the listing of the sage grouse under the Endangered Species Act. In 2015, the Fish and Wildlife Service postponed listing the sage grouse as an endangered species, relying heavily on the expectation that the Bureau's 2015 plans would remain in place "for the next 20 to 30 years." 80 Fed. Reg. at 59934. The Fish and Wildlife Service called

the 2015 Plan the "[m]ost important[]" of the changes in regulation that permitted departure from its 2010 determination regarding the sage grouse's endangered status. 80 Fed. Reg. at 59931. The Fish and Wildlife Service said that it was "certain that the [2015 Plan] will be implemented." *Id.*

47.    Despite the success of these plans, which were adopted with public notice and comment and years of stakeholder input, the Bureau has departed from its obligations to protect crucial sagebrush habitat on federal lands in and around Montana.

48.    Over the last three years, in which the Bureau has had no Senate-confirmed director, the agency has offered hundreds of oil and gas leases on land designated as priority habitat and general habitat. It has failed to prioritize leasing and development in other areas as required by the 2015 plans. In one analysis, for instance, over the six-month period from June through December 2018, more than three-quarters of the acreage in several states that was offered or proposed for leasing by the Bureau was in habitat protected under the 2015 plans.

49.    In December 2017, the Bureau held an oil and gas lease sale of more than 98,000 acres of land in Montana on more than 200 parcels, nearly 90 percent of which were in general habitat.

50.    In March 2018, the Bureau held another lease sale covering more than 45,000 acres in Montana in which 70 percent of the 83 parcels on offer were in

priority habitat or general habitat.

51.     In March 2019, the Bureau held a lease sale involving 305 parcels, 287 of which were in sage grouse habitat—including over 35,000 acres in priority habitat and more than 115,000 acres in general habitat.

52.     In July, September, and December 2019, the Bureau held additional lease sales involving thousands of acres of land in priority habitat and general habitat.

53.     In March of this year, the Bureau held another lease sale in which all 8 parcels available were in sage grouse habitat.

54.     Although issuing leases does not immediately impact habitat, the eventual impacts to habitat and sage-grouse populations attributable to oil and gas development on leased land are foreseeable: Exploration, drilling, and new infrastructure such as roads, power lines, compressor stations, tank farms or pipelines, and other anthropogenic disturbances follow. *See* 80 Fed. Reg. 59858, 59888-59890 (Oct. 2, 2015). New infrastructure is required to extract and transport oil and gas, further fragmenting sage-grouse habitat and impairing connectivity between and among designated habitat areas.

55.     These kinds of impacts are among those that the 2015 plans were designed to minimize. *See* 80 Fed. Reg. 59858, 59867–59868 (Oct. 2, 2015) (importance of habitat connectivity to population persistence; habitat fragmentation and loss likely primary influences on population trends instead of stochastic events),

59888–59890 (additional infrastructure needed to develop and transport nonrenewable energy), 59891–59892 (infrastructure historically known as a substantial contributor to habitat fragmentation and can "influence a larger ecological footprint by negatively affecting sage-grouse use of otherwise suitable habitats through indirect effects [. . .]").

56.    In addition to these lease sales, the Bureau has failed to implement adequate measures to mitigate harm to sage-grouse habitat on federal land as required by the 2015 plans. Mitigation was and is a necessary component of protecting sage-grouse habitat on lands where development does occur. But the Bureau has implemented policies limiting the mitigation efforts required of developments in sage-grouse habitats.

57.    These departures from the priorities and requirements laid out in the 2015 plans constitute an ongoing pattern or practice of behavior in which the Bureau is reneging on commitments that it made to the State of Montana and other stakeholders and threatening the long-term health of the sage grouse and other species that rely on sagebrush-steppe habitat.

58.    These departures are not business as usual. They constitute a revision of the 2015 plans without going through the procedures required by law under the Federal Land Management Plan Act and the National Environmental Policy Act. The Bureau has not undertaken adequate procedures to revise or amend a land

management plan, including the Federal Land Management and Policy Act's requirement for a Governor's Consistency Review, nor has it adequately considered alternatives that would evaluate impacts and conservation options for priority and general habitat.

59.    This pattern and practice of failing to provide adequate protection to sage-grouse habitat has been and continues to be implemented under Pendley, who unlawfully serves as the Bureau's Acting Director.

60.    This Court recently confirmed this pattern or practice of departing from the 2015 plans in its decision in *Montana Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, 2020 WL 2615631 (D. Mont. May 22, 2020). In that case, this Court held that certain guidance and lease sales by the Bureau violated the 2015 plans and had to be vacated. *Id.* at *8–*11. The guidance and lease sales at issue in that case are just some of the actions and omissions by the Bureau that are contrary to the commitments it undertook in the 2015 plans.

61.    The Bureau's actions and omissions disproportionately burden Montana. Montana bears a greater conservation burden than other states when it comes to protecting sage-grouse habitat. Montana therefore bears a disproportionate burden of the cost necessary to avert habitat loss and population decline; and if the sage grouse is listed under the Endangered Species Act, Montana will bear a disproportionate cost of the consequences.

62.     The Bureau's actions have caused and are continuing to cause the State of Montana to divert its own finite resources—including money, time, and staff—toward increased study and management of threats to the sage grouse, given that the federal government appears no longer to be committed to the protections it adopted in 2015.

63.     The Bureau's actions also create a substantial risk that the sage grouse will become endangered within the meaning of the Endangered Species Act and listed as endangered by the Fish and Wildlife Service.

64.     This risk of listing under the Endangered Species Act is imminent. The Fish and Wildlife Service has committed to reviewing the status of the sage grouse this year. *See 2020 Greater Sage-Grouse Status Review*, Fish and Wildlife Service. This review will evaluate whether "the federal greater sage-grouse plans" were "implemented as planned." *Id.* The Fish and Wildlife Service will examine whether "the federal plans reduce[d] the extent or magnitude of habitat loss and fragmentation from energy development, infrastructure, grazing, mining, and other regulated activities." *Id.*

**C.   In 2016, Bureau's Lewistown and Missoula field offices put together plans that provided protection for significant fish and wildlife habitat, cultural resources, and recreational values across the planning areas.**

65.     In 2016, after years of analysis and close work with a diverse group of local stakeholders, Bureau of Land Management field offices submitted draft

resource management plan documents for review by the Bureau's leadership in Washington. The documents submitted by field offices, including field offices in Montana, proposed changes to resource management—again, with the expectation of review by leadership at the Bureau. After Trump's inauguration, however, the Bureau delayed review of these plans, acting on them for the first time years later in May 2019, when the Bureau returned with a draft resource management plan. 84 Fed. Reg. 22517-01 (May 17, 2019). The Bureau's plan differed significantly from proposals by its own field offices and local stakeholders.

66.    After significant consideration and in accordance with prior plans, the documents sent by field offices to the Bureau's leadership in 2016 proposed protective designations for unique natural characteristics and wildlife values, including areas of critical environmental concern, lands with wilderness characteristics, and ecological emphasis areas. Federal law requires the Bureau to consider special management for lands that have special fish and wildlife, and unique archaeological values. This requirement includes the need to prioritize the designation and protection of areas of critical environmental concern. Lands with wilderness characteristics are managed to maintain opportunities for solitude and quiet recreation. Such lands are host to an estimated 2.9 million visits to Bureau lands in Montana in 2014 and $164 million in direct spending impacting local communities.

67.     The draft resource management plans returned by the Bureau's leadership after three years of delay, by contrast, virtually eliminated these special management designations in the Bureau's preferred alternative. The plan submitted to the Bureau by the Lewistown Field Office had 22,900 acres managed as areas of critical environmental concern, while the draft plan returned by the Bureau in 2019 had a preferred alternative of 0 acres. 1 Bureau of Land Management, *Draft Lewistown Resource Management Plan* (2019) available at https://perma.cc/S9JU-9P7H. The draft plan returned by the Bureau that covers the Missoula Field Office proposed eliminating half of the 1,225 acres managed under the areas-of-critical-environmental-concern designation in its preferred alternative. Both plans returned by the Bureau ignored the roughly 205,000 acres of lands that met the agency's own criteria for Lands with Wilderness Characteristics. *See, e.g.*, *Lewistown Proposed Resource Management Plan and Final Environmental Impact Statement*, Bureau of Land Management (Feb. 2020), https://perma.cc/XUT5-YQ6V; *Proposed Resource Management Plan and Final Environmental Impact Statement for the Missoula Field Office*, Bureau of Land Management (Feb. 2020).

68.     The Bureau's decision to exclude significant areas of critical environmental concern in their "preferred alternative" flouts its legal obligation under the Federal Land Management Policy Act to identify, manage, and prioritize areas of critical environmental concern. 43 U.S.C. § 1711(a) ("The Secretary shall

prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values . . ., giving priority to areas of critical environmental concern.").

69.    More than 800 people submitted comments on the draft resource management plans. The vast majority of these comments relayed conservation concerns and advocated prioritizing wildlife habitat management, protecting lands with wilderness characteristics and areas of critical environmental concern, and providing equitable multiple-use classifications.

**D.    In February, Pendley published final draft management plans for the Lewistown and Missoula field offices that continued to ignore public input and field office staff recommendations, and broke from past management practices.**

70.    The proposed resource management plan that the Bureau next published on February 14, 2020, failed to engage with the majority of these public comments, and instead continued to minimize the importance of lands with wilderness characteristics and areas of critical environmental concern. 85 Fed. Reg. 8607 (Feb. 14, 2020). William Pendley was quoted in several press releases touting the resource management plan's accomplishments.

71.    Under federal law, the Bureau is required to submit its land use plans for review by state authorities to reduce inconsistencies and friction between state and federal land management plans. Governor Bullock conducted the State of Montana's review in this instance. The Federal Land Policy and Management Act,

43 U.S.C. §§ 1701–1787, requires that the Interior Secretary "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a). Subsection (c)(9) of this section established coordination and consistency requirements for the Bureau, including requirements to "assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and… provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands."

72.    Governor Bullock objected to the plan as proposed by the Bureau, and raised a number of concerns related to the State of Montana's land management priorities and interests. These objections and concerns focused primarily on three areas: backcountry conservation areas, lands with wilderness characteristics, and areas of critical environmental concern.

73.    The Bureau's response to Governor Bullock failed meaningfully to engage with his objections, and asserted without explanation that the Bureau's new "preferred alternative" was in compliance with applicable laws and regulations and

rendered the use of the special management designations unnecessary.

74.     During this time, Acting Director William Perry Pendley oversaw the comment period as well as the state director's response to the Governor's consistency review.

75.     The Bureau's decisions that deprioritize lands with wilderness characteristics and areas of critical environmental concern are inconsistent with the agency's federal law obligations. And they erode longstanding management protections and fail to take into consideration concerns expressed by primary stakeholders, particularly the State of Montana.

76.     This pattern and practice of failing to manage public lands under principles of multiple use, fulfilling state consultation requirements and adequately protecting lands with wilderness characteristics and areas of critical environmental concern has been and continues to be implemented under Pendley, who serves unlawfully as the Bureau's Acting Director and who continues to oversee the resource-management-plan development process while his nomination is pending.

## CLAIMS FOR RELIEF

## COUNT ONE:
## VIOLATION OF THE FEDERAL VACANCIES REFORM ACT

77.     William Perry Pendley's continued appointment as acting director, his exercise of the authority of the Director, and his actions taken in that role violate the Federal Vacancies Reform Act. Pendley was only recently nominated to be the

Director of the Bureau of Land Management, after serving unlawfully for nearly a year, and he has not been confirmed by the Senate, as required both by the statutes governing the Bureau of Land Management and by the United States Constitution.

78.     Under the FVRA, a person may not serve as an acting officer for an office if the President has submitted their nomination to the Senate "for appointment to such office," with limited exceptions. 5 U.S.C. § 3345(b).

79.     Neither of those exceptions apply to Pendley. Pendley did not serve as the first assistant to the office of Director before the current vacancy arose, in early 2017. Nor has he been confirmed by the Senate to his current position as Deputy Director.

80.     Pendley has continued to serve as acting director to the Bureau of Land Management while his nomination for the position of Director is pending.

81.     "Once the President submitted his nomination to fill that position in a permanent capacity, subsection (b)(1) [of 5 U.S.C. § 3345] prohibited [Pendley] from continuing his acting service." *See N.L.R.B.*, 137 S. Ct. at 944.

82.     Since June 30, 2020, William Perry Pendley has violated the FVRA by exercising the authority of the Director of Bureau of Land Management.

**COUNT TWO:**
**VIOLATION OF THE UNITED STATES CONSTITUTION**

83.     William Perry Pendley's appointment as acting director, his exercise of the authority of the Director, and his actions taken in that role violate the

Appointments Clause of the U.S. Constitution. *See* U.S. Const. Art. II, § 2, cl. 2.

84.    "Any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by" the Appointments Clause. *Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (internal quotation marks omitted); *see also Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018).

85.    The Director of the Bureau of Land Management is an officer of the United States requiring Senate confirmation to be appointed. 43 U.S.C. § 1731(a). The Director exercises significant authority pursuant to the laws of the United States, including supervising the leasing and development of public lands.

86.    By exercising the authority of an officer of the United States without Senate confirmation, William Perry Pendley is violating the "critical structural safeguard" of the Constitution's Appointments Clause. *See NLRB v. SW General, Inc.*, 137 S. Ct. at 935 (internal quotation marks omitted).

87.    These violations of the Appointments Clause are independent of the violations of the FVRA described above. Even if the FVRA were construed to authorize William Perry Pendley's appointment as acting director, that appointment would nonetheless be unconstitutional as applied here.

## COUNT THREE:
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

88.    William Perry Pendley's appointment as acting director, his exercise of

the authority of the Director, and his actions taken in that role violate the Administrative Procedure Act. The APA forbids agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). It also forbids any action taken "without observance of procedure required by law," and any action that is "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B), (D).

89.     Secretary Bernhardt's order on July 29, 2019, appointing Pendley as acting director, was an unlawful agency action because it violated both the FVRA and the U.S. Constitution. The order therefore violated the APA. Secretary Bernhardt's subsequent orders reauthorizing Pendley to serve as acting director, including his service after his nomination was sent to the Senate, violate the APA for as well.

90.     The Bureau's pattern and practice of departing from its 2015 plans with respect to sage-grouse conservation violate the APA because the Bureau's actions were taken under the supervision of an unlawfully appointed officer.

91.     Because the Bureau's actions constitute a de facto revision of the 2015 plans, they are also unlawful for failure to observe the procedure required by law to revise a resource management plan.

92.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

93.     Plaintiffs have "no other adequate remedy in a court." 5 U.S.C. § 704.

## PRAYER FOR RELIEF

For these reasons, plaintiffs respectfully request that this Court:

a.     Declare that William Perry Pendley's appointment as acting director, his exercise of the authority of the Director, and his actions taken in that role, including during the pendency of his nomination to the position of Director, violate the U.S. Constitution, the Federal Vacancies Reform Act, and the Administrative Procedure Act;

b.     Enjoin William Perry Pendley from exercising the authority of the Director of the Bureau of Land Management while his nomination is pending;

c.     Enjoin Secretary Bernhardt from directing Pendley to exercise the authority of the Director of the Bureau of Land Management;

d.     Award the plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

e.     Grant any other relief this Court deems appropriate.

Dated:      July 20, 2020                    Respectfully submitted,

/s/ *Raphael Graybill*
RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-FLANAGAN
Deputy Legal Counsel
Office of the Governor
PO Box 200801
Helena, MT 59620-0801
Phone: (406) 444-3179
Fax: (406) 444-5529

*raphael.graybill@mt.gov*

DEEPAK GUPTA*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
Fax: 888-7792
*deepak@guptawessler.com*

*Attorneys for Plaintiffs Steve Bullock and
Montana Department of Natural Resources
and Conservation*

* *pro hac vice* pending

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1 of the Rules of Procedure of the United States District Court for the District of Montana, I certify the following concerning the Complaint:

1. the document is double spaced except for footnotes and quoted and indented material;

2. the document is proportionally spaced, using Baskerville, 14 point font; and

3. the document contains 6377 words as calculated by Microsoft Word.

Dated:        July 20, 2020

/s/ *Raphael Graybill*
Raphael Graybill