# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

STEVE BULLOCK, in his official
capacity as Governor of Montana;
MONTANA DEPARTMENT OF
NATURAL RESOURCES AND
CONSERVATION,

*Plaintiffs*,

vs.

Case No. 20-cv-00062

The Honorable Brian Morris,
Chief Judge

BUREAU OF LAND
MANAGEMENT; WILLIAM
PENDLEY, in his official capacity as the
person exercising the authority of the
Director of the Bureau of Land
Management; UNITED STATES
DEPARTMENT OF THE
INTERIOR; DAVID BERNHARDT,
in his official capacity as Secretary of the
Department of the Interior,

*Defendants*.

## PLAINTIFFS' BRIEF IN SUPPORT OF
## EXPEDITED MOTION FOR SUMMARY JUDGMENT

RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-
FLANAGAN
Deputy Legal Counsel
Office of the Governor
P.O. Box 200801
Helena, MT 59620-0801
(406) 444-3179

DEEPAK GUPTA*
JONATHAN E. TAYLOR*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

**\*** *pro hac vice*

August 20, 2020                    *Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of authorities................................................................................................ii

Introduction...........................................................................................................1

Factual background ...............................................................................................3

    A.    The Federal Vacancies Reform Act provides the only authority for acting officials to exercise the authority of a vacant office. ........................................................................................3

    B.    The Bureau's Director wields broad federal power and must be appointed by the President and confirmed by the Senate. ..............5

    C.    Pendley is installed as head of the Bureau, which has had no Senate-confirmed official in charge for over three years. .....................7

    D.    Pendley continued to exercise the authority of the Director even after President Trump submitted his nomination to the Senate..................................................................................................9

    E.    After Governor Bullock sues Pendley, President Trump withdraws Pendley's nomination as Director but retains him as the Bureau's acting director............................................................12

Argument..............................................................................................................14

    I.    Pendley's continued exercise of the Bureau Director's authority violates the Constitution's Appointments Clause.................14

    II.    The FVRA does not permit Pendley's continued exercise of the Bureau Director's authority, and interpreting it to do so here would give rise to serious constitutional problems.......................16

    III.  Expedited review is appropriate because of the nature of the constitutional violation and the ongoing harm that it causes. ............20

Conclusion ...........................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Edmond v. United States,*
    520 U.S. 651 (1997) ...............................................................3

*Lucia v. Securities and Exchange Commission,*
    138 S. Ct. 2044 (2018) ...........................................................3

*Montana Wildlife Federation v. Bernhardt,*
    — F. Supp. 3d —, 2020 WL 2615631 (D. Mont. May 22, 2020) ......................12

*National Labor Relations Board v. SW General, Inc.,*
    137 S. Ct. 929 (2017) ........................................................1, 3, 4

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ..........................................................5, 6, 10

*Oregon Natural Desert Ass'n v. Bureau of Land Management,*
    625 F.3d 1092 (9th Cir. 2010).................................................6, 7

**Statutes and regulations**

U.S. Const. Art. II, § 2, cl. 2 ...................................................3

5 U.S.C. § 3341 ..................................................................3

5 U.S.C. § 3342 ..................................................................3

5 U.S.C. § 3343 ..................................................................3

5 U.S.C. § 3344 ..................................................................3

5 U.S.C. § 3345 ..................................................................3

5 U.S.C. § 3345(a) ..............................................................5

5 U.S.C. § 3345(b) .........................................................1, 4, 9

5 U.S.C. § 3346 ..................................................................3

5 U.S.C. § 3346(a) ..............................................................4

5 U.S.C. § 3346(b) ..............................................................4

5 U.S.C. § 3347 ............................................................................................3

5 U.S.C. § 3348 ............................................................................................3

5 U.S.C. § 3348(a) ........................................................................................4

5 U.S.C. § 3348(d) ........................................................................................4

5 U.S.C. § 3349 ............................................................................................3

43 U.S.C. § 1711(b) ......................................................................................6

43 U.S.C. § 1712(c) ......................................................................................6

43 U.S.C. § 1731(a) ......................................................................................5

84 Fed. Reg. 22517-01 (May 17, 2019) ....................................................10

85 Fed. Reg. 47238 (Aug. 4, 2020) ...........................................................11

85 Fed. Reg. 47239 (Aug. 4, 2020) ...........................................................11

43 C.F.R. § 1601.0-5(n) ...............................................................................5

43 C.F.R. § 1610.2 ........................................................................................6

43 C.F.R. § 1610.3–2(e) ...........................................................................6, 7

43 C.F.R. § 1610.5-2(a)(3) ...........................................................................7

43 C.F.R. § 1610.5-2(b) ...............................................................................7

43 C.F.R. § 3160.0-2 ....................................................................................5

43 C.F.R. § 3590.0-2 ....................................................................................5

## Other Authorities

Jimmy Tobias, *He opposed public lands and wildlife protections. Trump gave him a top
environment job*, The Guardian (May 20, 2020), https://perma.cc/C33T-HW86 ..9

John T. Bennett, *Frustrated by 'My Generals,' Trump Turns to 'My Actings'*, Roll Call
(Jan. 14, 2019), https://perma.cc/6BCD-N83G ....................................................8

**INTRODUCTION**

At the heart of our national charter is the principle that federal power must be divided and balanced among three separate branches of government. As part of this division, the Constitution's Appointments Clause requires that the President nominate, and that the Senate confirm, the heads of significant federal agencies—a process that the Supreme Court has referred to as a "critical structural safeguard" of our democracy. *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017).

This case challenges a flagrant breach of that safeguard. The Bureau of Land Management wields broad federal power, overseeing the use and maintenance of over 245 million acres of public lands, including more than 27 million acres in Montana. Yet the Bureau has been run by unconfirmed acting directors for the entire duration of the Trump presidency. The most recent one is William Perry Pendley, who has unlawfully helmed the agency without Senate confirmation for the past year via a long-running series of "temporary" orders.

Pendley's service recently became even more overtly illegal. On June 30, 2020, President Trump finally nominated Pendley to lead the agency, officially putting him up for Senate consideration. But Pendley remained on as acting director even while his nomination was pending—directly contravening the Federal Vacancies Reform Act, which expressly bars acting officers from running agencies while their nominations are before the Senate. 5 U.S.C. § 3345(b). Then, on August 15, the

President withdrew Pendley's nomination amid vociferous criticism of his long track record advocating for the private sale of public lands. Despite choosing to withdraw Pendley from consideration, the Administration has no plans to alter the status quo: Pendley endures as the Bureau's acting director, flouting the Constitution's power-balancing mandate.

Even in the brief interval since Governor Bullock and the Montana Department of Natural Resources filed this lawsuit on July 20, the illegal nature of Pendley's service and the ongoing harm it causes Montana have been unmistakable. Pendley has acted to finalize two important plans that govern the present and future use of federal land in Montana, in addition to having already undermined conservation efforts by opening up oil, gas, and mineral extraction in sage-grouse habitat. He has subverted state wildlife management objectives and risked a sage grouse listing under the Endangered Species Act, which would profoundly impact land use in Montana. Pendley's tenure as acting director represents the culmination of more than three years of ambiguity and creates dangerous uncertainty in an area where predictability and long-term planning are crucial. The plaintiffs therefore ask this Court to grant summary judgment, to declare unconstitutional Pendley's continued service as acting director of the Bureau, and to enjoin him from taking any further action affecting Montana in that unlawful role.

## FACTUAL BACKGROUND

The Constitution provides "the exclusive means" for appointing officers of the United States. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018). Under Article II's Appointments Clause, officers must first be nominated by the President and then confirmed "by and with the Advice and Consent of the Senate." U.S. Const. Art. II, § 2, cl. 2. "The Senate's advice and consent power is a critical 'structural safeguard[] of the constitutional scheme.'" *SW Gen.*, 137 S. Ct. at 935 (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)).

**A.   The Federal Vacancies Reform Act provides the only authority for acting officials to exercise the authority of a vacant office.**

Because the nomination and confirmation process required by the Appointments Clause can take time, Congress has granted the President "limited authority to appoint acting officials to temporarily perform the functions" of a vacant office that is otherwise subject to Senate confirmation. *SW Gen., Inc.*, 137 S. Ct. at 935. That authority has been granted by several different statutes over time; it is currently governed by the Federal Vacancies Reform Act (FVRA). *Id.*; *see* 5 U.S.C. §§ 3341–49.

The FVRA provides that, when an office that requires Senate confirmation lies vacant, the President may appoint an acting officer from certain eligible categories of government officials to perform the functions and duties of that office on a temporary basis. 5 U.S.C. § 3345. That acting official may serve for no more

than 210 days, unless a nomination has been submitted to the Senate, at which point an eligible acting official's tenure may be temporarily extended. *Id.* § 3346(a), (b). Further, subject to only two exceptions not applicable here, the FVRA specifically "prohibits certain persons from serving as acting officers if the President has nominated them to fill the vacant office permanently." *SW Gen.*, 137 S. Ct. at 935; *see* 5 U.S.C. § 3345(b).[1]

The FVRA also specifies consequences for non-compliance. Any "action taken by any person" not properly serving as an acting officer "in the performance of any function or duty of a vacant office to which [the FVRA] appl[ies] shall have no force or effect" and "may not be ratified." *Id.* § 3348(d)(1)–(2). A "function or duty" is defined as one "established by statute" or "by regulation" and "required by statute" or "by such regulation to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A)–(B).

---

[1] First, if the nominee for an office served as first assistant to that office for more than 90 days before the vacancy at issue arose, the nominee may continue to serve in an acting capacity for that office while their nomination is pending. *Id.* Second, if the first-assistant position itself requires Senate confirmation and the Senate has already confirmed the official as first assistant, the official may serve in an acting capacity for the office in question. *Id.* Otherwise, a nominee may not serve as an acting officer for the vacant office. *Id.*

**B. The Bureau's Director wields broad federal power and must be appointed by the President and confirmed by the Senate.**

The office of the Director of the Bureau of Land Management is one that must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a). As a result, the Appointments Clause and the FVRA govern the appointment of nominees and acting officers who discharge the duties of the Bureau's Director. *See* 5 U.S.C. § 3345(a).

This is at least in part because of the Bureau's broad powers. The Bureau oversees the use and maintenance of around one eighth of the country's landmass across the United States, most of which is heavily concentrated in western states. In Montana—the fourth largest State in the nation—nearly one third of the land is federally owned, making the Bureau one of the most important stewards of land in the State.

Among the Director's authorities is the power to administer the Bureau's regulations regarding the exploration, development, and production of oil and gas, coal, and other minerals under the Bureau's leases. *See* 43 C.F.R. § 3160.0-2 ("The [oil-and-gas] regulations in this part are administered under the direction of the Director of the Bureau of Land Management."); *id.* § 3590.0-2 (same for minerals).

The Director also plays an indispensable role in approving long-term land-use plans, which the Bureau refers to as "resource management plan[s]." *Id.* § 1601.0-5(n). These plans are "the main tool that [the Bureau] employs to balance wilderness

protection against other uses." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004).

Resource management plans "describe[], for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Id.* By statute, "these plans are to 'use and observe the principles of multiple use and sustained yield'; 'use a systematic interdisciplinary approach'; 'give priority to the designation and protection of areas of critical environmental concern'; and 'weigh long-term benefits to the public against short-term benefits.'" *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1096 (9th Cir. 2010) (quoting 43 U.S.C. § 1712(c)).

Because of their importance to future agency action, the approval of a resource management plan is a multistep process requiring advance planning, coordination with state and local governments, and public notice and comment. *See* 43 C.F.R. § 1610.2. In recognition of the special interests that the States have in the use, management, and maintenance of public land within their borders, the statutory and regulatory framework allows covered States to weigh in to ensure maximal consistency with state prerogatives—be they "plans, policies or programs." *Id.* § 1610.3–2(e); *see* 43 U.S.C. § 1712(c)(9) (requiring that the Bureau provide "meaningful public involvement of State and local government officials . . . in the development of land use programs, land use regulations, and land use decisions for public lands"). The statutory regime recognizes that the States are also affected by

the maintenance of federal land "for the purpose of planning and regulating the uses of non-Federal lands in proximity of such public lands." *Id.* § 1711(b).

As part of the notice-and-comment process, interested members of the public may submit protests to proposed plans. The Director has the sole authority (and duty) to review and "render a decision on [each] protest." 43 C.F.R. § 1610.5-2(a)(3). "The decision shall be in writing and shall set forth the reasons for the decision." *Id.* "The decision of the Director shall be the final decision of the Department of the Interior." *Id.* § 1610.5-2(b). Only once each protest is resolved may a plan become final. *See Or. Natural Desert Ass'n*, 625 F.3d at 1097 ("Once the Director of the BLM has ruled on any protest, the decision is final and the plan may be adopted."). The Director also has final say over the process for reviewing recommendations from state and local governments and ensuring consistency in "the national interest and the State's interest." 43 C.F.R. § 1610.3-2(e).

## C. Pendley is installed as head of the Bureau, which has had no Senate-confirmed official in charge for over three years.

Despite the importance of the position and the need for Senate confirmation, there has been no Senate-confirmed Bureau Director for the entirety of President Trump's term in office. Around the time of the President's inauguration on January 20, 2017, the last Senate-confirmed Director of the Bureau, Neil Kornze, vacated the office. SUF ¶ 1. In the three and half years that followed, President Trump never submitted a nomination to the Senate for a new Director. SUF ¶ 1.

Instead, the President chose a series of acting directors to run the agency—none of whom were confirmed by the Senate to hold the position. SUF ¶ 1. The choice to rely on acting directors is part of the President's strategy calculated to avoid the Senate confirmation process. As he once explained to reporters: "I have 'acting' [sic]. And my 'actings' are doing really great . . . . I sort of like 'acting.' It gives me more flexibility." John T. Bennett, *Frustrated by 'My Generals,' Trump Turns to 'My Actings'*, Roll Call (Jan. 14, 2019), https://perma.cc/6BCD-N83G.

William Perry Pendley provides perhaps the most egregious example of this practice. First appointed on July 29, 2019, he has remained in the acting director role for more than a year through a series of purportedly "temporary" orders, and affirmed by way of a succession order that he signed on May 22, 2020, designating himself as the immediate successor to the non-existent Director of the Bureau. SUF ¶¶ 2–4, 6–8. Each of the roughly half dozen orders signed by Interior Secretary David Bernhardt claims that its effect is only for a specified "temporary" duration, merely "intended to ensure uninterrupted management and execution of the duties of [the Director] during the Presidential transition pending Senate-confirmation of [a] new non-career official[.]" SUF ¶¶ 2–4.

But Pendley continues to serve, with no end in sight. And, in designating the succession order for the Bureau's Director, Pendley delegated to himself "the authority to perform all duties and responsibilities of the Director . . . to perform

essential functions and activities of the office." SUF ¶ 8. The May 22, 2020 succession order in fact expanded beyond the prior orders, professing no time limit and delegating to Pendley even more discretion in exercising the authority of the Director. Taken together, these orders have empowered Pendley's unlawful exercise of the authority of the Director for more than a year—an authority that he continues to exercise to this day.

## D. Pendley continued to exercise the authority of the Director even after President Trump submitted his nomination to the Senate.

On June 30, 2020, President Trump submitted Pendley's nomination to become the Bureau's Director to the Senate, where the nomination was all but guaranteed to languish given Pendley's extreme, unpopular views on public land. Indeed, "Pendley has long opposed public lands and wildlife protections." Jimmy Tobias, *He opposed public lands and wildlife protections. Trump gave him a top environment job*, The Guardian (May 20, 2020), https://perma.cc/C33T-HW86. In 2016, Pendley wrote an article arguing "for the near-total abolition of federal public lands across the nation." And in 2017, he told a group of anti-conservation activists: "This is why out west we say 'shoot, shovel and shut up' when it comes to the discovery of endangered species on your property." *Id.*

Despite the FVRA expressly forbidding nominees from serving as acting directors of offices to which they are nominated, *see* 5 U.S.C. § 3345(b), Pendley continued to exercise the authority of the Director even after being nominated.

Among the many examples of actions arising from Pendley's unlawful conduct, in late July 2020—just days after this complaint was filed—the Bureau finalized Resource Management Plans for the Lewistown and Missoula Field Offices. SUF ¶ 8. These plans cover nearly a million surface acres and nearly a million and a half mineral estate acres within the State of Montana. The comprehensive nature of these plans, and the vast land they cover, "provides an apt illustration of the immense scope of projected activity that a land use plan can embrace." *Norton*, 542 U.S. at 70.

The finalized plans reversed course from draft plans that the Lewistown and Missoula field offices submitted to the Bureau's leadership in 2016, which had proposed protection for significant fish and wildlife habitat, cultural resources, and recreational uses. After the President took office, the Bureau delayed review of these plans, acting on them for the first time in May 2019, when the Bureau returned with draft plans that constituted a staggering departure from the earlier proposals that field offices and local stakeholders had formulated together. 84 Fed. Reg. 22517-01 (May 17, 2019). The new plans eliminate protections for areas of critical environmental concern and lands with unique wilderness characteristics, and "make available 95 percent of federal public land in Montana to oil and gas development." Williams Decl. ¶ 9.

Throughout the planning and approval process, Governor Bullock repeatedly voiced concerns on behalf of the State of Montana. *See* SUF ¶ 13 (letter from

Governor Bullock, dated August 15, 2019, conveying the State's concerns that, "at the very end of the planning process," "the BLM's Washington DC review" "eliminate[d] conservation protections"); SUF ¶ 13 (letter from Governor Bullock, dated April 13, 2020, again conveying the State's concerns).

These concerns were ignored or dismissed, as were the concerns of more than 200 individuals who participated in the notice-and-comment process. When the Bureau announced completion of its process in letters dated "July, 2020," it left no doubt as to Pendley's involvement. SUF ¶¶ 13–15. Specifically, the Bureau explained that "[t]he BLM received 150 protest letters" for the Lewistown Plan and "72 protest letters" for the Missoula Plan; that "*the BLM Director reviewed* all protest issues for the proposed planning decisions"; that "*[t]he Director concluded* that the BLM Montana State Director followed the applicable laws, regulations, and policies, and considered all relevant resource information and public input"; and that "*[t]he BLM Director denied* the protests, and that decision is the final decision of the US Department of the Interior." SUF ¶ 13 (emphasis added); *see also* 85 Fed. Reg. 47239 (Aug. 4, 2020) ("All protests have been resolved and/or dismissed by the BLM Director."). Pendley then took to the op-ed pages in Montana to defend his and the Bureau's actions in approving these plans. SUF ¶ 17.

Final notice of the approval of the plans was published in the Federal Register on August 4, 2020. *See* 85 Fed. Reg. 47238 (Aug. 4, 2020); 85 Fed. Reg. 47239 (Aug.

4, 2020); SUF ¶ 15. On the same day, in a news release describing an event including Pendley and President Trump, the White House listed Pendley's official title as "Acting Director of Bureau of Land Management." SUF ¶ 16.

The Bureau has taken other significant actions under Pendley's direction in the last year as well, approving countless oil-and-gas leases on land that was previously designated to receive special conservation protections. *Cf. Mont. Wildlife Fed'n v. Bernhardt*, — F. Supp. 3d —, No. 18-69, 2020 WL 2615631 (D. Mont. May 22, 2020) (vacating certain guidance and lease sales as unlawful under previous Bureau plans).

## E. After Governor Bullock sues Pendley, President Trump withdraws Pendley's nomination as Director but retains him as the Bureau's acting director.

To protect the State of Montana from ongoing harm caused by Pendley's unlawful service as acting director, Governor Bullock and the Montana Department of Natural Resources and Conservation filed this lawsuit on July 20, 2020. The State is harmed by Pendley's unlawful service because the Bureau manages a large amount of public land in Montana, which has a substantial effect on the State. For example, Pendley's decisions as acting director of BLM continue to "increase[] the potential for negative impacts to sage grouse and their habitats" and, without clear and consistent commitments to other complementary regulatory tools, the species' continued unlisted status is in jeopardy. Williams Decl. ¶ 11; *see also* Tubbs Decl.

¶ 10. If sage grouse were listed as an endangered species, the State would be forced to adopt costly measures to protect sage grouse from routine use and development of state and private property. Williams Decl. ¶ 12. Because the U.S. Fish and Wildlife Service determined in 2010 that sage-grouse habitat had been so fragmented and unregulated that the sage grouse was "at risk of extinction in the foreseeable future," 80 Fed. Reg. 59858, 59871, Montana worked with the federal government and other states to develop plans and other regulatory mechanisms that would address known threats to sage grouse habitat. *See* Compl. ¶¶ 37, 46. Since 2015, these plans have successfully avoided the listing of sage grouse under the Endangered Species Act. *Id.* Indeed, the Fish and Wildlife Service called the 2015 plan the most important of the regulatory changes that made the agency change its determination that the sage grouse remained at risk of extinction. *Id.* ¶ 46. But Pendley's actions during his tenure as acting director have jeopardized these gains, and increased the likelihood of costly harms to the State.

Just days ago, on August 15, 2020, the President withdrew Pendley's nomination. Steven Mufson, *White House withdraws nomination of William Pendley to head the Bureau of Land Management*, Wash. Post (Aug. 15, 2020), https://perma.cc/V6K7-YLDW. But nothing else has changed. In fact, according to press accounts, "White House and Interior officials said that Pendley would continue to serve in his current, lower-level deputy director position at the Interior Department, a job that effectively

lets him continue to act as head of the BLM." *Id.* In other words, Pendley continues to exercise the authority of the Director even as it has become apparent that he is unpalatable to the Senate and thus unconfirmable. *Id.* Montana is thus faced with continuing damage resulting from a lack of "consistent commitment to preservation and appropriate and consistent management." Tubbs Decl. ¶ 10.

## ARGUMENT

The plaintiffs seek summary judgment on one simple claim: They ask this Court to hold that Pendley's service as acting director of the Bureau of Land Management violates the Constitution's Appointments Clause and to enjoin that ongoing unconstitutional conduct, as it directly and adversely affects the State of Montana. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

## I. Pendley's continued exercise of the Bureau Director's authority violates the Constitution's Appointments Clause.

Pendley's continued exercise of the Director's authority is a straightforward violation of the Appointments Clause of the United States Constitution. "Any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Appointments Clause]." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991) (brackets and quotation marks omitted); *see also Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018) ("The Appointments Clause prescribes the exclusive

means of appointing 'Officers.'"). This constitutional requirement is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997).

The office of the Director of the Bureau is one that must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a). Pendley's official title, according to the Bureau itself, is Deputy Director of Policy and Programs. The Bureau nonetheless holds him out to the public as "Exercising Authority of the Director" in official communications and on the Bureau's website. Compl. ¶ 28. Interior Secretary Bernhardt has empowered him to exercise the authority of the Director in repeated so-called temporary authorizations. SUF ¶ 2–4, 6–8. Pendley himself has signed documents indicating that he exercises the Bureau Director's authority. SUF ¶ 2. He has directly and impliedly identified himself as the acting director of the Bureau in several editorials and other public statements. Compl. ¶ 29; SUF ¶ 5. In addition to describing Pendley as exercising the authority of the director, the Bureau has repeatedly identified him as the acting director in its official Twitter account. SUF ¶16. And the White House has recently and expressly identified Pendley as the "Acting Director of the Bureau of Land Management" in public documents, SUF ¶ 16, and has stated that Pendley will remain on in his current role, which it describes as a "lower-level" position when it suits them, SUF ¶ 19.

Given all this, Pendley is an unlawful acting director of the Bureau. And the Administration means to keep him on in that role, without the Senate's consent.

## II. The FVRA does not permit Pendley's continued exercise of the Bureau Director's authority, and interpreting it to do so here would give rise to serious constitutional problems.

The FVRA does not permit Pendley to remain indefinitely as acting director of the Bureau. Rather, the FVRA contemplates circumstances—on a genuinely temporary basis—in which an acting official may "perform the functions and duties of any office of an Executive agency" for which Senate confirmation is required. *See* 5 U.S.C. § 3347(a). None of the contemplated circumstances are present here.

To begin, the President submitted Pendley's nomination to the Senate more than three years after the vacancy in the Bureau's directorship arose. SUF ¶ 1. This was years beyond the FVRA's contemplated time period for an acting director to permissibly exercise the authority of the Director without Senate confirmation—a time period that lasts 210 days. 5 U.S.C. § 3346(a).

Although the FVRA allows this period to be extended if there is a nomination that is later "rejected by the Senate, withdrawn, or returned to the President by the Senate," *id.* § 3346(b)(1), that provision does not authorize Pendley's service. By its plain terms, "the person" who may "continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return," *id.*, must be a person who was lawfully serving *before* the failed nomination, *see id.* §§ 3345(b)(1),

3346(a). The President may not restart the clock on an unlawfully serving acting director simply by sending their nomination to the Senate and then withdrawing it.

It would be particularly inappropriate to interpret the statute to allow the President to do so here. Not only does Pendley's ongoing position as acting director fail to comply with the FVRA, it also evades the clear design of the Constitution, spurning separation-of-powers principles and defying the purpose underlying the Appointments Clause. *See Freytag*, 501 U.S. at 878 ("Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch. The Appointments Clause . . . guards against this encroachment.") (citation omitted). As explained, the Appointments Clause is a limitation on presidential power that requires Senate participation in the process of nominating powerful executive officers. *Id.* at 880; *see id.* ("The structural principles embodied in the Appointments Clause do not speak only, or even primarily, of Executive prerogatives simply because they are located in Article II.").

Although the Senate had not yet officially considered Pendley's nomination before his nomination was withdrawn, he faced strong opposition in the Senate and in public opinion. SUF ¶ 12. The President's decision to withdraw Pendley was apparently motivated by the calamitous political ramifications of his nomination. This is precisely the purpose of the Appointments Clause—that an unpalatable political nomination will not survive confirmation. But that constitutional safeguard

is not meaningful if the President can simply allow the nominee to remain in the role even after withdrawing the nomination. And that is what is happening here: Following Pendley's withdrawal, the Administration has made clear that no change is planned in the Bureau's existing leadership. Pendley thus continues to exercise the authority of the office without Senate confirmation, and each day that this reality persists, the fact of his leadership violates one of the Constitution's "critical structural safeguard[s]." *See SW Gen.*, 137 S. Ct. at 935 (quotation marks omitted).

Any argument that the FVRA permits Pendley's unlawful exercise of authority would fail for two independent reasons. *First*, for the reasons discussed above, the plain text of the FVRA unambiguously prohibits Pendley from holding this extended, unconfirmed acting director position.

*Second*, if there were any doubt about the FVRA's inapplicability, it would be necessary to read the FVRA as inapplicable to avoid a serious constitutional problem. *See* Scalia & Garner, *Reading Law* 247–48 (2012) (explaining that the constitutional-doubt canon "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality"). At the very least, Pendley's continued service as acting director presents a "substantial constitutional question" under the Appointments Clause, so there must be "clear evidence that Congress actually intended" this result. *See Peretz v. United States*, 501 U.S. 923, 930 (1991). Here, the

evidence shows just the opposite: The FVRA strictly limits temporary appointments to preserve the Senate's prerogatives and Congress specifically designated the Bureau Director as an office requiring nomination by the President subject to the advice and consent of the Senate. 43 U.S.C. § 1731(a).

No statutory stop-gap can cure this constitutional violation. Pendley's acting service is unlawful and should be enjoined. He has exercised the authority of the Director for over a year now, through an unending daisy chain of "temporary" authorizations. SUF ¶¶ 2–4, 6–8. These authorizations are ostensibly motivated by a desire to fill the vacancy "during the Presidential transition pending Senate-confirmation of [a] new [Director]." *Id.* But that period of transition has come and gone, and the President's term is nearly over. No nomination was forthcoming from this Administration until the summer of the last year of that term—and now the nominee has been withdrawn in the face of strong public opposition. There can be no serious doubt as to the real purpose of these purportedly "temporary" authorizations: to prevent the Senate from performing its constitutionally mandated role in the appointment process.

Thus, even if the text of the FVRA could somehow be twisted to allow for Pendley's indefinite leadership over a federal agency without Senate confirmation, the Constitution cannot be likewise twisted. It is unconstitutional for the Executive Branch to string together a series of temporary appointments into a single

appointment that lasts so long as to be permanent. Were it otherwise, the President could sidestep, for political expediency or any other reason, the Senate's constitutional role in the appointment process. He could effectively transform any office that requires Senate confirmation into one that does not. This would nullify the Appointments Clause. As this case illustrates, a President could do that even for the entirety of a presidential term, thereby allowing an entire Administration to bypass this critical constitutional safeguard. The Framers did not intend, and the Constitution does not permit, such a blatant end-run around the strictures of the Appointments Clause.

### III.  Expedited review is appropriate because of the nature of the constitutional violation and the ongoing harm that it causes.

Finally, the plaintiffs respectfully request that this Court expedite review of this motion. Expedited review is appropriate for several reasons. *First*, it is necessary to vindicate the critical role that the Appointments Clause and the FVRA play in the constitutional separation of powers. If the President could evade judicial review—by running out the clock through a series of temporary maneuvers whose legality would then become tied up in litigation until the end of his term—it would reduce the Appointments Clause to a triviality. And it would defeat the very purpose of the FVRA, which anticipates temporary acting service with short time limits. For these reasons, it is not uncommon for courts to grant expedited briefing in Appointments

Clause challenges, and this Court should do the same here. *See, e.g.*, *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019).

*Second*, the motion raises a discrete, purely legal question that does not require extensive briefing to resolve. *Third*, as noted above, Pendley's continued service as acting director—and the uncertain status of the actions taken by the Bureau under his unlawful leadership—is causing the State of Montana ongoing harm. Speedy resolution of this motion will put a stop to the State's ongoing harm, saving the State time, money, and resources, and allowing it to better plan its land-management activities and fish, wildlife, and conservation efforts in the remaining months of 2020 and beyond.

## CONCLUSION

This Court should grant summary judgment. The Court should declare William Perry Pendley's continued service as acting director of the Bureau of Land Management to be unconstitutional and should enjoin him from taking any further action over Montana in that unlawful role. Because of the ongoing nature of the harm and the particularly egregious nature of the constitutional violation, the plaintiffs request expedited briefing and review of their motion.

Respectfully submitted,

*/s/ Deepak Gupta*

DEEPAK GUPTA*
JONATHAN E. TAYLOR

GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-FLANAGAN
Deputy Legal Counsel
Office of the Governor
PO Box 200801
Helena, MT 59620-0801
Phone: (406) 444-3179

\* *pro hac vice* pending

August 20, 2020                    *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2020, I electronically filed this brief in support of the plaintiffs' motion for summary judgment through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*
Deepak Gupta