## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

STEVE BULLOCK, in his official
capacity as Governor of Montana;
MONTANA DEPARTMENT OF
NATURAL RESOURCES AND
CONSERVATION,

*Plaintiffs*,

vs.

BUREAU OF LAND
MANAGEMENT; WILLIAM
PENDLEY, in his official capacity as the
person exercising the authority of the
Director of the Bureau of Land
Management; UNITED STATES
DEPARTMENT OF THE
INTERIOR; DAVID BERNHARDT,
in his official capacity as Secretary of the
Department of the Interior,

*Defendants*.

Case No. 20-cv-00062

The Honorable Brian Morris,
Chief Judge

## DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am a member in good standing of the bar of the District of Columbia
and am submitting this declaration in support of the plaintiffs' motion for summary
judgment. The statements in this declaration are based on my personal knowledge
and information obtained in the course of my research for this case.

2.      The document attached as Exhibit A is an authentic copy of a letter,

dated August 15, 2019, from Governor Bullock to the Bureau of Land Management concerning the State of Montana's Comments to the Lewistown Field Office Draft Resource Management Plan. The letter was sent to me by Governor Bullock's office.

3.      The document attached as Exhibit B is an authentic copy of a letter, dated August 15, 2019, from Governor Bullock to the Bureau of Land Management concerning the State of Montana's Comments to the Missoula Field Office Draft Resource Management Plan. The letter was sent to me by Governor Bullock's office.

4.      The document attached as Exhibit C is an authentic copy of a letter, dated April 13, 2020, from Governor Bullock to John Melhoff, State Director of the Montana/Dakotas State Office of the Bureau of Land Management, concerning the Governor's Consistency Review of the Proposed Lewistown Field Office Resource Management Plan Revision. The letter was sent to me by Governor Bullock's office.

5.      The document attached as Exhibit D is an authentic copy of a letter, dated April 13, 2020, from Governor Bullock to John Melhoff, State Director of the Montana/Dakotas State Office of the Bureau of Land Management, concerning the Governor's Consistency Review of the Proposed Missoula Field Office Resource Management Plan Revision. The letter was sent to me by Governor Bullock's office.

6.      The document attached as Exhibit E is an authentic copy of a letter, dated April 30, 2020, from John Melhoff, State Director of the Montana/Dakotas State Office of the Bureau of Land Management, to Governor Bullock concerning

the Governor's Consistency Review of the Proposed Resource Management Plans for Lewistown and Missoula. The letter was sent to me by Governor Bullock's office.

7.     The document attached as Exhibit F is an authentic copy of the Bureau of Land Management's Record of Decision and Approved Lewistown Resource Management Plan, dated July 2020, which I obtained from the Bureau's website.

8.     The document attached as Exhibit G is an authentic copy of the Bureau of Land Management's Record of Decision and Approved Missoula Resource Management Plan, dated July 2020, which I obtained from the Bureau's website.

9.     The document attached as Exhibit H is an authentic copy of the Bureau of Land Management Director's Summary Protest Resolution Report for the Lewistown Resource Management Plan, dated June 9, 2020, which I obtained from the Bureau's website.

10.     The document attached as Exhibit I is a guest column by William Perry Pendley, published July 30, 2020, entitled *Trump Administration establishes backcountry conservation areas in Montana*. I accessed this column on the Missoulian's website. It is available at https://perma.cc/858K-SKAT.

11.     The document attached as Exhibit J is an official press release, dated July 30, 2020, from the Bureau of Land Management, announcing the release of Resource Management Plans for Lewistown and Missoula. I accessed this press release on the Bureau's website at https://perma.cc/9HMR-5836.

12.     The document attached as Exhibit K is an authentic copy of Order No. 3345 Amendment No. 28, dated July 29, 2019, signed by David Bernhardt, Secretary of the Interior, concerning Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions. This is accessible at https://perma.cc/3RYQ-WFLU.

13.     The document attached as Exhibit L is an authentic copy of Order No. 3345 Amendment No. 29, dated September 30, 2019, signed by David Bernhardt, Secretary of the Interior, concerning Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions. This is accessible at https://perma.cc/Q8G4-X676.

14.     The document attached as Exhibit M is an authentic copy of Order No. 3345 Amendment No. 30, dated January 2, 2020, signed by David Bernhardt, Secretary of the Interior, concerning Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions. This is accessible at https://perma.cc/2E78-XLZV.

15.     The document attached as Exhibit N is an authentic copy of Order No. 3345 Amendment No. 31, dated April 3, 2020, signed by David Bernhardt, Secretary of the Interior, concerning Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions. This is accessible at https://perma.cc/24ZX-EG4A.

16.     The document attached as Exhibit O is an authentic copy of Order No. 3345 Amendment No. 32, dated May 5, 2020, signed by David Bernhardt, Secretary of the Interior, concerning Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions. This is accessible at https://perma.cc/8NBJ-VUHQ.

17.     The document attached as Exhibit P is the official biography for William Perry Pendley, which I obtained from the Bureau of Land Management's website.

18.     The document attached as Exhibit Q is a copy of an official White House pool report that reports, verbatim, the White House's description of an official event—Pool Reports, Subject: In-town pool report no. 3—dated August 4, 2020. It is available at https://perma.cc/SUX8-KYHY.

19.     The document attached as Exhibit R is a copy of a succession order, dated May 22, 2020, signed by William Perry Pendley and Casey Hammond, Principal Deputy Assistant Secretary, exercising the delegated authority of the Assistant Secretary – Lands and Minerals Management. The order was sent to me by Governor Bullock's office. It is available at https://perma.cc/VL5K-9HSY.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                        */s/ Deepak Gupta*
Dated: August 20, 2020                  Deepak Gupta

# INDEX OF EXHIBITS

**Document**                                                 **Exhibit**

Letter from Gov. Bullock to Bureau Regarding Lewistown Draft
Resource Management Plan, August 15, 2019................................... Exhibit A

Letter from Gov. Bullock to Bureau Regarding
Missoula Draft Resource Management Plan, August 15, 2019........... Exhibit B

Letter from Gov. Bullock to John Melhoff Regarding Proposed
Lewistown Plan Revisions, April 13, 2020..........................................Exhibit C

Letter from Gov. Bullock to John Melhoff Regarding Proposed
Missoula Plan Revisions, April 13, 2020.............................................Exhibit D

Letter from John Melhoff Regarding Proposed Missoula
and Lewistown Plan Revisions, April 30, 2020.................................. Exhibit E

Bureau's Record of Decision and Approved Lewistown Resource
Management Plan, July 2020 ........................................................... Exhibit F

Bureau's Record of Decision and Approved Missoula Resource
Management Plan, July 2020 ........................................................... Exhibit G

Bureau Director's Summary Protest Resolution Report for the
Lewistown Resource Management Plan, June 9, 2020..................... Exhibit H

Guest Column by William Pendley, July 30, 2020 ............................ Exhibit I

Press Release, Bureau of Land Management, July 30, 2020 .............. Exhibit J

Secretary of the Interior, Order No. 3345 Amendment No. 28,
July 29, 2019 ................................................................................... Exhibit K

Secretary of the Interior, Order No. 3345 Amendment No. 29,
September 30, 2019.......................................................................... Exhibit L

Secretary of the Interior, Order No. 3345 Amendment No. 30,
January 2, 2020 ...............................................................................Exhibit M

Secretary of the Interior, Order No. 3345 Amendment No. 31,
April 3, 2020 ...................................................................................Exhibit N

Secretary of the Interior, Order No.3345 Amendment No. 32,
May 5, 2020 ..................................................................................... Exhibit O

Biography of William Pendley .......................................................... Exhibit P

In-Town Pool Report No. 3, August 4, 2020 ................................... Exhibit Q

Succession Order, May 22, 2020.......................................................Exhibit R

# Exhibit A

# OFFICE OF THE GOVERNOR
## STATE OF MONTANA

Steve Bullock
GOVERNOR



Mike Cooney
LT. GOVERNOR

August 15, 2019

RMP Comments
Bureau of Land Management
Lewistown field Office
920 NE Main Street
Lewistown, MT  59457

Re:     State of Montana Comments to the Lewistown Field Office (LFO) Draft Resource Management
        Plan

Thank you for the opportunity to comment on the Lewistown Field Office's Draft Resource
Management Plan (RMP). We appreciate the Field Office's efforts to engage state and local
governments and Montana citizens during the planning process.

As Montana's governor, I support the balanced use of our public lands, to include both responsible
resource development as well as the conservation of significant fish and wildlife habitats and outdoor
recreation opportunities. Outdoor recreation supports $7.1 billion in direct consumer spending and
71,000 direct jobs in Montana, and managing for these resources will help to support diverse rural
economies and sustain our state's outdoor traditions. Hunting for big game alone accounts for nearly
$4 million in annual spending in Fergus and Petroleum counties in just four hunting areas within the
LFO boundary and underscores the importance of safeguarding critical wildlife habitat on our public
lands in the region.

As you know, the Federal Land Policy and Management Act (FLPMA) requires that the BLM manage
public lands for multiple-use and sustained yield, including the conservation and management of lands
for recreation, watersheds, and fish and wildlife. FLPMA further requires the BLM to keep an updated
inventory of public lands and give priority to areas of critical environmental concern. Unfortunately,
after reading the Lewistown draft RMP, I believe that the preferred alternative in this plan includes
neither balance nor multiple-use considerations, and instead proposes to manage these public lands
solely for the purpose of resource extraction.

Most troubling to me is the fact that a decision to eliminate conservation protections in the agency's
preferred alternative appears to have occurred at the very end of the planning process, undermining
years of collaborative engagement among local and state partners to further shared management
objectives. The strategy adopted by the BLM's Washington DC review, which I understand to be
common to the other six draft RMPs released since March of this year across the country, not only
disregards BLM's FLPMA responsibilities for balanced management, it creates disincentives for
public engagement in the planning process and muddies public discourse over key management
decisions intended to guide the agency for decades to come.

As your team makes final revisions to the Lewistown RMP, I request that the BLM make modifications to include specific conservation measures for big game migration corridors, management for valuable recreation destinations, and measures to safeguard areas of critical environmental concern and outstanding natural areas. Specifically, the Acid Shale-Pine Forest, Blind Horse, Chute Mountain, Collar Gulch, Deep Creek/Battle Creek, Ear Mountain, Square Butte and Sun River areas should be considered for conservation management. Of note, Blind Horse, Chute Mountain, and Deep Creek/Battle Creek, are located along the Rocky Mountain Front and within the Conservation Management Area established by the Rocky Mountain Front Heritage Act providing critical habitat for bighorn sheep, mule deer, and grizzly bears and opportunities for primitive recreation.

Consistent with my prior comments, I want to make you aware of my support for the backcountry conservation area management tool and its application in the Lewistown RMP for the conservation of intact habitats to support wildlife-dependent recreation. Lands managed by the LFO are located in Montana Fish Wildlife and Parks Hunting Districts 410 and 417, which comprise some of the most renowned elk and mule deer hunting units in the nation. By design, the BCA management tool would conserve important habitats and recreation opportunities, while allowing for habitat management, public access, and ranching to co-exist on the landscape.

The Montana Department of Natural Resources and Conservation (DNRC), Trust Lands Management and Forestry Divisions are committed to continuing a positive working relationship with the LFO, specifically on resilient landscapes, wildfire response, community protection, sustainable land management, and access. Importantly, administrative access should be maintained in areas that are important for future state trust land management and to ensure safe and effective wildland fire response to protect values at risk. All alternatives should explicitly state the ability of owners of non-federal land to gain access across BLM land to make reasonable use and enjoyment of their land as provided for in the FLPMA and BLM Manual 2801. All alternatives should also explicitly recognize the existence of 870,000 acres of school trust land intermixed with BLM in the planning area and the shared obligation of the BLM and the State of Montana to provide administrative access across their respective lands for resource management. The state supports maintaining road infrastructure and access for wildfire protection particularly within, and adjacent to, the Wildland Urban Interface (WUI) for treating fuels, managing vegetation for health and resiliency, and managing fires before they reach nearby private lands.

To more effectively protect communities and increase landscape resiliency, management of vegetation should remain a priority in the plan.  The projected increase in size, severity, intensity, and frequency of wildfire, along with the expanding development in the WUI, points to the need for an increase in active management, particularly within and near the WUI. Further opening dense stands and adding variation on the landscape will provide greater resilience to drought stress, fires, and insect and disease outbreaks as the climate changes further in the years ahead. DNRC recognizes the need for and supports the plan to complete an inventory and assessment of forest health common to all alternatives.

The plan should emphasize coordination with Montana Fish, Wildlife and Parks to enhance and improve the quality of big-game winter range and migration corridors on federal lands in accordance with Secretarial Order 3362. Where appropriate, the plan should promote activities that address forage management on winter, summer, and migration ranges; hunter access; security habitat management; and which facilitate big game movement, such as fence modifications and highway crossings.
As I have emphasized in the past, the State believes that the BLM should avoid policy and land use plan changes that would undermine the conservation actions that US Fish and Wildlife Service relied upon when reaching its conclusion that Endangered Species Act protections for the Greater Sage

2

Grouse were not warranted in 2015. Additional leasing for oil and gas development must remain cognizant of state conservation interests across the planning area. Specifically, additional leasing should seek to avoid and minimize impacts to Greater Sage Grouse habitat and State of Montana Wildlife Management Areas, Fishing Access Sites, and State Parks, including the use of No Surface Occupancy (NSO) stipulations. The State expects that the BLM will continue to defer to the state's mitigation framework for Greater Sage Grouse consistent with our objectives for "all hands, all lands" conservation of the species across land ownerships.

Thank you for considering our comments. We appreciate your work on the revised plan, weighing the many interests involved and utilizing the best available science in plan development. We look forward to continuing to work as a partner with the Lewistown Field Office for the benefit of Montana's communities, grasslands, forests, wildlife and watersheds.

Sincerely,

STEVE BULLOCK
Governor


Attachment:
Additional Specific Comments

**Additional Specific Comments:**

**Executive Summary:**
Table ES-1 (page E-1): add acres available for timber management.

**Chapter 1- Introduction:**
1.5 Collaboration and Coordination; 1.51 Intergovernmental and Interagency (page 1-5). Add a statement about collaborative planning with local, state and federal governments to reduce wildfire risk and improve forest health and resiliency across ownerships. Linking to the Community Wildfire Protection Plans would show how the plan uses local fire risk assessment and mitigation plans.

**Chapter 2- Alternatives:**
Chapter 2, Section 2.7 Table, Vegetation Communities Alternatives Comparison Table: Vegetation Communities: add objectives and actions that focus on improvement of forest health and wildfire resiliency and community protection. Fish and Wildlife Objectives: add actions to manage wildfire and treat vegetation to maintain or improve habitat goals. Travel, Transportation, and Access: add an objective to allow for the access needs of adjacent private landowners and agency land management and fire response. Forest, Woodland, and Special Products: add an objective to support timber infrastructure to support long term sustainable woods products industry. A long-term woods product industry is necessary to achieve and maintain landscape condition goals and contribute to a strong local economy.

(Pg. 2-12): "Hay or seed cutting may be used as a land treatment to improve production of crested wheatgrass provided it is not in conflict with wildlife or habitat values." Crested wheatgrass has been established in relative monocultures throughout the planning area and show little value to livestock and wildlife except for early spring or in rare cases, fall regrowth. Further establishment of crested wheatgrass should be avoided in most cases except where cheatgrass is of concern. Crested wheatgrass provides little economic benefit from a livestock grazing (resource use) standpoint. It would be more economically and ecologically prudent over the long-term to focus on converting crested wheatgrass stands back to native species. Consider "enhancement" of crested wheatgrass where it is already established for the benefit of wildlife and livestock. Consider moving Alternative D to Alternative C, which focuses on long-term reduction of crested wheatgrass. Do not use fire where cheatgrass is a concern.

The ability to suppress a wildfire at private land boundaries is compromised when there are dense stands and high fuel accumulations on adjacent lands. The plan should ensure that land management designations adjacent to and near private land allow for active vegetation management and fire suppression. Consistent with the terms of the Montana Cooperative Wildland Fire Management and Stafford Act Response Agreement, DNRC will consider BLM wildland fire response when deciding whether to participate in cost share agreements for fires which have burned onto lands under DNRC or local government jurisdiction. We believe you should acknowledge this issue as it pertains to areas where full suppression may not be implemented. The approach to managing natural ignition fires should be discussed. If fires are to be managed for resource benefit, please discuss the strategy or criteria for making that determination and how the values and needs of adjacent ownerships will be protected.

Chapter 2, Section 2.6.3, Open Off-Highway Vehicle (OHV) Areas (Pg. 2-4): Montana Fish, Wildlife and Parks (FWP) supports the BLM in not considering an alternative or options that would provide open play areas for OHV and trail bikes. Not allowing OHV use off designated travel routes would reduce the potential for wildlife disturbance during important gestation, parturition, young-rearing, autumn (hunting), and winter range areas, as well as soil and habitat damage and/or destruction. Chapter 2, Section 2.7 Table, Line 25 (Pg. 2-8), Soil Resources: Add the following component from Alternative D to Alternative C: "Consider restoration of soils in previously degraded areas." Restoring healthy soils should restore resource values in the long-term and would not likely impede resource-use activities.

Chapter 2, Section 2.7 Table, Line 43, Water Resources (Pg. 2-10): Add the following component from Alternative D to Alternative C: "Maintain functioning hydrologic systems and provide a scientific, landscape, approach to natural and human-influenced water systems." This is a basic requirement to human and resource health that should be applied across all alternatives.

Chapter 2, Section 2.7 Table, Line 49, Water Resources (Pg. 2-11): FWP supports Alternative D when it comes to managing impoundments under the draft RMP. Impoundments on BLM lands provide important recreational opportunities for anglers and hunters. At the same time, those impoundments have resulted in disconnected watersheds and altered flow/sediment transport regimes to the detriment of the natural lotic/wetland habitats. Considering (versus implementing) other possibilities to proposed actions has no negative impacts on the goals of Alternative C and may provide more flexibility in the long term to choose actions which benefit conservation (including use). FWP would like to work with the BLM on prioritizing impoundments for decommissioning and see that decommissioning is done in a manner that does not further degrade the downstream habitats. FWP would like to work with the BLM to ensure a balanced approach to managing impoundments for both their recreational value and impacts to the watersheds. FWP supports the action of considering the feasibility of alternative water developments moving forward.

Add last paragraph, "Consider the feasibility of available alternatives to surface water development, such as groundwater wells, before increasing the percent of watershed disconnected by impoundments within the above watersheds."

Chapter 2, Section 2.7 Table, Line 109, Fish and Wildlife (Pg. 2-17): The importance of connectivity and unfragmented habitats are an emphasis of Secretarial Order (SO) 3362; and Alternative C conflicts with this mandate. Please consider replacing Alternative C language with Alternative D language here. Maintaining connectivity and large blocks of habitat for the three mentioned big-game species of SO 3362 also increases the economic viability and benefits associated with these species across the planning area.

Chapter 2, Section 2.7 Table, Line 112, Fish and Aquatic Communities (Pg. 2-17,18): FWP supports Alternative D when it comes to managing fish and aquatic communities. FWP supports the BLM's efforts to protect and conserve aquatic habitats and the native species that rely on them while balancing those efforts with recreational opportunities where appropriate. FWP appreciates the emphasis on coordination between FWP and the BLM mentioned under Alternative D to prioritize habitats and balance conservation with recreation.

Chapter 2, Section 2.7 Table, Line 109, Alternative C (Pg. 2-17):  Consider changing the objective to state: "Objective: Maintain and enhance suitable habitat for all wildlife species, with an emphasis on maintaining, enhancing, or restoring habitat availability and condition, while minimizing habitat loss."

5

Chapter 2, Section 2.7 Table, Line 123, Alternative C (Pg. 2-18): FWP supports this management strategy related to wild sheep and domestic sheep/goat interactions, assuming that potential "reclassified" existing domestic allotments includes the option of closing/retiring the allotment if warranted.

Chapter 2, Section 2.7 Table, Line 123, Bighorn Sheep (Pg. 2-18, 19): We recommend the buffer described in Alternative D is applied to Alternative C. Based on scientific literature, a buffer between domestic sheep/goats and wild sheep that maintains the appropriate level of separation would avoid the spread of disease across all three species. This is important for the health and viability of bighorn sheep, which is one of Montana's treasured big game species that contributes to the economy, as well as the health and safety of domestic livestock,

Chapter 2, Section 2.7 Table, Line 128, Special Status Species (Pg. 2-19): Removing the ACEC status for westslope cutthroat trout in Collar Gulch appears to remove protections for this special status species. Additionally, many areas included in expanding Right Of Way (ROW) developments, timber harvest, grazing expansion, fluid mineral developments, travel expansion may overlap with northern redbelly dace x finescale dace distribution in Preferred Alternative C. These expansions of potentially detrimental impacts to special status species under Alternative C seems to contradict the stated objective common to all alternatives listed in line 128.

Chapter 2, Section 2.7 Table, Line 129, Special Status Species (Pg. 2-19): Consider applying a portion of the language from Alternative B to Alternatives C: "Require surveys for the presence of BLM sensitive species before authorizing surface-disturbing and disruptive activities." Surveying for species presence, and then monitoring species presence/response to impacts will have minimal impact on the objectives behind Alternative C while providing additional opportunities for learning and adaptive management in the future.

Chapter 2, Section 2.7 Table, Line 138, Grizzly Bear (Pg. 2-20): FWP supports Alternative B, which implements a food-storage order in the NCDE Recovery Zone (RZ) and in Management Zone 1. Zone 1 is currently occupied by grizzly bears and management conflicts are occurring. To increase public safety and reduce bear management actions and mortalities related to unsecured food attractants, food-storage requirements should be in both zones. Additionally, there are connected or continuous BLM lands that are on both sides of the RZ boundary. If the BLM only required food-storage on the RZ side of the line, any regulations would be difficult to enforce, confuse the public and lead to bear conflict situations. All federal and state land managers should be consistent on bear related food-storage requirements and cooperatively implement them in adjacent geographic locations.

Chapter 2, Section 2.7 Table, Lines 142-144, Greater Sage-Grouse (Pg.2-21): The state supports the stipulations stated for Alternatives B, C, and D. The stated stipulations in Alternatives B, C, and D maintain the 2015 Lewistown Field Office Greater Sage-Grouse Approved RMP Amendment and are consistent with other BLM land use plan provisions for Greater Sage-Grouse in Montana.

Chapter 2, Section 2.7 Table, Line 145, Greater Sage-Grouse (Pg. 2-21): The state supports treating free and commercial use mineral sales consistently with respect to disturbance guidelines and other applicable conservation measures as provided for in Alternative C.

Chapter 2, Section 2.7 Table, Line 279, Livestock Grazing (Pg. 2-38): Evaluation of grazed BLM acres (i.e., level of AUM or timing of livestock grazing period(s)) surrounding the Ear Mountain Wildlife Management Area should be done in consultation with FWP staff and in conjunction with grazing practices/evaluation on the WMA for consistency and wildlife/habitat benefit.

Chapter 2, Section 2.7 Table, Line 281, Livestock Grazing (Pg. 2-39): Alternative D puts the emphasis on good range management that considers both the economic needs of the producer and the long-term viability of the rangeland in the face of variable weather conditions and climate change. Consider applying wording from Alternative D to Alternative C. Additionally, exceptions can be included to cover instances of drought, wildfire, severe weather, etc. that would ultimately force a producer to increase AUMs or utilization. This flexibility would ensure both resource conservation and the longer-term viability of agricultural production across the project area.

Chapter 2, Section 2.7 Table, Line 288, Livestock Grazing (Pg. 2-40): Flexibility in rest periods post-disturbance (as described in Alternative D) allow for variable conditions and response plans. Alternative D provides the flexibility that livestock grazing could be applied at any time but considers the short- and long-term impacts to grazing post-disturbance. However, implementing immediate post-disturbance (fire) grazing on areas with cheatgrass may help suppress its spread and avoid damage to more desirable perennial species that mature later.

Chapter 2, Section 2.7 Table, Line 289, Livestock Grazing (Pg. 2-41): Apply Alternative D to Alternative C for the health and viability of both domestic and wild sheep across the planning area. However, under no circumstances should domestic sheep/goats be allowed within the planning area on BLM lands; landowners still maintain the freedom to do as they wish on their private lands.

Chapter 2, Section 2.7 Table, Line 298, Special Recreation Management Areas (Pg. 2-42): FWP supports the BLM's Preferred Alternative C for the Special Recreation Management Area (SRMA), except we recommend that the Durfee Hills be listed as an SRMA. It currently is only listed as an SRMA under Alternative D.

Chapter 2, Section 2.7 Table, Line 300, Extensive Recreation Management Area (ERMA) (Pg. 2-43): FWP supports the BLM's Preferred Alternative C for the Extensive Recreation Management Areas, except for the following:

Designate the Arrow Creek Back Country Conservation Areas (BCAs) as stated in Alternative B, however provide for ROW 'avoidance' rather than 'exclusion".

Designate the North Moccasin as an ERMA as stated in Alternative D.

Chapter 2, Section 2.7 Table, Line 321, Travel, Transportation Management, and Access (Pg. 2-46): The four ONA's located along the RMF area are considered primary winter range areas for wildlife (bighorn sheep, elk, and mule deer).  Alternative D better supports limiting OSV use than Alternative C. Alternative D does still allow some OSV use in an area that is popular for recreationists as/if snow conditions allow for such use.

Chapter 2, Section 2.7 Table, Line 411, Wilderness Study Areas (Pg. 2-58): The lack of underlying protection of Wilderness Study Areas (WSA) leaves populations of westslope cutthroat trout vulnerable to multiple negative impacts from stated multiple use priorities within Alternative C. Increasing surface use such as livestock grazing would likely increase erosion, turbidity, and instream water temperatures from loss of riparian vegetation. For those reasons, FWP supports preserving wilderness characteristics of WSAs.

Access to Crystal Cave requires the use of state school trust land.  The DNRC supports development of a management plan that would allow for public access and use of Crystal Cave.  The DNRC supports

maintaining Crystal Cave's status as an Area of Critical Environmental Concern as identified in Alternative B.

**Chapter 3- Affected Environment**
3.3- Resource Uses; 3.38- Forest, Woodland, and Special Products (page 3-5): add the number of acres available (suitable) for timber management, including vegetation treatments.  Add description of timber infrastructure (mills and operators). 3.5- Social and Economic- add discussion of the relationship between resources available for use and the benefit to local economies including jobs. Include a discussion of payments to counties with timber and other revenues.

**Chapter 4- Environmental Consequences**
Effects discussions (pages 4-11 through 4-17):  For each alternative, in addition to the number of acres closed to commercial timber (currently stated), add the number of acres open to commercial timber harvest and projected number of acres to be treated per decade.  Also, disclose the projected number of acres of fuels reduction, including within WUI.  Add more discussion on the design considerations with vegetation treatments, and subsequent changes in vegetation composition, forest health and resiliency, and habitat quality.

Chapter 4, Section 4.2.1 Environmental Consequences (Air Resources and Climate) (Pg. 4-6, 4-7): The RMP seeks to shift the responsibility of understanding climate impacts at the landscape level (even on BLM lands) on to Landscape Conservation Cooperatives (LCC):
"Given the broad spatial influence of climate variability that requires response at the landscape level, the DOI also established landscape conservation cooperatives, which are management-science partnerships that help to inform management actions addressing climate change across landscapes. These cooperatives are formed and directed by land, water, wildlife, and cultural resource managers, and interested public and private organizations, to increase the scope of climate change response beyond federal lands."

The Department of Interior's LCCs are no longer funded and the Plains and Prairie Potholes LCC (encompassing most all of the BLM Lewistown District) is no longer active. Thus, there are no anticipated "management-science partnerships" to help inform BLM on how to address climate change at a landscape level. BLM should continue to identify the best available science to inform landscape-scale climate adaptation strategies.

Chapter 4, Section 4.2.10 Lands with Wilderness Characteristics (Pg. 4-113): The upper Sun River and Teton River are both uncompromised representatives of the Rocky Mountain Front Foothill and Valley Rivers ecosystem. Due to historic anthropogenic impacts, this ecotype in intact condition is relatively rare. Surface disturbance such as heavy livestock use, increased timber harvest, and resource extraction development along the Rocky Mountain Front may lead to degradation and loss of health and stability of this ecosystem type. For those reasons, FWP supports Alternative D as it relates to Lands with Wilderness Characteristics.

Chapter 4, Section 4.2.3 Environmental Consequences (Water Resources) (Pg. 4-19 through 4-32): FWP recommends Alternative D for this section. The environmental consequences summarized under Alternative D are more tolerable than the increased risks associated with Alternative C and would reduce the risk of water resource degradation. Alternative D provides adequate multiple use opportunities on BLM lands while maintaining basic protections of water quality, aquatic habitat, and the species that rely on them.

8

Alternative C also unnecessarily removes the designation of Areas of Critical Environmental Concern (ACEC) and contributes to the potential for irreparable harm to these sensitive habitats with the allowance of Right of Way (ROW) development. Furthermore, it appears that there is no reclamation plan for disturbed subsurface water resources and no consideration for long term impacts to water quality through the process of fluid mineral development. Without explicit Best Management Practices and outlined mitigation measures in place, impacts to water resource have not been fully assessed enough to adequately compare alternatives.

Finally, in the Effects Common to All Alternatives, not including an analysis of oil shale and coal development because those resources have shown limited interest in the past is not adequate justification for their exclusion in this RMP. These activities would have substantial impacts on water resources and would contribute to cumulative effects; thus, their evaluation should be included. Chapter 4, Section 4.2.5, Environmental Consequences (Fish and Wildlife) (Pg. 4-53 through 4-78): FWP recommends Alternative D for this section based on the summarized environmental consequences and the basic precautions taken to conserve/protect fish and aquatic habitats. The expansion of soil disturbing activities, fluid mineral leasing, timber harvesting, status quo grazing, and removal of all ACEC's proposed in Preferred Alternative C would have negative impacts on fish and aquatic habitats.

Chapter 4, Section 4.3.2 Environmental Consequences (Livestock Grazing) (Pg. 4-130): Livestock grazing and poor grazing practices are a persistent source of aquatic habitat degradation in the planning area. Any management plan alternative should address this issue to minimize and mitigate grazing impacts on aquatic/riparian habitats. FWP would encourage the BLM to ensure rangeland standards are being met, address grazing impacts on perennial waters, and take efforts to develop off-stream water sources.

Chapter 4, Section 4.3.4 Travel, Transportation Management, and Access (Pg. 4-147): FWP supports Alternative D for the Travel, Transportation Management, and Access aspects of the draft plan. Chapter 4, Section 4.4.1 Areas of Critical Environmental Concern and Outstanding Natural Areas (Pg. 4-165): FWP supports Alternative D for this section, which would maintain or add the following designations: Acid Shale-Pine Forest ACEC/RNA, Blacktail Creek ACEC, Blind Horse ACEC/ONA, Chute Mountain ACEC/ONA, Deep Creek/Battle Creek ACEC/ONA, Ear Mountain ACEC/ONA, Collar Gulch ACEC, Judith Mountains Scenic ACEC, Square Butte ACEC/ONA, and Sun River ACEC. Without these designations, these areas would be open to available to potential surface-disturbing activities such as ROW location, which could damage or destroy cultural and paleontological resources, endemic plant communities, critical native fish species habitat; and cause displacement of species, habitat fragmentation, and negative changes to the visual landscape, among other impacts.

The Blind Horse, Chute Mountain, Deep Creek, and Ear Mountain drainages are vital to the diversity and stability of the Rocky Mountain Front fishery ecosystem. These areas hold three Montana State Species of Concern: the westslope cutthroat trout, northern redbelly dace, and northern redbelly/finescale dace. Additionally, since the development of the RMP, FWP has documented what is believed to be the easternmost aboriginal population of westslope cutthroat trout in Alpine Gulch, a Judith Mountain headwater tributary of Warm Spring Creek. Portions of Alpine Gulch occur on BLM lands and FWP would strongly encourage the BLM to evaluate the drainage for ACEC status. Chapter 4, Environmental Consequences (Blind Horse, Chute Mountain, Deep Creek/Battle Creek, and Ear Mountain ACECs/ONAs) (Pg. 4-169): The Blind Horse ONA has good access from the Blackleaf Wildlife Management Area to the east.  The Deep Creek/Battle Creek and Chute Mountain ONA's

have recently gained seasonal access to these areas (July 31-Dec 31) via state DNRC lands from the east.

Under the Preferred Alternative C, motorized travel would be allowed on the Blind Horse ONA.  With the passage of the Rocky Mountain Front Heritage Act, the existing Activity Plan for the Blind Horse ONA was intended to guide management of this tract of land. Motorized travel is prohibited under the existing Activity Plan. Without this protection, motorized travel is a real possibility considering adjacent private land access and historic roads within the Blind Horse ONA and would not exclude ATV and snowmobile use.  The Blind Horse ONA is important winter and summer range for elk, mule deer, big horn sheep, grizzly bears, mountain goats and other wildlife species that are sensitive to disturbance.  The intent of the RMF Heritage Act and the current Activity Plan should be followed, and motorized travel should be prohibited within the Blind Horse ONA.

The Ear Mountain ONA opening/closing dates (July 1 – December 14) should be consistent with the Ear Mountain Wildlife Management Area opening/closing dates (May 15 – December 1), and consider making the Ear Mountain individual grazing allotment consistent with the opening/closing dates for the Ear Mountain ONA as well.

Chapter 4, Environmental Consequences (Areas of Critical Environmental Concern & Outstanding Natural Areas – Collar Gulch ACEC) (Pg. 4-170 through 4-172): FWP recommends maintaining ACEC protections for Collar Gulch to ensure that degradation of the habitat and water quality from surface disturbing activities would not occur, protecting westslope cutthroat trout. The Collar Gulch ACEC was designated primarily due to the presence of a genetically pure population of westslope cutthroat trout. Although not considered aboriginal, the population is of conservation concern and considered high-risk of extirpation given the small population size and limited habitat available. The BLM's review of the Collar Gulch ACEC found that it met relevance and importance criteria to warrant ACEC status (page 13-14, Appendix T).

In Alternatives B & D, the BLM proposes to expand the Collar Gulch ACEC to include the Chicago Gulch drainage. FWP had previously considered replicating and expanding the Collar Gulch westslope cutthroat trout population into Chicago Gulch. However, due to changes in local hydrology, the previously dry streambed barrier is no longer sufficient to prevent recolonization of brook trout, making a piscicide treatment and replication efforts unreasonable at this time. Because of this, FWP does not currently see the need to expand the ACEC to include Chicago Gulch.

Chapter 4, Section 4.4.2 Environmental Consequences (Back Country Byways) (Pg. 4-177): FWP supports BLM's efforts to encourage partnerships and interpretive programs along the Missouri Breaks Back Country Byway corridor. We see this as an important strategy for enhancing the visitor experience and are also in support of actions related to evaluating future routes for potential inclusion as back country byways.

Chapter 4, Section 4.4.3 Environmental Consequences (National Trails) (Pg. 4-178): FWP supports BLM's efforts to conserve, protect, and restore national trail resources, qualities, values, and associated settings to provide premier trail visitor experiences for the public. We hope that the BLM will maximize opportunities for shared national trail stewardship and reduce the potential for uses that substantially interfere with the nature and purposes of national trails.

**Volume III**
Appendix L: Some of the fluid mineral stipulations for Preferred Alternative C in Appendix L are not consistent with fluid mineral stipulations in RMPs from other field offices in Montana. It is unclear why there is inconsistency. FWP recommends that fluid mineral stipulations for Alternative D are included in the Lewistown RMP to protect fish, wildlife, parks, and recreation resources, and to be consistent with other field offices across Montana.

Appendix L: There are many FWP lands within the jurisdiction of the Lewistown Field Office, including wildlife management areas, state parks, and fishing access sites. For example, there is the potential for oil and gas leases to overlap or be located near Smith River and Sluice Boxes State Parks. In order to protect these lands, which are managed for recreation and resource protection, FWP recommends adding the following stipulation, which is in the BLM Billings Field Office RMP: State Lands (NSO 11-132): Surface occupancy and use is prohibited for oil and gas exploration and development within the State of Montana Wildlife Management Areas, Game Ranges, Fishing Access Sites, and State Parks.

Appendix L: While Appendix L lists fluid mineral stipulations for the various alternatives and the BLM's ePlanning website provides a GIS database of the data that will be used to apply stipulations, there is no information on data sources. FWP recommends using the best available fish, wildlife, parks, and recreation information to apply fluid mineral stipulations. For example, FWP maintains GIS layers of big game winter range and the Montana Natural Heritage Program has the most current database of raptor nests. FWP has been working with the BLM Montana State Office Division of Oil and Gas and several field offices (e.g., Miles City, Billings) to share and understand the GIS data that is used to apply stipulations. This has streamlined FWP's process to review oil and gas lease sales and resulted in FWP comments that are focused within the scope of RMPs. We would appreciate the opportunity to understand and provide input on the data and information the Lewistown Field Office is proposing to use to apply the fluid mineral stipulations listed in Appendix L. We understand that once the RMP is approved, an amendment is required to modify the list of stipulations and the data used to apply stipulations.

# Exhibit B



# OFFICE OF THE GOVERNOR
## STATE OF MONTANA

Steve Bullock
GOVERNOR

Mike Cooney
LT. GOVERNOR

August 15, 2019

RMP Comments
Bureau of Land Management
Missoula Field Office
3255 Fort Missoula Road
Missoula, MT  59804-7204

Re:     State of Montana Comments to the Missoula Field Office (MFO) Draft Resource Management
        Plan

Thank you for the opportunity to comment on the Missoula Field Office's Draft Resource Management
Plan (RMP). We appreciate the Field Office's efforts to engage state and local governments and
Montana citizens during the planning process.

As Montana's governor, I support the balanced use of our public lands, to include both responsible
resource development as well as the conservation of significant fish and wildlife habitats and outdoor
recreation opportunities. Outdoor recreation supports $7.1 billion in direct consumer spending and
71,000 direct jobs in Montana and managing for these resources will help to support diverse rural
economies and sustain our state's outdoor traditions. The MFO oversees public lands with unparalleled
wildlife habitat and recreational values, including reaches of the iconic Blackfoot River watershed.

As you know, the Federal Land Policy and Management Act (FLPMA) requires that the BLM manage
public lands for multiple-use and sustained yield, including the conservation and management of lands
for recreation, watersheds, and fish and wildlife. FLPMA further requires the BLM to keep an updated
inventory of public lands and give priority to areas of critical environmental concern. Unfortunately,
after reading the Missoula draft RMP, I believe that the preferred alternative does not offer balance nor
multiple-use considerations and must be modified to incorporate additional conservation measures.

Most troubling to me is the fact that a decision to eliminate conservation protections in the agency's
preferred alternative appears to have occurred at the very end of the planning process, undermining
years of collaborative engagement among local and state partners to further shared management
objectives. The strategy adopted by the BLM's Washington DC review, which I understand to be
common to the other six draft RMPs released since March of this year across the country, not only
disregards BLM's FLPMA responsibilities for balanced management, it creates disincentives for
public engagement in the planning process and muddies public discourse over key management
decisions intended to guide the agency for decades to come.

As your team makes final revisions to the Missoula RMP, I request that the BLM make modifications to include specific conservation measures for big game migration corridors, management for valuable recreation destinations, and measures to safeguard areas of critical environmental concern and outstanding natural areas. Specifically, the Limestone Cliff and Bear Creek Flats areas should be considered for continued conservation management, and the Lewis and Clark Trail and corridor should be designated a National Historic Trail to its fullest extent. Of note, the entire tract of BLM lands found in the area proposed as the Lower Blackfoot River Corridor--within the Gold Creek, Belmont Creek, Morrison Peak and Lower Blackfoot River complex--is extremely unique and should be carefully managed. This area is considered one of the more important wildlife movement zones between the Northern Continental Divide Ecosystem (via the Mission Mountains) south into the Garnet, Sapphire, and John Long mountain ranges. The area is intact with limited development, and the connecting ridge systems form a natural funnel for wolverine, fisher, and grizzly bear and are rich with elk, deer and other wildlife.

Consistent with my prior comments, I want to make you aware of my support for the backcountry conservation area (BCA) management tool and its application in the Missoula RMP for the conservation of intact habitats to support wildlife-dependent recreation. The Garnet and John Long mountain ranges are popular hunting destinations for local area residents. The BCAs considered in this plan could allow relatively intact and larger blocks of undeveloped BLM lands to function as habitat and connectivity areas for fish and wildlife, while providing important wildlife-related recreational opportunities for a wide range of users.  By design, the BCA management tool would conserve important habitats and recreation opportunities, while allowing for habitat management, public access, and grazing to co-exist on the landscape.

The Montana Department of Natural Resources and Conservation (DNRC), Trust Lands Management and Forestry Divisions are committed to continuing a positive working relationship with the MFO, specifically on resilient landscapes, wildfire response, community protection, sustainable land management, and access. Importantly, administrative access should be maintained in areas that are important for future state trust land management and to ensure safe and effective wildland fire response to protect values at risk. All alternatives should explicitly state the ability of owners of non-federal land to gain access across BLM land to make reasonable use and enjoyment of their land as provided for in FLPMA and BLM Manual 2801. The state supports maintaining road infrastructure and access for wildfire protection and suppression needs particularly within, and adjacent to, the Wildland Urban Interface (WUI) for treating fuels, managing vegetation for health and resiliency, and managing fires before they reach nearby private lands. These objectives should be balanced with appropriate protections for sensitive watershed and aquatic resources, including efforts to reduce sediment input from roads across the plan area, particularly in areas with bull trout.

To more effectively protect communities and increase landscape resiliency, management of vegetation should remain a priority in the plan.  The projected increase in size, severity, intensity, and frequency of wildfire, along with the expanding development in the WUI, points to the need for an increase in active management, particularly within and near the WUI. Further opening dense stands and adding variation on the landscape will provide greater resilience to drought stress, fires, and insect and disease outbreaks as the climate changes further in the years ahead. In addition, through my Forests in Focus 2.0 effort, we are focusing both on forest restoration and industry retention objectives in local communities within the MFO's region. The state's remaining logging industry and milling infrastructure are critical partners in meeting the ecological, social and economic components outlined in the plan's alternatives and should be appropriately consider as the BLM works with the State to prioritize forest restoration and management projects.

The plan should emphasize coordination with Montana Fish, Wildlife and Parks (FWP) to enhance and improve the quality of big-game winter range and migration corridors on federal lands in accordance with Secretarial Order 3362. Where appropriate, the plan should promote activities that address forage management on winter, summer, and migration ranges; hunter access; security habitat management; and which facilitate big game movement, such as fence modifications and highway crossings. In general, the State believes a higher acreage of lands should be withdrawn or segregated from minerals entry considering the high wildlife and recreational values in the plan area. FWP has been working closely with BLM on river recreation within the Blackfoot River Corridor and looks forward to continuing to implement the Blackfoot Corridor Agreement and collaborating with BLM, private landowners, and stakeholder groups within the Lower Blackfoot River Corridor area. Finally, the plan should manage eligible stream segments for possible future inclusion in the National Wild and Scenic Rivers system in accordance with prior BLM inventories and evaluations.

Thank you for considering our comments. We appreciate your work on the revised plan, weighing the many interests involved and utilizing the best available science in plan development. We look forward to continuing to work as a partner with the Missoula Field Office for the benefit of Montana's communities, grasslands, forests, wildlife and watersheds.

Sincerely,

STEVE BULLOCK
Governor

Attachment:
Additional Specific Comments

**Additional Specific Comments:**

**Executive Summary**

Overview of Environmental Consequences (ES.5), Special Designations, Areas of Critical Environmental Concern (ACEC) (Pg. 9): Under Alternatives B and C, Bear Creek Flats would no longer be an ACEC but would be managed as part of the proposed Chamberlain Special Recreation Management Area (SRMA, Alt B) or Backcountry Conservation Area (BCA, Alt C).  FWP recommends that under either action alternative, Bear Creek Flats should remain under ACEC classification. One reason this BLM land acquired ACEC classification was because Bear Creek Flats was recognized as an intricate part of the Sperry Grade Wildlife Movement Zone. ACEC classification also helps prioritize this area for any future Montana Department of Transportation projects on nearby Montana Highway 200. A strategically placed highway structure in this narrow canyon, where Bear Flats connects with the draws and ridges coming off the Blackfoot Clearwater Wildlife Management Area (WMA) would provide wildlife passage into perpetuity. This area provides linkage for forest carnivores, grizzlies, and other wildlife traveling south from the Northern Continental Divide Ecosystem (NCDE) to the Garnet Range and mountain ranges beyond.

**Chapter 1: Introduction**

Purpose and Need Statement:  We suggest the plan mention that there is a joint commitment by State and Federal land management agencies in Montana to manage across ownerships. Note that the Governor's Farm Bill (Healthy Forests Restoration Act) Insect and Disease Designated Treatment Areas (see attached map) exist adjacent to blocked BLM lands in the Marcum Mountain vicinity and in the area between Maxville and Philipsburg.  These areas might provide opportunities for cooperative projects with other agencies including Good Neighbor projects. The draft plan should document these locations and indicate how they will be used to determine priorities for treatments or reference opportunities to develop projects in coordination with priorities to be set through the State's updated Forest Action Plan.

The Blackfoot Canyon between the town of Lincoln and the junction of Montana Highways 200 and 141 is an important wildlife movement zone between the NCDE and the General Robert E. Lee Mountain Range to the south and southeast. This narrow canyon provides habitat connectivity between the two areas and is used heavily by an array of wildlife. This canyon is especially traveled by grizzly bears. In the last 10 years FWP has documented six road-killed grizzly bears along this stretch of Highway 200, and GPS points from radio-collared grizzlies indicate the area is a vital crossing area. FWP recommends that BLM lands within this canyon be given ACEC classification, or at the very least, designated as a BCA (with avoidance protection).

**Chapter 2: Alternatives**

Alternatives B & C (Section 2.3), Forest Vegetation and Special Status Plant Species, Goal 01: On page 32 it states that the vegetation management strategy is to restore or maintain forests within the Natural Range of Variability (NRV).  It is also to emulate natural disturbance patterns in terms of intensity, frequency and scale.  This is an appropriate strategy for lands outside of WUI.  In WUI more opening of stands may be necessary to effectively mitigate wildfire risk regardless of whether post-treatment condition is within the NRV.  This still fits the restoration strategy of developing and maintaining resilient, functional ecosystems. FWP generally supports Alternative B regarding forest vegetation management because of the emphasis on moving more acres (than C) towards the NRV. FWP is currently using forestry treatments on its  WMAs to manage timber resources towards more

historic stand conditions and disturbance regimes, and we believe our management objectives for those projects could align well with the BLM's.

Forest Vegetation, Objective #06 (Pg. 33): Suggest adding; "Prioritize development and maintenance of resilient conditions in WUI."  This is mentioned in Management Action 5 but not in the objectives. Noxious Weeds/Invasive Species (Pg. 34): In the Actions and Allowable Uses section: Suggest adding; "BMPs for prevention and spread of invasive species will be followed in wildfire management." Noxious and Invasive Plant Species, Management Actions and Allowable Uses 04 (Pg. 34): FWP recommends that grazing by domestic goats and/or sheep be limited or excluded as a method of biological weed treatment within the Grizzly Bear Conservation Strategies (GBCS) Zone 1, as well as BLM lands adjacent to Zone 1. Grizzly bears now occur throughout this area, and FWP believes depredations would be expected to occur.

> FWP recommendation: If goats and/or sheep were to be allowed, lethal control of predators should be kept to a minimum. Preventative measures such as use of guard dogs, electric night pens, night herders, and strict carcass management and food order practices should be required. And in the event of a depredation by a grizzly, the sheep or goats should be relocated out of the area.

> Recommend rewording: "Use manual, mechanical, cultural, chemical, and biological (includes classical and targeted grazing by cattle, goats, sheep) treatments to manage invasive species infestations. Exception: use of goats and/or sheep would not be allowed within the Grizzly Bear Conservation Strategies Zone 1 as well as BLM lands adjacent to Zone 1."

Wildlife Habitat and Special Status Species, Objectives, Grizzly Bear Specific 06 (Pg. 39): FWP agrees that new sheep allotments should not be allowed on BLM-managed lands in GBCS Zone 1 territories.  Further, FWP recommends that the BLM adopt a similar policy for any BLM lands directly adjacent to Zone 1.

> FWP appreciates that "carcass removal within grizzly habitat would be a term and condition of grazing leases" under both action alternatives, as mentioned in two places in Chapter 3.  We did not see this item specifically listed under this Grizzly Bear Specific section (Pg. 39).  FWP recommends adding carcass removal as a specific numbered item, perhaps adding it after 06 ("no new sheep allotments").

Forest Products, Goals (Pg. 44): Suggest adding; "Collaboration with State and Federal agencies to maintain and enhance forest products infrastructure and capacity in mill and woods operations." Include actions to accomplish this.

Access (Pg. 51):  Access is one of the most important aspects of cooperation/coordination between our two agencies.  Both alternatives B & C Right of Way (ROW) Maps (Appendix H-38 & H39) show ROW avoidance and exclusion areas.  The DNRC is concerned that management of state trust lands intermingled with; adjacent to; or accessed via avoidance areas may be substantially impaired should we be unable to secure/maintain reasonable access through BLM property.  On page 52 Item 04 it states; "Non-federal landowners who are surrounded by BLM land will be allowed a degree of access that will provide for the reasonable use and enjoyment of the non-federal land (BLM Manual 2801)".  The Lower Blackfoot River Corridor (LBRC) area is currently closed to Off-Highway Vehicles (OHV) (Alternative A), but both Alternatives B and C propose to open that area to limited (potential) OHV use.  This area is considered one of the more important wildlife movement zones between the NCDE (via the Mission Mountains) south into the Garnet, Sapphire, and John Long mountain ranges. The area

is intact with limited development, and the connecting ridge systems form a natural funnel for wolverine, fisher, and grizzly bear and are rich with elk, deer and other wildlife. Protecting this vitally important wildlife area with some sort of special designation and managing it accordingly--with no OHV trails--would enhance this area as a wildlife linkage zone within the lower reaches of the Blackfoot River Basin. FWP recommends against the OHV designation being changed from closed to "limited" under both Alternatives B and C.

Land Tenure (Lands & Realty, Pg. 49).  Alternative B consists of two categories under which all BLM land would fall:  1 is titled retention, 2 is retention-limited disposal.  Alternative C introduces a third category for numerous smaller parcels: 3 is disposal.  FWP supports Alternative B because several of the category 3 parcels under C are publicly accessible (by road or under Montana's Stream Access Law) and/or help form continuity with other adjacent public lands.  Sometimes these are accessible parcels near or within larger private land blocks where access may otherwise be limited for hunting purposes, thus complicating FWP's management of some big game species. Some of those parcels should be retention (Category 1) due to providing stream access in an otherwise limited access area; others could be retention-limited (Category 2), where their disposition could be predicated on continued public access (perhaps via a conservation easement with another entity). Continued consolidation of checkerboard management for public access in the region should remain a priority.

> There are two parcels adjacent to Rock Creek that FWP recommends should be designated as Category 1 under both Alternatives B and C. (Parcels are portions of T7N R16W Sec 17 and T7N R16W Sec 26.) These parcels provide access to Rock Creek in important reaches of Rock Creek that anglers otherwise would not be able to access.

> The half section of BLM land in the lower Boulder Creek drainage (off Flint Creek, near Maxville; T8N R13W Sec 16) provides important access for elk and deer hunters and receives a significant amount of use by hunters. Additionally, it includes ~1/3 mile of Boulder Creek, which is designated as bull trout critical habitat under all RMP alternatives.  Approximately 85% of the parcel's boundary is shared with state and National Forest lands. This parcel is designated Category 2 (retention, limited disposal) under Alternative B, and Category 3 (disposal) under Alternative C (Appendix H, maps H-17, H-18).  FWP recommends Alternative B for this parcel, as potential disposal to a private owner under Category C would fragment this overall block of public land.

Alternative B (Preferred, Pg. 57): In Forest Management - Management Actions; We recommend that in addition to the types of treatments, that you mention the scale (range of acres) of treatment areas (encourage large scale).


## Chapter 3: Affected Environment and Environmental Consequences

The vegetation management strategy targets NRV as the condition goal for all forested BLM lands (top of page 85).  We recommend that this condition goal not apply to forested lands within the WUI. Within these areas, management of wildfire hazards (property damage and public safety) should be of paramount importance.

Vegetation Treatments (Pg. 100): The paragraph title states, "timber harvest, thinning and prescribed fire."  The 1st sentence says timber harvest and prescribed fire.  Suggest adding non-commercial thinning.  Noncommercial thinning is mentioned later under regen harvest, but it belongs under the vegetation Treatments paragraph.

Wildland Fire Management (Pg. 111): As you mention in the draft RMP, we also recognize the need for plans and agreements to be developed to allow for the implementation of use of wildfire to achieve resource benefit given DNRC's current protection responsibilities.  If fires are to be managed for resource benefit, we will need to discuss the strategy and criteria for making that determination and how the values and needs of adjacent ownerships will be protected.

Aquatic Habitat and Special Status Species (3.3.2):  In Analytical Methods and Assumptions (Pg. 136), the BLM states, "Overall, the decision consists of only 4.2 percent of the analysis area, and the ability of the BLM to influence potential landscape and watershed-level management decisions and land use activities is relatively small."  FWP observes that 4.2% of an area may seem small, but riparian areas make up less than 3% of the landscape in Montana and these areas provide critical resources for the majority of its wildlife species. These habitats have a disproportionate impact on the surrounding landscape, so the effective scale of influence of riparian habitats is much larger than can be calculated by the amount of land cover they encompass. While the BLM may feel the aquatic and riparian resources on their lands are minor, we celebrate these BLM areas where management activities even on small wetland and riparian areas can have implications over a larger landscape or the entire length of a stream (e.g., maintenance of aquatic and terrestrial movement corridors, reducing sediment input, increasing large woody debris input, etc.). Therefore, thoughtful management is important even on small sections of streams or pocket wetlands, and FWP recommends the BLM emphasize protection of streams and riparian areas on properties under their management.

> FWP recommends the BLM rarely adhere to "standard" RHCA widths. These standards are often inadequate for protecting riparian resources and the hundreds of plant and animal species that depend on them. FWP recommends buffer widths of *at least* 300 feet. on either side of the stream channel to protect breeding birds and mammals (based on review by Ellis 2008[1]). We argue RHCA widths should not be delineated based on the current extent of riparian vegetation, but rather reflect the potential zone of riparian vegetation for the waterbody. FWP supports RHCA widths that are based on site-specific, project-level analyses, and recommend BLM err on the side of caution and establish the widest possible RHCAs when project-level analyses are logistically unfeasible.

FWP supports the statement (Pg. 160, at the beginning of the last paragraph) that beavers were an important component of many riparian systems and degradation of these resources may be related to localized extirpation of beavers. It is our hope that the BLM will take measures to expand the distribution of beavers in appropriate habitats while also proactively addressing beaver conflict issues. Forest Products (Pg. 239): Estimates are provided for annual sale quantity (ASQ) for Alternative A and then probable sale quantity (PSQ) for Alternatives B & C.  There should be an estimate of PSQ for Alternative A also so that the three alternatives can be compared.

In the Forest products affected environment section on pages 238 & 239 and figure 31a (Pg. 240) there is a discussion about past annual and average harvest levels.  We have found that measuring volume of timber sold rather than harvested to be a more consistent metric for evaluating our annual forest products sales program as it avoids market fluctuations affecting harvest that are beyond our control. Both the amount and consistency of volume sold are important metrics to the Forest Products Industry. It appears the consistency of past timber harvest suffered when the planning emphasis shifted to a

---

[1] Ellis, J. H. 2008. Scientific Recommendations on the Size of Stream Vegetated Buffers Needed to Protect Fish and Aquatic Habitat, Part Two, The Need for Stream Vegetated Buffers: What Does the Science Say? Report to Montana Department of Environmental Quality, EPA/DEQ Wetland Development Grant. Montana Audubon, Helena, MT. 20 pp.

watershed restoration-based approach.  We are pleased to see that Forest Products Goal 01 (Pg. 44) which is common to both Alternatives B & C shows a commitment to; "Manage forest resources to provide a sustainable flow of timber to local economies through timber harvest".

Economic Impacts (Pg. 270): Payments to states and counties with PILT is listed.  It would be helpful to also disclose projected payments for Secure Schools and 25% payments.


**Appendices**

Appendix B. Aquatic and Riparian Habitat Conservation Strategy, Protecting Aquatic Special Status Species Population Strongholds, Fish Key Watersheds (Pg. B-4, Map H-7): FWP is supportive of the emphasis on restoration in fish key watersheds. FWP recommends involving FWP biologists, local watershed groups, and non-government organization (NGOs) restoration practitioners when developing specific plans, to ensure that actions are complimentary to any ongoing habitat restoration efforts and fit within the broader strategic plan for the watershed. This involvement could also be added to the Fish and Wildlife Habitat Restoration section (pg. 30) within the Management Actions and Allowable Uses section of the Aquatic Habitat and Special Status Species (Vol 1, 2.3 Features Common to Alternatives B and C).

> FWP recommends that Gold Creek (a Blackfoot River tributary) be designated as a Fish Key Watershed given the BLM's ongoing action to acquire more land in this drainage. Gold Creek is an extremely important spawning tributary for migratory trout in the Blackfoot watershed and contains fisheries resource values of bull trout (BT), bull trout critical habitat (BTCH), and westslope cutthroat trout (WCT.)

> FWP recommends designating Braziel Creek (a Nevada Creek tributary) as a Fish Key Watershed because of its importance as a westslope cutthroat trout spawning tributary in the Nevada Creek system. The lower portion of this stream has been the focus of significant restoration actions on private land, including fish screening, instream flow leases, and channel reconstruction. Restoration and appropriate riparian management on BLM land would help ensure the continued importance of this Nevada Creek tributary in an otherwise recruitment-limited section of the watershed. The upper half of the Braziel Creek drainage is on BLM property, so it is very important to manage for high quality habitat in the upper reaches of this important WCT tributary.

> FWP recommends consideration of designating Scotchman Gulch as a Fish Key Watershed. (Scotchman is an Upper Willow Creek tributary, and we are unclear if the Upper Willow designation as a Fish Key Watershed automatically includes all its tributaries.) Scotchman Gulch contains a genetically pure and demographically strong WCT population.  FWP is aware that BLM has completed significant projects aimed at protecting this population, but FWP would like to see this drainage listed as a Fish Key Watershed to ensure future protection of this population.

Unnamed Table (Pg. B-4) only shows bull trout and western pearlshell mussel (WPM) listed for Upper Willow Creek.  Westslope cutthroat trout are also present in Upper Willow Creek.  FWP recommends rewording: "BT, WCT and WPM in Upper Willow Cr. and WCT in Scotchman and Miner gulches; very small reach of UWC is BLM."  Note: this same change should be made in Table 1 (Summary of Fish Key Watersheds Proposed) in the Aquatics RMP Handout.

In the Aquatics RMP handout (Key Points, 6th bullet), it states that monitoring will be completed in riparian habitat conservations area (RHCA) drainages that contain ESA-listed fish.  FWP recommends that monitoring should be completed in all allotments within Fish Key Watersheds.

Appendix L. Recreation Management Areas, Section 1.4 Blackfoot River and Lewis & Clark National Historic Trail, Table 8, Management Actions and Allowable Use Decisions; Recreation and Visitor Services (Pg. L-7): The Blackfoot Corridor Agreement is importantly referenced as is BLM's desire to continue working with the private and public landowners involved in the agreement.  We note that this agreement will be reviewed in 2020.

Appendix L. Recreation Management Areas, Section 1.8 Chamberlain SRMA and BCA, Table 25, Implementation Actions (Pg. L-7): Under Alternatives B and C, Bear Creek Flats would no longer be an ACEC but would be managed as part of the proposed Chamberlain SRMA (Alt B) or BCA (Alt C). Camping restrictions in Table 25 for both alternatives indicate Bear Creek Flats would be open to camping only in designated areas.  Will designated areas be provided?

Appendix L. Recreation Management Areas, Section 1.9 Lower Blackfoot River Corridor, Table 26, Targeted Activities, Experiences, and Benefits (Pg. L-19): Under Alternatives B and C for the Lower Blackfoot River Corridor, the targeted activities, etc. do not include outfitted or guided opportunities but instead focus on developing skills and abilities on one's own.  This area currently has a great deal of outfitted and guided opportunities on the Blackfoot (and Clark Fork) river, but nowhere in the RMP documents do we see mention of guiding or outfitting in relation to any waters in the RMP area. Is there a conflict here?

Appendix L. Recreation Management Areas, Section 1.9 Lower Blackfoot River Corridor, Table 28, Management Actions and Allowable Use Decisions; Recreation and Visitor Services (Pg. L-20): Alternatives B and C include "Consider developing float-in campsites."  FWP believes that this action is critical to the continued success of the Blackfoot Corridor Agreement (between agencies and private landowners).  In the Agreement, camping is limited to occurring only in designated areas.  The public expects designated camping areas to be allowed, especially on public lands.  There are currently only four camping sites on FWP property and one on private property in the Corridor.  The public has been vocal about their desire for one or more designated float-in site(s) on BLM property in what would be the Lower Blackfoot River Corridor under the RMP.

Alternatives B and C include "Consider developing a Scenic Driving loop."  Please provide more information on which road/s (paved and unpaved) this loop might involve.

Appendix L. Recreation Management Areas, Section 1.9 Lower Blackfoot River Corridor, Table 29, Implementation Actions (Pg. L-21): Designated camping in the Blackfoot River Corridor is addressed in Alternatives B and C. Camping is restricted to designated areas only, so we recommend that those be provided.

Appendix R. Rangeland Health Assessment, Table, Rangeland health Assessment (Pg. R-1): Please provide information on how often rangeland health assessments are conducted and whether this frequency varies among allotments.  For example, Arrastra Creek did not meet rangeland health standards, but was last surveyed in 2012 (Comments, Actions, Guidelines column lists "Rest sec 17 add t&c [terms & conditions]"). FWP would like to see more specifics about monitoring frequency, and subsequent effectiveness monitoring of implemented actions, particularly in Fish Key Watersheds.

FIGURE 1.  HEALTY FORESTS RESTORATION ACT DESIGNATED TREATMENT AREAS BLM MISSOULA MANAGEMENT AREA (Designated Areas in Dark Green)



# Exhibit C

# OFFICE OF THE GOVERNOR
### STATE OF MONTANA



STEVE BULLOCK
GOVERNOR

MIKE COONEY
LT. GOVERNOR

April 13, 2020

John Mehlhoff
State Director
BLM Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

RE:     Governor's Consistency Review of the Proposed Lewistown Field Office Resource Management
Plan Revision

Dear Director Mehlhoff:

The State of Montana has completed its consistency review of the Proposed Resource Management Plan
(PRMP) and Final Environmental Impact Statement (FEIS) for the Lewistown Field Office and portions
of the Butte Field Office. Thank you to you and your field staff for their efforts to answer questions and
share additional briefing on the proposed plan with state officials.

As Montana's governor, I support the balanced use of our public lands, to include both responsible
resource development as well as the conservation of significant fish and wildlife habitats and outdoor
recreation opportunities. Outdoor recreation supports $7.1 billion in direct consumer spending and 71,000
direct jobs in Montana, and managing for these resources will help to support diverse rural economies and
sustain our state's outdoor traditions. Hunting for big game alone accounts for nearly $4 million in annual
spending in Fergus and Petroleum counties in just four hunting areas within the LFO boundary and
underscores the importance of safeguarding critical wildlife habitat on our public lands in the region.

The Governor's Consistency Review is an important part of the process for creating, revising and
amending plans by the Bureau of Land Management (BLM) and has provided a number of opportunities
in the past to reconcile inconsistencies with the State of Montana in the interest of advancing
collaborative approaches to public lands management. In accordance with regulations 43 C.F.R. § 1610.3-
2, the State has identified the following issues with the proposed plan that are inconsistent with state laws,
plans, policies and programs. Thank you for your efforts to address these issues as you proceed with this
planning process.

Sincerely,

STEVE BULLOCK
Governor

Enclosure

I.      Backcountry Conservation Areas:

Lands managed by the Lewistown Field Office are located in Montana Fish Wildlife and Parks (FWP) Hunting Districts 410 and 417, which comprise some of the most renowned elk and mule deer hunting units in the nation. By design, the BCA management tool can conserve important habitats and recreation opportunities, while allowing for habitat management, public access, and ranching to co-exist on the landscape. However, absent protective measures such as no surface occupancy stipulations, ROW and development exclusions and others, the BCA designation may not adequately safeguard important wildlife habitat and primitive recreation experiences.

Presently, the BCAs identified in the planning area are managed by a Controlled Surface Use (CSU) stipulation for fluid mineral leasing where prior to surface use, occupancy or disturbance, a plan shall be prepared by the proponent and approved by the BLM, with notification to FWP. The plan must facilitate the long-term maintenance of big game wildlife populations and promote public access to support wildlife-dependent recreation and hunting opportunities.

Through their sovereign and statutory powers, states have primary management authority over fish and wildlife within their borders. Following decades of work, states have developed extensive science, expertise, and knowledge of species and habitats within their borders. While states exercise primary management authority over fish and wildlife within their borders, habitat for fish and wildlife often spans a patchwork of land ownership types, complicating state efforts to manage and conserve species under their management jurisdiction. Accordingly, the State of Montana believes this CSU stipulation in concert with the other limitations identified in the plan, does not frame the appropriate level of consultation that should be required prior to the authorization of surface disturbance and inappropriately vests the development of project design and mitigation measures solely within the purview of the project proponent. The State requests that the CSU stipulation clearly articulate a requirement for consultation, as opposed to notification, and that appropriate measures for dispute resolution be incorporated.

II.     Lands with Wilderness Characteristics

Inventorying and managing lands with wilderness characteristics remains an important part of the BLM's multiple use mission. Alternative C2 does not manage any of the 202,500 acres identified as having wilderness Characteristics, principally located along the eastern portion of the planning area, adjacent to the Charles M. Russell National Wildlife Refuge and the Upper Missouri River Breaks National Monument, to protect or preserve those values. Crooked Creek BCA is made up almost exclusively of these identified lands with wilderness character. BCA management in the Lewistown area under its current stipulations and exclusions does not offer an alternative to managing for wilderness characteristics. The State recommends the agency-identified lands with wilderness characteristics receive additional conservation protections through management prescriptions such as ROW exclusions, NSO,

and others as appropriate. The state is particularly concerned that the BLM is proposing to maintain routes not formally designated under travel planning or other NEPA processes creating potential to open additional sensitive areas to future motorized encroachments.

III.    ACECs

As you know, the Federal Land Policy and Management Act (FLPMA) requires that the BLM manage public lands for multiple-use and sustained yield, including the conservation and management of lands for recreation, watersheds, and fish and wildlife. FLPMA further requires the BLM to keep an updated inventory of public lands and give priority to areas of critical environmental concern (ACECs).

The State of Montana strongly recommends maintaining ACEC protections for Collar Gulch to ensure that degradation of the habitat and water quality from surface disturbing activities would not occur, protecting westslope cutthroat trout. The Collar Gulch ACEC was designated primarily due to the presence of a genetically pure population of westslope cutthroat trout. Although not considered aboriginal, the population is of conservation concern and considered high-risk of extirpation given the small population size and limited habitat available. The BLM's review of the Collar Gulch ACEC found that it met relevance and importance criteria to warrant ACEC status. The proposed plan's .5 mile NSO restrictions do not adequately protect these sensitive aquatic resources.

The Judith Mountains Scenic ACEC was found to meet the relevance criteria 1 and 2 and importance criteria 1 and 2 for regionally significant scenic values. It is one of the few forested mountain islands in the Great plains Physiographic Region. The BLM interdisciplinary team recommended in its January 2015 ACEC report to expand the ACEC to include the Crystal Cave area, which also meets the relevance and importance criteria. The state recommends that this portion of the Judith Mountain SRMA include ROW exclusion, wind energy exclusion, and NSO restrictions commensurate with these values despite the fact that wind and oil and gas potential is low for the area. The State's revised Comprehensive Outdoor Recreation Plan notes that all planning efforts should focus on identifying natural resources that are unique to a specific area and should make efforts to balance outdoor recreation use with the resource base. The state believes these additional management protections are consistent with that objective and reasonable in light of low development potential for the lands in question.


IV.    Administrative Access to State Trust Lands

Comments submitted on the draft RMP highlighted the importance of maintaining administrative access to state trust lands for future management purposes and for purposes of wildfire suppression. A response in the FEIS indicates that the BLM believes access for interagency wildfire suppression and response is maintained under the plan, but fails to address the needs for access for state trust lands management and use. The state requests that an affirmative statement acknowledging this access be included in the plan.

3

# Exhibit D



# OFFICE OF THE GOVERNOR
### STATE OF MONTANA

STEVE BULLOCK
GOVERNOR

MIKE COONEY
LT. GOVERNOR

April 13, 2020

John Mehlhoff
State Director
BLM Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

RE:     Governor's Consistency Review of the Proposed Missoula Field Office Resource Management
        Plan Revision

Dear Director Mehlhoff:

The State of Montana has completed its consistency review of the Proposed Resource Management Plan
(PRMP) and Final Environmental Impact Statement (FEIS) for the Missoula Field Office. Thank you to
you and your field staff for their efforts to answer questions and share additional briefing on the proposed
plan with state officials.

As Montana's governor, I support the balanced use of our public lands, to include both responsible
resource development as well as the conservation of significant fish and wildlife habitats and outdoor
recreation opportunities. Outdoor recreation supports $7.1 billion in direct consumer spending and 71,000
direct jobs in Montana, and managing for these resources will help to support diverse rural economies and
sustain our state's outdoor traditions.

The Governor's Consistency Review is an important part of the process for creating, revising and
amending plans by the Bureau of Land Management (BLM) and has provided a number of opportunities
in the past to reconcile inconsistencies with the State of Montana in the interest of advancing
collaborative approaches to public lands management. In accordance with regulations 43 C.F.R. § 1610.3-
2, the State has identified the following issues with the proposed plan that are inconsistent with state laws,
plans, policies and programs. Thank you for your efforts to address these issues as you proceed with this
planning process.

Sincerely,

STEVE BULLOCK
Governor

Enclosure

I.      Lands with Wilderness Characteristics and Backcountry Conservation Areas (BCAs)

Inventorying and managing lands with wilderness characteristics remains an important part of the BLM's multiple use mission. By design, the BCA management tool can conserve important habitats and recreation opportunities, while allowing for habitat management, public access, and ranching to co-exist on the landscape. However, absent protective measures such as no surface occupancy stipulations, ROW and development exclusions and others, the BCA designation may not adequately safeguard important wildlife habitat and primitive recreation experiences and should not be used as surrogate for management protections that should be afforded to lands with wilderness characteristics. The State recommends the agency-identified lands with wilderness characteristics receive additional conservation protections through management prescriptions such as ROW exclusions, NSO, and others as appropriate. The state further recommends that the BLM manage for wilderness characteristics in lands that are adjacent to inventoried roadless or wilderness study areas managed by the USDA forest service regardless of size to allow for future all-lands management and conservation opportunities. The State's revised Comprehensive Outdoor Recreation Plan notes that all planning efforts should focus on identifying natural resources that are unique to a specific area and should make efforts to balance outdoor recreation use with the resource base. The state believes these additional management protections are consistent with that objective and reasonable in light of low development potential for the lands in question.

II.     ACECs

As you know, the Federal Land Policy and Management Act (FLPMA) requires that the BLM manage public lands for multiple-use and sustained yield, including the conservation and management of lands for recreation, watersheds, and fish and wildlife. FLPMA further requires the BLM to keep an updated inventory of public lands and give priority to areas of critical environmental concern (ACECs).

Through their sovereign and statutory powers, states have primary management authority over fish and wildlife within their borders. Following decades of work, states have developed extensive science, expertise, and knowledge of species and habitats within their borders. While states exercise primary management authority over fish and wildlife within their borders, habitat for fish and wildlife often spans a patchwork of land ownership types, complicating state efforts to manage and conserve species under their management jurisdiction.

The State of Montana strongly recommends maintaining ACEC protections for the Bear Creek Flat's area. The FEIS indicates that other laws and regulations are in place to protect the wildlife and habitat values of this area, with significant emphasis on the protections provided by the Endangered Species Act to protect bald eagles and bull trout. Given these ESA protections may not be in place over the life of the plan and that state primary management responsibilities may be implicated in the future, ACEC protections remain appropriate.

# Exhibit E



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montana/Dakotas State Office
5001 Southgate Drive
Billings, Montana 59101
http://www.blm.gov/montana-dakotas



April 30, 2020

MAY 4 2020 PM 2:27

In Reply Refer To:
1610 (MT930)

The Honorable Governor Steve Bullock
Governor of Montana
Montana State Capitol Building
P.O. Box 200801
Helena, MT 59620-0801

Dear Governor Bullock:

Thank you for your letters dated April 13, 2020, in which you provided your consistency reviews of the Missoula and Lewistown Proposed Resource Management Plans (Proposed RMPs)/Final Environmental Impact Statements (EISs). The Governor's consistency review is an important part of the Bureau of Land Management's (BLM) land use planning process. Partnership between the State and the BLM is an integral part of successful land management. We greatly appreciate the time and attention of you and your staff on this important effort.

The BLM did not identify any specific inconsistency issues from your letter; however, we were able to address some of the concerns outlined in your letter either through a change in the Approved RMP, or a clarification of our intent. The specific responses to your issues are found below.

## 1. Missoula Proposed RMP Issue: Lands with Wilderness Characteristics and Backcountry Conservation Areas

**Governor's Concern**: Absent protective measures such as no surface occupancy stipulations (NSO), ROW (right-of-way) and development exclusions and others, the BCA (Backcountry Conservation Area) designation may not adequately safeguard important wildlife habitat and primitive recreation experiences and should not be used as surrogate for management protections that should be afforded to lands with wilderness characteristics. The state further recommends that the BLM manage for wilderness characteristics in lands that are adjacent to inventoried roadless or wilderness study areas managed by the USDA Forest Service regardless of size to allow for future all-lands management and conservation opportunities. The State's revised Comprehensive Outdoor Recreation Plan notes that all planning efforts should focus on

identifying natural resources that are unique to a specific area and should make efforts to balance outdoor recreation use with the resource base.

**BLM Response:** The Missoula Proposed RMP balances outdoor recreation use with the resource base similar to the State's Comprehensive Outdoor Recreation Plan. The BCA allocations are areas with generally intact, undeveloped lands that contain priority habitats for recreationally important fish and wildlife species, and that provide high-quality wildlife-dependent recreation opportunities afford by those species.

The Missoula Proposed RMP does not have NSO stipulations because these are applicable when making fluid mineral decisions in an RMP. Due to the negligible oil and gas potential in the Missoula FO, fluid mineral decisions are not being made as part of this planning effort. The ROW avoidance allocation for all three BCAs in the Proposed RMP does contain specific language to consider the function and suitability of the wildlife habitat. Additionally, the ROW exclusion allocation recommendation for the Wales Creek BCA (2,300 acres) would be an unnecessary allocation given the negligible possibility of a ROW in this area. There are no ROWs in the proposed Wales Creek BCA, nor any reasonably foreseeable ROW requests given the parcels are adjacent to the Wales Creek WSA and not in close proximity to any existing structures or infrastructure. There are also no active grazing allotments existing or proposed in the Wales BCA.

The Wales BCA will be managed to meet the Proposed RMP objective to: "Provide dispersed wildlife-dependent recreation opportunities including but not limited to hunting, camping, wildlife viewing and hiking. Conserve, maintain, restore and enhance high quality habitat for recreationally dependent fish and wildlife species".

This issue does not identify any specific inconsistency between the BLM actions and State or local resource related plans, policies, or programs. And the above direction shows that the Missoula Proposed RMP provides a balance of outdoor recreation with the resource base, making it consistent with the referenced general guidance of the revised State Comprehensive Outdoor Recreation Plan.

## 2. Missoula Proposed RMP Issue: Areas of Critical Environmental Concern (ACECs)

**Governor's Concern:** While states exercise primary management authority over fish and wildlife within their borders, habitat for fish and wildlife often spans a patchwork of land ownership types, complicating state efforts to manage and conserve species under their management jurisdiction. The State of Montana strongly recommends maintaining ACEC protections for the Bear Creek Flat's area. The Final EIS indicates that other laws and regulations are in place to protect the wildlife and habitat values of this area, with significant emphasis on the protections provided by the Endangered Species Act to protect bald eagles and bull trout. Given these ESA protections may not be in place over the life of the plan and that state primary

3

management responsibilities may be implicated in the future, ACEC protections remain appropriate.

**BLM Response**: The relevant and important values of the Bear Creek Flat's area will be protected under the Proposed RMP. A delisting of the bull trout is not reasonably foreseeable at this time. However, if at any time over the life of this plan the USFWS makes a determination (subject to public involvement) that any species are no longer protected by the Endangered Species Act, BLM would continue to work with the State, and implement any USFWS conservation and recovery plans, etc. Similarly, the eagle is afforded protections from the Bald and Golden Eagle Protection Act, which provides protection for eagles, their feathers and parts, nest trees, winter/nighttime roosts, as well as the Migratory Bird Treaty Act which prohibits the taking, killing, possession, transportation, and importation of migratory birds, their eggs, parts, killing, and nests except as authorized under a valid permit. Congressional removal of these federal laws is not reasonably foreseeable at this time.

In the case of a delisting under the ESA, any delisted species would become a Bureau Sensitive Species for a minimum of five years. The BLM would be required to follow any conservation plans and, if delisting ever occurs, the USFWS delisting recovery plans. Whether listed under the ESA or identified as a Bureau Sensitive Species, the bull trout habitat and bald eagle habitat in Bear Creek Flats, and other parts of the planning area must: "Manage terrestrial special status species in a manner consistent with restoration, conservation, recovery plans, and conservation agreements; inventory and monitor in cooperation with USFWS; Forest Service; Montana Fish, Wildlife, and Parks; and Montana Natural Heritage Plans." In addition to conservation and recovery plans, the Missoula Proposed RMP states that the BLM, at the project level, will: "Implement design features to restore habitats, and to avoid or reduce impacts to Bureau sensitive species, priority species, including elk and migratory birds (Appendix P); develop site-specific design features or best management practices as appropriate."

Beyond the bull trout and bald eagle, the mature ponderosa pines were identified as one of the important values of the area. The BLM modified the Proposed RMP to include management for the mature ponderosa pines in the Bear Creek Flats area under *Forest Vegetation and Special Status Species*; Management Action 12 requires the BLM to "Manage the Bear Creek Flats mature ponderosa pine trees (40 acres) to maintain the late-successional, mature values."

Our partnership with Montana Fish Wildlife and Parks is essential to facilitate effective habitat management, as MTFWP provides the Missoula BLM with terrestrial wildlife habitat layers and population data. We will continue to coordinate with the State of Montana and USFWS. The RMP specifically states: "Create wildlife habitat management consistent with U.S. Department of the Interior guidance and the Montana Department of Fish and Wildlife objectives. Coordinate with the Montana Department of Fish, Wildlife, and Parks pursuant to Secretarial Order 3362 to enhance and improve the quality of big-game winter range and migration corridors on federal lands."

4

This issue does not identify any specific inconsistency between the BLM actions and State or local resource related plans, policies, or programs.

## 3. Lewistown Proposed RMP Issue:  Backcountry Conservation Areas

**Governor's Concern**: By design, the BCA management tool can conserve important habitats and recreation opportunities, while allowing for habitat management, public access, and ranching to co-exist on the landscape. However, absent protective measures such as NSO stipulations, ROW and development exclusions and others, the BCA designation may not adequately safeguard important wildlife habitat and primitive recreation experiences.  While states exercise primary management authority over fish and wildlife within their borders, habitat for fish and wildlife often spans a patchwork of land ownership types, complicating state efforts to manage and conserve species under their management jurisdiction. Accordingly, the State of Montana believes this CSU (controlled surface use) stipulation in concert with the other limitations identified in the plan, does not frame the appropriate level of consultation that should be required prior to the authorization of surface disturbance and inappropriately vests the development of project design and mitigation measures solely within the purview of the project proponent. The State requests that the CSU stipulation clearly articulate a requirement for consultation, as opposed to notification, and that appropriate measures for dispute resolution be incorporated.

**BLM Response**:  The BCA management tools (e.g., CSU, ROW avoidance areas, etc.) do allow for protective measure for wildlife habitat. For instance, using a CSU with objectives specifically to facilitate the long-term maintenance of big game wildlife populations does allow protection of the habitat (i.e., habitat can be protected with measures other than NSO).  The RMP also contains goals and objectives and stipulations for wildlife habitat that apply to all BLM managed lands and minerals (e.g., NSOs for protecting specific wildlife habitats like Greater-Sage Grouse, raptor nests, etc.).

We will continue to coordinate with the State on our actions that have the potential to affect wildlife.  The use of the term 'notify' versus 'consult' does not constitute a consistency issue; the RMP specifically states, as a Planning Criteria that: "The BLM will recognize the State of Montana's responsibility to manage wildlife populations, including uses such as hunting and fishing. Coordination with the State of Montana will be conducted pursuant to Secretarial Order 3362 to enhance and improve the quality of big-game winter range and migration corridors on federal lands".  Notification requirements in an oil and gas stipulation do not negate this overall direction in our RMP to coordinate with the State of Montana; it is another requirement in the Proposed RMP in addition to the overarching coordination requirements.

## 4. Lewistown Proposed RMP Issue:  Lands with Wilderness Characteristics

**Governor's Concern**: Alternative C2 does not manage any of the 202,500 acres identified as having wilderness Characteristics, principally located along the eastern portion of the planning

5

area, adjacent to the Charles M. Russell National Wildlife Refuge and the Upper Missouri River Breaks National Monument, to protect or preserve those values. Crooked Creek BCA is made up almost exclusively of these identified lands with wilderness character. BCA management in the Lewistown area under its current stipulations and exclusions does not offer an alternative to managing for wilderness characteristics. The State recommends the agency-identified lands with wilderness characteristics receive additional conservation protections through management prescriptions such as ROW exclusions, NSO, and others as appropriate. The state is particularly concerned that the BLM is proposing to maintain routes not formally designated under travel planning or other NEPA processes creating potential to open additional sensitive areas to future motorized encroachments.

**BLM Response:** While the Lewistown Proposed RMP doesn't manage specifically for wilderness characteristics, the Proposed RMP provides other management actions within BCAs, Greater Sage-Grouse habitat and Special Recreation Management Areas (SRMAs) that offer management direction that is complimentary to maintaining wilderness characteristics. For example, under the Proposed RMP, 93,400 acres of lands with wilderness characteristics in the Crooked Creek Area would be managed as a BCA and has similar management actions as were proposed for wilderness characteristics management (e.g., ROW Avoidance and Visual Resource Management Class II).

The BLM is unaware of any known proposals to maintain routes not formally designated during travel planning. In fact, the RMP specifically states: "The BLM would pursue opportunities to conduct restoration of routes not designated during travel management planning, with priority given to areas with special management concerns." This issue does not identify an inconsistency between the BLM actions and State or local resource related plans, policies, or programs.

## 5. Lewistown Proposed RMP Issue: ACECs – Collar Gulch

**Governor's Concern:** The State of Montana strongly recommends maintaining ACEC protections for Collar Gulch to ensure that degradation of the habitat and water quality from surface disturbing activities would not occur, protecting westslope cutthroat trout. The Collar Gulch ACEC was designated primarily due to the presence of a genetically pure population of westslope cutthroat trout. Although not considered aboriginal, the population is of conservation concern and considered high-risk of extirpation given the small population size and limited habitat available. The BLM's review of the Collar Gulch ACEC found that it met relevance and importance criteria to warrant ACEC status. The proposed RMP's .5-mile NSO restrictions do not adequately protect these sensitive aquatic resources.

**BLM Response:** During the planning process, additional westslope cutthroat trout (WSCT) fisheries outside of Collar Gulch were identified by Montana Fish, Wildlife and Parks that warrant management attention. As a result, the Lewistown Proposed RMP was modified from the Draft EIS/Draft RMP to include a Required Design Feature when authorizing surface disturbing activities within .5 miles from centerline of any stream containing known populations of 90-100 percent genetically pure WSCT. This would provide protections for WSCT in Collar

6

Gulch, as well as Alpine Gulch and extend to future restoration sites and populations outside of the Judith Mountains.

Although this issue does not identify an inconsistency between the BLM actions and State or local resource related plans, policies, or programs, the Approved RMP for the Judith SRMA will be modified to: (1) include a requirement that future management activities be designed to emphasize the protection and enhancement of wildlife habitat and fisheries, and cave and karst resources; and (2) emphasize non-motorized/mechanized travel in watersheds containing populations of WSCT within the Judith Mountains SRMA during future site-specific travel planning.

## 6. Lewistown Proposed RMP Issue:  ACECs – Judith Mountains

**Governor's Concern**: The Judith Mountains Scenic ACEC was found to meet the relevance criteria 1 and 2 and importance criteria 1 and 2 for regionally significant scenic values. It is one of the few forested mountain islands in the Great plains Physiographic Region. The BLM interdisciplinary team recommended in its January 2015 ACEC report to expand the ACEC to include the Crystal Cave area, which also meets the relevance and importance criteria. The state recommends that this portion of the Judith Mountain SRMA include ROW exclusion, wind energy exclusion, and NSO restrictions commensurate with these values despite the fact that wind and oil and gas potential is low for the area. The State's revised Comprehensive Outdoor Recreation Plan notes that all planning efforts should focus on identifying natural resources that are unique to a specific area and should make efforts to balance outdoor recreation use with the resource base. The state believes these additional management protections are consistent with that objective and reasonable in light of low development potential for the lands in question.

**BLM Response:**  Planning generally focuses restrictions where the potential for impacts from development is moderate/high and there are the potential for impacts to resources (e.g., water bodies, cultural sites, etc.), versus where potential is low/negligible, and therefore does not include additional restrictions where the resource development potential is negligible (with some exceptions).  Although the entire SRMA is not an NSO for oil and gas, there are NSO stipulations and Required Design Features applied to protect applicable resources such as streams, steep slopes, and various wildlife and fisheries NSOs.

This issue does not identify any specific inconsistency between the BLM actions and State or local resource related plans, policies, or programs; however, the Approved RMP for the Judith SRMA will be modified to include a requirement that future management activities be designed to emphasize the protection and enhancement of wildlife and fisheries habitat and associated cave resources. The Lewistown Proposed RMP also contains actions to develop a site-specific cave management plan and coordinate access with the State of Montana for Crystal Cave.

7

## 7. Lewistown Proposed RMP Issue: Administrative Access to State Trust Lands

**Governor's Concern:** Comments submitted on the draft RMP highlighted the importance of maintaining administrative access to state trust lands for future management purposes and for purposes of wildfire suppression. A response in the Final EIS indicates that the BLM believes access for interagency wildfire suppression and response is maintained under the plan but fails to address the needs for access for state trust lands management and use. The state requests that an affirmative statement acknowledging this access be included in the plan.

**BLM Response:** This issue does not identify an inconsistency between the BLM actions and State or local resource related plans, policies, or programs. The BLM will continue to provide access to non-federal inholdings, including state school trust lands, in accordance with existing law, regulations, and policy. The BLM does consider access by the State to be administrative access; therefore, to clarify this issue, the definition of administrative access in the glossary in the Approved RMP will be adjusted to specify that the State of Montana is included in our definition of administrative access.

Please note that you have the opportunity to appeal this response to the Director of the BLM pursuant to 43 CFR 1610.3-2(e). An appeal must be filed within 30 days of your receipt of this letter. Please submit appeals to:

> BLM Washington Office
> Attention: Director of the BLM
> 1849 C Street NW, Rm. 5665
> Washington DC 20240

Thank you for your interest and participation in the Missoula and Lewistown planning efforts. We look forward to a continuing partnership with the State of Montana on implementation of these plans. Again, we appreciate the time and attention that you and your staff have placed on this important effort, especially knowing how busy you and your agencies have been during this time of the COVID-19 pandemic. If you have questions regarding the above responses, please feel free to contact me at 406-896-5012, or jmehlhoff@blm.gov.

> Sincerely,
>
> John Mehlhoff
> State Director
> Montana/Dakotas BLM

# Exhibit F

U.S. Department of the Interior

**Bureau of Land Management**

# Record of Decision and Approved Lewistown Resource Management Plan



**July 2020**

The Bureau of Land Management's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

Cover Photo Credit: Ken Dickerson/BLM

BLM/MT/PL-20/004+1610



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Montana/Dakotas State Office
5001 Southgate Drive
Billings, Montana  59101
http://www.blm.gov/montana-dakotas

July, 2020

In Reply Refer To:
1610 (MT930)

Dear Reader:

The Bureau of Land Management (BLM) is pleased to announce that the BLM Lewistown Approved Resource Management Plan (RMP) is complete. The Approved RMP will provide guidance for managing approximately 651,200 acres of BLM-administered public lands and 1,196,800 acres of federal mineral estate across Cascade, Chouteau, Fergus, Judith Basin, Lewis and Clark, Meagher, Petroleum, Pondera and Teton counties in central Montana.

The enclosed Record of Decision (ROD) for the Butte Field Office and Lewistown Field Office and Approved RMP were prepared in accordance with the Federal Land Policy and Management Act of 1976, as amended, and the National Environmental Policy Act of 1969, as amended. The ROD's approval serves as the final decision for all land use planning and implementation decisions described in the enclosed Lewistown Approved RMP.

The Proposed RMP/Final Environmental Impact Statement (EIS) was subject to a 30-day protest period that ended on March 16, 2020. The BLM received 150 protest letters, and the BLM Director reviewed all protest issues for the proposed planning decisions. The Director concluded that the BLM Montana State Director followed the applicable laws, regulations, and policies, and considered all relevant resource information and public input. The BLM Director addressed the protests, and that decision is the final decision of the US Department of the Interior.

The 60-day Governor's consistency review period for the Proposed RMP/Final EIS, which promotes consistency with State government plans or policies, concluded on April 13, 2020. The Governor submitted a letter identifying some concerns in response to the consistency review. The BLM did not identify any specific inconsistency issues from this review; however, some of the concerns outlined in the Governor's letter are addressed either through a change in the Approved RMP, or either as a change or a clarification of our intent. Section I.2.1 *Clarifications and Modifications* of the attached document provides a complete description of changes since the Lewistown Proposed RMP/Final EIS.

The ROD and Approved RMP are available online at the BLM's ePlanning site https://eplanning.blm.gov. Limited printed copies or flash drive copies are available by request from the Lewistown Field Office, 920 NE Main Street, Lewistown, Montana 59457, or by calling (406) 538-1900.

The BLM greatly appreciates all those who contributed to the Lewistown RMP planning effort, particularly members of the public, who provided important feedback; our cooperating agencies, which included federal, state, local governments; and tribes. The extensive public interest and involvement in this planning process ensured that the Approved RMP will sustain the health, diversity, and productivity of BLM-administered lands for present and future generations to use and enjoy.

Sincerely,

John Mehlhoff
State Director, Montana/Dakotas BLM

# Lewistown

# Record of Decision

# and

# Approved Resource Management Plan

**Prepared by US Department of the Interior**
**Bureau of Land Management**
**Lewistown Field Office**
**Lewistown, Montana**

**Cooperating Agencies:**

US Department of the Interior, Fish and Wildlife Service (Charles M. Russell National Wildlife Refuge)
Montana Department of Natural Resources and Conservation (Northeastern Land Office)
Montana Fish, Wildlife and Parks
Indian Butte Cooperative State Grazing District
Fergus County
Judith Basin County
Lewis and Clark County
Pondera County
Petroleum County

**July 2020**

This page intentionally left blank.

# TABLE OF CONTENTS

Chapter                                                                                                          Page

**I. RECORD OF DECISION** ...................................................................................................... I-1

I.1    Introduction................................................................................................................ I-3
    I.1.1    Overview......................................................................................................... I-3
    I.1.2    Description of the Planning Area .............................................................. I-3
I.2    Decision..................................................................................................................... I-3
    I.2.1    Clarifications and Modifications................................................................. I-3
    I.2.2    Mitigation Measures...................................................................................... I-5
    I.2.3    Plan Monitoring............................................................................................. I-5
I.3    Alternatives............................................................................................................... I-5
    I.3.1    Introduction................................................................................................... I-5
    I.3.2    Alternatives and Issues Considered but Not Analyzed in Detail ............. I-6
    I.3.3    Alternatives Analyzed in Detail.................................................................. I-8
I.4    Management Considerations and Decision Rationale ....................................... I-10
I.5    Application of the Resource Management Plan to Existing Projects ............. I-11
I.6    Public Involvement................................................................................................ I-11
    I.6.1    Public Scoping............................................................................................. I-11
    I.6.2    Public Review of and Comment on the Draft EIS/RMP........................ I-12
    I.6.3    Protest Resolution – Proposed RMP/Final EIS....................................... I-12
    I.6.4    Governor's Consistency Review ............................................................... I-13
I.7    Consultation and Coordination.......................................................................... I-13
    I.7.1    Cooperating Agencies Collaboration ....................................................... I-13
    I.7.2    Tribal Government-to-Government Consultation .................................... I-14
    I.7.3    US Fish and Wildlife Service Section 7 Consultation............................. I-14
    I.7.4    State Historic Preservation Office Section 106 Consultation................. I-14
I.8    Availability of the Plan ......................................................................................... I-15
I.9    Approval .................................................................................................................. I-16

**II. APPROVED RESOURCE MANAGEMENT PLAN** ............................................................... II-1

II.1    Introduction............................................................................................................ II-3
    II.1.1    Purpose of and Need for the Resource Management Plan....................... II-3
    II.1.2    Lewistown Planning Area and Decision Area .......................................... II-4
    II.1.3    Scoping And Issues...................................................................................... II-4
    II.1.4    Planning Criteria and Legislative Constraints .......................................... II-6
    II.1.5    Planning Process.......................................................................................... II-8
    II.1.6    Related Plans and Policy ............................................................................. II-9
II.2    Management Decisions .......................................................................................... II-9
    II.2.1    Links to Approved RMP Decisions ......................................................... II-13
II.3    Public Involvement.............................................................................................. II-55
II.4    Management Plan Implementation .................................................................... II-55
II.5    RMP Evaluation, Amendment, Maintenance, Monitoring, and Adaptive Management .... II-55
    II.5.1    RMP Evaluation ......................................................................................... II-55
    II.5.2    RMP Monitoring......................................................................................... II-56
    II.5.3    Adaptive Management............................................................................... II-56
II.6    References.............................................................................................................. II-57
II.7    Glossary.................................................................................................................. II-60

# TABLES
<div align="right">Page</div>

1-1     Planning Issue Categories and Statements................................................................................II-5
II-2    RMP Program Categories and Abbreviations ........................................................................II-9
II-3    RMP Types of Decisions and Abbreviations .......................................................................II-11
II-4    Approved RMP Decisions.......................................................................................................II-14

# APPENDICES

**Appendix D    Implementation and Monitoring**
**Appendix F    Design Features and Best Management Practices**
**Appendix G    Reclamation**
**Appendix H    Air Resource Management Plan: Adaptive Management Strategy**
**Appendix I    Fire and Emergency Stabilization and Rehabilitation**
**Appendix J    Impoundments**
**Appendix L    Stipulations and Allocations Applicable to Fluid Minerals Leasing**
**Appendix Q    Recreation Management Areas**
**Appendix R    Land Tenure Adjustment Categories**
**Appendix S    Withdrawal Segregations**
**Appendix U    Land Management Allocations**

**MAP Appendix A    Figures**

## ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| CFR | Code of Federal Regulations |
| CPW | Colorado Department of Natural Resources, Parks and Wildlife |
| CSU | controlled surface use |
| Decision Area | public lands and federal mineral estate managed by the BLM |
| DOI | Department of the Interior |
| EIS | environmental impact statement |
| ERMA | extensive recreation management area |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| Forest Service | United States Department of Agriculture, Forest Service |
| GIS | geographic information systems |
| LWCF | Land and Water Conservation Fund |
| NEPA | National Environmental Policy Act |
| NGD | no ground disturbance |
| NSO | no surface occupancy |
| OHV | off-highway vehicle |
| Planning Area | Lewistown Field Office boundary, including all lands regardless of ownership, including those portions of the Butte Field Office in Northern Lewis and Clark County |
| RMP | resource management plan |
| RMZ | recreation management zone |
| ROD | record of decision |
| ROW | right-of-way |
| SRMA | special recreation management area |
| SRP | special use permit |
| SSR | site-specific relocation |
| TL | timing limitation |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| VRM | visual resource management |
| WSA | wilderness study area |
| WSR | Wild and Scenic River |

This page intentionally left blank.

# I. RECORD OF DECISION

This page intentionally left blank.

## 1.1   INTRODUCTION

### 1.1.1   OVERVIEW

The United States (US) Department of the Interior, Bureau of Land Management (BLM) uses Resource Management Plans (RMPs) to guide management of the land it administers. This Record of Decision (ROD) approves the BLM's proposal to manage BLM-administered lands and minerals in the Lewistown Field Office (Lewistown FO), and a portion of the Butte Field Office (Butte FO), as presented in the attached approved Resource Management Plan (RMP). The decision regarding BLM surface lands and minerals covered by the Lewistown Approved RMP revise the Headwaters RMP (BLM 1984) and Judith-Valley-Phillips RMP (BLM 1994). The Approved RMP is similar to the Proposed Plan (Alternative C2) in the Lewistown Proposed RMP/Final Environmental Impact Statement (FEIS). Wherever the term RMP is used below, it refers to the Approved RMP. The background and rationale for approving the decisions in the Proposed Plan (as modified, in consideration of public and agency comments, public protest, and the Governor's consistency review) are described in this ROD.

### 1.1.2   DESCRIPTION OF THE PLANNING AREA

The Lewistown RMP planning area comprises all or portions of nine counties in central Montana: Cascade, Chouteau, Fergus, Judith Basin, Lewis and Clark, Meagher, Petroleum, Pondera, and Teton. In the planning area, BLM-administered surface lands are intermingled with National Forest System land, National Wildlife Refuges (NWR), lands managed by the US Army Corps of Engineers and the US DOI, Bureau of Reclamation (BOR), and state, private, and tribal lands, including federal lands where tribes retain treaty rights. In total, the planning area covers 12,906,800 surface acres, and the decision area covers approximately 651,200 surface acres and 1,196,800 acres of federal mineral estate. A map of the decision area and land ownership in the planning area is in **Map Appendix A; Figure A1-A2**.

## 1.2   DECISION

The decision is hereby made to approve the attached RMP. The BLM has determined that the Proposed Plan (as modified, in consideration of public and agency comments, public protest, and the Governor's consistency review) is the most consistent with the purposes, policies, and programs associated with implementing its legal mandates.

The BLM prepared the Lewistown RMP in accordance with NEPA, the Council on Environmental Quality (CEQ) regulations implementing NEPA (40 Code of Federal Regulations [CFR] 1500–1508), the US Department of the Interior NEPA regulations (43 CFR 46), and the requirements of the BLM's NEPA Handbook, H-1790-1 (BLM 2008a).[1] Management decisions identified in the Approved RMP are final and become effective when this ROD is signed.

### 1.2.1   CLARIFICATIONS AND MODIFICATIONS

As a result of internal review, protests, the Governor's Consistency Review and ongoing consultation, the BLM made some clarifications and modifications between the Proposed RMP/Final EIS and the Approved RMP. These clarifications and modifications are listed below (minor grammatical or editorial

---

[1] BLM (Bureau of Land Management). 2008. Handbook H-1790-1. BLM NEPA Handbook. Washington, DC. January 2008.

changes are not included).  None of the clarifications or modifications are substantial changes to the Proposed Plan, relevant to environmental concerns, that would require the need for a supplemental analysis (40 CFR 1502.9(c)).

The modifications or clarifications that result in changes specific to goals, objectives, management actions or allowable use are:

- The Proposed RMP/Final EIS (Page 2-19, Row 138) included direction to manage habitat in accordance with the Northern Continental Divide Ecosystem (NCDE) Conservation Strategy for Grizzly Bears. The Conservation Strategy prescribes No Surface Occupancy (NSO) for fluid mineral leasing in PCAs and Zone 1. Appendix 2 (Management Allocations: Minerals) did not accurately reflect this direction and therefore was not consistent with FW-MA-17.  Appendix U.2 was adjusted and an allowable use to reflect this stipulation (FW-AU-32) is being included in Section II. A complete description of the stipulation is also included in Appendix L.

- In response to the Governor's comments on the Draft RMP/Draft EIS, and to be consistent with the other Montana BLM RMPs, the oil and gas stipulations were modified for the Proposed RMP/ FEIS; however, the NSO-State Lands stipulation was inadvertently omitted from the Proposed RMP/Final EIS. A stipulation addressing leasing in state parks, fishing access sites and state wildlife management areas has been included as an Allowable Use in REC-AU-04 and is listed in App.L.

- Management actions specific to land tenure (LR-MA-05, LR-MA-08 and LR-MA-09) were clarified to accurately reflect that no lands in Category II are available for FLPMA Section 203 sale. Appendix R and the Glossary were adjusted to match management actions accordingly.

- Comments were received on the Proposed Plan from the Hunting and Shooting Sports Conservation Council Federal Advisory Committee and the Montana Governor requesting that the Backcountry Conservation Areas (BCAs) be allocated as a Wind Exclusion area vs. a Wind Avoidance area.  Both allocations were analyzed in the Final EIS and due to the very low potential for wind development in this area, the impacts were similar.  Though the likelihood of a wind development in these BCAs is very low (due to no nearby infrastructure and other factors), wind turbines would affect the wildlife-dependent recreation values of the BCAs; therefore, the allocation has been changed to Wind Exclusion.

The clarifications, corrections and/or minor modifications that do not result in changes specific to goals, objectives, management actions or allowable use are:

- Clarification is provided here that the EIS does not consider Target Shooting a 'hazardous activity'; rather, it is a public safety topic in high visitor use areas and/or developed recreation sites and  was included under the Public Safety section of the EIS because the management action/restriction in the Proposed Plan related to Target Shooting was "Discharge of firearms is prohibited in all developed recreation sites (campgrounds, trailheads, picnic areas, etc.) per 43 CFR 8365.2-5(a)."

- As a result of the Governor's Consistency Review, Appendix Q - Judith Mountains Special Recreation Management Area (SRMA) - was modified to include management of wildlife/wildlife habitat, westslope cutthroat trout and cave and karst resources within the SRMA to better align with State wildlife and fish species management objectives.

- Management actions in the Lewistown Proposed RMP/FEIS included an allowable use stipulation for NSO within the two ACECs proposed for designation (Square Butte and Acid-Shale Pine Forest). See page U-6 for a description of those actions. It was also displayed in the Minerals U.12 Section correctly.   However, the stipulation language was not listed in the appendix of the Proposed RMP/FEIS and it is now included in the Approved RMP (Appendix L) for clarification.

- The Final EIS renewable energy maps for Alternatives B, C2, and D were missing the potential wind development areas. This was a "display-only" error that did not affect the acres calculations or impact analysis.
- As a result of the Governor's Consistency Review the definition for 'administrative access' was clarified in the glossary to include the official duties of state and federal partners as administrative use for access on BLM lands.
- LG-MA-06 was modified from 'would' to 'may'. This was due to a technical error from an administrative draft that was incorrectly incorporated into the Lewistown PRMP/FEIS.
- The Controlled Surface Use (CSU) stipulation for Greater Sage-Grouse (General Habitat Management Areas) in Appendix L (pg. L-25) was reworded for greater clarity (i.e., it now aligns with the 2015 HiLine and Miles City RMPs.  This clarifies that, for General Habitat Management Areas, the CSU stipulation applies to a 2-mile buffer around a lek and the NSO stipulation applies to a .6-mile buffer.
- The management action (FW-MA-17) was updated from the "2018 Conservation Strategy" to the "Current Conservation Strategy."
- A definition of "Management Actions" was added to the glossary.

## I.2.2  MITIGATION MEASURES

Mitigation broadly includes any means that would reduce or avoid adverse effects of the proposed action. The Council on Environmental Quality states that mitigation includes avoiding, minimizing, rectifying, reducing or eliminating over time, and compensating for adverse environmental impacts (40 CFR 1508.20). A ROD must state whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why not (40 CFR 1505.2(c)).

In the Lewistown RMP, most of the measures that would avoid, minimize, rectify, or reduce environmental impacts are integral to the design of the alternatives and have been included in the designations, allocations, and actions.

The Approved RMP adopts the mitigations included in the Proposed Plan. All mitigations adopted in the Approved RMP were included as part of the Proposed Plan's design in the EIS; there are no additional mitigation measures adopted with this decision. The Approved RMP incorporates measures that include restrictions on uses such as seasonal closures, and application of Best Management Practices (BMPs) and Required Design Features (RDFs).

## I.2.3  PLAN MONITORING

The CEQ regulations implementing NEPA state that agencies may monitor to ensure that their decisions are carried out, and they should do so in important cases (40 CFR 1505.2(c)). To meet these requirements, the BLM will prepare periodic reports on the implementation of the Approved RMP. The BLM will use land use plan evaluations to determine if the decisions in this Approved RMP, supported by the accompanying NEPA analysis, are still valid. Additional information on implementation and monitoring is in Section II.5.4 of the Approved RMP. Adaptive Management is discussed in Section II.5.5.

# I.3   ALTERNATIVES

## I.3.1  INTRODUCTION

The Federal Land Policy and Management Act (FLPMA) directs the BLM to develop RMPs as the primary means to identify and allow for appropriate uses of BLM-administered land. The RMP decisions establish

goals and objectives (desired outcomes) for resource management that guide future implementation decisions. In addition, the RMP also identifies measures necessary for achieving the outcomes, expressed as management actions (proactive management techniques) and allowable uses (lands that are open or closed to certain uses), including any restrictions on uses.

The NEPA requires the development and consideration of a reasonable range of alternatives, including a no action alternative, to analyze impacts and guide decision-makers in developing and selecting the Approved RMP. The BLM developed five alternatives and analyzed them in detail in the Proposed RMP/ Final EIS.

## 1.3.2   ALTERNATIVES AND ISSUES CONSIDERED BUT NOT ANALYZED IN DETAIL

### Analyzing an Alternative that Makes All Lands in the Planning Area Unavailable for Livestock Grazing and Eliminates Livestock Forage Allocation

No issues or conflicts were identified during this land use planning project to warrant the complete elimination of livestock grazing across the planning area. The analysis of an alternative entirely eliminating grazing was not needed; this is because the BLM has considerable discretion through its grazing regulations to determine and adjust stocking levels, seasons-of-use, and grazing management  activities and to allocate forage to uses of the public lands in RMPs.

From 1956 through 1972, the BLM conducted a classification of public lands to estimate the amount of available forage in the planning area. From this project, the BLM generated multiple subbasin reports, which provided the carrying capacities by AUMs for all BLM-administered lands at the time of survey. These are typically referred to as the Missouri River Basin Surveys. The BLM, in cooperation with grazing advisory boards, used the information to make adjustments to the AUMs allocated to grazing permits and leases. This cooperation resulted in making appropriate changes to grazing permits in the planning area. Generally, livestock allocation levels were estimated to be approximately 30 to 50 percent of the annual vegetation production of area landforms. These changes were implemented before 1975.

These historical grazing allocations have been adjusted over time and were subsequently included in the 1984 and 1994 RMPs and were carried forward in the EIS. The historical forage allocations are validated periodically, which can occur independently or can coincide with the renewal of each 10-year grazing permit or lease.

The BLM fully analyzed eliminating livestock grazing in the Lewistown FO Greater Sage-Grouse Proposed RMP Amendment/Final EIS (BLM 2015b). The analysis was done for priority habitat management areas (PHMA) and general habitat management areas (GHMA). These areas constitute 337,165 acres of BLM-administered lands occurring throughout Chouteau, Fergus, Judith Basin, Meagher, and Petroleum Counties, with 69,408 associated AUMs, all of which are in the planning area.

Current resource conditions on BLM-administered land, including range vegetation, watershed, and wildlife habitat, as reflected in land health assessments, do not warrant an area-wide prohibition of livestock grazing. Following initial surveyed forage allocations, the basis for increasing or decreasing permitted use has been land health evaluations, inventories, and monitoring data (vegetative and levels of use). Suitable measures, which could include reducing or eliminating livestock grazing, were provided for in the EIS. They could become necessary in specific situations where livestock grazing causes or contributes to conflicts with protecting or managing other resource values or uses. Such determinations would be made during site-specific activity planning or permit renewal and their associated environmental review.

### Master Leasing Plan

During public scoping for the Lewistown RMP, the Montana Wilderness Association submitted the following proposal to produce three master leasing plans within the planning area:

Southeast portion of the planning area. This is the area south of Highway 200 and east of Highway 87. This includes the Elk Creek, Pike Creek, Cemetery Road, Cat Creek, and Cottonwood Creek potential lands with wilderness characteristics  units. This area has recognized conflicts between recreational opportunities and oil and gas development.

North-central portion of the planning area. This is the area north of Winifred, including Chimney Bend, Woodhawk Creek, Dry Armells, and Armells Creek potential lands with wilderness characteristics units. This area has recognized conflicts between oil and gas development and wildlife habitat, and between oil and gas development and recreational opportunities.

Western portion of the planning area along the Rocky Mountain Front. This area includes Blind Horse Creek, Ear Mountain, Chute Mountain, Deep Creek/Battle Creek, and Beaver Meadows potential lands with wilderness characteristics  units, and the North Fork Sun River WSA . This area has recognized conflicts between oil and gas development and wildlife habitat, and between oil and gas development and recreational opportunities.

The BLM rescinded its Master Leasing Plan policy on January 31, 2018, and did not initiate any new Master Leasing Plans.  Stipulations were analyzed in all action alternatives that address conflicts with wildlife habitat and recreation. Oil and gas lease stipulations and lease notices in the Approved RMP will apply to all new leases and terminated leases that are reinstated. Any activity-level or project-specific authorization or management action must conform with the Approved RMP (i.e., be specifically provided for in the RMP or consistent with the terms, conditions, and decisions in the Approved RMP; 43 CFR 1601.0-5(b)). In accordance with IM-2018-026, where the BLM has a backlog of Expressions of Interest for leasing, the BLM will prioritize its work first in non-habitat management areas for Greater Sage-Grouse, followed by lower priority habitat management areas (e.g., GHMA) and then higher priority habitat management areas (i.e., PHMA).  In addition, the BLM will continue to work with parties who file expressions of interest and potential lessees to voluntarily prioritize leasing in less-sensitive areas. Consistent with the GRSG Plans, however, parcels may be leased within GRSG habitat management areas without first leasing parcels in non-habitat areas.

## Open Off-Highway Vehicle  Areas

During scoping, commenters requested that the BLM provide open or play areas for OHV recreation opportunity and trail bikes, where acceptable in selected areas. This designation was within the scope of the RMP revision. However, no specific areas were recommended, and the BLM was unable to identify any portion of the decision area suitable for this use. Therefore, an alternative considered but not analyzed was to designate a portion of the planning area as open to cross-country OHV travel. Therefore, OHVs must remain on existing travel routes at all times, unless travel is for an administrative use or an exception as described in the ROD. Activity-level travel planning in travel management areas will delineate BLM's transportation network by specifying designations of individual route segments throughout the planning area.

## Oil Shale and Geothermal  Resources

Development of oil shale and geothermal  resources has never been proposed or permitted in the planning area. Because the development potential for these resources is minimal to nonexistent in the planning area, these actions were considered but not analyzed in detail in the EIS.

## Designating Major Transportation and Energy Corridors

Major transportation and energy corridors were considered but not analyzed in detail. Because federal lands are scattered in a checkerboard land pattern interspersed with private and state lands in most of the planning area, a major transportation or energy corridor would not be feasible to implement.

However, in consideration of corridors, the EIS did state in the *Lands and Realty, Land Use Authorizations* alternatives, "require the placement of new facilities or upgrades to existing facilities in areas with previous disturbance and existing facilities, as determined practical, consistent with other resource values" (Alternative B), and "encourage applicants to locate new facilities within previously disturbed areas or adjacent similar rights-of-way (ROWs )" (Alternatives C1, C2 and D).

## Relocate Bison as Wildlife onto Public Lands

On BLM-administered lands, primary authority and responsibility for managing fish and resident wildlife rests with the state (43 Code of Federal Regulations [CFR] 24.4[c]). If public lands are proposed for bison restoration, the BLM would work closely with the State of Montana through the BLM's established planning processes. Any consideration of placing wild bison on BLM-administered lands would also include full involvement by tribal and local governments and the public. At this time, the State of Montana has not proposed to reintroduce wild bison on any BLM-administered lands managed by the Lewistown FO and Butte FO.

Privately owned bison are considered livestock and, as such can be permitted by the BLM (43 CFR 4130.6-4). The primary test in making this distinction is whether the owner of the animals qualifies as an applicant under the requirements of the grazing regulations. The grazing regulations define qualified applicants and apply equally to all qualified applicants, regardless of the class of livestock. Privately owned bison may be authorized to graze under the regulations, provided it is consistent with multiple-use objectives. As with other classes of livestock, bison may be permitted to graze where environmental review indicates no conflict with resource objectives or attainment of Standards for Rangeland Health (BLM 1997).

## Designated Leasing Areas for Wind Energy

While the Lewistown FO contains wind resources that could be developed if interest existed, the availability of private or other non-federal lands coupled with the lack of transmission and paucity of pre-application discussion and interest in the field office indicated that demand to develop renewable energy on BLM-administered lands is very low. Given this low demand, identification of designated leasing areas for wind and solar that would be made available through a competitive process, as provided for under the 43 CFR 2800 regulations finalized in January 2017, was not warranted in the Lewistown RMP.

## Coal

There is no known coal  development potential within the planning area. Under the first regulatory screening procedure at 43 CFR 3420.1-4(e), only the areas that have development potential may be identified as acceptable for further consideration for leasing. A coal lease application could still be submitted to the BLM, but the applicant must be able to adequately demonstrate development potential and the merit of their data. If the application is determined to be adequate and passes the remaining screening and unsuitability assessment procedures required by regulation, a plan amendment would be required before issuing a coal lease.

## I.3.3   ALTERNATIVES ANALYZED IN DETAIL

### Alternative A (No Action)

Alternative A meets the requirement that a no action alternative be considered. This alternative continues current management direction and prevailing conditions derived from existing planning documents. Goals and objectives for resources and resource uses are based on the applicable portions of the Headwaters RMP, approved in July 1984 (BLM 1984) and the JVP RMP, approved in September 1994 (BLM 1994), along with associated amendments, activity and implementation level plans, and other

management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would also apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, timber harvesting, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

There is an existing protest resolution decision affecting federal mineral estate in the Lewistown FO that does not allow oil and gas leasing of nominated parcels that would require a special stipulation to protect important wildlife values. Existing fluid mineral leases that expire can be re-nominated for leasing but would be deferred.

## Alternative B (Environmentally Preferable Alternative)

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, communication site s, and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. In addition, this alternative aims to restore water quality through the greatest level of protection and active restoration of streams and riparian-wetland areas.

Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas, such as ACECs and SRMAs . It includes specific measures designed to protect or enhance resource values, such as lands with wilderness characteristics . Appropriate and allowable uses and restrictions would be contingent on minimizing adverse effects on natural and cultural resources.

Under Alternative B, the following vegetative communities would be priority habitat for management: grasslands, sagebrush /grasslands, ponderosa pine /badlands, montane forest and meadows, and riparian - wetland communities. Priority species for management are listed in Appendix E, Special Status Species Confirmed or Likely to Inhabit the Planning Area.

## Alternative C (Preferred Alternative: Lewistown Draft RMP/Draft EIS)

Under Alternative C, the appropriate mix of uses on BLM-administered lands and mineral estate would be based on making the most of resources that target social and economic outcomes, while protecting land health. Management direction would recognize and expand existing uses and would accommodate new uses to the greatest extent possible. The development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, communication sites, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources. Appropriate and allowable uses and restrictions would emphasize social and economic outcomes, while mitigating impacts on land health. Priority species for management would be focused on special status species.

## Alternative C2 (Proposed Plan: Lewistown Proposed RMP/Final EIS)

The Proposed Plan is a modification of alternative C as analyzed in the Draft RMP/EIS.

In developing the Proposed RMP, the BLM made modifications based on its internal review, new information and best available science, the need for clarification in the RMP, and ongoing coordination

with stakeholders. The BLM also received many substantive public comments on the Draft RMP/Draft EIS (Appendix X), which greatly informed the BLM's development of the Proposed RMP.

Alternative C2 also emphasizes an appropriate mix of uses on BLM-administered lands and mineral estate. Management direction would differ from Alternative C in the degree to which existing uses are expanded and new uses are accommodated. The development scenarios for allowable uses would emphasize maximizing resource production in an environmentally responsible manner, similar to Alternative C. Priority vegetation communities and species for management would be the same as those described for Alternative B and D. Social and economic outcomes, as well as mitigating impacts on land health, would be emphasized when considering appropriate and allowable uses and restrictions. The proposed alternative emphasizes wildlife-dependent recreation through the allocation of two Backcountry Conservation Areas. The Approved RMP is similar to the Proposed Plan (Alternative C2) in the Lewistown Proposed RMP/Final Environmental Impact Statement (FEIS).

### Alternative D

Alternative D emphasizes distributing and examining resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates varying degrees of protection, restoration, enhancement, and use of resources and serves to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Priority vegetation communities and species for management under Alternative D would be the same as those described for Alternative B.

## I.4   MANAGEMENT CONSIDERATIONS AND DECISION RATIONALE

The Approved RMP reflects statutory, regulatory, and national policy considerations. The decision is also based on review and substantive comments from federal, tribal, state, and local governments and agencies, the public, industry, and the 9 cooperating agencies that participated in the planning process.

The Approved RMP provides the best combination of management decisions to meet the purpose of and need for the RMP in consideration of the planning issues and management concerns identified through the planning process. It fulfills the purpose by providing goals and objectives for public lands management and by resolving multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP. It fulfills the need by addressing current resource conditions, changes in circumstances, such as evolving demands on resources, and new or revised national-level policies (43 CFR 1610.5-6) since preparation of the 1984 Headwaters RMP (BLM 1984), 1994 Judith-Valley-Phillips RMP (BLM 1994), and subsequent amendments.

The Approved RMP provides the most comprehensive framework for addressing the diverse management needs of BLM-administered lands in the Decision Area because it allows for maximizing resource production in an environmentally responsible manner. Social and economic outcomes, as well as, mitigating impacts on land health will be emphasized when considering appropriate and allowable uses and restrictions.

The Approved RMP includes stipulations for fluid mineral leasing, as well as Required Design Features (RDFs) which apply as identified to other surface-disturbing activities. Stipulations are designed to provide resource-specific protections (Appendix L). The NSO stipulations restrict fluid mineral activities

by requiring surface-disturbing activities to be located outside of the boundary of the NSO area.  The CSU stipulations allows fluid mineral leasing but can require imposing special operational constraints or moving the activity to protect identified values. The BLM may modify the operations of surface and other disturbance activities caused by the presence of humans and require additional specific or specialized mitigation. Surface disturbance restrictions and management of disturbing activities for non-fluid mineral activities are listed in Appendix F. These features, as well as other restrictions and management allocations, such as avoidance or exclusion areas, are designed to sustain land health and other resource conditions.

The BLM interdisciplinary team reviewed BLM-administered lands in the Planning Area to determine whether new areas should be considered for designation as ACECs and whether existing ACECs should continue to be managed as ACECs to protect the identified values. The BLM determined that management actions and restrictions as applied under the Proposed RMP, Alternative C2, are adequate to protect the relevant and important values of the potential ACECs that were not carried forward for designation.

## I.5   APPLICATION OF THE RESOURCE MANAGEMENT PLAN TO EXISTING PROJECTS

Numerous rights and privileges have been established on BLM-administered lands under law, regulation, or planning decisions. The decisions included in this ROD and Approved RMP supersede the Headwaters RMP (BLM 1984), the Judith-Valley-Phillips RMP (BLM 1994), and their subsequent amendments. Beyond the decisions in the Approved RMP, all BLM-administered lands and federal mineral estate in the planning area remain subject to valid existing rights and to the stipulations and conditions of approval associated with the given right at the time it was granted.

Oil and gas lease stipulations and lease notices in the Approved RMP will apply to all new leases and terminated leases that are reinstated. Any activity-level or project-specific authorization or management action must conform with the Approved RMP (i.e., be specifically provided for in the RMP or consistent with the terms, conditions, and decisions in the Approved RMP; 43 CFR 1601.0-5(b)). A land use plan amendment may be necessary to consider monitoring and evaluation findings; substantive new data; new or revised policy; changes in circumstances; or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the Approved RMP.

Projects that require a decision to extend an existing authorization or permit may require modification to conform to the RMP before approval, such as ROW grant and grazing permit renewals. Projects for which site-specific decisions have not yet been signed, but for which preparation of NEPA documents began before the ROD's effective date, may also require modification to conform to the RMP.

## I.6   PUBLIC INVOLVEMENT

### I.6.1   PUBLIC SCOPING

The policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American tribal governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS. The formal scoping period began with publication of the Notice of Intent (NOI; 79 Federal Register 7694) on February 10, 2014. Planning issues were identified during the scoping period and are presented in the

Scoping Report (BLM 2014), available on the Lewistown RMP/EIS ePlanning website at https://eplanning.blm.gov.

Throughout the planning process, the BLM actively engaged the public and its cooperating agencies, as well as consulted with the Montana State Historic Preservation Office and US Fish and Wildlife Service. The BLM also engaged in government-to-government consultation with Native American tribes. Public review of the Draft RMP/EIS occurred for 90 days following its publication. Information about the RMP/EIS process can be obtained by the public at any time by visiting the Lewistown RMP/EIS ePlanning website at the link above. This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process.

## I.6.2  PUBLIC REVIEW OF AND COMMENT ON THE DRAFT EIS/RMP

A notice of availability announcing the release of the Draft RMP/EIS was published in the Federal Register on May 17, 2019 (84 Federal Register 22517), initiating a 90-day public comment period ending on August 15, 2019. The BLM also issued a news release on May 17, 2019, announcing the release of the Draft RMP/EIS and providing a link to the draft documents and information about upcoming public meetings and instructions for submitting comments. During the public comment period, the BLM held three public comment open houses for the Draft RMP/EIS between July 8 and 10, 2019, in three planning area communities. The public open houses provided opportunities for the public to ask questions and submit comments. The BLM managers, resource specialists, and other representatives of the BLM were present during these open houses to discuss and answer questions.

During the 90-day public comment period, BLM received a total of 811 comment letter submissions; 332 of these were considered unique submissions and 479 were part of form letter campaigns. These documents resulted in 651 unique substantive comments received on the Draft RMP/EIS. Excerpted substantive comments from individual submissions, as well as summaries of and the BLM's responses to those substantive comments, are in Appendix X, Public Comments and BLM Response. Section X.1 of Appendix X (Draft EIS Comment Process) summarizes the public comment process, provides a detailed description of the comments received during the public comment period, and explains the comment analysis methodology used.

## I.6.3  PROTEST RESOLUTION – PROPOSED RMP/FINAL EIS

Pursuant to the BLM's planning regulations (43 CFR 1610.5-2), The Proposed RMP/Final EIS was subject to a 30-day protest period that ended on March 16, 2020. The BLM received 150 protest letters, and the BLM Director reviewed all protest issues for the proposed planning decisions. The Director concluded that the BLM Montana State Director followed the applicable laws, regulations, and policies, and considered all relevant resource information and public input. The BLM Director addressed the protests, and that decision is the final decision of the US Department of the Interior.

The BLM Director's decisions on the protests are summarized in the Lewistown Protest Summary Report that is available on the BLM website. . Each protesting party was notified in writing of the Director's findings and the disposition of their protests.

The BLM Director resolved the protests without making significant changes to the Proposed RMP, though one minor modification was made and is explained in Section 1.2.1 Clarifications and Modifications.

### I.6.4 GOVERNOR'S CONSISTENCY REVIEW

In order to promote consistency with state government plans or policies, (as required by 43 CFR 1610.3-2(e)), the BLM initiated the Montana Governor's Consistency Review for the Lewistown Proposed RMP/Final EIS in a letter dated February 14, 2020. The consistency review period concluded on April 13, 2020.

The Governor submitted a letter on April 13, 2020 identifying some concerns in response to the consistency review. These concerns included consistency with the State comprehensive outdoor recreation plan, State wildlife and fish species management, and administrative access. The BLM thoroughly reviewed the Governor's response letter and the BLM did not identify any specific inconsistency issues from this review; however, some of the concerns outlined in the Governor's letter are addressed either through a change in the Approved RMP, or a clarification of our intent. Section 1.2.1 Clarifications and Modifications of this document provides a complete description of changes since the Lewistown Proposed RMP/Final EIS.

## I.7   CONSULTATION AND COORDINATION

The BLM land use planning regulations (43 CFR 1610.3), FLPMA (43 US Code 1712), and regulations for implementing NEPA (40 CFR 1501.5 and 1501.6) guide the BLM in coordinating and cooperating with other federal and state agencies, local governments, and Native American tribes during the land use planning process. This collective guidance instructs the BLM as follows:

- Stay informed of federal, state, local, and tribal plans
- Ensure that it considers these plans in its own planning
- Seek ways to resolve inconsistencies between such plans and BLM planning
- Cooperate with other agencies and tribal governments in developing RMPs and NEPA analyses

### I.7.1 COOPERATING AGENCIES COLLABORATION

The BLM invites agency cooperation early in the RMP process using the process outlined in 43 CFR 1501.6. A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1; BLM 2005a). The primary role of cooperating agencies during the planning process is to provide input on issues for which they have a special expertise or jurisdiction.

The BLM is the lead agency for the Lewistown RMP. On August 16, 2013, the BLM wrote to 67 local, state, federal, and tribal governments, inviting them to participate as cooperating agencies for the Lewistown RMP. Nine agencies agreed to participate in the RMP as designated cooperating agencies and signed a memorandum of understanding (MOU) with the BLM. Cooperating agencies included:

- US Department of the Interior, Fish and Wildlife Service (Charles M. Russell National Wildlife Refuge)
- Montana Department of Natural Resources and Conservation (Northeastern Land Office)
- Montana Fish, Wildlife and Parks
- Indian Butte Cooperative State Grazing District

- Fergus County
- Judith Basin County
-  Lewis and Clark County
- Pondera County

(See Lewistown Proposed RMP/Final EIS; Appendix B, Collaboration and Coordination, for details).

## I.7.2   TRIBAL GOVERNMENT-TO-GOVERNMENT CONSULTATION

Government-to-government consultation began in February 2014 with the BLM sending requests for consultation letters to all area tribes. The BLM held informational meetings with tribal representatives in April and May 2014. This was to ensure that management actions are consistent with treaty rights retained by tribes and that the concerns of tribal groups were considered. The BLM has consulted the following state and federal recognized Native American tribes: Blackfeet, Shoshone Bannock, Chippewa Cree, Salish Kootenai, Crow, Fort Belknap, Northern Cheyenne, Mandan, Hidatsa, Arikara, Spirt Lake Sioux, Standing Rock Sioux, Turtle Mountain, Cheyenne River Sioux, Crow Creek Sioux, Lower Brule, Rosebud, Yankton, Eastern Shoshone, Northern Arapahoe, Santee Sioux, Confederated Tribes of the Colville Indian Reservation, Comanche, Kiowa, Nez Perce, Flandreau Santee Sioux, Sisseton Wahpeton Oyate, Oglala Sioux, Lower Sioux, Umatilla, Fort Peck Assiniboine and Sioux. Government-to-government consultation continued throughout the development of the Proposed RMP.

## I.7.3   US FISH AND WILDLIFE SERVICE SECTION 7 CONSULTATION

To comply with Section 7(c) of the Endangered Species Act of 1973 (ESA), the BLM began consulting with the USFWS early in the planning process. The USFWS provided input on planning issues, data collection and review, and alternatives development. On May 20, 2020, USFWS concurred with BLM's determination that the proposed plan *may affect but is not likely to adversely affect* the threatened grizzly bear, Canada lynx, piping plover and endangered pallid sturgeon. The USFWS also acknowledged BLM's *no effect* determination for Canada lynx critical habitat.

## I.7.4   STATE HISTORIC PRESERVATION OFFICE SECTION 106 CONSULTATION

The State Historic Preservation Officer (SHPO) was notified of the status of the Lewistown RMP and received the Proposed RMP/Final EIS containing additional information on for SHPO consultation. Specific to Cultural Resources, the BLM will continue to consult with the Montana SHPO when implementing actions under this Approved RMP in order to properly identify and assess culturally significant properties, nominate properties to the National Register of Historic Places, conduct Section 106 reviews of agency projects and conduct educational programs on the importance of preserving historic properties.

## I.8   AVAILABILITY OF THE PLAN

Copies of the ROD and the Lewistown RMP may be obtained from the BLM website
at: https://eplanning.blm.gov or by obtaining a copy at the following locations:

   Bureau of Land Management
   Montana State Office
   5001 Southgate Drive
   Billings, MT 59101

   Bureau of Land Management
   Lewistown Field Office
   920 NE Main Street
   Lewistown, Montana 59457

## I.9    APPROVAL

I hereby approve the land use plan decisions. My approval of the land use plan decisions constitutes the final decision of the Department of the Interior in accordance with the land use planning regulations at 43 CFR 1610.

Approved by:

Casey Hammond
Principal Deputy Assistant Secretary
Exercising the Authority of the Assistant Secretary,
Land and Minerals Management

7/30/20

Date

# II. APPROVED RESOURCE MANAGEMENT PLAN

This page intentionally left blank.

## II.1   INTRODUCTION

The US Department of the Interior (DOI), Bureau of Land Management (BLM), Lewistown Field Office (FO) prepared the Lewistown Resource Management Plan (RMP). The intent is to provide comprehensive current and future management direction for BLM-administered lands in the Lewistown FO and portion of the Butte FO located in northern Lewis and Clark County.

The BLM prepared the RMP in compliance with its planning regulations, Title 43, Code of Federal Regulations (CFR), 1600, under the authority of the Federal Land Policy and Management Act of 1976 (FLPMA). This document also meets the requirements of the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality Regulations for Implementing the NEPA (40 CFR 1500-1508), the BLM's NEPA regulations (43 CFR 46), and requirements of the BLM's NEPA Handbook, 1790-1 (BLM 2008a).

### II.1.1   PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

The purpose of this RMP is to ensure that BLM-administered lands and minerals in the planning area are managed in accordance with the multiple use and sustained yield principles stated in the Federal Land Management and Policy Act of 1976 (FLPMA; 43 United States Code [USC] 1701 et seq.). The FLPMA states the BLM shall "develop, maintain, and, when appropriate, revise land use plans" (43 USC, Section 1712 [a]); therefore, this RMP provides planning-level management strategies that are expressed in the form of goals, objectives, allowable uses, and management actions for resources and resource uses. The RMP neither prioritizes certain projects nor describes how particular programs would be implemented; rather, those decisions are deferred to more detailed implementation-level planning.

The 1984 Headwaters RMP and 1994 JVP RMP have guided the BLM's management of public lands. Resource conditions, public demands, and policies have changed sufficiently to warrant revisiting these decisions. Past plan evaluations (5- and 15-year plan evaluations for Headwaters and an 8-year plan evaluation for the JVP RMP) indicated a need for a plan revision.

Although the JVP RMP was approved in 1994 to guide management of all resources in the Lewistown FO, it did not make any specific decisions relative to leasing of fluid minerals; this was due to a protest on the 1992 Final JVP RMP/EIS. Since that time, the Lewistown FO has deferred fluid mineral leasing of nominated parcels that would require special stipulations to protect important wildlife values. (Nominated parcels not requiring special wildlife stipulations have continued to be leased in the Lewistown FO through reliance on the leasing decisions made in previous land use plans and programmatic analyses.)

The need for the RMP revision was to address policies and resource issues that have arisen since the adoption of the previous RMPs. Issues included topics such as increased conflicts between competing resource value and lands uses, mineral and energy develop, and maintaining and improving terrestrial and aquatic habitats.

## II.1.2 LEWISTOWN PLANNING AREA AND DECISION AREA

### Planning Area

The Lewistown RMP planning area comprises all or portions of nine counties in central Montana: Cascade, Chouteau, Fergus, Judith Basin, Lewis and Clark, Meagher, Petroleum, Pondera, and Teton. Within the planning area, landownership is mixed. The BLM-administered lands and minerals are intermingled with National Forest System land; national wildlife refuges (NWR); lands managed by the US Army Corps of Engineers and the US DOI, Bureau of Reclamation (BOR); and state, private, and tribal lands. In total, the planning area covers 12,906,800 surface acres and 1,196,800 acres of federal mineral estate (**Figure A-1, A-2 [Map Appendix A]**).

### Decision Area

The BLM-administered lands and minerals addressed in this RMP revision are referred to as the decision area; these lands are managed by both the Lewistown FO and the Butte FO. This land area totals approximately 651,200 surface acres and 1,196,800 acres of federal mineral estate. (Note: Based on an administrative boundary realignment, effective October 1, 2011, the Butte FO manages approximately 10,400 surface acres and 62,900 acres of subsurface federal mineral estate in the northern portion of Lewis and Clark County [Federal Register Notice of Administrative Boundary Change, Volume 76, Number 237, 12/9/2011]. For purposes of this RMP, the BLM addresses that portion of Lewis and Clark County as part of the Lewistown planning and decision areas.)

Except for several contiguous blocks of land in Fergus and Petroleum Counties, most of the BLM-administered lands in the planning area are scattered tracts, intermingled with private and state lands.

## II.1.3 SCOPING AND ISSUES

The formal public scoping process for the Lewistown RMP began with the publication of the Notice of Intent (NOI) in the *Federal Register* on February 10, 2014; the BLM also posted the NOI on the project website. It served to notify the public of the BLM's intent to revise the RMP for the Lewistown planning area, provided the location of the public scoping meetings, and identified the preliminary issues to be considered in the RMP revision process. Public notification of the scoping process also included news releases, newsletters, and flyers.

During the weeks of March 4 and April 3, 2014, the BLM hosted scoping meetings at six locations across the planning area. The meetings were to provide the public with an opportunity to ask questions and learn about the project and the planning process and to submit their issues and concerns to the BLM.

The BLM received a total of 48 unique submissions and 5 form letters during public scoping. These submissions contained a total of 526 separate comments (370 unique and 156 duplicate).

### Issues Addressed

To initiate the RMP process, the BLM identified preliminary planning issues through internal scoping based on RMP evaluations, new program guidance, and staff input. Broadly defined planning issue statements identified in internal and external scoping are listed in **Table 1-1**, Planning Issue Categories and Statements. More detailed information on each planning issue is included in the Lewistown RMP Revised Scoping Report (BLM 2014c), available at https://eplanning.blm.gov.

**Table 1-1**
**Planning Issue Categories and Statements**

| Issue | Planning Issue Category | Planning Issue Statement |
|---|---|---|
| 1. | Air resources and climate | How can the BLM prevent degradation of air resources and minimize contributions to variability in climate? |
| 2. | Geology and soil resources | How can the BLM maintain and restore geologic and soil resources? |
| 3. | Water resources | How can land use practices be managed to maintain and improve water resources? |
| 4. | Vegetation communities | How can the BLM maintain and restore vegetation communities? |
| 5. | Fish and wildlife | How can the BLM manage public land uses while maintaining and improving terrestrial and aquatic habitats? |
| 6. | Wildfire and ecology | How can the BLM manage fire and fuels to protect public safety, and natural and cultural resources? |
| 7. | Cultural and heritage resources | How will the BLM provide for the preservation and interpretation of cultural and heritage resources? |
| 8. | Paleontological resources | How can the BLM manage paleontological resources to provide both resource protection and opportunities for public education and study? |
| 9. | Visual resources | How should visual resource management (VRM) classes be determined, and how can current and potential conflicts with managing VRM values be mitigated? |
| 10. | Wilderness characteristics | How will the BLM maintain wilderness values? |
| 11. | Cave and karst resources | What management is needed for cave and karst resources? |
| 12. | Minerals and energy resources (including renewable energy) | Which areas should be open to mineral and energy development and how should the BLM manage such development while protecting human health, and natural and cultural resources? |
| 13. | Livestock grazing | How can the BLM manage livestock use on public lands while protecting natural and cultural resources? |
| 14. | Recreation and visitor services | How can the BLM provide recreation opportunities on public lands while protecting public safety, and natural and cultural resources? |
| 15. | Travel, transportation management, and access | How should travel be managed on BLM-administered lands to allow access and recreation while protecting natural, biological, and cultural resources? What management actions are needed to maintain and improve access to public lands? |
| 16. | Lands and realty (including tenure and withdrawals) | What land tenure, withdrawals, and management adjustments are needed to meet access and development needs while protecting natural and cultural resources? |
| 17. | Forest, woodland, and special products | How can the BLM provide forest products while protecting natural and cultural resources? |
| 18. | Special designations | How can the BLM manage areas that contain unique or sensitive resources? |
| 19. | Social and economic conditions (including environmental justice) | How can the BLM manage public land use while preserving local traditions and economies that rely on BLM-administered lands and minerals? |
| 20. | Treaty rights and tribal interests | What management actions are required to support tribal interests in the planning area, and how will management be consistent with treaty rights retained by tribes? |

**Issues Considered but Not Further Analyzed**

During scoping, commenters raised several concerns regarding issues that would not be addressed in the RMP including administrative, policy, and implementation issues; issues outside the scope of the RMP; and issues that have already been addressed through other BLM activities.  These were the issues considered but not analyzed in detail:

- Regulations and BLM policy issues involved requests for changes to, or continuation of, state or national BLM policies or existing laws and regulations. These types of policy and regulatory decisions are set at the national level. Examples of this type of comment included requests to increase grazing fees, that the BLM should redefine the terms used for calculating animal unit months (AUMs), or that it should implement broad-scale, recreational user fees on BLM-administered lands.

- Issues outside the scope of the planning process were requests for the BLM to take actions outside of its jurisdiction or manage resources not within the planning area (such as the Upper Missouri River Breaks National Monument or National Forest System lands). Examples of comments considered to be outside of the scope are a request to stop the take of animals in the planning area and a request to provide for the restoration of free-roaming bison.

- The BLM also received multiple comments that supported designation for all potential lands as wilderness areas. The designation of wilderness status is the sole responsibility of Congress; no new wilderness can be created except by Congress.

- Planning and public involvement process comments included requests for the BLM to follow the principles of multiple use or to implement required planning statutes (such as the National Environmental Policy Act of 1969 [NEPA] and FLPMA). Some commenters offered recommendations based on personal interpretations of court decisions or research studies. Other commenters provided suggestions on BLM management that were administrative in nature and that do not require further analysis, such as "increase education." Some commenters simply requested specific data sets be made available to the public or to be notified regarding the status of the RMP project.

Requests for implementation-level (i.e., project- or site-specific) management actions included requests that are not addressed at the RMP level. These commenters often requested the establishment of allotment -specific forage objectives, site-specific route designation, or suggestions on the design of timber sales or specific management actions related to cave management.

## II.1.4 PLANNING CRITERIA AND LEGISLATIVE CONSTRAINTS

The BLM developed preliminary planning criteria for focused planning of the Lewistown RMP and to guide decision-making by topic. These criteria were introduced to the public for review in the NOI published on February 10, 2014 (79 *Federal Register* 7694) and at all scoping meetings. The public was encouraged to comment on and suggest additions to these criteria. Additional planning criteria were identified during scoping by individuals, organizations, agencies, and tribes. The planning criteria were:

- The RMP/EIS will be completed in compliance with FLPMA, NEPA, and all other applicable laws, regulations, secretarial and executive orders, and BLM policies and guidance.

- Advance efforts to expand hunting, fishing and recreational opportunities consistent with Secretarial Order 3347, Secretarial Order 3356 and Secretarial Order 3366.

- The planning process will incorporate measures to protect against catastrophic wildfires consistent with Executive Order 13855 and Secretarial Order 3372.
- The RMP will establish new guidance and will identify existing guidance that the BLM will rely on in managing public lands within the LFO and the BFO (for the northern portion of Lewis and Clark County).
- The RMP/EIS will incorporate, by reference, the Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Montana, North Dakota, and South Dakota; the Off-Highway Vehicle EIS and Proposed Plan Amendment for Montana, North Dakota, and Portions of South Dakota; Montana Forestry Best Management Practice s; the Montana Guide to the Streamside Management Zone Law and Rules; the ROD and Approved RMP Amendments for the Rocky Mountain Region, including the Greater Sage-Grouse Sub-Region of Lewistown; the ROD on the Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement (BLM 2007); and the ROD on the Vegetation Treatments Using Aminopyralid, Fluroxypyr, and Rimsulfuron on BLM Lands in 17 Western States EIS (BLM 2016).
- The RMP/EIS will incorporate, by reference, 603 Wilderness Study Area (WSA) findings that affect public lands in the planning area.
- The BLM will consult Native American tribes. The Blackfeet Indian Reservation is next to the planning area in Pondera County. Also, other tribes in Montana, Idaho, North and South Dakota, and Wyoming were contacted during the scoping process to determine what level of participation they would like to have during the RMP process. Early consultation and close coordination will take place to ensure that the BLM fulfills its trust responsibilities and that management actions proposed in the RMP/EIS are consistent with treaty rights retained by tribes.
- The BLM will consult the Montana SHPO early on for any potential effect of the plan on cultural resources under provisions of the National Historic Preservation Act of 1966 (NHPA), as amended (16 USC 470f) and under the National Programmatic Agreement. The BLM will invite relevant and interested tribal governments and the SHPO to participate as cooperating agencies.
- The RMP/EIS will incorporate the requirements of the interagency reference guide entitled Reasonably Foreseeable Development Scenarios and Cumulative Effects Analysis developed by the Rocky Mountain Federal Leadership Forum on NEPA, Oil and Gas, and Air Quality.
- The RMP/EIS will recognize the State of Montana's responsibility to manage wildlife populations, including uses such as hunting and fishing. Coordination with the State of Montana will be conducted pursuant to Secretarial Order 3362 to enhance and improve the quality of big-game winter range and migration corridors on federal lands.
- To the extent possible, goals and objectives in the plan for plants and wildlife (including special status species) will incorporate or respond to goals and objectives from established recovery plans, conservation strategies, and strategic plans.
- To the extent possible, decisions in the RMP/EIS will be compatible with the existing plans and policies of adjacent local, state, tribal, and federal agencies, as long as the decisions conform with legal mandates on public lands management.
- The RMP/EIS will evaluate public access and recreational opportunities when evaluating land-tenure decisions consistent with Secretarial Order 3373.

- The scope of analysis will be consistent with the level of analysis in approved plans and in accordance with BLM-wide standards and program guidance.

- Geospatial data will be automated in a geographic information system (GIS) to facilitate the affected environment discussions, alternative formulation, and environmental consequences analysis and to display the results.

- The RMP/EIS will promote active management to reduce risk of wildland fire consistent with Secretarial Order 3372 and Executive Order 13855.

- The BLM will add best management practice s (BMPs) for oil and gas, road drainage, grazing, water quality for Montana forests, fire rehabilitation and management, wind energy, power lines, and greater sage-grouse (GRSG) conservation.

- During the land use planning process, the BLM will coordinate with administrators of the Lewis and Clark National Historic Trail (NHT), Nez Perce NHT, and Continental Divide National Scenic Trail (NST) to establish national trail management corridors.

The BLM received the following additional criteria in public scoping comments during the scoping period (February 10, 2014, to April 11, 2014) and added them to the list of planning criteria.

- Off-highway vehicle (OHV) management strategies will be consistent with the Final National Management Strategy for Motorized Off-highway Vehicle Use on Public Lands, January 19, 2001 (BLM 2001).

- The RMP/EIS will be consistent with the Montana State Water Plan, Montana Water Supply Initiative—2015 (http://www.dnrc.mt.gov/wrd/water_mgmt/state_water_plan/default.asp).

- The planning process will incorporate the United States Environmental Protection Agency (EPA), US Department of Agriculture (USDA), and DOI MOU dated June 23, 2011, regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through the NEPA Process.

- The RMP/EIS will be consistent with the Interagency Prescribed Fire Planning and Implementation Procedures Guide (NWCG 2014).

- The RMP/EIS will be consistent with the Federal Lands Hunting, Fishing and Shooting Sports Roundtable MOU (2006).

- The BLM will incorporate key aspects of Water Quality BMPs for Montana Forests (DNRC 2015) and the Montana Guide to Streamside Management Zone Law and Rules (Montana DNRC 2006).

## II.1.5 PLANNING PROCESS

The BLM uses a multistep planning process when developing RMPs, as required by 43 CFR 1600 and illustrated in the BLM's Land Use Planning Handbook, H-1601-1 (BLM 2005). The planning process is designed to help the BLM identify the uses desired by the public of BLM-administered lands. During this process, the BLM considers these uses to the extent they are consistent with the laws established by Congress and the policies of the executive branch of the federal government. The planning process is issue driven. The BLM used the public scoping process to identify planning issues (noted above) to direct the development of the Missoula RMP. It used the scoping process to introduce the public to planning criteria.

## II.1.6 RELATED PLANS AND POLICY

Since the Headwaters RMP (BLM 1984) and JVP RMP (BLM 1994) were developed and approved, the BLM has implemented amendments to provide additional land management direction. These planning documents are presented in **Appendix C**, RMP Amendments, Implementation-Level Plans, and Related Land Use Plans (See Lewistown PRMP/FEIS).

The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans of other federal, state, local, and tribal governments, to the extent possible. The RMPs also should be consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands and minerals. These plans are discussed in **Appendix C** (See Lewistown PRMP/FEIS). This RMP is consistent with and incorporates requirements identified in various laws, regulations, and policies. These include executive orders, legislative designations, and court settlements and rulings. Management Decisions.

# II.2   MANAGEMENT DECISIONS

This section of the Approved RMP presents the goals, objectives, actions, allowable uses, and stipulations established for BLM-administered lands in the Decision Area. Most of the goals are long range and are assumed to require a period of time to achieve. These management decisions are presented by program area under four category headings: resources, resource uses, special designations, and social and economic (see **Table II-2**, below). Not all types of decisions were identified for each program. Types of management decisions are presented in **Table II-3**, and management decisions are presented in **Table II-4**.

### Table II-2
### RMP Program Categories and Abbreviations

| RMP Program Category | Abbreviation |
|---|---|
| General management | GM |
| **Resources** | |
| Air quality | AIR |
| Climate | CL |
| Soil Resources | SR |
| Water resources | WTR |
| Vegetation, general | VEG |
| Vegetation – Sagebrush/Grasslands | VEG |
| Vegetation – Grasslands | VEG |
| Vegetation – Ponderosa Pine Breaks/Badlands | VEG |
| Vegetation – Montane Forests and Meadows | VEG |
| Vegetation – Riparian/Wetland Communities | VEG |
| Vegetation – Invasive Plant Species | VEG |
| Fish and wildlife, general | FW |
| Fish and wildlife – Fish and Aquatic | FW |
| Fish and wildlife – Wildlife and Habitat | FW |
| Fish and Wildlife – Bighorn Sheep | FW |

| RMP Program Category | Abbreviation |
|---|---|
| Fish and Wildlife - Special Status Species | FW |
|     Special Status Species – Grizzly Bear | FW |
|     Special Status Species – Prairie Dog Habitat | FW |
|     Special Status Species – Greater Sage-Grouse | FW |
| Fish and Wildlife – Stipulations and Restrictions for Biological Resources | FW |
| Fish and Wildlife – Surface Disturbing Activities for Biological Resources | FW |
| Wildland Fire Ecology and Management | WF |
| Cultural and Heritage Resources | CUL |
| Paleontological Resources | PAL |
| Visual Resources | VIS |
| Lands with Wilderness Characteristics | LWC |
| Cave and Karst Resources | CK |
| **Resource Uses** | |
| Non-Energy Solid Leasable Minerals | NESL |
| Fluid leasable minerals (oil and gas) | FLM |
| Locatable minerals | LOC |
| Mineral Materials | MM |
| Livestock grazing | GRZ |
| Recreation and visitor services | REC |
|     Special recreation management areas | REC |
|     Extensive recreation management areas | REC |
|     Backcountry Conservation Areas | REC |
|     Special Recreation Permits | REC |
|     Target Shooting | REC |
| Travel, Transportation Management and Access | TRV |
| Lands and realty, land tenure adjustments | LR |
|     Lands and Realty – Land Use Authorizations | LR |
|     Lands and Realty – Land Tenure | LR |
| Renewable Energy | RE |
| Withdrawals | WTH |
| Forest, Woodland and Special Products | FOR |
| **Special Designations** | |
|     Areas of critical environmental concern (ACECs) | SD |
|     Backcountry Byways | BB |
|     National Trails | NT |
|     Wild and Scenic Rivers | WSR |
|     Wilderness Study Areas | WSA |
|     Rocky Mountain Front Conservation Management Areas | CMA |

Decisions are presented in **Table II-4**, and each is numbered, for ease of identification. The numbering sequences for the decisions are by program, each of which has an identified abbreviation (**Table II-2**), and each decision in that program is numbered in coordination with the program abbreviation (**Table II-2**), type of decision (**Table II-3**), and decision number.

**Table II-3**
**RMP Types of Decisions and Abbreviations**

| Type of Decision | Abbreviation |
|---|---|
| Goal | GOAL |
| Objective | OBJ |
| Management action | MA |
| Allowable use | AU |

An example is as follows:

- AIR-GOAL-01: First air program goal
    - AIR-OBJ-01: First air program objective
        - AIR-MA-01: First air program management action decision
        - AIR-MA-02: Second air program management action decision

All acreages and maps presented in the Approved RMP are estimations, based on current data. Calculations depend on the quality and availability of data, and most calculations in this RMP are rounded to the nearest 10 acres or 0.1 mile. Given the scale of the analysis, the compatibility constraints between datasets and lack of data for some resources, all calculations are approximate; they are for comparison and analytic purposes only. Likewise, the figures in **Appendix A** are provided for illustrative purposes and subject to the limitations discussed above. Updating these data is considered plan maintenance, which will occur over time as the Approved RMP is implemented, additional surveys are completed, and information is revised.

**Table II-4** lists supporting information for the decisions contained in the Approved RMP. Maps depicting resource information and stipulations applicable to surface-disturbing activities in the Approved RMP are provided in **Map Appendix A**. **Appendices B** through **W** contain supporting information for decisions outlined in the Approved RMP. Please see the Lewistown Proposed RMP/Final EIS for Appendix B, C, E, K, M, N, O, P, T, V and W.  Appendices in bold are included in this document as follows:

| | |
|---|---|
| Appendix B | Collaboration and Coordination (See Lewistown PRMP/FEIS) |
| Appendix C | RMP Amendments, Implementation-Level Plans and Related Land Use Plans (See Lewistown PRMP/FEIS) |
| **Appendix D** | **Implementation and Monitoring** |
| Appendix E | Special Status Species Confirmed or Likely to Inhabit the Planning Area (See Lewistown PRMP/FEIS) |
| **Appendix F** | **Design Features and Best Management Practices** |
| **Appendix G** | **Reclamation** |
| **Appendix H** | **Air Resource Management Plan: Adaptive Management Strategy for Oil and Gas Resources** |
| **Appendix I** | **Fire and Emergency Stabilization and Rehabilitation** |
| **Appendix J** | **Impoundments** |
| Appendix K | North Continental Divide Ecosystem Grizzly Bear Conservation Strategy (See Lewistown PRMP/FEIS) |

**Appendix L**     **Stipulations and Allocations Applicable to Fluid Minerals Leasing**

Appendix M     Summary of the Lewistown Field Office Wilderness Characteristics
(See Lewistown PRMP/FEIS)

Appendix N     BLM Standards for Rangeland Health and Guidelines for Livestock Management
(See Lewistown PRMP/FEIS)

Appendix O     Grazing Allotments (See Lewistown PRMP/FEIS)

Appendix P     Drought Policy (See Lewistown PRMP/FEIS)

**Appendix Q**     **Recreation Management Areas**

**Appendix R**     **Land Tenure Adjustment Categories**

**Appendix S**     **Withdrawal Segregations**

Appendix T     ACEC Report (See Lewistown PRMP/FEIS)
(See Lewistown PRMP/FEIS)

**Appendix U**     **ACEC Management Actions**

Appendix V     Wild and Scenic Rivers Report (See Lewistown PRMP/FEIS)
(See Lewistown PRMP/FEIS)

Appendix W     Analysis Assumptions and Cumulative Effects Scenario
(See Lewistown PRMP/FEIS)


**MAP Appendix A**     **Figures**

## II.2.1 LINKS TO APPROVED RMP DECISIONS

Use the hyperlinks in the following table to access the applicable section of **Table II-4**.

Areas of Critical Environmental Concern
Air Resources
Backcountry Byways
Cave and Karst Resources
Climate
Cultural and Heritage Resources
Fish and Wildlife
    Fish and Aquatic Communities
    Special Status Species
    Stipulations for Biological Resources
Fluid Leasable Minerals
Forestry and Woodland Products
General Management
Lands with Wilderness Characteristics

Conservation Management Areas
Lands and Realty
Withdrawals
Renewable Energy
Livestock Grazing
Locatable Minerals
Mineral Materials
Nonenergy Solid Leasable Minerals
National Trails
Paleontological Resources
Recreation and Visitor Services
Travel, Transportation and Access

Soil Resources
Vegetation Communities
Visual Resources
Water Resources
Wild and Scenic Rivers
Wilderness Study Areas
Wildland Fire Ecology and Management

**Table II-4**
**Approved RMP Decisions**

| GENERAL MANAGEMENT | |
|---|---|
| GM-MA-01 | Apply conditions of approval (COAs), BMPs, and mitigation measures (shown in Appendix F, Design Features and Best Management Practices) and other site-specific design features to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion. |
| GM-MA-02 | As described in **Appendix G**, Reclamation, reclamation would be required for surface-disturbing activities. |

| RESOURCES | |
|---|---|
| **Air Resources** | |
| AIR-GOAL-01 | **Goal:** Maintain compliance with the NAAQS, MAAQS, and the Montana State Implementation Plan. |
| AIR-OBJ-01 | **Objective:** Reduce air quality and air quality-related value (AQRV) effects, including visibility and acid deposition, by including technically and economically feasible management actions to reduce emissions of criteria and hazardous air pollutants (HAPs). |
| AIR-MA-01 | **Action:** Implement an air quality adaptive management strategy to assess future air quality and AQRVs (**Appendix H**, Air Resource Management Plan: Adaptive Management Strategy for Oil and Gas Resources). |
| AIR-MA-02 | **Action:** Implement design features, construction techniques, or control measures to minimize fugitive dust emissions from BLM-authorized or permitted surface-disturbing activities. |
| AIR-MA-03 | **Action:** Apply engine and stationary source emission control requirements needed to ensure compliance with NAAQS, MAAQS, and the Montana State Implementation Plan. |
| AIR-MA-04 | **Action:** Incorporate additional emission control design features if unacceptable air quality or AQRV degradation trends are identified at the project scale. |

| **Climate** | |
|---|---|
| CL-GOAL-01 | **Goal:** Provide for diverse, healthy ecosystems that are resilient to climate stressors. |
| CL-OBJ-01 | **Objective:** Apply ecosystem-level climate adaptation management strategies where climate conditions necessitate (as indicated by changes to plant communities, drought conditions, and similar events). |

| Climate | |
|---|---|
| CL-MA-01 | **Action:**<br>Manage for connectivity between habitats and sustainability of resource uses by:<br>• Conducting quantitative monitoring to inform an adaptive management framework<br>• Utilizing integrated monitoring protocols, such as the Assessment Inventory and Monitoring (AIM) strategy<br>• Considering the data and future forecasts/trends produced by the Rapid Ecoregional Assessment (REA), including step-down recommendations or analysis updates<br>• Using adaptive management strategies to identify specific climate vulnerabilities<br>• Working cooperatively with multiple agencies and stakeholders to establish and maintain a network of climate monitoring sites and stations<br>• Considering potential changes in climate when proposing restoration seeding of native plants. Consider collection from the warmer component of the species' current range when selecting native seed<br>• Using the State and Transition models from approved Ecological Site Descriptions (ESDs) to evaluate potential changes in water resources and vegetation communities when completing land health assessments<br>• Promoting vegetative capture and storage of carbon, with consideration for resource objectives, by using Standards for Rangeland Health (BLM 1997) and Montana Forestry/Rangeland BMP guidelines at the project planning and implementation levels |
| CL-GOAL-02 | **Goal:**<br>Reduce greenhouse gas (GHG) emissions from authorized activities to the lowest practical levels that are technically and economically feasible based on current technologies. |
| CL-OBJ-02 | **Action:**<br>Evaluate the observed and anticipated long-term dynamic of climate variability and reduce GHG emissions from projects when feasible. |
| CL-MA-02 | **Action:**<br>For oil and gas activities, reduce GHG emissions on a unit-production basis. |
| CL-MA-03 | **Action:**<br>Identify opportunities for geophysical carbon sequestration on federal lands where federal mineral ownership exists as outlined in national guidance. |
| CL-MA-04 | **Action:**<br>Consider applying BMPs to BLM-authorized activities to reduce emissions of GHGs. |
| CL-MA-05 | **Action:**<br>Place priority on actions such as: enhanced energy efficiency, use of lower GHG-emitting technologies or renewable energy, planning for carbon capture and sequestration, and the capture or beneficial use of fugitive methane ($CH_4$) emissions. |
| CL-MA-06 | **Action:**<br>Adjust the timing of BLM-authorized activities, as needed to accommodate long-term changes in weather patterns, while considering the effects on other resources and resource uses. |

| Climate | |
|---|---|
| CL-MA-07 | **Action:**<br>Use the State and Transition models from approved ESDs to evaluate potential changes in water resources and vegetative communities when completing land health assessments. |

| Soil Resources | |
|---|---|
| SR-GOAL-01 | **Goal:**<br>Maintain, improve, or restore soil quality, productivity, and stability; prevent or minimize erosion and compaction while supporting multiple-use management while meeting proper functioning condition (PFC) and the Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Montana, North Dakota, and South Dakota (BLM 1997). |
| SR-OBJ-01 | **Objective:**<br>Maintain and/or improve soil productivity by increasing vegetation cover and reducing soil compaction and erosion for all land areas while prioritizing other areas for resource protection. Consider restoration of soils in previously degraded areas. Incorporate soil protection consistent with soil resource capabilities in management actions and objectives for other resources/uses. Ensure surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals, and actively eroding gullies). |
| SR-MA-01 | **Action:**<br>Apply COAs, BMPs, and design features as described in **Appendix F**. Apply reclamation, as described in **Appendix G**. |
| SR-MA-02 | **Action:**<br>Authorized surface-disturbing activities would include plans for reclamation (**Appendix G**). |
| SR-MA-03 | **Action:**<br>Any proposed activities that are located in sensitive soils would incorporate BMPs and other mitigation measures. |
| SR-MA-04 | **Action:**<br>Avoid and mitigate disturbance to biological soil crusts that are determined to be key in sustaining PFC of upland soil health. |
| SR-MA-05 | **Action:**<br>Do not authorize activities in areas where erosion could not be effectively controlled or mitigated. |
| SR-MA-06 | **Action:**<br>Use BMPs and Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Montana, North Dakota, and South Dakota (BLM 1997) at the project level to assess and mitigate effects on fragile and unstable soils prone to slumping. |
| SR-AU-01 | **Allowable Use:**<br>Prior to authorizing any surface-disturbing activity (including but not limited to range improvements, mineral development, or ROW location), the BLM would evaluate the activity and if necessary apply mitigating measures, require reclamation, deny the authorization, or relocate the activity to a more suitable soil type. Site-specific measures would be developed for soils with high erosion susceptibility, steep slopes, sparse vegetation, and shallow soil depth. Activity plans would include mitigation to |

| Soil Resources | |
|---|---|
| | protect ground cover and streambank stability and to reduce sediment yields from surface-disturbing activities. All surface-disturbing activities are subject to an on-site evaluation to develop mitigations to reduce erosion and soil compaction and improve soil stability and salinity control. |
| SR-MA-07 | **Action:** Implement emergency stabilization and rehabilitation (ES&R) in a cost-effective manner to minimize negative effects of fire on soil, vegetation, and water resources (see **Appendix I**, Fire and Emergency Stabilization and Rehabilitation). |
| SR-AU-02 | **Allowable Use: STIPULATION** *CSU Sensitive Soils* |
| SR-AU-03 | **Allowable Use: STIPULATION** *NSO Soils- Badlands, Rock Outcrop* |

| Water Resources | |
|---|---|
| WTR-GOAL-01 | **Goal:** Manage surface and groundwater quality on BLM-administered lands to maintain, improve, or restore the chemical, physical, and biological integrity of waters to protect beneficial uses. Manage water quantity and quality to achieve or make significant and measurable progress toward achieving Montana State water quality standards, while ensuring that sufficient water quantity and quality are available to support BLM resources and resource uses. |
| WTR-OBJ-01 | **Objective:** Maintain functioning hydrologic systems and provide a scientific, landscape approach to natural and human-influenced water systems. Increase the percentage of lotic riparian-wetland miles in PFC and/or desired future condition (DFC), or at their capability from approximately 63 percent to 80 percent by 2040 on all streams, including those streams listed as water quality impaired. |
| WTR-OBJ-02 | **Objective:** Maintain or increase water quantity availability for natural instream flow to benefit fish, wildlife, riparian- wetland areas, and water quality while providing current and future water needs for BLM programs and users. |
| WTR-OBJ-03 | **Objective:** Maintain the beneficial use class of groundwater. |
| WTR-OBJ-04 | **Objective:** Reduce known sources of non-point source pollution that are contributing to water quality impairment. |
| WTR-MA-01 | **Action:** Through assessment of PFC, identify those elements that are limiting PFC attainment and develop actions that move toward PFC. These actions could be restoration (planting, revegetation, invasive species removal, streambank stabilization, beaver reintroduction, structures) and/or changes in use (protective fencing, reduction in numbers or utilization). |
| WTR-MA-02 | **Action:** BLM actions or authorized activities would be designed to ensure that state and federal water quality standards are met or exceeded, and water quantity is both physically and legally available to meet the BLM's current or future water resource needs for multiple-use management. |

| Water Resources | |
|---|---|
| WTR-MA-03 | **Action:**<br>BLM actions or authorized activities would be designed to ensure that state and federal water quality standards are met or exceeded, and water quantity is both physically and legally available. |
| WTR-MA-04 | **Action:**<br>Manage impoundments and supplemental water to provide resource values that support the BLM's multiple-use objectives in a manner that minimizes adverse effects on water quality, riparian habitat, and watershed function.<br>Manage the number of surface water impoundments for stock and wildlife to maintain or decrease the percentage of watershed disconnected by impoundments within the following watersheds: Armells Creek, Blood Creek, Carroll Coulee, Cottonwood Creek, Crooked Creek, Dovetail Creek, Drag Creek, Sand Creek, and Two Calf Creek.<br>Consider the feasibility of available alternatives to surface water development, such as groundwater wells, before increasing the percent of watershed disconnected by impoundments within the above watersheds. |
| WTR-MA-05 | **Action:**<br>Manage reservoirs considering the Reservoir Ranking Criteria and direction provided in **Appendix J**. |
| WTR-MA-06 | **Action**:<br>Claim possessory interests in water rights in the name of the United States for water uses on public lands. This would take place when the water right is needed to implement and preserve options for multiple use management. Purchase or lease essential water rights, when needed to meet management objectives and water is not otherwise available.<br>Provided that the developments are compatible with BLM resource objectives, places of use associated with privately owned water rights would be allowed on BLM-administered land through a cooperative agreement (e.g., a stock water tank fed by a groundwater well on private property) and at the cooperator's expense, unless a water use agreement is signed to ensure a continued water supply to the places of use on BLM-administered lands. |
| WTR-AU-01 | **Allowable Use:**<br>**STIPULATION** *NSO Water, Riparian, Wetland, and Floodplains* |
| WTR-AU-02 | **Allowable Use:**<br>**STIPULATION** *NSO State-designated Source Water Protection Areas* |
| WTR-AU-03 | **Allowable Use**<br>Roads and utility corridors would avoid riparian zones, unless there is no practical alternative. |

| Vegetation | |
|---|---|
| *Vegetation/General* | |
| VEG-GOAL-01 | **Goal:**<br>Manage priority vegetative resources to maintain a diversity of ecological conditions within the planning area while providing for a variety of multiple uses that are economically and biologically feasible. |
| VEG-OBJ-01 | **Objective:**<br>Provide plant communities that reflect the desired plant community appropriate for the ecological site. Where appropriate, active management techniques consistent with *Secretarial Orders 3362 and 3372*, would be used to achieve, maintain, and restore disturbance regimes supporting healthy functioning vegetation conditions. |
| VEG-MA-01 | **Action:**<br>Design vegetation treatments to enhance vegetative health and/or habitat diversity consistent with desired conditions for vegetation and wildlife habitat. |
| VEG-MA-02 | **Action:**<br>Selling grass seed, hay, or other vegetative products may be authorized. Hay or seed cutting may be used as a land treatment to improve production of crested wheatgrass provided it is not in conflict with wildlife or wildlife habitat values. |
| VEG-MA-03 | **Action:** When reseeding surface disturbances, native plant species common to the site's natural plant community would be used. Use of introduced species would only be allowed where difficult site stabilization or wildlife concerns prevail. Locally collected seed should be emphasized following seed collection procedures outlined in the *Seeds of Success* Protocol (BLM 2014a) to create sources of native plant materials. |
| VEG-AU-01 | **Allowable Use:**<br>Consider commercial seed harvesting in all areas. |
| *Sagebrush/Grasslands* | |
| VEG-GOAL-02 | **Goal:**<br>Maintain and increase a diverse community of native sagebrush/grassland species. |
| VEG-OBJ-02 | **Objective:**<br>Maintain or improve the ecological status of BLM-administered lands in the sagebrush/grasslands to achieve, or make significant progress towards achieving, Standards for Rangeland Health (BLM 1997) on at least 80 percent of the BLM-administers land by 2040. |
| VEG–OBJ-03 | **Objective:**<br>Minimize fragmentation of large intact blocks of sagebrush/ grasslands. The necessary habitat, biological processes, and disturbance regimes would be allowed to maintain, enhance, or restore sagebrush/grassland species. |
| VEG-MA-04 | **Action:**<br>Manage existing crested wheatgrass seedings as spring use pastures, where feasible to defer native rangeland grazing. Where native restoration of old crested wheatgrass seedings is desired, farming and herbicide use could be authorized for up to 5 years in order to help destroy the crested wheatgrass seed bank. Fire may also be used to assist with restoration of native grassland/shrublands, where needed. |

| Vegetation | |
|---|---|
| *Grasslands* | |
| VEG-OBJ-04 | **Objective:** Maintain or improve the ecological status of BLM-administered lands in the grasslands to achieve, or make significant progress towards achieving, Standards for Rangeland Health (BLM 1997) on at least 80 percent of the BLM-administers land by 2040. |
| VEG-MA-05 | **Action:** Use a combination of wildfire, prescribed fire, and mechanical methods to improve or maintain ecological conditions in the grasslands with emphasis on achieving land health objectives. |
| *Ponderosa Pine Breaks/Badlands* | |
| VEG-OBJ-05 | **Objective:** Treat areas of high departure (Vegetation Condition Class [VCC] 3) or moderate departure (VCC 2) to improve VCC. Treatments should maintain VCC 1. |
| VEG-OBJ-06 | **Objective:** One hundred twenty-five thousand acres within ponderosa pine and grassland National Vegetation Classification System macro-groups would be burned within the Breaks Fire Management Unit (FMU) over the 20-year plan. (*Fire frequency is 12-20 years for the system—acres for each treatment/burn would be counted, so some areas would be counted multiple times and some areas would receive no vegetation disturbance.*) |
| VEG–OBJ--07 | **Objective:** Maintain or improve the ecological status of BLM-administered lands in the ponderosa pine breaks/badlands to achieve, or make significant progress towards achieving, Standards for Rangeland Health (BLM 1997) on at least 80 percent of the BLM-administers land by 2040. |
| VEG-MA-06 | **Action:** • Complete inventory and health assessment of forested stands within the planning area during the life of the plan. • Monitor forest health indicators, including populations of insects, and apply management methods that promote natural function based on the forest type. • Silvicultural prescriptions would be consistent with accepted methods related to site, species, habitat types, and the individual requirements of forest stands. • Manage old forest structure in a sustainable manner. (*Note: Old forest structure is defined by the presence of the following: large, old trees; large snags; coarse woody debris on the forest floor; multiple canopy layers with a developed, patchy understory.*) |
| VEG-MA-07 | **Action:** Use a combination of wildfire, prescribed fire, and mechanical methods to improve or maintain ecological conditions on ponderosa pine breaks/badlands with emphasis on achieving land health objectives and reducing unwanted ignitions, resource threats, and fuel accumulations. |

| Vegetation | |
|---|---|
| *Montane Forests and Meadows* | |
| VEG-GOAL-03 | **Goal:**<br>Maintain, enhance, or restore forest and woodland community health, resiliency, composition, and diversity to a desired mosaic, considering factors such as density, basal area, canopy cover, age class, stand health, and understory species diversity. |
| VEG–OBJ-08 | **Objective:** Manage both dry and moist forest types to produce healthy stands with diverse age classes, densities, and structure. Treatments are designed to maintain or improve VCC and reduce conditions conducive to insect and disease epidemics. |
| VEG-OBJ-09 | **Objective:**<br>Maintain, enhance, or increase deciduous, shrubland and meadow communities. |
| VEG–OBJ-10 | **Objective:**<br>Maintain and protect characteristics of mature forests and woodland communities. |
| VEG–OBJ-11 | **Objective:**<br>Maintain, enhance or increase five-needle pine communities. |
| VEG–OBJ-12 | **Objective:**<br>Maintain stands that support 35-100 year fire frequency with mixed to high severity that promote a mosaic of grasslands and mixed seral stages. |
| VEG-MA-08 | **Action:**<br>• Complete inventory and health assessment of forested stands within the planning area during the life of the plan.<br>• Monitor health indicators, including populations of insects, and apply forest management methods that promote natural function based on the forest type.<br>• Silvicultural prescriptions would be consistent with accepted methods related to site, species, habitat types, and the individual requirements of forest stands.<br>• Manage old forest structure in a sustainable manner. (*Note: Old forest structure is defined by the presence of the following: large, old trees; large snags; coarse woody debris on the forest floor; multiple canopy layers with a developed, patchy understory.*) |
| VEG-MA-09 | **Action:**<br>Emphasize the use of prescribed fire, mechanical and appropriate silvicultural methods to restore historical composition within montane forests and meadows. |
| VEG-MA-10 | **Action:**<br>Restore areas where five-needle pine habitats are being affected by mountain pine beetle, white pine blister rust, or lack of fire. Silvicultural treatments would involve commercial and pre-commercial thinning of competing trees, pruning infected tree limbs, and planting rust-resistant seedlings from appropriate seed zones. |

| Vegetation | |
|---|---|
| *Riparian/Wetland Communities* | |
| VEG-GOAL-04 | **Goal:**<br>Riparian and wetland areas would be managed to achieve, or make significant and measurable progress toward PFC and/or DFCs based upon site potential. The DFCs would give consideration to restoring and/or promoting natural communities and complex riparian conditions valuable to water quality and fish and wildlife habitat. |
| VEG-OBJ-13 | **Objective:**<br>Increase the percentage of lotic riparian-wetland miles in PFC, or at their capability, to 80 percent for those streams currently not meeting standards due to anthropogenic impacts that are within BLM's ability to manage for improved change. |
| VEG-MA-11 | **Action:**<br> Establish riparian management zones for forested and non-forested streams. Riparian management zone descriptions are provided in the Glossary.<br>Each project would incorporate specific design features to maintain the key ecological function of the riparian management zones.<br>• Commercial timber harvest would be allowed in riparian management zones to meet riparian restoration or maintenance objectives and only if adequate woody material remains in the riparian area to meet site-specific (project level) riparian objectives.<br>Livestock grazing would be allowed in riparian management zones in accordance with Standards for Rangeland Health (BLM 1997). |
| VEG-AU-02 | **Allowable Use:**<br> Roads and utility corridors would avoid riparian zones to the extent practicable |
| VEG-AU-03 | **Allowable Use:**<br>**STIPULATION *NSO Water, Riparian, Wetland, and Floodplains*** |
| VEG-AU-04 | **Allowable Use:**<br>**STIPULATION *CSU Riparian, Wetlands*** |
| VEG-AU-05 | **Allowable Use:**<br>**LEASE NOTICE (*LN*) *Grasslands-Wetlands*** |
| *Invasive Plant Species* | |
| VEG-OBJ-14 | **Objective:**<br>Manage for healthy plant communities by reducing, preventing expansion of, or eliminating the occurrence of noxious/invasive species. |
| VEG-MA-12 | **Action:**<br>Manage invasive species in accordance with the most current vegetation treatment EIS or amendment. |

| Vegetation | |
|---|---|
| VEG-MA-13 | **Action:**<br>Use integrated weed and pest management and education and awareness of staff, cooperators, and the public, for pest management:<br>• inventory of public and cooperator lands for noxious weeds;<br>• control of noxious weeds by various methods that include cultural, physical, biological, and chemical controls or other land practices; and<br>• monitoring of treatment areas. |
| VEG-MA-14 | **Action:**<br>Focus control efforts on the Montana State Noxious Weed List; county noxious weed lists; neighboring states' noxious weed lists; and BLM invasive species list. |
| VEG-MA-15 | **Action:**<br>Issue all grazing permits with a term and condition requiring entering a cooperative range improvement agreement for control of noxious weeds, where appropriate, on permittee(s), lessee(s), or allotment(s). |
| VEG-MA-16 | **Action:**<br>Cooperate with local, state, and federal agencies on the control of non-weed, invasive pest species. |
| VEG-MA-17 | **Action:**<br>Planned or permitted surface-disturbing activities would be considered with BMPs on BLM-administered lands with infestations (see **Appendix F**). |
| VEG-MA-18 | **Action:**<br>Using "Early Detection Rapid Response," treatment areas would be prioritized in publicly-accessible areas, riparian areas, ES&R areas, and special status species habitat areas. The remaining BLM-administrated lands in the planning area would be the next priority. |

| Fish and Wildlife | |
|---|---|
| *Wildlife/General* | |
| FW-GOAL-01 | **Goal:**<br>Ensure habitat for native wildlife is of sufficient quantity and quality to enhance biological diversity and sustain ecological, economic, and social values. |
| FW-OBJ-01 | **Objective:**<br>Manage native, naturalized and exotic species to maintain or improve the biological and genetic diversity of natural ecosystems. Intentional exotic species introduction will not adversely affect natural ecosystems or their biological diversity. |
| FW-MA-01 | **Action:**<br>Species introductions or reestablishment may be considered throughout the planning area. |

| Fish and Wildlife | |
|---|---|
| FW-OBJ-02 | **Objective:**<br>Manage habitats to support Montana Fish, Wildlife & Parks (MFWP) big game herd unit objectives, fish management objectives, and well-distributed, healthy populations of fish and wildlife species consistent with the MFWP's State Wildlife Action Plan (MFWP 2015) and strategic population plans, and to achieve the stated purpose of designated wildlife habitat management areas. |
| FW-MA-02 | **Action:**<br>Species transplants or augmentations may be allowed on all BLM-administered lands on a case-by-case basis in cooperation with the USFWS and/or State of Montana. Site-specific analysis would be required at that time. |
| FW-OBJ-03 | **Objective:**<br>Maintain and enhance connectivity and large, intact blocks of habitat for wildlife species. Emphasis for habitat maintenance and restoration would be placed on present and potential habitat for priority species, such as sensitive, threatened, and endangered species. |
| *Fish and Aquatic Communities* | |
| FW-GOAL-02 | **Goal:**<br>Provide for aquatic, riparian, and wetland habitats for abundance and diversity of fish and aquatic wildlife with self-sustaining populations. |
| FW-OBJ-04 | **Objective:**<br>Maintain and improve BLM-administered lands for cold-water or warm-water aquatic priority habitats for native species, with the exceptions of reservoirs managed in coordination with MFWP for recreational fisheries for native or desired nonnative species. |
| FW-OBJ-05 | **Objective:**<br>Maintain habitats sufficient to fulfill the life cycle requirements of diverse fish and wildlife species. Manage to protect important breeding, and natal or parturition habitats for terrestrial and aquatic species. |
| FW-MA-03 | **Action:**<br>Design and install bridges and culverts to maintain adequate fish passage. |
| *Wildlife and Habitat* | |
| FW–MA-04 | **Action:**<br>Coordinate with MFWP on all vegetation treatments in priority species habitat, crucial big game winter range and large vegetation treatments (>100 acres). |
| FW–MA-05 | **Action:**<br>Power lines and substations authorized by the BLM comply with the most current raptor protection standards (currently Reducing Avian Collisions with Power Lines: The State of the Art in 2012 [Avian Power Line Interaction Committee 2012]). Correct and modify existing power lines, which have been identified as having problems with collision or electrocution of wildlife and do not meet Avian Power Line Interaction Committee standards, to prevent future wildlife collision threats or electrocution. Maintain and upgrade power lines that are in good working order as deemed necessary. |

| Fish and Wildlife | |
|---|---|
| FW-MA-06 | **Action:**<br>Improve or maintain woody vegetation. Short-term treatment effects may be allowed if long-term benefits are expected. |
| FW-MA-07 | **Action:**<br>Management actions will focus on 1) migratory bird populations, habitat restoration, and enhancement where actions can benefit specific ecosystems and migratory birds that depend on them; and 2) recognize that actions that may provide long-term benefits to migratory bird populations may also have negative effects on individual birds. Effects on individuals will be considered in relation to overall, long-term desired conditions. |
| FW-MA-08 | **Action:**<br>Existing fences may be modified or removed to enhance wildlife movements. Build new fences to allow wildlife passage. |
| *Bighorn Sheep* | |
| FW-MA-09 | **Action:**<br>Domestic sheep/goats would not be allowed within 9 miles of wild bighorn sheep populations. Between 9 and 20 miles, domestic sheep and goats may be considered if mechanisms are in place to achieve effective separation from wild sheep. |
| FW-MA-10 | **Action:**<br>Provide habitat on BLM-administered land to maintain and expand bighorn sheep in the planning area. Allow for new bighorn sheep populations in unoccupied habitat, where suitable conditions are available. |
| FW-MA-11 | **Action:**<br>Do not allow pack goats in bighorn sheep habitat areas. |
| Special Status Species | |
| FW–GOAL-03 | **Goal:**<br>Manage for the biological integrity and habitat function to facilitate the conservation, recovery, and maintenance of populations of fish, wildlife, and plant special status species. |
| FW–OBJ--06 | **Objective:**<br>Protect or enhance areas of ecological importance for special status species. Manage for no net loss of habitat for special status species. |
| FW-MA-12 | **Action:**<br>No action would be initiated on BLM-administered land that would jeopardize any candidate or federally listed threatened and endangered plant or animal. Effects on state-designated species of special interest would be evaluated and applicable mitigation developed prior to any action on BLM-administered land. |
| FW-OBJ-07 | **Objective:**<br>Manage and recover special status species by determining and implementing strategies, restoration opportunities, use restrictions, and management actions. |

| Fish and Wildlife | |
|---|---|
| FW-MA-13 | **Action:**<br>Upon designation of special status species, identify distribution, key habitat areas, and special management needs to be used in watershed assessments. |
| FW–MA-14 | **Action:**<br>Develop site-specific design features for BLM-authorized activities, such as those identified in **Appendix F**, to protect threatened, endangered, sensitive species and migratory birds. |
| FW-MA-15 | **Action:**<br>Caves and other structures utilized by bats would be managed for public access following the Montana white-nose syndrome (WNS) response strategy (MFWP 2016). |
| FW-OBJ-08 | **Objective:**<br>Develop and implement habitat management plans, activity plans, or use other mechanisms to protect special status species. |
| FW-MA-16 | **Action:**<br>Whenever possible, design management activities in habitat for threatened and endangered species to benefit those species through habitat improvement. |
| *Grizzly Bear* | |
| FW-MA-17 | **Action:**<br>Manage habitat in accordance with the current Northern Continental Divide Ecosystem (NCDE) Grizzly Bear Conservation Strategy: **Appendix K (See PRMP/FEIS)**, Northern Continental Divide Ecosystem Grizzly Bear Conservation Strategy). |
| FW-MA-18 | **Action:**<br>In consultation with USFWS, implement a food storage order on BLM-administered lands within the grizzly bear Primary Conservation Area, Zone 1, Zone 2 and other areas for public safety and to reduce wildlife conflicts. |
| *Prairie Dog Habitat* | |
| FW-MA-18 | **Action:**<br>Maintain abundance and distribution of prairie dogs. Acreages of active prairie dog towns would range between 41,400 and 30,600 acres (36,000 acres plus or minus 15 percent) in the planning area for the next 20 years (or until revised/amended) and would consist of:<br>• At least one complex of 1,000 or more acres of active prairie dog towns following the 7-kilometer rule; and prairie dog towns less than 1,000 acres would be scattered throughout the historical prairie dog range in the planning area. |
| *Greater Sage-Grouse (see 2015 Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region for all other goals, objectives, allowable uses, and management actions [BLM 2015d])* | |
| FW–AU-01 | **Allowable Use:**<br>Apply NSO stipulations to greater sage-grouse PHMA. |
| FW–AU-02 | **Allowable Use:**<br>Apply NSO stipulations within 0.6 miles of a lek within GHMA. |

| Fish and Wildlife | |
|---|---|
| FW-AU-03 | **Allowable Use:**<br>Apply CSU stipulations within 2 miles of a lek within GHMA. |
| FW-AU-04 | **Allowable Use:**<br>PHMA are open to new mineral material sales for both free and commercial use following disturbance guidelines and other applicable conservation measures. |
| FW-MA-19 | **Action:**<br>Follow current BLM policy on mitigation. |

| Stipulations and Restrictions for Biological Resources | |
|---|---|
| *Stipulations for Fluid Minerals (see **Appendix L**, Stipulations and Allocations Applicable to Fluid Minerals, for detailed description of stipulations and waivers, exceptions, and modifications.)* | |
| FW-AU-05 | **Allowable Use:**<br>**STIPULATION NSO** *Fisheries*:<br>• Westslope Cutthroat Trout<br>• Blue Ribbon Trout Stream<br>• Bull Trout (Butte FO Portion) |
| FW-AU-06 | **Allowable Use:**<br>**STIPULATION NSO** *Fisheries and Aquatic Species* |
| FW-AU-07 | **Allowable Use:**<br>**STIPULATION NSO** *Special Status Fisheries* |
| FW-AU-08 | **Allowable Use:**<br>**STIPULATION NSO** *Water Bird Nesting Colony* |
| FW-AU-09 | **Allowable Use:**<br>**STIPULATION TL** *Water Bird Nesting Colony* |
| FW-AU-10 | **Allowable Use:**<br>**STIPULATION NSO** *Crucial Winter Range* |
| FW-AU-11 | **Allowable Use: STIPULATION** *CSU Winter Range (pronghorn, elk, moose, bighorn sheep, mule and whitetail deer)* |
| FW-AU-12 | **Allowable Use:**<br>**STIPULATION** *CSU Elk Calving Grounds* |
| FW-AU-13 | **Allowable Use:**<br>**STIPULATION NSO** *Sharp-tailed Grouse Lek* |
| FW-AU-14 | **Allowable Use:**<br> **STIPULATION TL** *Sharp-tailed Grouse Lek* |

| Stipulations and Restrictions for Biological Resources | |
|---|---|
| FW-AU-15 | **Allowable Use:**<br>**STIPULATION** *NSO Bats* |
| FW-AU-16 | **Allowable Use:**<br>**LEASE NOTICE** *LN Special Status Species* |
| FW-AU-17 | **Allowable Use:**<br>**LEASE NOTICE** *LN Migratory Bird Treaty Act.* |
| FW-AU-18 | **Allowable Use:**<br>**STIPULATION** *NSO Raptors* |
| FW-AU-19 | **Allowable Use:**<br>**STIPULATION** *TL Raptors* |
| FW-AU-20 | **Allowable Use:**<br>**STIPULATION** *NSO Bald Eagle* |
| FW-AU-21 | **Allowable Use:**<br>**STIPULATION** *NSO Peregrine Falcon* |
| FW-AU-22 | **Allowable Use:**<br>**STIPULATION** *NSO Piping Plover* |
| FW-AU-23 | **Allowable Use:**<br>**STIPULATION** *NSO Prairie Dog Habitat* |
| FW-AU-24 | **Allowable Use:**<br>**STIPULATION** *NSO Bighorn Sheep Lambing* |
| FW-AU-25 | **Allowable Use:**<br>**STIPULATION** *CSU Bighorn Sheep Range* |
| FW-AU-26 | **Allowable Use:**<br>**STIPULATION** *NSO Pallid Sturgeon* |
| FW-AU-27 | **Allowable Use:**<br>**STIPULATION** *NSO Mountain Plover* |
| FW-AU-28 | **Allowable Use:**<br>**STIPULATION** *TL Mountain Plover* |
| FW-AU-29 | **Allowable Use:**<br>**STIPULATION** *TL Sprague's Pipit* |
| FW-AU-30 | **Allowable Use:**<br>**LEASE NOTICE** *LN Sprague's Pipit* |
| FW-AU-31 | **Allowable Use:**<br>**STIPULATION** *NSO Greater Sage-Grouse PHMAs/CSU Greater Sage-Grouse GHMA* |

| Stipulations and Restrictions for Biological Resources | |
|---|---|
| FW-AU-32 | **Allowable Use:**<br>**Stipulation *NSO Grizzly Bear PCA and Zone 1*** |
| FW-AU-33 | **Allowable Use:**<br>**LEASE NOTICE *LN Greater Sage-Grouse*** |
| *Surface-Disturbing Activities (Non-Fluid Minerals Activities; see Fluid Leasable Minerals alternatives below for restrictions for fluid minerals activities)* | |
| FW-AU-34 | **Allowable Use:**<br>Apply appropriate BMPs, conservation actions, and design features as outlined in **Appendix F** to all site-specific surface-disturbing or disrupting activities during implementation-level project analysis. |

| Wildland Fire Ecology and Management | |
|---|---|
| WF-GOAL-01 | **Goal:**<br>Manage fire and fuels to protect life and property and to protect or enhance resource values. |
| WF-OBJ-01 | **Objective:**<br>Having provided for firefighter and public safety, which is the first priority (2009 Guidance for Implementation of Federal Wild Fire Management Policy, p. 10), manage wildfires to protect property and meet resource objectives described in the vegetation section. |
| WF-MA-01 | **Action:**<br>Manage the Big Open, Front, Island Ranges, and Prairie Forests FMUs as Category B (**Appendix I**). Suppress wildfires in areas with resource values that would be damaged by fire, including structures, improvements, oil and gas developments, commercial forest values, Wyoming big sagebrush (Artemisia tridentata spp. wyomingensis), fire-sensitive riparian areas, and cultural values. The initial response to BLM wildfires would be to suppress using direct and indirect tactics. Fires adjacent to, or near, wildland-urban interface areas have the highest priority for fire suppression.<br>Manage the Breaks FMU as Category C.<br>Use an interdisciplinary approach and a decision support process to guide and document wildfire management decisions. The process would provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions. When natural ignition fires are managed with less than full suppression, fire tactics will be discussed in collaboration with partner agencies and adjacent landowners. |
| WF-MA-02 | **Action:**<br>Fire management of BLM-administered lands would be guided by the following categories (**Map Appendix A** Fire Management [**Figure A-3**]):<br>• Category A: Fire is not desired (0 acres)<br>• Category B: Unplanned fire would cause negative effects (452,800 acres)<br>• Category C: Fire is desired to manage ecosystems, but current vegetative condition creates constraints on use (197,300 acres<br>• Category D: Fire is desired; few or no constraints on its use (0 acres). |

| Wildland Fire Ecology and Management | |
|---|---|
| WF-OBJ-02 | **Objective:**<br>Use of prescribed fire, mechanical treatment, and chemical treatment to protect, maintain, and enhance resources across the landscape; and to function in its ecological role, where appropriate. |
| WF-MA-03 | **Action:**<br>Use of prescribed fire, pile burns, mechanical treatment, and chemical treatment to restore and maintain fire regimes, land health, and to reduce hazardous fuels accumulations. Approved prescribed fire implementation plans would be used for any planned fire ignition. Continue to use prescribed fire in support of resource objectives. |
| WF-MA-04 | **Action:**<br>Plan and prioritize vegetation and fuels treatments on BLM-administered lands based on values at risk (including WUIs) and land health assessments, including VCC assessments. In conjunction with forestry, wildlife, riparian, and range management priorities, mechanical and prescribed fire, and other appropriate treatments may be used in all fire management units. Prescribed fire and fuels treatments may be applied in accordance with Manual 6330, Management of BLM WSAs (BLM 2012a).<br>WUI areas are identified through inter-agency working groups, updates to Community Wildfire Protection Plans and Pre-Disaster Mitigation Plans, and during project-level vegetation treatment planning. |
| WF-MA-05 | **Action:**<br>Mechanical, chemical, and prescribed fire treatments would be used to comply with BLM-sponsored initiatives that build resilience to climate variability and improve fire regime/VCC, DFC, native rangelands, wildlife habitat, forest health, and healthy lands. Appropriate weather patterns are key factors influencing actual treatment accomplishments.<br>Unplanned wildfire to meet resource objectives and agency initiatives would be used, when appropriate, with the approved planning documents and agency coordination in place. |
| WF-MA-06 | **Action:**<br> In partnership with local, state, and federal partners, build capacity within communities bordering federal lands to reduce risks and threats from wildfire. BLM will plan collaboratively with local, state and federal governments to reduce wildfire risk and improve forest health and resiliency across land ownership units and incorporate Community Wildfire Protection Plans and Pre- Disaster Mitigation Plans in its approach toward local fire risk assessment and mitigation as time and funding allows. |

| Cultural and Heritage Resources | |
|---|---|
| CUL-GOAL-01 | **Goal:**<br>Identify, preserve, and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103 (c), 201(a) and (c); NHPA, Section 110(a); Archaeological Resources Protection Act (ARPA), Section 14(a)). |
| CUL-OBJ-01 | **Objective:**<br>Assign cultural resources to particular uses and assess and establish thresholds for determining cultural property significance. The cultural resource management plan would establish the management prescriptions best suited for fulfilling management goals and objectives. |
| CUL-AU-01 | **Allowable Uses:**<br>Categorizing cultural resources according to their potential uses is the culmination of the identification process and the bridge to protection and utilization decisions. Use categories establish what needs to be protected, and when or how use should be authorized. All cultural resources have uses, but not all should be used in the same way (BLM 8110 Manual, BLM 2004). All recorded cultural resources would be assessed according to six use categories for prehistoric and historic resources, as identified below:<br>• **Scientific Use:** Scientific Use properties include sites similar in composition to:<br>• Smith River Chert Quarries (Meagher County). This area is important because of the extent of the chert quarries, and the dispersal of the material across Montana.<br>• **Public Use:** Public Use properties include sites of similar composition to:<br>• Wartzenluft Homestead (24FR0408). This homestead represents a type and period of development representing early 20th century activity in central Montana. Restoration and interpretive work at the Wartzenluft Homestead showcase this as a recreational opportunity in the field office.<br>• Lewistown Satellite Airfield/Bombing Range (24PT0236). This National Register of Historic Places (NRHP)-listed property represents a unique World War II site type.<br>• Lewistown Satellite Airfield/Gunnery Range (Fergus County) This NRHP -eligible property represents a unique World War II site type.<br>• **Conservation for Future Use:** Conservation for Future Use properties include sites of similar composition to:<br>• Square Butte (Chouteau County, multiple site #s). This area has numerous cultural and archaeological sites, including vision quests, campsites, and quarry sites that could constitute a district.<br>• Black Butte (Fergus County, multiple site #s). This area has numerous cultural and archaeological sites, including stone circles, vision quests, and lithics that could constitute a district.<br>• Nordahl Cemetery (24PT0217) This homestead-era cemetery has one finished headstone and other unmarked graves, with stories associated with the local history.<br>• Arrow Creek Burial (24FR0364). This site has reportedly been used historically as a Native American burial site, and also a local landmark with historic graffiti (stone carvings). |

| **Cultural and Heritage Resources** | |
|---|---|
| CUL-AU-01 *(continued)* | • Sun River Complex (Teton/Lewis & Clark counties). This area near the Rocky Mountain Front contains numerous rock alignments, stone circles, and cairns, with reported buffalo jumps and notable geographic features visible. This area is a proposed ACEC.<br>• **Experimental Use:** No Experimental Use properties have been identified at this time.<br>• **Traditional Use:** Traditional Use properties include sites of similar composition to:<br>• Ear Mountain (Teton County). This is a noted landmark on the Rocky Mountain Front and is in a proposed ACEC.<br>• **Discharged from Management:** No Discharged from Management properties have been identified at this time. |
| CUL-MA-01 | **Action:**<br>Prioritize NHPA Section 106 compliance inventory, completing Section 110 inventory as time and funding allow. |
| CUL-GOAL-02 | **Goal:**<br>Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA, Section 203(c), NHPA, Section 106, 110(a; 2)) by ensuring that all authorizations for land use and resource use would comply with the NHPA, Section 106. |
| CUL-OBJ-02 | **Objective:**<br>Identify special areas or historical properties and develop activity plans identified as high risk for adverse effects. |
| CUL-AU-02 | **Allowable Use:**<br>**LEASE NOTICE *MT-CR 16-1 Cultural Resources Lease*** |
| CUL-AU-03 | **Allowable Use: STIPULATON**<br>***NSO Cultural Resources*** |
| CUL-AU-04 | **Allowable Use:**<br>**LEASE NOTICE *LN Cultural Resources*** |
| CUL-MA-07 | **Allowable Use:**<br>**LEASE NOTICE *LN Sacred and Historic Properties*** |
| CUL-OBJ-03 | **Objective:**<br>Provide and promote research opportunities that would contribute to understanding of the ways humans have used and influenced the landscape. |
| CUL-MA-08 | **Action:**<br> Identify documented sites and site types through the allocation process that are conducive to research. |
| CUL-GOAL-03 | **Goal:**<br>Enhance public understanding of, and appreciation for, cultural resources through educational outreach and heritage tourism opportunities. |

| Cultural and Heritage Resources | |
|---|---|
| CUL-OBJ-04 | **Objective:**<br>The purposes of this program are to analyze the scientific and sociocultural values of cultural resources, to provide a basis for allocation of cultural resources, to make cultural resources an important part of the planning system, and to identify information needed when existing documentation is inadequate to support a reasonable cultural resource-based land use allocation. |
| CUL-MA-09 | **Action:**<br>Monitor sites when potential conflicts with proposed undertakings surface. |
| CUL-MA-10 | **Action:**<br>Prioritize NRHP nominations as mitigation for adverse effects on eligible historic properties, preparing nominations as time and funding allow. |

| Paleontological Resources | |
|---|---|
| PAL-GOAL-01 | **Goal:**<br>Identify, preserve, and protect significant paleontological resources, and ensure that they are available to present and future generations for appropriate uses such as scientific studies and public education. |
| PAL-OBJ-01 | **Objective:**<br>Protect major paleontological resources of scientific interest. |
| PAL-MA-01 | **Action:**<br>Casual collection of common invertebrate and plant fossils is allowed for noncommercial purposes without a permit, as allowed by existing statute, except that it is not allowed in the following locations: Blacktail Paleontological Withdrawal and Sun River. |
| PAL-MA-02 | **Action:**<br>Promote the stewardship, conservation, and appreciation of paleontological resources through appropriate educational and public outreach programs. |
| PAL-AU-01 | **Allowable Use:**<br>**STIPULATION NSO** Paleontological Areas |
| PAL-AU-02 | **Allowable Use:**<br>Close Egg Mountain and the Blacktail Paleontological Area to mineral material disposal |
| PAL-AU-03 | **Allowable Use:**<br>**LEASE NOTICE LN** Paleontological Resource Inventory Requirement |

| Visual Resources | |
|---|---|
| VIS-GOAL-01 | **Goal:**<br>Maintain the scenic quality and natural aesthetics of river canyons, open space landscapes, cultural landscapes, and other areas with high-quality visual resources that are considered important as social, economic, and environmental benefits. |
| VIS-OBJ-01 | **Objective:**<br>Manage visual resources for overall multiple use in accordance with VRM classification objectives (currently described in the BLM Visual Resource Inventory Handbook (H-8410-1; BLM 1986). |
| VIS-AU-01 | **Allowable Use:**<br>Adopt the VRM classes as follows (**Map Appendix A** Visual Resource Management [**Figure A-4**]):<br>• Class I: 15,700 acres<br>• Class II: 107,200 acres<br>• Class III: 186,800 acres<br>• Class IV: 341,500 acres |
| VIS-MA-01 | **Action:**<br>Develop user facilities (e.g., trailheads, nonmotorized trails, campgrounds, roads, utilities, and interpretive areas) to take advantage of views of scenic and historical landscapes in such a way that visual quality is protected. |
| VIS-MA-02 | **Action:**<br>Design and implement fuel treatments with an emphasis on protecting VRM classifications. Closely evaluate the benefits of the fuel breaks against the loss of landscape characteristics. |
| VIS-MA-03 | **Action:**<br>All fire break lines within VRM I must be rehabilitated in order to meet VRM I characteristics. If the fire break line is in a WSA (VRM I), the rehabilitated line must meet non-impairment standards and native seeds/plants must be used. |
| VIS-AU-02 | **Allowable Use:**<br>**STIPULATION CSU** *VRM Class II* |
| VIS-OBJ-02 | **Objective:**<br>Manage permitted activities to reduce alteration of natural night sky light and maintain dark, clear skies for stargazing and other nighttime activities. |
| VIS-MA-04 | **Action:**<br>Prohibit permanent outdoor lighting in VRM Class I areas. |
| VIS-MA-05 | **Action:**<br>Prevent or reduce effects from artificial lighting by using BMPs that reduce skyward projection of lighting, minimizing illumination and off-site projection of lighting, and by designing required lighting to be downward directing. |

| Lands with Wilderness Characteristics | |
|---|---|
| LWC-GOAL-01 | **Goal:**<br>Manage lands with wilderness characteristics to emphasize other multiple uses as a priority over protecting wilderness characteristics. |
| LWC-OBJ-01 | **Objective:**<br>Identify lands with wilderness characteristics but do not manage to maintain those characteristics |
| LWC-MA-01 | **Action:**<br> Identify wilderness characteristics on acquired lands. |

| Cave and Karst Resources | |
|---|---|
| CK-GOAL-01 | **Goal:**<br>Manage all cave resources as mandated by Federal Cave Resources Protection Act of 1988 (FCRPA) to protect unique, nonrenewable, and fragile biological, geological, hydrological, cultural, paleontological, scientific, and recreational values for present and future users. |
| CK-OBJ-01 | **Objective:**<br>Cave and karst resources would be managed to provide opportunities for scientific research, educational study, and recreational experiences that are compatible and consistent with protection of resources associated with caves and karst landforms. |
| CK-MA-01 | **Action:**<br>Manage the Tate-Poetter Cave in the Judith Mountains to protect significant values. |
| CK-MA-02 | **Action:**<br>Develop Cave Management Plan for Crystal Cave and Tate-Poetter Cave. |
| CK-MA-03 | **Action:**<br>Maintain the Crystal Cave withdrawal from locatable mineral entry. |
| CK-MA-04 | **Action:**<br>Coordinate access to Crystal Cave and Lick Creek Cave with the State of Montana and Forest Service, respectively. |

| RESOURCE USES | |
|---|---|
| **Non-Energy Solid Leasable Minerals** | |
| NESL-GOAL-01 | **Goal:** <br> Provide opportunities for exploration and development of nonenergy solid leasable minerals consistent with other resource goals. |
| NESL-OBJ-01 | **Objective:** <br> Provide opportunities for nonenergy leasable exploration and/or development in accordance with existing regulations (43 CFR 3500). |
| NESL-AU-01 | **Allowable Use:** Manage WSAs (1,900 acres) as closed to nonenergy solid mineral leasing in accordance with BLM policy (see BLM Manual 6330, BLM 2012a; **Figure A-5; Map Appendix A)**. |
| NESL-AU-01 | **Allowable Use:** <br> Manage 110,200 acres of federal mineral estate as closed to nonenergy solid mineral leasing in accordance with withdrawal orders (see Withdrawals section in Lands and Realty alternatives section in this table (Figure 2-11, Alternative A: Nonenergy Solid Leasable Minerals, Figure 2-12, Alternative B: Nonenergy Solid Leasable Minerals, Figure 2-13 Alternative C2: Nonenergy Solid Leasable Minerals, and **Figure A-5; Map Appendix A**. |
| NESL-AU-02 | **Allowable Use:** <br> Manage 284,100 acres of federal mineral estate as administratively closed to nonenergy leasable mineral exploration and/or development **Figure A-5; Map Appendix A** |
| NESL-AU-03 | **Allowable Use:** <br> Manage 800,600 acres of federal mineral estate as open for consideration for nonenergy leasable mineral exploration and/or development **Figure A-5; Map Appendix A**. |

| **Fluid Leasable Minerals** | |
|---|---|
| FLM-GOAL-01 | **Goal:** Ensure dependable and environmentally responsible production of leasable minerals by identifying lands appropriate for lease and development. |
| FLM-OBJ-01 | **Objective:** Provide opportunities for exploring, leasing, and developing fluid mineral resources, while applying the appropriate lease stipulations and conditions of approval to mitigate environmental effects from development. |
| FLM-AU-01 | **Allowable Use:** Manage 110,200 acres of federal mineral estate as closed to fluid mineral leasing in accordance with withdrawal orders *(see Withdrawals section in Lands and Realty alternatives section in this table;* **Figure A-6; Map Appendix A**. |
| FLM-AU-02 | **Allowable Use:** Manage WSAs (1,900 acres) as closed to fluid mineral leasing in accordance with the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 USC 181; **Figure A-6; Map Appendix A**. |
| FLM-MA-01 | **Action:** Manage 0 acres of federal mineral estate as administratively closed to fluid mineral leasing **Figure A-6; Map Appendix A**. |
| FLM-MA-02 | **Action:** Manage 1,084,700 acres of federal mineral estate as open to fluid mineral leasing. **Figure A-6 Map Appendix A**. |
| FLM-MA-03 | **Action:** Manage 239,000 acres of federal mineral estate as open to fluid mineral leasing, subject to standard stipulations. |

| Fluid Leasable Minerals | |
|---|---|
| FLM-AU-03 | **Allowable Use:** Apply NSO stipulations to fluid mineral leases on 468,000 acres of federal mineral estate (**Map Appendix A** No Surface Occupancy for Fluid Minerals Leasing [**Figure A-7**]): |
| FLM-AU-04 | **Allowable Use:** Apply CSU stipulations to fluid mineral leases on 629,000 acres of federal mineral estate (**Map Appendix A** Controlled Surface Occupancy for Fluid Minerals Leasing [**Figure A-8**]): |
| FLM-AU-05 | **Allowable Use:** Apply TL stipulations to fluid mineral leases as described in **Appendix L**. |
| FLM-AU-06 | **Allowable Use:** May recommend modifications or disapprove a proposed activity that is likely to adversely affect federally listed threatened or endangered species or their critical habitat; or contribute to a need to list other species. |

| Locatable Minerals | |
|---|---|
| LOC-GOAL-01 | **Goal:** Provide land use opportunities contributing to economic opportunities while protecting or minimizing adverse effects on other resources. |
| LOC-OBJ-01 | **Objective:** Provide for locatable mineral entry in accordance with existing laws and regulations (43 CFR 3700 and 3800). |
| LOC-AU-01 | **Allowable Use:** Manage 23,500 acres of BLM surface as withdrawn from locatable mineral entry in accordance with withdrawal orders *(see Withdrawals section in Lands and Realty;* (**Map Appendix A** Locatable Minerals [**Figure A-9**]): Under the appropriate authority, withdrawals would be maintained. |
| LOC-MA-01 | **Action:** Allow mineral exploration and development (locatable minerals) under the General Mining Law of 1872 on 628,000 acres of BLM surface not withdrawn from locatable mineral entry (**Map Appendix A** Locatable Minerals [**Figure A-9**]) Regulate locatable mineral exploration and development on BLM-administered land under 43 CFR 3800. |

| Mineral Materials | |
|---|---|
| MM-GOAL-01 | **Goal:** Provide for the extraction of mineral materials to meet public demand while minimizing adverse effects on other resource values. |
| MM-OBJ-01 | **Objective:** Provide for mineral material sales in accordance with existing laws and regulations (43 CFR 3600). |
| MM-MA-01 | **Action:**<br>• Issue sales contracts for mineral materials (sand, gravel, stone, limestone, and clay) where disposal is deemed to be in the public interest, while providing for reclamation of mined lands and preventing unnecessary or undue effects on other resources. All lands not withdrawn or discretionally closed are available for mineral material disposal. Mineral material permits are considered on a case-by-case basis and issued at the discretion of the BLM Authorized Officer.<br>• Free use permits may be issued. Materials obtained by a free use permit may not be bartered or sold.<br>• Mineral material sale contracts are valued according to the BLM statewide general appraisal schedule or through individual site-specific appraisals.<br>• Common use areas or community pits would be designated if the level of localized activity warrants. New mineral material sites would be evaluated on a case-by-case basis. |

| Mineral Materials | |
|---|---|
| MM-MA-01 *(continued)* | • Mineral material sales would be processed on a case-by-case basis. Salable mineral sites would have an approved mining and reclamation plan and an environmental review prior to being opened. Where resource conflicts cannot be adequately mitigated, a permit would be denied. Operating stipulations to protect other resource values would be included in mineral material permits |
| MM-AU-02 | **Allowable Use:** Manage 1,179,600 acres of federal mineral estate as open for mineral material disposal. (**Map Appendix A** Mineral Materials [**Figure A-10**]) |
| MM-AU-02 | **Allowable Use:** Manage 17,200 acres of federal mineral estate as closed to mineral material disposal (**Map Appendix A** Mineral Materials **Figure A-10**]) |

| Livestock Grazing | |
|---|---|
| LG-GOAL-01 | **Goal:** Provide opportunities for livestock grazing to support and sustain local communities while providing habitat for native plants, fish, and animals (including special status species). |
| LG-OBJ-01 | **Objective:** Meet the forage demands of livestock operations based on current permitted use (AUMs active and suspended). |
| LG-MA-01 | **Action:** Make 636,600 acres available for livestock grazing (**Map Appendix A** Livestock Grazing [**Figure A-11**]). Periodically evaluate acres available, permitted use (i.e., AUMs), and permit terms and conditions (e.g., periods of use and class of livestock) and adjust as needed based on monitoring and land health conditions. |
| LG-MA-02 | **Action:** Manage 14,600 acres as unavailable for livestock grazing. All other lands, including parcels not currently authorized for grazing use and certain other tracts similarly unauthorized for grazing use, are available for livestock grazing. |
| LG-MA-03 | **Action:** Establish allotment stocking rates to maintain healthy diverse vegetation and wildlife communities, and to maintain or achieve Standards for Rangeland Health (BLM 1997). Forage utilization levels by livestock may vary based on the implementation of comprehensive grazing strategies necessary to maintain or achieve vegetation and/or habitat objectives. Continue to allocate 126,042 AUMs to livestock grazing across the planning area. Increases in allotment-specific allocations based on forage availability and improvement to vegetation/habitat communities would be considered, not to exceed 63,021 additional AUMs across the planning area. |

| Livestock Grazing | |
|---|---|
| LG-MA-04 | **Action:**<br> Exclude developed recreation sites from livestock grazing, except where grazing is needed to maintain the desired plant community. For example, sheep or goat grazing may be needed to control leafy spurge. Manage grazing by horses and other livestock used by recreationists in developed recreation sites through specific activity plans. |
| LG-MA-05 | **Action:**<br> In allotments where Standards for Rangeland Health (BLM 1997; **Appendix N: See PRMP/FEIS**) are not met, livestock grazing was a causal factor in the failure to meet these standards, and there was no progress toward meeting the standards in the allotments within 5 years of making management changes, suspend use, all or in part, and do not reauthorize until standards and habitat objectives are attained. Once standards and habitat objectives are met, reauthorize use at levels to maintain resource objectives. Allotments would be unavailable for grazing if standards and habitat objectives could not be met by any level of authorized use. |
| LG-MA-06 | **Action:**<br>All vegetation increases within an allotment would be allocated to watershed, until the soil and vegetation resource is stabilized at a satisfactory condition as determined by an interdisciplinary team. These increases could come from, but are not limited to, livestock grazing, wildfire rehabilitation areas, prescribed burn areas, and vegetation treatment areas. Once stabilized, forage may be allocated to livestock grazing. |
| LG-MA-07 | **Action:**<br>Do not consider the yearling factor on new permits/leases. Remove yearling factors on permits/leases that currently employ one as the permits/leases are renewed |
| LG-MA-08 | **Action:**<br>As appropriate, line managers would follow the drought policy in **Appendix P (See PRMP/FEIS)**, Drought Policy. |
| LG-MA-09 | **Action:**<br>Newly acquired lands would be evaluated to determine if they should be designated as reserve common allotments, allocated for grazing, or designated as unavailable for livestock grazing in consideration of the management needs and objectives for the acquisition. |
| LG-MA-10 | **Action:**<br>In priority vegetation, there would be no minimum rest period from livestock grazing following disturbances. Site-specific requirements for resting or deferring areas from livestock grazing following major disturbance would depend on a variety of factors, including resource objectives, the type of fuel, time and intensity of burn, accessibility of the burned area to livestock, and post-burn climatic factors. |

| Livestock Grazing | |
|---|---|
| LG-MA-11 | **Action:**<br>Domestic sheep/goats would not be allowed within 9 miles of wild bighorn sheep populations. Between 9 and 20 miles, domestic sheep and goats may be considered if mechanisms are in place to achieve effective separation from wild sheep. Sheep and goat allotments in areas with risk of contact (between 9 and 20 miles) with bighorn sheep and domestic sheep and/or goats in the planning area would be reviewed and managed, or reclassified if necessary, to achieve effective separation (both temporal and/or spatial) between domestic sheep and/or goats and bighorn sheep. Contact risk would be based on habitat, distance between bighorn sheep range (current and anticipated), sheep and goat allotments, movement potential, and current science and guidelines. Domestic sheep/goats would not be allowed within occupied wild bighorn sheep habitat unless mechanisms are in place to achieve effective separation from wild sheep |

| Recreation and Visitor Services | |
|---|---|
| REC-GOAL-01 | **Goal:** Pursuant to Secretarial Orders 3347 and 3356, the recreation program will increase opportunities for outdoor recreation that add to the participant's quality of life while contributing to local economies. |
| REC-OBJ-01 | **Objective:**<br>• Visitor Services Resource Protection Objective: Increase awareness, understanding, and sense of stewardship in recreational activity participants so their conduct safeguards cultural and natural resources.<br>• Visitor Health and Safety Objective: Ensure that visitors are not exposed to unhealthy or unsafe human-created conditions (defined by a repeat or recurring incident in the same year, of the same type, in the same location, due to the same cause).<br>• Use/User Conflict Objective: Achieve a minimum level of conflict between recreation participants and (1) other resource/resource uses sufficient to enable the achievement of identified land use plan goals, objectives, and actions; (2) private landowners sufficient to curb illegal trespass and property damage; and (3) other recreation participants sufficient to maintain a diversity of recreation activity participation. |
| REC-MA-01 | **Action:** Prioritize construction for developed and undeveloped recreation sites that can be realized through enacting a fee-based program at developed recreation sites, partnerships with other government entities, local service organizations, etc. |
| REC-AU-01 | **Allowable Use:**<br>**STIPULATION** *NSO Recreation Areas* |
| REC-AU-02 | **Allowable Use:**<br>**STIPULATION** *NSO Developed Recreation Sites* |
| REC-AU-03 | **Allowable Use:**<br>**STIPULATION** *NSO Fisheries and Aquatic Species* |
| REC-AU-04 | **Allowable Use:**<br>**STIPULATION** *NSO State Lands* |

| Recreation and Visitor Services | |
|---|---|
| *Special Recreation Management Areas (SRMA-specific outcomes-focused objectives, proposed recreation setting characteristics [RSCs], and the management framework for each can be found in **Appendix Q**, Recreation Management Areas).* | |
| REC–MA--02 | **Action:**<br>Designate four SRMAs (**Figure A-12**, Recreation Management Areas [**Appendix A**]):<br>• Judith Mountains (19,180 acres)<br>  o Limekiln Canyon Recreation Management Zone (RMZ) (4,790 acres)<br>  o Judith Peak/Red Mountain RMZ (14,389 acres)<br>• Lowry Bridge (80 acres)<br>• North Moccasin (3,200 acres)<br>• Snowy Mountains (470 acres) |
| *Extensive Recreation Management Area (ERMAs) (ERMA-specific objectives and the management framework for each can be found in **Appendix Q**.)* | |
| REC–MA-03 | **Action:**<br>Designate one ERMA (**Figure A-12; Map Appendix A**):<br>• Judith (8 reservoirs; 781 acres) |
| *Backcountry Conservation Areas (BCAs)* | |
| REC–MA--04 | **Action**<br>Designate two BCAs (**Figure A-12; Map Appendix A**):<br>• Arrow Creek BCA (12,800 acres)<br>• Crooked Creek BCA (93,400 acres) |
| *Special Recreation Permits (SRPs)* | |
| REC–MA-05 | **Action:** Do not allow SRPs in priority habitat unless they are consistent with the goals and objectives for that habitat or species. |
| *Target Shooting* | |
| REC–MA-06 | **Action:** No similar action. Note: Discharge of firearms is prohibited in all developed recreation sites (campgrounds, trailheads, picnic areas, etc.) per 43 CFR 8365.2-5(a). |

| Travel, Transportation Management and Access | |
|---|---|
| TRV-GOAL-01 | **Goal:** <br> Manage both motorized and nonmotorized travel to support the BLM's mission, achieve resource management objectives, and provide appropriate, sustainable public and administrative access. |
| TRV-OBJ-01 | **Objective:** <br> Maintain and improve land health while promoting responsible use through active travel management. Within each travel management area, designate a comprehensive travel management system that achieves resource management objectives; provides appropriate, sustainable public and administrative access; communicates with the public about opportunities; and monitors the effects of use. |
| TRV-MA-01 | **Action:** <br> Manage specific areas to protect resource values in special designations, protect vegetation and soils to maintain watersheds and water quality, reduce user conflicts, and reduce harassment of wildlife and provide habitat security. In areas designated as limited, restrict public cross-country OHV use on BLM-administered land yearlong or seasonally to existing routes. |
| TRV-MA-02 | **Action:** <br> Existing and/or new individual routes would be designated using criteria described in 43 CFR 8342.1 rather than just using all the inherited routes. |
| TRV-MA-03 | **Action:** <br> The BLM would emphasize management of the transportation system to reduce effects on natural resources from authorized roads, primitive roads, and trails. The BLM would also consider, through travel management planning, closing and restoring unauthorized routes to prevent resource damage. |
| TRV-MA-04 | **Action:** <br> Resource considerations would be assessed in determining designation criteria. All designations would be based on the protection of resources, safety of all users, and the minimization of conflicts among various uses (43 CFR 8342.1). The following elements to be considered during route selection fall within the designation criteria: administrative access for the BLM and BLM-authorized activities; at-risk watersheds; cultural resources; current maintenance agreements; DFC; elimination of route redundancy; energy development; erodible soils; forest resources; low bearing strength soils (saline); paleontological resources; potential for adverse or positive economic effects; prescriptions for land use allocations including SRMAs; public health and safety; emergency services; recreation opportunities, experiences, settings, benefits; riparian resources, assessment of PFC; ROWs, easements and inholdings; Standards for Rangeland Health (BLM 1997); user preferences and conflicts of use; vegetation (at-risk vegetative sites, relic vegetation); visual resources; watershed resources; WSAs; wildlife resources (greater sage-grouse habitat, raptor nesting locations, sensitive species habitats, winter range, big game habitat, prairie dog habitat). |

| Travel, Transportation Management and Access | |
|---|---|
| TRV-MA-05 | **Action:**<br>Motorized wheeled cross-country travel for lessees and permittees is limited to the administration of a federal lease or permit. Persons or corporations having such a permit or lease could perform administrative functions on public lands within the scope of the permit or lease; however, this would not preclude modifying permits or leases to limit motorized wheeled cross-county travel during further site-specific analysis to meet resource management objectives or standards and guidelines (BLM 2003a). |
| TRV-MA-06 | **Action:**<br>New permanent routes would be constructed subject to environmental review and approved engineering standards, following criteria described in this section. Consideration would be given to use demands, location, safety, and resource constraints when determining the level of road necessary (BLM Manuals 9113 [BLM 2015e], 9114, 9115 [BLM 2012d], and associated handbooks). If an existing route is substantially contributing to resource effects, the route would be considered for redesign, rerouting, decommissioning, or closure to minimize the adverse effects. |
| TRV-MA-07 | **Action:**<br>The BLM would pursue opportunities to conduct restoration of routes not designated during travel management planning, with priority given to areas with special management concerns. This includes routes that have not been designated as "primitive routes" within WSAs and those that have been closed within areas that are being managed to protect or enhance special status species such as the greater sage-grouse. Applicable requirements such as specific seed mixes or transplanting recommendations would also be applied where special status species or issues are a concern (e.g., mitigation for greater sage-grouse). |
| TRV-MA-08 | **Action:**<br>BLM regulations (43 CFR 8341.2 and 8364.1) allow for area or road closures where OHVs are causing, or would cause, considerable adverse effects on soil, vegetation, wildlife, threatened or endangered species, wildlife habitat, cultural resources, other authorized uses, public safety, or other resources. The BLM Authorized Officer can immediately close the area or road affected until the effects are eliminated and measures are implemented to prevent future recurrence. |
| TRV-MA-09 | **Action:**<br>Manage 2,700 acres as closed to motorized travel (**Figure A-13**, Travel, Transportation Management, and Access – Motorized and OHV [**Map Appendix A**]). |
| TRV-AU-01 | **Allowable Use:**<br>Allocate the decision area as follows for OHV travel (**Figure A-13**, Travel, Transportation Management, and Access – Motorized and OHV [**Map Appendix A**]):<br>• 13,000 acres closed*<br>• 487,700 acres limited yearlong<br>• 147,800 acres limited seasonally<br>*Closed to OHV travel means closed to those modes of travel that meet the OHV definition, including exclusions, at 8340.0-5(a). |

| Travel, Transportation Management and Access | |
|---|---|
| TRV-MA-10 | **Action:**<br>Manage 487,700 acres as limited to designated routes yearlong for OHV travel. |
| TRV-MA-11 | **Action:**<br>Seasonally limit OHV travel and promote nonmotorized travel in the Chain Buttes and East Indian Butte BMAs (147,800 acres).<br>The seasonal limitation, September 1 through December 1, is based on the big game hunting season. Travel would be limited from 10 am to 2 pm for game retrieval only. If the hunting season were to change, the seasonal limitation would be modified accordingly as an implementation-level decision. |
| TRV-AU-02 | **Allowable Use:**<br>Allocate the decision area as follows for mechanized travel (**Figure A-13, A-14** Travel, Transportation Management, and Access – Motorized and OHV; Mechanized [**Map Appendix A**]):<br>• 502,200 acres open<br>• 2,700 acres closed<br>• 146,300 acres limited |
| TRV-MA-12 | **Action:**<br>Prohibit motorized cross-country OSV travel in the following locations (**Figure A-15**, Over-Snow Vehicle Travel, [**Map Appendix A**]):<br>• WSAs<br>• Crucial wildlife winter range<br>• Conservation Management Areas (CMAs) |
| TRV-AU-03 | **Allowable Use:**<br>Allow motorized cross-country OSV travel on 620,000 acres.<br>Motorized cross-country OSVs (with the exception of administrative and emergency use) are subject to the following management guidelines: Avoid locations where wind or topographic conditions may have reduced snow depth and created situations where damage to vegetation or soils could occur, or where the majority of vegetation is taller than the protective snow cover. Sensitive areas could be closed to motorized OSV travel if resource damage is found to be occurring in these areas. |
| TRV-MA-13 | **Action:**<br>Continue to allow fixed-wing aircrafts and helicopters to land on designated 2-tracks and roads. |

| Travel, Transportation Management and Access | |
|---|---|
| TRV-MA-14 | **Action:**<br>Complete travel planning in the following Travel Management Areas.<br>• Judith Moccasin<br>• Musselshell Breaks<br>• Crooked Creek<br>• Petrolia<br>• Judith River<br>• Headwaters |
| TRV-MA-15 | **Action:** Where private landowners have demonstrated willingness to provide public access across their lands, the BLM would manage for public access from BLM-administered lands across such private lands in travel plans. Exceptions include routes that the BLM has proposed as closed or are known to be posted or otherwise closed to the public by private property owners. The BLM has no control over private road traveling through private land onto BLM-administered lands. Access across private land is subject to change. Where public motorized access is contingent upon the governing consent of adjoining landowner(s), the BLM would exercise a reciprocal "All or None" road use policy. This means that as long as the public is allowed access to these roads, no changes in travel management would occur; however, should the adjacent landowner refuse public access, then the BLM would reciprocate by closing its roads to their use as well. *(This action only pertains portions of the planning area administered by the Butte Field Office. No similar action for portions of the planning area administered by the Lewistown Field Office).* |
| TRV-MA-16 | **Action:** Obtain legal public or administrative access over nonfederal lands from willing landowners or state or other federal agencies, as appropriate, on a case-by-case basis as the need or as the opportunity arises and using criteria and direction in the *Land Tenure* alternatives (see *Land Tenure* section below). Methods used to acquire access include easements acquired through purchase, exchange, or donation; reciprocal ROWs; land exchanges; fee title purchase; cooperative agreements; reservations; permits; donation of fee land; covenant language in patents or deeds; or long-term land use agreements. |

| Lands and Realty | |
|---|---|
| LR-GOAL-01 | **Goal:** Meet resource needs while providing public use authorizations such as ROWs, permits, and leases. |
| *Land Use Authorizations* | |
| LR-OBJ-01 | **Objective:** Address the needs of industry, utilities, the public, or government entities for land use authorizations while minimizing adverse effects on other resource values. |
| LR-AU-01 | **Allowable Use:** Manage 16,500 acres as ROW exclusion areas; **Figure A-16** Right-of-Way Exclusion and Avoidance **[Map Appendix A]).** |
| LR-AU-02 | **Allowable Use:** Manage 438,200 acres as ROW avoidance **Figure A-16** Right-of-Way Exclusion and Avoidance **[Map Appendix A]).**<br>Roads and utility corridors would avoid riparian zones to the extent practicable. |

| Lands and Realty | |
|---|---|
| LR-AU-03 | **Allowable Use:**<br>**LEASE NOTICE LN** *Land Use Authorizations* |
| LR-AU-04 | **Allowable Use:** Communications sites would be confined to the Judith Peak and the South Moccasin Mountains communication sites. Judith Peak and the South Moccasin Mountains would be used for existing and future communications facilities.<br>Future management at these sites would conform to the most recent individual site plans. |
| LR-MA-01 | **Action:** Co-locate new ROWs, including those associated with valid existing rights, within existing ROWs or where it best minimizes effects. Use existing roads, or realignments as described above, to access valid existing rights that are not yet developed. If valid existing rights cannot be accessed via existing roads, then authorize to the minimum standard necessary any new road constructed to an approved BLM standard. |
| LR-AU-05 | **Allowable Use:**<br>Close the decision area to new cabin site leases. Open the decision area to non-cabin site leases on a case-by-case basis for short-term authorizations (3 years or less), which may be renewed. |
| LR-MA-02 | **Action:**<br>Consider Section 302(b) non-cabin site leases/permits on a case-by-case basis for renewable short-term authorizations (3 years or less). |
| LR-AU-06 | **Allowable Use:**<br>**LEASE NOTICE LN** *Setback from Human-Occupied Residences* |
| LR-AU-07 | **Allowable Use:**<br>**LEASE NOTICE LN** *Cemeteries* |
| *Land Tenure* | |
| LR-OBJ-02 | **Objective:**<br>Attain a BLM land pattern that blends multiple resource values and brings about better manageability. Consistent with Secretarial Order 3373, ensure that public access and recreational opportunities are important consideration of any land tenure adjustment **(See Criteria for Land Tenure Adjustments listed in Appendix R).** |
| LR-AU-08 | **Allowable Use:**<br>Manage 27,300 acres as closed to appropriation under the public land laws (unless and until the withdrawal is lifted; see Withdrawals alternatives section in this table). |
| LR-MA-03 | **Action:**<br>Manage public lands tenure based on three categories of BLM-administered land as described in **Appendix R**, Land Tenure Adjustment Categories. |
| LR-MA-04 | **Action:**<br>Identify 55,800 acres as Category 1 - Retention (**Figure A-17**, Land Tenure [**Map Appendix A**]). |
| LR-MA-05 | **Action:**<br>Identify 595,500 acres as Category 2 – Limited Exchange (**Figure A-17**, Land Tenure [**Map Appendix A**]). |

| Lands and Realty | |
|---|---|
| LR-MA-06 | **Action:**<br> Identify 0 acres as Category 3 – Disposal  (**Figure A-17**, Land Tenure [**Map Appendix A**]). |
| LR-MA-07 | **Action:** Pursue FLPMA Section 205 acquisitions, as opportunities arise, through FLPMA Section 206 exchanges or purchases with willing proponents and/or sellers. Any new acquisitions should include permanent administrative access to those parcels as well as include at least seasonal access to the public. |
| LR-MA-08 | **Action:**<br>Transfers to other federal agencies would be considered where improved management efficiency would result. Lands acquired with LWCF funds would generally not be subject to transfer, depending on the purpose for which they were acquired. Minor adjustments may be considered on a case-by-case basis using site-specific application of the land tenure adjustment criteria. Acquisition of land should:<br>• provide new legal access or facilitate improved access to public land and resources,<br>• block up parcels of federally owned land for management efficiency,<br>• maintain or enhance important public values and uses,<br>• maintain or enhance local social and economic values, or<br>• facilitate implementation of other aspects of this RMP.<br>Manage newly acquired lands for the purpose for which they were acquired. Lands acquired within special management areas with specific congressional mandates would be managed in conformance with established guidelines for those areas. Manage lands acquired within administratively designated special management areas that have fragile or unique resources the same as the special management area. Lands acquired without special values or management goals would be managed in the same manner as comparable surrounding public lands. BLM will extend applicable land use plan decisions through plan maintenance where possible or by a plan amendment in the case of ACEC land acquisitions and boundary modification. |
| LR-MA-09 | **Action:** The BLM will prioritize land tenure adjustments consistent with the criteria identified in **Appendix R**. |

| Renewable Energy | |
|---|---|
| RE-GOAL-01 | **Goal:** Provide opportunities for the development of renewable energy resources (from sources such as wind and solar) while minimizing adverse effects on other resource values. |
| RE-OBJ-01 | **Objective:** Allow renewable energy development to the extent consistent with other goals, objectives, and requirements of this plan. |
| RE-MA-01 | **Action:** Analyze proposals for solar and hydrological energy and biomass development on a case-by-case basis and authorize those that are consistent with resource management goals and objectives. |
| RE-MA-02 | **Action:** Adopt BMPs and policies related to wind energy development **(Appendix F).** |
| RE-AU-01 | **Allowable Use:** Manage 370,400 acres as exclusion areas for wind energy (**Figure A-18**, Wind Energy Development **[Map Appendix A]**). |

| Renewable Energy | |
|---|---|
| RE-AU-02 | **Allowable Use:** Manage 98,400 acres as avoidance areas for wind energy (**Figure A-18**, Wind Energy Development **[Map Appendix A]**). |
| RE-AU-03 | **Allowable Use:** Manage 182,400 acres as open for wind energy development (i.e., areas outside of exclusion and avoidance areas for wind energy development). Within open areas, manage 102,300 acres as potential wind development areas (**Figure A-18**, Wind Energy Development **[Map Appendix A]**). Potential wind development areas are open for wind energy development, where wind speed data collected at 120 meters exhibit wind speeds of 7 meters/second or greater. |

| Withdrawals | |
|---|---|
| WTH-GOAL-01 | **Goal:**<br>Protect significant resources or significant government investment. |
| WTH-OBJ-01 | **Objective:**<br>Utilize withdrawal actions with the least restrictive measures and of the minimum size necessary to accomplish the required purpose. |
| WTH-AU-01 | **Allowable Use:**<br>Manage 147,100 acres of federal mineral estate as withdrawn under one or more types of segregations (**Figure A-19**, Withdrawn Lands **[Map Appendix A]** and **Appendix S**, Withdrawal Segregations). |
| WTH-MA-01 | **Action:**<br>Consider revocations of withdrawals on a case-by-case basis pending evaluation of water power potential and possible land tenure adjustments. Maintain all other types of withdrawals. |

| Forest, Woodland, and Special Products | |
|---|---|
| FOR-GOAL-01 | **Goal:**<br>Provide opportunities for traditional and nontraditional uses of forest products by incorporating sound ecological principles while contributing to the economic stability of the local communities. |
| FOR-OBJ-01 | **Objective:**<br>Provide woody and non-woody biomass consistent with other resource uses as part of an ecologically healthy system and consistent with the principles of multiple use. |
| FOR-OBJ-02 | **Objective:**<br>Develop management strategies and implement treatments to improve the health, sustainability, resiliency, and productivity of forests, woodlands, and the desired vegetative community based on scientifically sound principles and an environmentally responsible level of timber sales. |
| FOR-OBJ-03 | **Objective:**<br>Manage forest vegetation structure, species composition, patch size, pattern, and distribution in a manner that reduces the occurrence of severe wildfires and forest insect and disease outbreaks. |

| Forest, Woodland, and Special Products | |
|---|---|
| FOR-OBJ-04 | **Objective:**<br>Implement selective treatments on natural forests and woodlands that mimic natural disturbance regimes to enhance resiliency to wildfires and insect and disease outbreaks. Manage forest resources to improve resilience to disturbance and maintain and enhance their ability for the long-term sequestration of carbon. |
| FOR-OBJ-05 | **Objective:**<br>Maintain and promote forest stand structures with large trees appropriate to forest types and successional stages. |
| FOR-OBJ-06 | **Objective:**<br>Promote forest and woodland vegetation regeneration and recovery on forested lands after management treatments, insect and disease outbreaks, and wildfire events. |
| FOR-MA-01 | **Action:**<br>• Complete and inventory and health assessment of forested stands within the planning area during the life of the plan.<br>• Coordinate with appropriate entities pertaining to forest health and/or other administrative concerns.<br>• Consider removal of suitable biomass on a case-by-case basis.<br>• Manage nontraditional forest products according to sustainability limits and where removal of these products is consistent with other resource management objectives.<br>• Due to whitebark pine species decline, protect all healthy whitebark from prescribed burning and forest management activities when feasible. |
| FOR-MA-02 | **Action:** Meet the public demand for commercial forest products. Probable sale quantity is estimated at 4.9 MMBF of wood products per year as a result of treatments on 1,665 acres. Probable sale quantity is based on the following criteria:<br>• 185,000 acres of montane forest and meadows on a 100-year rotation (1,850 acres annually)<br>10 percent of 1850 (185 acres) would be excluded from treatment due to various environmental factors (slope, riparian areas, special designations, access) |
| FOR-MA-03 | **Action:** Manage 18,400 acres* as closed to forest product sales. Additional areas may be found as unsuitable for harvest on a case-by-case basis to meet desired resource conditions (**Figure A-20**, Forest Products [**Map Appendix A**]).<br>Exception: Provide opportunities for small sales of forest products to the public on a case-by-case basis (5450- permit). Small sales would only occur where sufficient physical access currently exists. No new permanent roads would be constructed to meet the demands of the small sale program.<br>*1,500 acres are within montane forests and meadows and have commercial timber resources* |
| FOR-MA-04 | **Action:** New roads would be authorized where multiple entries would be necessary to meet objectives. Temporary roads would be decommissioned, with reclamation initiated within 1 year of project completion. |
| FOR-MAJ-05 | **Action:** Unless specifically reserved from cutting, standing dead or down wood may be taken as firewood. The BLM could designate specific areas for cutting of live trees for firewood to meet other resource objectives. The joint firewood permit system used by the BLM and Forest Service would continue to be used. |

| Forest, Woodland, and Special Products | |
|---|---|
| FOR-MA-06 | **Action:** Conduct forest and woodland management activities using silvicultural prescriptions based upon the best available science. At a minimum, prescriptions would require a description of the current stand condition and DFCs. In addition, all forest management activities would follow the Best Management Practices for Forestry in Montana (DNRC 2006). |
| FOR-MA-07 | **Action:** When salvage is proposed in dead and dying forests, contiguous acres of undisturbed standing and down woody material would be retained on a site-specific basis, consistent with wildlife species, forest health restoration, and other resource requirements (e.g., soils, riparian, and visual resources). |
| FOR-MA-08 | **Action:** Utilize pre-commercial thinning and other silvicultural practices to create healthy and economically sustainable forest stands consistent with other resource values. |
| FOR-MA-09 | **Action:** Manage aspen communities to maintain and expand aspen stands and strive for the DFC of all aspen forests. Forest products would be sold in conjunction with aspen treatments and stewardship contracting opportunities would be considered on a case-by-case basis. |
| FOR-MA-10 | **Action:** Actively manage woodlands to prevent expansion into other communities. Forest products would be sold in conjunction with conifer encroachment treatments. |

| SPECIAL DESIGNATIONS | |
|---|---|
| **Areas of Critical Environmental Concern** | |
| SD-GOAL-01 | **Goal:** Manage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards. |
| SD-OBJ-01 | **Objective:** Designate 2 ACECs (3,600 acres; **Figure A-21**: Special Designations [**Map Appendix A**]). |
| SD-MA-01 | **Action:** Manage the following areas (3,600 acres) as ACECs according to management actions in **Appendix U** (**Figure A-21**, Special Designations [**Map Appendix A**]): <br>• Acid Shale-Pine Forest (2,700 acres) <br>• Square Butte (900 acres) |
| SD-MA-02 | **Action:** Designate 2 ACECs (3,600 acres) (**Figure A-21**, Special Designations [**Map Appendix A**]). |
| SD-MA-03 | **Action:** ACECs identified as retention parcels. |
| SD-AU-01 | **Allowable Use:** **STIPULATION** *NSO ACEC* |

*Record of Decision and Approved Resource Management Plan*

| Backcountry Byways | |
|---|---|
| SD-GOAL-02 | **Goal:**<br>Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated back country byways in partnership with communities, interest groups, and state and federal agencies. |
| SD-OBJ-02 | **Objective:**<br>Enhance opportunities for the public to see and enjoy the unique scenic and historical opportunities on public lands by communicating the multiuse management message through effective interpretive programs. |
| SD-MA-04 | **Action:**<br>Continue to manage the Missouri Breaks Back Country Byway to enhance visitor experiences while evaluating future routes for potential inclusion as back country byways. |

| National Trails | |
|---|---|
| NT-GOAL-01 | **Goal:** Safeguard the nature and purposes; and conserve, protect, and restore the national trail resources, qualities, values, and associated settings and the primary use or uses. Manage the following national trails (**Figure A-21 Map Appendix A**): Lewis and Clark NHT; Nez Perce NHT; Continental Divide NST |
| NT-OBJ-01 | **Objective:** For all national trails: provide premier trail visitor experiences for public benefit; maximize opportunities for shared national trail stewardship; reduce the potential for uses that substantially interfere with the nature and purposes of the national trail; avoid activities that are incompatible with the purposes for which the national trail was established.<br>For NSTs: provide for maximum compatible outdoor recreation potential; maintain the continuous nature of the trail; maintain the special environments and landforms that support trail visitor experiences.<br>For NHTs: identify and manage the historical route and historical remnants and artifacts for public use, enjoyment, and vicarious trail experiences; identify and manage high-potential historical sites or high-potential route segments, including the recommendation of additional Federal Protection Components. |
| NT-MA-01 | **Action:** Designate a 0.5-mile area from centerline as the trail management corridor for NSTs and NHTs. |
| NT-AU-01 | **Allowable Use:**<br>**STIPULATION** *NSO National Scenic Trails* |
| NT-AU-02 | **Allowable Use:**<br>**STIPULATION** *NSO National Historic Trails* |
| NT-MA-02 | **Action:**<br>For trail corridors containing High-Potential Route Segments and Sites: propose for withdrawal from locatable mineral entry; closed to nonenergy solid mineral leasing; closed to mineral material disposal. |
| NT-MA-03 | **Action:**<br>No similar action. (Comply with the National Trails System Act, comprehensive plans, and National Landscape Conservation System manuals for inventory standards and requirements.) |
| NT-MA-04 | **Action:**<br>Manage NHT and NST corridors as VRM Class III unless the adjacent landscape is VRM Class I or II. |

| National Trails | |
|---|---|
| NT-AU-03 | **Action:**<br>Manage NST and NHT corridors as exclusion areas for wind energy (BLM 2005b). |

| Wild and Scenic Rivers | |
|---|---|
| WSR-GOAL-01 | **Goal:** Evaluate eligible river segments to determine suitability for inclusion in the National Wild and Scenic Rivers System, providing interim protection in accordance with the Wild and Scenic Rivers Act and BLM guidance (currently BLM Manual 6400; BLM 2012e). |
| WSR-OBJ-01 | **Action:** Determine that all 27 eligible stream segments are not suitable for inclusion in the National Wild and Scenic Rivers System and release them from interim management protections afforded eligible segments. (See Alternative A for list of 27 stream segments.) |

| Wilderness Study Areas (WSAs) | |
|---|---|
| WIL-GOAL-01 | **Goal:** Preserve the wilderness characteristics of WSAs. |
| WIL-OBJ-01 | **Objective:**<br>Preserve wilderness characteristics in the Beaver Meadows, North Fork of Sun River, and Square Butte WSAs (2,700 acres; **Figure A-21**; **Map Appendix A**) in accordance with nonimpairment standards, as defined in BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), until Congress either designates it as wilderness or releases it for other purposes.<br>● *Note: Acreage differs from the Montana Statewide Wilderness Study Report due to the use of GIS-generated acres and rounding for consistency in this document. The use of GIS-generated acres does not change the 595 acres for Beaver Meadows, 196 acres for North Fork Sun River, or 1,947 acres for Square Butte identified in the Montana Statewide Wilderness Study Report.* |
| WIL-MA-01 | **Action:** The Montana Statewide Wilderness Study Report Volume I (September 1991) required two units in the planning area to be examined (Beaver Meadows and North Fork Sun River) for wilderness suitability in future land use plan revisions. In response to the Montana Statewide Wilderness Study Report Volume I (September 1991) direction, Beaver Meadows and North Fork Sun River WSAs were evaluated in this land use plan revision. Both WSAs met the criteria when combined with National Forest System Lands located along the eastern portions of the Rocky Mountain Front at the time of the 1991 report. Management of adjacent National Forest System lands was resolved in Section 3065 of the National Defense Authorization Act (2015), which removed the National Forest System lands from wilderness consideration. On their own, without contiguous National Forest System lands, Beaver Meadows and North Fork Sun River WSAs are unsuitable for wilderness consideration, due to their small size. |

| Wilderness Study Areas (WSAs) | |
|---|---|
| WIL-MA-01 | **Action:**<br>  Apply management prescriptions to the WSAs to meet the non-impairment standard (BLM Manual 6330, BLM 2012b):<br>• Manage as VRM Class I<br>• Manage as ROW exclusion, including wind<br>• Closed to nonenergy solid mineral leasing<br>• Closed to fluid mineral leasing<br>• Closed to mineral material disposal (Exception: free collection of small amounts of mineral materials for personal use may be permitted if it satisfies the nonimpairment criteria. (See Section 1.6.C.5.b of BLM Manual 6330 [BLM 2012b, p. 1-22].) |
| WIL-MA-02 | **Action:**<br>Close the WSAs to motorized and mechanized travel except for access to grandfathered uses (BLM Manual 6630). |
| WIL-MA-03 | **Action:**<br>Manage wildfire in accordance with BLM policy for WSAs (BLM Manual 6330; BLM 2012b). |
| WIL-MA-04 | **Action:**<br>Manage the Square Butte WSA as an avoidance area for fire retardant use to protect visual resources. |
| WIL-GOAL-02 | **Goal:**<br>Implement management strategies for lands within WSAs, should Congress release the WSAs from wilderness consideration. |
| WIL-OBJ-02 | **Objective:**<br>If Congress releases the WSAs from wilderness consideration, manage those lands consistent with underlying land use designations. |
| WIL-MA-05 | **Action:**<br>If Congress releases Square Butte WSA from wilderness consideration manage as the Square Butte ACEC (*see ACECs alternatives section in this table*). |
| WIL-MA-06 | **Action:**<br>If Congress releases the Beaver Meadows or North Fork Sun River WSAs from wilderness consideration, both areas will remain withdrawn from all mineral entry under the Tax Relief and Health Care Act of 2006. These areas would be managed as VRM I and ROW exclusion (including wind). |

| Rocky Mountain Front Conservation Management Areas | |
|---|---|
| CMA-GOAL-01 | **Goal:** Enhance and protect the natural resource values described in the National Defense Authorization Act of 2015 for the Conservation Management Areas (CMAs). |
| CMA-OBJ-01 | **Objective:** Conserve, protect, and enhance for the benefit and enjoyment of present and future generations the recreational, scenic, historical, cultural, fish, wildlife, roadless, and ecological values of CMAs. |
| CMA-MA-01 | **Action:** Management actions for CMAs:<br>• Pursue legal access through acquisition<br>• Withdrawn from fluid mineral leasing<br>• Withdrawn from nonenergy solid mineral leasing<br>• Closed to mineral material disposal<br>• Open to mechanized travel<br>• Withdrawn from locatable mineral entry (Public Law 109-432 Sect. 403a)<br>• VRM Class I<br>• Closed to OHV travel<br>• ROW exclusion<br>• Prohibit commercial timber sales<br>• Closed to OSV travel<br>• Mechanized travel limited to designated routes, except for game retrieval<br>**Figure A-22**: Conservation Management Area [**Map Appendix A**]. |

## II.3   PUBLIC INVOLVEMENT

The BLM will continue to work with existing partners, to cultivate new partnerships, and to seek the views of the public during the implementation of this RMP.  It will use such techniques as news releases and website postings to ask for participation and to inform the public of new and ongoing management actions and implementation-level planning. Site-specific projects implemented under the Lewistown Approved RMP will be publicly available on BLM's ePlanning website at https://eplanning.blm.gov.

The BLM will also continue to coordinate, both formally and informally, with the numerous federal and state agencies, Native American tribes, local agencies, and officials interested and involved in the management of public lands in the Lewistown Planning Area.

## II.4   MANAGEMENT PLAN IMPLEMENTATION

The BLM will develop an implementation plan to identify actions to achieve the desired outcomes of the Approved RMP. The implementation plan will assist BLM managers and staff to prepare budget requests and to schedule work priorities.

The BLM will issue implementation decisions to fully implement the RMP. During implementation of the RMP, the BLM will prepare additional documentation for site-specific actions to comply with NEPA. This can vary from a simple statement of conformance with the RMP and adequacy of existing NEPA analysis to more complex EAs or EISs that analyze several alternatives.

## II.5   RMP EVALUATION, AMENDMENT, MAINTENANCE, MONITORING, AND ADAPTIVE MANAGEMENT

The BLM will monitor and periodically evaluate implementation of the RMP based on guidance in the BLM's Land Use Planning Handbook, H-1601-1 (BLM 2005a), as amended.

### II.5.1  RMP EVALUATION

Evaluation is the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and how effectively the plan is being implemented. In accordance with the BLM's Land Use Planning Handbook (H-1601-1; BLM 2005a), the BLM will periodically evaluate an approved RMP to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented effectively. Land use plan evaluations determine whether:

- The decisions remain relevant to current issues.
- Decisions are effective in achieving or making progress toward achieving the desired outcomes specified in the RMP.
- Any decisions need revision, amendment, or deletion.
- Any new decisions are needed.

In making these determinations, the BLM's evaluation will consider whether mitigation measures such as those described in the Approved RMP are effective in mitigation impacts, whether there are significant changes in the related plans of other entities, or whether there is significant new information. In addition to periodic evaluations, special evaluations may also be required to review unexpected management actions or significant changes in the related plans of Native American tribes, other federal agencies, and state and local governments, or to evaluate legislation or litigation that has the potential to trigger an amendment or revision to the RMP. Evaluations may identify resource needs, as well as the means for correcting deficiencies and addressing issues through plan maintenance, amendments, or revisions. Evaluations should also identify where new and emerging issues and other values have surfaced.

## II.5.2  RMP MONITORING

Monitoring is the process of tracking and documenting the implementation (or the progress of implementation) of land use plan decisions. Land use plan decision monitoring is a continuous process occurring over the life of the RMP. The aim is to maintain a dynamic RMP. Monitoring data are collected, examined, and used to draw conclusions about 1) whether planned actions have been implemented in the manner prescribed by the RMP (implementation monitoring) identified in **Section II.2**, Management Decisions, 2) whether RMP allowable use and management action decisions and the resultant implementation actions are effective in achieving program-specific objectives or desired outcomes (effectiveness monitoring), and 3) calculating the cost of delivering a service or product (efficiency monitoring by program elements). Implementation monitoring tracks the completion of land use plan decisions, whereas effectiveness monitoring helps determine whether completion of land use plan decisions achieves anticipated desired outcomes. If implementation of land use plans does not achieve anticipated desired outcomes, adaptive management may be necessary.

The BLM uses conclusions drawn from monitoring to make recommendations on whether to continue current management or to determine what changes need to be made to implementation practices to better achieve RMP goals. Indicators, methods, locations, units of measures, frequency, and action triggers can be established by national policy guidance, in RMPs, or by technical specialists in order to address specific issues.

Based on staffing and funding levels, monitoring is annually prioritized consistently with the goals and objectives of the RMP. The BLM may work in cooperation with local, state, and other federal agencies, or it may use data collected by other agencies and sources when appropriate and available.

## II.5.3  ADAPTIVE MANAGEMENT

Adaptive management is a system of management practices based on clearly identified outcomes, monitoring to determine if management actions are meeting outcomes, and, if not, facilitating management changes that will best ensure that outcomes are met or to reevaluate the outcomes. The BLM will implement the adaptive management process for decisions appropriate to be adapted in order to meet resource goals and objectives. The BLM will implement an adaptive management strategy to account for changing resource conditions and to minimize adverse impacts on resources from BLM-authorized activities. The strategy includes evaluating conditions on an ongoing basis and, if necessary, implementing appropriate mitigation measures to meet the identified RMP objectives and targets. Monitoring, reports, documents, and timelines associated with the adaptive management process will be subject to budget and staffing constraints.

## II.6   REFERENCES

Avian Power Line Interaction Committee. 2012. Reducing Avian Collisions with Power Lines: The State of the Art in 2012. Edison Electric Institute and APLIC. Washington, DC.

BLM (United States Department of Interior, Bureau of Land Management).

_____. 1986. Handbook H-8410-1—Visual Resource Inventory. Rel. 8-28. Washington, DC. January 17, 1986.

_____. 1994. Approved Judith Resource Area Resource Management Plan. Lewistown District, Lewistown, Montana. September 1994.

_____. 1997. Record of Decision: Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Montana, North Dakota and South Dakota. Montana State Office, Billings. August 1997.

_____. 2001. National Management Strategy for Motorized Off-highway Vehicle Use. Washington, DC. January 2001.

_____. 2003a. Off-Highway Vehicle Record of Decision and Proposed Plan Amendment for Montana, North Dakota, and Portions of South Dakota. Montana State Office, Billings. June 2003.

_____. 2004. Manual 8110—Identifying and Evaluating Cultural Resources. Rel 8-73. Washington, DC. December 3, 2004. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.15876.File.dat/8110.pdf.

_____. 2005a. Handbook H-1601-1—Land Use Planning Handbook. Rel. 1-1693. Washington, DC. March 11, 2005.

_____. 2005b. Record of Decision: Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. Washington, DC. December 15, 2005.

_____. 2007. Record of Decision for Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement. Washington Office. Washington, DC.

_____. 2008a. Handbook H-1790-1. BLM NEPA Handbook. Washington, DC. January 2008.

_____. 2008b. Manual 6840—Special Status Species Management. Rel. 6-125. Washington, DC. December 12, 2008.

_____. 2012a. Manual 6330—Management of Wilderness Study Areas. Rel. 6-134. Washington, DC. July 13, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.31915.File.dat/6330.pdf.

_____. 2012b. Manual 6310—Conducting Wilderness Characteristics Inventory on BLM Lands. Rel. 6-129. Washington, DC. March 15, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.38337.File.dat/6310.pdf.

. _____2012c. BLM Instruction Memorandum 2012-169, Resource Management Plan Alternative Development for Livestock Grazing [BLM 2012a]) Internet website: https://www.blm.gov/policy/im-2012-169

_____. 2012e. Manual 6400—Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management. Rel. 6-136. Washington, DC. July 13, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.76771.File.dat/6400.pdf.

_____. 2014a. Bureau of Land Management Technical Protocol for the Collection, Study, and Conservation of Seeds from Native Plant Species for Seeds of Success. Internet website: http://www.blm.gov/wo/st/en/prog/more/fish__wildlife_and/plants/seeds_of_success/protocol.html. Updated January 3, 2014.

_____. 2014b. Handbook H-8320-1—Planning for Recreation and Visitor Services. Rel. 8-85. Washington, DC. August 22, 2014.

_____. 2014c. Lewistown RMP Revised Scoping Report. Lewistown and Butte Field Offices. Lewistown, Montana. August 2014.

_____. 2015d. Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Including the Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, Worland. Washington, DC. September 2015.

_____. 2016. Record of Decision for Final Programmatic Environmental Impact Statement for Vegetation Treatments Using Aminopyralid, Fluroxypyr, and Rimsulfuron on Bureau of Land Management Land in 17 Western States. Washington Office. Washington, DC.

DNRC (Montana Department of Natural Resources and Conservation).

_____. 2006. Best Management Practices for Forestry in Montana. Internet website: http://dnrc.mt.gov/divisions/forestry/forestry-assistance/forest-practices/best-management-practices-bmp-2. January 2006.

_____. 2015. Montana Forestry Best Management Practices. 2015 Revision of original MSU Extension Forestry publication EB158. Internet website: http://dnrc.mt.gov/divisions/forestry/docs/assistance/practices/mt-forestry-management-best-practices-guide.pdf.

Federal Lands Hunting, Fishing, and Shooting Sports Roundtable. 2006. Memorandum of Understanding. August 2006.

MFWP (Montana Fish, Wildlife, & Parks). 2015. Montana's State Wildlife Action Plan. 2015. Helena, Montana.

_____. 2016. Montana's White-Nose Syndrome Prevention and Response Guidelines. Helena, Montana. April 2016. Internet website: ftp://nris.mt.gov/public/Maxell/MT_WNS_Response_Guidelines/MT_WNS_Response_Guidelines_Updated_20160415.pdf.

NWCG (National Wildfire Coordinating Group). 2014. Interagency Prescribed Fire Planning and Implementation Procedures Guide (PMS 484). April 2014.

## II.7   GLOSSARY

**Acquisition.** Acquisition of lands can be pursued to facilitate various resource management objectives. Acquisitions, including easements, can be completed through exchange, purchase, or donation.

**Activity plan.** A type of implementation plan (see *Implementation plan*); an activity plan usually describes multiple projects and applies best management practices to meet land use plan objectives. Examples of activity plans include interdisciplinary management plans, habitat management plans, recreation area management plans, and grazing plans.

**Actual use.** The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by the BLM during periodic field checks.

**Adaptive management.** A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

**Administrative access.** Motorized wheeled cross-country travel for lessees and permittees is limited to the administration of a federal lease or permit. Persons or corporations having such a permit or lease could perform administrative functions on public lands within the scope of the permit or lease; however, this would not preclude modifying permits or leases to limit motorized wheeled cross-country travel during further site-specific analysis to meet resource management objectives or standards and guidelines (BLM 2003a). Typically, access across BLM lands for administration and performance of official duties also includes other federal and state agencies.

**Air basin.** A land area with generally similar meteorological and geographic conditions throughout. To the extent possible, air basin boundaries are defined along political boundary lines and include both the source and receptor areas.

**Air pollution.** The addition to the atmosphere of any material that may have a deleterious effect on life on our planet.

**Allotment.** An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of BLM-administered lands but may include other federally managed, state-owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment management plan (AMP).** A concisely written program of livestock grazing management, including supportive measures if required, designed to attain specific, multiple-use management goals in a grazing allotment. An AMP is prepared in consultation with the permittees, lessees, and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife. An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**Alluvial soil.** A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**Alluvium.** Clay, silt, sand, gravel, or other rock materials transported by moving water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in rivers, floodplains, lakes, and shores, and in fans at the base of mountain slopes.

**Ambient air quality.** The state of the atmosphere at ground level as defined by the range of measured or predicted ambient concentrations of all significant pollutants for all averaging periods of interest.

**Amendment.** The process for considering or making changes in the terms, conditions, and decisions of approved resource management plans or management framework plans. Usually only one or two issues are considered and they involve only a portion of the planning area.

**Animal unit month (AUM).** The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Anthropogenic disturbances.** Those caused by human actions. Examples are paved highways, graded gravel roads, transmission lines, substations, wind turbines, oil and gas wells, geothermal wells and associated facilities, pipelines, landfills, agricultural conversion, homes, and mines.

**Aquatic.** Living or growing in or on the water.

**Areas of critical environmental concern (ACEC).** Special area designation established through the BLM's land use planning process (43 CFR 1610.7-2) where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards. The level of allowable use within an ACEC is established through the collaborative planning process. Designation of an ACEC allows for resource use limitations in order to protect identified resources or values.

**Atmospheric deposition.** Air pollution produced when acid chemicals are incorporated into rain, snow, fog, or mist and fall to the earth. Sometimes referred to as acid rain, it comes from sulfur oxides and nitrogen oxides, products of burning coal and other fuels and from certain industrial processes. If the acid chemicals in the air are blown into the area where the weather is wet, the acids can fall to earth in the rain, snow, fog, or mist. In areas where the weather is dry, the acid chemicals may become incorporated into dust or smoke.

**Attainment area.** A geographic area in which levels of a criteria air pollutant meet the health-based National Ambient Air Quality Standard for that specific pollutant.

**Authorized/authorized use.** Typically, a commercial activity, facility placement or event occurring on the public lands that is either explicitly or implicitly recognized and legalized by law or regulation. This term may refer to those activities occurring on the public lands for which the BLM, or other appropriate authority has issued a formal authorization document. These formally authorized uses are often spatially or temporally limited. Unless constrained or bounded by statute, regulation, or an approved land use plan decision.

**Avoidance/avoidance area.** An area identified through resource management planning to be avoided but may be available for right-of-way location with special stipulations.

**Backcountry Conservation Area (BCA).** BLM-managed lands in a specific planning area which promote public access to support wildlife-dependent recreation and hunting opportunities and facilitate the long-term maintenance of big game wildlife populations. These areas are primarily contiguous and intact. Management of BCAs includes activities such as active forest and rangeland management, grazing, motorized access on designated routes and other areas for game retrieval, fluid and solids leasable

minerals, and other actions consistent with the BLM's multiple use, sustained yield mission. Further management actions and allowable uses are described further in Appendix Q.

**Baseline.** The preexisting condition of a defined area or resource that can be quantified by appropriate metrics. During environmental reviews, the baseline is considered the affected environment that exists at the time of the reviews initiation and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.

**Best management practices (BMPs).** A suite of techniques that guide or may be applied to management actions to aide in achieving desired outcomes. BMPs are often developed in conjunction with land use plans, but they are not considered a planning decision unless the plans specify that they are mandatory.

**Big game.** Indigenous, ungulate (hoofed) wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biodiversity (biological diversity).** The variety of life and its processes, and the interrelationships within and among various levels of ecological organization. Conservation, protection, and restoration of biological species and genetic diversity are needed to sustain the health of existing biological systems. Federal resource management agencies must examine the implications of management actions and development decisions on regional and local biodiversity.

**Biologically significant unit (BSU).** A BSU for the Lewistown Field Office Greater Sage-Grouse Resource Management Plan Amendment is the summary of all the Priority Habitat Management Areas (PHMA) in a greater sage-grouse population, as delineated in the Conservation Objectives Team report.

**Biological soil crust.** A complex association between soil particles and cyanobacteria, algae, microfungi, lichens, and bryophytes that live within or atop the uppermost millimeters of soil.

**BLM Sensitive Species.** Those species that are not federally listed as endangered, threatened, or proposed under the Endangered Species Act, but that are designated by the BLM State Director under 16 USC, Subsection 1536(a)(2), for special management consideration. By national policy, federally listed candidate species are automatically included as sensitive species. Sensitive species are managed so they will not need to be listed as proposed, threatened, or endangered under the Endangered Species Act.

**Candidate species.** Taxa for which the US Fish and Wildlife Service has sufficient information on their status and threats to propose the species for listing as endangered or threatened under the Endangered Species Act, but for which issuing a proposed rule is currently prevented by higher priority listing actions. Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the Federal Register (BLM 2008b[2]).

**Casual use.** Activities ordinarily resulting in no or negligible disturbance of the public lands, resources, or improvements. For examples for rights-of-way casual uses see 43 CFR 2801.5. For examples for locatable minerals casual uses see 43 CFR 3809.5.

**Categorical exclusion.** A category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental

---

[2]US Department of the Interior, Bureau of Land Management. 2008. Manual 6840—Special Status Species Management. Rel. 6-125. Washington, DC. December 12, 2008. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.43545.File.dat/6840.pdf.

assessment nor an environmental impact statement is required (40 CFR 1508.4), but a limited form of NEPA analysis is performed.

**Checkerboard.** This term refers to a landownership pattern of alternating sections of federal owned lands with private or State owned lands for 20 miles on either side of a land grant railroad (e.g., Union Pacific and Northern Pacific). On land status maps this alternating ownership is either delineated by color-coding or alphabetic code resulting in a checkerboard visual pattern.

**Chemical vegetation treatment**. Application of herbicides to control invasive species and noxious weeds and other unwanted vegetation. To meet resource objectives, the preponderance of chemical treatments would be used in areas where cheatgrass or noxious weeds have invaded sagebrush steppe.

**Clean Air Act of 1963 (as amended).** Federal legislation governing air pollution control.

**Clean Water Act of 1972 (as amended).** Federal legislation governing water pollution control.

**Climate change.** Any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from the following:

- Natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun
- Natural processes within the climate system (e.g., changes in ocean circulation)
- Human activities that change the atmosphere's composition (e.g., driving motor vehicles) and the land surface (e.g., deforestation, reforestation, urbanization, and desertification).

**Closed area.** Closed area means an area where off-road vehicle (aka OHV) use is prohibited. Use of off-road vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer (43 CFR 8340.0-5 [h]).

**Collaboration.** A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration may take place with any interested parties, whether or not they are a cooperating agency.

**Communication site.** Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, and broadcast translator) and non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, and passive reflector).

**Comprehensive trails and travel management (CTTM).** The proactive interdisciplinary planning; on-the-ground management and administration of travel networks (both motorized and nonmotorized) to ensure that public access, natural resources, and regulatory needs are considered. It consists of inventory, planning, designation, implementation, education, enforcement, monitoring, easement acquisition, mapping and signing, and other measures necessary to provide access to public lands for a wide variety of uses (including those that are recreational, traditional, casual, agricultural, commercial, and educational; it also includes landing strips).

**Condition class (fire regimes).** Fire regime condition classes are a measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components, such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire suppression, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, or introduced insects or disease.

**Conformance.** A proposed action should be specifically provided for in the land use plan or, if not specifically mentioned, should be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation measures.** Measures to conserve, enhance, or restore greater sage-grouse habitat by reducing, eliminating, or minimizing threats to that habitat.

**Conservation plan.** The recorded decisions of a landowner or operator, cooperating with a conservation district, on how the landowner or operator plans, within practical limits, to use his or her land according to its capability and to treat it according to its needs for maintenance or improvement of the soil, water, animals, plants, and the air.

**Conservation strategy.** A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the US Fish and Wildlife Service or National Oceanographic and Atmospheric Administration-Fisheries to be federal candidates under the Endangered Species Act.

**Controlled surface use (CSU).** A category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral leasing and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, and construction of wells and pads). CSU areas are open to fluid mineral leasing but the stipulation allows the BLM to require special operational constraints, or the activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value.

**Cooperating agency.** Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or federal, state, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Council on Environmental Quality (CEQ).** An advisory council to the President, established by the National Environmental Policy Act of 1969. It reviews federal programs to analyze and interpret environmental trends and information.

**Criteria pollutant.** The US Environmental Protection Agency uses six criteria pollutants as indicators of air quality. It has established for each of them a maximum concentration above which adverse effects on human health may occur. These threshold concentrations are called National Ambient Air Quality Standards. The criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, particulate matter, and lead.

**Crucial wildlife habitat.** The environment essential to plant or animal biodiversity and conservation at the landscape level. Crucial habitats include biological core areas, severe winter range, winter concentration areas, reproduction areas, and movement corridors.

**Crucial winter range.** That part of the winter range where a high proportion of the species population is located during severe winter conditions.

**Cultural resources.** Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social or cultural groups.

**Cumulative effects.** The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**Decision area.** Lands and federal mineral estate within the BLM-administered planning area.

**Deferred/deferred use.** To set aside, or postpone, a particular resource use or activity on the public lands to a later time. Generally, when this term is used, the period of the deferral is specified. Deferments sometimes follow the sequence time frame of associated serial actions (e.g., Action B will be deferred until Action A is completed).

**Degraded vegetation.** An area where the plant community is not complete or is under threat. Examples include missing components such as perennial forbs or cool season grasses, weed infestations, or lack of regeneration of key species, such as sagebrush or cottonwoods trees.

**Designated roads and trails.** Specific roads and trails identified by the BLM or other agency where some type of motorized or nonmotorized use is appropriate and allowed, either seasonally or yearlong (BLM 2005a).

**Desired future condition (DFC).** For rangeland vegetation, the condition of rangeland resources on a landscape scale that meet management objectives. It is based on ecological, social, and economic considerations during the land planning process. It is usually expressed as ecological status or management status of vegetation (species composition, habitat diversity, and age and size class of species) and desired soil qualities (soil cover, erosion, and compaction). In a general context, DFC is a portrayal of the land or resource conditions that are expected to result if goals and objectives are fully achieved.

**Desired outcomes.** A type of land use plan decision expressed as a goal or objective.

**Direct impact.** Caused by an action or implementation of an alternative; a direct impact take place at the same time and place.

**Directional drilling.** A drilling technique whereby a well is deliberately deviated from the vertical in order to reach a particular part of the oil- or gas-bearing reservoir. Directional drilling technology enables the driller to steer the drill stem and bit to a desired bottom hole location. Directional wells initially are drilled straight down to a predetermined depth and then are gradually curved at one or more different points to penetrate one or more given target reservoirs. This specialized drilling usually is accomplished with the use of a fluid-driven downhole motor, which turns the drill bit. Directional drilling also allows multiple production and injection wells to be drilled from a single surface location, such as a gravel pad, thus minimizing cost and the surface impact of oil and gas drilling, production, and transportation facilities. It can be used to reach a target beneath an environmentally sensitive area (ADNR 2009[3]).

**Disposal lands.** Transfer of public land out of federal ownership to another party through sale, exchange, Recreation and Public Purposes Act of 1926, Desert Land Entry, or other land law statutes.

---

[3]Alaska Department of Natural Resources. 2009. Beaufort Sea Areawide Oil and Gas Lease Sale: Final Finding of the Director. November 9, 2009.

**Disruptive activities.** Those public land resource uses or activities that are likely to alter the behavior or displace or cause excessive stress to animal or human populations occurring at a specific location and time. In this context, disruptive activities refer to those actions that alter behavior or displace individuals such that reproductive success is negatively affected or that compromises an individual's physiological ability to cope with environmental stress. This term does not apply to the physical disturbance of the land surface, vegetation, or features. When administered as a land use restriction (e.g., No Disruptive Activities), this term may prohibit or limit the physical presence of sound above ambient levels, light beyond background levels, or the nearness of people and their activities. The term is commonly used in conjunction with protecting wildlife during crucial life stages (e.g., breeding, nesting, and birthing), although it could apply to any resource value on public land. The use of this land use restriction is not intended to prohibit all activity or authorized uses.

**Diversity.** The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Easement.** A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Ecological emphasis area.** The central and primary area of habitat for a population of a given species or group of species. These areas include corridors, which are strips of land that aid in the movement of species between disconnected emphasis areas of their natural habitat. Emphasis areas may be divided into smaller geographical zones.

**Ecological Site.** A distinctive kind of land with specific physical characteristics that differs from other kinds of land in its ability to produce a distinctive kind and amount of vegetation.

**Eligible river.** A river or river segment found to meet criteria in Sections 1(b) and 2(b) of the Wild and Scenic Rivers Act of being free flowing and possessing one or more outstandingly remarkable value.

**Emergency stabilization.** Planned actions to stabilize and prevent unacceptable degradation of natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair, replace, or construct physical improvements necessary to prevent land or resource degradation. Emergency stabilization actions must be taken within one year following wildfire containment.

**Endangered species.** Any species that is in danger of extinction throughout all or a significant portion of its range (BLM 2008b). Under the Endangered Species Act in the US, endangered is the more protected of two categories; the other is "threatened." Designation as endangered or threatened is determined by US Fish and Wildlife Service as directed by the Endangered Species Act.

**Endangered Species Act of 1973 (as amended).** Designed to protect critically imperiled species from extinction as a consequence of economic growth and development untempered by adequate concern and conservation. The act is administered by the US Fish and Wildlife Service and the National Oceanic and Atmospheric Administration. Its purpose is to protect species and the ecosystems that they depend on (16 US Code, Sections 1531-1544).

**Enhance.** The improvement of habitat by increasing missing or modifying unsatisfactory components or attributes of the plant community to meet greater sage-grouse objectives.

**Environmental assessment (EA).** A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. An EA includes a brief discussion of the need for the proposal,

alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental impact statement (EIS).** A detailed statement prepared by the responsible official in which a major federal action that significantly affects the quality of the human environment is described, alternatives to the proposed action are provided, and effects are analyzed (BLM 2001[4]).

**Evaluation (plan evaluation).** The process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and National Environmental Policy Act of 1969 analysis are still valid and whether the plan is being implemented.

**Exchange.** A transaction whereby the federal government receives land or interests in land in exchange for other land or interests in land.

**Exclusion area.** An area identified through resource management planning that is not available for right-of-way location under any conditions.

**Exemplary (vegetation).** An area of vegetation that does not show signs of degradation and which may serve as a comparison to illustrate what the vegetation potential is for a given type of environment.

**Existing routes.** The roads, trails, or ways that are used by motorized vehicles (such as jeeps, all-terrain vehicles, and motorized dirt bikes), mechanized uses (such as mountain bikes, wheelbarrows, ad game carts), pedestrians (hikers), and horseback riders and are, to the best of the BLM's knowledge, in existence at the time of resource management plan/environmental impact statement publication.

**Exploration.** Active drilling and geophysical operations to determine the presence of the mineral resource or the extent of the reservoir or mineral deposit.

**Extensive Recreation Management Area (ERMA).** Administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor services program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses (BLM 2014b[5]).

**Federal Land Policy and Management Act of 1976 (FLPMA).** Public Law 94-579, October 21, 1976, often referred to as the BLM's Organic Act, which provides most of its legislated authority, direction policy, and basic management guidance.

**Federal mineral estate.** Subsurface mineral estate owned by the United States and administered by the BLM. It is the mineral estate underlying BLM-administered land, privately owned lands and state-owned land.

**Fire frequency.** A general term referring to the recurrence of fire in a given area over time.

**Fire management plan (FMP).** A plan that identifies and integrates all wild fire management and related activities within the context of approved land/resource management plans. It defines a program to manage wild fires (wildfire and prescribed fire). The plan is supplemented by operational plans

---

[4]US Department of the Interior, Bureau of Land Management. 2001. National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands. Washington, DC. January 19, 2001.

[5]US Department of Interior, Bureau of Land Management. 2014. Handbook H-8320-1—Planning for Recreation and Visitor Services. Rel. 8-85. Washington, DC. August 22, 2014. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.36142.File.dat/H-8320-1%20Recreation%20and%20Visitor%20Services%20Planning.pdf.

including, but not limited to, preparedness plans, preplanned dispatch plans, and prevention plans. FMPs ensure that wild fire management goals and components are coordinated.

**Fire Regime Condition Classification System (FRCCS).** Measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition.

**Fire suppression.** All work and activities connected with control and fire-extinguishing operations, beginning with discovery and continuing until the fire is completely extinguished.

**Fluid minerals.** Oil, gas, coal bed natural gas, and geothermal resources.

**Forage.** All browse and herbaceous foods that are available to grazing animals.

**Forage base.** The amount of vegetation available for wildlife and livestock use.

**Forest Health.** The perceived condition of a forest derived from concerns about such factors as its age, structure, composition, function, vigor, presence, or unusual levels of insects and disease, and resilience to disturbance.

**Forest Resilience.** The capacity of a forest to absorb disturbance, retain ecosystem function and return, over time, to its pre-disturbance state.

**Fragile soils.** Soils having a shallow depth to bedrock, minimal surface layer of organic material, textures that are more easily detached and eroded, or are on slopes over 35 percent.

**Fugitive dust.** Significant atmospheric dust arises from the mechanical disturbance of granular material exposed to the air. Dust generated from these open sources is termed fugitive because it is not discharged to the atmosphere in a confined flow stream. Common sources of fugitive dust include unpaved roads, agricultural tilling operations, aggregate storage piles, and heavy construction operations.

**General Mining Law of 1872.** Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the General Mining Law or Mining Law.

**Geographic information system (GIS).** A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geophysical exploration.** Work to locate deposits of oil and gas resources and to better define the subsurface.

**Geothermal energy.** Natural heat from within the Earth captured for production of electric power, space heating, or industrial steam.

**Goal.** A broad statement of a desired outcome; usually not quantifiable and may not have established time frames for achievement.

**Grandfathered use.** The right to use in a nonconforming manner due to existence prior to the establishment of conforming terms and conditions.

**Grant.** Any authorization or instrument (e.g., easement, lease, license, or permit) that the BLM issues under Title V of the Federal Land Policy and Management Act (43 USC, Section 1761 et. seq.) and those authorizations and instruments that the BLM and its predecessors issued for like purposes before

October 21, 1976, under the existing statutory authority. It does not include authorizations issued under the Mineral Leasing Act (43 USC, Section 185).

**Grazing preference.** Grazing preference or preference means a superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee. (43 CFR 4100.0-5)

**Grazing relinquishment.** The voluntary and permanent surrender by an existing permittee or lessee (with concurrence of any base property lienholder) of their priority (preference) to use livestock forage allocation on public land as well as their permission to use this forage. Relinquishments do not require consent or approval by BLM. The BLM's receipt of a relinquishment is not a decision to close areas to livestock grazing.

**Grazing retirement.** Ending livestock grazing on a specific area of land.

**Grazing system.** Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation. Include, but are not limited to, developing pastures, utilization levels, grazing rotations, timing and duration of use periods, and necessary range improvements.

**Greater sage-grouse general habitat management area (GHMA).** Greater sage-grouse-occupied (seasonal or year-round) habitat outside of priority habitat. These areas have been identified by the BLM in coordination with respective state wildlife agencies.

**Greater sage-grouse priority habitat management area (PHMA).** Areas that have been identified as having the highest conservation value to maintaining sustainable greater sage-grouse populations. These areas would include breeding, late brood-rearing, and winter concentration areas. These areas have been identified by the BLM in coordination with respective state wildlife agencies.

**Greenhouse gas (GHG).** A gas in an atmosphere that absorbs and emits radiation within the thermal infrared range. This process is the fundamental cause of the greenhouse effect. The primary greenhouse gases in Earth's atmosphere are water vapor, carbon dioxide, methane, nitrous oxide, and ozone.

**Groundwater.** Water held underground in soil or permeable rock, often feeding springs and wells.

**Guidelines.** Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as BMPs. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

**Habitat.** An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of their life cycle.

**Hazardous material.** A substance, pollutant, or contaminant that, due to its quantity, concentration, or physical or chemical characteristics, poses a potential hazard to human health and safety or to the environment if released into the workplace or the environment.

**High voltage transmission lines.** 100 kilovolts and over.

**Impact.** The effect, influence, alteration, or imprint caused by an action.

**Impairment.** The degree to which a distance of clear visibility is degraded by human-made pollutants.

**Implementation decisions.** Decisions that take action to implement land use planning; generally appealable to Interior Board of Land Appeals under 43 CFR 4.410.

**Implementation plan.** An area- or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans.

**Indicators.** Factors that describe resource condition and change and can help the BLM determine trends over time.

**Indirect impact.** Result from implementing an action or alternative but usually occurs later in time or is removed in distance and is reasonably certain to occur.

**Integrated ranch planning.** A planning method that takes a holistic look at all elements of the ranching operations, including strategic and tactical planning, rather than approaching planning as several separate enterprises.

**Intermittent stream.** A stream that flows only at certain times of the year when it receives water from springs or from some surface sources, such as melting snow in mountainous areas. During the dry season and throughout minor drought periods, these streams will not exhibit flow. Geomorphological characteristics are not well defined and are often inconspicuous. In the absence of external limiting factors, such as pollution and thermal modifications, species are scarce and adapted to the wet and dry conditions of the fluctuating water level.

**Invertebrate.** An animal lacking a backbone or spinal column, such as insects, snails, and worms. The group includes 97 percent of all animal species.

**Key wildlife ecosystems.** Specific areas within the geographic area occupied by a species in which are found those physical and biological features essential to the conservation of the species and that may require special management considerations or protection.

**Land health condition.** A classification for land health that includes these categories: Meeting land health standard(s) and not meeting land health standard(s).

**Land treatment.** All methods of artificial range improvement arid soil stabilization, such as reseeding, brush control (chemical and mechanical), pitting, furrowing, and water spreading.

**Land use allocation.** The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions (BLM 2005a[6]).

**Land use plan.** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of Federal Land Policy and Management Act; an

---

[6]US Department of the Interior, Bureau of Land Management. 2005. Handbook H-1601-1—Land Use Planning Handbook. Rel. 1-1693. Washington, DC. March 11, 2005. Internet website: https://www.blm.gov/style/medialib/blm/ak/aktest/planning/planning_general.Par.65225.File.dat/blm_lup_handbook.pdf.

assimilation of land use plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both resource management plans and management framework plans (BLM 2005a[7]).

**Land use plan decision.** Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to the Interior Board of Land Appeals.

**Large pipelines.** Those that are 24 inches in width and over.

**Late brood-rearing area.** Habitat includes mesic sagebrush and mixed shrub communities, wet meadows, and riparian habitats as well as some agricultural lands (e.g., alfalfa fields).

**Leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. These include energy-related mineral resources, such as oil, natural gas, coal, and geothermal, and some nonenergy minerals, such as phosphate, sodium, potassium, and sulfur. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lease.** Section 302 of the Federal Land Policy and Management Act of 1976 provides the BLM with the authority to issue leases for the use, occupancy, and development of public lands. Leases are issued for such purposes as commercial filming, advertising displays, commercial or noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, native or introduced species harvesting, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy (if the residential structures are not incidental to the mining operation), and water pipelines and well pumps related to irrigation and non-irrigation facilities. The regulations establishing procedures for processing these leases and permits are found in 43 CFR 2920.

**Lease stipulation.** A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek.** A traditional courtship display area attended by male sage-grouse in or next to sagebrush dominated habitat. A lek is designated based on observations of two or more male sage-grouse engaged in courtship displays. Subdominant males may display on itinerant strutting areas during population peaks. Such areas usually fail to become established leks; therefore, a site where less than five males are observed strutting should be confirmed active for two years before meeting the definition of a lek (Connelly et al 2000[8]; Connelly et al. 2003[9], Connelly, et al. 2004[10]). Each state may have a slightly different definition of lek, active lek, inactive lek, occupied lek, and unoccupied leks. Regional planning will use the appropriate definition provided by the state of interest.

---

[7]Ibid.

[8]Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. "Guidelines to manage sage-grouse populations and their habitats." Wildlife Society Bulletin 28(4):967-985.

[9]Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of Greater Sage-Grouse Habitats and Populations. University of Idaho College of Natural Resources Experiment Station Bulletin, Bulletin 80. University of Idaho, Moscow.

[10]Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming.

**Lentic.** Pertaining to standing water, such as lakes and ponds.

**Limited area.** Means an area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails (43 CFR 8340.0-5 [g]).

**Locatable minerals.** Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Long-term effect.** The effect could occur for an extended period after implementation of the alternative. The effect could last several years or more.

**Lotic.** Pertaining to moving water, such as streams or rivers.\

**Management Action.** Actions to achieve desired outcomes, including actions to maintain, restore, or improve land health. These include proactive measures, as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land.

**Management decision.** A decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Master development plans.** A set of information common to multiple planned wells, including drilling plans, surface use plans of operations, and plans for future production.

**Mechanized transport.** Any vehicle, device, or contrivance for moving people or material in or over land, water, snow, or air that has moving parts.

**Mineral.** Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (such as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral entry.** The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral estate.** The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineralize.** The process where a substance is converted from an organic substance to an inorganic substance.

**Mineral materials.** Common varieties of mineral materials, such as soil, sand and gravel, stone, pumice, pumicite, and clay, that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Mining claim.** A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, mill site, and tunnel site.

**Mining Law of 1872.** Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the General Mining Law or Mining Law.

**Mitigation.** Specific means, measures, or practices that could reduce, avoid, or eliminate adverse impacts. Mitigation can include avoiding the impact altogether by not taking a certain action or parts of an action, minimizing the impact by limiting the degree of magnitude of the action and its implementation, rectifying the impact by repairing, rehabilitating, or restoring the affected environment, reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action, and compensating for the impact by replacing or providing substitute resources or environments.

**Modification.** A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Monitoring (plan monitoring).** The process of tracking the implementation of land use plan decisions and collecting and assessing data necessary to evaluate the effectiveness of land use planning decisions.

**Motorized travel.** Moving by means of vehicles that are propelled by motors, such as cars, trucks, off-highway vehicles, motorcycles, snowmobiles, aircraft, and boats.

**Motorized vehicles or uses.** Vehicles that are motorized, such as jeeps, all-terrain vehicles (e.g., four-wheelers and three-wheelers), trail motorcycles or dirt bikes, and aircraft.

**Multiple-use.** The management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (Federal Land Policy and Management Act; BLM 2008b[11]).

**Municipal watershed.** A watershed area that provides water for use by a municipality as defined by the community and accepted by the State.

**National Environmental Policy Act of 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Historic Trail (NHT).** A congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a NHT is the

---

[11]US Department of the Interior, Bureau of Land Management. 2008. Manual 6840—Special Status Species Management. Rel. 6-125. Washington, DC. December 12, 2008. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.43545.File.dat/6840.pdf.

identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A NHT is managed in a manner to protect the nationally significant resources, qualities, values, and associated settings of the areas that such trails may pass through, including the primary use or uses of the trail (BLM 2012[12]).

**Native vegetation.** Plant species that were found here prior to Euro-American settlement and consequently are in balance with these ecosystems because they have well developed parasites, predators, and pollinators.

**Natural processes.** Fire, drought, insect and disease outbreaks, flooding, and other events that existed prior to Euro-American settlement and that shaped vegetation composition and structure.

**Net conservation gain.** The intent of the Lewistown Field Office Greater Sage-Grouse Approved Resource Plan Amendment is to provide a net conservation gain to greater sage-grouse. The BLM would require and ensure mitigation that provides a net conservation gain to the species, including accounting for any uncertainty associated with the effectiveness of such mitigation. This would be required when the BLM undertakes management actions and, consistent with valid existing rights and applicable law, when it authorizes third-party actions that result in habitat loss and degradation within priority habitat (core population areas and core population connectivity corridors). Net conservation gain is achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.

**Nonenergy leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Nonenergy minerals include resources such as phosphate, sodium, potassium, and sulfur.

**Nonmotorized travel.** Moving by foot, stock or pack animal, nonmotorized boat, ski, or mechanized vehicle, such as a bicycle.

**Nonfunctional condition.** Riparian-wetland areas that clearly are not providing adequate vegetation, landform, or woody debris to dissipate energies associated with flow events, and thus are not reducing erosion or improving water quality.

**No surface occupancy (NSO).** A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, and construction of wells and pads) are prohibited to protect identified resource values. Areas identified as NSO are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land. Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the NSO area.

**Noxious weeds.** A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage, parasitic, a carrier or host of serious insects or disease or nonnative, new, or not common to the United States.

**Objective.** A description of a desired outcome for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

---

[12]US Department of the Interior, Bureau of Land Management. 2012. Manual 6280—Management of National Scenic and Historic Trails and Trails Under Study or Recommended as Suitable for Congressional Designation. Rel. 6-139. Washington, DC. September 14, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/ Information_Resources_Management/policy/blm_manual.Par.1039.File.dat/M6280%20NSHT%20Management_Final _091212%20(2).pdf.

**Occupancy.** Full-time or part-time residence on public lands. It also means activities that involve residence; the construction, presence, or maintenance of temporary or permanent structures that may be used for such purposes; or the use of a watchman or caretaker to monitor activities. Residences or structures include barriers to access, fences, tents, motor homes, trailers, cabins, houses, buildings, and storage of equipment or supplies (43 CFR 3715.0-5).

**Off-highway vehicle (OHV; also off-road vehicle).** Any motorized vehicle capable of, or designated for travel on or immediately over land, water or other natural terrain. OHV does not include the following:

- Any nonamphibious registered motorboat
- Any military, fire, emergency, or law enforcement vehicle while being used for emergencies
- Any vehicle whose use is expressly authorized by the authorized officer or otherwise officially approved
- Vehicles in official use
- Any combat or combat support vehicle when used for national defense emergencies (43 CFR 8340.0-5)

**Open.** Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines open as it relates to OHV use.

**Ozone.** A faint blue gas produced in the atmosphere from chemical reactions of burning coal, gasoline, and other fuels and chemicals found in such products as solvents, paints, and hairsprays.

**Paleontological resources.** The physical remains or other physical evidence of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for correlating and dating rock strata and for understanding past environments, environmental change, and the evolution of life.

**Particulate matter (PM).** One of the six criteria pollutants for which the US Environmental Protection Agency established National Ambient Air Quality Standards. Particulate matter is defined as two categories: fine particulate, with an aerodynamic diameter of 10 micrometers ($PM_{10}$) or less, and fine particulate, with an aerodynamic diameter of 2.5 micrometers or less ($PM_{2.5}$).

**Perennial stream.** One that flows continuously. Perennial streams are generally associated with a water table in the localities that they flow through.

**Permitted use.** The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and expressed in animal unit months (43 CFR 4100.0-5).

**Permittee.** A person or company permitted to graze livestock on public land.

**Physiography.** The study and classification of the surface features of the Earth.

**Plan of Operations.** Required for all mining activity exploration greater than 5 acres or surface disturbance greater than casual use on certain special category lands. Special category lands are described under 43 CFR 3809.11(c), and include such lands as designated ACECs, lands in the National Wilderness Preservation System, and areas closed to OHVs, among others. In addition, a plan of operations is required for activity greater than casual use on lands patented under the Stock Raising

Homestead Act with federal minerals, where the operator does not have the written consent of the surface owner (43 CFR 3814). The plan of operations needs to be filed in the BLM field office with jurisdiction over the land involved. It does not need to be on a particular form but must address the information required by 43 CFR 3809.401(b).

**Planning area.** The planning area comprises all or portions of nine counties in central Montana: Fergus, Petroleum, Chouteau, Judith Basin, Cascade, Teton, Pondera, Meagher, and Lewis and Clark. Within the planning area, landownership is mixed. BLM-administered public lands are next to National Forest System lands, a national wildlife refuge, lands managed by the US Army Corps of Engineers and the Bureau of Reclamation, and state, private, and tribal lands. In total, the planning area covers 12,906,800 surface acres and 1,196,800 acres of federal mineral estate

**Planning criteria.** The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision-making, analysis, and data collection during planning. Planning criteria streamlines and simplifies the resource management planning actions.

**Planning issues.** Concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses or how the protection of resources affects land uses.

**Policy.** This is a statement of guiding principles, or procedures, designed and intended to influence planning decisions, operating actions, or other affairs of the BLM. Policies are established interpretations of legislation, executive orders, regulations, or other presidential, secretarial, or management directives.

**Potential wind development area.** BLM-administered lands in areas open for wind energy development that exhibit wind speeds of 7 meters (23 feet) per second or greater when measured at 120 meters (394 feet).

**Prairie Dog Complex Category 1.** A minimum of two black-tailed prairie dog complexes sufficient to maintain viable populations of black-footed ferrets. These should be at least 100 kilometers apart, with each encompassing at least 5,000 acres of prairie dogs, buy may range up to 12,000 acres, since complexes of this size have occurred in Montana in the recent past. Standards for these complexes will follow the "7K rule" adopted by the Interstate Black-tailed Prairie Dog Conservation Team.

**Prairie Dog Complex Category 2.** A total of 36,000 acres occupied by black-tailed prairie dogs, composed of at least 20 complexes of at least 1,000 acres or more. These complexes would be defined using the "7K rule" adopted by the Interstate Black-tailed Prairie Dog Conservation Team. Many combinations of complex sizes could be incorporated here, so long as the minimums are met.

**Prairie Dog Complex Category 3.** Complexes less than 1,000 acres in size, as defined by the "7K rule" adopted by the Interstate Black-tailed Prairie Dog Conservation Team, plus scattered, isolated colonies of any acreage. A major function of black-tailed prairie dog colonies in this category is to ensure continued distribution over 90 percent of the historical range of the species in Montana, and to accommodate distributional needs of associated species.

**Prescribed fire.** A wild fire originating from a planned ignition to meet specific objectives identified in a written, approved, prescribed fire plan for which National Environmental Policy Act requirements (where applicable) have been met before ignition.

**Primitive road.** A linear route managed for use by four-wheel drive or high-clearance vehicles. Primitive roads do not normally meet any BLM road design standards.

**Primitive route.** Any transportation linear feature located within areas that have been identified as having wilderness characteristics and not meeting the wilderness inventory road definition (BLM 2012[13]).

**Proper functioning condition (PFC).** A term describing stream health that is based on the presence of adequate vegetation, landform and debris to dissipate energy, reduce erosion, and improve water quality.

**Public domain.** Any or all of those areas of land ceded to the federal government by the original states and other lands that were later acquired by treaty, purchase, or cession and are disposed of only under the authority of Congress.

**Public land.** Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired ownership, except lands on the Outer Continental Shelf and lands held for the benefit of Indians, Aleuts, and Eskimos (BLM 2005a[14]).

**Public lands not designated as recreation management areas.** All lands not designated as a SRMA or ERMA.

**Range Improvement.** An authorized physical modification or treatment which is designed to improve production of forage, to change vegetation composition, to control patterns of use, to provide water, to stabilize soil and water conditions, to restore, protect, and improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife. The term includes structures, treatment projects, and use of mechanical devices or modifications achieved through mechanical means (43 CFR 4100.0-5).

**Range improvement project.** An authorized physical modification or treatment which is designed to improve production of forage, to change vegetation composition, to control patterns of use, to provide water, to stabilize soil and water conditions, to restore, protect, or improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife. This definition includes, but is not limited to: structures, treatment projects and use of mechanical devices, or modifications achieved through mechanical means.

**Raptor.** Bird of prey with sharp talons and strongly curved beaks, such as a hawk, owl, falcon, or eagle.

**Reasonably foreseeable development (RFD) scenario.** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

> **Unconstrained RFD scenario.** The baseline RFD scenario. No management prescriptions or restrictions are applied when projecting future activities. Where legislatively imposed restrictions area applied to analyzed lands, those restrictions are considered when projecting future activities.

---

[13]US Department of the Interior, Bureau of Land Management. 2012. Manual 6310—Conducting Wilderness Characteristics Inventory on BLM Lands. Rel. 6-129. Washington, DC. March 15, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.38337.File.dat/6310.pdf.

[14]US Department of the Interior, Bureau of Land Management. 2005. Handbook H-1601-1—Land Use Planning Handbook. Rel. 1-1693. Washington, DC. March 11, 2005. Internet website: https://www.blm.gov/style/medialib/blm/ak/aktest/planning/planning_general.Par.65225.File.dat/blm_lup_handbook.pdf.

**Constrained RFD scenario.** An RFD scenario where management prescriptions or restrictions are considered when projecting future activities under the alternative. Where legislatively imposed restrictions area applied to analyzed lands, those restrictions are considered when projecting future activities.

**Reclamation.** The suite of actions taken within an area affected by human disturbance, the outcome of which is intended to change the condition of the disturbed area to meet predetermined objectives or make it acceptable for certain defined resources (e.g., wildlife habitat, grazing, and ecosystem function).

**Recreation experiences.** Psychological outcomes realized either by recreation-tourism participants as a direct result of their on-site leisure engagements and recreation-tourism activity participation or by nonparticipating community residents as a result of their interaction with visitors and guests within their community or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation management area (RMA).** Includes SRMAs and ERMAs; see *SRMA* and *ERMA*.

**Recreation management zone (RMZ).** A subdivision of a recreation management area that further delineates specific recreation opportunities and recreation setting characteristics (BLM 2014b[15]).

**Recreation opportunities.** Favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation settings.** The collective distinguishing attributes of landscapes that influence and sometimes actually determine what kinds of recreation opportunities are produced.

**Reference state.** The state where the functional capacities represented by soil/site stability, hydrologic function, and biotic integrity are performing at an optimum level under the natural disturbance regime. This state usually includes what is often referred to as the potential natural plant community.

**Rehabilitate.** Returning disturbed lands as near to its pre-disturbed condition as is reasonably practical or as specified in approved permits.

**Renewable energy.** Energy resources that constantly renew themselves or that are regarded as practically inexhaustible. These include solar, wind, geothermal, hydro, and biomass. Although particular geothermal formations can be depleted, the natural heat in the Earth is a virtually inexhaustible reserve of potential energy.

**Required design feature (RDF).** Required for certain activities in all greater sage-grouse habitat. RDFs establish the minimum specifications for certain activities to help mitigate adverse impacts. However, the applicability and overall effectiveness of each RDF cannot be fully assessed until the project level when the project location and design are known. Because of site-specific circumstances, some RDFs may not apply to some projects (e.g., a resource is not present on a given site) and/or may require slight variations (e.g., a larger or smaller protective area). All variations in RDFs would require that at least one of the following be demonstrated in the National Environmental Policy Act analysis associated with the project/activity:

---

[15]US Department of Interior, Bureau of Land Management. 2014. Handbook H-8320-1—Planning for Recreation and Visitor Services. Rel. 8-85. Washington, DC. August 22, 2014. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.36142.File.dat/H-8320-1%20Recreation%20and%20Visitor%20Services%20Planning.pdf.

- A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g., due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.
- An alternative RDF is determined to provide equal or better protection for greater sage-grouse or its habitat.
- A specific RDF will provide no additional protection to greater sage-grouse or its habitat.

**Reserve common allotment.** An area designated in the land use plan as available for livestock grazing but reserved as an area available for use as an alternative to grazing in another allotment in order to facilitate rangeland restoration treatments and recovery from natural disturbances, such as drought and wildfire. The reserve common allotment would provide needed flexibility that would help the agency apply temporary rest from grazing where vegetation treatments or management would be most effective.

**Resource management plan (RMP).** A land use plan prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land use allocations and coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Restore/restoration.** Implementation of passive or active management actions designed to increase or maintain perennial herbaceous species and landscape cover of sagebrush so that plant communities are more resilient to disturbance and invasive species over the long term. The long-term goal is to create functional, high quality habitat that is occupied by sage-grouse. A short-term goal may be to restore the landform, soils, and hydrology and to increase the percentage of preferred vegetation, seeding of desired species, or treatment of undesired species.

**Restriction/restricted use.** A limitation or constraint on public land uses and operations. Restrictions can be of any kind, but most commonly apply to certain types of vehicle use, temporal or spatial constraints, or certain authorizations.

**Revegetate/revegetation.** The process of putting vegetation back in an area where it previously existed, which may or may not simulate natural conditions.

**Revision.** The process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Right-of-way (ROW).** Public lands that the BLM authorizes a holder to use or occupy under a grant; examples are roads, pipelines, power lines, and fiber optic lines.

**Right-of-way avoidance area.** An area identified through resource management planning to be avoided but may be available for ROW location with special stipulations.

**Right-of-way exclusion area.** An area identified through resource management planning that is not available for ROW location under any conditions.

**Riparian area.** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, next to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian management zone.** Areas where riparian values receive primary emphasis with all activities to the extent possible. Maintaining and restoring quality riparian habitat (including vegetation) is important as habitat for many wildlife species, to maintain water quality, appropriate woody material, and nutrient routing to aquatic habitats, and to maintain appropriate stream channel morphology.

**Riparian zone.** An area one-quarter-mile wide encompassing riparian and adjacent vegetation.

**Road.** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Rotation.** Grazing rotation between pastures in the allotment for the permitted time.

**Routes.** Multiple roads, trails, and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system.

**Sagebrush focal areas (SFA).** Areas identified by the US Fish and Wildlife Service that represent recognized "strongholds" for greater sage-grouse and that have been noted and referenced by the conservation community as having the highest densities of greater sage-grouse and other criteria important for its persistence.

**Sale (public land).** A method of land disposal pursuant to Section 203 of the Federal Land Policy and Management Act, whereby the United States receives a fair-market payment for the transfer of land from federal ownership. Public lands determined suitable for sale are offered on the initiative of the BLM. The lands must be identified in the RMP. Any lands to be disposed of by sale that are not identified in the current RMP, or that meet the disposal criteria identified in the RMP, require a plan amendment before a sale can occur.

**Saturated soils.** Occur when the infiltration capacity of the soil is exceeded from above due to rainfall or snowmelt runoff. Soils can also become saturated from groundwater inputs.

**Scarification.** Shallow loosening of the soil surface.

**Scoping process.** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of use.** The time during which livestock grazing is permitted on a given range area, as specified in the grazing lease.

**Seeding.** A vegetation treatment that includes the application of grass, forb, or shrub seed, either by air or from the ground. In areas of gentle terrain, ground applications of seed are often accomplished with a rangeland drill. Seeding allows the establishment of native species or placeholder species and restoration of disturbed areas to a perennial-dominated cover type, thereby decreasing the risk of subsequent invasion by exotic plant species. Seeding would be used primarily as a follow-up treatment in areas where disturbance or the previously described treatments have removed exotic plant species and their residue.

**Segregation, segregative effect.** As it pertains to withdrawals, refers to the closure of lands to the operation of all or some of the public land laws and mineral laws. Public land laws authorize some means to dispose of the surface estate, whereas the mineral laws authorize disposal of the subsurface estate. The segregative effect of a withdrawal is stated in the order itself, or it is prescribed by the authority that a withdrawal is made under.

**Sensitive soils.** Sensitive soils have a high risk of degradation from surface uses, such as the soils poorly suited to reclamation, badlands, soils with severe erosion hazard, soils on steep slopes, and hydric soils. Criteria used to determine soil sensitivity to surface uses are continually adapted as conditions change or new information or technology becomes available.

**Short-term effect.** Occurs only during or immediately after implementation of an alternative.

**Special Recreation Management Area (SRMA).** An administrative public lands unit identified in land use plans where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, or distinctiveness, especially as compared to other areas used for recreation (BLM 2014b)[16].

**Special recreation permit (SRP).** Authorization that allows for recreational uses of public lands and related waters. Issued as a means to control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Commercial SRPs are also issued to provide a fair return for the commercial use of public lands.

**Special status species.** BLM special status species are those listed, candidate, or proposed for listing under the Endangered Species Act and those requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the Endangered Species Act that are designated as BLM sensitive by a BLM State Director. All federally listed candidate species, proposed species, and delisted species in the five years following delisting are conserved as BLM sensitive species.

**Split-estate.** The circumstance where the surface of a particular parcel is owned by a different party than the minerals underlying the surface. Split-estates may have any combination of surface/subsurface owners: federal/state, federal/private, state/private, or percentage ownerships. When referring to the split-estate ownership on a particular parcel of land, it is generally necessary to describe the surface/subsurface ownership pattern of the parcel.

**Stabilize.** The process of stopping further damage from occurring.

**Standard.** A description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards). To be expressed as a desired outcome (goal).

**Standard lease terms and conditions.** Areas may be open to leasing with no specific management decisions defined in an RMP; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State.** An integrated soil and vegetation unit having one or more biological communities that occur on a particular ecological site and that are functionally similar with respect to the three attributes (soil/site stability, hydrologic function, and biotic integrity) under natural disturbance regimes.

**Steep slopes.** Those that are 30 percent or greater.

**Stipulation (general).** A term or condition in an agreement or contract.

---

[16]US Department of Interior, Bureau of Land Management. 2014. Handbook H-8320-1—Planning for Recreation and Visitor Services. Rel. 8-85. Washington, DC. August 22, 2014. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.36142.File.dat/H-8320-1%20Recreation%20and%20Visitor%20Services%20Planning.pdf.

**Stipulation (oil and gas).** A provision that modifies standard oil and gas lease terms and conditions in order to protect other resource values or land uses and is attached to and made a part of the lease. Typical lease stipulations are no surface occupancy (NSO), timing limitations (TL), and controlled surface use (CSU). Lease stipulations are developed through the RMP process.

**Surface disturbance.** Surface-disturbing activities result from land uses and affect soils and vegetation to varying degrees depending on the amount, location, and type of disturbance; soil type; time of year; climate; and surface hydrology. Surface-disturbing activities remove protective vegetative cover and soil crusts and can alter soil physical, chemical, and biological properties, increasing soil susceptibility to water and wind erosion and decreasing its quality and site productivity.

**Surface-disturbing activities.** An action that alters the vegetation, surface/near surface soil resources, or surface geologic features beyond natural site conditions and on a scale that affects other public land values. Examples of surface-disturbing activities are operation of heavy equipment to construct well pads, roads, pits and reservoirs; installation of pipelines and power lines; and the conduct of several types of vegetation treatments (e.g., prescribed fire). Surface-disturbing activities may be either authorized or prohibited.

**Surface uses.** These are all the various activities that may be present on the surface or near-surface (e.g., pipelines) of the public lands. The term does not refer to those subterranean activities (e.g., underground mining) on public lands or federal mineral estate. When administered as a use restriction (e.g., *No Surface Use*), this phrase prohibits all but specified resource uses and activities in a certain area to protect particular sensitive resource values and property. This designation typically applies to small acreage sensitive resource sites (e.g., plant community study exclosure) and administrative sites (e.g., government ware-yard) where only authorized agency personnel are admitted.

**Sustained yield.** The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple uses.

**Technically/economically feasible.** Actions that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. It is the BLM's sole responsibility to determine what actions are technically and economically feasible. The BLM will consider whether implementation of the proposed action is likely given past and current practice and technology; this consideration does not necessarily require a cost-benefit analysis or speculation about an applicant's "costs and profit" (CEQ 1981[17]; BLM 2008a[18]).

**Temporary/temporary use.** The opposite of permanent/permanent use. It is a relative term and has to be considered in the context of the resource values affected and the nature of the resource uses and activities taking place. Generally a temporary activity is considered to be one that is not fixed in place and is of short duration.

**Temporary route.** Temporary routes are defined as short-term overland roads, primitive roads or trails; authorized or acquired for the development, construction or staging of a project or event that has a finite lifespan.

---

[17]Council on Environmental Quality. 1981. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations. Washington, DC. March 23, 1981.
[18]US Department of the Interior, Bureau of Land Management. 2008. Handbook H-1790-1—National Environmental Policy Act. Rel. 1-1710. Washington, DC. January 30, 2008. Internet website: https://www.blm.gov/style/medialib/blm/ak/aktest/planning/planning_general.Par.2116.File.dat/Handbook.NEPA.H-1790-1.2k8.01.30[1].pdf.

**Terrestrial.** Living or growing in or on the land.

**Threatened species.** Any species that is likely to become endangered in the foreseeable future throughout all or a significant portion of its range (BLM 2008b). Under the Endangered Species Act in the United States, threatened is less protected than endangered. Designation as threatened or endangered is determined by US Fish and Wildlife Service, as directed by the Endangered Species Act.

**Timber.** Standing trees, downed trees, or logs that are capable of being measured in board feet.

**Timing limitation (TL).** This stipulation, a moderate constraint, is applicable to fluid mineral leasing, all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, and construction of wells and pads), and other surface-disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for TL are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. TLs can overlap spatially with no surface occupancy and controlled surface use, as well as with areas that have no other restrictions.

**Total dissolved solids.** Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**Total maximum daily load (TMDL).** An estimate of the total quantity of pollutants (from all point, nonpoint, and natural sources) that may be allowed into waters without exceeding applicable water quality criteria.

**Trail.** A linear route managed for human-power (e.g., hiking or bicycling), stock (e.g., horseback riding), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transition.** A shift between two states. Transitions are not reversible by simply altering the intensity or direction of factors that produced the change. Instead, they require new inputs such as revegetation or shrub removal. Practices such as these that accelerate succession are often expensive to apply.

**Transmission.** The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points where it is transformed for delivery to consumers or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**Transportation system.** The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Travel management areas (TMA).** Polygons or delineated areas where a rational approach has been taken to classify areas open, closed or limited, and has identified or designated a network of roads, trails, ways, landing strips, and other routes that provide for public access and travel across the planning area. All designated travel routes within travel management areas should have a clearly identified need

and purpose, as well as clearly defined activity types, modes of travel, and seasons or time frames for allowable access or other limitations (BLM 2005a[19]).

**Trespass.** Any unauthorized use of public land.

**Tribal interests.** Native American or Native Alaskan economic rights, such as Indian trust assets, resource uses, access guaranteed by treaty rights, and subsistence uses.

**Understory.** That portion of a plant community growing underneath the taller plants on the site.

**Unitization.** Operation of multiple leases as a single lease under a single operator.

**Unitized area.** A group of contiguous oil and gas lease holdings where the lessee holds an agreement with the federal government so that exploration, drilling, and production of the resource proceeds in the most efficient and economical manner.

**Unnecessary or undue degradation.** Conditions, activities, or practices that are characterized as follows (43 CFR 3809.5):

- Fail to comply with one or more of the following: the performance standards in 43 CFR 3809.420, the terms and conditions of an approved plan of operations, operations described in a complete notice, and other federal and state laws related to environmental protection and protection of cultural resources
- Are not "reasonably incident" to prospecting, mining, or processing operations, as defined in 43 CFR 3715.0-5
- Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas

**Utility corridor.** Tract of land varying in width and forming a passageway that various commodities such as oil, gas, and electricity are transported through.

**Valid existing rights.** Documented legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include fee title ownership, mineral rights, rights-of-way, easements, permits, and licenses. Such rights may have been reserved, acquired, leased, granted, permitted, or otherwise authorized over time.

**Vegetation condition class (VCC).** Quantifies the amount that current vegetation has departed from the simulated historical vegetation reference conditions. Three condition classes describe low departure (VCC 1), moderate departure (VCC 2), and high departure (VCC 3). VCC is calculated based on changes to species composition, structural stage, and canopy closure.

**Vegetation manipulation.** Planned alteration of vegetation communities through use of mechanical or chemical means, seeding, or prescribed fire or managed fire to achieve desired resource objectives.

---

[19]US Department of the Interior, Bureau of Land Management. 2005. Handbook H-1601-1—Land Use Planning Handbook. Rel. 1-1693. Washington, DC. March 11, 2005. Internet website: https://www.blm.gov/style/medialib/blm/ak/aktest/planning/planning_general.Par.65225.File.dat/blm_lup_handbook.pdf.

**Vegetation treatments.** Management practices that change the vegetation structure to a different stage of development. Vegetation treatment methods include managed fire, prescribed fire, chemical or mechanical means, and seeding.

**Vegetation type.** A plant community with immediately distinguishable characteristics based on and named after the apparent dominant plant species.

**Visibility (air quality).** A measure of the ability to see and identify objects at different distances.

**Visitor day.** Twelve visitor hours that may be aggregated by one or more persons in single or multiple visits.

**Visual resources.** The visible physical features on a landscape, (topography, water, vegetation, animals, structures, and other features) that comprise the scenery of the area.

**Watershed.** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**West Nile virus.** Found in temperate and tropical regions of the world and most commonly transmitted by mosquitos. West Nile virus can cause flu-like symptoms in humans and can be lethal to birds, including sage-grouse.

**Wild and Scenic Study River.** Rivers identified for study by Congress under Section 5(a) of the Wild and Scenic Rivers Act or identified for study by the Secretary of Agriculture or the Secretary of the Interior under Section 5(d)(1) of the Wild and Scenic Rivers Act. These rivers are studied under the provisions of Section 4 of the Wild and Scenic Rivers Act (BLM 2012[20]).

> **Eligible river.** A river or river segment found to meet criteria found in Sections 1(b) and 2(b) of the Wild and Scenic Rivers Act of being free flowing and possessing one or more outstandingly remarkable value

> **Suitable river.** An eligible river segment found through administrative study to meet the criteria for designation as a component of the National System, as specified in Section 4(a) of the Wild and Scenic Rivers Act

**Wildcat well.** An exploratory oil well drilled in land not known to be an oil field.

**Wilderness.** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that has the following characteristics:

- Generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable

- Has outstanding opportunities for solitude or a primitive and unconfined type of recreation

- Has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition

---

[20]US Department of the Interior, Bureau of Land Management. 2012. Manual 6400—Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management. Rel. 6-136. Washington, DC. July 13, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.76771.File.dat/6400.pdf.

- May also contain ecological, geological, or other features of scientific, educational, scenic, or historic value

The definition is contained in Section 2(c) of the Wilderness Act of 1964 (78 Stat. 891).

**Wilderness characteristics.** Wilderness characteristics attributes are the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values, such as ecological, geological, or other features of scientific, educational, scenic, or historical value. Lands with wilderness characteristics have been inventoried and determined by the BLM to contain wilderness characteristics, as defined in section 2(c) of the Wilderness Act, as follows:

- Naturalness—The degree to which an area generally appears to have been affected primarily by the forces of nature with the imprint of people's work substantially unnoticeable

- Opportunity—A situation or condition favorable for attainment of a goal

- Outstanding—1. Standing out among others of its kind, conspicuous, prominent; 2. Superior to others of its kind, distinguished, excellent

- Primitive and Unconfined recreation—Nonmotorized, nonmechanized (except as provided by law), and undeveloped types of recreational activities

- Solitude—The state of being alone or remote from others, isolation; a lonely or secluded place

**Wilderness Study Area (WSA).** A designation made through the land use planning process of a roadless area found to have wilderness characteristics, as described in Section 2(c) of the Wilderness Act of 1964.

**Wildfire.** Wildfire is a general term describing any non-structure fire that occurs in the wild. Wild fires are categorized into two distinct types (USDA and DOI 2009[21]):

- Wildfires—Unplanned ignitions or prescribed fires that are declared wildfires.

- Prescribed Fires—Planned ignitions

**Wildland-urban interface (WUI).** The line, area, or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuels.

**Wind avoidance area.** May be available for locating wind energy ROWs with special stipulations, design features, or mitigation measures that go beyond the standard terms and conditions applied to ROW grants and best management practices. Unlike areas designated as open, avoidance areas contain constraints that may result in substantial restrictions or mitigation measures in order for an applicant to proceed with a wind energy development.

**Wind exclusion area.** Those that are not available for locating wind energy ROWs under any conditions.

**Wind open area.** Available for consideration for locating wind ROWs, with standard ROW terms and conditions, less restrictive design features incorporated into the applicant's plan of development, and

---

[21]US Department of Agriculture and US Department of the Interior. 2009. Guidance for Implementation of Federal Wildland Fire Management Policy. Wildland Fire Leadership Council. Internet website: https://www.nifc.gov/policies/policies_documents/GIFWFMP.pdf. February 2009.

general BMPs that can be found in the 2005 ROD for Wind Energy Development and Associated Land Use Plan Amendments (BLM 2005b[22]).

**Withdrawal.** An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

**Winter concentration areas.** Sage-grouse winter habitats that sage-grouse occupy annually and that provide sufficient sagebrush cover and food to support the birds throughout the entire winter (especially periods with above-average snow cover). Many of these areas support several different breeding populations of sage-grouse. Sage-grouse typically show high fidelity for these areas, and loss or fragmentation can result in significant population impacts.

**Yearling factor.** Adjustments made to grazing permits in which yearlings are the class of livestock. Yearlings were rated at 0.75 animal unit months for these permits, allowing for more yearlings to be run then cattle.

---

[22]US Department of the Interior, Bureau of Land Management. 2005. Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments – Record of Decision. Washington, DC. December 2005.

This page intentionally left blank.

# Appendix D
## Implementation and Monitoring

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                          Page

**APPENDIX D. IMPLEMENTATION AND MONITORING** ............................................................ **D-1**

    D.1     Planning ............................................................................................................ D-1

    D.2     Implementation ............................................................................................... D-2

    D.3     Monitoring........................................................................................................ D-3

    D.4     Evaluation......................................................................................................... D-4

This page intentionally left blank.

# Appendix D. Implementation and Monitoring

Plan implementation is a continuous process, occurring over the life of the resource management plan (RMP), that will take into consideration the changing circumstances and new information that comes about through monitoring. The goal is to maintain a dynamic resource management plan that is evaluated and amended if necessary on an issue-by-issue basis.

The implementation and monitoring process for the Lewistown Resource Management Plan involves five major steps: planning, implementation, monitoring, evaluation, and adjustments, as necessary. Planning involves a great amount of time and resources to identify issues and management opportunities to address those issues. During the planning process, the scope of the issue is identified, and management goals, objectives, and actions are defined to address the issues. Once the planning process is completed, decisions are implemented, monitored, and evaluated overtime to determine if goals are being met and if management actions are achieving the desired objective or standard. Results of monitoring are documented and communicated to the appropriate parties, and management objectives and actions are modified based on results, if necessary.



## D.1   PLANNING

The Proposed RMP and Final Environmental Impact Statement (EIS) is approved once the Record of Decision (ROD) is signed. An Approved Plan will also be available that will include all the approved decisions from the RMP.

The US Department of the Interior, Bureau of Land Management (BLM) regulation in 43 Code of Federal Regulations (CFR) 1610.5-4 provides that land use plan decisions and supporting components can be maintained to reflect minor changes in data. Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the plan. Maintenance must

not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the Approved Plan.

Land use plan decisions are changed through either a plan amendment or a plan revision. The process for conducting plan amendments is basically the same as the land use planning process used in developing RMPs. The primary difference is that circumstances may allow for completing a plan amendment through the environmental assessment (EA) process, rather than through an EIS. Plan amendments (43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan. Plan amendments are most often prompted by the need for the following:

- To consider a proposal or action that does not conform to the plan
- To implement new or revised policy that changes land use plan decisions
- To respond to new, intensified, or changed uses on BLM-administered land
- To consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions

## D.2   IMPLEMENTATION

Implementation of the RMP begins once the ROD and Approved Plan for the Proposed RMP/Final EIS are signed.

Decisions made through the RMP planning process are implemented over time. Some of the decisions are immediate and go into effect with the ROD. These are decisions such as the road designations and lands available for disposal through exchange. Some decisions would be implemented after a site-specific environmental review is completed. Examples are range improvements, recreation sites, or approval of an application for permit to drill a natural gas well. Other decisions include guidance that would be applied during site-specific analysis or activity planning.

Any future proposals or management actions will be reviewed against the Approved Plan to determine if the proposal would be in conformance with the RMP. While the Final EIS for the Lewistown RMP will comply with the National Environmental Policy Act of 1969 (NEPA) for the broad-scale decisions to be made in the ROD, it does not replace the requirement to comply with NEPA for implementation actions. Proposed actions fall into one of the following five categories:

- Actions that are exempt from NEPA
- Actions that are categorically excluded
- Actions that are covered by an existing NEPA environmental document
- Actions that require preparation of an EA to determine if an EIS is needed
- Actions that require preparation of an EIS

The NEPA procedural, documentation, and public involvement requirements are different for each category.

Activity level planning will address any proposed new activities and long-term permitted activities that need to be brought into compliance with plan decisions, subject to valid existing rights. Monitoring of these activities will then determine the effectiveness of applying the land use plan direction. Where land

use plan actions or best management practices (BMPs) are not effective, the plan could be modified, without amendment or revision as long as assumptions and effects disclosed in the analysis remain valid and that broad-scale goals and objectives are not changed. This approach uses on-the-ground monitoring, a scientific information review, and practical experience and common sense to adjust management and modify implementation of the plan to reach the desired outcome.

As part of this process, the BLM will review management actions and the plan periodically to determine whether the objectives set forth in this document are being met. Where they are not being met, the BLM will consider adjusting the scope. Where the BLM considers taking or approving actions that would alter or not conform to overall direction of the plan, it would prepare a plan amendment and environmental analysis of appropriate scope.

In addition, during the life of the Approved Plan, the BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data or support new management techniques, BMPs, and scientific principles. To the extent that such new information or actions address issues covered in the plan, the BLM would integrate the data through plan maintenance.

## D.3   MONITORING

Monitoring is the repeated measurement of activities and conditions over time. Monitoring data gathered over time is examined and used to draw conclusions on whether management actions are meeting stated objectives, and if not, why. Conclusions are then used to make recommendations on whether to continue current management or what changes need to be made in management practices to meet objectives.

Monitoring determines whether planned activities have been implemented in the manner prescribed by the plan. This monitoring documents the BLM's progress toward full implementation of the land use plan decision. No specific thresholds or indicators are required for this type of monitoring.

Monitoring also is used to determine if the implementation of activities has achieved the desired goals and objectives. This requires knowledge of the objectives established in the RMP and of the indicators that can be measured. Indicators are established by technical specialists in order to address specific questions, and thus avoid collecting unnecessary data. Success is measured against the benchmark of achieving desired future conditions established by the plan.

Monitoring is also used to ascertain whether a cause-and-effect relationship exists among management activities or resources being managed. It confirms whether the predicted results occurred and if assumptions and models used to develop the plan are correct. This type of monitoring is often done by contract with another agency, academic institution, or other entity. It is usually expensive and time consuming since the results are not known for many years.

Regulations at 43 CFR 1610.4-9 require that the proposed plan establish intervals and standards, as appropriate, for monitoring and evaluating the plan, based on the sensitivity of the resource decisions involved. The BLM periodically reviews the progress in meeting the plan objectives and adhering to the management framework established by the plan. Council on Environmental Quality (CEQ) regulations implementing NEPA state that agencies may provide for monitoring to ensure that their decisions are

carried out and should do so in important cases (40 CFR 1505.2[c]). To meet these requirements, the BLM would prepare periodic reports on the implementation of the RMP.

## D.4   EVALUATION

Evaluation is a process in which the plan and monitoring data are reviewed to see if management goals and objectives are being met and if management direction is sound.

The BLM would use land use plan evaluations to determine if the decisions in the RMP, supported by the accompanying NEPA analysis, are still valid. Generally, the RMP will be evaluated every five years, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation. Land use plan evaluations determine if decisions are being implemented, whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, whether there is new data of significance to the plan, and if decisions should be changed through amendment or revision.

Scheduled evaluations for the Lewistown RMP/EIS will take place in March of 2025, 2030, 2035, and 2042.

Evaluations will follow the protocols established by the BLM Land Use Planning Handbook H-1601-1[1] in effect at the time the evaluation is initiated.

---

[1] US Department of the Interior, Bureau of Land Management. 2005. Handbook H-1601-1—Land Use Planning Handbook. Rel. 1-1693. Washington, DC. March 11, 2005. Internet website: https://www.blm.gov/style/medialib/blm/ak/aktest/planning/planning_general.Par.65225.File.dat/blm_lup_handbook.pdf.

# Appendix F
Design Features and Best Management Practices

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                            Page

**APPENDIX F. DESIGN FEATURES AND BEST MANAGEMENT PRACTICES ................................. F-1**

F.1     Design Features ................................................................................................................ F-1
F.2     General Best Management Practices ........................................................................... F-12
        F.2.1   Air Resource BMPs ....................................................................................... F-12
        F.2.2   Erosion and Sediment Control Practices: Field Manual .......................... F-12
        F.2.3   Erosion and Sediment Control Practices: Reference Manual ................ F-13
        F.2.4   Fluid Minerals BMPs ..................................................................................... F-13
        F.2.5   Montana Guide to the Streamside Management Zone Law .................... F-14
        F.2.6   Montana Nonpoint Source Management Plan .......................................... F-14
        F.2.7   Montana Placer Mining BMPs ..................................................................... F-15
        F.2.8   Water Quality BMPs for Montana Forests ................................................ F-15
        F.2.9   Wind Energy BMPs ....................................................................................... F-15
        F.2.10  Communication Tower BMPs ..................................................................... F-16
        F.2.11  Grazing Management BMPs (Guidelines) ................................................. F-17
        F.2.12  Herbicide Special Operating Procedures ................................................. F-18
        F.2.13  BLM BMPs ...................................................................................................... F-18
        F.2.14  Visual Resources ........................................................................................... F-18
        F.2.15  Renewable Energy Development ................................................................ F-18
        F.2.16  Healthy Watersheds ..................................................................................... F-18
        F.2.17  Storm Water BMPs ....................................................................................... F-19
        F.2.18  Pasture, Rangeland, and Grazing Operations BMPs ............................... F-19
        F.2.19  National Range and Pasture Handbook ..................................................... F-19
        F.2.20  Montana Nonpoint Source Management Program ................................. F-19

# TABLES

Page

F-1     Implementation-Level Design Features ...................................................................... F-2

This page intentionally left blank.

# Appendix F. Design Features and Best Management Practices

## F.1   DESIGN FEATURES

The United States Department of the Interior, Bureau of Land Management (BLM) will use the design features discussed in this appendix to meet statutory requirements for environmental protection and to comply with resource-specific goals and objectives set forward in the Lewistown Resource Management Plan RMP/Environmental Impact Statement (EIS). The BLM will apply design features to modify the operations of authorized land uses or activities to meet these obligations.

The BLM will apply these measures to avoid, minimize, rectify, reduce, and compensate for effects if an evaluation of the authorization area indicates the presence of resources of concern. These include air, water, soils, cultural resources, national historic trails, recreation values, and important wildlife habitat. The intent is to reduce effects associated with authorized land uses or activities such as road, pipeline, or power line construction, mineral development, range improvements, and recreation.

The design features for authorizations will be identified as part of the National Environmental Policy Act of 1969 (NEPA) process. This will come about through interdisciplinary analysis involving resource specialists, project proponents, government entities, landowners, and other surface management agencies. Those measures selected for implementation will be identified in the record of decision (ROD) (for an EIS) or Decision Record (for an environmental assessment [EA] or categorical exclusion) for those authorizations. The measures chosen will inform a potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered lands and minerals and will mitigate effects from those authorizations.

Because these actions create a clear obligation for the BLM—to ensure any proposed mitigation action adopted in the environmental review process is performed—they will ensure that mitigation will reduce environmental effects in the implementation stage and include binding mechanisms for enforcement[1].

Because of site-specific circumstances and local resource conditions, some design features may not apply to some or all activities (e.g., a resource or conflict is not present on a given site), or they may require slight variations from what is described in this appendix. The BLM may add additional measures it deems necessary through the environmental analysis and as developed through coordination with other federal, state, and local regulatory and resource agencies. Application of design features is subject to valid existing rights and technical and economic feasibility.

The BLM will monitor the effectiveness of design features to determine whether they are achieving resource objectives and accomplishing desired goals. Timely adjustments would be made as necessary to meet the resource goals and objectives.

---

[1] Council on Environmental Quality memorandum for heads of federal departments and agencies, *Appropriate Use of Mitigation and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, January 14, 2011.

The list included in this appendix is not limiting but references the most frequently used sources. The BLM may add additional site-specific restrictions it deems necessary by further environmental analysis and as developed through coordination with other federal, state, and local regulatory and resource agencies.

Because design features change or are modified, based on new information, the BLM will update the guidelines periodically. As new publications are developed, the BLM may consider those BMPs that they contain. In addition, many BLM handbooks (such as BLM Manual 9113, Roads, and 9213, Interagency Standards for Fire and Aviation Operation) also contain BMP-type measures for minimizing effects. (These BLM-specific guidance and direction documents are not referenced in this appendix.)

The EIS for this RMP does not decide or dictate the exact wording or inclusion of these design features. Rather, they are used in the RMP and EIS process as a tool to help demonstrate at the land use plan scale how they will be applied when subsequent activity plans and site-specific authorizations are considered.

The design features and their wording are matters of policy. As such, specific wording is subject to change, primarily through administrative review, not through the RMP and EIS process. Any further changes that may be made in the continuing refinement of these design features and any development of program-specific standard procedures will be handled in another forum, which will include appropriate public involvement and input. These design features are not to be confused with actual oil and gas stipulations, which can be found in Appendix L.

**Table F-1**
**Implementation-Level Design Features**

| Resource | Design Feature | Objective |
|----------|----------------|-----------|
| **Sensitive Soils** | Prior to surface disturbance on sensitive soils, a reclamation plan will be approved by the BLM Authorized Officer. The plan would demonstrate the following: (1) no other practicable alternatives exist for relocating the activity, (2) the activity will be located to reduce effects on soil and water resources, (3) site productivity will be maintained or restored, (4) surface runoff and sedimentation will be adequately controlled, (5) on- and off-site areas will be protected from accelerated erosion, (6) no areas susceptible to mass wasting will be disturbed and (7) surface-disturbing activities will be prohibited during extended wet periods. | **Objective:** To maintain the chemical, physical, and biotic properties of soils, this includes maintaining the soil's productivity, stability, and biotic properties. This will prevent excessive erosion and potential mass wasting and will improve the likelihood of successful reclamation. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Slope** | Surface disturbances are subject to the following best management practices (BMPs): Prior to surface disturbance on slopes over 30 percent, an engineering/reclamation plan will be approved by the BLM Authorized Officer. Such plan must demonstrate how the following will be accomplished: Site productivity will be restored; surface runoff will be adequately controlled; off-site areas will be protected from accelerated erosion, such as rilling, gullying, piping, and mass wasting; water quality and quantity will be in conformance with state and federal water quality laws; surface-disturbing activities will not be conducted during extended wet periods; construction will not be allowed when soils are frozen. | **Objective:** To maintain soil productivity, provide necessary protection to prevent excessive soil erosion on steep slopes and to avoid areas subject to slope failure, mass wasting, piping, or excessive reclamation problems. |
| **Source Water Protection Areas** | Surface disturbance and disrupting activities would not be located in State-designated source water protection areas. | **Objective:** To protect human health by minimizing the potential contamination of public water systems. Source water is untreated water from streams, rivers, lakes, or aquifers used to supply public water systems. Ensuring that source water is protected from contamination can reduce the costs of treatment and risks to public health. This practice would protect the State-designated source water protection areas that protect public water systems from potential contamination. |
| **Water, Riparian, Wetland, and Floodplains** | Surface disturbance and disrupting activities will not occur in perennial or intermittent streams, lakes, ponds, reservoirs, 100-year floodplains, wetlands, and riparian areas, unless the appropriate environmental review indicates that such actions are the only practicable alternative. | **Objective:** To protect the unique biological and hydrological features and functions associated with perennial and intermittent streams, lakes, ponds, reservoirs, floodplains, wetlands, and riparian areas. |
| **Water, Riparian, Wetlands** | Surface disturbance will be controlled within 300 feet of riparian and wetland areas. Surface-disturbing activities will require a plan with design features that demonstrate how all actions would maintain or improve the functionality of riparian/wetland areas. The plan will address (a) potential effects on riparian and wetland resources, (b) mitigation to reduce effects to acceptable levels (including timing restrictions), (c) post-project restoration, and (d) monitoring (the operator must conduct monitoring capable of detecting early signs of changing riparian and wetland conditions). | **Objective:** To protect the unique biological and hydrological features associated with wetlands and riparian areas. Disturbances adjacent to wetland and riparian areas (including road use) can adversely affect these sensitive areas. This practice would protect these features from the indirect effects of activities on the nearby surface. This would also encompass the floodplain along most first- to third-order streams. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Winter Range (Pronghorn, Elk, Moose, Bighorn Sheep, Mule Deer, and Whitetail Deer)** | Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the application to be approved by the BLM Authorized Officer with confirmation from the state wildlife management agency. The proponent will not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction that the function and suitability of the habitat will not be impaired. | **Objective:** To protect during mild to severe winters the winter range of big game identified by the BLM as priority species for management, as follows: white-tailed deer, mule deer, elk, pronghorn, moose, and bighorn sheep. |
| **Elk Calving Grounds** | Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the project application to be approved by the BLM Authorized Officer, with confirmation from the state wildlife management agency. The proponent should not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction that the function and suitability of the habitat would not be impaired. | **Objective:** To protect traditional elk calving ground habitat crucial for successful recruitment of calves. |
| **Bighorn Sheep Range** | Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the project application to be approved by the BLM Authorized Officer, with confirmation from the state wildlife management agency. The proponent should not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction that the function and suitability of the habitat would not be impaired. | **Objective**: To protect bighorn sheep and their habitats, a BLM priority species for management. |
| **Lentic Fisheries** | No surface disturbance or disrupting activities are allowed within one-quarter mile of designated reservoirs with fisheries. | **Objective:** To protect lentic fisheries habitat. |
| **Lotic Fisheries** | Surface disturbance or disrupting activities are prohibited within 0.5 mile from the centerline of streams or 0.5 mile from bankfull edge of lakes and reservoirs containing Class 1 and Class 2 fisheries, as defined by Montana Fish, Wildlife and Parks (MFWP) Crucial Areas Assessment Game Fish Quality. | **Objective:** To ensure healthy aquatic habitats are maintained along Class 1 and Class 2 fisheries. |
| **Special Status Fisheries** | No surface disturbance or disturbing activities are allowed within 0.5 mile of the centerline of streams that are identified by the BLM as having high restoration potential for westslope cutthroat trout, Yellowstone cutthroat trout, arctic grayling, or bull trout. | **Objective**: To ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Westslope Cutthroat Trout** | No surface disturbance or disturbing activities are allowed within one-half mile from centerline of streams containing known populations of 90% – 100% genetically pure Westslope Cutthroat trout. Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the project application to be approved by the BLM Authorized Officer, with confirmation from the state wildlife management agency. The proponent should not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction that the function and suitability of the habitat would not be impaired. | **Objective**: To ensure healthy aquatic habitat exists in drainages important to the viability of upper Missouri River Basin westslope cutthroat trout. |
| **Blue Ribbon Trout Stream** | No surface disturbance or disturbing activities are allowed within one-half mile from the centerline of Class 1 fishery streams (Blue Ribbon Trout streams).

Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the project application to be approved by the BLM Authorized Officer, with confirmation from the state wildlife management agency. The proponent should not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate the function and suitability of the habitat would not be impaired.  An exception may be granted if the Montana Fish, Wildlife and Parks modifies the Class 1 fisheries rating. Application of the following mitigation measures apply:
  a) No net increase in sediment over existing condition.
  b) No adverse effects on water quality and quantity. | **Objective**: To ensure healthy aquatic habitat are maintained along Class 1 fisheries. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Bull Trout** | No surface disturbance or disturbing activities allowed within one-half mile from centerline of streams containing known populations of Bull Trout.<br><br>Prior to surface disturbance and disrupting activities, the proponent will prepare a plan as a component of the project application to be approved by the BLM Authorized Officer, with confirmation from the state wildlife management agency. The proponent should not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate the function and suitability of the habitat would not be impaired.  An exception may be granted if Montana Fish, Wildlife and Parks determines the stream is no longer considered important to the viability of the species or, if after a site assessment is conducted and if the operator can demonstrate in a surface use plan of operations that adverse effects can be eliminated and activities would not affect sensitive trout populations. Apply the following mitigation measures:<br>a) No net increase in sediment over existing condition.<br>b) No adverse effects on water quality and quantity. | **Objective**: To ensure healthy aquatic habitat exists in drainages important to the viability of Bull Trout. |
| **Water bird Nesting Colony** | Surface disturbance and disrupting activities are prohibited within 0.25 mile of a water bird nesting colony. Priority species for management are special status species and the following species, regardless of special status designation:<br>• American white pelican<br>• Black-crowned night heron<br>• Black tern<br>• Caspian tern<br>• Clark's grebe<br>• Common tern<br>• Double-crested cormorant<br>• Forster's tern<br>• Franklin's gull<br>• Great blue heron<br>• White-faced ibis | **Objective**: To protect colonial-nesting birds identified as BLM priority species for management. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Water bird Nesting Colony** | Apply timing limitation (TL) within 0.5 mile[2] of a water bird nesting colony from April 1 to July 15. Priority species for management are special status species and the following species, regardless of special status designation:<br>• American white pelican<br>• Black-crowned night heron<br>• Black tern<br>• Caspian tern<br>• Clark's grebe<br>• Common tern<br>• Double-crested cormorant<br>• Forster's tern<br>• Franklin's gull<br>• Great blue heron<br>• White-faced ibis | **Objective:** To protect nesting activities associated with colonial-nesting birds identified as BLM priority species for management. |
| **Crucial Winter Range** | Surface disturbance and disrupting activities that would adversely impact crucial winter range are prohibited for the following BLM priority species:<br>• Bighorn sheep<br>• Elk<br>• Greater sage-grouse<br>• Moose<br>• Mule deer<br>• Pronghorn<br>• Whitetail deer | **Objective:** To protect in the most severe of winters the winter ranges crucial to the survival of 80 percent of the species identified as BLM priority species. |
| **Sharp-tailed Grouse Lek[3]** | Surface disturbance and disrupting activities are prohibited on and within 0.5 mile of the perimeter of leks. | **Objective:** To protect leks for sharp-tailed grouse, a BLM priority species for management. |
| **Sharp-tailed Grouse Lek** | Surface disturbance and disrupting activities are prohibited within 2 miles of the perimeter of sharp-tailed grouse leks from April 1 to July 15. | **Objective:** To protect nesting activities associated with sharp-tailed grouse, identified as BLM priority species. |
| **Bats** | Prohibit surface disturbance or disruption that would adversely effect bats or their habitat within 0.25 mile of identified bat maternity roosts and hibernation areas. | **Objective:** To protect bat maternity roosts and hibernation habitat. |

[2]Bendel and Therres (1999) recommend buffer distances of 0.5 mile, one of the few sources who specifically address disturbance related to surface occupancy rather than just human disturbance. However, other sources suggest shorter distances for disturbance during the breeding season. Additional rationale for distances related to colonial water birds is needed.

[3]Based on conversations with Aaron Robinson, a doctoral student looking at the effects of oil and gas development on sharp-tailed grouse, the 0.25-mile buffer and a June 15-30 ending dates for nesting are probably inadequate. As a result, the revisions identified in the stipulations are recommended.

| Resource | Design Feature | Objective |
|---|---|---|
| **Raptors**[4] | Surface disturbance and disruptive activities are prohibited within 0.25 mile of raptor nest sites active within the preceding 7 years[5] for the following BLM priority species for management:<br>• Burrowing owl<br>• Ferruginous hawk<br>• Golden eagle<br>• Long-eared owl<br>• Merlin<br>• Northern goshawk<br>• Osprey<br>• Prairie falcon<br>• Red-tailed hawk<br>• Sharp-shinned hawk<br>• Short-eared owl<br>• Swainson's hawk | **Objective:** To protect nest sites of raptors identified as BLM priority species. |
| **Raptors** | Surface disturbance and disrupting activities are prohibited within 0.5 mile of active raptor nest sites from March 1 through July 31. | **Objective:** To protect nesting activities associated with raptors identified as BLM priority species. |
| **Bald Eagle** | Surface occupancy and use is prohibited within 0.5 mile of bald eagle nest sites active within the preceding 5 years.[6] | **Objective:** To protect nest sites and nesting activities of bald eagles, a BLM priority species. |
| **Peregrine Falcon** | Surface disturbance and disrupting activities are prohibited within 1 mile of peregrine falcon nest sites active within the preceding 7 years.[7] | **Objective:** To protect nest sites and nesting activities of peregrine falcons, a BLM priority species. |

[4]Raptor definition for application of stipulations includes raptor species without species-specific stipulations noted above. The exact list may vary by RMP but may include the following species: golden eagle, northern goshawk, ferruginous hawk, red-tailed hawk, sharp-shinned hawk, Swainson's hawk, prairie falcon, merlin, osprey, burrowing owl, long-eared owl, and short-eared owl. Because nest structures are often used by different species throughout the life of the structure, these distances and dates should be considered minimums, and the site-specific assessment should include the needs of specific species present at the time of the action and should be adjusted accordingly. The 0.25-mile buffer was the distance cited for most of these species in Romin and Muck (2002). Additional species-specific information can be found in Whittington and Allen (2008). Species-specific stipulations may be developed if warranted in the planning area; however, the language of the stipulation should not vary from these examples, only the distances and dates used.
[5]Seven years was selected based on the period that a known preferred prey species fluctuates from population highs to lows (C. White, Brigham Young University 1998, pers. comm., in Romin and Muck 2002). Expanded species-specific information for the nest period can be found in Whittington and Allen (2008).
[6]Five years was selected for bald eagles based on United States Fish and Wildlife Service (USFWS) National Bald Eagle Management Guidelines (2007) recommendations.
[7]American Peregrine Falcon Recovery Plan (Rocky Mountain Southwest Populations), USFWS, (1984) and Whittington and Allen (2008).

| Resource | Design Feature | Objective |
|---|---|---|
| **Piping Plover** | Surface disturbance and disrupting activities are prohibited within 0.25 mile of piping plover nesting habitat. | **Objective:** To protect the nesting habitat of the federally threatened piping plover. |
| **Prairie Dog Habitat** | Surface disturbance and disrupting activities are prohibited within 0.25 mile of prairie dog colonies active within the past 10 years.[8] | **Objective:** To protect prairie dog habitat, a BLM priority species, as well as obligate species. |
| **Bighorn Sheep Lambing** | Surface disturbance and disrupting activities are prohibited within bighorn sheep lambing areas. | **Objective:** To protect traditional bighorn sheep lambing habitat, crucial for successful recruitment of bighorn sheep lambs. |
| **Pallid Sturgeon** | Surface disturbance and disrupting activities are prohibited within 0.25 mile of the water's edge of the Missouri River to protect pallid sturgeon. | **Objective:** To protect the habitat of the federally endangered pallid sturgeon. |
| **Mountain Plover** | Surface disturbance and disrupting activities are prohibited within mountain plover habitat. | **Objective:** To protect mountain plover habitat. |
| **Mountain Plover** | Surface disturbance and disrupting activities are prohibited within 0.25 mile of mountain plover habitat from April 1 through July 15. | **Objective**: To protect nesting activities associated with mountain plovers, a BLM priority species. |
| **Greater Sage-Grouse** | See Lewistown Greater Sage Grouse ARMPA. | |
| **Sprague's Pipit** | Surface disturbance and disrupting activities are prohibited from April 15 through July 15 in Sprague's pipit habitat.[9] | **Objective:** To protect nesting activities of Sprague's pipit, a BLM priority species. |
| **Cultural Resources** | Surface disturbance is prohibited within National Register of Historic Places (NRHP)-eligible properties, districts, and cultural sites allocated to conservation for future, traditional, and public use.<br><br>Some leased areas may be found to contain historical properties or resources protected under the National Historic Preservation Act, the American Indian Religious Freedom Act, the Native American Graves Protection and Repatriation Act, Executive Order 13007, or other statutes and executive orders. The BLM will not approve any ground-disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the National Historic | **Objective**: To protect NRHP-eligible properties, districts, and cultural sites allocated to conservation for future, traditional, and public use. Standard exceptions and modifications apply. |

[8]The 0.25-mile buffer would account for fluctuations in the size of prairie dog colonies and serves as a surrogate for the maximum extent of areas occupied by prairie dogs at any time during the last 10 years.
[9]Sprague's pipit habitat is defined as the moderately suitable and optimal habitat classes from the Montana Natural Heritage Program Maxent Inductive Model of Sprague's pipit breeding habitat. A similar condition of approval would be applied for those applications for permits to drill on parcels not identified as optimal or moderately suitable Sprague's pipit habitat, but where pipits are located or would be expected to be, based on habitat.

| Resource | Design Feature | Objective |
|---|---|---|
| **Cultural Resources** *(continued)* | Preservation Act and other authorities. The BLM may require modification to development proposals to protect such properties or may disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized, or mitigated. | *(see above)* |
| **Cemeteries** | Cemeteries occupy portions of the lands in this project area. Surface disturbance will be excluded from the cemetery and a 300-foot buffer zone around it. | **Objective**: To protect cemetery properties and gravesites. |
| **Cultural Resource Inventories Sacred and Historic Properties** | The surface management agency is responsible for ensuring that the affected lands are examined to determine of cultural resources are present and to specify design features.<br><br>Leased land within or next to known sacred sites and historical properties and contains high potential for NRHP-eligible historical and cultural properties. Project proponents are notified that archaeological resource inventory and mitigation costs may be high in this area. A cultural plan of operations will be developed in consultation with the Lewistown Field Office or Butte Field Office and must be approved before field development takes place. All surface use plans will be presented to the Lewistown Field Office or Butte Field Office archaeologist for review. | **Objective:** To protect cultural resources.<br><br>**Objective:** To protect sacred and historical properties. |
| **Paleontological Areas** | Surface disturbance is prohibited within Egg Mountain and the Blacktail Paleontological Area. | **Objective:** To preserve and protect significant vertebrate fossils and paleontological locales. |
| **Lands with Wilderness Characteristics** | Surface disturbance and disrupting activities are prohibited in areas that are managed to protect wilderness characteristics. | **Objective:** To protect wilderness characteristics. |
| **Recreation Areas** | No surface disturbance or disrupting activities are allowed within developed recreation areas and undeveloped recreation areas receiving concentrated public use. | **Objective:** Protect developed recreation areas and undeveloped recreation areas receiving concentrated public use. |
| | No surface disturbance or disrupting activities are allowed within 0.5 mile of developed recreation sites. | **Objective:** To recognize and protect the public's opportunity for quality recreation experiences at those sites developed for that purpose. Since BLM-administered recreation sites are generally developed to support the use of surrounding lands, the 0.5-mile buffer offers some protection for perpetuating those opportunities that the site was developed for, as well as protecting capital investments at the site. |

| Resource | Design Feature | Objective |
|---|---|---|
| **Recreation Areas** *(continued)* | No surface disturbance or disrupting activities are allowed within 0.25 mile of developed recreation sites, regardless of administering agency. | **Objective**: To recognize and protect the public's opportunity for quality recreation experiences at those sites developed for that purpose. Since BLM-administered recreation sites are generally developed to support the use of the surrounding lands, the 0.5-mile buffer offers some protection for perpetuating those opportunities that the site was developed for, as well as protecting capital investments at the site. |
| **Fishing Reservoirs (Judith Extensive Recreation Management Area)** | No surface disturbance or disruptive activities are allowed within 0.25 mile of designated reservoirs with fisheries. | **Objective:** To protect recreational fisheries. |
| **Visual Resource Management (VRM) Class II** | In order to retain the existing character of the landscape (VRM Class II Objective), surface-disturbing activities will be located, designed, constructed, operated, and reclaimed so that they should not attract attention to the casual observer within 2 years from when construction begins. | **Objective:** To protect visual resource values, while allowing development and related activities that have been mitigated to retain the character of the existing area. |
| **Land Use Authorizations** | Land use authorizations incorporate specific surface land uses allowed on BLM-administered lands by Authorized Officers and those surface uses acquired by the BLM on lands administered by other entities. These BLM authorizations include rights-of-way (ROW), leases, permits, conservation easements, and recreation and public purpose leases and patents. The rights acquired, reserved, or withdrawn by the BLM for specified purposes are for non-oil and gas leases, conservation easements, archaeological easements, road easements, fence easements, and administrative site withdrawals. The existence of such land use authorizations will not prevent surface-disturbing activities. The locations of land use authorizations are noted on the oil and gas plats and in LR2000. The plats are a visual source noting location; LR2000 provides location by legal description through the Geographic Cross Reference Program.<br><br>The specifically authorized acreage for land use should be avoided by developers. All authorized surface land uses are valid claims to prior existing rights, unless the authorization states otherwise. | **Objective:** Address the needs of industry, utilities, the public, and government entities for land use authorizations, while minimizing adverse effects on other resource values. |

| Resource | Design Feature | Objective |
|---|---|---|
| **National Scenic Trails** | No surface disturbance or disturbing activities are allowed within 0.5 mile of the Continental Divide National Scenic Trail. | **Objective**: Preserve and protect scenic character of the landscape along the trail. |
| **National Historic Trails** | Surface disturbance and disrupting activities are prohibited within the National Trail Management Corridor of designated National Historic Trails; this includes the Lewis and Clark Trail and the Nez Perce Trail. | **Objective:** The purpose of BMPs is to protect the nature and purposes, trail resources, qualities, values, and associated settings, and primary use of the historic trail, in accordance with the National Trails System Act. |
| **Backcountry Conservation Areas** | Surface disturbance and disturbing activities are subject to the following operating constraint:\n\nPrior to surface use, occupancy or disturbance in BCAs, a plan shall be prepared by the proponent and approved by the AO, with notification to MFWP. The plan must facilitate the long-term maintenance of big game wildlife populations and promote public access to support wildlife-dependent recreation and hunting opportunities. Proposed activities may not alter or depreciate important recreational values located within Backcountry Conservation Areas. | **Objective:** To facilitate long-term maintenance of big game wildlife populations and access to support primitive recreation and hunting opportunities. |

## F.2    GENERAL BEST MANAGEMENT PRACTICES

### F.2.1    Air Resource BMPs

*Developed by:* Bureau of Land Management

*Publication reference:* BLM/Colorado State Office, Updated July 2015

*Internet website:* https://www.blm.gov/sites/blm.gov/files/uploads/program_natural%20resources_soil%20air%20water_airco_quick%20link_CARPP.pdf

*Description:* Identifies (in Table VI-I) a range of typical BMPs for protecting air resources during oil and gas development and production.

### F.2.2    Erosion and Sediment Control Practices: Field Manual

*Developed by:* Prepared for the Montana Department of Transportation

*Publication reference:* FHWA/MT-030003/8165

*Available from:* National Technical Information Service, Springfield, VA 21161

*Description:* The Erosion and Sediment Control Best Management Practices Construction Field Manual was developed to assist in design, construction, and post-construction phases of Montana Department of Transportation projects. This manual provides background to concepts of erosion and sediment control. Most of Montana Department of Transportation's BMPs are listed in the manual based on

application categories. Each BMP is described; its applications and limitations are listed, as well as its design criteria. Construction phase and post-construction phase BMPs are described. This manual is a field guide and a condensed version of the Erosion and Sediment Control Design Construction Best Management Practices Manual. For more detailed discussion on topic found within, refer to the Erosion and Sediment Control Construction Best Management Practices Manual.

### F.2.3   Erosion and Sediment Control Practices: Reference Manual

*Developed by:* Prepared for the Montana Department of Transportation

*Publication reference:* FHWA/MT-030003/8165

*Available from:* National Technical Information Service, Springfield, VA 21161

*Description:* The Erosion and Sediment Control Construction Best Management Practices Manual was developed to assist in the design, construction, and post-construction phases of Montana Department of Transportation projects. This manual provides background for state and federal regulations associated with erosion and sediment control, including a general overview of the erosion and sediment processes. BMPs are listed in the manual and are based on application categories. Each BMP is described; its applications and limitations are listed, as well as its design criteria. The design phase includes development of construction plans, notices of intent (NOIs), and stormwater pollution prevention plans (SWPPP). The construction phase includes the finalization of the SWPPPs and NOIs and the implementation of BMPs. The post-construction phase includes monitoring, maintenance, and removal activities.

### F.2.4   Fluid Minerals BMPs

*Developed by:* Bureau of Land Management

*Publication references:* BLM/WO/ST-06/021+3071; BLM/OC/ST-15/004+8400

*Internet websites:*

- http://www.blm.gov/bmp/
- https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/the-gold-book
- https://www.blm.gov/download/file/fid/20540

*Description:* The BMPs for oil and gas demonstrate practical ideas that may eliminate or minimize adverse effects from oil and gas development on public health and the environment, landowners, and natural resources, enhance the value of natural and landowner resources, and reduce conflict. The publication reference is to the "Gold Book," which is formally titled "Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. In addition, the first Internet citation is for a location maintained by the BLM's Washington, DC, Office, containing general and technical information on the use and application of BMPs. The second location refers the reader directly to an online version of the "Gold Book"; the third location refers the reader to information regarding the use of select paint colors for oil and gas facilities.

### F.2.5   Montana Guide to the Streamside Management Zone Law

*Developed by:* Montana Department of Natural Resources and Conservation Service Forestry Bureau, in cooperation with the Montana Department of Environmental Quality, Montana Logging Association, Montana Wood Products Association, Plum Creek Timber LP, United States Department of Agriculture (USDA), Forest Service, and the BLM.

*Publication reference:* Revised August 2002

*Available from:* Montana Department of Natural Resources and Conservation, 2705 Spurgin Road, Missoula, MT 59801-3199, (406) 542-4300, or from the local Montana Department of Natural Resources and Conservation (DNRC) field office

*Description:* The Montana Guide to the Streamside Management Zone Law is a field guide to compliance with State of Montana Law 77-5-301(1) MCA. Complementary BMPs are found in the Water Quality BMPs for Montana Forests (also referenced in this appendix). The guide provides definitions, stream classifications, and guidelines on the seven forest practices prohibited by Montana law in streamside management zones (SMZs): broadcast burning; operation of wheeled or tracked vehicles, except on established roads; the practice of clear-cutting forests; the construction of roads (except when necessary to cross a stream or wetland); the handling, storage, application, or disposal of hazardous or toxic materials in a manner that pollutes streams, lakes, or wetlands or that may damage or injure humans, land, animals, or plants; the side casting of road material into a stream, lake, wetland, or watercourse; and the deposit of slash in streams, lakes, or other water bodies.

### F.2.6   Montana Nonpoint Source Management Plan

*Developed by:* Montana Department of Environmental Quality, Water Quality Planning Bureau, Watershed Protection Section

*Publication reference:* 2017

*Available from:* Montana Department of Environmental Quality, Water Quality Planning Bureau, Watershed Protection Section, PO Box 200901, Helena, MT 59620-0901

*Internet website:* https://deq.mt.gov/Portals/112/Water/WPB/Nonpoint/Publications/Annual%20Reports/2017NPSManagementPlanFinal.pdf

*Description:* This document describes the Montana Department of Environmental Quality's (DEQ) updated strategy for controlling nonpoint source (NPS) water pollution, which is the state's single largest source of water quality impairment. NPS pollution is contaminated runoff from the land surface that can be generated by most land use activities, including agriculture, forestry, urban and suburban development, and mining. Common NPS pollutants are sediment, nutrients, temperature, heavy metals, pesticides, pathogens, and salt. The purposes of the Montana NPS Pollution Management Plan are to inform the state's citizens about NPS pollution problems and to establish goals, objectives, and long-term and short-term strategies for controlling NPS pollution statewide. The goal of Montana's NPS Management Program is to protect and restore water quality from the effects of nonpoint sources of pollution in order to provide a clean and healthy environment.

## F.2.7   Montana Placer Mining BMPs

*Developed by:* Montana Bureau of Mines and Geology

*Publication reference:* Special Publication 106, October 1993

*Available from:* Montana Bureau of Mines and Geology, Main Hall, Montana College of Mineral Science and Technology, Butte MT 59701

*Description:* Provides guidelines for planning, erosion control, and reclamation in arid to semiarid, alpine, and subalpine environments and to prevent or decrease environmental damage and water quality degradation.

## F.2.8   Water Quality BMPs for Montana Forests

*Developed by:* Montana State University Extension Service

*Publication reference:* R. Logan. 2001. Water Quality BMPs – Best Management Practices for Montana Forests. EB158, MSU Extension Forestry, Missoula, Montana

*Available from:* MSU Extension Forestry, 32 Campus Dr., Missoula, MT 59812, or from MSU Extension Publications, PO Box 172040, Bozeman, MT 59717

*Description:* Discusses methods for managing forest land while protecting water quality and forest soils. It is intended for all forest land in Montana, including non-industrial private, forest industry, and state or federal owned forests. These are preferred (but voluntary) methods that go beyond Montana State Law SMZs. It includes definitions, basic biological information, and BMPs for streamside management zones; road design, use, planning and locating, construction, drainage, and closure; and stream crossings, soil, timber harvesting methods, reforestation, winter planning, and clean up.

## F.2.9   Wind Energy BMPs

*Developed by:* Bureau of Land Management

*Publication reference:* Wind Energy Development Programmatic EIS

*Available from:* Final EIS Chapter 2 (section 2.2.3.2) at http://windeis.anl.gov/

*Description:* As part of the proposed action, the BLM developed BMPs for each major step of the wind energy development process, including site monitoring and testing, plan of development preparation, construction, operation, and decommissioning. General BMPs are available for each step, and certain steps also include specific BMPs to address the following resource issues: wildlife and other ecological resources, visual resources, roads, transportation, noise, noxious weeds and pesticides, cultural and historical resources, paleontological resources, hazardous materials and waste management, stormwater, human health and safety, monitoring program, air emissions, and excavation and blasting activities.

*Developed by:* Bureau of Land Management

*Publication reference:* Best Management Practices for Reducing Visual Impacts of Renewable Energy Facilities on BLM-Administered Lands, First Edition 2013

*Available from:* http://blmwyomingvisual.anl.gov/docs/BLM_RenewableEnergyVisualBMPs_LowRes.pdf

*Description:* This publication presents 122 BMPs to avoid or reduce potential visual effects associated with siting, designing, constructing, operating, and decommissioning utility-scale renewable energy generation facilities, including wind, solar, and geothermal facilities. The publication includes BMPs for avoiding and reducing visual effects associated with the energy generation components of a facility, such as wind turbines or solar energy collectors, and includes BMPs for reducing visual effects associated with ancillary components, such as electric transmission, roads, and structures.

### F.2.10 Communication Tower BMPs

*Developed by:* United States Fish and Wildlife Service

*Publication reference:* Service Guidance on the Siting, Construction, Operation and Decommissioning of Communications Towers

*Internet website:* http://www.fws.gov/habitatconservation/com_tow_guidelines.pdf

*Description:* These guidelines were developed by USFWS personnel from research conducted in several eastern, mid-western, and southern states and have been refined through regional review. They are based on the best information available at this time and are the most prudent and effective measures for avoiding bird strikes at towers.

- Any company/applicant/licensee proposing to construct a new communications tower should be strongly encouraged to collocate the communications equipment on an existing communication tower or other structure (e.g., billboard, water tower, or building mount). Depending on tower load factors, from 6 to 10 providers may collocate on an existing tower.

- If collocation is not feasible and a new tower or towers are to be constructed, communications service providers should be strongly encouraged to construct towers no more than 199 feet above ground level, using construction techniques that do not require guy wires (e.g., use a lattice structure or monopole). Such towers should not be lighted, if Federal Aviation Administration (FAA) regulations permit.

- If constructing multiple towers, providers should consider the cumulative effects of all of those towers on migratory birds and threatened and endangered species, as well as the effects of each individual tower.

- If at all possible, new towers should be sited within existing "antenna farms," which are clusters of towers. Towers should not be sited in or near wetlands, other known bird concentration areas (e.g., state or federal refuges, staging areas, or rookeries), in known migratory or daily movement flyways, or in habitat of threatened or endangered species. Towers should not be sited in areas with a high incidence of fog, mist, and low ceilings.

- If towers taller than 199 feet must be constructed, which would require lights for aviation safety, the minimum amount of pilot warning and obstruction avoidance lighting required by the FAA should be used. Unless otherwise required by the FAA, only white (preferable) or red strobe lights should be used at night, and these should be the minimum number, minimum intensity, and

minimum flashes per minute (longest duration between flashes) allowable by the FAA. The use of solid red or pulsating red warning lights at night should be avoided. Current research indicates that solid or pulsating (beacon) red lights attract night-migrating birds at a much higher rate than white strobe lights. Red strobe lights have not yet been studied.

- Tower designs using guy wires for support and that are proposed for known raptor or water bird concentration areas or daily movement routes, or in major diurnal migratory bird movement routes or stopover sites, should have daytime visual markers on the wires to prevent collisions by these diurnal species. (For guidance on markers, see Avian Power Line Interaction Committee [(APLIC]. 1994. Mitigating Bird Collisions with Power Lines: The State of the Art in 1994. Edison Electric Institute, Washington, DC; and APLIC. 1996. Suggested Practices/or Raptor Protection on Power Lines. Edison Electric Institute Raptor Research Foundation, Washington, DC. Copies can be obtained via the Internet at https://www.eei.org/resourcesandmedia/products/Pages/ProductDetails.aspx?prod=67C93494-D8BE-4FE9-AE6B-4ADE061A6795&type=P or by calling 1-800/334-5453).

- Towers and appendant facilities should be sited, designed, and constructed so as to avoid or minimize habitat loss in and next to the tower footprint. However, a larger tower footprint is preferable to the use of guy wires in construction. Road access and fencing should be minimized to reduce or prevent habitat fragmentation and disturbance and to reduce aboveground obstacles to birds in flight.

- If significant numbers of breeding, feeding, or roosting birds are known to habitually use the proposed tower construction area, the tower should be relocated to an alternate site. If this is not an option, seasonal restrictions on construction may be advisable in order to avoid disturbance during periods of high bird activity.

- In order to reduce the number of towers needed in the future, the applicant/licensee should be encouraged to design new towers structurally and electrically to accommodate antennas and comparable antennas for at least two additional users (minimum of three users for each tower structure), unless this design would require the addition of lights or guy wires.

- Security lighting for ground facilities and equipment should be shielded to direct light downward and within the boundaries of the site.

- If a tower is constructed or proposed for construction, USFWS personnel or researchers from the Communication Tower Working Group should be allowed access to the site to evaluate bird use, to conduct dead bird searches, to place net catchments below the towers but above the ground, and to place radar, GPS, infrared, thermal imagery, and acoustical monitoring equipment to assess and verify bird movements and to gain information on the effects of various tower sizes, configurations, and lighting systems.

- Towers no longer in use or determined to be obsolete should be removed within 12 months of cessation of use.

## F.2.11  Grazing Management BMPs (Guidelines)

Guidelines for grazing management are the types of methods and practices determined to be appropriate to ensure that rangeland health standards can be met or significant progress can be made toward meeting the standards. Guidelines are BMPs, treatments, and techniques and implementation of range of improvements that will help achieve rangeland health standards. Guidelines are flexible and are applied in site-specific situations. Standards for Rangeland Health and Guidelines for Livestock Grazing

Management for the Lewistown Field Office can be found at https://www.blm.gov/sites/blm.gov/files/ Lewistown%20MT%20standards%20for%20rangeland%20health%20and%20guidelines%20for%20grazing. pdf. Standards for Rangeland Health and Guidelines for Livestock Grazing Management for the Butte Field Office can be found at https://www.blm.gov/sites/blm.gov/files/Butte%20MT%20standards%20for %20rangeland%20health%20and%20guidlines%20for%20grazing.pdf.

### F.2.12  Herbicide Special Operating Procedures

This plan incorporates by reference the 2016 Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement and adopts the Herbicide Treatment Standard Operating Procedures listed in Appendix B.

### F.2.13  BLM BMPs

The website http://www.blm.gov/bmp/ provides an introduction to BLM BMPs. It has links to BLM contacts, general BMP Information, BMP frequently asked questions, BMP technical information, oil and gas exploration, the Gold Book, specific resource BMPs, and other BLM links.

### F.2.14  Visual Resources

The website http://www.blm.gov/pgdata/content/wo/en/prog/Recreation/recreation_national/RMS.html provides numerous design techniques that can be used to reduce the visual effects from surface-disturbing projects. The techniques described should be used in conjunction with BLM's visual resource contrast rating process, wherein both the existing landscape and the proposed development or activity are analyzed for their basic element of form, line, color, and texture. In addition, the BLM's Best Management Practices for Reducing Visual effects of Renewable Energy Facilities on BLM-Administered Lands, First Edition 2013, presents 122 BMPs to avoid or reduce potential visual effects associated with siting, designing, constructing, operating, and decommissioning utility-scale renewable energy generation facilities, including wind, solar, and geothermal facilities. It is available at: http://blmwyomingvisual.anl.gov/docs/BLM_RenewableEnergyVisualBMPs_LowRes.pdf.

### F.2.15  Renewable Energy Development

The following resources provide information on BMPs related to renewable energy development.

- Wind Energy Development Programmatic Environmental Impact Statement— http://windeis.anl.gov/documents/fpeis/index.cfm
- BLM Instruction Memorandum 2009-043, Rights-of-Way, Wind Energy— https://www.blm.gov/policy/im-2009-043
- Solar Energy Development Programmatic Environmental Impact Statement— http://solareis.anl.gov/
- Best Management Practices for Reducing Visual Impacts of Renewable Energy Facilities on BLM-Administered Lands, First Edition 2013—http://blmwyomingvisual.anl.gov/docs/BLM_Renewable EnergyVisualBMPs_LowRes.pdf

### F.2.16  Healthy Watersheds

The website http://www.epa.gov/owow/nps/ provides conservation approaches and tools designed to ensure healthy watersheds remain intact. It also provides site-specific examples.

## F.2.17 Storm Water BMPs

The website https://www.epa.gov/npdes/national-menu-best-management-practices-bmps-stormwater#edu provides BMPs designed to meet the minimum requirements for six control measures specified by the United States Environmental Protection Agency's (EPA) Phase II Stormwater Program.

## F.2.18 Pasture, Rangeland, and Grazing Operations BMPs

The website http://www.epa.gov/oecaagct/anprgbmp.html provides BMPs compiled by the EPA to prevent or reduce effects from livestock grazing.

## F.2.19 National Range and Pasture Handbook

The website http://www.nrcs.usda.gov/wps/portal/nrcs/detailfull/national/landuse/rangepasture/?cid=stelprdb1043084 provides procedures to support USDA Natural Resources Conservation Service (NRCS) policy for the inventory, analysis, treatment, and management of grazing land resources.

## F.2.20 Montana Nonpoint Source Management Program

The website http://www.deq.mt.gov/wqinfo/nonpoint/nonpointsourceprogram.mcpx provides links to information on funding for implementing nonpoint source controls, examples of control projects, and Montana's current NPS Management Plan. This plan identifies and provides details for BMPs to improve and maintain water quality.

The following would be applied, if warranted, to any BLM authorized activity:

- The total disturbance area would be minimized to the extent possible.
- Surface disturbances would be collocated in areas of previous or existing disturbance to the extent technically feasible.
- Linear facilities would be located in the same trenches (or immediately parallel to) and when possible, installed at the same time.
- Plans of development would be required for major ROWs, renewable energy, and minerals development. Such plans would identify measures for reducing effects.
- Where the federal government owns the surface and the mineral estate is in nonfederal ownership, the BLM would apply appropriate fluid mineral BMPs to surface development.
- Facilities and infrastructure would have to be removed when use is completed.
- Vegetation would be removed only when necessary; mowing would be preferred. If mowed, when possible, work would be performed when vegetation is dormant.
- Two-track (primitive) roads would be used when possible.
- Utilization of the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (i.e., The Gold Book) would be used for the design of roads, utilities, and oil and gas operations.
- Using directional drilling, drilling multiple wells from the same pad, commingling, making use of recompletion, or using existing well pads would be required to the extent technically feasible to minimize surface effects from oil and gas development.
- Utilities would be ripped or wheel trenched whenever practical.

- Remote telemetry would be used to reduce vehicle traffic to the extent technically feasible (e.g., monitoring oil and gas operations).
- Perennial streams would be crossed using bore crossing (directional drill) or another environmentally sound method.
- For activities resulting in major surface-disturbance, as determined by the BLM Authorized Officer, a mitigation monitoring and reporting strategy would be developed and implemented (see the Lewistown RMP/EIS **Appendix B**, Implementation and Monitoring, for further guidance).
- Operations would avoid sensitive resources, including riparian areas, wetlands, floodplains, water bodies, and areas subject to erosion and soil degradation.
- The BLM would use, on a case-by-case basis, temporary or permanent enclosures (e.g., in woody draw or riparian areas) to promote species diversity, recruitment, and structure.
- Accelerated erosion, soil loss, and effects on water quality would be reduced by diverting stormwater and trapping sediment during activity.
- Pitless or aboveground closed-loop drilling technology would be used to the extent technically feasible. Drilling mud and completion fluids would be recycled for use in future drilling activities.
- Where needed, pits would be lined with an impermeable liner. Pits would not be placed in fill material or natural watercourses, and pits may not be cut or trenched.
- Fertilizer would not be applied within 500 feet of wetlands and water bodies.
- Vehicles and equipment would be serviced and refueled 500 feet from the outer edge of riparian areas, wet areas, and drainages.
- Activity may be restricted during wet or frozen conditions. Mechanized equipment would not be used if it would cause rutting to a depth of 4 inches or greater.
- Vehicles would be washed before being allowed to enter or leave a disturbance area to reduce the transport and establishment of invasive species.
- Invasive species plant parts would not be transported off-site without appropriate disposal measures.
- Alternative energy (solar or wind power) would be used to power new water source developments.
- Overhead power lines, where authorized, would follow the recommendations in the most recent guidance from APLIC (1994, as amended 2006, 2012).
- Weed management prescriptions would be included in all new treatment projects and incorporated into existing contracts, agreements, task forces, designated weed-free management areas, and land use authorizations that resulted in ground-disturbing activities.
- Whenever possible, ROWs would be constructed in or next to compatible ROWs, such as roads, pipelines, communications sites, and railroads.
- The operator would be responsible for locating and protecting existing pipelines, power lines, communication lines, and related infrastructure.
- Climate variability would be considered when proposing restoration seedings using native plants. Collecting from the warmer component of the species current range would be considered when selecting native species.

# Appendix G
## Reclamation

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                                    Page

**APPENDIX G. RECLAMATION**.................................................................................................. **G-1**
    G.1     Introduction .................................................................................................G-1
    G.2     Objectives....................................................................................................G-1
    G.3     Reclamation Requirements......................................................................G-1
            G.3.1   Manage all Waste Materials...........................................................G-2
            G.3.2   Ensure Subsurface Integrity and Eliminate Sources of Ground and
                    Surface Water Contamination.........................................................G-2
            G.3.3   Ensure Surface Stability and Reestablish Slope Stability and Desired
                    Topographic Diversity......................................................................G-2
            G.3.4   Reconstruct and Stabilize Water Courses and Drainage Features .................G-2
            G.3.5   Maintain the Biological, Chemical, and Physical Integrity of Topsoil...............G-3
            G.3.6   Prepare Site for Revegetation.......................................................G-3
            G.3.7   Establish a Desired Self-perpetuating Native Plant Community.....................G-3
            G.3.8   Reestablish a Complementary Visual Composition...........................G-3
            G.3.9   Manage Invasive Plants....................................................................G-4
            G.3.10 Develop and Implement a Reclamation Monitoring and Reporting Strategy.G-4
    G.4     Seeding .........................................................................................................G-4

# TABLES

Page

G-1     Lewistown Field Office Reclamation Seeding Mixtures.......................................................G-5

This page intentionally left blank.

# Appendix G. Reclamation

## G.1   Introduction

Reclamation would be required for surface-disturbing activities. Some activities and areas, such as existing routes or routes or areas designated as open under future travel management, would be exempt. Other such activities and areas would be reviewed for exemption during the site-specific environmental analysis.

Reclamation is not the site restoration; instead, the long-term objective of reclamation is to set the course for eventual ecosystem restoration. A reclamation plan appropriate in detail and complexity and tailored to a specific surface-disturbing activity would be required and made a stipulation or condition of approval of any action. The level of detail for the reclamation plan should reflect the complexity of the project, the environmental concerns generated during project review, and the reclamation potential for the site.

This appendix details the elements that need to be considered during pre-disturbance authorization of any surface-disturbing activity and the post-disturbance steps required to ensure timely and proper site reclamation.

The reclamation plan will provide a framework to develop project-specific and site-specific reclamation actions and guide land management efforts toward a planned future condition for any surface-disturbing activity. Early coordination between the BLM and project proponents is necessary to produce the appropriate plan. The reclamation plan will serve as a binding agreement between a project proponent and the BLM for the expected reclamation condition of the disturbed lands. The BLM must periodically review and modify it as necessary to adjust to changing conditions or to correct any oversight. The reclamation plan may consist of required design features or mitigation measures, but must include sufficient monitoring requirements, reports, and components to ensure that it is adequate.

In preparing and reviewing reclamation plans, the BLM and the project proponent must set reasonable, achievable, and measurable reclamation goals and objectives that are consistent with the land use plan and are ecologically feasible. Achievable goals and objectives will ensure reclamation and will encourage a project proponent to conduct research on different aspects of reclamation for different environments. These goals and objectives should be based on available information and techniques, should offer incentives to both parties, and, as a result, should generate useful information for future use.

## G.2   Objectives

The short-term objective is to immediately stabilize disturbed areas and to provide the necessary conditions to achieve the long-term objective, which is to facilitate eventual ecosystem reconstruction to maintain a safe and stable landscape and meet the desired outcomes.

## G.3   Reclamation Requirements

The following reclamation requirements apply to all surface-disturbing activities, including BLM-initiated activities, and must be addressed in each reclamation plan. These requirements also must be met before a bond or reclamation liability is released. Where these reclamation requirements differ from other

applicable federal laws, rules, and regulations, those requirements supersede this policy. State and local statutes and regulations may also apply.

### G.3.1   Manage all Waste Materials

- Segregate, treat, remove, and bio-remediate contaminated soil material in accordance with applicable laws, regulations, and policy.
- Bury only authorized waste materials on-site. Buried material must be covered with a minimum of 3 feet of suitable material or meet other program standards.
- Ensure all waste materials moved off-site are transported to an authorized disposal facility.

### G.3.2   Ensure Subsurface Integrity and Eliminate Sources of Ground and Surface Water Contamination

- Properly plug all drill holes and other small openings.
- Stabilize, properly backfill, cap, and restrict from entry all open shafts, underground workings, and other openings.
- Control sources of contamination and implement best management practices (BMPs) to protect surface water and groundwater quality.

### G.3.3   Ensure Surface Stability and Reestablish Slope Stability and Desired Topographic Diversity

- Evaluate erosion susceptibly prior to disturbance.
- Implement the appropriate erosion control and sediment containment measures and devices whenever and wherever needed (e.g., erosion control mats/blankets, mulch, water bars, silt fences, straw wattles, and surface roughening).
- Inspect and maintain all runoff and erosion control structures on a regular schedule and after major runoff events.
- Reconstruct the landscape to the approximate original contour; however, at the discretion of the BLM Authorized Officer, if the disturbed area has stabilized and if returning the original contour will cause additional disturbance, then recontouring may not be required.
- Maximize geomorphic stability and topographic diversity of the reclaimed topography.
- Eliminate high walls, cut slopes, and topographic depressions on-site, unless otherwise approved.
- Minimize sheet and small rill erosion on or next to the reclaimed area. There should be no evidence of mass wasting, head cutting, large rills or gullies, down cutting in drainages, or general slope instability on or next to the reclaimed area.

### G.3.4   Reconstruct and Stabilize Water Courses and Drainage Features

- Reconstruct drainage basins and reclaim impoundments to maintain the drainage pattern, profile, and dimension to approximate the natural features found in nearby naturally functioning basins.
- Reconstruct and stabilize stream channels, drainages, and impoundments to exhibit similar hydrologic characteristics found in stable, naturally functioning systems.

### G.3.5   Maintain the Biological, Chemical, and Physical Integrity of Topsoil

- Identify, delineate, and salvage topsoil based on a site-specific soil evaluation, including depth and chemical and physical properties.
- Protect all stored topsoil from erosion, degradation, noxious weed and invasive plant infestations, and contamination. Topsoil that is not re-spread within 30 days should be covered with a tackifier, mulch, or other approved cover. Piling subsurface soil on top of topsoil will be prohibited.
- Maintain stored topsoil viability by incorporating it into the disturbed landscape.
- Seed topsoil stored beyond one growing season with desired vegetation.
- Identify topsoil storage with appropriate signage.

### G.3.6   Prepare Site for Revegetation

- Redistribute topsoil and subsoil in a manner similar to the original vertical profile.
- Reduce compaction to an appropriate depth (generally below the root zone) before redistributing topsoil to accommodate desired plant species.
- Provide suitable subsurface physical, chemical, and biological properties to support the long-term establishment and viability of the desired plant community.
- Protect seed and seedling establishment (e.g., erosion control matting, mulching, hydro-seeding, surface roughening, and fencing).
- Defer grazing until reclamation goals and objectives are met.

### G.3.7   Establish a Desired Self-perpetuating Native Plant Community

- Determine appropriate species composition and cover based on information from the appropriate ecological site descriptions (ESDs) and plant community descriptions.
- Establish species composition, diversity, structure, and total ground cover appropriate for the desired plant community, as described in the appropriate ESD.
- Enhance critical resource values (e.g., wildlife habitat), where appropriate, by augmenting plant community composition, diversity, and structure.
- Select genetically appropriate and locally adapted native plants based on the site characteristics and ecological setting that meet desired plant community objectives.
- Select nonnative plants only as an approved short-term and non-persistent alternative to native plants. Ensure the nonnatives will not hybridize, displace, impede, or pose long-term competition to the desired plant community outlined in the ESDs and that they are designed to aid in the reestablishment of native plant communities.
- Do not apply nitrogen fertilizer when annual bromes are found on-site or have the potential to invade the site from nearby infestations.

### G.3.8   Reestablish a Complementary Visual Composition

- Ensure the reclaimed landscape features blend into the adjacent area and conform to the land use plan decisions.
- Ensure the landscape is reclaimed back to or better than the scenic quality level (visual resource inventory) predating disturbance.

### G.3.9   Manage Invasive Plants

- Inventory for and treat noxious weeds before initiating surface-disturbing activities. Inventory for and consider treating nonnative and naturalized plants before initiating surface-disturbing activities.
- Develop an invasive plant management plan.
- Control invasive plants by using an integrated pest management approach.
- Monitor invasive plant treatments.

### G.3.10  Develop and Implement a Reclamation Monitoring and Reporting Strategy

- Monitor for the success of the vegetation management objectives and reclamation goals.
- Conduct compliance and effectiveness monitoring in accordance with a BLM- or other surface management agency-approved monitoring protocol (e.g., Assessment, Inventory, and Monitoring Strategy).
- Evaluate monitoring data for compliance with and success of the outlined goals and objectives written in the reclamation plan.
- Document and report monitoring data and recommend revised reclamation strategies.
- Implement revised reclamation strategies, as needed.
- Repeat the process of monitoring, evaluating, documenting and reporting, and implementing until reclamation goals and vegetation management objectives are achieved.

## G.4   SEEDING

Disturbed areas will be seeded, although most areas that have burned will not need seeding. As much seeding as possible will be conducted during the fall before the ground freezes. Occasional seeding may occur in the spring as long as favorable conditions exist. Seeding will not be allowed in frozen or saturated soil conditions, except for when it is approved by the BLM Authorized Officer, or winter seeding of sagebrush on snow. Reseeding will be required when a satisfactory stand is not obtained.

There should be no invasive or nonnative weed seeds in the mixture. Seed should be tested for purity and germination, and the viability testing should be done in accordance with Montana law. A tetrazolium test will be allowed for germination testing. Test results will be made available for BLM review, if requested. Commercial seed should be either state certified or tested weed-seed free. The seed mixture container should be tagged in accordance with state law, and it should be available for inspection. The amount of seed planted will be enough so that, on germination, the soil would be adequately covered.

**Table G-1** lists generalized species that are commonly available from BLM seed networks. The species listed are not all inclusive because some sites may warrant other species and are subject to availability. Approved species will be used on all BLM-administered surface land and on private surface unless the landowner requests otherwise. Using species that are already present in an area increases the probability that the area will be revegetated successfully. Soil sampling may also be necessary to ensure that the species in the seed mix will establish on the site.

After the vegetation survey and soil sampling have been completed, a mix should be developed using species such as those listed in **Table G-1**; further refinements based on surrounding native vegetation, ecological site descriptions, or other sources are encouraged. No monocultures (pure stand) will be allowed. The mixture should be diverse enough to show a variety of native desirable plants and community structure on germination. The percentage of each species in the mixture will determine the percentage of that species' pure-stand seeding rate used. Forbs and shrubs should be included in the seed mixtures; however, they should not be included when herbicides are used to control invasive weeds. Cover or nurse crops may be used in certain situations and where warranted.

**Table G-1**
**Lewistown Field Office Reclamation Seeding Mixtures**

| Vegetation Type | Species | Scientific Name | Mountain Mix | Prairie Mix | Breaks/ Badlands Mix | Local Occurrence |
|---|---|---|---|---|---|---|
| **Shrubs** | Big sagebrush, Wyoming | *Artemisia tridentata wyomingensis* | No | Yes | Yes | No |
| | Big sagebrush, mountain | *Artemisia tridentata vaseyana* | Yes | No | Yes | No |
| | Big sagebrush, basin | *Aremisia tridentata tridentate* | No | No | No | Yes |
| | Bitterbrush, antelope | *Purshia tridentate* | No | No | No | Yes |
| | Black sagebrush | *Artemisia nova* | No | No | No | Yes |
| | Fourwing saltbush | *Atriplex canescens* | No | Yes | Yes | No |
| | Gardners saltbush | *Atriplex gardneri* | No | Yes | Yes | No |
| | Rubber rabbitrush | *Ericameria nauseosa* | No | Yes | Yes | No |
| | Shadscale | *Atriplex confertifolia* | No | No | Yes | No |
| | Spiny hopsage | *Grayia spinose* | No | No | No | Yes |
| | Winterfat | *Krascheninnikovia lanata* | No | Yes | Yes | No |
| **Forbs** | Arrowleaf balsamroot | *Balsamorhiza sagittata* | Yes | No | No | No |
| | Globemallow, scarlet | *Sphaeralcea coccinea* | Yes | Yes | Yes | No |
| | Lewis flax | *Linum lewisii* | No | Yes | Yes | No |
| | Longleaf phlox | *Phlox longifolia* | Yes | Yes | Yes | No |
| | Mules ears | *Wyethia amplexicaulis* | Yes | No | No | No |
| | Penstemon, blue | *Penstemon cyaneus* | Yes | No | No | No |
| | Penstemon, narrow leaf | *P. angustifolius* | No | Yes | Yes | No |
| | Penstemon, sand (sharpleaf) | *P. accuminatus* | No | Yes | No | No |
| | Slender white prairieclover - Antelope (MT) | *Dalea candida* | No | Yes | Yes | No |
| | Prairie coneflower | *Ratibida* spp. *columnifera* | Yes | Yes | Yes | No |
| | Silky lupine | *Lupinus sericeus* | Yes | Yes | No | No |
| | Silvery lupine | *L. argenteus* | Yes | Yes | No | No |

| Vegetation Type | Species | Scientific Name | Mountain Mix | Prairie Mix | Breaks/ Badlands Mix | Local Occurrence |
|---|---|---|---|---|---|---|
| **Forbs** (continued) | Western yarrow | *Achillea millefolium* var. *occidentalis* | Yes | Yes | Yes | No |
| | Yellow beeplant | *Cleome lutea* | Yes | Yes | No | No |
| | Rocky Mountain beeplant | *C. serrulata* | Yes | Yes | No | No |
| **Grasses** | Alkali sacaton | *Sporobolus airoides* | Yes | Yes | Yes | Salt, alkaline, clay, riparian |
| | Basin wildrye | *Leymus cinereus* | Yes | Yes | Yes | Riparian, valley bottoms |
| | Big bluegrass | *Poa secunda* ssp. *ampla* | No | Yes | Yes | No |
| | Blue wildrye | *Elymus glaucus* | Yes | No | No | Moist and deeper forest soils |
| | Bluebunch wheatgrass | *Pseudoroegneria spicata* | Yes | Yes | No | No |
| | Bottlebrush squirreltail | *Elymus elymoides* ssp. *Elymoides* | No | Yes | Yes | Minor component of variable soils |
| | Canby's bluegrass, Canbar | *Poa secunda canbyi* | No | Yes | Yes | No |
| | Green needlegrass | *Stipa viridula* | No | Yes | No | No |
| | Idaho fescue | *Festuca idahoensis* | Yes | No | No | No |
| | Indian ricegrass | *Acnatherum hymenoides* | No | Yes | Yes | No |
| | Letterman needlegrass | *A. lettermanii* | Yes | No | No | No |
| | Mountain brome | *Bromus marginatus* | Yes | No | No | No |
| | Prairie junegrass | *Koeleria macrantha* | Yes | Yes | Yes | No |
| | Sand dropseed | *Sporobolus cryptandrus* | No | Yes | Yes | Loamy to sandy open sites |
| | Sandberg's bluegrass | *Poa secunda* ssp. *secunda* | No | Yes | Yes | No |
| | Sideoats grama grass | *Bouteloua curtipendula* | No | Yes | Yes | No |
| | Six weeks fescue | *Vulpia octoflora* | No | Yes | Yes | No |
| | Slender wheatgrass | *Elymus trachycaulus* | Yes | Yes | Yes | No |
| | Thickspike wheatgrass | *E. lanceolatus* | No | Yes | Yes | No |
| | Streambank wheatgrass | *E.s lanceolatus* | No | Yes | Yes | Moist, riparian zones |
| | Western wheatgrass | *Pascopyrum smithii* | No | Yes | Yes | Uplands and drier streamside zones |
| | Tufted hairgrass | *Deschampsia caespitosa* | Yes | Yes | Yes | Riparian |

# Appendix H
## Air Resource Management Plan: Adaptive Management Strategy for Oil and Gas Resources

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                          Page

**APPENDIX H. AIR RESOURCE MANAGEMENT PLAN: ADAPTIVE MANAGEMENT STRATEGY FOR OIL AND GAS RESOURCES** ......................................................................................... **H-1**

H.1   Introduction ........................................................................................................ H-1
      H.1.1   Purpose of the Air Resource Management Plan ................................. H-1
      H.1.2   Revision of the Air Resource Management Plan ................................. H-2
      H.1.3   Current Air Quality ................................................................................ H-2
      H.1.4   Background of the Air Quality Technical Workgroup and the Memorandum of Understanding Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the National Environmental Policy Act Process .................................................... H-3
      H.1.5   MDEQ Air Quality Management and BLM Mitigation Measures ....... H-4
H.2   Oil and Gas Activity Assessment ...................................................................... H-7
H.3   Ambient Air Quality Monitoring Support ....................................................... H-7
H.4   Air Quality and Air Quality Related Value Assessment ................................. H-8
      H.4.1   Annual National Ambient Air Quality Standards and Montana Ambient Air Quality Standards Assessment ......................................... H-8
      H.4.2   Ozone Assessment ................................................................................. H-8
      H.4.3   AQRV Assessment .................................................................................. H-9
H.5   Photochemical Grid Modeling (PGM) ............................................................. H-10
      H.5.1   Photochemical Grid Modeling Details and Results ........................... H-10
      H.5.2   Modeling after Air Resource Management Plan Photochemical Grid Modeling Completion ........................................................................... H-11
H.6   Mitigation ............................................................................................................. H-12
      H.6.1   Initial Mitigation Actions ...................................................................... H-12
      H.6.2   Monitoring-Based Enhanced Mitigation ............................................. H-13
      H.6.3   Modeling-Based Enhanced Mitigation ................................................ H-14
H.7   References ............................................................................................................. H-14

# TABLES

                                                                                                                 Page

H-1   Ambient Concentration Data for Pollutants Monitored in the Planning Area (2012–2014) ... H-3
H-2   Ambient Air Quality Standards for Pollutants Monitored in the Planning Area ........................ H-5
H-3   8 Hour Rolling Monitored O₃ Values for Ozone Season (June through September) .................. H-9

## ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| µg/m³ | micrograms per cubic meter |
| AQRV | air quality related value |
| AQTW | Air Quality Technical Workgroup |
| BACT | best available control technology |
| BLM | Bureau of Land Management |
| CFR | Code of Federal Regulations |
| CAA | Clean Air Act |
| CO | carbon monoxide |
| DOI | US Department of the Interior |
| EPA | United States Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| Forest Service | United States Forest Service |
| LFO | Lewistown Field Office |
| MAAQS | Montana Ambient Air Quality Standards |
| MAQP | Montana Air Quality Permits |
| MDEQ | Montana Department of Environmental Quality |
| MOU | memorandum of understanding |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $N_2O$ | nitrous oxide |
| $NO_2$ | nitrogen dioxide |
| $NO_x$ | nitrogen oxides |
| NPS | National Park Service |
| NSR | new source review |
| $O_3$ | ozone |
| PGM | photochemical grid modeling |
| $PM_{10}$ | particulate matter with a diameter less than or equal to 10 microns |
| $PM_{2.5}$ | particulate matter with a diameter less than or equal to 2.5 microns |
| ppb | parts per billion |
| ppm | parts per million |
| RMP | resource management plan |
| ROD | record of decision |
| $SO_2$ | sulfur dioxide |
| USDA | United States Department of Agriculture |
| USFWS | United States Fish and Wildlife Service |
| VOC | volatile organic compound |

# Appendix H. Air Resource Management Plan: Adaptive Management Strategy for Oil and Gas Resources

## H.1   INTRODUCTION

### H.1.1   Purpose of the Air Resource Management Plan

The air resource adaptive management strategy that would be used to assess future air quality and air quality related values (AQRVs) is described in the US Department of the Interior (DOI), Bureau of Land Management (BLM) Lewistown Field Office Air Resource Management Plan: Adaptive Management Strategy for Oil and Gas Resources Air Resource Management Plan for oil and gas activities. The Air Resource Management Plan also identifies mitigation measures to address potential unacceptable effects of future oil and gas development.

The adaptive management strategy focuses on oil and gas activity because aggregated emissions from multiple small sources at well sites can cause air quality and AQRV effects under certain circumstances. The BLM prepared the oil and gas adaptive management strategy in collaboration with or with the review of the United States Environmental Protection Agency (EPA) and two other federal land management agencies under the Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the National Environmental Policy Act Process (USDA, USDI, and EPA 2011). This agreement is described in more detail in **Section H.4**, Air Quality and Air Quality Related Value Assessment.

The Air Resource Management Plan includes both near-term and long-term actions. In the near-term, the Air Resource Management Plan proposed initial actions to maintain good air quality until regional modeling was completed to further assess potential effects on air quality and AQRVs. The long-range regional model was completed in 2016 and the results are summarized in Section H.5. In the long term, the Air Resource Management Plan provides ongoing management strategies to assess and adapt to new air quality and AQRV ambient monitoring and modeling data during the life of the Lewistown Field Office resource management plan (RMP).

The Air Resource Management Plan includes a multifaceted approach, involving the following activities:

- Oil and gas activity assessment
- Ambient air quality monitoring support
- Air quality and AQRV assessment
- Air quality and AQRV modeling
- Initial and enhanced mitigation

Pollutant emissions addressed by the Air Resource Management Plan include the criteria air pollutants carbon monoxide (CO), nitrogen dioxide ($NO_2$), Ozone ($O_3$), particulate matter with a diameter less than or equal to 10 microns ($PM_{10}$), particulate matter with a diameter less than or equal to 2.5 microns ($PM_{2.5}$),

and sulfur dioxide (SO2). Hazardous Air pollutants (HAPs) such as benzene, ethyl benzene, formaldehyde, N-hexane, toluene, and xylene are also addressed in the Air Resource Management Plan. These pollutants were modeled and discussed in the RMP.

Three criteria air pollutants, CO, lead, and $SO_2$, are not monitored within the Lewiston Field Office management area because high concentrations of these pollutants are unlikely. Elevated concentrations of CO are associated with vehicle traffic in very large urban areas, while high concentrations of lead and $SO_2$ are typically found near industrial facilities that emit large quantities of these pollutants or in areas with sour gas production. These situations do not occur in the Lewiston planning area. CO and $SO_2$ emissions would be modeled to demonstrate compliance with the NAAQS. Due to the lack of lead emissions from oil and gas activities, lead emissions were not modeled as part of the air quality analysis.

The sulfur content of oil and gas in the LFO management area is very low and $SO_2$ release would not be significant. Additionally, the sulfur content of diesel gas used in mobile sources and construction equipment is low and regulated by EPA at the bulk supplier level.

The Air Resource Management Plan also addresses modeling and mitigation for the following AQRVs:

- Deposition of sulfur and nitrogen
- Lake acid neutralizing capacity
- Visibility

The adaptive management strategy for oil and gas resources provides the flexibility to respond to changing conditions that could not have been predicted during Air Resource Management Plan development. The strategy allows for the use of new technology and methods that may minimize or reduce effects.

## H.1.2   Revision of the Air Resource Management Plan

This Air Resource Management Plan may be modified as necessary to comply with laws, regulations, and policies and to address new information and changing circumstances. Changes to the goals or objectives set forth in the LFO RMP would require maintaining or amending the Air Resource Management Plan; conversely, changes to implementation, including modifying this Air Resource Management Plan, may be made without maintaining or amending the RMP.

## H.1.3   Current Air Quality

The air quality in the LFO planning area is good as shown by ambient monitoring results from the Lewiston monitoring site. **Table H-1**, Ambient Concentration Data for Pollutants Monitored in the Planning Area (2012–2014). All areas within the LFO comply with the National Ambient Air Quality Standards (NAAQS) and the Montana Ambient Air Quality Standards (MAAQS).

For all criteria pollutants except ozone, ambient monitoring data available from August 2012 through December 31, 2014, indicate that concentrations at the Lewistown monitor are less than 64 percent of the NAAQS. **Table H-1** provides ambient concentration data for each pollutant monitored at the site. NAAQS set forth allowable concentrations in terms of parts per million (ppm) or parts per billion (ppb) for gaseous pollutants, while particulate pollutant concentrations are provided in micrograms per cubic meter ($\mu g/m^3$). Air pollutant data collected by MDEQ's ambient air monitoring program and the MDEQ

**Table H-1**
**Ambient Concentration Data for Pollutants Monitored in the Planning Area (2012–2014)**

| Pollutant | Average Period | Metric | Form | NAAQS | NAAQS Units | Monitored Concentration[1] | Percentage of NAAQS |
|---|---|---|---|---|---|---|---|
| $NO_2$ | 1 hour | 98th Percentile | 3-year average | 100 | Ppb | 14 | 14 |
| $O_3$ | 8 hour | 4th maximum | 3-year average | 0.070 | Ppm | 0.048 | 69[2] |
| $PM_{2.5}$ | 24 hour | 98th Percentile | 3-year average | 35 | µg/m³ | 10 | 29 |
| | Annual | Mean | 3-year average | 12.0 | µg/m³ | 3.3 | 28 |
| $PM_{10}$ | 24 hour | Not to be exceeded more than once per year | 3-year average | 150 | µg/m³ | No exceedances | Not applicable |

Source: MDEQ 2015
Data exclude exceptional events.
[1]Based on monitoring data from the Lewistown monitor (AQS No. 30-027-0006). The monitor became operational in August 2012; therefore, 3-year averaged concentrations reflect a partial year for 2012.
[2]The $O_3$ 8-hour standard at the time this table was produced was 0.075, and measured $O_3$ 8-hour average is 64 percent of the NAAQS. In 2015, EPA revised the 8-hour $O_3$ standard to a more protective 0.070 ppm.

annual air monitoring plans for the years 2015-2019 demonstrate that the ambient air quality in the LFO planning area continues to comply with the NAAQS and MAAQS (MDEQ 2019).

## H.1.4 Background of the Air Quality Technical Workgroup and the Memorandum of Understanding Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the National Environmental Policy Act Process

The Air Quality Technical Workgroup (AQTW) includes representatives from the following agencies: the BLM, EPA, United States Department of Agriculture (USDA), United States Forest Service (Forest Service), United States Fish and Wildlife Service (USFWS), and the National Park Service (NPS). Each of these agencies was party to a memorandum of understanding (MOU; USDA et al. 2011) during the development of the Lewistown RMP. The agreement was designed to "... facilitate the completion of NEPA [National Environmental Policy Act] environmental analyses for Federal land use planning and oil and gas development decisions" (USDA et al. 2011, p. 1). Additional entities, such as the Montana Department of Environmental Quality (MDEQ) and tribal entities, may also participate in the AQTW. The MOU was ended in 2019.

AQTW agencies used collaborative procedures to analyze potential air quality and AQRV effects. The agencies worked together to identify potential mitigation measures that may be needed to reduce effects on air quality and AQRVs. The lead agency (the BLM, in this case), in collaboration with the other agencies, identified reasonable mitigation and control measures and design features to address adverse effects on air quality. Mitigation measures may also address effects on AQRVs at Class I areas and at Class II areas of interest[1] that the BLM, Forest Service, USFWS, and NPS have identified. The AQTW provided input

---

[1]Class I federal lands include areas such as national parks, national wilderness areas, and national monuments. These areas are granted special air quality protections under Section 162(a) of the federal Clean Air Act. Class II lands are all non-Class I areas.

to this Air Resource Management Plan and will continue to collaborate on future air modeling associated with BLM activities.

In some cases, air quality and AQRV modeling performed under this Air Resource Management Plan may be sufficient to address modeling needs for future oil and gas projects that would otherwise require additional modeling under the MOU. Additional modeling and AQRV assessment may be required when oil and gas activities are proposed and permitted for specific projects.

## H.1.5  MDEQ Air Quality Management and BLM Mitigation Measures

The MDEQ has the primary authority to protect air quality in Montana except in Native American tribal areas managed by the EPA or individual tribes. The BLM also plays a role in protecting air resources under the Federal Land Policy and Management Act (FLPMA) and NEPA. Successful air quality management of BLM-authorized oil and gas activities depends on a close working relationship between the MDEQ and the BLM. The two agencies have worked together to improve air quality monitoring and will continue to share data, air modeling, and identify emission reduction measures to maintain good air quality. Indeed, BLM has funded two monitoring sites at Lewistown and Malta to monitor ambient air.

The BLM's air resource analysis during the RMPA and NEPA process is for future activities and thus, forward looking. This is due to the nature of NEPA analyses for land use planning, and because air resource effects are analyzed for future activities that may or may not occur.

### H.1.5.1  MDEQ Air Quality Programs

The MDEQ is charged with protecting a clean and healthy environment as guaranteed to citizens by Montana State Constitution. MDEQ's ultimate goal is to protect public health and to maintain Montana's high quality of life for current and future generations. The MDEQ has implemented state ambient air quality standards for additional air pollutants and has established more stringent standards for some criteria air pollutants. The NAAQS and MAAQS are listed in **Table H-2**, Ambient Air Quality Standards for Pollutants Monitored in the Planning Area.

The MDEQ has State Implementation Plan-approved new source review (NSR) permitting programs, which include prevention of significant deterioration, nonattainment area, and minor source programs. The MDEQ's prevention of significant deterioration and nonattainment area permitting programs impose controls on major stationary sources in order to control emissions of regulated pollutants. Emission controls are typically required through the application of best available control technology (BACT) or lowest achievable emission rate, depending on the applicable NSR permitting program.

In addition, the MDEQ implements a minor source NSR permitting program (e.g., minor source Montana Air Quality Permits [MAQP] and registrations). The MDEQ's minor source NSR program requires operators of sources with a potential to emit greater than 25 tons per year of any regulated air pollutant to apply for a permit to construct; alternatively, the operators must register with the MDEQ under the Administrative Rules of Montana.

To ensure compliance with the NAAQS, MDEQ's minor NSR program contains regulatory requirements that track activity and require the application of best available control technology. Additionally, the

**Table H-2**
**Ambient Air Quality Standards for Pollutants Monitored in the Planning Area**

| Pollutant | Averaging Period | Federal NAAQS[a] | | | MAAQS[b] |
| | | Concentration | Standard Type | Form of NAAQS Primary Standard | Concentration |
|---|---|---|---|---|---|
| NO$_2$ | 1 hour | 100 ppb | Primary | 3-year average of the 98th percentile concentrations | 0.30 ppm |
| | Annual | 53 ppb | Primary, secondary | Annual mean | 0.05 ppm[f] |
| Ozone | 1 hour | 0.10 ppm | — | — | 0.12 ppm[g] |
| | 8 hour | 0.070 ppm | Primary, secondary | 3-year average of the fourth daily maximum 8-hour average | — |
| PM$_{2.5}$ | 24 hour | 35 µg/m$^3$ | Primary, secondary[c] | 3-year average of the maximum | — |
| | Annual | 12.0 µg/m$^3$ | Primary | Annual mean | — |
| | Annual | 15.0 µg/m$^3$ | Secondary | Annual mean | — |
| PM$_{10}$ | 24 hour | 150 µg/m$^3$ | Primary, secondary | Not to be exceeded more than one per year, on average, over 3 years | — |
| | Annual | Revoked[d] | — | — | 50 µg/m$^{3\,e}$ |

[a] NAAQS are codified in Title 40 of the Code of Federal Regulations (CFR), Part 50.
[b] Montana AAQS are codified in Title 17, Chapter 8, Subchapter 2, of the Ambient Air Quality in the Administrative Rules of Montana.
[c] The EPA proposed a new secondary standard for PM$_{2.5}$ visibility of 28 or 30 deciviews (equivalent to 24 or 19 kilometers [15 or 12 miles] standard visual range).
[d] The annual PM$_{10}$ NAAQS was revoked October 17, 2006.
[e] Based on annual second maximum.
[f] Not to be exceeded in the averaging period specified.
[g] State violation when exceeded more than once during any 12 consecutive months.

Administrative Rules of Montana require reasonable precautions to limit fugitive particulate emissions from all activities in Montana, including permitted and registered facilities and operations that do not require a permit or registration.

The MDEQ's NSR program requires equipment and operational emission controls necessary to attain Montana's NAAQS and MAAQS, while allowing flexibility in the implementation of Montana's air quality programs.

### H.1.5.2 MDEQ Oil and Gas Emission Control Requirements

The MDEQ minor source permitting and registration program for oil and gas facilities includes a robust set of emission controls. Any facility that produces and processes oil and gas in the Lewistown planning area is subject to the rules and regulations of the MDEQ air program and required to obtain appropriate permits to operate. MDEQ rules require oil or gas well facilities to control emissions from the time the well is completed until the source is registered or permitted. Facility operators who choose to register must meet the emission control requirements contained in Administrative Rules of Montana 17.8.17. If source operators cannot meet these requirements, they must apply for an MAQP, which requires a case-by-case BACT analysis. This may include design, equipment, work practice, or operational standards in place of or in combination with an emission limitation.

The following measures to limit emissions are examples of MDEQ emission control requirements for oil and gas facilities (defined as those with a potential to emit more than 25 tons per year of any airborne pollutant):

- Each piece of oil or gas well facility equipment containing volatile organic compound (VOC) vapors (as defined in the permitting or registration regulations), with a potential to emit 15 tons per year or more, must be routed to a gas pipeline or to air pollution control equipment with 95 percent or greater control efficiency (registered facilities). This requirement applies to the following equipment:
  - Oil and gas wellhead production equipment, including wellhead assemblies, amine units, prime mover engines, phase separators, heater treatment units, dehydrator units, storage tanks, and connector tubing
  - Transport vehicle loading operations
- Hydrocarbon liquids must be loaded into transport vehicles using submerged fill technology.
- Stationary internal combustion engines greater than 85 brake horsepower must be equipped with nonselective catalytic reduction (for rich burn engines) or oxidation catalytic reduction (for lean burn engines) or equivalent emission reduction technologies.
- Piping components containing VOCs must be inspected for leaks each month. The first attempt to repair any leaking VOC equipment must occur within 5 days, and the repair must be completed no later than 15 days after the leak is initially detected, unless facility shutdown is required. Facility operators are required to maintain monthly leak inspection and repair records.

Although MDEQ emissions control requirements do not mention greenhouse gases, the VOC emission control measures would also reduce methane emissions, while the engine emission controls would reduce nitrous oxide emissions. The MDEQ oil and gas emission control requirements have successfully protected air quality throughout the planning area, as demonstrated by ambient air quality monitoring data that indicate good air quality in oil and gas activity areas.

### H.1.5.3 BLM Air Resource Management and MDEQ Coordination

The BLM's authority to address air resources derives primarily from Federal Land Policy and Management Act of 1976 As Amended (FLPMA) and the National Environmental Policy Act (NEPA). Under FLPMA, the BLM must "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans" in the development and revision of land use plans (FLPMA Section 202 [c][8]). FLPMA also authorizes the BLM to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" (FLMPA Section 102[8]).

Under NEPA, the BLM ensures that information on the potential environmental and human effect of federal actions is available to public officials and citizens before decisions are made and before actions are taken. Two of the purposes of NEPA are to "promote efforts which will prevent or eliminate damage to the environment and biosphere" and to promote human health and welfare. (NEPA, Section 2 42 USC §4321). NEPA requires that the BLM and other federal agencies prepare a detailed statement on the environmental impact of the proposed action for major federal actions expected to significantly affect the quality of the human environment (NEPA, Section 102 [c] 42 USC §4321).

The BLM's authority under the Clean Air Act (CAA) primarily derives from the requirement that BLM-authorized activities comply with the CAA. BLM-authorized activities may not violate the CAA or federal, state, local and tribal regulations and state implementation plans issued to implement the CAA. When air quality or AQRV modeling performed during NEPA analysis predicts potential violations of the CAA or unacceptable AQRV effects, the BLM evaluates the data and determines whether mitigation measures are needed. For example, the initial mitigation measure requiring drill rig engines to meet Tier 4 emission standards reduces $NO_2$ emissions. This measure was demonstrated via modeling to prevent NAAQS violations from multiple, large, drill rig engines that may operate on one well pad. The mitigation measure includes an exception that allows use of drill rig engines meeting Tier 1, 2, or 3 emission standards if future modeling or near-field monitoring demonstrates compliance with the NAAQS.

When determining whether mitigation measures are needed, the BLM reviews current and proposed federal, state, and local regulations to determine if mitigation will occur due to other agency actions. If the BLM determines that additional mitigation is needed while implementing this Air Resource Management Plan, it will work closely with the MDEQ to coordinate future mitigation measures for BLM-authorized activities.

## H.2   OIL AND GAS ACTIVITY ASSESSMENT

Under this Air Resource Management Plan, the BLM would track the number and locations of new oil and gas wells drilled on federal mineral estate and the number of new and abandoned producing wells on federal mineral estate. These numbers would be compared to any reasonably foreseeable developments in the planning area and to the level of oil and gas development identified in the preferred alternative.

In addition, the BLM would estimate oil and gas emissions from federal mineral estate every 3 years for oil and gas wells drilled and producing after the record of decision (ROD) is signed. Emission estimates would be based on well types, well numbers, and knowledge of typical equipment and operations. Methods used to estimate emissions are expected to improve over time as better data become available. The emission estimates will also account for implemented mitigation measures and for new emission control regulations as they become effective.

Each 3-year oil and gas emission inventory would be compared with emission estimates for the reasonably foreseeable development and the preferred alternative. The BLM would collect additional data related to oil and gas equipment and operations to improve emissions inventory quality. One area identified for improvement involves acquiring better data on oil and gas equipment used in the planning area. In order to improve fugitive dust emission estimates, the number, type, and length of vehicle trips in high-activity areas would be assessed. Each 3-year oil and gas emission inventory would be compared with emissions estimates for the preferred alternative.

## H.3   AMBIENT AIR QUALITY MONITORING SUPPORT

The MDEQ has primary responsibility for siting and operating ambient air quality monitors in Montana and for reporting monitoring data to the EPA and to the public. "The Purpose of Montana's ambient air monitoring network is to monitor, assess and provide information on statewide air quality conditions and trends as specified by the Montana and Federal Clean Air Acts" (MDEQ 2019). The Air Quality Monitoring Program works in conjunction with local air pollution agencies and some industries, measuring air quality throughout Montana. This data provides the factual basis for regulatory decisions as well as provides air quality information to our local counterparts and the public." As described in its annual State of Montana

Air Quality Monitoring Network Plan (MDEQ 2019), the MDEQ identifies monitoring objectives for assessing ambient concentrations of criteria air pollutants and assessing compliance with the NAAQS and MAAQS. Historically, most MDEQ monitors were placed in cities to assess human health effects in the more densely populated areas of Montana.

The BLM provided funding to help purchase, install, and operate monitoring equipment in Lewistown and Malta. The Lewistown monitor (EPA AQS Number 30-027-0006) measures ambient concentrations of $NO_2$, nitric oxide, nitrogen oxides, ozone, particulate matter ($PM_{10}$), and fine particulate matter ($PM_{2.5}$), $O_3$, as well as meteorological parameters, such as temperature, wind speed, and wind direction. The monitor, which began operating in 2012, is located at a latitude of 47.048537 and longitude of -109.455315.

## H.4   AIR QUALITY AND AIR QUALITY RELATED VALUE ASSESSMENT

The BLM would assess monitored air quality and AQRVs annually, using quality-assured data from the EPA, MDEQ, Forest Service, USFWS, NPS, and other sources. The purpose of the assessment is to assess trends in ambient air quality and AQRV and implement mitigation strategies to prevent air resource deterioration and violations.

### H.4.1   Annual National Ambient Air Quality Standards and Montana Ambient Air Quality Standards Assessment

The BLM would review MDEQ air quality monitoring data and AQRVs annually to assess air quality trends. The purposes of the annual assessment are to compare monitored data to NAAQS and MAAQS and to identify seasonal and long-term trends in air pollutant concentrations and AQRVs. Federal rules implemented by the EPA require each state to establish a network of monitors to measure concentrations of criteria pollutants in ambient air based upon population, regional air quality, and regulatory concerns. The MDEQ develops the Air Quality Monitoring Network Plan and submits it on an annual basis in accordance with the requirements contained in Title 40 of the Code of Federal Regulations (CFR) Part 58.10.

NAAQS and MAAQS are provided in **Table H-2** for pollutants monitored in the LFO planning area. Montana standards are shown only if they are more stringent than the NAAQS. As of December 31, 2015, the criteria pollutants CO, Pb, and $SO_2$ are not monitored in the planning area; moreover, with regard to pollutants regulated exclusively under the MAAQS, hydrogen sulfide and settleable particulate matter (PM) are not monitored in the planning area. Hydrogen sulfide is not monitored because ambient concentrations are believed to be very low due to low sulfur levels in gas produced in the area. Settleable particulate is not monitored in the area because the MDEQ prioritizes monitoring of pollutants subject to NAAQS, and settleable particulate is a Montana state ambient air quality standard.

Results of the annual NAAQS assessment would be used to determine if additional mitigation measures are needed to reduce impacts to ambient air quality from oil and gas operations.

### H.4.2   Ozone Assessment

The MDEQ has endeavored, in several cases with collaborative funding from the Bureau of Land Management (BLM), to define background levels of $O_3$ across Montana and to assess impacts from petroleum exploration within the eastern portion of the state. The MDEQ conducts $O_3$ monitoring in Broadus (30-075-0001), Birney (30-087- 0001), Sidney (30-083-0002), Malta (30-071-0010), Lewistown (30-027-0006), and at the National Core Monitoring Site (NCore) (30-049-0004).

In the LFO planning area, the MDEQ collects and publishes ambient concentrations of ozone data from the Lewistown monitor. The MDEQ calculates NAAQS design values and publishes these numbers in the annual Network Monitoring Plan (See 2016, 2017, 2018 and 2019 MDEQ Network Monitoring Plans). A design value is the monitored reading used by EPA to determine an area's air quality status for a criteria pollutant. For $O_3$, the EPA defines the Design Value as the 4th highest daily maximum 8-hour average concentration, averaged over a 3-year period. The current USEPA standard for Ozone is 0.070 parts per million, or ppm. Any design value above this level is considered non-attainment of the standard. The Lewistown Design Values calculated by the MDEQ are from EPA's AQS database and the list below shows that the highest $O_3$ design value is just below 85% of the 8-hour $O_3$ NAAQS during the ozone season in the summer. The $O_3$ design value has increased since 2013, but the highest design value is still below 85% of the 8-hour NAAQS. The BLM will continue to monitor this trend both in the Lewistown monitoring site and across the state of Montana.

**Table H-3**
**8-Hour Rolling Monitored $O_3$ Values for Ozone Season (June through September)**

| Averaging Years | NAAQS Design Values (ppm) |
|---|---|
| 2016-2018 | 0.059 |
| 2015-2017 | 0.057 |
| 2014-2016 | 0.055 |
| 2013-2015 | 0.055 |
| 2012-2014 | 0.048 |

The MDEQ has observed little variability in the monitored ambient $O_3$ concentrations across the state. The MDEQ operates seven monitoring stations located at or near Birney, Broadus, Lewistown, Malta, Missoula, NCore, and Sidney-201 to ambient $O_3$. Two of the seven monitoring sites (including the 2005–2007 Billings site) are located in the two largest-population communities in Montana, two are in small towns, one is in a rural oilfield, two are in very rural settings with minimal population and no industry, and one is in a pristine background location adjacent to a federal wilderness area. According to the MDEQ, it appears that the $O_3$ monitored in the ambient air across Montana is indicative of general background concentrations produced principally by natural sources or transported in from sources outside the state, with little anthropogenic source input from within Montana (MDEQ 2019).

## H.4.3   AQRV Assessment

Federal land managers track the status, condition, and trends of AQRVs for Class I and for some Class II areas of interest under their jurisdictions. Consequently, the BLM would obtain visibility, sulfur, and nitrogen deposition and lake acid neutralizing capacity data from the Forest Service, USFWS, and NPS. The BLM would include the AQRV data in its annual Montana Air Resource Report.

The annual Montana BLM Air Resource Report would help ascertain trends in ambient air quality and AQRV. However, ambient air quality and AQRV trends in the area may not necessarily be related to BLM authorized oil and gas development. AQRV effects are often associated with pollutants that can be transported long distances from many different types of sources. For example, visibility degradation in eastern Montana primarily results from large stationary sources, such as electric-generating units and cement kilns, as described in the Montana Regional Haze Federal Implementation Plan (EPA 2012).

## H.5    PHOTOCHEMICAL GRID MODELING (PGM)

The EPA regulatory preferred air dispersion model AERMOD is a near-field model that performs well to a range of 50-km but not capable of modeling long-range effects or $O_3$ which is formed by complex interactions in the atmosphere. The BLM Montana/Dakotas (BLM-MT/DK) state office Photochemical Grid Model (PGM) modeling study was a three-year work effort (2013-2016) to assess the future year oil and gas air quality (AQ) and Air Quality Related Value (AQRV) impacts in the Montana/Dakotas region. The United States Forest Service (USFS) requested an examination of the potential impacts related to oil and gas activities in the Little Missouri National Grassland (LMNG) that lies within the BLM North Dakota Field Office (NDFO) planning area that was added to the study.

The PGM analysis was conducted because it can predict ozone and regional haze effects by cumulatively accounting for pollutants and precursors that are emitted in the Montana and Dakotas field office management areas, and model pollutants from far-field that are transported many hundreds of miles from areas outside the LFO and other field offices. During the course of the BLM-MT/DK – USFS/LMNG PGM modeling study, numerous reports were prepared. The two reports that describe the modeling effort and the results are: "*Bureau of Land Management Montana/Dakotas State Office PGM Modeling Study Air Resource Impact Assessment Final Report*" (Ramboll Environ & Kleinfelder, 2016a) and the "*Bureau of Land Management Montana/Dakotas State Office PGM Modeling Study Air Resource Technical Support Document (ARTSD) Final Report*" (Ramboll Environ & Kleinfelder, 2016b). During this comprehensive modeling effort, the USFS also provided funding to obtain a separate AQ and AQRV assessment due to their O&G activities within the Little Missouri National Grasslands (LMNG) in North Dakota.

### H.5.1   Photochemical Grid Modeling Details and Results

The BLM performed PGM to assess regional air quality and AQRV impacts due to proposed BLM activities in multiple BLM field offices in Montana, North Dakota, and South Dakota. In addition to addressing oil and gas development in the LFO, the modeling supports the effect analyses for oil and gas activities in the RMP revisions and EISs for the Billings Field Office, Miles City Field Office, HiLine District, and South Dakota Field Office.

The Comprehensive Air-quality Model with extensions (CAMx) Photochemical Grid Model (PGM) was used to estimate the air quality (AQ) and air quality related value (AQRV) impacts due to new oil and gas (O&G) development within the three-state Montana/Dakotas region. CAMx was first applied for the October 2012 – September 2013 (2012/2013) base year using 2012/2013 emissions and meteorological conditions and the modeling results were compared against concurrent observations in a model performance evaluation. In order to use a full 12 months of ambient monitoring data from the Lewistown monitor, the baseline year used for PGM is a 12-month period from October 2012 through September 2013. Emissions were then projected to the 2032 future year and CAMx was applied using the 2012/2013 meteorological conditions with the 2032 emissions. The future year AQ impacts due to emissions from new O&G development and all other sources were compared against the NAAQS and state standards. The impacts of the new O&G emissions on visibility and acid (sulfur and nitrogen) deposition were assessed at Class I and Class II areas of interest. The AQ impacts due to new oil and gas emissions were also compared against PSD increments at Class I/II areas.

Throughout the PGM data collection and modeling process, the BLM collaborated with the MDEQ, AQTW, and other agencies that requested to be involved in the PGM effort. These collaborators provided technical review and comment on the modeling protocol, meteorological modeling performance, and base

year modeling performance. The MDEQ, AQTW, and other agencies also reviewed and commented on the future year modeling results and draft air resource technical support document. The PGM reports and appendices are posted on the BLM Montana e-planning website.

The PGM report's summary of the AQ and AQRV impacts of the new O&G emissions due to BLM actions and all other sources within the Montana/Dakotas region includes the following conclusions:

- There were no estimated exceedances of the NAAQS or any state standards in the region in the current (2012/2013) or future (2032) year modeling.

- Emissions from O&G activity due to BLM actions were estimated to cause exceedances of the 0.5 and 1.0 change in deciview ($\Delta$dv) visibility thresholds at the Fort Peck and Medicine Lake Class I areas. When examining the visibility impacts of the cumulative O&G emission scenarios, there were also exceedances of the 0.5 and 1.0 $\Delta$dv thresholds at the Theodore Roosevelt and Lostwood Class I areas in additional to Fort Peck and Medicine Lake.

- Nitrogen deposition due to new O&G from BLM actions was below Critical Load levels but above the Deposition Analysis Threshold (DAT) at Fort Peck, Medicine Lake and Theodore Roosevelt Class I areas. Cumulative nitrogen deposition levels due to O&G activity was also below Critical Load levels but above the DAT at Fort Peck, Medicine Lake, Lostwood and Theodore Roosevelt Class I areas.

- Sulfur deposition due to BLM O&G actions was below Critical Loads but above the DAT at the Theodore Roosevelt Class I area with cumulative O&G sulfur deposition impacts also below Critical Loads but above the DAT at the Fort Peck, Medicine Lake, Lostwood and Theodore Roosevelt Class I areas. O&G due to BLM actions and cumulative O&G impacts on Acid Neutralizing Capacity (ANC) did not exceed any thresholds of concern at any sensitive lake in the region.

- BLM O&G actions are not estimated to cause any exceedances of PSD increments except for 24-hour PM2.5 PSD increment at the Fort Peck Class I areas. Similarly, the cumulative O&G scenarios are not estimated to cause any exceedances of PSD increments except for 24-hour PM2.5 at the Fort Peck, Medicine Lake and Lostwood Class I areas.

PSD increment analysis included in the PGM study is usually conducted when a major air pollution facility is permitted by a regulatory agency. At the RMP level, details of equipment location, stack parameters, exact equipment model and facility emissions are not known accurately. A refined analysis is conducted during the air quality permitting process in Air Quality Control Regions where PSD increment consumption triggered or when a major air pollution source is permitted. To address concerns with visibility and deposition effects observed in the PGM study, the BLM funded and is currently monitoring AQRVs at Medicine Lake Class I area through an agreement with Colorado State University.

### H.5.2   Modeling after Air Resource Management Plan Photochemical Grid Modeling Completion

To the extent that future emission increases are within the levels modeled with PGM or other modeling and are proximate to modeled emission locations, far-field air quality and AQRV effect analysis for future environmental impact statements may incorporate by reference PGM and other modeling results. The BLM and the AQTW would determine whether previous modeling is sufficient future proposed activities to. This air quality management approach is consistent with the MOU among the US Department of

Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the National Environmental Policy Act Process (USDA et al. 2011).

If additional modeling is performed after the 2016 Montana/Dakotas PGM, the BLM would assess impacts to air quality and AQRV and, if necessary, would identify additional mitigation measures.

## H.6   MITIGATION

Air quality and AQRV effect mitigation would involve:

- Initial measures that become effective when the ROD is signed
- Enhanced measures that may be identified, based on future ambient monitoring data or modeling results

### H.6.1   Initial Mitigation Actions

The air quality mitigation measures described below would be applied when the ROD is issued, through leasing documents and project-specific NEPA documents. To the extent practical, emission reductions associated with these mitigation measures have been included in the LFO emission inventory.

- Design and construct roads and well pads to reduce the amount of fugitive dust generated by traffic or other sources. During construction and except when the ground is wet or frozen, apply water, dust-suppression chemicals, or gravel or use other control methods to achieve 50 percent fugitive dust control efficiency.
- Except when the ground is wet or frozen, use water or other BLM-approved dust suppression during drilling, completion, and well workover operations for dust abatement on access roads, as needed, to achieve 50 percent fugitive dust control efficiency.
- Except when ground is wet or frozen, use water or other BLM-approved dust suppression in high traffic areas during production operations for dust abatement, as needed, to achieve 50 percent fugitive dust control efficiency. Operators would work with local government agencies to improve dust suppression on roads.
- For oil and gas project plans of development, oil and gas operators would establish speed limits for project-required unpaved roads in and next to the project area; oil and gas operations employees would comply with these speed limits.
- For oil and gas project plans of development and when feasible, oil and gas operators would be encouraged to reduce surface disturbance, vehicle traffic, and fugitive dust emissions by consolidating facilities, such as using multi-well pads and storage vessels.
- All diesel-fueled non-road engines greater than 200 horsepower would meet Tier 4 emission standards for non-road diesel engines. Alternatively, oil and gas operators may use drill rig engines that exceed Tier 4 emission standards, if modeling or monitoring at the project level or at a programmatic level demonstrates compliance with the NAAQS and protection of AQRVs.
- Non-road diesel engines would be required to use ultra-low sulfur diesel fuel (15 parts per million weight), as required by 40 CFR, Subpart 80.610(e)(3)(iii).

## H.6.2  Monitoring-Based Enhanced Mitigation

Enhanced mitigation would be considered and implemented if ambient monitoring data at the Lewistown monitoring site indicate that measured pollutant concentrations are approaching or threatening the NAAQS or MAAQS, and BLM's oil and gas leasing may contribute to the air quality deterioration. The BLM would communicate with MDEQ regarding the data and potential sources of air pollutant emissions in the LFO planning area. BLM would review monitored data and design values provided by MDEQ in their annual networking plan.

If ambient air quality assessment indicates that an MDEQ calculated design value is greater than 85 percent of a NAAQS and if BLM's activities and oil and gas operations are determined to substantially contribute to the monitored pollutant concentration, then one or more enhanced mitigation measures addressing that pollutant or pollutant precursor would be evaluated. During this process, the BLM would confer with the MDEQ, the interagency working group, and EPA. The geographic extent of the mitigation measures would be limited to the area determined to contribute substantially to air pollutant concentrations above 85 percent of the NAAQS. Potential enhanced mitigation measures are those measures listed below, as well as additional measures that may be identified in the future. Preference would be given to mitigation methods that the MDEQ might require as new regulations or air quality permitting provisions. Selected mitigation measures would be implemented within one year after the BLM decision to apply additional mitigation.

Potential enhanced mitigation measures are those listed below and are based on current information concerning potential emission reduction technologies. Additional measures or equivalent methods or emission restrictions may be identified in the future.

Potential mitigation measures include:

- Drilling or blow down activity restrictions based on meteorological conditions
- Construction restrictions based on meteorological conditions
- Centralization of gathering facilities
- Electric drill rigs
- Field electrification for compressors or pumpjack engines
- Plunger lift systems with smart automation
- Oil tank load out vapor recovery
- VOC controls on tanks with a potential to emit less than 5 tons per year
- Selective catalytic reduction on stationary engines not associated with drill rigs
- Reduced emission completions beyond those required by EPA regulations if determined to be technically and economically feasible
- Well pad density limitations
- A reduced total number of drill rigs operating simultaneously
- Seasonal reductions or cessations of drilling during specified periods
- Use of only lower-emitting drill and completion rig engines during specified periods
- Use of natural-gas-fired drill and completion rig engines
- Replacement of internal combustion engines with gas turbines for natural gas compression

- Use of a monthly, infrared leak detection program to reduce VOCs
- Tank load out vapor recovery
- Enhanced VOC emission controls with 95 percent control efficiency on additional production equipment having a potential to emit greater than 5 tons per year
- Enhanced direct inspection and maintenance program

### H.6.3  Modeling-Based Enhanced Mitigation

Future modeling will assess air quality and AQRV effects from future BLM-authorized oil and gas activity and may include regional PGM and project-specific modeling. Enhanced mitigation would be considered and implemented if ambient air quality and AQRV models indicate potential future impact to NAAQS or MAAQS or effects above specific levels of concern for AQRVs in Class I or Class II areas of interest as identified on a case-by-case basis by MDEQ or a federal land management or tribal agency.

If BLM-authorized oil and gas activity is predicted to cause or contribute to criteria pollutant ambient concentrations approaching or exceeding the NAAQS, or levels of concern for visibility, acid deposition, or lake acidification, the BLM would facilitate an interagency process to develop a comprehensive strategy to manage air quality impact from future oil and gas development within the region.

The local, state, federal, and tribal agencies involved in the regulation of air quality and the authorization of oil and gas development would evaluate air quality modeling results during facility permitting process and would identify potential air quality concerns and implement necessary reductions in air emissions. During permitting and registration, agencies including MDEQ would use their regulatory authorities to implement enhanced emission control strategies, operating limitations, and equipment emission limits or would pace development as necessary to ensure continued compliance with applicable ambient air quality standards. The emission control measures would include measures listed in **Section H.6.1**, Initial Mitigation Actions, other future mitigation measures identified through the BLM's adaptive management strategy, or reasonable mitigation measures suggested by the MDEQ or AQTW. If necessary, the BLM would implement mitigation measures within one year of obtaining final modeling results for mitigation measures that conform to currently implemented land use planning decisions and constraints.

The strategies in this Air Resource Management Plan provide steps to ensure that the monitored ambient air quality complies with the NAAQS and MAAQS, and the AQRV levels do not reach levels of significance during BLM's activities including oil and gas drilling and operation.

### H.7  REFERENCES

Ramboll Environ & Kleinfelder. 2016a. Bureau of Land Management Montana/Dakotas State Office PGM Modeling Study Air Resource Impact Assessment Final Report.

Ramboll Environ & Kleinfelder. 2016b. Bureau of Land Management Montana/Dakotas State Office PGM Modeling Study Air Resource Technical Support Document (ARTSD) Final Report.

EPA (United States Environmental Protection Agency). 2012. Approval and Promulgation of Implementation Plans; State of Montana; State Implementation Plan and Regional Haze Federal Implementation Plan. Docket No. EPA-R08-OAR-2011-0851. August 15, 2012.

MDEQ (Montana Department of Environmental Quality). 2015. State of Montana Air Quality Monitoring Network Plan. May 2015. MDEQ, Air Resources Management Bureau, Helena. May. Internet website: http://deq.mt.gov/airmonitoring/Home.mcpx.

MDEQ, 2019. State of Montana Air Quality Monitoring Network Plans for 2016, 2017, 2018 and 2019. Website: https://deq.mt.gov/Air/CurrentAQ, site accessed on 12 Sep 2019.

USDA, USDI, and EPA (United States Department of Agriculture, United States Department of the Interior, and United States Environmental Protection Agency). 2011. Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the National Environmental Policy Act Process. June 23, 2011. Internet website: http://www.epa.gov/oecaerth/resources/policies/nepa/air-quality-analyses-mou-2011.pdf.

This page intentionally left blank.

# Appendix I
## Fire and Emergency Stabilization and Rehabilitation

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                    Page

**APPENDIX I. FIRE AND EMERGENCY STABILIZATION AND REHABILITATION** ........................... **I-1**

    I.1      Fire .................................................................................................................................. I-1
    I.2      Emergency Stabilization and Rehabilitation ........................................................... I-2
          I.2.1    Introduction ........................................................................................................ I-2
          I.2.2    Emergency Stabilization and Rehabilitation Protocols .......................... I-2

# TABLES

Page

I-1    Fire Management Category Descriptions ............................................................................ I-1
I-2    ES&R Program Time Frames, Tasks, and Responsibilities................................................. I-6

This page intentionally left blank.

# Appendix I. Fire and Emergency Stabilization and Rehabilitation

## I.1    FIRE

**Table I-1**, Fire Management Category Descriptions, compares fire management categories. It is adapted from the Montana/Dakotas Fire/Fuels Plan Environmental Assessment/Plan Amendment (2003).

**Table I-1**
**Fire Management Category Descriptions**

| *Category A:* Fire is not desired at all | *Category B:* Unplanned fire is likely to cause negative effects | *Category C:* Fire is desired to manage ecosystems, but current vegetative condition creates constraints on use | *Category D:* Fire is desired; no constraints on its use |
| --- | --- | --- | --- |
| *Fire Management Activities:* <br>• Mitigation and suppression required <br>• Fire should not be used to manage fuels | *Fire Management Activities:* <br>• Suppression required <br>• Fire and non-fire fuels treatments may be used | *Fire Management Activities:* <br>• Suppression may be required <br>• Fire and non-fire fuels treatments may be used | *Fire Management Activities:* <br>• Suppression may not be necessary <br>• Both fire and non-fire treatments could be used |
| *Rationale for Categorization:* <br>• Direct threats to life or property <br>• Ecosystems not fire dependent <br>• Long fire return intervals | *Rationale for Categorization:* <br>• Unplanned ignitions would have negative effects on ecosystems unless mitigated | *Rationale for Categorization:* <br>• Significant ecological, social, or political constraints | *Rationale for Categorization:* <br>• Few ecological, social, or political constraints <br>• Less need for fuels treatment |
| *Fire Suppression Considerations:* <br>• Emphasis on prevention, detection, and rapid suppression response and techniques | *Fire Suppression Considerations:* <br>• Emphasis on prevention, education, and suppression | *Fire Suppression/Use Considerations:* <br>• Emphasis on reducing unwanted ignitions, resource threats, and fuels accumulations | *Fire Suppression/Use Considerations:* <br>• Emphasis on using planned and unplanned wildfire to achieve resource objectives |
| *Multiple Fire Priority[1]:* Highest | *Multiple Fire Priority[1]:* High | *Multiple Fire Priority[1]:* Medium | *Multiple Fire Priority[1]:* Lowest |

Source: Adapted from the Montana/Dakotas Fire/Fuels Plan Environmental Assessment/Plan Amendment

[1]If multiple fires were burning, Categories A and B would generally receive priority for fire management resources.

## I.2   EMERGENCY STABILIZATION AND REHABILITATION

### I.2.1   Introduction

Emergency stabilization plans and rehabilitation (ES&R) plans are prepared after a wildfire. Their purposes are to minimize threats to life and property and to stabilize and prevent unacceptable degradation to natural and cultural resources resulting from the effects of the fire, in a cost-effective and expeditious manner. Not all fires need emergency stabilization and rehabilitation.

The United States Department of the Interior, Bureau of Land Management's (BLM's) Burned Area Emergency Stabilization and Rehabilitation Handbook (H-1742-1[1]) provides detailed information specific to BLM policies, standards, and procedures used in the burned area ES&R programs. Handbook H-1742-1 is intended to be the primary guidance to the BLM's ES&R activities. These activities and treatment undertaken in the Lewistown Field Office will follow the handbook's guidance. ES&R activities and treatments in wilderness study areas will comply with policy in the Management of BLM Wilderness Study Areas (BLM Manual 6330[2]). As the departmental manuals are updated and revised, conformance to the new direction will supersede the criteria included herein.

Emergency stabilization is defined as "Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life and property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency Stabilization actions must be taken within one year following containment of a wildfire" (620 DM 3.3E).

Rehabilitation is defined as "Efforts undertaken within 3 years of containment of a wildfire to repair or improve fire-damaged lands unlikely to recover naturally to management approved conditions, or to repair or replace minor facilities damaged by fire" (620 DM 3.3M).

Emergency stabilization and rehabilitation funds are not used for rehabilitating wildfire suppression; this includes rehabilitating fire lines, helispots, and fire camp. Costs for rehabilitating wildfire suppression will be funded by the wildfire project code.

### I.2.2   Emergency Stabilization and Rehabilitation Protocols

Emergency stabilization protection priorities are first, human life and safety and second, property and unique biological resources (designated critical habitat for federally and-state listed, proposed, or candidate threatened and endangered species) and significant heritage sites (620 DM 3.7A). Burned area rehabilitation protection priorities are first, to repair or improve lands damaged directly by a wildfire and second, to rehabilitate or establish healthy, stable ecosystems in the burned area (620 DM 3.8A).

---

[1]BLM. Handbook H-1742-1—Burned Area Emergency Stabilization and Rehabilitation Handbook. Rel. 1-1702. Washington, DC. February 12, 2007. Internet website: https://www.blm.gov/sites/blm.gov/files/uploads/ Media_Library_BLM_Policy_Handbook_h1742-1.pdf.

[2]BLM. Manual 6330—Management of Wilderness Study Areas. Rel. 6-134. Washington, DC. July 13, 2012. Internet website: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_ manual.Par.31915.File.dat/6330.pdf.

*Emergency Stabilization*

The objective of emergency stabilization is "To determine the need for and to prescribe and implement emergency treatments to minimize threats to life or property or to stabilize and prevent unacceptable degradation to natural and cultural resources resulting from the effects of a fire" (620 DM 3.4A).

Emergency stabilization plans are prepared by an interdisciplinary team immediately following a wildfire. The plan preparers specify emergency treatments and activities to be carried out within 1 year following containment of the wildfire. Generally, activities are prescribed only within the perimeter of a burned area.

Allowable emergency stabilization actions are limited to the items below, grouped by issue topic.

*Human Life and Safety*
- Replacing or repairing minor facilities essential to public health and safety when no other protection options are available
- Removing hazard trees along access routes and around areas with high public use

*Soil and Water Stabilization*
- Placing structures to slow soil and water movement
- Stabilizing soil to prevent loss of degradation or productivity
- Increasing road drainage frequency and capacity to handle additional post-fire runoff
- Installing protective fences or barriers to protect treated or recovering areas

*Designated Critical Habitat for Federally or State-Listed, Proposed, or Candidate Species*
- Conducting assessments of critical habitat in those areas affected by emergency stabilization treatments
- Seeding or planting to prevent permanent impairment of designated critical habitat for federally and state-listed, proposed, or candidate threatened and endangered species

*Critical Heritage Resources*
- Assessing significant heritage sites in those areas affected by emergency stabilization treatments
- Stabilizing critical heritage resources
- Patrolling, camouflaging, or burying significant heritage sites to prevent looting

*Greater Sage-Grouse Priority Areas and Protection Priority Areas*
- Prioritizing native seed allocation for use in greater sage-grouse habitat in years when preferred native seed is in short supply. Where the probability of success or native seed availability is low, nonnative seeds may be used, as long as they meet greater sage-grouse habitat conservation objectives. Reestablishing appropriate sagebrush species/subspecies and important understory plants, relative to site potential, will be the highest priority for rehabilitation.
- Designing post-ES&R management to ensure long-term persistence of seeded or pre-burn native plants
- Considering potential changes in climate when proposing post-fire seedings using native plants

- Considering seed collections from the warmer component within a species' current range for selecting native seed
- Developing an appropriate seed mix for the location, based on current climatic data as well as soils/ecological site descriptions

### Invasive Plants

- Seeding to prevent the establishment of invasive plants and treating invasive plants directly. Such actions will be specified in the emergency stabilization plan under the following circumstances:
  - Only when immediate action is required and when standard treatments are used that have been validated by monitoring data from previous projects
  - When there is documented research establishing the effectiveness of such actions
- Using integrated pest management techniques to minimize the establishment of nonnative, invasive species within the burned area
- Using emergency stabilization treatments to stabilize the invasive species when there is an existing approved management plan that addresses nonnative, invasive species

### Monitoring

- Monitoring treatments and activities for up to 3 years from the date of fire containment

### Burned Area Rehabilitation

The objectives of rehabilitation are as follows:

- To evaluate actual and potential long-term post-fire impacts on critical cultural and natural resources
- To identify those areas unlikely to recover naturally from severe wildfire damage
- To develop and implement cost-effective plans to emulate historic or pre-fire ecosystem structure, function, diversity, and dynamics consistent with approved land management plans, or, if that is infeasible, then to restore or establish a healthy, stable ecosystem in which native species are well represented
- To repair or replace minor facilities damaged by wildfire (620 DM 3.4B)

Rehabilitation plans are prepared separately by an interdisciplinary team; these plans are independent of an emergency stabilization plan. The rehabilitation plan specifies nonemergency treatments and activities to be carried out within 3 years following containment of a wildfire. Generally, rehabilitation is prescribed only within the perimeter of a burned area.

Allowable rehabilitation actions are limited to the items below, grouped by issue topic.

### Lands Unlikely to Recover Naturally

- Repairing or improving lands unlikely to recover naturally from wildfire damage by emulating historic or pre-fire ecosystem structure, function, diversity, and dynamics, consistent with existing land management plans

**Weed Treatments**

- Removing invasive species chemically, manually, and mechanically
- Planting native and nonnative species to restore or establish a healthy, stable ecosystem even if this ecosystem cannot fully emulate historic or pre-fire conditions

**Tree Planting**

- Planting trees to reestablish burned habitat and native tree species lost in fire and to prevent establishment of invasive plants

**Repair/Replace Fire Damage to Minor Facilities**

- Repairing or replacing fire damage to minor operating facilities (e.g., fences, campgrounds, interpretive signs and exhibits, shade shelters, and wildlife guzzlers). Rehabilitation may not include planning or replacing major infrastructure, such as visitor centers, residential structures, administration offices, work centers, and similar facilities. Rehabilitation does not include constructing new facilities that did not exist before the fire, except for temporary and minor facilities necessary to implement burned area rehabilitation.

**Monitoring**

- Monitoring treatments and activities for up to 3 years from date of fire containment

After 3 years, the long-term monitoring of an ES&R project will be officially transferred to a designated resource program. Long-term responsibility for tracking the ES&R investment should be identified early in the ES&R planning process through an interdisciplinary team. Those in charge of the resource program are encouraged to conduct an evaluation at the 5-year interval. The purpose is to identify management changes needed to ensure project success in reaching the intended objectives (Washington Office-Instruction Memorandum [IM]-2010-195, 9/3/2010).

Policies on time frames for ES&R planning, funding, and implementation are very specific. ES&R treatments must be implemented, to the extent possible, before additional damage occurs to the burned area, immediately downslope of the burned area, or before undesirable vegetation becomes established. Treatments must be implemented at a time that will ensure a high or maximum probability of success. The ES&R program time frames in relation to tasks and responsibilities are shown in **Table I-2**, ES&R Program Time Frames, Tasks, and Responsibilities.

Due to the broad spectrum of situations encountered in emergency stabilization and rehabilitation, several options of possible treatments must be considered, either separately or in combination. The ES&R handbook list several treatments under the treatment guidance section.

**Table I-2**
**ES&R Program Time Frames, Tasks, and Responsibilities**

| Event | Time Frames | Task |
|---|---|---|
| Wildfire occurs | Immediately | Manager assigns a resource advisor (READ). While the fire is still burning, the READ, in consultation with resource specialists and the appropriate manager, decides if ES&R is warranted based on values at risk/resources at risk. If the READ decides that ES&R is warranted, he or she notifies the North Central Montana District Fire Management Officer (NCMD-FMO) or District Office ES&R lead before the fire is contained. The NCMD-FMO or District Office ES&R lead then notifies the State Office ES&R program lead of the scope of the fire and the anticipated fire containment date. |
| Initial ES plan needed. Submit Form 1310-20 plus supplemental attachments (LF2200000 [2822] and LF3200000 [2881]); indicate functional areas on the form | Within 7 days of fire containment | Concurrently with state ES&R program lead, national ES&R program lead, and national operations center. |
| Prepare and submit a complete emergency stabilization plan | Within 21 days of fire containment | If less than $100,000, submit to the state ES&R program lead; if $100,000 or greater, submit to the state ES&R program lead (for review) and concurrently to the national ES&R program lead. |
| Receive approval or disapproval of emergency stabilization plan | Within 6 working days of receipt by Approval Office | Requesting office receives memorandum approving funding or the need for revision on a plan-by-plan basis. The state director has funding approval authority for plans less than $100,000. The BLM Budget Officer, after concurrence with Assistant Director WO-200, has funding approval authority for plans $100,000 or greater. |
| Receive notification of emergency stabilization funding approval | Immediately | The local fire office enters project data into the National Fire Plan Operations and Reporting System. |
| Prepare and submit the necessary burned area rehabilitation (BAR) plan | Timely; ideally soon after submitting emergency stabilization plan but no later than September 5 annually | To state ES&R program lead and national ES&R program lead. Field Office; local fire office enters project data into the National Fire Plan Operations and Reporting System. |
| Receive approval/disapproval of the BAR plan funding | Before October 31 annually | Funding for the BAR plans is approved via the annual work plan. |
| Accomplishment report and funding request form for 2881 funds for next fiscal year | Early September | To state ES&R program lead for review and submission to national ES&R program lead for concurrence. Funding for years 2 and 3 is approved via the annual work plan. |
| Close-out report | Early September of year 3 | To state ES&R program lead for review and submission to the national ES&R program lead. |

# Appendix J
## Impoundments

This page intentionally left blank.

# Appendix J. Impoundments

Management actions in this appendix are applicable to the 19 constructed, surface water impoundments that have previously been identified as sport fishery reservoirs, recreation sites, and/or hazard-size class. These features may or may not support riparian-wetland habitat based on water level fluctuation, but all are mapped as freshwater pond or lake wetland types.

**Action:** The primary factors considered for the 19 constructed, surface water impoundments that have previously been identified as sport fishery reservoirs, recreation sites, and/or hazard-size class include valid existing rights, hazard-class size, legal public access, sport fisheries habitat, livestock/wildlife water, and functionality. Using these criteria, the following reservoirs would currently be managed as described below. Primary factors (e.g., access and the potential to support fish) may be subject to changing conditions during the life of this plan; therefore, this action would be considered an implementation-level decision. Management actions would comply with state water rights law.

Those features with valid existing rights (e.g., privately-owned water rights and ROW authorizations) would be maintained at the discretion/expense of the right holder at 3 sites, totaling 17 acres. These include:

- Box Elder (Vogel)* Reservoir
- Little Bear Reservoir
- Iverson Dam

The BLM would support cooperative agreements with right holders to maintain 2 sites totaling 130 acres of freshwater pond. These include:

- Holland Reservoir*
- Whisker Reservoir*

*The embankments for Box Elder, Holland, and Whisker Reservoirs are not on property administered by the BLM, but the water feature behind the embankment is on BLM-administered land.

The BLM would maintain 6 sites, totaling 167 acres of freshwater pond. These include:

- Fritzner Reservoir
- Drag Creek Reservoir
- Dry Blood Reservoir
- South Fork Dry Blood Reservoir
- Payola Reservoir
- Bubs Reservoir (Hedman Dam)

A plan for decommissioning and developing alternative livestock/wildlife water (if and when necessary) would be developed for 8 sites, totaling 137 acres. These include:

- Crooked Creek Reservoir
- Buffalo Wallow Reservoir
- Jakes Reservoir
- Mauland Reservoir
- Wolf Coulee Reservoir #1
- Dry Wolf Reservoir
- Duck Creek Reservoir
- Zimmerman Dam

---

Reservoir Ranking Criteria for the sport fisheries, recreation sites, and hazard class reservoirs**

1) Valid Existing Rights (e.g. rights-of-way, private water rights, etc.)
   a) Are valid existing rights present on the feature?
      i) Yes, feature maintained at discretion/expense of right holder.
         a. If valid, existing right holder chooses not to maintain it, go to 2
      ii) No
         a. If hazard class go to 2.
         b. If not hazard class, go to 3.

2) Hazard-class status reservoirs (applicable to hazard class dams only)
   b) Does the feature support other values (e.g. fisheries, recreation, etc.)?
      i) Yes, go to 3
      ii) No, develop plan for decommissioning.

3) Legal Public Access Status
   a. Does the feature have existing, legal, motorized access?
      i. Yes, go to 4
      ii. No, go to 3b.
   b. Is an alternate route possible?
      i. Yes, go to 4
      ii. No, go to 3c.
   c. Does the feature have existing, legal, overland, non-motorized access?
      i. Yes, go to 4.
      ii. No, is landowner interested in allowing public access?
         1. Yes, go to 4.
         2. No, go to 5.

4) Sport Fisheries Habitat
   a. Could the feature support over-wintering fish population?
      i. Yes, go to 6 (*functionality*).
      ii. No, go to 4b.

---

      b.   Can it support a fishery with cooperators (put and take)?
           i.   Yes, go to 6 (*functionality*).
           ii.  No, go to 5.

5)  Livestock/Wildlife Water
      a.   Are other existing or potential reliable alternate water resources available within 1.5 miles (e.g. pit dams, pipelines, tanks)?
           i.   Yes, develop plan for decommissioning.
           ii.  No, maintain feature.

6)  Functionality
      a.   Is there an embankment deficiency?
           i.   No, consider maintaining feature in site specific NEPA (consider public interest, lifespan, costs, other values).
           ii.  Yes, go to 6b.
      b.   Does the fishery warrant maintenance?
           i.   Yes, maintain feature.
           ii.  No, consider decommissioning.

 * This flowchart documents the thought process to determine reservoir placement.
**Embankments on lands not administered by the BLM are: Holland, Whisker, and Box Elder/Vogel.

This page intentionally left blank.

# Appendix L
## Stipulations and Allocations Applicable to Fluid Minerals Leasing

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                                Page

APPENDIX L. STIPULATIONS AND ALLOCATIONS APPLICABLE TO FLUID MINERALS
    LEASING .................................................................................................................... L-1
    L.1     No Leasing Allocations.................................................................................. L-1
    L.2     Description of Stipulations ........................................................................... L-1
            L.2.1   Standard Terms and Conditions for Fluid Minerals Leasing............... L-2
            L.2.2   No Surface Occupancy....................................................................... L-2
            L.2.3   Controlled Surface Use....................................................................... L-3
            L.2.4   Timing Limitations .............................................................................. L-3
            L.2.5   Lease Notice ....................................................................................... L-3
            L.2.6   Condition of Approval......................................................................... L-3
            L.2.7   Project Mitigation and Monitoring....................................................... L-3
    L.3     Exceptions, Modifications, and Waivers........................................................ L-4
            L.3.1   Standard Modification, Exception, and Waiver ................................... L-4

# TABLES

                                                                                                                       Page

L-1     No Surface Occupancy Stipulations for Fluid Minerals Leasing....................................... L-6
L-2     Controlled Surface Use Stipulations for Fluid Minerals Leasing.................................... L-23
L-3     Timing Limitation Stipulations Applicable to Fluid Minerals Leasing ........................... L-29
L-4     Lease Notices Applicable to Fluid Minerals Leasing...................................................... L-33

This page intentionally left blank.

# Appendix L. Stipulations and Allocations Applicable to Fluid Minerals Leasing

This appendix lists by alternative the stipulations for fluid minerals leasing (e.g., oil, gas, and geothermal) referred to throughout the Lewistown Resource Management Plan (RMP) and Environmental Impact Statement (EIS). The stipulations would not apply to activities and uses where they are contrary to laws, regulations, or specific program guidance, including locatable minerals development under the 1872 mining law. While they are not stipulations, this appendix also presents descriptions of the no leasing (NL) allocations for fluid minerals presented in the alternatives.

## L.1   NO LEASING ALLOCATIONS

### NL State-designated Source Water Protection Areas

Closed to fluid mineral leasing and geophysical exploration in State-designated Source Water Protection Areas.

### NL Cultural Resources (Alternative B)

Close to fluid mineral leasing and geophysical exploration NRHP-eligible and -listed historical properties and cultural sites allocated to conservation for future use, traditional use, and public use.

### NL Cultural Resources (Alternative D)

Close NRHP-listed historical properties to fluid mineral leasing.

### NL Egg Mountain

Close Egg Mountain to fluid mineral leasing and geophysical exploration.

### NL Lands with Wilderness Characteristics

Close to fluid mineral leasing and geophysical exploration within areas that are managed to protect wilderness characteristics.

### NL High Potential Route Segments

Close trail management corridors containing High Potential Route Segments and Sites to fluid mineral leasing.

## L.2   DESCRIPTION OF STIPULATIONS

**Table L-1**, No Surface Occupancy Stipulations for Fluid Minerals Leasing, through **Table L-3**, Timing Limitation Stipulations Applicable to Fluid Minerals Leasing, provide details of the stipulations and restrictions by alternative. Three types of stipulations and restrictions could be applied to fluid minerals leases: no surface occupancy (NSO), controlled surface use (CSU), and timing limitation (TL).

NSO, CSU, and TL are stipulation decisions and apply to fluid minerals leasing and development of fluid mineral estate underlying US Department of the Interior, Bureau of Land Management (BLM)-administered lands, privately owned lands, and state-owned lands, but not underlying National Forest System lands or

national wildlife refuges. To lease minerals beneath surface lands administered by the US Department of Agriculture, Forest Service (Forest Service), the BLM must receive consent to lease from the Forest Service. Also, the BLM must incorporate any accompanying stipulations required by forest land use plans or forest-wide programmatic leasing analyses.

Federal fluid mineral estate acres are greater than BLM-administered surface acres. In the planning area, the BLM administers 651,200 acres of surface estate and 1,196,800 acres of federal mineral estate. The latter includes minerals administered by the BLM overlain by BLM-administered and private and state-owned land. It also includes federal mineral estate overlain by lands administered by other federal agencies for which the BLM has decision-making authority for minerals. Acreages are calculated on current information and may be adjusted in the future through plan maintenance as conditions warrant.

Lease stipulations and lease notices would be applied, as applicable, to all new leases and to expired leases that are reissued. On existing leases, the BLM would develop conditions of approval for applications for permits to drill to achieve resource objectives of lease stipulations contained in the Lewistown RMP. New development on existing leases would have to comply with current management direction. This direction is consistent with Interior Board of Land Appeals decisions.[1] These decisions give the BLM discretion to modify surface operations to add specific mitigation measures, supported by site-specific National Environmental Policy Act (NEPA) analysis undertaken during the development phase on existing leases. Any additional mitigation measures would need to be justifiable, would still need to provide for lease development, and would need to be incorporated in a site-specific document.

The BLM developed the stipulations identified in Alternative A, Current Management, in the 1983 Headwaters Resource Area RMP (HRMP) and the 1992 Judith-Valley-Phillips (JVP) RMP. There is an existing protest resolution decision affecting federal mineral estate in the LFO that does not allow oil and gas leasing of nominated parcels that would require a special stipulation to protect important wildlife values. Existing fluid minerals leases that expire can be re-nominated for leasing, but they would be deferred. New leasing of areas with important wildlife values cannot occur until the BLM completes this EIS and issues a Record of Decision.

## L.2.1   Standard Terms and Conditions for Fluid Minerals Leasing

Oil and gas development is subject to standard terms and conditions of the lease. Onshore Oil and Gas Order No. 1[2] gives the BLM the ability to relocate proposed operations up to 656 feet (200 meters) and to prohibit surface-disturbing operations for a period not to exceed 60 days.

## L.2.2   No Surface Occupancy

Use or occupancy of the land surface for fluid minerals exploration or development and all activities associated with fluid minerals leasing are prohibited to protect identified resource values. Examples of these activities are truck-mounted drilling, stationary drill rigs in unison, geophysical exploration equipment off designated routes, and construction of wells or pads (refer to **Table L-1**).

---

[1]Yates Petroleum Corp., 176 Interior Board of Land Appeals 144 (2008) and William P. Maycock, 180 Interior Board of Land Appeals 1 (2010).

[2]Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations regulations (43 CFR, Part 3160).

The NSO stipulation is a category of major constraints. NSO areas are open to fluid minerals leasing, but surface occupancy or surface-disturbing activities associated with fluid minerals leasing cannot be conducted on the surface of the land. Access to fluid mineral deposits would require directional drilling or drilling from outside the boundaries of the NSO area. This differs from areas identified as closed to leasing in which neither the surface area nor mineral estate is available for fluid minerals leasing.

### L.2.3   Controlled Surface Use

CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values. It is applicable to fluid minerals leasing and all activities associated with it, such as truck-mounted drilling, stationary drill rigs in unison, geophysical exploration equipment off designated routes, and construction of wells or pads. CSU areas are open to fluid minerals leasing, but the stipulation allows the BLM to require special operational constraints. Alternatively, the activity can be shifted more than 656 feet (200 meters) to protect the specified resource or value (refer to **Table L-2**, Controlled Surface Use Stipulations for Fluid Minerals Leasing).

### L.2.4   Timing Limitations

Areas identified for TL, a moderate constraint, are closed to fluid minerals exploration and development, surface-disturbing activities, and intensive human activity for periods that may exceed 60 days. This stipulation does not apply to operation and basic maintenance, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive are not allowed. Intensive maintenance, such as work-overs on wells, is not permitted. Administrative activities are allowed at the discretion of the BLM Authorized Officer (refer to **Table L-3**).

### L.2.5   Lease Notice

A lease notice (LN), provides more-detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. An LN also addresses special considerations for lessees when they plan their operations, but it does not impose additional restrictions. LNs are not an RMP-level decision, and new LNs may be added to fluid minerals leases at the time of sale. LNs apply only to leasable minerals, such as oil, gas, and geothermal, and not to other types of leases, such as livestock grazing or coal leases (refer to **Table L-4**).

### L.2.6   Condition of Approval

Conditions of approval (COA) are requirements under which an application for permit to drill is approved, after a lease is issued. COAs are based on site-specific analysis and are designed to minimize, mitigate, or prevent effects on resource values or other uses of public lands. A particular condition of approval is not an RMP-level decision and is applicable only to fluid minerals leasing.

### L.2.7   Project Mitigation and Monitoring

Stipulations are designed to provide resource-specific protections. Permit holders are responsible for monitoring and reporting deemed necessary to document and maintain mandated protective measures. Also, the BLM retains the right to modify the operations of all surface and other disturbance activities caused by the presence of humans. It also has the right to require additional specific or specialized mitigation. This would be required after a lessee submits a detailed plan of development or other project proposal, a monitoring report, and an environmental analysis of such.

## L.3   EXCEPTIONS, MODIFICATIONS, AND WAIVERS

The BLM Authorized Officer could modify, make exceptions to, or waive stipulations and restrictions. These actions provide a viable and effective means of applying adaptive management techniques to development of fluid minerals leases.

### L.3.1   Standard Modification, Exception, and Waiver

The standard exceptions, modifications, and waivers apply to all NSOs, CSUs, and TLs, unless otherwise stated. (In the following paragraphs, leasehold refers to fluid minerals leases.)

A *modification* is a change to the provisions of a lease stipulation or project, either temporarily or for the lease term or length of the project. Depending on the specific modification, the stipulation may or may not apply to all sites in the leasehold that the restrictive criteria are applied to. The BLM Authorized Officer may modify a stipulation or the area subject to the stipulation. This would be the case if he or she determines that the factors leading to its inclusion in the lease or project area have changed sufficiently.

The BLM Authorized Officer may modify a stipulation as a result of new information under one or more of the following circumstances:

- If the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP
- If the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP
- If the proposed operations would not cause unacceptable effects

The BLM Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analyses and may consult with other government agencies or the public to make this determination.

An *exception* is a one-time exemption for a particular site in the leasehold and is determined on a case-by-case basis. The exception continues to apply to all other sites in the leasehold. The BLM Authorized Officer may grant an exception to a stipulation. This would come about if he or she determines that the factors leading to its inclusion in the lease have changed sufficiently such that one of the following occurs:

- The protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP
- The proposed operations would not cause unacceptable effects

The BLM Authorized Officer may require additional plans of development, surveys, mitigation proposals, or environmental analysis. He or she may consult with other government agencies or the public to make this determination.

A *waiver* is a permanent exemption from a lease stipulation. When a waiver is granted, the stipulation no longer applies anywhere in the leasehold. The BLM Authorized Officer may waive a stipulation. This would be the case if he or she determines that the factors leading to its inclusion in the lease or project no longer exist. The Authorized Officer may require additional plans of development, surveys, mitigation proposals,

or environmental analysis. He or she may be required to consult with other government agencies or the public to make this determination.

The environmental analysis document prepared for site-specific proposals, such as oil and gas development, such as applications for permits to drill (APD) and sundry notices, also needs to address any proposal to modify, except, or waive a surface stipulation.

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 248 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

**Table L-1**
**No Surface Occupancy Stipulations for Fluid Minerals Leasing**

| Resource: *Soil Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **NSO Soils-Badlands, Rock Outcrop** | Surface occupancy and use is prohibited on badlands and rock outcrop. | **Objective:** To prevent excessive soil erosion and to avoid disturbing areas subject to potential reclamation problems.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if it is determined that the entire leasehold does not include these types of areas.<br><br>**Exception:** The Authorized Officer may not grant exceptions to this stipulation.<br><br>**Modification:** The Authorized Officer may modify the area affected by this stipulation if it is determined that portions of the leasehold do not include these types of areas. |

| Resource: *Water Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **State-designated Source Water Protection Areas** | Surface occupancy and use is prohibited within State-designated Source Water Protection Areas. | **Objective**: To protect human health by minimizing the potential contamination of public water systems. Source water is untreated water from streams, rivers, lakes, or aquifers used to supply public water systems. Ensuring that source water is protected from contamination can reduce the costs of treatment and risks to public health. This stipulation would protect the State-designated Source Water Protection Areas that protect public water systems from potential contamination.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if it is determined that the entire leasehold does not include Source Water Protection Areas.<br><br>**Exception:** The Authorized Officer may not grant exceptions to this stipulation.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if it is determined that portions of the leasehold do not include Source Water Protection Areas. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 249 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Vegetative Communities* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Water, Riparian, Wetland, and Floodplains** | Surface occupancy and use is prohibited within perennial or intermittent streams, lakes, ponds, reservoirs, 100-year floodplains, wetlands, and riparian areas. | **Objective** - To protect the unique biological and hydrological features and functions associated with perennial and intermittent streams, lakes, ponds, reservoirs, floodplains, wetlands, and riparian areas.<br><br>**Waiver** – The Authorized Officer may waive this stipulation if it is determined that the entire leasehold does not include these types of areas.<br><br>**Exception** – No exceptions would be allowed in streams, natural lakes, or wetlands. An exception may be granted by the Authorized Officer for riparian areas, floodplains, and artificial ponds or reservoirs if the operator can demonstrate that: (1) there are no practicable alternatives to locating facilities in these areas, (2) the proposed actions would maintain or enhance resource functions, and (3) all reclamation goals and objectives would be met.<br><br>**Modification** – The Authorized Officer may modify the boundaries of the stipulated area if it is determined that portions of the leasehold do not include these types of areas. |

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Fisheries** | Surface occupancy or use is prohibited within 0.5 mile from the centerline of streams or 0.5 mile from bank-full edge of lakes/ reservoirs containing Class 1 and 2 fisheries as defined by Montana Fish, Wildlife and Parks (MFWP) Crucial Areas Assessment Game Fish Quality. | **Objective**: To insure healthy aquatic habitats are maintained along Class 1 and 2 fisheries.<br><br>**Waiver**: The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if the entire leasehold can be occupied without adversely effecting the habitat associated with the Class 1 and 2 fisheries.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action is will not impair the function or suitability of the fisheries habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold can be occupied without adversely effecting the habitat associated with the Class 1 and 2 fisheries. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 250 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource:<br>*Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| Fisheries | Westslope Cutthroat Trout: No surface occupancy or use is allowed within one-half mile from centerline of stream containing known populations of 99 – 100% genetically pure Westslope Cutthroat trout. | **Objective**: To ensure healthy aquatic habitat exists in drainages important to the viability of upper Missouri River Basin westslope cutthroat trout. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.<br><br>**Waiver:** A waiver may be granted if the Montana Fish, Wildlife and Parks determines the stream is no longer considered important to the viability of the species.<br><br>**Exception:** An exception may be granted after a site assessment is conducted and if the operator can demonstrate in a surface use plan of operations that adverse effects can be eliminated and activities would not affect sensitive trout populations. Apply the following mitigation measures:<br><br>a) No net increase in sediment over existing condition.<br>b) No adverse effects on water quality and quantity.<br><br>**Modification:** None |
| Fisheries | Westslope Cutthroat Trout: No surface occupancy or use is allowed within one-half mile from centerline of stream containing known populations of 90-99% genetically pure Westslope Cutthroat Trout. | **Objective:** To ensure healthy aquatic habitat exists in drainages important to the viability of Upper Missouri River and Columbia River Basins Westslope Cutthroat Trout. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.<br><br>**Waiver:** A waiver may be granted if the Montana Fish, Wildlife and Parks determines the stream is no longer considered important to the viability of the species.<br><br>**Exception:** An exception may be granted after a site assessment is conducted and if the operator can demonstrate in a surface use plan of operations that adverse effects can be eliminated and activities would not affect sensitive trout populations. Apply the following mitigation measures:<br><br>a) No net increase in sediment over existing condition.<br>b) No adverse effects on water quality and quantity.<br><br>**Modification:** None |

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Fisheries** | Blue Ribbon Trout Stream: No surface occupancy or use is allowed within one-half mile from the centerline of Class 1 fishery streams (Blue Ribbon trout streams). | **Objective**: To ensure healthy aquatic habitat are maintained along Class 1 fisheries. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. <br><br> **Waiver:** None <br><br> **Exception:** An exception may be granted if the Montana Fish, Wildlife and Parks modifies the Class I fisheries rating. Application of the following mitigation measures apply: <br><br> a) No net increase in sediment over existing condition. <br> b) No adverse effects on water quality and quantity. <br><br> **Modification:** None |
| **Fisheries** | Bull Trout (Butte FO Portion): No surface occupancy or use is allowed within one-half mile from centerline of streams containing known populations of Bull Trout. | **Objective**: To ensure healthy aquatic habitat exists in drainages important to the viability of Bull Trout. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. <br><br> **Waiver:** A waiver may be granted if the Montana Fish, Wildlife and Parks determines the stream is no longer considered important to the viability of the species. <br><br> **Exception:** An exception may be granted after a site assessment is conducted and if the operator can demonstrate in a surface use plan of operations that adverse effects can be eliminated and activities would not affect sensitive trout populations. Apply the following mitigation measures: <br><br> a) No net increase in sediment over existing condition. <br> b) No adverse effects on water quality and quantity. <br><br> **Modification:** None |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 252 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource:<br>*Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Fisheries and Aquatic Species** | Surface occupancy and use is prohibited within 0.25 mile of designated reservoirs with fisheries. | **Objective:** Protection the fisheries and aquatic species.<br><br>**Exception:** An exception to this stipulation can be granted by the Authorized Officer if the operator submits a plan that demonstrates that effects from the proposed action are acceptable or can be adequately mitigated.<br><br>**Modification:** The boundaries of the stipulated area can be modified if the Authorized Officer determines that portions of the area can be occupied without adversely affecting the fisheries and recreational values of the reservoir.<br><br>**Waiver**: This stipulation can be waived if the Authorized Officer determines that the entire leasehold is no longer a fishery and it can be occupied without adversely affecting the recreational values of the reservoir. |
| **Special Status Fisheries** | No surface occupancy or use is allowed within 0.5 mile from centerline of streams that are identified by the BLM as having high restoration potential for westslope cutthroat trout, Yellowstone cutthroat trout, Arctic grayling, and/or bull trout. | **Objective:** To ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration.<br><br>**Exception:** An exception may be granted after a site assessment is conducted and if the operator can demonstrate in a surface use plan of operations that adverse effects can be eliminated and activities would not affect potential habitat for native fish populations or degrade suitable habitat for native fish restoration/reintroduction. The following mitigation measures would apply:<br>a.   No net increase in sediment over existing condition.<br>b.   No adverse effects on water quality and quantity.<br><br>**No WAIVER or MODIFICATION.** |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 253 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Water Bird Nesting Colony** | Surface occupancy and use is prohibited within 0.25 mile of a water bird nesting colony. Priority species for management includes special status species in addition to the following species regardless of special status designation:<br><br>• American white pelican<br>• Black-crowned night heron<br>• Black tern<br>• Caspian tern<br>• Clark's grebe<br>• Common tern<br>• Double-crested cormorant<br>• Forster's tern<br>• Franklin's gull<br>• Great blue heron<br>• White-faced ibis | **Objective**: To protect nesting colonial-nesting birds identified as BLM priority species for management.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of nest sites historically used by colonial-nest birds or if the habitat has been altered to an extent, future use by colonial nesting birds is unlikely.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not result in colony abandonment.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.25 mile of colonial nest bird sites. |
| **Crucial Winter Range** | Surface occupancy and use is prohibited in crucial winter range for the following BLM priority species for management:<br><br>• bighorn sheep<br>• elk<br>• greater sage-grouse<br>• moose<br>• mule deer<br>• pronghorn<br>• whitetail deer | **Objective:** To protect winter ranges crucial to the survival of 80 percent of the species identified as BLM priority species for management in the most severe of winters.<br><br>**Waiver:** The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if entire leasehold has been altered to an extent, future use by wintering wildlife is unlikely.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not impair the function or suitability of the crucial winter range habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold no longer support wintering wildlife. |

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Sharp-tailed Grouse Lek** | Surface occupancy and use is prohibited on and within 0.5 mile of the perimeter of leks. | **Objective:** To protect leks for sharp-tailed grouse, BLM priority species for management.<br><br>**Waiver:** The Authorized Officer may waive this stipulation after coordination with the state wildlife management agency if the entire leasehold is no longer within 0.5 mile of the perimeter of active leks active within the past 5 years or if the habitat has been altered to an extent, future use by sharp-tailed grouse is unlikely.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not result in lek abandonment.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area after coordination with the state wildlife management agency if portions of the leasehold are no longer within 0.5 mile of the perimeter of leks active within the past 5 years or if the habitat has been altered to an extent, future use by sharp-tailed grouse is unlikely. |
| **Bats** | Prohibit surface-disturbing or disruptive activities within 0.25 mile of identified bat maternity roosts and hibernation areas that would adversely effect bats or their habitat. | **Objective:** To protect bat maternity roost and hibernation habitat.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of bat maternity roost or hibernation habitat within the past 10 years.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not impair the function or suitability of bat maternity roost or hibernation habitat.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.25 mile of bat maternity roost or hibernation habitat active within the past 10 years. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 255 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Raptors**[3] | Surface occupancy and use is prohibited within 0.25 mile of raptor nest sites active within the preceding 7 years[3] for the following BLM priority species for management. Priority species includes special status species in addition to the following species regardless of special status designation:<br><br>• Burrowing Owl<br>• Ferruginous Hawk<br>• Golden Eagle<br>• Long-eared Owl<br>• Merlin<br>• Northern Goshawk<br>• Osprey<br>• Prairie Falcon<br>• Red-tailed Hawk<br>• Sharp-shinned Hawk<br>• Short-eared Owl<br>• Swainson's Hawk | **Objective:** To protect nest sites of raptors identified as BLM priority species for management.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of raptor nest sites active within the past 7 years or if the habitat has been altered to an extent, future use by nesting raptors is unlikely.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not to result in nest territory abandonment.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.25 mile of raptor nest sites active within the past 7 years. |

[3]Raptor definition for application of stipulations includes raptor species without species specific stipulations noted above. The exact list may vary by RMP but may include the following species: golden eagle, northern goshawk, ferruginous hawk, red-tailed hawk, sharp-shinned hawk, Swainson's hawk, prairie falcon, merlin, osprey, burrowing owl, long-eared owl, and short-eared owl. Because nest structures are often used by different species throughout the life of the structure, these distances and dates should be considered minimums and the site specific assessment should consider the needs of specific species present at the time of the action and adjust accordingly. The 0.25 mile buffer was the distance cited for most of these species in Romin and Muck (2002). Additional species specific information can be found in Whittington and Allen (2008). Species specific stipulations may be developed if warranted in the planning area, however the language of the stipulation should not vary from these examples, only the distances and dates used.

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 256 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Bald Eagle** | Surface occupancy and use is prohibited within 0.5 mile of bald eagle nest sites active within the preceding 5 years[4]. | **Objective:** To protect nest sites and nesting activities of bald eagles, a BLM priority species for management.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.5 mile of bald eagle nest sites active within the past 5 years or if the habitat has been altered to an extent, future use by nesting bald eagles is unlikely.<br><br>**Exception:** The Authorized Officer may grant an exception, subject to coordination with the US Fish and Wildlife Service (USFWS), if the action will not to result in nest territory abandonment.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.5 mile of bald eagle nest sites active within the past 5 years. |
| **Peregrine Falcon** | Surface occupancy and use is prohibited within 1 mile of peregrine falcon nest sites active within the preceding 7 breeding seasons[5]. | **Objective:** To maintain the reproductive potential of raptor nest sites.<br><br>**Waiver:** This stipulation may be waived if the Authorized Officer determines that the entire leasehold no longer contains habitat for raptor nest sites.<br><br>**Exception:** The Authorized Officer may grant an exception if the operator submits a plan that demonstrates the effects to raptors from the proposed action can be adequately mitigated.<br><br>**Modification:** The boundaries of the stipulated area may be modified if the Authorized Officer determines that portions of the area can be occupied without adversely affecting the production potential of raptor nest sites. The Authorized Officer may also modify the size and shape of the area based on studies documenting actual habitat suitability and/or local periods of actual use. |

---

[4]Five years was selected for Bald Eagles based on USFWS National Bald Eagle Management Guidelines (2007) recommendations.

[5]American Peregrine Falcon Recovery Plan (Rocky Mountain Southwest Populations), US Fish and Wildlife Service, 1984 and Whittington and Allen (2008).

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 257 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Piping Plover** | Surface occupancy and use is prohibited within 0.25 mile of piping plover habitat. | **Objective:** To protect the nesting habitat of the federally threatened piping plover.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of piping plover nesting habitat.<br><br>**Exception:** The Authorized Officer, subject to consultation with the USFWS, grant an exception if the action will not result in nest territory abandonment or decrease productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated areas if portions of the leasehold are no longer within 0.25 mile of piping plover nesting habitat. |
| **Prairie Dog Habitat** | Surface occupancy and use is prohibited for oil and gas exploration and development within 0.25 mile of black-tailed or white-tailed prairie dog habitat. Prairie dog habitat is defined as the maximum extent of areas occupied by prairie dogs at any time during the last 10 years[6]. | **Objective:** To protect prairie dog habitat, a BLM priority species for management, as well as burrowing owls, mountain plover, and other obligate species.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of prairie dog colonies active within the past 10 years.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not impair the function or suitability of the prairie dog habitat.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.25 mile of prairie dog habitat active within the past 10 years. |
| **Bighorn Sheep Lambing** | Surface occupancy and use is prohibited within bighorn sheep lambing areas. | **Objective:** To protect traditional bighorn sheep lambing habitat, crucial for successful recruitment of bighorn sheep lambs.<br><br>**Waiver:** The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if the entire leasehold is no longer bighorn sheep lambing habitat.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not to impair the function or suitability of the habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold are no longer within bighorn sheep lambing habitat. |

[6]The 0.25 mile buffer would account for fluctuations in the size of prairie dog colonies and serves as a surrogate for the maximum extent of areas occupied by prairie dogs at any time during the last 10 years.

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 258 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Pallid Sturgeon** | Surface occupancy and use is prohibited within 0.25 mile of the water's edge of the Missouri River to protect pallid sturgeon. | **Objective:** To protect the habitat of the federally endangered pallid sturgeon. **Waiver**: The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of the water's edge of the Missouri River. **Exception:** The Authorized Officer, subject to consultation with the USFWS, may grant an exception if the action will not impair habitat of the pallid sturgeon. **Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are not within 0.25 mile of the water's edge of the Missouri River. |
| **Mountain Plover** | Surface occupancy and use is prohibited in and within mountain plover habitat. | **Objective:** To protect mountain plover habitat and to maintain mountain plover populations. **Waiver:** The stipulation may be waived if the Authorized Officer determines that the entire leasehold is no longer mountain plover habitat. **Exception:** The Authorized Officer may grant an exception if portions of the area can be occupied without adversely affecting mountain plover habitat. **Modification:** The boundaries of the stipulated area may be modified if the Authorized Officer determines that portions of the area can be occupied without adversely affecting mountain plover habitat. The Authorized Officer may also modify the size and shape of the area based on studies documenting actual habitat suitability and/or local periods of actual use. |
| **Sagebrush Focal Area** | Surface occupancy and use is prohibited within the Sagebrush Focal Area (SFA). | **Objective:** To provide the protection needed in order to preserve areas of BLM-administered land identified by the USFWS as "strongholds" for greater sage-grouse having the highest densities of greater sage-grouse and other criteria important for the persistence of greater sage-grouse. **No WAIVER, EXCEPTION, or MODIFICATION.** |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 259 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource:<br>*Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Greater Sage-Grouse Priority Habitat Management Areas (PHMAs)** | To protect greater sage-grouse, a priority species for management, surface occupancy and use is prohibited for oil and gas exploration and development within greater sage-grouse Priority Habitat Management Areas (PHMAs). | **Objective:** To protect greater sage-grouse PHMA (outside SFAs).<br><br>**Exception:** The Authorized Officer may grant an exception only where the proposed action:<br>(i)  Will not have direct, indirect, or cumulative effects on greater sage-grouse or its habitat; or,<br>(ii)  Is proposed to be undertaken as an alternative to a similar action occurring on a nearby parcel, and will provide a clear conservation gain to greater sage-grouse.<br><br>Exceptions based on conservation gain (ii) may only be considered in (a) PHMAs of mixed ownership where federal minerals underlie less than fifty percent (50%) of the total surface, or (b) areas of the public lands where the proposed exception is an alternative to an action occurring on a nearby parcel subject to a valid Federal fluid mineral lease existing as of the date of this RMP revision. Exceptions based on conservation gain must also include measures, such as enforceable institutional controls and buffers, sufficient to allow the BLM to conclude that such benefits will endure for the duration of the proposed action's effects.<br><br>Any exceptions to this lease stipulation may be approved by the Authorized Officer only with the concurrence of the State Director. The Authorized Officer may not grant an exception unless the applicable state wildlife agency, the USFWS, and the BLM unanimously find that the proposed action satisfies (i) or (ii). Such finding shall initially be made by a team of one field biologist or other greater sage-grouse expert from each respective agency. In the event the initial finding is not unanimous, the finding may be elevated to the appropriate BLM State Director, USFWS State Ecological Services Director, and state wildlife agency head for final resolution. In the event their finding is not unanimous, the exception will not be granted. Approved exceptions will be made publicly available at least quarterly.<br><br>**No WAIVER or MODIFICATION.** |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 260 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Greater Sage-Grouse Leks in General Habitat Management Areas (GHMAs)** | Surface occupancy and use is prohibited within 0.6 miles of the perimeter of greater sage-grouse leks in general habitat management areas. | **Objective:** To maintain the integrity of Greater Sage-Grouse general habitat management areas and promote movement and genetic diversity to support sustainable Greater Sage-Grouse populations. |
| | | **Exception:** The Authorized Officer may grant exception if the action will not result in Greater Sage-Grouse lek abandonment. |
| | | **Modification:** The Authorized Officer may modify the boundaries of the stipulation area if portions of the leasehold are no longer within 0.6 miles of the perimeter of an active lek, or a portion of the habitat has been altered to the point Greater Sage-Grouse no longer occupy the site and there is no likelihood of habitat capable of supporting Greater Sage-Grouse being restored. |
| | | **Waiver:** The Authorized Officer may waive this stipulation if no portion of the leasehold is within 0.6 miles of the perimeter of an active lek. |
| **Grizzly Bear (PCA and Zone 1)** | Surface occupancy and use is prohibited within the boundary of the Grizzly Bear Recovery Zone (Primary Conservation Area and Management Zone 1. | **Objective:** To avoid surface disturbing activities in the Grizzly Bear Recovery Zone Primary Conservation Area (PCA) and Management Zone 1. |
| | | **Exception:** An exception may be granted by the authorized officer if the operator submits a plan which demonstrates that the proposed action will not affect grizzly bears or grizzly bear habitat. If the authorized officer determines that the action may have an adverse effect, the operator may submit a plan demonstrating that the impacts can be adequately mitigated. This plan must be approved by BLM in close coordination with MFWP. |
| | | **Modification:** The stipulation may be modified if the authorized officer, in coordination with MFWP determines a portion of the area is no longer important to grizzly bear conservation or the boundaries of the stipulated area may be modified if the area can be occupied without adversely affecting grizzly bears or grizzly bear habitat. |
| | | **Waiver:** This stipulation may be waived if the authorized officer, in coordination with MFWP, determines that the entire leasehold can be occupied without adversely affecting grizzly bears or grizzly bear habitat. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 261 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Cultural Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Cultural Resources** | Surface use and occupancy prohibited within NRHP-eligible properties/districts and cultural sites allocated to conservation for future use, traditional use, and public use. | **Objective:** To protect NRHP-eligible properties and districts and cultural sites allocated to conservation for future use, traditional use, and public use. <br><br> **Standard WAIVERS, EXCEPTIONS, and MODIFICATIONS apply.** |

| Resource: *Paleontological Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Paleontological Areas** | Surface occupancy and use prohibited within Egg Mountain and the Blacktail Paleontological Area. | **Objective:** To preserve and protect significant vertebrate fossils and paleontological locales. <br><br> **Exception:** An exception to this stipulation can be granted by the Authorized Officer if the lessee or operator submits a plan which demonstrates that the adverse effects to significant paleontological resources can be mitigated through recovery and extensive recordation. Where effects to paleontological resources cannot be mitigated to the satisfaction of the surface management agency, surface occupancy on that area must be prohibited. <br><br> **Modification:** The boundaries of the stipulated area can be modified if the Authorized Officer determines that portions of the designated site/locale can be occupied without adversely affecting the resource values. <br><br> **No WAIVER.** |

| Resource: *Recreation* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Recreation Areas** | No surface occupancy or use is allowed within developed recreation areas and undeveloped recreation areas receiving concentrated public use. | **Objective:** Protect developed recreation areas and undeveloped recreation areas receiving concentrated public use. <br><br> **Exception:** An exception to this stipulation can be granted by the Authorized Officer if the operator submits a plan demonstrating that effects from the proposed action are acceptable or can be adequately mitigated. <br><br> **Waiver**: This stipulation can be waived if the Authorized Officer determines that the entire leasehold no longer contains developed recreation areas or undeveloped recreation areas receiving concentrated public use. <br><br> **Modification:** The boundaries of the stipulated area can be modified by the Authorized Officer if the recreation area boundaries are changed. |

Case 4:20-cv-00062-BMM  Document 10-5  Filed 08/20/20  Page 262 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Recreation* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Developed Recreation Sites** | No surface occupancy or use is allowed within 0.25 mile of developed recreation sites, regardless of administering agency. | **Objective:** To recognize and protect the public's opportunity for quality recreation experiences at those sites developed for that purpose. Since BLM recreation sites are generally developed to support the use of the surrounding lands, the one-quarter mile buffer offers some protection for perpetuating those opportunities for which the site was developed, as well as protecting capital investments at the site. |
| | | **Waiver:** A waiver may be granted if a site is moved or eliminated. |
| | | **Exception:** An exception may be granted if a site is moved or eliminated. |
| | | **Modification:** The list of developed recreation sites may be modified if development is moved, or if a currently undeveloped site is developed in the future. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. |
| **Fisheries and Aquatic Species** | Surface occupancy and use is prohibited within 0.25 mile of designated reservoirs with fisheries. | **Objective:** Protection the fisheries and aquatic species. |
| | | **Exception:** An exception to this stipulation can be granted by the Authorized Officer if the operator submits a plan that demonstrates that effects from the proposed action are acceptable or can be adequately mitigated. |
| | | **Modification:** The boundaries of the stipulated area can be modified if the Authorized Officer determines that portions of the area can be occupied without adversely affecting the fisheries and recreational values of the reservoir. |
| | | **Waiver**: This stipulation can be waived if the Authorized Officer determines that the entire leasehold is no longer a fishery and it can be occupied without adversely affecting the recreational values of the reservoir. |
| **State Lands** | Surface occupancy and use is prohibited for oil and gas exploration and development within the State of Montana Wildlife Management Areas, Game Ranges, Fishing Access Sites, and State Parks | **Objective:** To prevent user conflicts, incompatible uses in areas with high recreational values, provide the opportunity for quality recreation experiences, and to protect habitat suitability. |
| | | **Waiver:** This stipulation may be waived by the authorized officer, in consultation with the State of Montana, determines that the entire leasehold no longer contains a State of Montana management area or leasing is allowed. |
| | | **Exception:** An exception may be granted by the authorized officer, in consultation with the State of Montana, if the operator submits a plan demonstrating that impacts from the proposed action are acceptable or can be mitigated. |
| | | **Modification:** The boundaries of the area may be modified by the authorized officer, in consultation with the State of Montana; if it is determined the management boundaries can be changed. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 263 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource: *Recreation* | Stipulation | Objective, Waiver, Exception, Modification |
| --- | --- | --- |
| Resource: *Areas of Critical Environmental Concern* | Stipulation | Objective, Waiver, Exception, Modification |
| ACEC | Surface occupancy and use is prohibited within the following areas of critical environmental concern:<br>• Acid-Shale Pine Forest ACEC<br>• Square Butte ACEC | **Objective:** To provide protection needed in order to preserve the qualities that prompted the BLM to designate these ACECs.<br><br>**NO WAIVER, EXEMPTIONS OR MODIFICATIONS.** |

| Resource: *National Trails* | Stipulation | Objective, Waiver, Exception, Modification |
| --- | --- | --- |
| National Scenic Trails | Surface occupancy and use prohibited within national scenic and historic trails management corridors containing High Potential Route Segments and Sites, and within 300 feet, or within the viewshed (whichever is less) from NST and NHT centerlines. | *Objective: The purpose of this lease stipulation is to protect the nature and purposes; trail resources, qualities, values and associated settings; and primary use or uses of the historic and scenic trails, in accordance with the National Trails System Act.*<br>*Exception: This stipulation may be excepted when the operator submits a comprehensive trail inventory, as outlined in Manual 6280, and presents a proposal which demonstrates resource values are not affected or that adverse effects can be adequately mitigated to prevent effects to:*<br>• The nature and purposes of the trail<br>• National Trail resources, qualities, values and associated settings.<br>• National Trail primary use or uses.<br>• The National Trail from the cumulative or trail-wide perspective.<br>*Modification: A modification may be granted should the trail be relocated or effects of the action will not be noticed by users of the trail.* |
| National Scenic Trails | No surface occupancy or use is allowed within 0.5 mile of the Continental Divide NST. | *Objective: Preserve and protect scenic character of the landscape along the trail. Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.*<br>*Waiver: A waiver may be granted if the trail is moved from current location.*<br>*Exception: An exception may be granted if this portion of the trail is relocated or if operator submits a plan that demonstrates the effects to the area and the user experiences can be mitigated.*<br>*Modification: A modification may be granted should the trail be relocated or effects of the action will not be noticed by users of the trail.* |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 264 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-1, No Surface Occupancy Stipulations for Fluid Minerals Leasing)

| Resource:<br>*National Trails* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **National Historic Trails** | Surface occupancy and use is prohibited within the National Trail Management Corridor of designated NHTs. Designated NHTs include the Lewis and Clark Trail and the Nez Perce Trail. | **Objective:** To protect the nature and purpose; trail resources, qualities, values, and associated settings; and primary use or uses of the historic trail, in accordance with National Trail System Act.<br><br>**Exception:** An exception to this stipulation may be granted by the Authorized Officer if the lessee or project proponent completes a comprehensive trail inventory, as outlined in Manual 6280, and presents a proposal which demonstrates resource values are not affected or that adverse effects can be adequately mitigated to prevent effect to:<br>• The nature and purposes of the National Trail.<br>• National Trail resources, qualities, values, and associated settings.<br>• National Trail primary use or uses.<br>• The National Trail from the cumulative or trail-wide perspective.<br><br>**Modification**: None.<br><br>***Waiver:*** *None.* |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 265 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-2, Controlled Surface Use Stipulations for Fluid Minerals Leasing)

**Table L-2**
**Controlled Surface Use Stipulations for Fluid Minerals Leasing**

| Resource:<br>*Air Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **NO$_2$ NAAQS** | Surface occupancy and use is subject to the requirement that each diesel-fueled non-road engine with greater than 200 horsepower design rating to be used during drilling or completion activities meets one of the following two criteria: (1) the engine was manufactured to meet EPA NOx emission standards for Tier 4 non-road diesel engines, or (2) the engine emits NOx at rates less than or equal to EPA emission standards for Tier 4 non-road diesel engines. | **Objective:** To protect air resources and meet the 1-hour NO$_2$ NAAQS.<br><br>**Exception:** An exception may be granted by the AO if air quality modeling, air quality monitoring, or other information demonstrates compliance with the NO$_2$ NAAQS.<br><br>**Modification:** This stipulation may be modified if the EPA or the applicable state environmental agency adds, deletes, or revises NOx emission standards for drill rig, completion rig, or non-road engines.<br><br>**Waiver:** The stipulation may be waived if new information demonstrates that compliance with the NO$_2$ NAAQS will be achieved consistently throughout the lease area. The stipulation may also be waived if the NO$_2$ NAAQS is revoked or otherwise rendered inapplicable to drilling/completion operations. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 266 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-2, Controlled Surface Use Stipulations for Fluid Minerals Leasing)

| Resource: *Soil Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Soils - Sensitive Soils** | Surface occupancy and use will be controlled on sensitive soils. Sensitive soils are determined using a combination of slope and soil erodibility. Prior to surface disturbance on sensitive soils, a reclamation plan must be approved by the Authorized Officer. The plan must demonstrate the following: (1) no other practicable alternatives exist for relocating the activity, (2) the activity will be located to reduce effects to soil and water resources, (3) site productivity will be maintained or restored, (4) surface runoff and sedimentation will be adequately controlled, (5) on- and off-site areas will be protected from accelerated erosion, (6) that no areas susceptible to mass wasting would be disturbed and (7) surface-disturbing activities will be prohibited during extended wet periods. | **Objective:** To maintain the chemical, physical, and biotic properties of soils, this includes maintaining soil productivity, soil stability, and soil biotic properties. This will prevent excessive erosion, potential mass wasting, and improve the likelihood of successful reclamation.<br><br>**Waiver:** The Authorized Officer may waive this stipulation if it is determined that the entire leasehold does not contain sensitive soils.<br><br>**Exception:** The Authorized Officer may grant an exception to this stipulation if the operator can demonstrate that the proposed action will not contribute to degradation of the soil resource (e.g. excessive soil erosion, mass wasting, and/or lost productivity) or downslope resource conditions (e.g. reduced water quality due to sedimentation).<br><br>**Modification:** The Authorized Officer may modify the area affected by this stipulation if it is determined that portions of the leasehold do not contain sensitive soils. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 267 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-2, Controlled Surface Use Stipulations for Fluid Minerals Leasing)

| Resource: *Vegetative Communities* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Riparian, Wetlands** | Surface occupancy and use is subject to the following operating constraints: prior to surface occupancy and use within 300 feet of riparian and/or wetland areas, a plan must be approved by the Authorized Officer with design features that demonstrate how all actions would maintain and/or improve the functionality of riparian/wetland areas. The plan would address: (a) potential effects to riparian and wetland resources, (b) mitigation to reduce effects to acceptable levels (including timing restrictions), (c) post project restoration, and (d) monitoring (the operator must conduct monitoring capable of detecting early signs of changing riparian and/or wetland conditions). | **Objective:** To protect the unique biological and hydrological features associated with wetland and riparian areas. Disturbances adjacent to wetland and/or riparian areas (including road use) can adversely effect these sensitive areas. This stipulation would protect these features from indirect effects produced within the adjacent ground. This would also encompass the floodplain along most first to third order streams.<br><br>**Waiver:** This stipulation can be waived by the Authorized Officer if it is determined that the entire lease area does not contain wetlands or riparian areas.<br><br>**Exception:** The Authorized Officer may grant an exception to this stipulation if the operator can demonstrate that the proposed action would not adversely effect wetland or riparian function or associated water quality.<br><br>**Modification:** The area affected by this stipulation can be modified by the Authorized Officer if it is determined that portions of the lease area do not contain wetlands or riparian areas. |

| Resource: *Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Greater Sage-Grouse General Habitat Management Areas (GHMAs)** | Within Greater Sage-Grouse general habitat surface-disturbing or disruptive activities may be restricted or prohibited within 2 miles of Greater Sage-Grouse leks. Prior to surface-disturbing or disruptive activities, a plan to maintain functionality of Greater Sage-Grouse habitat will be prepared by the proponent and implemented upon approval by the authorized officer. This plan shall address how short-term and long-term direct and indirect effects to nesting and brood-rearing areas will be mitigated based on current science and research. | **Objective:** To protect the integrity of the habitat to maintain or improve Greater Sage-Grouse populations.<br><br>**Exception:** The AO may grant an exception if an environmental review determines that the action, as proposed or conditioned would not compromise the functionality of the habitat for Greater Sage-Grouse and would meet the objective for Greater Sage-Grouse habitat and populations. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 268 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-2, Controlled Surface Use Stipulations for Fluid Minerals Leasing)

| Resource: *Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Greater Sage-Grouse General Habitat Management Areas (GHMAs)** (continued) | *(see above)* | **Modification:** The AO may modify the area subject to the stipulation if an environmental analysis finds that a portion of the area is no longer Greater Sage-Grouse habitat and supports no Greater Sage-Grouse populations.<br><br>**Waiver:** The AO may waive this stipulation if no portion of the leasehold is within 2 miles of the perimeter of an active lek. |

| Resource: *Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Winter Range (pronghorn, elk, moose, bighorn sheep, mule and whitetail deer)** | Prior to surface occupancy and use a plan shall be prepared by the proponent as a component of the application for permit to drill, sundry notice, etc. and approved by the Authorized Officer with confirmation from the state wildlife management agency. The operator shall not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction the function and suitability of the habitat will not be impaired. | **Objective:** To protect winter range utilized during mild to severe winters by big game identified as BLM priority species for management; including; white-tailed deer, mule deer, elk, pronghorn, moose, and bighorn sheep.<br><br>**Waiver:** The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if the entire leasehold is no longer big game winter range habitat.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not impair the function or suitability of the winter range habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold are no longer big game winter range habitat. |
| **Elk Calving Grounds** | Surface occupancy and use is subject to the following operating constraints: prior to surface occupancy and use, a plan shall be prepared by the proponent as a component of the application for permit to drill, sundry notice, etc. and approved by the Authorized Officer in coordination with the state wildlife management agency. The operator shall not initiate surface-disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction the function and suitability of the habitat will not be impaired. | **Objective:** To protect traditional elk calving ground habitat crucial for successful recruitment of elk calves.<br><br>**Waiver:** The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if the entire leasehold is no longer elk calving habitat.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not to impair the function or suitability of the elk calving habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold are no longer within elk calving habitat. |

| Resource:<br>*Fish and Wildlife* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Bighorn Sheep Range** | Surface occupancy and use is subject to the following operating constraints: Prior to surface occupancy and use a plan shall be prepared by the proponent as a component of the application for permit to drill, sundry notice, etc., and approved by the Authorized Officer in coordination with the state wildlife management agency. The operator shall not initiate surface disturbing activities unless the Authorized Officer has approved the plan. The plan must demonstrate to the Authorized Officer's satisfaction that the function and suitability of the habitat will not be impaired. | **Objective:** To protect bighorn sheep and their habitats, a BLM priority species for management.<br><br>**Waiver**: The Authorized Officer, after coordination with the state wildlife management agency, may waive this stipulation if the entire leasehold is no longer bighorn sheep habitat.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not impair the function or suitability of the bighorn sheep habitat.<br><br>**Modification:** The Authorized Officer, after coordination with the state wildlife management agency, may modify the boundaries of the stipulated area if portions of the leasehold are no longer within bighorn sheep habitat. |

| Resource:<br>*Visual Resources* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **VRM Class II, III, and IV** | All surface disturbing activities and construction of semi-permanent and permanent facilities in VRM Class II, III, and IV areas may require special design, including location, painting and camouflage, to blend with the natural surroundings and meet the visual quality objectives for each respective class. | **Objective:** Control the visual effects of activities and facilities within acceptable levels.<br><br>**No WAIVER, EXCEPTION, or MODIFICATION** |
| **VRM Class II** | In order to retain the existing character of the landscape (VRM Class II Objective), oil and gas development activities will be located, designed, constructed, operated, and reclaimed within 2 years from initiation of construction so that activities should not attract attention of the casual observer. This stipulation does not apply to maintenance or workover activities. | **Objective:** To protect visual resource values while allowing energy development and related activities to occur which have been mitigated to retain the existing character of the landscape.<br><br>**No WAIVER, EXCEPTION, or MODIFICATION.** |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 270 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-2, Controlled Surface Use Stipulations for Fluid Minerals Leasing)

| Resource: *Recreation* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Arrow Creek BCA, Crooked Creek BCA** | Surface occupancy and use is subject to the following operating constraint:<br><br>Prior to surface use, occupancy or disturbance in BCAs, a plan shall be prepared by the proponent and approved by the AO, with notification to MFWP. The plan must facilitate the long-term maintenance of big game wildlife populations and promote public access to support wildlife-dependent recreation and hunting opportunities. Proposed activities may not alter or depreciate important recreational values located within Backcountry Conservation Areas. | **Objective:** To facilitate long-term maintenance of big game wildlife populations and access to support primitive recreation and hunting opportunities.<br><br>**No WAIVER, EXCEPTION, or MODIFICATION.** |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 271 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-3, Timing Limitation Stipulations Applicable to Fluid Minerals Leasing)

**Table L-3**
**Timing Limitation Stipulations Applicable to Fluid Minerals Leasing**

| Resource:<br>*Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Water bird Nesting Colony** | Apply TL within 0.5 mile[7] of a water bird nesting colony from April 1 – July 15. Priority species for management includes special status species in addition to the following species regardless of special status designation:<br><br>• American white pelican<br>• Black-crowned night heron<br>• Black tern<br>• Caspian tern<br>• Clark's grebe<br>• Common tern<br>• Double-crested cormorant<br>• Forster's tern<br>• Franklin's gull<br>• Great blue heron<br>• White-faced ibis | **Objective:** To protect nesting activities associated with colonial-nesting birds identified as BLM priority species for management.<br><br>**Waiver**: The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.5 mile of an active colonial nesting bird colony.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not result in nest territory abandonment or decrease productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.5 mile of an active nesting colony. |

---

[7]Buffer distances of 0.5 mile are recommended by Bendel and Therres (1999), one of the few citations I could find which specifically addresses disturbance related to surface occupancy rather than just human disturbance. However, other citations suggest shorter distances for disturbance during the breeding season. Additional rational for distances related to colonial water birds is needed.

Case 4:20-cv-00062-BMM  Document 10-5  Filed 08/20/20  Page 272 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-3, Timing Limitation Stipulations Applicable to Fluid Minerals Leasing)

| Resource: *Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Sharp-tailed Grouse Lek** | Surface use is prohibited within 2 miles of the perimeter of sharp-tailed grouse leks from April 1 to July 15. | **Objective:** To protect nesting activities associated with sharp-tailed grouse, identified as BLM priority species for management.<br><br>**Waiver**: The Authorized Officer may waive this stipulation after coordination with the state wildlife management agency if the entire leasehold is no longer within 2 miles of a lek, active within the past 5 years.<br><br>**Exception:** The Authorized Officer, after coordination with the state wildlife management agency, may grant an exception if the action will not result in nest territory abandonment or decrease productivity, by substantially interfering with normal breeding.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area after coordination with the state wildlife management agency, if portions of the leasehold are no longer within 2 miles of a lek, active within the past 5 years. |

*Lewistown Approved Resource Management Plan*

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 273 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-3, Timing Limitation Stipulations Applicable to Fluid Minerals Leasing)

| Resource:<br>*Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Raptors**[8] | Surface use is prohibited within 0.5 mile of active raptor nest sites from March 1 through July 31 for the following BLM priority species for management. Priority species includes special status species in addition to the following species regardless of special status designation:<br><br>• Burrowing owl<br>• Ferruginous hawk<br>• Golden eagle<br>• Long-eared owl<br>• Merlin<br>• Northern goshawk<br>• Osprey<br>• Prairie falcon<br>• Red-tailed hawk<br>• Sharp-shinned hawk<br>• Short-eared owl<br>• Swainson's hawk | **Objective:** To protect nesting activities associated with raptors identified as BLM priority species for management.<br><br>**Waiver**: The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.5 mile of an active raptor nest.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not to result in nest territory abandonment or decrease productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.5 mile of an active raptor nest. |

[8]Raptor definition for application of stipulations includes raptor species without species specific stipulations noted above. The exact list may vary by RMP but may include the following species: golden eagle, northern goshawk, ferruginous hawk, red-tailed hawk, sharp-shinned hawk, Swainson's hawk, prairie falcon, merlin, osprey, burrowing owl, long-eared owl, and short-eared owl. Because nest structures are often used by different species throughout the life of the structure, these distances and dates should be considered minimums and the site specific assessment should consider the needs of specific species present at the time of the action and adjust accordingly. The 0.25 mile buffer was the distance cited for most of these species in Romin and Muck (2002). Additional species-specific information can be found in Whittington and Allen (2008). Species specific stipulations may be developed if warranted in the planning area, however the language of the stipulation should not vary from these examples, only the distances and dates used.

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 274 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-3, Timing Limitation Stipulations Applicable to Fluid Minerals Leasing)

| Resource: *Special Status Species* | Stipulation | Objective, Waiver, Exception, Modification |
|---|---|---|
| **Mountain Plover** | Surface use is prohibited within 0.25 mile of mountain plover habitat from April 1 through July 15. | **Objective:** To protect nesting activities associated with mountain plovers, a BLM priority species for management.<br><br>**Waiver**: The Authorized Officer may waive this stipulation if the entire leasehold is no longer within 0.25 mile of mountain plover habitat.<br><br>**Exception:** The Authorized Officer may grant an exception if the action will not to result in nest territory abandonment or decrease productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior of mountain plovers.<br><br>**Modification:** The Authorized Officer may modify the boundaries of the stipulated area if portions of the leasehold are no longer within 0.25 mile of mountain plover habitat. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 275 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-4, Lease Notices Applicable to Fluid Minerals Leasing)

**Table L-4**
**Lease Notices Applicable to Fluid Minerals Leasing**

| Resource: *Water Resources/ Vegetative Communities* | Lease Notice |
|---|---|
| Wetlands | The lease parcel is encumbered with a U.S. Fish and Wildlife Wetland and/or Grassland Easement to restrict draining, burning, filling, or leveling of wetlands and/or protection of grassland depending on the specific easement. The operator may be required to implement specific measures to reduce the effects of oil and gas operations on wetlands or grasslands on easements. Additional measures may be developed during the application for permit to drill during the on-site inspection, as well as the environmental review process, consistent with the lease rights granted and in accordance with 43 CFR 3101.1-2. |

| Resource: *Special Status Species* | Lease Notice |
|---|---|
| Special Status Species | The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that would contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM would not approve any ground-disturbing activity that may affect any such species or requirements of the Endangered Species Act as amended, 16 USC § et seq., including completion of any required procedure for conference or consultation. |
| Migratory Bird Treaty Act | The Operator is responsible for compliance with provisions of the Migratory Bird Treaty Act by implementing one of the following measures; a) avoidance by timing; ground disturbing activities will not occur from April 15 to July 15; b) habitat manipulation; render proposed project footprints unsuitable for nesting prior to the arrival of migratory birds (blading or pre-clearing of vegetation must occur prior to April 15 within the year and area scheduled for activities between April 15 and July 15 of that year to deter nesting); or c) survey-buffer-monitor; surveys will be conducted by a BLM approved biologist within the area of the proposed action and a 300 foot buffer from the proposed project footprint between April 15 to July 15 if activities are proposed within this timeframe. If nesting birds are found, activities will not be allowed within 0.1 miles of nests until after the birds have fledged. If active nests are not found, construction activities must occur within 7 days of the survey. If this does not occur, new surveys must be conducted. Survey reports would be submitted to the appropriate BLM office. |
| Greater Sage-Grouse | The lease may in part, or in total contain important Greater Sage-Grouse habitats as identified by the BLM, either currently or prospectively. The operator may be required to implement specific measures to reduce effects of oil and gas operations on the Greater Sage-Grouse populations and habitat quality. Such measures shall be developed during the application for permit to drill on-site and environmental review process and will be consistent with the lease rights granted. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 276 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-4, Lease Notices Applicable to Fluid Minerals Leasing)

| Resource: *Cultural Resources* | Lease Notice |
|---|---|
| **Cultural Resources Lease** | This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act, American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, Executive Order 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the National Historic Preservation Act and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated. |
| **Cultural Resources** | The surface management agency is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Guidance for application of this requirement can be found in NTL-MSO-85-1. This notice would be consistent with present Montana guidance for cultural resource protection related to oil and gas operations (NTL-MSO-85-1). |
| **Sacred and Historic Properties** | Lease is located adjacent to known sacred sites and historic properties, and contains high potential for National Register eligible historic and cultural properties. Lessees are notified that archaeological resource inventory and mitigation costs may be high within this area. A cultural plan of operations will be developed in consultation with the Field Office and must be approved before field development takes place. All surface use plans will be presented to the Field Office archaeologist for review. |

| Resource: *Paleontological Resources* | Lease Notice |
|---|---|
| **Paleontological Resource Inventory Requirement** | This lease has been identified as being located within geologic units rated as being moderate to very high potential for containing significant paleontological resources. The locations meet the criteria for Class 3, 4 and/or 5 as set forth in the Potential Fossil Yield Classification System, WO IM 2008-009, Attachment 2-2. The BLM is responsible for assuring that the leased lands are examined to determine if paleontological resources are present and to specify mitigation measures. Guidance for application of this requirement can be found in WO IM 2008-009 dated October 15, 2007, and WO IM 2009-011 dated October 10, 2008.

Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or project proponent shall contact the BLM to determine if a paleontological resource inventory is required. If an inventory is required, the lessee or project proponent will complete the inventory subject to the following:

• the project proponent must engage the services of a qualified paleontologist, acceptable to the BLM, to conduct the inventory.
• the project proponent will, at a minimum, inventory a 10-acre area or larger to incorporate possible project relocation which may result from environmental or other resource considerations.
• paleontological inventory may identify resources that may require mitigation to the satisfaction of the BLM as directed by WO IM 2009-011. |

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 277 of 663

L. Stipulations and Allocations Applicable to Fluid Minerals Leasing (Table L-4, Lease Notices Applicable to Fluid Minerals Leasing)

| Resource: Lands and Realty | Lease Notice |
|---|---|
| Land Use Authorizations | Land Use Authorizations incorporate specific surface land uses allowed on BLM-administered lands by Authorized Officers and those surface uses acquired by BLM on lands administered by other entities. These BLM authorizations include rights-of-way, leases, permits, conservation easements, and Recreation and Public Purpose Act (R&PPA) leases and patents. |
| | The rights acquired, reserved, or withdrawn by the BLM for specified purposes include non-oil and gas leases, conservation easements, archeological easements, road easements, fence easements, and administrative site withdrawals. The existence of such land use authorizations shall not preclude the leasing of the oil and gas. The locations of land use authorizations are noted on the oil and gas plats and in LR2000. The plats are a visual source noting location; LR2000 provides location by legal description through the Geographic Cross Reference program. |
| | The specifically authorized acreage for land use should be avoided by oil and gas exploration and development activities. All authorized surface land uses are valid claims to prior existing rights unless the authorization states otherwise. |
| | The right of the Secretary to issue future land use authorizations on an oil and gas lease is reserved by provision of Section 29 of the Mineral Leasing Act, 30 U.S.C. |
| Setback from Human Occupied Residences | The lease area may contain human occupied residences. Under Regulation 43 CFR 3101.1-2 and terms of the lease (BLM Form 3100-11), the Authorized Officer may require reasonable measures to minimize adverse effects to other resource values, land uses, and users not addressed in lease stipulations at the time operations are proposed. Such reasonable measures may include, but are not limited to, modification of siting or design of facilities, which may require relocating proposed operations up to 200 meters, but not off the leasehold. |
| | The setback requirement of 500 feet from human occupied residences has been established based upon the best information available. The following condition of approval may be applied as a result of the APD process during the on-site inspection and the environmental review unless an acceptable plan for mitigation of effects is reached between the resident, lessee and BLM: |
| | • Facilities will not be allowed within 500 feet of human occupied residences. |
| | The intent of this Lease Notice is to provide information to the lessee that would help design and locate oil and gas facilities to preserve the aesthetic qualities around human occupied residences. |
| Cemeteries | Portions of the lands in this parcel are occupied by a cemetery. As per the Standard Stipulation (May 2001) attached to this lease, occupancy will be excluded from the cemetery and a 300 foot buffer zone around the cemetery |

This page intentionally left blank

# Appendix Q
## Recreation Management Areas

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                      Page

**Appendix Q. Recreation Management Areas...........................................................................Q-1**

Q.1     Judith Mountains Special Recreation Management Area, Judith Peak/Red
        Mountain Recreation Management Zones...............................................................Q-1
Q.2     Judith Mountains Special Recreation Management Area, Limekiln Canyon
        Recreation Management Zone .................................................................................Q-3
Q.3     Lowry Bridge Special Recreation Management Area ...........................................Q-5
Q.4     North Moccasin Special Recreation Management Area.......................................Q-7
Q.5     Snowy Mountains Special Recreation Management Area ....................................Q-9
Q.6     Arrow Creek Backcountry Conservation Area....................................................Q-11
Q.7     Crooked Creek Backcountry Conservation Area.................................................Q-13
Q.8     Judith Extensive Recreation Management Area ..................................................Q-15
Q.9     Recreation Setting Characteristics Matrix...........................................................Q-17

# FIGURES

                                                                                                            Page

Q-1     Judith Mountains Special Recreation Management Area...........................................Q-19
Q-2     Lowry Bridge Special Recreation Management Area................................................Q-20
Q-3     North Moccasin Recreation Management Area........................................................Q-21
Q-4     Snowy Mountains Recreation Management Area.....................................................Q-22
Q-5     Arrow Creek Backcountry Conservation Area.........................................................Q-23
Q-6     Crooked Creek Backcountry Conservation Area.....................................................Q-24
Q-7     Judith Extensive Management Area..........................................................................Q-25

This page intentionally left blank.

# Appendix Q. Recreation Management Areas

## Q.1   JUDITH MOUNTAINS SPECIAL RECREATION MANAGEMENT AREA, JUDITH PEAK/RED MOUNTAIN RECREATION MANAGEMENT ZONES

***Objective:*** *Participants in visitor assessments report an average 4.0 realization of the targeted experiences and benefit outcome stated in the following table (4.0, on a probability scale, where 1=not at all realized to 5=totally realized). (see **Figure Q-1**, Judith Mountains Special Recreation Management Area)*

| | **Lewistown ARMP** |
|---|---|
| *Targeted Activities* | Camping, hiking, scenic viewing, casual rock collection; and winter activities: cross-country skiing and snowshoeing |
| *Targeted Experiences* | • Enjoying exploration.<br>• Having a greater understanding about what will happen while here.<br>• Enjoying peace and quiet.<br>• Enjoying social interactions and family togetherness.<br>• Enjoying participation in outdoor activities. |
| *Targeted Benefits* | • Enhanced ability for visitors to find areas providing recreation experiences and benefits.<br>• Experiencing greater self-reliance.<br>• Developing improved skills for outdoor enjoyment with others.<br>• Developing improved community cooperation and involvement with site maintenance.<br>• Having a closer relationship with the natural world. |

| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | | |
|---|---|---|
| *Physical* | *Remoteness* | • Enjoying Front country |
| | *Naturalness* | • Rural |
| | *Facilities* | • Back country<br>• Middle country |
| *Social* | *Contacts* | • Back country |
| | *Group Size* | • Front country |
| | *Evidence of Use* | • Front country |
| *Operational* | *Access* | • Primitive/back country |
| | *Visitor Services* | • Back country |
| | *Management Controls* | |

| **Management Actions and Allowable Use Decisions** | |
|---|---|
| *Visual Resource Management (VRM) Class* | Manage as VRM Class III. |
| *Rights-of-Way (ROW)* | • Available for ROW location<br>• Consider whether the function or suitability of the recreation experience and benefits will be impaired. |
| *Leasable Minerals: Fluids and Solids* | Open |
| *Locatable Minerals* | Designate the Judith Peak diamonds area for casual rock collection. |
| *Mineral Materials* | Open |
| *Special Recreation Permits (SRPs)* | • Require all SRPs to be beneficial or neutral to the recreation management zone (RMZ).<br>• Authorize organized and competitive SRP events that do not create user conflicts. |
| *Travel Management* | Limited |

| Lewistown ARMP | |
|---|---|
| *Forestry/Fire* | • Forest management activities may be undertaken to accomplish resource objectives while maintaining the character of the area.<br>• Allow mechanical manipulation, such as chainsaws and helicopters, while maintaining the character of the area.<br>• Allow the suppression of wildfires using mechanized equipment. |
| **Implementation Actions** | |
| *Management* | • Evaluate Red Mountain for a trail system.<br>• Manage for camping opportunities.<br>• Manage for motorized and nonmotorized activities.<br>• Allow prescribed burning to mimic natural processes.<br>• Allow for herbicide application to maintain and restore native vegetation.<br>• Manage for projects to restore riparian and stream functions.<br>• Support native fish restoration projects.<br>• Management activities will emphasize the protection and enhancement of wildlife and habitat and fisheries within the Judith Mountains SRMA.<br>• Management activities will emphasize the protection of cave and karst features and associated wildlife values of Tate-Poetter Cave.<br>• Consider installation of water developments that benefit wildlife.<br>• Maintain improved roads, primitive roads, and motorized trails located outside of the Special Recreation Management Area (SRMA) that serve as important access points.<br>• Maintain primitive roads and motorized trails located within the SRMA boundaries that are important for public access.<br>• Manage primitive roads and motorized trails within the SRMA boundaries to maintain the existing character; do not improve primitive roads and motorized trails to a higher transportation standard.<br>• Restrict the construction of new improved roads, primitive roads, and motorized trails within designated areas, allowing for emergencies and valid existing rights, to conserve unfragmented habitat and hunting and fishing opportunities. |
| *Administration* | • Pursue partnerships with local clubs for adopt-a-trail programs and to support area maintenance.<br>• Manage issues that impact public safety. |
| *Information and Education* | • Provide visitor services, such as trail identification and route signs, information kiosks, and visitor use maps onsite.<br>• Post rules and regulations regarding camping at all developed campsites. |
| *Monitoring* | Supported by BLM field staff, in conjunction with collaborating partnerships and agencies. |
| *Facility Development* | • Provide visitor services, such as trail identification, route signs, portal entry kiosks, and access maps.<br>• Develop staging and parking areas to protect resources.<br>• Designate camping sites for both developed and dispersed sites.<br>• Include in developed sites camping pads, vault toilets, picnic tables, fire pits, and shelters.<br>• Develop trailhead at Collar Gulch.<br>• Develop interpretive site at Judith Peak Scenic Overlook. |
| *Camping Restrictions* | • 16-day camping limit rules apply.<br>• 10-day caching limit (caching limit included in camping limit).<br>• Pack in/pack out policy must be adhered to at all times.<br>• Montana camping rules must be adhered to at all times, including camping within 300 feet of an open road on BLM-administered land. |
| *Travel Management* | • Designate the area as limited to designated routes.<br>• Emphasize non-motorized travel in watersheds containing populations of westslope cutthroat trout. |

## Q.2   JUDITH MOUNTAINS SPECIAL RECREATION MANAGEMENT AREA, LIMEKILN CANYON RECREATION MANAGEMENT ZONE

***Objective:*** *Participants in visitor assessments report an average 4.0 realization of the targeted experiences and benefit outcome stated in the following table. (4.0, on a probability scale, where 1=not at all realized to 5=totally realized).  (see **Figure Q-1**, Judith Mountains Special Recreation Management Area)*

| Lewistown ARMP | |
|---|---|
| *Targeted Activities* | Camping, hiking, horseback riding, mountain biking, scenic viewing, and caving; and winter activities: cross-country skiing and snowshoeing. |
| *Targeted Experiences* | • Enjoying access to close-to-home outdoor amenities.<br>• Enjoying meeting new people with similar interests.<br>• Enjoying exploration.<br>• Releasing or reducing stress.<br>• Getting physical exercise.<br>• Savoring a natural experience. |
| *Targeted Benefits* | • Enhanced ability for visitors to find areas providing wanted recreation experiences and benefits.<br>• Greater sensitivity to/respect for other visitors.<br>• Greater understanding of the importance of recreation and tourism in our community.<br>• Enlarged sense of personal accountability for acting responsibly on public lands.<br>• Improved community cooperation and involvement with site maintenance. |
| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | |

| | | |
|---|---|---|
| **Physical** | *Remoteness* | Front country |
| | *Naturalness* | Rural |
| | *Facilities* | Front country |
| **Social** | *Contacts* | Middle country |
| | *Group Size* | Primitive |
| | *Evidence of Use* | Middle country |
| **Operational** | *Access* | Middle country |
| | *Visitor Services* | Middle country |
| | *Management Controls* | Back country |

| **Management Actions and Allowable Use Decisions** | |
|---|---|
| *Visual Resource Management (VRM) Class* | Manage as VRM Class III. |
| *Rights-of-Way (ROW)* | • Available for ROW location.<br>• Consider whether the function or suitability of the recreation experience and benefits will be impaired. |
| *Leasable Minerals: Fluids and Solids* | Open |
| *Locatable Minerals* | Open |
| *Mineral Materials* | Open |
| *Special Recreation Permits (SRPs)* | • Require that all SRPs be beneficial or neutral to the recreation management zone (RMZ).<br>• Authorize organized and competitive SRP events that do not create user conflicts. |
| *Travel Management* | Limited |
| *Forestry/Fire* | • Forest management activities may be undertaken to accomplish resource objectives, while maintaining the character of the area. |

| **Lewistown ARMP** | |
|---|---|
| | • Allow mechanical manipulation, such as chainsaws and helicopters, while maintaining the character of the area.<br>• Allow the suppression of wildfires using mechanized equipment. |
| **Implementation Actions** | |
| *Management* | • Manage Limekiln Canyon for primarily nonmotorized and mechanized activities and camping opportunities.<br>• Evaluate the eastern portion of the RMZ for developing additional nonmotorized and mechanized trails.<br>• Allow prescribed burning to mimic natural processes.<br>• Allow herbicide application to maintain and restore native vegetation.<br>• Manage for projects to restore riparian and stream functions.<br>• Support native fish restoration projects.<br>• Management activities will emphasize the protection and enhancement of wildlife and habitat and fisheries within the Judith Mountains SRMA.<br>• Management activities will emphasize the protection of cave and karst features and associated wildlife values of Crystal Cave.<br>• Consider installing water developments that benefit wildlife.<br>• Maintain improved roads, primitive roads, and motorized trails outside of the Special Recreation Management Area (SRMA) that serve as important access points.<br>• Maintain primitive roads and motorized trails in the SRMA boundaries that are important for public access.<br>• Manage primitive roads and motorized trails in the SRMA boundaries to maintain the existing character and do not improve primitive roads and motorized trails to a higher transportation standard.<br>• Restrict the construction of new improved roads, primitive roads, and motorized trails within designated areas, allowing for emergencies and valid existing rights, to conserve unfragmented habitat and hunting and fishing opportunities. |
| *Administration* | • Pursue partnerships with local clubs for adopt-a-trail programs and to support area maintenance.<br>• Manage issues that impact public safety. |
| *Information and Education* | • Provide visitor services, such as trail identification and route signs, information kiosks, and visitor use maps onsite.<br>• Post rules and regulations regarding camping at all developed campgrounds. |
| *Monitoring* | Supported by BLM field staff in conjunction with collaborating partnerships and agencies. |
| *Facility Development* | • Provide visitor services, such as trail identification, route signs, portal entry kiosks, and access maps.<br>• Develop staging and parking areas to protect resources.<br>• Designate camping sites for both developed and dispersed sites; developed sites may include camping pads, vault toilets, picnic tables, fire pits, and shelters.<br>• Consider an additional trail system that expands into the eastern portion of the RMZ. |
| *Camping Restrictions* | • 16-day camping limit rules apply.<br>• 10-day caching limit (caching limit included in camping limit).<br>• Pack in/pack out policy must be adhered to at all times.<br>• Montana camping rules must be adhered to at all times, including camping within 300 feet of an open road on BLM-administered land. |

## Q.3   LOWRY BRIDGE SPECIAL RECREATION MANAGEMENT AREA

*Objective: Participants in visitor assessments report an average 4.0 realization of the targeted experiences and benefit outcome stated in the following table (4.0, on a probability scale, where 1=not at all realized to 5=totally realized). (see Figure Q-2, Lowry Bridge Special Recreation Management Area)*

| Lewistown ARMP | |
|---|---|
| *Targeted Activities* | Camping, picnicking, fishing and boating access. |
| *Targeted Experiences* | • Enjoying the closeness of friends and family.<br>• Releasing or reducing stress.<br>• Savoring the total sensory (sight, sound, and smell) experience of a natural landscape.<br>• Enjoying easy access to natural landscapes.<br>• Escaping everyday responsibilities. |
| *Targeted Benefits* | • Improved appreciation of nature's splendor.<br>• Stronger ties with family and friends.<br>• A more outdoor-oriented lifestyle.<br>• Enhanced ability for visitors to find areas providing recreation experiences and benefits. |
| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | |

| | | |
|---|---|---|
| *Physical* | *Remoteness* | Rural |
| | *Naturalness* | Rural |
| | *Facilities* | Front country |
| *Social* | *Contacts* | Back country |
| | *Group Size* | Back country |
| | *Evidence of Use* | Rural |
| *Operational* | *Access* | Front country |
| | *Visitor Services* | Front country |
| | *Management Controls* | Front country |

| **Management Actions and Allowable Use Decisions** | |
|---|---|
| *Visual Resource Management (VRM) Class* | Manage as VRM Class IV. |
| *Rights-of-Way (ROW)* | • Available for ROW location.<br>• Consider whether the function or suitability of the recreation experience and benefits will be impaired. |
| *Leasable Minerals: Fluids* | Open |
| *Leasable Minerals: Coal and Nonenergy Solids* | Open |
| *Locatable Minerals* | Open |
| *Mineral Materials* | Open |
| *Special Recreation Permits (SRPs)* | All SRPs must be beneficial or neutral. |
| *Forestry* | Forest management activities may be undertaken to accomplish resource objectives. |

| Lewistown ARMP | |
|---|---|
| **Implementation Actions** | |
| *Management* | • Designate campsites. |
| *Administration* | Pursue partnerships with local groups to support area maintenance. |
| *Information and Education* | • Provide visitor services, such as information kiosks and directional signs, from the highway.<br>• Post rules and regulations on camping, food storage, and pack in/pack out policy. |
| *Monitoring* | Supported by BLM law enforcement, recreation staff, and volunteer camp hosts. |
| *Facility Development* | • Provide visitor services, such as informational kiosks and directional signs, from main access points.<br>• Expand number of developed campsites. |
| *Camping Restrictions* | • 3-day camping limit rules apply.<br>• Pack in/pack out policy must be adhered to at all times.<br>• Food storage compliance is required.<br>• Store and dispose of garbage, food, and other possible wildlife attractants. |

## Q.4   NORTH MOCCASIN SPECIAL RECREATION MANAGEMENT AREA

*Objective: Participants in visitor assessments report an average 4.0 realization of the targeted experiences and benefit outcome stated in the following table (4.0, on a probability scale, where 1=not at all realized to 5=totally realized). (see **Figure Q-3**, North Moccasin Recreation Management Area)*

| | Lewistown ARMP |
|---|---|
| Targeted Activities | Riding all-terrain-vehicles (ATVs) and dirt bikes. |
| Targeted Experiences | • Developing skills and abilities.<br>• Feeling good about solitude, isolation, and independence.<br>• Feeling good about how this attraction is being used and enjoyed.<br>• Enjoying access to close-to-home outdoor amenities.<br>• Enjoying exploration.<br>• Releasing or reducing stress. |
| Targeted Benefits | • Greater opportunity for people with the same skills to recreate in the same place.<br>• Improved mental well-being.<br>• Improved skills with equipment for enjoying the outdoors.<br>• Enhanced sense of personal freedom.<br>• Improved appreciation of public land with access.<br>• Enhanced ability for visitors to find areas providing wanted recreation experiences and benefits. |

| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | | |
|---|---|---|
| Physical | Remoteness | Middle country |
| | Naturalness | Front country |
| | Facilities | Back country |
| Social | Contacts | Back country |
| | Group Size | Primitive/back country |
| | Evidence of Use | Middle country |
| Operational | Access | Middle country |
| | Visitor Services | Primitive |
| | Management Controls | Primitive |

| **Management Actions and Allowable Use Decisions** | |
|---|---|
| Visual Resource Management Class (VRM) Class | Manage as VRM Class IV. |
| Rights-of-Way (ROW) | • Available for ROW location.<br>• Consider whether the function or suitability of the recreation experience and benefits will be impaired. |
| Leasable Minerals: Fluids | Open |
| Leasable Minerals: Coal and Nonenergy Solids | Open |
| Locatable Minerals | Open |
| Mineral Materials | Open |
| Special Recreation Permits (SRPs) | All SRPs must be beneficial or neutral. |
| Forestry | Forest management activities may be undertaken to accomplish resource objectives. |
| Travel Management | Designate travel as limited to designated routes. |

| Lewistown ARMP | |
|---|---|
| **Implementation Actions** | |
| *Management* | • Trail maintenance.<br>• Any additional facilities, such as tables, fire pits, and toilets, will be designed for recreation experiences and benefits.<br>• Develop and designate a trail system that supports both ATVs and dirt bikes. |
| *Administration* | • Pursue developing collaborative partnerships.<br>• Pursue partnerships with local clubs for adopt-a-trail programs and to support area maintenance. |
| *Information and Education* | • Promote recreational off-highway-vehicle (OHV)-based tourism.<br>• Develop and provide recreation access maps.<br>• Develop and provide informational and regulatory signs and kiosks at major access points and staging areas. |
| *Monitoring* | Supported by BLM law enforcement and recreation staff. |
| *Facility Development* | • Develop trail systems specifically for ATVs and dirt bikes (width restrictions).<br>• Develop loop systems.<br>• Develop staging and parking areas to protect resources.<br>• Provide visitor services with trail identification, route signs, portal entry kiosks, and access maps. |
| *Camping Restrictions* | • 16-day camping limit rules apply.<br>• 10-day caching limit (caching limit included in camping limit).<br>• Pack in/pack out policy must be adhered to at all times. |

## Q.5   SNOWY MOUNTAINS SPECIAL RECREATION MANAGEMENT AREA

*Objective: Participants in visitor assessments to report an average 4.0 realization of the targeted experiences and benefit outcome stated in the following table (4.0, on a probability scale, where 1=not at all realized to 5=totally realized). (see Figure Q-4, Snowy Mountains Recreation Management Area)*

| Lewistown ARMP | |
|---|---|
| Targeted Activities | Hunting, hiking, horseback riding, picnicking, snowshoeing, and cross-country skiing. |
| Targeted Experiences | • Developing skills and abilities.<br>• Testing endurance.<br>• Savoring the total sensory (sight, sound, and smell) experience of a natural landscape.<br>• Experiencing a greater sense of independence.<br>• Contemplating human's relationship with the land. |
| Targeted Benefits | • A more holistic sense of wellness.<br>• Improved outdoor knowledge and self-confidence.<br>• Greater sensitivity to, and awareness of, outdoor aesthetics, nature, and its elegance.<br>• Improved physical fitness and health maintenance.<br>• Increased awareness and protection of natural landscapes. |
| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | |
| Physical | Remoteness | Front country |
| | Naturalness | Middle country |
| | Facilities | Back country/middle country |
| Social | Contacts | Middle country |
| | Group Size | Back country |
| | Evidence of Use | Middle country |
| Operational | Access | Front country |
| | Visitor Services | Primitive/back country |
| | Management Controls | Primitive/back country |
| **Management Actions and Allowable Use Decisions** | |
| Visual Resource Management (VRM Class)<br><br>Rights-of-Way (ROW) | • Manage as VRM Class III (390 acres).<br>• Manage as VRM Class IV (80 acres).<br>• Available for ROW location.<br>• Consider whether the function or suitability of the recreation experience and benefits will be impaired. |
| Leasable Minerals: Fluids | Open |
| Leasable Minerals: Coal and Nonenergy Solids | Open |
| Locatable Minerals | Open |
| Mineral Materials | Open |
| Special Recreation Permits (SRPs) | All SRPs must be beneficial or neutral. |
| Forestry | Forest management activities may be undertaken to accomplish resource objectives. |
| Travel Management | Designate travel as limited to designated routes. |

| Lewistown ARMP | |
|---|---|
| **Implementation Actions** | |
| *Management* | • Trailhead maintenance.<br>• Develop facilities at staging areas, such as tables, fire pits, and toilets, that positively influence recreation benefits and experiences |
| *Administration* | Pursue partnerships with local clubs to support site maintenance. |
| *Information and Education* | • Provide visitor services, such as trail identification and route signage, information kiosks, and visitor use maps onsite.<br>• Post rules and regulations regarding camping at all developed campgrounds. |
| *Monitoring* | Supported by BLM law enforcement and recreation staff. |
| *Facility Development* | • Develop staging and parking areas to protect resources.<br>• Develop and designate camping sites.<br>• Developed sites may include informational kiosks, visitor registers, camping pads, vault toilets, picnic tables, fire pits, and shelters. |
| *Camping Restrictions* | • 16-day camping limit rules apply.<br>• 10-day caching limit (caching limit included in camping limit).<br>• Pack in/pack out policy must be adhered to at all times. |
| *Travel Management* | • Develop new trails that access National Forest System lands.<br>• Maintain BLM routes. |

## Q.6    ARROW CREEK BACKCOUNTRY CONSERVATION AREA

*Objective: Manage the Arrow Creek Backcountry Conservation Area (BCA) as an intact landscape to provide visitors a primitive recreation experience to benefit hunters for big game and upland birds. (see **Figure Q-5**, Arrow Creek Backcountry Conservation Area)*

| | | Lewistown ARMP |
|---|---|---|
| Targeted Activities | | Manage for primitive recreation in support of hunters and anglers. |
| Targeted Experiences | | No similar action. |
| Targeted Benefits | | No similar action. |
| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | | |
| Physical | Remoteness | Back country |
| | Naturalness | Middle country |
| | Facilities | Primitive |
| Social | Contacts | Primitive |
| | Group Size | Primitive |
| | Evidence of Use | Back country |
| Operational | Access | Middle country |
| | Visitor Services | Primitive |
| | Management Controls | Primitive |
| **Management Actions and Allowable Use Decisions** | | |
| Visual Resource Management (VRM) Class | | Manage as VRM Class II. |
| Rights-of-Way (ROW) | | ROW Avoidance and Wind Energy Exclusion |
| Leasable Minerals: Fluids and Solids | | • Manage as CSU for fluid mineral leasing<br>• Open to non-energy leasables |
| Locatable Minerals | | • Open |
| Mineral Materials | | • Open to mineral materials (subject to underlying prescriptions for Greater Sage-Grouse management) |
| Special Recreation Permits (SRPs) | | All SRPs must be beneficial or neutral. |
| Travel Management | | • Designate travel as limited to designated routes.<br>• Limited mechanized travel to designated routes, except for game retrieval.<br>• OSV open to existing routes |
| Fire/Forestry | | • Undertake forest management activities to accomplish resource objectives while maintaining the character of the area.<br>• Allow mechanical manipulation, such as with chainsaws and helicopters, while maintaining the character of the area.<br>• Allow the suppression of wildfires using mechanized equipment. |

| Lewistown ARMP | |
|---|---|
| **Implementation Actions** | |
| *Management* | <ul><li>These areas will receive minimal maintenance at dispersed recreation sites.</li><li>Any additional facilities, such as tables, fire pits, and toilets, will be provided for recreation experiences and benefits.</li><li>Manage for camping opportunities.</li><li>Manage for motorized and nonmotorized activities.</li><li>Allow prescribed burning to mimic natural processes.</li><li>Allow for herbicide application to maintain and restore native vegetation.</li><li>Manage for projects to restore riparian and stream functions.</li><li>Support native fish restoration projects.</li><li>Consider installing water developments that benefit wildlife.</li></ul> |
| *Administration* | <ul><li>Manage issues that impact public safety.</li><li>Pursue developing collaborative partnerships.</li></ul> |
| *Information and Education* | <ul><li>Develop a recreation access map and brochure.</li><li>Install and maintain directional signs and signs at key access points.</li></ul> |
| *Monitoring* | Supported by BLM field staff in conjunction with collaborating partnerships and agencies. |
| *Travel Management* | Provide motorized and nonmotorized access to designated routes. |
| *Camping Restrictions* | <ul><li>16-day camping limit rules apply.</li><li>10-day caching limit (caching limit included in camping limit).</li><li>Pack in/pack out policy must be adhered to at all times.</li><li>Montana camping rules must be adhered to at all times, including camping within 300 feet of an open road on BLM-administered land.</li></ul> |

## Q.7    CROOKED CREEK BACKCOUNTRY CONSERVATION AREA

*Objective: Manage the Crooked Creek Backcountry Conservation Area (BCA) as an intact landscape to provide visitors a primitive recreation experience to benefit hunters, anglers, and other recreationists. (see **Figure Q-6**, Crooked Creek Backcountry Conservation Area)*

| | | Lewistown ARMP |
|---|---|---|
| Targeted Activities | | Manage for primitive recreation in support of hunters and anglers. |
| Targeted Experiences | | No similar action. |
| Targeted Benefits | | No similar action. |
| **Recreation Setting Characteristics** *(refer to page Q-27 for descriptions)* | | |
| Physical | Remoteness | Middle country |
| | Naturalness | Middle country |
| | Facilities | Primitive |
| Social | Contacts | Back country |
| | Group Size | Back country |
| | Evidence of Use | Middle country |
| Operational | Access | Middle country |
| | Visitor Services | Back country |
| | Management Controls | Back country |
| **Management Actions and Allowable Use Decisions** | | |
| Visual Resource Management (VRM) Class | | Manage as VRM Class II. |
| Rights-of-Way (ROW) | | ROW Avoidance and Wind Energy Exclusion |
| Leasable Minerals: Fluids and Solids | | • Manage as CSO for fluid mineral leasing<br>• Open to non-energy leasables |
| Locatable Minerals | | Open |
| Mineral Materials | | Open |
| Special Recreation Permits (SRPs) | | All SRPs must be beneficial or neutral. |
| Travel Management | | • Designate travel as limited to designated routes.<br>• Limited mechanized travel to designated routes, except for game retrieval.<br>• OSV open to existing routes |
| Forestry/Fire | | • Forest management activities may be undertaken to accomplish resource objectives, while maintaining the character of the area.<br>• Allow mechanical manipulation, such as chainsaws and helicopters, while maintaining the character of the area.<br>• Allow the suppression of wildfires using mechanized equipment. |

| **Lewistown ARMP** | |
|---|---|
| **Implementation Actions** | |
| *Management* | • These areas will receive minimal maintenance at dispersed recreation sites.<br>• Any additional facilities, such as tables, fire pits, and toilets, will take into consideration recreation experiences and benefits.<br>• Manage for camping opportunities.<br>• Manage for motorized and nonmotorized activities.<br>• Allow prescribed burning to mimic natural processes.<br>• Allow for herbicide application to maintain and restore native vegetation.<br>• Manage for projects to restore riparian and stream functions.<br>• Support native fish restoration projects.<br>• Consider installing water developments that benefit wildlife. |
| *Administration* | • Manage issues that impact public safety.<br>• Pursue developing collaborative partnerships. |
| *Information and Education* | • Develop a recreation access map and brochure.<br>• Install and maintain directional signs and signs at key access points. |
| *Monitoring* | Supported by BLM field staff, in conjunction with collaborating partnerships and agencies. |
| *Facility Development* | Provide facilities for dispersed and unstructured recreation activities. |
| *Camping Restrictions* | • 16-day camping limit rules apply.<br>• 10-day caching limit (caching limit included in camping limit).<br>• Pack in/pack out policy must be adhered to at all times.<br>• Montana camping rules must be adhered to at all times, including camping within 300 feet of an open road on BLM-administered land. |
| *Travel Management* | Provide motorized and nonmotorized access to designated routes. |

## Q.8   JUDITH EXTENSIVE RECREATION MANAGEMENT AREA

*Objective: Manage the Judith Extensive Recreation Management Area (ERMA) fishing reservoirs for visitors to provide dispersed and unstructured recreation. (see **Figure Q-7**, Judith Extensive Management Area)*

| | Lewistown ARMP |
|---|---|
| *Targeted Activities* | Manage eight undeveloped recreation sites associated with these fishing reservoirs:<br>• Drag<br>• Dry Blood<br>• Fritzner<br>• Holland\*<br>• Payola<br>• South Fork Dry Blood<br>• Bubs<br>• Whisker\*<br><br>\*The embankments for Holland and Whisker Reservoirs are not on property administered by the BLM, but the water feature behind the embankment is on BLM-administered land.<br><br>Fisheries potential in active recreation management sites may vary over time depending on sediment accumulation and overall condition of the reservoir which directly affects suitability of these reservoirs to maintain fisheries. |
| *Targeted Experiences* | |
| *Targeted Benefits* | |
| **Management Actions and Allowable Use Decisions** | |
| *Visual Resource Management (VRM) Class* | • Manage as VRM Class III (450 acres).<br>   Manage as VRM Class IV (550 acres). |
| *Rights-of-Way (ROW)* | • Available for ROW location<br>• Consider if the function or suitability of the fisheries and the recreation experience and benefits will be impaired |
| *Leasable Minerals: Fluids* | Open |
| *Leasable Minerals: Coal and Nonenergy Solids* | Open |
| *Locatable Minerals* | Open |
| *Mineral Materials* | Open |
| *Special Recreation Permits (SRPs)* | All SRPs must be beneficial or neutral. |
| *Travel Management* | Designate travel as limited to designated routes. |
| *Forestry* | Forest management activities may be undertaken to accomplish resource objectives. |

| Lewistown ARMP | |
|---|---|
| **Implementation Actions** | |
| *Management* | • These sites will receive minimal maintenance.<br>• Any additional facilities, such as tables, fire pits, and toilets, will be provided in consideration of recreation experiences and benefits. |
| *Administration* | • Manage embankment issues that impact public safety.<br>• Pursue developing collaborative partnerships. |
| *Information and Education* | • Develop a recreation access map and brochure.<br>• Maintain signs at key access points. |
| *Travel Management* | Provide motorized access to reservoirs. |
| *Facility Development* | Provide dispersed and unstructured recreation. |
| *Camping Restrictions* | • 16-Day Camping Limit<br>• Pack in/Pack out garbage policy<br>• Pursue developing collaborative partnerships. |

*Lewistown Approved Resource Management Plan*

## Q.9   RECREATION SETTING CHARACTERISTICS MATRIX

| | Primitive Classification | Back Country Classification | Middle Country Classification | Front Country Classification | Rural Classification | Urban Classification |
|---|---|---|---|---|---|---|
| *Physical Component – Qualities of the Landscape* | | | | | | |
| Remoteness (approx. distance from routes) | More than 0.5 mile from either mechanized or motorized routes | Within 0.5 mile of mechanized routes | Within 0.5 mile of four-wheel drive vehicle, all-terrain-vehicle (ATV), and motorcycle routes | Within 0.5 mile of low-clearance or passenger vehicle routes (including unpaved county roads and private land routes) | Within 0.5 mile of paved/primary roads and highways | Within 0.5 mile of streets and roads in municipalities and along highways |
| Naturalness (landscape texture, form, line, color) | Undisturbed natural landscape | Natural landscape with any modifications in harmony with surrounds and not visually obvious or evident (e.g., stock ponds and trails) | Character of the natural landscape retained; a few modifications contrast with character of the landscape (e.g., fences and primitive roads) | Character of the natural landscape partially modified, but none overpower natural landscape (e.g., roads, structures, and utilities) | Character of the natural landscape considerably modified (e.g., agriculture, residential, or industrial) | Urbanized developments dominate landscape |
| Facilities | No structures; foot/horse and water trails only | Developed trails made mostly of native materials, such as log bridges; structures are rare and isolated | Maintained and marked trails, simple trailhead developments, and basic toilets | Rustic facilities such as campsites, restrooms, trailheads, and interpretive displays | Modern facilities such as campgrounds, group shelters, boat launches, and occasional exhibits | Elaborate full-service facilities such as laundries, restaurants, and grocery stores |
| *Social Component – Qualities Associated with Use* | | | | | | |
| Contacts (avg. with any other group) | Fewer than 3 encounters per day at campsites and fewer than 6 encounters per day on travel routes | 3 to 6 encounters per day off travel routes (e.g., campsites) and 7 to 15 encounters per day on travel routes | 7 to 14 encounters per day off travel routes (e.g., staging areas) and 15 to 29 encounters per day on travel routes | 15 to 29 encounters per day off travel routes (e.g., campgrounds) and 30 or more encounters per day on travel routes | People seem to be generally everywhere | Busy place with other people constantly in view |
| Group Size (average, other than your own) | Fewer than or equal to 3 people per group | 4 to 6 people per group | 7 to 12 people per group | 13 to 25 people per group | 26 to 50 people per group | Greater than 50 people per group |
| Evidence of Use | No alterations of the natural terrain; footprints only observed; sounds of people rare | Areas of alteration uncommon; little surface vegetation wear observed; sounds of people infrequent | Small areas of alteration; surface vegetation showing wear, with some bare soils; sounds of people occasionally heard | Small areas of alteration prevalent; surface vegetation gone, with compacted soils observed; sounds of people regularly heard | A few large areas of alteration; surface vegetation absent, with hardened soils; sounds of people frequently heard | Large areas of alteration prevalent; some erosion; constantly hear people |
| *Operational Component – Conditions Created by Management and Controls over Recreation Use* | | | | | | |
| Access (type of travel allowed) | Foot, horse, and nonmotorized float boat travel | Mountain bikes and perhaps other mechanized use, but all are nonmotorized | Four-wheel drive vehicles, dirt bikes, or snowmobiles, in addition to nonmotorized mechanized use | Two-wheel drives, all-terrain vehicles, but also four-wheel drives and nonmotorized, mechanized use | Ordinary highway auto and truck traffic is characteristic | Wide variety of street vehicles, and highway traffic is ever-present |
| Visitor Services (and information) | No maps or brochures available onsite; staff rarely present to provide onsite assistance | Basic maps, staff infrequently present (e.g., seasonally and high use periods) to provide onsite assistance | Area brochures and maps, staff occasionally present (e.g., most weekends) to provide onsite assistance | Information materials describe recreation areas and activities, staff periodically present (e.g., weekdays and weekends) | Information described to the left, plus experience and benefit descriptions; staff regularly present (e.g., almost daily) | Information described to the left, plus regularly scheduled on-site outdoor demonstrations and clinics |
| Management Controls | No onsite posting and signing of visitor regulations, interpretive information, or ethics; few use restrictions | Basic user regulations at key access points; minimum use restrictions | Some regulatory and ethics signing; moderate use restrictions (e.g., camping and human waste) | Rules, regulations, and ethics clearly posted; use restrictions, limitation, and closures | Regulations strict and ethics prominent; use may be limited by permits and reservations | Enforcement, in addition to rules to reduce conflicts, hazards, and resource damage |

Source: IM No. 2011-004, Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates. Attachment 5, Recreation Setting Characteristics Matrix. BLM, Washington, DC. October 14, 2010.

This page intentionally left blank.





Judith Mountains
Special Recreation Management Area
Special Recreation Management Area
BLM RMP Planning Area
PONDERA
TETON
LEWIS & CLARK
CASCADE
CHOUTEAU
FERGUS
PETROLEUM
JUDITH BASIN
MEAGHER
17N 18E
17N 19E
17N 20E
Judith Peak/ Red Mountain RMZ
Limekiln Canyon RMZ
16N 19E
16N 20E
15N 19E
15N 20E
0
2
Miles
May 22, 2016,
LFO_appx_rec_JudithMountains_SRM_V04.pdf
Source: BLM GIS 2015a, TRCP GIS 2015
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Lowry Bridge
Special Recreation Management Area
Special Recreation Management Area
BLM RMP Planning Area
PONDERA
TETON
CHOUTEAU
LEWIS & CLARK
CASCADE
FERGUS
JUDITH BASIN
PETROLEUM
MEAGHER
20N 3W
Lowry
0
1,000
Feet
May 22, 2016,
LFO_appx_rec_LowryBridge_SRM_V04.pdf
Source: BLM GIS 2015a
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Q. Recreation Management Areas, Figure Q-3



**North Moccasin Recreation Management Area**

- Special Recreation Management Area (SRMA)
- Extensive Recreation Management Area (ERMA)
- BLM RMP Planning Area

North Moccasin is an SRMA in Alternative C and an ERMA in Alternative D.

November 23, 2016, LFO_appx_rec_NorthMoccasin_RMA_V05.pdf
Source: BLM GIS 2015a BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of
these data. Original data were compiled from various sources. This information
may not meet National Map Accuracy Standards. This project was developed
through digital means and may be updated without notice.

Snowy Mountains
Recreation Management Area
Special Recreation Management Area (SRMA)
Extensive Recreation Management Area (ERMA)
BLM RMP Planning Area
Snowy Mountains is an SRMA in Alternative C and an ERMA in Alternative D.
PONDERA
TETON
LEWIS & CLARK
CASCADE
CHOUTEAU
FERGUS
PETROLEUM
JUDITH BASIN
MEAGHER
13N 17E
13N 18E
13N 19E
13N 20E
12N 18E
12N 19E
12N 20E
11N 18E
11N 19E
11N 20E
LEWIS AND CLARK
NATIONAL FOREST
BIG SNOWY MOUNTAINS
FERGUS CO
WHEATLAND CO
GOLDEN VALLEY CO
N
0
2
Miles
November 23, 2016,
LFO_appx_rec_SnowyMountains_RMA_V05.pdf
Source: BLM GIS 2015a, BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.



### Arrow Creek Backcountry Conservation Area

Backcountry Conservation Area

BLM RMP Planning Area

October 16, 2019,
LFO_appx_rec_ArrowCreek_BCAERMA_V04.pdf
Source: BLM GIS 2015a, TRCP GIS 2015
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability,
or completeness of these data. Original data were compiled
from various sources. This information may not meet National
Map Accuracy Standards. This project was developed
through digital means and may be updated without notice.

Alternative C: Crooked Creek Backcountry Conservation Area
Backcountry Conservation Area
BLM RMP Planning Area
22N 24E
22N 25E
22N 26E
22N 27E
21N 24E
21N 25E
21N 26E
21N 27E
21N 28E
21N 29E
20N 24E
20N 25E
20N 26E
20N 27E
20N 28E
20N 29E
20N 30E
19N 24E
19N 25E
19N 26E
19N 27E
19N 28E
19N 29E
19N 30E
18N 24E
18N 25E
18N 26E
18N 27E
18N 28E
18N 29E
18N 30E
17N 24E
17N 25E
17N 26E
17N 27E
17N 28E
17N 29E
17N 30E
16N 24E
16N 25E
16N 26E
16N 27E
16N 28E
16N 29E
16N 30E
15N 27E
15N 28E
15N 29E
15N 30E
PONDERA
TETON
LEWIS & CLARK
CASCADE
CHOUTEAU
FERGUS
PETROLEUM
JUDITH BASIN
MEAGHER
October 16, 2019,
LFO_appx_rec_CrookedCreek_BCAERMA_AltC_V04.pdf
Source: BLM GIS 2015a, TRCP GIS 2015
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.
N
0
4
Miles



Judith
Extensive Management Area
Extensive Recreation Management Area
BLM RMP Planning Area
Mauland Reservoir
Fritzner Reservoir
Jakes Reservoir
Whisker Reservoir
Buffalo Wallow Reservoir
Wolf Coulee #1 Reservoir
Holland Reservoir
Bubs Reservoir (Headman Dam)
Crooked Creek Reservoir
Drag Creek Reservoir
Dry Blood Reservoir
South Fork Dry Blood Reservoir
Payola Reservoir
Box Elder (Vogel) Reservoir
21N 24E
21N 26E
20N 25E
20N 26E
20N 27E
20N 28E
19N 25E
19N 26E
19N 27E
19N 28E
18N 25E
18N 26E
18N 27E
18N 28E
17N 25E
17N 26E
17N 27E
17N 28E
16N 25E
16N 26E
16N 27E
N
0
6
Miles
May 22, 2016,
LFO_appx_rec_Judith_ERM_V04.pdf
Source: BLM GIS 2015a
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

This page intentionally left blank.

# Appendix R
Land Tenure Adjustment Categories

This page intentionally left blank.

# Appendix R. Land Tenure Adjustment Categories

**RMP Land Tenure Allocation Categories**

To provide transparency and assist with discussion and analysis in this land use planning effort, the BLM has identified three land tenure categories, which include types of lands and management thereof as follows:

Category 1 (Retention): The BLM-administered lands in Category 1 include lands with high resource values and are identified for retention. These lands do not meet the FLPMA section 203 criteria and are not suitable for exchange out of federal ownership under section 206 of FLPMA. Included in this category are areas such as ACECs, WSAs, NHTs, lands acquired through the LWCF, and other congressionally designated areas. Acquisition of lands or interests in lands would receive priority if located within and/or adjacent to BLM-administered land in Category 1 provided that such acquisisition is consistent with one or more of the **Criteria for Land Tenure Adjustments** listed below. Lands within Category 1 would not be transferred out of BLM management by any method for the life of the plan; however, with the exception of lands acquired with funds from the LWCF, transfers to other public agencies would be considered where improved management efficiency would result.

Category 2 (Limited Exchange): These lands are generally identified for retention in public ownership and are not available for sale under section 203 of FLPMA. However, BLM-administered lands within Category 2 may be exchanged for lands or interests in lands under limited circumstances. Exchanges consistent with section 206 of FLPMA are permitted only when such exchange would enhance public resource values, improve management capabilities, or reduce the potential for land use conflict. In addition, parcels of BLM-administered land within Category 2 are available to be identified for transfer under the R&PP Act, for transfer of administrative jurisdiction to another Federal agency, on a case-by-case basis. BLM-administered lands in Category 2 may contain significant resource values protected by law or policy, and any exchange or transfer action is contingent upon prior review and approval. If actions cannot be taken to adequately manage impacts from exchange or transfer of those lands, the parcels would be retained. The BLM would consider exchanges on a case-by-case basis consistent with section 206 of FLPMA and the **Criteria for Land Tenure Adjustments** listed below.

Category 3 (Disposal):  No acres are identified in Category 3; see Lewistown Proposed RMP/Final EIS for a description of this category.

**Criteria for Land Tenure Adjustments**

Criteria listed herein are not in order or priority and all land tenure decisions must be in the public's interest to proceed. The BLM shall prioritize the retention or acquisition of lands that contain or provide one or more of the following:

• Class A Scenery

• Accessibility of the land for public uses;

• Greater sage-grouse PHMA and GHMA;

• Key big game seasonal habitat;

• Habitat for game animals, fisheries, nesting/breeding;

• Lands with a substantial amount of public investments in facilities and the potential for recovering those investments;

• Lands that will improve access or the contiguous nature of wilderness characteristics;

• Lands with valuable forest types, habitat diversity, and potential for carbon sequestration;

• Recreation and (recreation access) sites and areas with high recreational values;

• National Conservation Areas and National Monuments and other statutorily authorized designations (e.g. Conservation Management Areas); or

• Action would overall improve access to public land and/or not weaken an existing public access.


Other factors for consideration when determining whether BLM-administered lands should be transferred out of BLM management include:

• Difficulty or cost of administration (manageability)

• Suitability of the land for management by another federal agency

• Significance of the decision in stabilizing business, social and economic conditions, and/or lifestyles

• Encumbrances, including but not limited to,

– R&PP and small tract leases

– Other leases and permits

– Consistency of the decision with cooperative agreements and plans or policies of other agencies

– Suitability and need for change in land tenure or use for purposes including but not limited to: community expansion or economic development, such as industrial, residential or agricultural (other than grazing) developments

This page intentionally left blank.

This page intentionally left blank.

# Appendix S
## Withdrawal Segregations

This page intentionally left blank.

# Appendix S. Withdrawal Segregations

The withdrawals described below are common to all alternatives. These withdrawals overlap in some instances, so acres cannot be summed.

| Segregated Effect | Total Federal Mineral Estate (acres) |
|---|---|
| Surface estate is closed to disposition under the public land laws. All surface and subsurface estates are closed to disposition under the mining laws and all subsurface estate is closed to mineral leasing applications. These areas include (but are not limited to):<br><br>• Grass Range Missile Silo (JVP)<br>• US Air Force Facilities<br>• Fort Shaw Townsite<br>• Simms Town | 70 |
| Surface and subsurface estates are closed to disposition under the mining laws and all subsurface estate is closed mineral leasing applications. This includes (but is not limited to) the Rocky Mountain Front. | 93,600 |
| Surface estate is closed to disposition under the public land laws. All surface and subsurface estates are closed to disposition under the mining laws. These areas include (but are not limited to):<br><br>• Freezeout Lake Waterfowl Management Area<br>• Crystal Cave<br>• Blacktail Paleontological Area<br>• Sun River Project<br>• Muddy Creek Project<br>• Fort Peck Dam and Reservoir | 17,500 |
| Withdrawn for administration by another federal agency (e.g., USFWS, Forest Service, BOR, and BIA). | 20,400 |
| Power site classifications: Surface estate is closed to disposition under the public land laws. Open to mineral leasing with special stipulations from the Federal Energy Regulatory Commission and open to location and entry under the Mining Law with concurrence from the Federal Energy Regulatory Commission. | 3,900 |
| Open only to homestead, mining and special reclamation entry. | 15,700 |

This page intentionally left blank.

# Appendix U
## Land Management Allocations

This page intentionally left blank.

# TABLE OF CONTENTS

Section                                                                                                          Page

**APPENDIX U. LAND MANAGEMENT ALLOCATIONS** ............................................................... **U-1**
    U.1    Rights-of-Way ................................................................................................ U-1
    U.2    Minerals ......................................................................................................... U-2
    U.3    Visual Resource Management ..................................................................... U-5
    U.4    Travel and Transportation Management................................................... U-6
    U.5    Areas of Critical Environmental Concern ............................................... U-8
    U.6    Conservation Management Areas............................................................... U-9
    U.7    Forestry .........................................................................................................U-10
    U.8    Renewable Energy .......................................................................................U-11
    U.9    Extensive Recreation Management Area .................................................U-12
    U.10   Backcountry Conservation Area................................................................U-13
    U.11   Special Recreation Management Areas.....................................................U-14

This page intentionally left blank.

# Appendix U. Land Management Allocations

## U.1   RIGHTS-OF-WAY

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Allowable Use:** Manage the following areas as ROW exclusion areas for new land use authorizations (16,500 acres): <br> • Conservation Management Areas (CMAs) <br> • ACECs <br>   ○ Square Butte <br> • WSAs |
| **Allowable Use:** Manage the following areas as ROW avoidance areas for new land use authorizations (438,200 acres): <br> • Greater sage-grouse PHMA <br> • Greater sage-grouse GHMA for high voltage transmission lines and large pipelines <br> • ACECs <br>   ○ Acid Shale-Pine Forest <br> • BCAs <br>   ○ Crooked Creek <br>   ○ Arrow Creek <br><br> *Roads and utility corridors would avoid riparian zones to the extent practicable.* |

## U.2   MINERALS

| **Lewistown Approved Resource Management Plan**<br>**(Land Management Allocations)** |
|---|
| **Fluid Leasable Minerals** |
| Closed per withdrawal orders |
| **Allowable Use:**<br>Manage 110,200 acres of federal mineral estate as closed to fluid mineral leasing in accordance with withdrawal orders |
| Closed per laws |
| **Allowable Use:**<br>Manage WSAs (1,900 acres) as closed to fluid mineral leasing in accordance with the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 USC 181) |
| Administratively closed |
| Open to fluid mineral leasing |
| **Action:**<br>Manage 1,084,700 acres of federal mineral estate as open to fluid mineral leasing |
| Open to leasing subject to standard stipulations |
| **Action:**<br>Manage 239,000 acres of federal mineral estate as open to fluid mineral leasing, subject to standard stipulations. |
| Open to leasing subject to no surface occupancy (NSO) |
| Apply NSO stipulations to fluid mineral leases in the following areas (468,000 acres of federal mineral estate):<br>• ACECs<br>  ○ Acid Shale-Pine Forest<br>  ○ Square Butte ACEC<br>• Badlands and rock outcrops<br>• Within perennial or intermittent streams, lakes, ponds, reservoirs, 100-year floodplains, wetlands, and riparian areas<br>• State-designated Source Water Protection Areas<br>• Within 0.25 miles of designated reservoirs with fisheries<br>• Within 0.5 mile from the centerline of streams or 0.5 mile from bank-full edge of lakes/reservoirs containing Class 1, 2 fisheries as defined by MFWP Crucial Areas Assessment Game Fish Quality<br>• Within 0.5 mile from centerline of streams that are identified by the BLM as having high restoration potential for westslope cutthroat trout, Yellowstone cutthroat trout, Arctic grayling, and/or bull trout<br>• Within 0.25 miles of a water bird nesting colony for BLM priority species for management<br>• Crucial winter range for BLM priority species for management<br>• Within 0.5 mile of the perimeter of sharp-tailed grouse leks<br>• Within 0.25 miles of identified bat maternity roosts and hibernation areas<br>• Within 0.25 miles of raptor nest sites for BLM priority species for management<br>• Within 0.5 miles of bald eagle nest sites<br>• Within 1 mile of peregrine falcon nest sites<br>• Within 0.25 miles of piping plover nesting habitat<br>• Within 0.25 miles of prairie dog colonies<br>• Bighorn sheep lambing areas<br>• Within 0.25 miles of the water's edge of the Missouri River to protect pallid sturgeon<br>• Mountain plover habitat<br>• Greater sage-grouse SFAs<br>• Greater sage-grouse PHMA<br>• NRHP-eligible properties/districts and cultural sites allocated to conservation for future use, traditional use, and public use<br>• Egg Mountain and the Blacktail Paleontological Area |

• Grizzly Bear PCA and Zone 1

• State Parks, Wildlife Management Areas, and State Fishing Access sites.

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Open to leasing subject to controlled surface use (CSU)** |
| Apply CSU stipulations to fluid mineral leases in the following areas (629,000 acres of federal mineral estate): <br>• BCAs <br>  ○ Crooked Creek <br>  ○ Arrow Creek <br>• Sensitive soils <br>• Within 300 feet of riparian and/or wetland areas <br>• Winter range for pronghorn, elk, moose, bighorn sheep, mule and whitetail deer <br>• Elk calving grounds <br>• Bighorn sheep range <br>• VRM Class II <br>• Within 2 miles of a lek within GHMA |
| **Nonenergy Solid Leasable Minerals** |
| **Closed to nonenergy solid mineral leasing** |
| **Closed per withdrawal orders** |
| **Allowable Use:** <br>Manage 110,200 acres of federal mineral estate as closed to nonenergy solid mineral leasing in accordance with withdrawal orders |
| **Closed per BLM policy** |
| **Allowable Use:** <br>Manage WSAs (1,900 acres) as closed to nonenergy solid mineral leasing in accordance with BLM policy (see BLM Manual 6330, BLM 2012b) |
| **Administratively closed** |
| **Allowable Use:** <br>Manage 284,100 acres of federal mineral estate as administratively closed to nonenergy leasable mineral exploration and/or development: <br>• Greater sage-grouse PHMA <br>• NST and NHT corridors containing High Potential Route Segments and Sites <br>• ACECs <br>  ○ Square Butte |
| **Open to nonenergy solid mineral leasing** |
| **Allowable Use:** <br>Manage 800,600 acres of federal mineral estate as open for consideration for nonenergy leasable mineral exploration and/or development |
| **Locatable Minerals** |
| **Withdrawn from locatable mineral entry** |
| **Allowable Use:** <br>Manage 23,500 acres of BLM surface as withdrawn from locatable mineral entry in accordance with withdrawal orders. |
| **Open for locatable mineral entry** |
| **Action:** <br>Allow mineral exploration and development (locatable minerals) under the General Mining Law of 1872 on 628,000 acres of BLM surface not withdrawn from locatable mineral entry. Regulate locatable mineral exploration and development on BLM-administered land under 43 CFR 3800. |

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Mineral Materials (Salable Minerals)** |
| Closed to mineral material disposal |
| **Allowable Use:** Manage 17,200 acres of federal mineral estate as closed to mineral material disposal: <br>• Conservation Management Areas (CMAs) <br>• Egg Mountain <br>• ACECs <br>   ○ Square Butte <br>• WSAs (except for as described in Section 1.6.C.5.b of BLM Manual 6330 (BLM 2012b) <br>• Blacktail Paleontological Area |
| Open to mineral material disposal |
| **Allowable Use:** Manage 1,179,600 acres of federal mineral estate as open for mineral material disposal |

## U.3   VISUAL RESOURCE MANAGEMENT

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Allowable Use:** Adopt the VRM classes as follows:<br>• Class I: 15,700 acres<br>• Class II: 107,200 acres<br>• Class III: 186,800 acres<br>  Class IV: 341,500 acres |
| **Action:**<br>Manage 15,700 acres as VRM Class I:<br>• WSAs<br>   Rocky Mountain Front CMA |
| **Action:**<br>Manage 107,200 acres as VRM Class II., including, but not limited to, the following:<br>• Square Butte ACEC (900 acres)<br>• Arrow Creek BCA<br>• Crooked Creek BCA |
| **Action:**<br>Manage 186,800 acres as VRM Class III, including, but not limited to, the following:<br>• SRMAs:<br>  ○ Judith<br>  ○ Portion of Snowy Mountains<br>• ERMA<br>  ○ Portion of Judith Reservoirs<br>  NHT and NST corridors (unless the adjacent landscape is VRM I or II) |
| **Action:**<br>Manage 341,500 acres as VRM Class IV, including, but not limited to, the following:<br>• Acid Shale-Pine Forest ACEC (2,700 acres)<br>• ERMA<br>  ○ Portion of Judith Reservoirs<br>• SRMAs:<br>  ○ Portion of Snowy Mountains<br>  ○ North Moccasins<br>   Lowry Bridge |

## U.4   TRAVEL AND TRANSPORTATION MANAGEMENT

| **Lewistown Approved Resource Management Plan**<br>**(Land Management Allocations)** |
| --- |
| **Action:**<br>Manage the following areas (2,700 acres) as<br>Closed* to motorized travel:<br>• WSAs<br>*Closed to motorized travel means closed to any and all motorized vehicles, with no exceptions. |
| **Allowable Use:**<br>Allocate the decision area as follows for OHV travel:<br>• 13,000 acres closed*<br>• 487,700 acres limited yearlong<br>• 147,800 acres limited seasonally<br>*Closed to OHV travel means closed to those modes of travel that meet the OHV definition, including exclusions, at 8340.0-5(a). |
| **Action:**<br>Manage the following areas as closed to OHV travel:<br>   Conservation Management Areas (CMAs) |
| **Action:**<br>Manage 487,700 acres, including the following areas, as limited to designated routes yearlong for OHV travel:<br>• ACECs:<br>  o Acid Shale-Pine Forest<br>  o Square Butte<br>• ERMAs:<br>  o Judith Reservoirs ERMA<br>  o Crooked Creek and Arrow Creek BCAs<br>• SRMAs:<br>  o Judith SRMA<br>  o Snowy Mountains SRMA<br>  o North Moccasins SRMA<br>    Lowry Bridge SRMA |
| **Action:**<br>Seasonally limit OHV travel and promote nonmotorized travel in the Chain Buttes and East Indian Butte BMAs (147,800 acres) to reduce user conflicts and enhance recreational experiences.<br><br>The seasonal limitation, September 1 through December l, is based on the big game hunting season. Travel would be limited from 10 am to 2 pm for game retrieval only. If the hunting season were to change, the seasonal limitation would be modified accordingly as an implementation-level decision. |
| **Allowable Use:**<br>Allocate the decision area as follows for mechanized travel:<br>• 502,200 acres open<br>• 2,700 acres closed<br>   146,300 acres limited |
| **Action:**<br>Manage the following areas as closed to mechanized travel:<br>   WSAs |
| **Action:**<br>Prohibit motorized cross-country OSV travel in the following locations (28,400 acres):<br>• WSAs<br>• Crucial wildlife winter range<br>   Conservation Management Areas (CMAs) |

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Allowable Use:** Allow motorized cross-country OSV travel on 620,000 acres.<br><br>Motorized cross-country OSVs (with the exception of administrative and emergency use) are subject to the following management guidelines: Avoid locations where wind or topographic conditions may have reduced snow depth and created situations where damage to vegetation or soils could occur, or where the majority of vegetation is taller than the protective snow cover. Sensitive areas could be closed to motorized OSV travel if resource damage is found to be occurring in these areas. Additional management guidance regarding the use of OSVs, such as area closures, seasonal closures, or limiting their use to designated roads, primitive roads, and trails may be considered and implemented in subsequent travel management plans. |

## U.5  AREAS OF CRITICAL ENVIRONMENTAL CONCERN

| Lewistown Approved Resource Management Plan<br>(Land Management Allocations) |
|---|
| *Acid-Shale Pine Forest ACEC* |
| **Action:** Manage 2,700 acres as the Acid Shale-Pine Forest ACEC to protect an endemic plant community unique to the area that has developed because of unique Volberg soils. Allow research to determine the effects of grazing, fire, etc. on this type of plant community. Management actions are as follows:<br>• Allow research at War Horse Unit (900 acres) and maintain Briggs Coulee (1,800 acres) as a control site<br>• ROW avoidance<br>• Manage as VRM Class IV<br>• Prohibit disposal of forest products unless necessary for stand preservation<br>• OHV travel limited to designated routes yearlong<br>• Limit mechanized travel to designated routes, except for game retrieval<br>• NSO for fluid mineral leasing<br>• Open to mineral materials and non-energy mineral leasing (subject to underlying prescriptions for Greater Sage-Grouse Management)<br>• During travel planning, limit route density to existing main stem routes. Extraneous spurs, problematic braided, or duplicative routes would be considered for closure during site-specific travel planning.<br>Prohibit commercial timber sales unless necessary for stand preservation |
| **Action:** The Acid Shale-Pine Forest ACEC is a Fire Management Category B in the Prairie Forests FMU. |
| *Square Butte ACEC* |
| **Action:** Manage 900 acres as the Square Butte ACEC to protect cultural sites, scenic qualities, rare geologic features unique to Montana, and wildlife. Management actions are as follows:<br>• Same as Alternative A, plus:<br>  ○ Manage as VRM Class II<br>  ○ Closed to OSV travel<br>  ○ Mechanized travel limited to designated routes, except for game retrieval<br>  ○ NSO for fluid mineral leasing<br>  ○ Closed to mineral materials leasing<br>  ○ Closed to non-energy mineral leasing<br>  ○ Allow wildfire and prescribed fire |
| **Action:** Manage the Square Butte ACEC as limited to designated routes yearlong for OHV travel. Limit mechanized travel to designated routes, except for game retrieval. |
| **Action:** The Square Butte ACEC is a Fire Management Category C in the Prairie Forests FMU. Although the Prairie Forests FMU is a Fire Management Category B, this individual ACEC would be managed as a Category C. |
| **Action:** Manage the Square Butte ACEC as an avoidance area for fire retardant use to protect visual resources. |

## U.6   CONSERVATION MANAGEMENT AREAS

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Rocky Mountain Front CMA** |
| • VRM Class I |
| • Withdrawn from fluid mineral leasing |
| • Withdrawn from non-energy solid leasing |
| • Withdrawn from locatable mineral entry |
| • Closed to mineral materials leasing |
| • Closed to OHV travel |
| • Open to OSV travel |
| • Open to mechanized travel |
| • ROW Exclusion |
| • Commercial timber sales prohibited |
| • Closed to OSV travel |
| • Mechanized travel limited to designated routes, except for game retrieval |

## U.7   FORESTRY

| Lewistown Approved Resource Management Plan |
| --- |
| (Land Management Allocations) |

**Action:** Manage 18,400 acres* as closed to forest product sales. Additional areas may be found as unsuitable for harvest on a case-by-case basis to meet desired resource conditions.

Public land within set aside areas would not be available for the harvest of forest products (18,400 acres).

- Conservation Management Areas (CMAs)
- ACECs/ONAs:
  - Acid Shale-Pine Forest
  - Square Butte
  - WSAs

Exception: Provide opportunities for small sales of forest products to the public on a case-by-case basis (5450-permit). Small sales would only occur where sufficient physical access currently exists. No new permanent roads would be constructed to meet the demands of the small sale program.

## U.8   RENEWABLE ENERGY

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
| --- |
| **Allowable Use:** <br> Manage 370,400 acres as exclusion areas for wind energy: <br> • Greater sage-grouse PHMA     •   Conservation Management Areas (CMAs) <br> • WSAs     •   Backcountry Conservation Areas (BCAs) <br> • NSTs and NHTs |
| **Allowable Use:** <br> Manage 98,400 acres as avoidance areas for wind energy. |

## U.9    EXTENSIVE RECREATION MANAGEMENT AREA

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Judith Reservoirs ERMA** |
| Manage 8 undeveloped recreation sites associated with these fishing reservoirs:<br>• Drag<br>• Dry Blood<br>• Fritzner<br>• Holland<br>• Payola<br>• South Fork Dry Blood<br>• Bubs<br>• Whisker<br><br>• Manage as VRM Class III (450 acres).<br>• Manage as VRM Class IV (550 acres).<br><br>• Open to mineral materials leasing<br>• Open to fluid leasables and non-energy leasables<br>• Designate travel as limited to designated routes.<br>  Vegetative treatments allowed |

## U.10   BACKCOUNTRY CONSERVATION AREA

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Crooked Creek and Arrow Creek BCAs** |
| • Manage as VRM Class II. |
| • Manage as CSU for fluid mineral leasing |
| • Open to non-energy leasables (subject to underlying prescriptions for Greater Sage-Grouse management) |
| • Open to mineral materials leasing (subject to underlying prescriptions for Greater Sage-Grouse management) |
| • Limited motorized travel |
| • Limit mechanized travel to designated routes, except for game retrieval |
| • ROW Avoidance/Wind Energy Exclusion |
| • Allow for forest management activities |
| • OSV limited to designated routes |

## U.11   SPECIAL RECREATION MANAGEMENT AREAS

| Lewistown Approved Resource Management Plan (Land Management Allocations) |
|---|
| **Judith SRMA (Including Collar Gulch)** |
| • Manage as VRM Class III |
| • Open to fluid leasable and non-energy leasables |
| • Open to mineral materials leasing |
| • Limited motorized travel |
| • Allow for forest management activities |
| **Snowy Mountains SRMA** |
| • Manage as VRM Class III/IV |
| • Open to fluid leasables and non-energy leasables |
| • Open to mineral materials leasing |
| • Limited motorized travel |
| **North Moccasins SRMA** |
| • Manage as VRM Class IV |
| • Open to fluid leasables and non-energy leasables |
| • Open to mineral materials leasing |
| • Limited motorized travel |
| • Vegetative Treatments Allowed |
| **Lowry Bridge SRMA** |
| • Manage as VRM Class IV |
| • Open to fluid leasables and non-energy leasables |
| • Open to mineral materials leasing |
| • Limited motorized travel |

# Map Appendix A

## Figures

This page intentionally left blank.

# Map APPENDIX A

Figures

A-1     Project Planning Area
A-2     RMP Planning Area and Federal Mineral Estate

A-3     Fire Management
A-4     Visual Resource Management
A-5     Nonenergy Solid Leasable Minerals
A-6     Fluid Minerals Leasing
A-7     No Surface Occupancy for Fluid Minerals Leasing
A-8     Controlled Surface Use for Fluid Minerals Leasing
A-9     Locatable Minerals
A-10    Mineral Materials
A-11    Livestock Grazing
A-12    Recreation Management Areas
A-13    Travel, Transportation Management, and Access – Motorized and OHV
A-14    Travel, Transportation Management, and Access – Mechanized
A-15    Over-Snow Vehicle Travel
A-16    Right-of-Way Exclusion and Avoidance
A-17    Land Tenure
A-18    Wind Energy Development
A-19    Withdrawn Lands
A-20    Forest Products
A-21    Special Designations
A-22    Conservation Management Area

This page intentionally left blank.

## Project Planning Area

**Legend:**
- Private or other
- Forest Service
- State
- Bureau of Land Management
- Bureau of Indian Affairs
- US Fish and Wildlife Service
- State Park or Recreation
- Bureau of Reclamation
- Water
- US Department of Defense
- BLM RMP Planning Area
- BLM Field Office

The Lewistown RMP planning area covers nine counties in central Montana. Within the planning area, landownership is mixed; BLM-administered lands are adjacent to National Forest System lands, a national wildlife refuge (NWR), state, private, and tribal lands, the US Army Corps of Engineers, and the Bureau of Reclamation (BOR).

May 26, 2016,
LFO_intro_surface_V04.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Source: BLM GIS 2015a

Figure A-1

RMP Planning Area and Federal Mineral Estate

Federal mineral estate: subsurface mineral estate administered by the BLM
BLM RMP Planning Area
BLM Field Office

Private or other
Forest Service
State
Bureau of Land Management
Bureau of Indian Affairs
US Fish and Wildlife Service
State Park or Recreation
Bureau of Reclamation
US Department of Defense

Source: BLM GIS 2015a

May 26, 2016,
LFO_intro_minerals_V04.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Figure A-2



### Fire Management

Category A: Fire is not desired (none)
Category B: Unplanned fire would cause negative effects
Category C: Fire is desired to manage ecosystems, but current vegatative condition creates constraints on use
Category D: Fire is desired; few or no constraints on its use (none)

**Fire Management Unit**
Big Open
Breaks
Front
Island Ranges
Prairie Forests

BLM RMP Planning Area
BLM Field Office

Source: BLM GIS 2015a

**Figure A-3**

October 15, 2019
LFO_alts_fire_C2_V04.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

**Visual Resource Management**

- VRM Class I — preserve the existing character of the landscape
- VRM Class II — retain the existing character of the landscape
- VRM Class III — partially retain the existing character of the landscape
- VRM Class IV — provide for management activities that require major modification of the existing character of the landscape
- BLM RMP Planning Area
- BLM Field Office

Source: BLM GIS 2015a

October 15, 2019.
LFO_alts_VRM_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Figure A-4



**Nonenergy Solid Leasable Minerals**

Closed to nonenergy solid mineral leasing in accordance with withdrawal orders

Administratively closed to nonenergy leasable mineral exploration and/or development

Open for consideration of nonenergy leasable mineral exploration and/or development subject to stipulations

BLM RMP Planning Area

BLM Field Office

Note: nonenergy solid mineral leasing displayed on federal mineral estate in the decision area

Source: BLM GIS 2015a

**Figure A-5**

October 15, 2019.
LFO_alts_NEL_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Fluid Minerals Leasing
Closed to fluid mineral leasing in accordance with withdrawal orders
Closed to fluid minerals leasing
Open to fluid minerals leasing
BLM RMP Planning Area
BLM Field Office
Note: fluid mineral leasing displayed on federal mineral estate in the decision area
GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
PONDERA COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
Conrad
TETON COUNTY
Choteau
Fort Benton
CHOUTEAU COUNTY
BLAINE COUNTY
PHILLIPS COUNTY
Winifred
BUTTE FIELD OFFICE
Great Falls
CASCADE COUNTY
LEWIS & CLARK COUNTY
LEWISTOWN FIELD OFFICE
FERGUS COUNTY
GARFIELD COUNTY
Stanford
PETROLEUM COUNTY
JUDITH BASIN COUNTY
Lewistown
Winnett
Judith River
Missouri River
POWELL COUNTY
MEAGHER COUNTY
White Sulphur Springs
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
WHEATLAND COUNTY
Musselshell River
BROADWATER COUNTY
GALLATIN COUNTY
PARK COUNTY
N
0 15
Miles
Source: BLM GIS 2015a
CANADA
M O N T A N A
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
ID
ND
SD
WY
October 15, 2019,
LFO_alts_fluidmin_closed_C2.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.
Figure A-6



Note: Fluid mineral leasing displayed on federal mineral estate in the decision area.

**No Surface Occupancy for Fluid Minerals Leasing**

- Closed to fluid mineral leasing in accordance with withdrawal orders
- Administratively closed to fluid minerals leasing
- Open to leasing subject to NSO
- Federal mineral estate
- BLM RMP Planning Area
- BLM Field Office

Source: BLM GIS 2015a

July 02, 2020,
LFO_alts_fluidmin_NSO_C2_V06.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Figure A-7



Note: Fluid mineral leasing displayed on federal mineral estate in the decision area.

**Controlled Surface Use for Fluid Minerals Leasing**

- Closed to fluid mineral leasing in accordance with withdrawal orders
- Administratively closed to fluid minerals leasing
- Open to leasing subject to CSU
- Federal mineral estate
- BLM RMP Planning Area
- BLM Field Office

Source: BLM GIS 2015a

October 15, 2019.
LFO_alts_fluidmin_CSU_C2_V06.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Figure A-8

**Locatable Minerals**

- Withdrawn from locatable mineral entry in accordance with withdrawal orders
- Propose for withdrawal from locatable mineral entry
- Open for locatable mineral entry

- BLM RMP Planning Area
- BLM Field Office

Source: BLM GIS 2015a

Figure A-9

October 15, 2019.
LFO_alts_locmin_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

**Mineral Materials**

- Closed to mineral material disposal
- Open to mineral material disposal
- BLM RMP Planning Area
- BLM Field Office

Note: mineral material leasing displayed on federal mineral estate in the decision area

Figure A-10

Source: BLM GIS 2015a

October 15, 2019.
LFO_alts_MMD_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

**Livestock Grazing**

- Available for livestock grazing
- Unavailable for livestock grazing
- BLM RMP Planning Area
- BLM Field Office

October 15, 2019.
LFO_alts_graz_AD_V03.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Source: BLM GIS 2015a

Figure A-11



## Recreation Management Areas

- Special Recreation Management Area (SRMA)
- Extensive Recreation Management Area (ERMA)
- Backcountry Conservation Area (BCA)
- Bureau of Land Management Public lands not designated as Recreation Management Areas (PLND)
- BLM RMP Planning Area
- BLM Field Office

October 15, 2019,
LFO_alts_RMA_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Source: BLM GIS 2015a

**Figure A-12**

**Travel, Transportation Management and Access; Motorized and OHV**

- Closed to motorized travel (including administrative use)
- Closed to OHV travel only (open to administrative use)
- Limited to designated routes yearlong for OHV travel
- Limited seasonally for OHV travel, limited to designated routes for OHV when not seasonally limited

- BLM RMP Planning Area
- BLM Field Office

GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
FLATHEAD COUNTY
PONDERA COUNTY
LIBERTY COUNTY
44
Conrad
89
Choteau
TETON COUNTY
Fort Benton
CHOUTEAU COUNTY
BLAINE COUNTY
Missouri River
PHILLIPS COUNTY
87
80
Winifred
191
BUTTE FIELD OFFICE
21
200
Great Falls
CASCADE COUNTY
81
FERGUS COUNTY
191
GARFIELD COUNTY
287
LEWIS & CLARK COUNTY
LEWISTOWN FIELD OFFICE
200
80
Stanford
19
PETROLEUM COUNTY
15
89
JUDITH BASIN COUNTY
Judith River
87
Lewistown
200
Winnett
MEAGHER COUNTY
191
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
87
POWELL COUNTY
White Sulphur Springs
12
WHEATLAND COUNTY
Musselshell River
BROADWATER COUNTY

N

0        15
Miles

Source: BLM GIS 2015a

GALLATIN COUNTY
PARK COUNTY

October 16, 2019.
LFO_alts_ttma_AC2D_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

CANADA
MONTANA
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
ND
ID
SD
Lewistown RMP Planning Area
WY

**Figure A-13**

**Travel, Transportation Management and Access; Mechanized**

Legend:
- Closed to mechanized travel
- Limited to designated routes yearlong for mechanized travel
- Open to mechanized travel
- BLM RMP Planning Area
- BLM Field Office

October 16, 2019,
LFO_alts_ttma_mec_C2.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Source: BLM GIS 2015a

Figure A-14

Over-Snow Vehicle Travel
Prohibit Over-Snow Vehicle (OSV) travel
Open/ limited to OSV travel
BLM RMP Planning Area
BLM Field Office
GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
PONDERA COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
Conrad
TETON COUNTY
Choteau
Fort Benton
CHOUTEAU COUNTY
BLAINE COUNTY
PHILLIPS COUNTY
Winifred
BUTTE FIELD OFFICE
Great Falls
CASCADE COUNTY
LEWIS & CLARK COUNTY
LEWISTOWN FIELD OFFICE
FERGUS COUNTY
GARFIELD COUNTY
Stanford
PETROLEUM COUNTY
JUDITH BASIN COUNTY
Lewistown
Winnett
Missouri River
Judith River
Musselshell River
POWELL COUNTY
MEAGHER COUNTY
White Sulphur Springs
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
WHEATLAND COUNTY
BROADWATER COUNTY
GALLATIN COUNTY
PARK COUNTY
Miles
Source: BLM GIS 2015a
CANADA
M O N T A N A
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
ND
ID
SD
WY
October 15, 2019,
LFO_alts_ttmaOSV_C2.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Figure A-15

Right-of-Way Exclusion and Avoidance
Right-of-way exclusion
Right-of-way avoidance
Open for ROW application
BLM RMP Planning Area
BLM Field Office
GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
PONDERA COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
TETON COUNTY
CHOUTEAU COUNTY
BLAINE COUNTY
PHILLIPS COUNTY
BUTTE FIELD OFFICE
LEWIS & CLARK COUNTY
CASCADE COUNTY
LEWISTOWN FIELD OFFICE
FERGUS COUNTY
GARFIELD COUNTY
PETROLEUM COUNTY
JUDITH BASIN COUNTY
MEAGHER COUNTY
POWELL COUNTY
BROADWATER COUNTY
WHEATLAND COUNTY
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
GALLATIN COUNTY
PARK COUNTY
Conrad
Choteau
Fort Benton
Great Falls
Winifred
Stanford
Lewistown
Winnett
White Sulphur Springs
Missouri River
Judith River
Musselshell River
Miles
0
15
Source: BLM GIS 2015a
CANADA
MONTANA
ND
SD
ID
WY
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
October 15, 2019,
LFO_alts_ROW_ExcludAvoid_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Figure A-16



Land Tenure
Category 1—identified for retention
Category 2—identified for Limited ExChange
BLM RMP Planning Area
BLM Field Office
GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
PONDERA COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
Conrad
Choteau
TETON COUNTY
Fort Benton
CHOUTEAU COUNTY
BLAINE COUNTY
PHILLIPS COUNTY
Missouri River
Winifred
Great Falls
BUTTE FIELD OFFICE
CASCADE COUNTY
FERGUS COUNTY
GARFIELD COUNTY
LEWIS & CLARK COUNTY
LEWISTOWN FIELD OFFICE
Stanford
PETROLEUM COUNTY
JUDITH BASIN COUNTY
Lewistown
Winnett
Judith River
MEAGHER COUNTY
White Sulphur Springs
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
WHEATLAND COUNTY
POWELL COUNTY
Musselshell River
BROADWATER COUNTY
GALLATIN COUNTY
PARK COUNTY
CANADA
MONTANA
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
ND
SD
ID
WY
0 15
Miles
Source: BLM GIS 2015a
October 15, 2019,
LFO_alts_ROWdisposal_C2_V06.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Figure A-17

**Wind Energy Development**

- Right-of-way exclusion
- Right-of-way avoidance
- Potential wind development area
- Open for wind energy development
- BLM RMP Planning Area
- BLM Field Office

July 02, 2020,
LFO_alts_ROW_ExcludAvoidWind_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Source: BLM GIS 2015a

**Figure A-18**

**Withdrawn Lands**

Legend:
- Withdrawn land
- Bureau of Land Management
- BLM RMP Planning Area
- BLM Field Office

October 15, 2019.
LFO_alts_withdrawalsABC2D_V01.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

Source: BLM GIS 2015a

Figure A-19

**Forest Products**

- Closed to forest product sales or harvest
- Bureau of Land Management
- BLM RMP Planning Area
- BLM Field Office

Figure A-20

Source: BLM GIS 2015a

October 15, 2019.
LFO_alts_forestry_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

**Special Designations**

Wilderness Study Area (WSA)
National Historic or Scenic Trail (NHT/NST)
Back Country Byway

Bureau of Land Management
BLM RMP Planning Area
BLM Field Office

GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
PONDERA COUNTY
Lewis and Clark NHT
44
Conrad
89
TETON COUNTY
Choteau
CHOUTEAU COUNTY
Fort Benton
BLAINE COUNTY
PHILLIPS COUNTY
87
North Fork Sun River WSA
Lewis and Clark NHT
21
Great Falls
200
80
Square Butte ACEC
Square Butte WSA
Winifred
191
Missouri Breaks Back Country Byway
BUTTE FIELD OFFICE
Continental Divide NST
287
Beaver Meadows WSA
LEWIS & CLARK COUNTY
Lewis and Clark NHT
CASCADE COUNTY
81
FERGUS COUNTY
191
GARFIELD COUNTY
19 Acid Shale-Pine Forest ACEC
LEWISTOWN FIELD OFFICE
200
80
Stanford
JUDITH BASIN COUNTY
Judith River
87
Lewistown
Nez Perce NHT
200
PETROLEUM COUNTY
Winnett
191
649
MEAGHER COUNTY
87
POWELL COUNTY
White Sulphur Springs
BROADWATER COUNTY
WHEATLAND COUNTY
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
12
Musselshell River
191
N
0        15
Miles
Source: BLM GIS 2015a
GALLATIN COUNTY
PARK COUNTY

October 15, 2019.
LFO_alts_SpecDes_C2_V05.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy,
reliability, or completeness of these data. Original
data were compiled from various sources. This
information may not meet National Map Accuracy
Standards. This project was developed through
digital means and may be updated without notice.

CANADA
MONTANA
ND
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
ID
SD
WY

**Figure A-21**

Conservation Management Areas
Conservation management area
Bureau of Land Management
BLM RMP Planning Area
BLM Field Office
GLACIER COUNTY
TOOLE COUNTY
HILL COUNTY
PONDERA COUNTY
LIBERTY COUNTY
FLATHEAD COUNTY
Conrad
Blind Horse CMA
Ear Mountain CMA
Chute Mountain CMA
Deep Creek/ Battle Creek CMA
Choteau
TETON COUNTY
Fort Benton
CHOUTEAU COUNTY
Missouri River
BLAINE COUNTY
PHILLIPS COUNTY
Winifred
BUTTE FIELD OFFICE
Great Falls
CASCADE COUNTY
LEWIS & CLARK COUNTY
LEWISTOWN FIELD OFFICE
FERGUS COUNTY
GARFIELD COUNTY
Stanford
JUDITH BASIN COUNTY
Judith River
Nez Perce NHT
Lewistown
PETROLEUM COUNTY
Winnett
POWELL COUNTY
MEAGHER COUNTY
GOLDEN VALLEY COUNTY
MUSSELSHELL COUNTY
WHEATLAND COUNTY
White Sulphur Springs
Musselshell River
BROADWATER COUNTY
GALLATIN COUNTY
PARK COUNTY
0 15
Miles
N
Source: BLM GIS 2015a
CANADA
MONTANA
BUTTE FIELD OFFICE
LEWISTOWN FIELD OFFICE
Lewistown RMP Planning Area
ID
ND
SD
WY
October 15, 2019,
LFO_alts_CMAs_ABCD_V07.pdf
BLM Montana Lewistown Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice.

Figure A-22

# Exhibit G

U.S. Department of the Interior
Bureau of Land Management

# Resource Management Plan
## Missoula Field Office



The Bureau of Land Management is responsible for the stewardship of our public lands. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM/MT/PL-20/005+1610

# Missoula Resource Management Plan

### July 2020

Lead Agency: Bureau of Land Management

Responsible Official: Montana/Dakota State Director

For Information Contact: Missoula Field Manager

Missoula Field Office
3255 Fort Missoula Road
Missoula, MT 59804-7204

(406) 329-3914

https://go.usa.gov/xmyyG

This page intentionally left blank



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montana/Dakotas State Office
5001 Southgate Drive
Billings, Montana 59101
http://www.blm.gov/montana-dakotas



July, 2020

In Reply Refer To:
1610 (MT930)

Dear Reader:

The Bureau of Land Management (BLM) is pleased to announce that, after many years of hard work and collaboration, the BLM Missoula Field Office (MiFO) Approved Resource Management Plan (RMP) is complete. The Approved RMP will provide guidance for managing approximately 163,000 acres of BLM-administered public lands and approximately 267,000 acres of federal mineral estate across western Montana.

The enclosed Record of Decision (ROD) and Approved RMP were prepared in accordance with the Federal Land Policy and Management Act of 1976, as amended, and the National Environmental Policy Act of 1969, as amended. The ROD's approval serves as the final decision for all land use planning and implementation decisions described in the enclosed Missoula Approved RMP.

The Proposed RMP/Final Environmental Impact Statement (EIS) was subject to a 30-day protest period that ended March 16, 2020.   The BLM received 72 protest letters, and the BLM Director reviewed all protest issues for the proposed planning decisions. The Director concluded that the BLM Montana State Director followed the applicable laws, regulations, and policies, and considered all relevant resource information and public input. The BLM Director denied the protests, and that decision is the final decision of the US Department of the Interior.

The 60-day Governor's consistency review period for the Proposed RMP/Final EIS, which promotes consistency with State government plans or policies, concluded on April 13, 2020. The Governor submitted a letter identifying some concerns in response to the consistency review. They included consistency with recently enacted State legislation and State wildlife plans. The BLM thoroughly reviewed the Governor's letter and confirmed that the Proposed RMP is consistent with existing State plans.

The ROD and Approved RMP are available online at the BLM's ePlanning site https://eplanning.blm.gov.   Limited printed copies or flash drives available by request from the Missoula Field Office, 3255 Fort Missoula Road, Missoula, Montana 59804 or by calling (406) 329-3914.

The BLM greatly appreciates all those who contributed to the Missoula RMP planning effort, particularly members of the public, who provided important feedback; our cooperating agencies, which included federal, state, and local agencies; the Western Montana Resource Advisory Council; and the Confederated Salish and Kootenai Tribe. The extensive public interest and involvement in this planning process ensured that the Approved RMP will sustain the health, diversity, and productivity of BLM-administered lands for present and future generations to use and enjoy.

Sincerely,

John Mehlhoff
State Director, Montana/Dakotas BLM

# Missoula Field Office

## Record of Decision

## and

## Approved Resource Management Plan

**Prepared by US Department of the Interior**
**Bureau of Land Management**
**Missoula Field Office**
**Missoula, Montana**

**Cooperating Agencies:**
US Department of Agriculture, Forest Service, Region 1
Montana Department of Natural Resources and Conservation, Southwestern Land Office
Montana Fish Wildlife and Parks, Region 2
Missoula County

**July 2020**

This page intentionally left blank.

# TABLE OF CONTENTS

Chapter    Page

**I. RECORD OF DECISION** ........................................................................................................... I-1

  I.1    Introduction ................................................................................................................ I-3
      I.1.1    Overview ....................................................................................................... I-3
      I.1.2    Description of the Planning Area.......................................................... I-3
  I.2    Decision ....................................................................................................................... I-4
      I.2.1    Clarifications and Modifications .......................................................... I-4
      I.2.2    Mitigation Measures ................................................................................. I-4
      I.2.3    Plan Monitoring ......................................................................................... I-4
  I.3    Alternatives ................................................................................................................ I-5
      I.3.1    Introduction ................................................................................................ I-5
      I.3.2    Alternatives and Issues Considered but Not Analyzed in Detail....... I-5
      I.3.3    Alternatives Analyzed in Detail ............................................................ I-7
  I.4    Management Considerations and Decision Rationale......................................... I-10
  I.5    Application of the Approved RMP to Existing Projects ................................... I-10
  I.6    Public Involvement.................................................................................................... I-11
      I.6.1    Public Envisioning.................................................................................... I-11
      I.6.2    Public Scoping ........................................................................................... I-11
      I.6.3    Recreation Focus Group Workshops ................................................ I-11
      I.6.4    Release of Preliminary Alternatives.................................................... I-12
      I.6.5    Public Review and Comment on the Draft EIS/Draft RMP ............ I-12
      I.6.6    Protest Resolution – Proposed RMP/Final EIS............................... I-13
      I.6.7    Governor's Consistency Review.......................................................... I-13
  I.7    Consultation and Coordination ............................................................................ I-14
      I.7.1    Tribal Consultation ................................................................................. I-14
      I.7.2    Montana State Historic Preservation Office Consultation ............ I-14
      I.7.3    U.S. Fish and Wildlife Service Consultation ..................................... I-14
      I.7.4    Cooperating Agencies ............................................................................ I-14
  I.8    Availability of the Plan.............................................................................................. I-15
  I.9    Approval...................................................................................................................... I-16

**II. APPROVED RESOURCE MANAGEMENT PLAN** ...................................................... II-1

  II.1    Introduction .............................................................................................................. II-3
      II.1.1    Purpose of and Need for the Resource Management Plan ............ II-3
      II.1.2    Missoula Planning Area and Decision Area ...................................... II-3
      II.1.3    Scoping and Issues ................................................................................... II-4
      II.1.4    Planning Criteria and Legislative Constraints.................................... II-6
      II.1.5    Planning Process........................................................................................ II-8
      II.1.6    Related Plans and Policy......................................................................... II-8
  II.2    Management Decisions............................................................................................. II-9
      II.2.1    General Decisions .................................................................................... II-11
      Resources ................................................................................................................... II-12
      II.2.2    Air Quality and Climate ......................................................................... II-12
      II.2.3    Aquatic Habitat and Special Status Aquatic Species ....................... II-13
      II.2.4    Cave and Karst Resources .................................................................... II-15
      II.2.5    Cultural and Heritage Resources........................................................ II-15
      II.2.6    Paleontological Resources .................................................................... II-16

    II.2.7   Soil, Water, and Riparian-Wetland Vegetation ..................................... II-17

    II.2.8   Vegetation:  Forest Veg and Special Status Plant Species..................... II-19

    II.2.9   Vegetation:  Grassland and Shrubland ................................................. II-22

    II.2.10  Vegetation:  Noxious and Invasive Plants ........................................... II-22

    II.2.11  Visual Resources .............................................................................. II-23

    II.2.12  Wildlife Habitat and Special Status Wildlife Species ........................... II-24

    II.2.13  Wildland Fire Management ................................................................ II-29

    Resource uses .......................................................................................... II-31

    II.2.14  Forest Products .............................................................................. II-31

    II.2.15  Livestock Grazing ........................................................................... II-33

    II.2.16  Recreation and Visitor Services ....................................................... II-34

    II.2.17  Travel and Transportation Management ............................................ II-36

    II.2.18  Lands & Realty:  Access .................................................................. II-38

    II.2.19  Lands and Realty:  Land Tenure ...................................................... II-38

    II.2.20  Lands & Realty:  Land Use Authorizations ....................................... II-40

    II.2.21  Minerals ........................................................................................ II-42

    II.2.22  Withdrawals and other Segregation ................................................ II-42

    II.2.23  Roads and Facilities ....................................................................... II-43

    Special Designations ................................................................................ II-44

    II.2.24  Areas of Critical Environmental Concern (ACECs) ........................... II-44

    II.2.25  National Trails ............................................................................... II-45

    II.2.26  Wild and Scenic Rivers .................................................................. II-46

    II.2.27  Wilderness Study Areas .................................................................. II-46

    Public Safety and Tribal Interests .............................................................. II-47

    II.2.28  Public Safety ................................................................................. II-47

    II.2.29  Tribal Interests .............................................................................. II-47

II.3     Public Involvement .................................................................................... II-1

II.4     Management Plan Implementation ............................................................... II-1

II.5     RMP Implementation, Monitoring, and Evaluation......................................... II-1

    II.5.1   RMP Evaluation ............................................................................... II-1

    II.5.2   RMP Monitoring .............................................................................. II-2

II.6     References ................................................................................................ II-3

II.7     Glossary ................................................................................................. II-20

II.8     Appendices ............................................................................................. II-53

**III. APPENDICES** ..................................................................................... III-54

    Appendix B. Aquatic and riparian habitat conservation strategy .................. III-56

    Riparian Conservations Areas (RCAs) and Riparian Management .............. III-57

    Objectives (RMOs)................................................................................ III-57

    Specific goals, objectives and standards................................................. III-58

    Protecting Aquatic Special Status Species Population Strongholds ............. III-59

    Multi-scale analysis .............................................................................. III-60

    Monitoring and Adaptive Management.................................................... III-61

    Appendix H. Approved RMP MAPS ......................................................... III-63

    Appendix L. Approved recreation Management areas ................................ III-79

    Blackfoot SRMA ................................................................................... III-80

    Garnet SRMA (2 RMZs)........................................................................ III-86

    Garnet Ghost Town Recreation Management Zone.................................. III-86

    Garnet Trails Recreation Management ZONE (RMZ) ................................ III-88

    Hoodoos BCA....................................................................................... III-95

Ram Mountain BCA .................................................................................................... III-98
Wales Creek BCA..................................................................................................... III-101
Appendix O. Supplemental Rules ...................................................................................... III-104
Definitions ................................................................................................................ III-104
Prohibited Acts on All BLM-Administered lands in the planning area..................... III-104
Seasonal Closure at Sperry Grade Area................................................................. III-105
Prohibited Acts within the Dupont Acquired Lands................................................ III-105
Prohibited Acts within Bear Creek Flats ................................................................ III-105
Prohibited Acts within Garnet Ghost Town ........................................................... III-105
Prohibited Acts within Blackfoot River Recreation Corridor ................................. III-106
Prohibited Acts within Limestone Cliffs Area ........................................................ III-106
Penalties ................................................................................................................... III-106
Appendix P. Project Design Features and Best Management Practices........................... III-107
Introduction ............................................................................................................. III-107
GENERAL mitigation measures and conservation actions ..................................... III-114
Air Resource BMPs .................................................................................................. III-114
Erosion and Sediment Control BMPs ...................................................................... III-114
Montana Guide to the Streamside Management Zone Law..................................... III-115
Montana Non-Point Source Management Plan ........................................................ III-115
Montana Placer Mining BMPs .................................................................................. III-115
Montana Forestry Best Management Practices ........................................................ III-116
BLM BMPs................................................................................................................. III-116
Communication Tower BMPs ................................................................................... III-116
Grazing Management ................................................................................................ III-118
Storm Water BMPs................................................................................................... III-118
National Range and Pasture Handbook .................................................................... III-118
Montana Nonpoint source management program .................................................... III-118
Wildland Fire Management........................................................................................ III-120
Appendix Q. Lands and Realty ......................................................................................... III-121
RMP Land Tenure Allocation Categories ............................................................... III-121
Criteria for Land Ownership Adjustments............................................................... III-121
Appendix T. Summary of USFWS Biological Opinions...................................................... III-124
Introduction ............................................................................................................. III-124
USFWS Conclusion................................................................................................... III-124
USFWS Incidental Take Statements.......................................................................... III-124
USFWS Reporting Requirements .............................................................................. III-125
USFWS Conservation Recommendations ................................................................. III-125
USFWS Reinitiation Notice........................................................................................ III-127

# TABLES AND FIGURES                                                                    Page

Figure 1 Missoula Planning Area.......................................................................................... I-3

Table 1 Program Categories ................................................................................................ II-9
Table 2 Decisions Types .................................................................................................... II-10
Table 3. Cultural resource use allocations ........................................................................ II-16

## ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| BCA | Backcountry Conservation Area |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| CFR | Code of Federal Regulations |
| Decision Area | public lands and federal mineral estate managed by the BLM |
| DOI | Department of the Interior |
| EIS | environmental impact statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| Forest Service | United States Department of Agriculture, Forest Service |
| GIS | geographic information systems |
| MiFO | Missoula Field Office |
| MTDNRC | Montana Department of Natural Resources and Conservation |
| MTFWP | Montana Fish Wildlife and Parks |
| NEPA | National Environmental Policy Act |
| OHV | off-highway vehicle |
| PDF | project design feature |
| Planning Area | Missoula Field Office boundary, including all lands regardless of ownership |
| RMP | resource management plan |
| RMZ | recreation management zone |
| RNA | research natural area |
| ROD | record of decision |
| ROW | right-of-way |
| SRMA | special recreation management area |
| SRP | special recreation use permit |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| VRM | visual resource management |
| WSA | wilderness study area |
| WSR | Wild and Scenic River |

This page intentionally left blank.

# I. RECORD OF DECISION

This page intentionally left blank.

## 1.1   INTRODUCTION

### 1.1.1   OVERVIEW

The United States (US) Department of the Interior, Bureau of Land Management (BLM) uses Resource Management Plans (RMPs) to guide management of the land it administers. This Record of Decision (ROD) approves the BLM's proposal to manage BLM-administered lands and minerals in the Missoula Field Office (Missoula) as presented in the attached approved Resource Management Plan (RMP). This RMP is substantially similar to the Proposed Plan in the Missoula Proposed RMP/Final Environmental Impact Statement (FEIS)/Proposed RMP revision. The background and rationale for approving the decisions in the Proposed Plan are described in this ROD.

### 1.1.2   DESCRIPTION OF THE PLANNING AREA

The Missoula RMP planning area is located in western Montana in Flathead, Granite, Lake, Lincoln, Mineral, Missoula, Powell, Ravalli, and Sanders Counties (see Figure 1 below). Within these nine counties, the BLM will only make decisions on lands that fall under the BLM's jurisdiction, including subsurface minerals. Over 99 percent of these surface acres are located in Granite, Missoula, and Powell Counties. Other land managers and owners in the planning area include national forests, Glacier National Park, state, tribal, and private lands. A map of the decision area and land ownership in the planning area below in Figure 1.

**Figure 1 Missoula Planning Area**



## I.2    DECISION

The decision is hereby made to approve the attached RMP (Section II). The BLM has determined that the Proposed Plan (with consideration of public and agency comments, public protests, and the Governor's consistency review) is the most consistent with the purposes, policies, and programs associated with implementing its legal mandates.

The BLM prepared the Missoula RMP in accordance with NEPA, the Council on Environmental Quality (CEQ) regulations implementing NEPA (40 Code of Federal Regulations [CFR] 1500–1508), the US Department of the Interior NEPA regulations (43 CFR 46), and the requirements of the BLM's NEPA Handbook, H-1790-1 (BLM 2008).[1] Management decisions identified in the Approved RMP are final and become effective when this ROD is signed.

### I.2.1    CLARIFICATIONS AND MODIFICATIONS

The BLM only made minor changes from the Proposed RMP/Final EIS to the Approved RMP:  a definition of prescriptive grazing was added to the glossary; the term land classification was removed from the glossary; and we clarified land tenure terms.

### I.2.2    MITIGATION MEASURES

Mitigation broadly includes any means that would reduce or avoid adverse effects of the proposed action. The Council on Environmental Quality states that mitigation includes avoiding, minimizing rectifying, reducing or eliminating over time, and compensating for adverse environmental impacts (40 CFR 1508.20).

In the Missoula Proposed RMP, most of the measures that would avoid, minimize, rectify, or reduce environmental impacts are integral to the design of the alternatives and have been included in the designations, allocations, and actions.

The Approved RMP adopts the mitigations included in the designations, allocations, and actions included in the Proposed RMP. All mitigations adopted in the Approved RMP were included as part of the Proposed RMP's design in the EIS; there are no additional mitigation measures adopted with this decision. The Approved RMP incorporates measures that include restrictions on uses such as seasonal closures, and application of Best Management Practices (BMPs) and Required Design Features (RDFs) in Appendix P.

### I.2.3    PLAN MONITORING

The CEQ regulations implementing NEPA state that agencies may monitor to ensure that their decisions are carried out, and they should do so in important cases (40 CFR 1505.2(c)).  Land use plan decision monitoring is a continuous process occurring over the life of the RMP. The aim is to maintain a dynamic RMP. Monitoring data are collected, examined, and used to draw conclusions about the following:

---

[1] BLM (Bureau of Land Management). 2008. Handbook H-1790-1. BLM NEPA Handbook. Washington, DC. January 2008.

- Whether planned actions have been implemented in the manner prescribed by the RMP (implementation monitoring).
- Whether RMP allowable use and management action decisions and the resultant implementation actions are effective in achieving program-specific objectives or desired outcomes (effectiveness monitoring).

The BLM uses conclusions drawn from monitoring to make recommendations on whether to continue current management or identify changes that need to be made to implementation practices to better achieve RMP goals. Indicators, methods, locations, units of measure, frequency, and action triggers can be established by national policy guidance, in RMPs, or by technical specialists in order to address specific issues. If implementation of land use plans does not achieve anticipated desired outcomes, adaptive management may be necessary.

Based on staffing and funding levels, monitoring is annually prioritized to be consistent with the goals and objectives of the RMP. The BLM may work in cooperation with local, state, and other federal agencies, or it may use data collected by other agencies and sources when appropriate and available.

# I.3   ALTERNATIVES

## I.3.1   INTRODUCTION

An RMP provides broad guidance for managing public lands. The Federal Land Policy and Management Act (FLPMA) directs the BLM to develop RMPs as the primary means to identify and allow for appropriate uses of BLM-administered land. The RMP decisions establish goals and objectives (desired outcomes) for resource management that guide future implementation decisions. In addition, the RMP also identifies measures necessary for achieving the outcomes, expressed as management actions (proactive management techniques) and allowable uses (lands that are open or closed to certain uses), including any restrictions on uses.

The NEPA requires the development and consideration of a reasonable range of alternatives, including a no action alternative, to analyze impacts and guide decision-makers in developing and selecting the Approved RMP. The BLM developed three alternatives and one sub-alternative and analyzed them in detail in the Proposed RMP/Final EIS.

## I.3.2   ALTERNATIVES AND ISSUES CONSIDERED BUT NOT ANALYZED IN DETAIL

### Bison Reintroduction

At this time, the state of Montana has not proposed to reintroduce wild bison on any BLM lands managed by the Missoula Field Office. Bison in private ownership are considered livestock, and as such, are permitted by the BLM pursuant to 43 CFR 4130.3-2(e).

### Site-Specific Travel Management

The RMP designates off-highway vehicle (OHV) allocations. Specifically, this RMP allocates BLM-managed lands in the planning area as either: (a) Open motorized travel, (b) Closed to motorized travel, or (c) Limited motorized travel. These allocations set the stage for subsequent step-down travel management plans. Travel management route designations (e.g., motorized or non-motorized trails, types of vehicles

or use per route, seasonal restrictions, etc.) are implementation-level decisions, which align with the RMP allocations and are subject to site-specific NEPA analysis and public involvement.

**Fluid Mineral Leasing**

The BLM has not received an expression of interest in fluid leasable minerals since 1985 and there is no reasonably foreseeable future expression of interest. Thus, fluid mineral leasing was considered but not analyzed further in the EIS. If in the future the BLM were to receive an expression of interest, the BLM would proceed with the requisite environmental analysis and public involvement process at that time.

**Wind and Solar Renewable Energy**

The BLM has not received an expression of interest for wind or solar development. There is no known infrastructure in the BLM-managed lands to support any development. At this time, there is no reasonably foreseeable future demands for wind or solar energy on the BLM-managed lands. Thus, provisions specific to wind and solar developments were not addressed further in the EIS, and no allocations of preferred areas for competitive leasing, known as designated leasing areas, were made in this land use plan. Any applications for testing or development would be addressed on a case-by-case basis with the requisite NEPA analysis and public involvement.

**Release Wilderness Study Areas or Designate Wilderness**

Only Congress can designate lands as "Wilderness" and only Congress can release Wilderness Study Areas (WSAs) for other management. With the passage of FLPMA, Congress mandated that the BLM conduct a wilderness review of its administered public lands. The BLM studied the Wales Creek area and the Hoodoo Mountain area under the authority of Section 603 of FLPMA, which directs the BLM to inventory, study, and report to Congress the suitability of certain lands for wilderness preservation. The BLM studied the Quigg West area under Section 202 of FLPMA. The WSAs are managed under BLM Manual 6330 until Congress decides whether to designate these areas as wilderness or release them to multiple use management. The BLM will prepare a wilderness management plan for any areas designated as wilderness by Congress. Thus, designating lands as wilderness or removing the WSA designations is outside the BLM's authority and was beyond the scope of the revision

**Analyzing an Alternative that Makes All Lands in the Planning Area Unavailable for Livestock Grazing and Eliminates Livestock Forage Allocation**

No issues or conflicts were identified during this land use planning project to warrant the complete elimination of livestock grazing across the planning area. The analysis of an alternative entirely eliminating grazing was not needed; this is because the BLM has considerable discretion through its grazing regulations to determine and adjust stocking levels, seasons-of-use, and grazing management activities and to allocate forage to uses of the public lands in RMPs.

Current resource conditions on BLM-administered land, including range vegetation, watershed, and wildlife habitat, as reflected in land health assessments, did not warrant an area-wide prohibition of livestock grazing. Following initial surveyed forage allocations, the basis for increasing or decreasing permitted use has been land health evaluations, inventories, and monitoring data (vegetative and levels of use). Suitable measures, which could include reducing or eliminating livestock grazing, were provided for in the EIS. They could become necessary in specific situations where livestock grazing causes or contributes to conflicts with protecting or managing other resource values or uses. Such determinations would be made during site-specific activity planning or permit renewal and their associated environmental review.

**Backcountry Conservation Areas Proposal**

The Theodore Roosevelt Conservation Partnership submitted a proposal for allocating 54,331 acres of BLM-managed lands as backcountry conservation areas. The BLM considered the Theodore Roosevelt Conservation Partnership proposal and analyzed a similar alternative, although not the exact proposal, in detail. The BLM reduced acres that would not be feasible for management due to road infrastructure, distance from the primary BCA polygon, and the potential for user conflicts.

## I.3.3   ALTERNATIVES ANALYZED IN DETAIL

**Alternative A** (No Action)

Alternative A meets the requirement that a no action alternative be considered. This alternative continues current management direction and prevailing conditions derived from existing planning documents. Goals and objectives for resources and resource uses are based on the applicable portions of the Garnet RMP, approved in 1986, along with associated amendments, activity and implementation level plans, and other management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would also apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, timber harvesting, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

**Alternative B** (Draft RMP/Draft EIS Agency Preferred)

Alternative B meets the purpose and need with an emphasis on healthy forests through active vegetation management while sustaining and enhancing ecological integrity for plant, wildlife, and fish habitat across the landscape.

This alternative provides for the most vegetation treatments and noxious weed treatments annually. Treatments would restore forested vegetative communities to achieve the mid-range of the natural range of variability sooner and provide for the multiple terrestrial and aquatic species dependent upon these habitats. Treatments also restore and improve grassland and shrubland vegetative communities. Quantities of forest-based commodity resources from vegetation restoration activities would be the greatest.

This alternative emphasizes dispersed recreation opportunities, especially for hunting and fishing. Recreation would be a priority in four areas—the Lower Blackfoot Corridor, the Garnets (Garnet Ghost Town and winter trails), and Chamberlain, Limestone Cliffs —with updated management direction.  Wildlife-dependent recreation would be a priority in the Hoodoos Backcountry Conservation Area (6,100 acres). Dispersed recreation would continue throughout the planning area. Alternative B also sets the stage for step-down travel management focused on snowmobiles, mountain biking, and hiking opportunities in the Blackfoot and Garnet areas with the "Limited motorized travel" allocation.

Existing allotments of livestock grazing would remain available subject to the Rangeland Health Standards with flexibility at the site-specific level to adjust the terms and conditions such as season of use, rest rotations, AUMs, and more. More acres are available for prescriptive grazing under this alternative.

The ESA threatened or endangered species would continue to receive priority emphasis in accordance with USFWS recovery plans. Other priority species and habitats for management include Bureau sensitive species, big game, and migratory birds. Restoration of key species habitats would be important in this alternative. The Lewis and Clark National Historic Trail corridor would be 1/2 mile on public lands on either side of the centerline of the trail.

## Alternative C

Alternative C meets the purpose and need, while emphasizing the greatest degree of conservation of fish and wildlife habitat, and conservation of cultural and historic resources. It also places an emphasis on allowing natural processes to occur in moving toward attainment of natural range of variability in forests. Alternative C emphasizes wildlife-dependent recreation and moderate levels of resource use balanced with various human demands and land uses, while sustaining and enhancing ecological integrity for plant, wildlife, and fish habitat across the landscape.

This alternative provides for active restoration of vegetative communities to achieve the natural range of variability, but to a lesser extent than alternatives A and B. Treatments within forested and grassland vegetative communities would emphasize terrestrial and aquatic habitat restoration. Quantities of forest-based commodity resources from vegetation restoration activities would be the lowest.

Alternative C also emphasizes dispersed recreation opportunities, especially hunting and fishing. Wildlife-dependent recreation (hunting, fishing, wildlife viewing) would be a priority in four areas through Backcountry Conservation Area designations— the northern Garnets (Chamberlain), the Hoodoos, Marcum Mountain, and Ram Mountain. Recreation would also be a priority in the Blackfoot, but for a diversity of recreation experiences. Dispersed recreation would continue throughout the planning area. This alternative also sets the stage for step-down travel management focused on snowmobiles, mountain biking, and hiking opportunities in the Blackfoot and Garnet areas with the "Limited motorized travel" allocation.

Existing allotments of livestock grazing would remain available subject to the Rangeland Health Standards with flexibility at the site-specific level to make adjustments to the terms and conditions such as season of use, rest rotations, AUMs, and more. Stricter requirements are triggered when rangeland health standards are not met, and the causal factor is livestock grazing.  Very few acres are available for prescriptive grazing under this alternative.

The ESA threatened or endangered species would continue to receive priority emphasis in accordance with USFWS recovery plans. Other priority species and habitats for management include Bureau sensitive species, big game, and migratory birds. Restoration of key species habitats would be a high priority in this alternative. The Lewis and Clark National Historic Trail corridor would be 1 mile on public lands on either side of the centerline of the trail. Wildlife habitat objectives would be similar to alternative B, but with a greater emphasis on conservation and restoration of terrestrial wildlife habitat. Riparian conservation criteria for project-level implementation would be similar to alternative B.

**Sub-Alternative C** (Environmentally Preferred)

Sub-alternatives are variations of an action alternative that modify an individual component of the alternative to explore how these changes would alter certain outcomes. The BLM developed this sub-alternative in the Final EIS because of public comments.  Individual components vary to test specific questions about alternative design based on input received during external and internal scoping. The sub-alternative primarily includes:

-   Reduced animal unit months (25%) to allocate more forage for wildlife.
-   Finding of suitability for five of the wild and scenic river segments.
-   Inclusion of two Research Natural Areas managed for their relevant and important biological values.
-   Additional acreage for Backcountry Conservation Areas.
-   Manage lands with wilderness characteristics and a majority of WSAs, if released, as Backcountry Conservation Areas.

**Agency Proposed** (Selected Alternative)

The BLM developed the Proposed RMP as a variation on Alternative B, which the BLM identified in the Draft RMP/EIS as the preferred alternative. The Proposed RMP meets the purpose and need with an emphasis on healthy forests through active vegetation management while sustaining and enhancing ecological integrity for plant, wildlife, and fish habitat across the landscape.

This alternative provides for the most vegetation treatments and noxious weed treatments annually. Treatments would restore forested vegetative communities to achieve the mid-range of the natural range of variability sooner and provide for the multiple terrestrial and aquatic species dependent upon these habitats. Treatments also restore and improve grassland and shrubland vegetative communities. Quantities of forest-based commodity resources from vegetation restoration activities would be the greatest.

Recreation with updated management directions would be a priority in four areas—the Blackfoot, the Garnets (Garnet Ghost Town and winter trails), Chamberlain, and Limestone Cliffs.

Wildlife-dependent recreation would be a priority in three areas, which would be designated as Backcountry Conservation Areas – Ram Mountain, Hoodoos, and Wales.  Dispersed recreation would continue throughout the planning area. The Proposed RMP also sets the stage for step-down travel management focused on snowmobiles, mountain biking, and hiking opportunities in the Blackfoot and Garnet areas with the "Limited motorized travel" allocation.  Dispersed recreation opportunities, especially for hunting and fishing, would be allowed throughout the entire planning area.

Existing allotments of livestock grazing would remain available subject to the Rangeland Health Standards with flexibility at the site-specific level to adjust the terms and conditions such as season of use, rest rotations, AUMs, and more. More acres are available for prescriptive grazing under this alternative.

The ESA threatened or endangered species would continue to receive priority emphasis in accordance with USFWS recovery plans. Other priority species and habitats for management include Bureau

sensitive species, big game, and migratory birds. Restoration of key species habitats would be important in this alternative. The Lewis and Clark National Historic Trail corridor would be 1/2 mile on public lands on either side of the centerline of the trail. The West Fork Buttes would be managed as a Research Natural Area (950 acres) prioritizing maintaining the biologically diverse plant species, treating invasive species, and partnering on opportunities for education and research.

## I.4    MANAGEMENT CONSIDERATIONS AND DECISION RATIONALE

The Approved RMP reflects statutory, regulatory, and national policy considerations. The decision is also based on review and substantive comments from federal, tribal, state, and local governments and agencies, the public, industry, and the three cooperating agencies that participated in the planning process.

The Approved RMP provides the best combination of management decisions to meet the purpose of and need for the RMP in consideration of the planning issues and management concerns identified through the planning process. It fulfills the purpose by providing goals and objectives for public lands management and by resolving multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP. It fulfills the need by addressing current resource conditions, changes in circumstances, such as evolving demands on resources, and new or revised national-level policies (43 CFR 1610.5-6) since preparation of the 1986 Garnet Resource Area RMP (BLM 1986) as amended.

The Approved RMP provides the most comprehensive framework for addressing the diverse management needs of BLM-administered lands in the Decision Area.  The Approved RMP is responsive to the public demand for recreation as it includes four special recreation management areas, three backcountry conservation areas, and allows dispersed hunting throughout the planning area.  The Approved RMP also emphasizes active forest management that balances providing fire resiliency, timber production, and improving wildlife and aquatic habitats.

## I.5    APPLICATION OF THE APPROVED RMP TO EXISTING PROJECTS

Numerous rights and privileges have been established on BLM-administered lands under law, regulation, or planning decisions. The decisions included in this ROD and Approved RMP supersede 1986 Garnet Resource Area RMP (BLM 1986), and their subsequent amendments. Beyond the decisions in the Approved RMP, all BLM-administered lands and federal mineral estate in the Missoula remain subject to valid existing rights and to the stipulations and conditions of approval associated with the given right at the time it was granted. This includes the right of reasonable access to surface and subsurface parcels leased for the development of the mineral interest.

Projects that require a decision to extend an existing authorization or permit may require modification to conform to the RMP before approval, such as ROW grant and grazing permit renewals. Projects for which site-specific decisions have not yet been signed, but for which preparation of NEPA documents began before the ROD's effective date, may also require modification to conform to the RMP.

## 1.6    PUBLIC INVOLVEMENT

The policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS. Preparation of the Missoula Draft RMP /Draft EIS included four distinct public involvement efforts: (1) pre-scoping envisioning; (2) formal public scoping; (3) recreation focus groups; and, (4) public review of preliminary alternatives.

Throughout the planning process, the BLM actively engaged the public and its cooperating agencies, as well as consulted with the Montana State Historic Preservation Office and US Fish and Wildlife Service. The BLM also engaged in government-to-government consultation with Native American tribes. Public review of the Draft RMP/EIS occurred for 90 days following its publication. Information about the RMP/EIS process can be obtained by the public at any time by visiting the Missoula RMP/EIS ePlanning website at the link above. This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process.

### 1.6.1    PUBLIC ENVISIONING

In the spring of 2016, the Missoula BLM kicked off a pre-scoping public envisioning phase. During this phase, the BLM held multiple listening sessions and four public workshops in Missoula, Philipsburg, Greenough, and Helmsville. The facilitators gathered information on general perspectives on BLM-managed lands and minerals, public lands, and issues. The Public Envisioning Report (June 2016, USDI-BLM) is available on the Missoula RMP/EIS website at https://go.usa.gov/xmyyG.

### 1.6.2    PUBLIC SCOPING

In the winter of 2016 –2017, the BLM entered the public scoping period. Public scoping commenced upon publication of the Notice of Intent in the Federal Register, on December 12, 2016. The BLM subsequently hosted four public workshops in Missoula, Phillipsburg, Greenough, and Helmsville to share information about the planning process. The BLM Scoping Report (August 2017, USDI-BLM) summarizes the public scoping comments, also available on the Missoula RMP/EIS ePlanning website: https://go.usa.gov/xmyyG

### 1.6.3    RECREATION FOCUS GROUP WORKSHOPS

In July 2017 members of the Public Lands Recreation Research Partnership (PLRRP) conducted a series of three focus groups (35 participants) regarding recreational outcomes and experiences on BLM managed lands in and around Missoula, Montana. A mixed methodology focus group was employed to establish the recreational experience baseline. Participants were asked a series of open-ended questions as well as survey-type questions (recorded on handouts provided) in a 90-minute discussion focusing on their relationship to these public lands, and their preferences for recreational settings, experiences, and outcomes related to these lands. The focus group script covered all the major elements needed in planning for recreation on public lands: preferences for outcomes and experiences, interests and expectations, setting characteristics, activities, and the services needed to support the recreation experience. Additional questions encouraged participants to express their preferences for management practices including the BLM's engagement with the public during its planning process.

The majority of participants in the focus groups came from communities within 50 miles of Missoula such as Seeley Lake, Bonner, Clinton, and Stevensville. They highlighted the scenic beauty, recreational opportunities, and close proximity of these lands to their communities as vitally important characteristics of the landscape that greatly enhanced their quality of life and the character of their communities. The participants were concerned about access to these landscapes and the impacts of vandalism and development on the character and sustainability of the natural resources including wildlife, vegetation, soils, water, and visual resources. Typical of public lands across the west, these landscapes provide opportunities for a variety of recreational activity, but land managers have the challenge of handling the conflict that often arises between user groups. The diversity of the population, culture, and the landscape were particularly prized by participants in this study. This made it even more important that managers included a wide variety of stakeholders in the planning process and focused on transparent ways to communicate with the public and included them in partnerships for planning and management of the landscape. According to most of the participants, this is a natural landscape that should be managed for recreational opportunities, the protection of unique biological and physical qualities, and as a place to experience tranquil escapes and self-reliant adventures that enhance the quality of life for local residents and tourist visitors into the future.

BLM Missoula FO Recreation Focus Group Report provides detailed results of the focus group data collection, both the written responses and group discussions with public land users concerning recreation on BLM-administered lands in the Missoula BLM.

## I.6.4  RELEASE OF PRELIMINARY ALTERNATIVES

In the winter of 2018, the Missoula BLM provided the public an opportunity to view an early version of the alternatives —mainly the high-level allocations and concepts—before a full draft was complete. The BLM posted the preliminary alternatives to its website and hosted three public open houses in Missoula, Greenough, and Philipsburg in January 2018.  The handouts provided during these workshops are available on the Missoula RMP/EIS ePlanning website:  https://go.usa.gov/xmyyG

## I.6.5  PUBLIC REVIEW AND COMMENT ON THE DRAFT EIS/DRAFT RMP

A notice of availability announcing the release of the Draft RMP/EIS was published in the Federal Register on May 17, 2019 initiating a 90-day public comment period ending on August 15, 2019. The BLM also issued a news release on May 17, 2019, announcing the release of the Draft RMP/EIS and providing a link to the draft documents and information about upcoming public meetings and instructions for submitting comments. During the public comment period, the BLM held one public comment open house for the Draft RMP/EIS on July 11, 2019, in Missoula. The public open house provided opportunities for the public to ask questions and submit comments. BLM managers, resource specialists, and other representatives of the BLM were present during these open houses to discuss and answer questions.

During the 90-day public comment period, BLM received a total of approximately 6,000 email submissions, and 72 of these were considered unique submissions while the remainder were part of Form Letters in support of either Backcountry Conservation Areas, Areas of Critical Environmental Concern, or Wilderness Study Areas. These documents resulted in 520 unique substantive comments received on the Draft RMP/EIS. Excerpted substantive comments from individual submissions, as well as summaries of and the BLM's responses to those substantive comments, are in Appendix S of the

Proposed RMP/Final EIS.   This appendix summarizes the public comment process, provides a detailed description of the comments received during the public comment period, and explains the comment analysis methodology used.

## I.6.6   PROTEST RESOLUTION – PROPOSED RMP/FINAL EIS

Pursuant to the BLM's planning regulations (43 CFR 1610.5-2), the Proposed RMP/Final EIS was subject to a 30-day protest period ending that ended on March 16, 2020.  The BLM received 72 protest letters during the protest period. The agency dismissed 68 protest letters because they were comments and not protests, or they were incomplete protests.

The BLM received 4 valid/complete protest letters from parties with standing during the 30-day protest period. Issues raised by protestors included those associated with the following:

- NEPA range of alternatives
- NEPA impact analysis – grazing
- NEPA impact analysis - lands with wilderness characteristics
- FLPMA – monitoring
- FLPMA – unnecessary and undue degradation
- FLPMA – consistency with other plans, travel management
- WSA - wild and scenic rivers
- ESA – consultation

The BLM Director and staff at the BLM Washington Office reviewed all of the protest issues. After review, the protests were denied by the BLM Director, whose decision is the final decision for the US DOI. The BLM Director concluded that the BLM Montana State Director followed the applicable laws, regulations, and policies and considered all relevant resource information and public input in developing the Proposed RMP. The BLM Director also concluded that the Proposed RMP did not require changes. The Director's resolution report is available on the BLM's Protest Resolution website, at https://www.blm.gov/programs/planning-and-nepa/public-participation/protest-resolution-reports.

## I.6.7   GOVERNOR'S CONSISTENCY REVIEW

To promote consistency with state government plans or policies (as required by 43 CFR 1610.3-2(e)), the BLM initiated the Montana Governor's Consistency Review for the Missoula Proposed RMP/Final EIS in a letter dated February 14, 2020. The consistency review period concluded on April 13, 2020.

The Governor submitted a letter on April 13, 2020, identifying some concerns in response to the consistency review. These concerns included consistency with the State comprehensive outdoor recreation plan and State wildlife and fish species management. The BLM thoroughly reviewed the Governor's response letter and determined that the Proposed RMP was consistent with existing State plans and no changes were made to the Approved RMP.

# I.7  CONSULTATION AND COORDINATION

The BLM land use planning regulations (43 CFR 1610.3), FLPMA (43 US Code 1712), and regulations for implementing NEPA (40 CFR 1501.5 and 1501.6) guide the BLM in coordinating and cooperating with other federal and state agencies, local governments, and Native American tribes during the land use planning process. This collective guidance instructs the BLM as follows:

- Stay informed of federal, state, local, and tribal plans.
- Ensure that it considers these plans in its own planning.
- Seek ways to resolve inconsistencies between such plans and BLM planning.
- Cooperate with other agencies and tribal governments in developing RMPs and NEPA analyses.

## I.7.1  TRIBAL CONSULTATION

Government-to-government consultation began in March 21, 2017 with the BLM sending requests for consultation letters to all area tribes – Nez Perce Tribe, Shoshone-Bannock Tribes Fort Hall Reservation, Blackfeet Nation, and the Confederated Salish and Kootenai Tribes. The Confederated Salish and Kootenai Tribes expressed an interest to stay informed and continue the formal consultation throughout the planning process.  The BLM held informational meetings with tribal representatives of the Salish and Kootenai Tribes. This was to ensure that management actions were consistent with treaty rights retained by tribes and that the concerns of tribal groups were considered. Government-to-government consultation continued throughout the development of the Proposed RMP.

## I.7.2  MONTANA STATE HISTORIC PRESERVATION OFFICE CONSULTATION

The State Historic Preservation Officer (SHPO) was notified of the status of the Missoula RMP and received the Proposed RMP/Final EIS containing additional information on SHPO consultation.

## I.7.3  U.S. FISH AND WILDLIFE SERVICE CONSULTATION

To comply with Section 7(c) of the Endangered Species Act of 1973 (ESA), the BLM began consulting with the USFWS early in the planning process. The USFWS provided input on planning issues, data collection and review, and alternatives development. The BLM consulted with the USFWS to identify ESA issues associated with Canada Lynx, Grizzly Bear, and Bull trout and their respective Critical Habitats. On June 6, 2020, USFWS provided Biological Opinions with determinations of no-jeopardy findings for the grizzly bear, Canada lynx, and bull trout. The Conservation Recommendations from the Biological Opinions are included in Appendix T.

## I.7.4  COOPERATING AGENCIES

The BLM invites agency cooperation early in the RMP process using the process outlined in 43 CFR 1501.6. A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1; BLM 2005). The primary role of cooperating agencies during the planning process is to provide input on issues for which they have a special expertise or jurisdiction.

The BLM is the lead agency for the Missoula RMP.  In the spring of 2016, the BLM sent letters to over 40 federal, state, and local agencies, and tribal governments, inviting them to participate in the RMP revision as an official cooperating agency. Of the 40 agencies invited, three agencies signed a memorandum of understanding with the BLM to become official cooperating agencies. These agencies are: (1) Missoula County; (2) Montana Fish Wildlife and Parks, Region 2; and, (3) U.S. Forest Service—Region 1 (Lolo National Forest; Helena and Lewis and Clark National Forest, Lincoln Ranger District; Bitterroot Deerlodge National Forest, Pintler Ranger District; Flathead National Forest; Rocky Mountain Research Station, Forestry Science Lab (Missoula); Fire Science Lab).

## I.8   AVAILABILITY OF THE PLAN

Copies of the ROD and the Missoula RMP may be obtained from the BLM website at https://go.usa.gov/xmyyG or by obtaining a copy at the following locations:

> Bureau of Land Management
> Montana State Office
> 5001 Southgate Drive
> Billings, MT 59101
>
> Bureau of Land Management
> Missoula Field Office
> 3255 Fort Missoula Road
> Missoula, Montana 59804

## I.9   APPROVAL

I hereby approve the land use plan decisions. My approval of the land use plan decisions constitutes the final decision of the Department of the Interior in accordance with the land use planning regulations at 43 CFR 1610.

Approved by:

Casey Hammond
Principal Deputy Assistant Secretary
Exercising the Authority of the Assistant Secretary,
Land and Minerals Management

7/30/20

Date

# II. APPROVED RESOURCE MANAGEMENT PLAN

This page intentionally left blank

# II.1   INTRODUCTION

The US Department of the Interior (DOI), Bureau of Land Management (BLM), Missoula Field Office (FO) prepared the Missoula Resource Management Plan (RMP). The intent is to provide comprehensive management direction for BLM-administered lands in the Missoula FO. This is the Approved Resource Management Plan for the public lands administered by the BLM Missoula FO.

The BLM prepared the RMP in compliance with its planning regulations, Title 43, Code of Federal Regulations (CFR), 1600, under the authority of the Federal Land Policy and Management Act of 1976 (FLPMA). This document also meets the requirements of the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality Regulations for Implementing the NEPA (40 CFR 1500-1508), the BLM's NEPA regulations (43 CFR 46), and requirements of the BLM's NEPA Handbook, 1790-1 (BLM 2008a).

## II.1.1   PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

The resource management planning process is a key tool that the BLM uses, in collaboration with interested public parties, to ensure a coordinated and consistent approach to managing BLM-administered lands. An RMP is a set of comprehensive decisions concerning the use and management of programs and resources administered by BLM. In general, the purpose of an RMP is twofold: first, it provides an overview of goals, objectives, and needs associated with public lands management; second, it resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances, such as evolving demands on resources, and new or revised policy on the national level (43 CFR 1610.5-6). Management direction for lands in the Missoula Planning Area was contained in the 1986 Garnet Resource Area RMP (BLM 1986). Although the 1986 RMP has been subsequently amended, they did not satisfactorily address new and emerging issues. Laws, regulations, policies, and issues regarding management of BLM-administered lands have changed during the life of the plans. The BLM needed to revise the 1986 RMP to ensure compliance with current laws and policies and to address issues that have arisen since its preparation.

## II.1.2   MISSOULA PLANNING AREA AND DECISION AREA

**Planning Area**

The Missoula RMP planning area is located in western Montana in Flathead, Granite, Lake, Lincoln, Mineral, Missoula, Powell, Ravalli, and Sanders Counties (see Figure 1 below). Within these nine counties, the BLM will only make decisions on lands that fall under the BLM's jurisdiction including subsurface minerals. Over 99 percent of these surface acres are located in Granite, Missoula, and Powell Counties (see Figure 2). Other land managers and owners in the planning area include national forests, Glacier National Park, state, tribal, and private landowners (see Table 1 and Table 2).

**Analysis Area.** The analysis area refers to any lands, regardless of jurisdiction, for which the BLM synthesizes, analyzes, and interprets data and information that relates to planning for BLM-managed

lands. This generally includes all lands within Granite, Missoula, and Powell Counties, regardless of jurisdiction or ownership. Although the cumulative effects analysis area for a particular resource or resource use may expand beyond this general 3-county analysis area boundary, depending on the issue.

**Decision Area.** The decision area refers to lands within a planning area for which the BLM has authority to make land use and management decisions, which includes the approximately 163,000 surface acres of BLM-managed lands, and the approximately 267,389 acres of subsurface minerals in split estate as described above.

## II.1.3 SCOPING AND ISSUES

The formal scoping period began with publication of the Notice of Intent in the *Federal Register* on December 12, 2016 (81 Federal Register 89504, December 12, 2016). The scoping period ended March 16, 2010.  The BLM identified issue statements and management concerns in the Notice of Intent. Based on public scoping and internal scoping, the BLM revised these issues and management concerns that were carried forward for analysis were:

*Air Quality and Climate.* How would the alternatives address air quality and the changing climate in the plan?

*Economics and Community.* How would the BLM consider social and economic conditions in the planning area when managing BLM lands, specifically how should the BLM contribute to local economies and infrastructure needs through recreation opportunities, rights-of-way, mineral exploration and development, livestock grazing, and forest products while managing for wildlife and aquatics habitat?

*Environmental Justice.* What communities or populations, if any, will receive disproportionate impacts as an effect of RMP implementation? How would the BLM mitigate these effects if any exist?

*Noxious and Invasive Species.* How would the alternatives address management to limit the spread of invasive species, including aquatic invasive species?

*Lands available for and recommended for withdrawal from mineral entry.* How will the alternatives either release or recommend for withdrawal acres of interminable temporary segregation?

*Lands, Realty, and Access.* How should the BLM-managed lands improve public access and resource management, including hunting opportunities, through land tenue actions?

*Lands with Wilderness Characteristics.* How would the alternatives address lands with wilderness characteristics?

*Paleontological Resources.* How would the alternatives address surface disturbing activity and paleontological resources?

*Partnerships.* How would the alternatives address local, state, tribal, and national partnerships to achieve shared goals for priority watersheds and forest vegetation projects?

*Recreation.* How would the alternatives provide for public demands for access and recreation, specifically hunting, fishing, mountain biking, snowmobiling, off-highway vehicles, hiking, and river-related recreation?

*Special Designations.* How should special designations be managed to protect values that warrant special designation status?

*Visual Resources.* How would varying types and intensities of resource uses in the RMP alternatives impact visual resource quality on BLM-managed lands in the planning area?

*Vegetation Management.* What is the appropriate intensity of active forest management to achieve natural range of variability in order to achieve fish and wildlife habitat objectives, and also to provide a sustainable supply of forest products and forage for wildlife and domestic livestock?

*Watershed Management.* How could the BLM-managed lands be managed to contribute to restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters, safe drinking water supplies, soil and vegetation health, and the proper functioning condition of riparian-wetlands?

*Wildlife and Aquatics Species and Habitats*. How would the alternatives manage for ecologically resilient fish and wildlife habitat, including contribution to the recovery of Canada lynx, grizzly bear, and bull trout, big game species, and other Bureau sensitive species?

## Issues Considered but Not Further Analyzed

During scoping, participants raised several concerns regarding issues that would not be addressed in the RMP, including administrative, policy, and implementation issues; issues outside the scope of the RMP; and issues that have already been addressed through other BLM activities. The Missoula RMP Scoping Summary Section 3.5 of the Missoula Resource Management Plan Scoping Report (USDI-BLM 2017) contains a comprehensive list of the issues, concerns, and questions by the public that were outside of the scope of the RMP, which is incorporated here by reference. These were the issues considered but not analyzed in detail:

*Reintroduce Bison:* At this time, the state of Montana has not proposed reintroducing wild bison on any BLM lands managed by the Missoula Field Office. Bison in private ownership are considered livestock, and as such, are permitted by the BLM pursuant to 43 CFR 4130.3-2(e).

*Site-Specific Travel Management:* The RMP designated off-highway vehicle (OHV) allocations. Specifically, this RMP allocates BLM-managed lands in the planning area as either: (a) Open motorized travel, (b) Closed to motorized travel, or (c) Limited motorized travel. These allocations set the stage for subsequent step-down travel management plans. Travel management route designations (e.g., motorized or non-motorized trails, types of vehicles or use per route, seasonal restrictions, etc.) are implementation-level decisions, which align with the RMP allocations and are subject to site-specific NEPA analysis and public involvement.

*Fluid Mineral Leasing:* The BLM has not received an expression of interest in fluid leasable minerals since 1985, and there is no reasonably foreseeable future expression of interest. Thus, fluid mineral leasing was considered, but not analyzed further. If, in the future, the BLM were to receive an

expression of interest, the BLM would proceed with the requisite environmental analysis and public involvement process at that time.

***Wind and Solar Renewable Energy:***  The BLM has not received an expression of interest for wind or solar development. There is no known infrastructure in the BLM-managed lands to support any development. At this time, there are no reasonably foreseeable future demands for wind or solar energy on the BLM-managed lands. Thus, provisions specific to wind and solar developments were not addressed further in this document, and no allocations of preferred areas for competitive leasing, known as designated leasing areas, were made Any applications for testing or development would be addressed on a case-by-case basis with the requisite NEPA analysis and public involvement.

***Release Wilderness Study Areas or designate areas as Wilderness:***  Only Congress can designate lands as "Wilderness" and only Congress can release Wilderness Study Areas (WSAs). With the passage of the FLPMA, Congress mandated that the BLM conduct a wilderness review of its administered public lands. The BLM studied the Wales Creek area and the Hoodoo Mountain area under the authority of Section 603 of FLPMA, which directs the BLM to inventory, study, and report to Congress the suitability of certain lands for wilderness preservation. The BLM studied Quigg West under Section 202 of FLPMA. The WSAs are managed under BLM Manual 6330 until Congress decides whether to designate these areas as wilderness or release them to multiple use management. The BLM will prepare a wilderness management plan for any areas designated as wilderness by Congress. Thus, designating lands as wilderness or removing the WSA designations is outside the BLM's authority and was beyond the scope of the revision.

## II.1.4  PLANNING CRITERIA AND LEGISLATIVE CONSTRAINTS

The FLPMA is the primary authority for the BLM's management of public lands. This law provides the policy by which BLM-administered lands will be managed and establishes provisions for land use planning, land acquisition and disposition, administration, range management, rights-of-way (ROWs), designated management areas, and the repeal of certain statutes.

The NEPA establishes a national policy for the environment. It requires the consideration and public availability of information regarding the environmental impacts of major federal actions significantly affecting the quality of the human environment. In concert, FLPMA and NEPA provide the overarching guidance for administrating BLM activities.

Planning criteria are the standards, rules, and guidelines that help to guide data collection and alternative formulation and selection in the RMP development process. In conjunction with the planning issues, planning criteria ensure that the planning process is focused. The criteria also help guide the final plan selection and provide a basis for judging the responsiveness of the planning options.

The Missoula BLM planning criteria:

- Complete the plan and associated environmental impact statement in compliance with the Federal Land Policy and Management Act (FLPMA); the National Environmental Policy Act (NEPA); the National Historic Preservation Act; the National Trails Act; Wild and Scenic Rivers Act; Endangered Species Act; Clean Water Act; Clean Air Act; Migratory Bird Treaty Act; Minerals Leasing Act; and other federal laws, regulations, and policies as required.

- Establish new guidance and identify existing guidance upon which the BLM will manage public lands within the Missoula Field Office.

- Provide opportunities for public participation throughout the planning process, including a preliminary alternatives outreach.

- Recognize and manage for valid existing rights.

- Work cooperatively with state and federal agencies, tribes, and local governments. Working closely with the USFWS, the BLM will develop the action alternatives to provide sufficient detail in the analysis to facilitate RMP-level endangered species consultation. Working closely with the Montana Department of Environmental Quality, in coordination with the Environmental Protection Agency, the BLM will develop the action alternatives to satisfy state and federal water quality rules and regulations at the RMP level.

- Initiate consultation with Native American tribes to identify and discuss management options for any sacred sites located on BLM lands within the decision area.

- Consider relevant plans and policies of adjacent conservation system units, landowners, and local governments so that RMP decisions will be consistent to the degree reasonably practical.

- Consider public access and recreational opportunities when evaluating land tenure decisions consistent with Secretarial Order 3373.

- Conform to the BLM's H-1601-1 Land Use Planning Handbook, Appendix C; program-specific and resource-specific decision guidance; and applicable BLM manuals and handbooks as updated by program guidance.

- Incorporate by reference the Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Montana/Dakotas; the BLM's H-9214-1 Fuels Management and Community Assistance Handbook; Best Management Practices for Forestry in Montana; the Montana Streamside Management Zone Law and Rules, and the Vegetation Treatments Using Herbicides FEIS.

- Create wildlife habitat management consistent with U.S. Department of the Interior guidance and the Montana Department of Fish and Wildlife objectives. Coordinate with the Montana Department of Fish, Wildlife, and Parks pursuant to Secretarial Order 3362 to enhance and improve the quality of big-game winter range and migration corridors on federal lands.

- Consider efforts to expand hunting, fishing, and recreational opportunities consistent with Secretarial Orders 3347, 3356, and 3366.

- Geospatial data will be automated within a geographic information system (GIS) to facilitate discussions of the affected environment, alternative formulation, analysis of environmental consequences, and display of the results.

- Consider resource allocations that are reasonable and achievable within available technological and budgetary constraints.

- Incorporate environmental justice considerations in the action alternatives to respond to environmental justice issues facing minority populations, low-income communities, and Native American tribes living near public lands and using public land resources. The environmental justice analysis will use guidance provided in H-1601-1, Appendix D, Social Science Considerations in Land Use Planning Decisions.

- Incorporate best management practices (BMPs) for road drainage, grazing, Water Quality BMPs for Montana Forests, fire rehab, fire management, wind energy, power lines, and ESA-listed species.

- Develop action alternatives and provide cumulative effects analysis to provide a framework to simplify and facilitate project-level NEPA analysis for management actions implementing the RMP.

- Incorporate measures to protect against catastrophic wildfires consistent with Executive Order 13855 and Secretarial Order 3372.

## II.1.5 PLANNING PROCESS

The BLM uses a multistep planning process when developing RMPs, as required by 43 CFR 1600 and illustrated in the BLM's Land Use Planning Handbook, H-1601-1 (BLM 2005). The planning process is designed to help the BLM identify the uses desired by the public of BLM-administered lands. During this process, the BLM considers these uses to the extent they are consistent with the laws established by Congress and the policies of the executive branch of the federal government. The planning process is issue driven. The BLM used the public scoping process to identify planning issues (noted above) to direct the development of the Missoula RMP. It used the scoping process to introduce the public to planning criteria.

Title II, Section 202, of FLPMA directs the BLM to coordinate planning efforts with Native American tribes, other federal agencies, and state and local governments as part of its land use planning process. The BLM is also directed to integrate NEPA requirements with other environmental review and consultation requirements, to reduce paperwork and delays (40 CFR 1500.4-5). The BLM coordinated with the Confederated Tribes of the Salish Kootenai as well as other Federal, State, and local agencies through ongoing communications and collaboration with an interdisciplinary team of BLM specialists.

Any activity-level or project-specific authorization or management action must conform with the Approved RMP (i.e., be specifically provided for in the RMP or consistent with the terms, conditions, and decisions in the Approved RMP; 43 CFR 1601.0-5(b)). A land use plan amendment may be necessary to consider monitoring and evaluation findings; substantive new data; new or revised policy; changes in circumstances; or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the Approved RMP.

## II.1.6 RELATED PLANS AND POLICY

The BLM considered federal, state, local, and tribal plans that were germane to the development of the RMP/EIS. The BLM worked closely with federal, state, local, and tribal governments during preparation of the RMP/EIS. A list of all plans and policies BLM considered can be found in Sections 1.7 and 1.8 of the Proposed RMP/Final EIS. Chapter 4 of the Proposed RMP/Final EIS describes coordination that occurred throughout the development of the RMP.

This RMP is consistent with and incorporates requirements identified in various laws, regulations, and policies. These include executive orders, legislative designations, and court settlements and rulings.

## II.2   MANAGEMENT DECISIONS

This section of the Approved RMP presents the goals, objectives, actions, allowable uses, and stipulations established for BLM-administered lands in the Decision Area. Most of the desired future conditions are long range and are assumed to require a period of time to achieve and framed as goals. These management decisions are presented by program area under three category headings:  resources, resource uses, special designations, and public safety and Tribal Interests.  Types of management decisions are presented in Table II-3 and management decisions are presented below.

### Table 1 Program Categories

| RMP Program Category | Abbreviation |
| --- | --- |
| General management | GM |
| **Resources** | |
| Air quality and climate | AC |
| Aquatic habitat and special status aquatic species | AQ |
| Cave and Karst Resources | CK |
| Cultural and Heritage Resources | CH |
| Paleontological Resources | PL |
| Soil, Water and Riparian-Wetland Vegetation | SWR |
| Vegetation, general | |
| Vegetation – Forest including special status plant species | FV |
| Vegetation – Grassland and Shrubland | GS |
| Vegetation – Noxious and Invasive Plants | NX |
| Wildlife Habitat and special status species | WL |
| Wildland Fire Management | WF |
| **Resource Uses** | |
| Forestry and woodland products | FOR |
| Livestock grazing | GRZ |
| Minerals - locatable minerals, mineral materials, and nonenergy solid leasable materials | MI |
| Recreation and visitor services | REC |
| Travel and transportation management | TM |
| Lands and realty, land tenure adjustments | |
| Lands and Realty – Access | LA |
| Lands and Realty – Land tenure | LT |
| Lands and Realty – Land Use Authorizations | LU |
| Lands and realty, land tenure adjustments | |
| Lands and Realty – Access | LA |
| Lands and Realty – Land tenure | LT |
| Lands and Realty – Land Use Authorizations | LU |

| RMP Program Category | Abbreviation |
| --- | --- |
| Minerals - locatable minerals, mineral materials, and nonenergy solid leasable materials MN | |
| Withdrawals and other segregation WI | |
| Roads and Facilities RF | |
| **Special Designations** | |
| Areas of critical environmental concern (ACECs) | ACEC |
| National Trails | NT |
|     Garnet National Winter Trail | |
|     Lewis and Clark National Historic Trail | |
| Wilderness Study Areas | WSA |
| Wild and Scenic Rivers | WSR |
| **Safety and Tribal Interests** | |
| Native American tribal interests | TRB |
| Public health and safety | PS |

Decisions are presented below, and each is numbered, for ease of identification. The numbering sequences for the decisions are by program, each of which has an identified abbreviation (**Table II-1**), and each decision in that program is numbered in coordination with the program abbreviation (**Table II-1**), type of decision (**Table II-2**), and decision number.

**Table 2 Decisions Types**

| Type of Decision | Abbreviation |
| --- | --- |
| Goal | GOAL |
| Objective | OBJ |
| Management action and allowable uses | MA |

An example is as follows:

- AIR-GOAL-01: First air program goal
  - AIR-OBJ-01: First air program objective
    - AIR-MA-01: First air program management action decision
    - AIR-MA-02: Second air program management action decision

All acreages and maps presented in the Approved RMP are estimations, based on current data. Calculations depend on the quality and availability of data, and most calculations in this RMP are rounded to the nearest 10 acres or 0.1 mile. Given the scale of the analysis, the compatibility constraints between datasets and lack of data for some resources, all calculations are approximate; they are for comparison and analytic purposes only. Likewise, the figures in **Appendix H** are provided for illustrative purposes and subject to the limitations discussed above. Updating these data is considered plan maintenance, which will occur over time as the Approved RMP is implemented, additional surveys are completed, and information is revised.

The support information for the decisions contained in the Approved RMP are within the Proposed RMP/Final EIS incorporated and available here: https://eplanning.blm.gov.

Maps depicting resource information and stipulations applicable to surface-disturbing activities in the Approved RMP are provided in Appendix H.  Appendices A through R contain supporting information for decisions outlined in the Approved RMP.  Appendices not bolded are located in the Proposed RMP/Final EIS: https://eplanning.blm.gov. Appendices in bold are included in this document:

Appendix A.     Air Quality and Climate (*see Missoula PRMP/Final EIS*)
**Appendix B.     Aquatic and Riparian Habitat Conservation Strategy**
*Appendix C.*     Forest Vegetation (*see Missoula PRMP/Final EIS*)
Appendix D.     Impaired Waters (*see Missoula PRMP/Final EIS*)
Appendix E.     Locatable Minerals Reasonably Foreseeable Development Scenario (*see Missoula PRMP/ Final EIS*)
Appendix F.     Major Laws (see Missoula PRMP/Final EIS)
Appendix G.     Wild and Scenic River Suitability Report (*see Missoula PRMP/Final EIS*)
**Appendix H.   Approved RMP Maps**
Appendix I.     Noxious and Invasive Species List (*see Missoula PRMP/Final EIS*)
Appendix J.     Post-Wildfire Emergency Stabilization and Rehabilitation Procedures (*see Missoula PRMP/Final EIS*)
Appendix K.     Probable Sale Quantity Determinations and Calculations (*see Missoula PRMP/Final EIS*)
**Appendix L.   Approved Recreation Management Areas**
Appendix M.     Socioeconomic Report (*see Missoula PRMP/Final EIS*)
Appendix N.     Summary of No Action Alternative Management (*see Missoula PRMP/Final EIS*)
**Appendix O.   Supplemental Rules**
**Appendix P.   Design Features and Best Management Practices**
*Appendix Q.*     Lands and Realty (*see Missoula PRMP/Final EIS*)
Appendix R.     Rangeland Health (*see Missoula PRMP/Final EIS*)
**Appendix S.   Biological Opinions**

## II.2.1  GENERAL DECISIONS

GD-MA-1. Comply with federal laws, regulations, standards, and Secretarial Orders, including but not limited to the FLPMA multiple-use and sustained yield mandates.

GD-MA-2. Preserve valid existing rights, which include any leases, claims, or other use authorizations established before a new or modified authorization, change in land designation, or new or modified regulations is approved.

GD-MA-3. Continue management of the Garnet Winter Back Country Byway, which is part of the national scenic byway system. The goal of the Garnet Winter Back Country Byway is to highlight and interpret scenic, historic, archaeological or other interest values associated with Garnet Winter Back Country Byways in partnership with communities, interest groups, and state and federal agencies. The BLM manages it as a Type IV byway, specifically for winter use, and to accommodate snowmobiling and cross-country skiing along the byway, and to enhance visitor experiences, while evaluating future trails or roads for potential inclusion to this byway.

GD-MA-4. Implement administrative actions at approximately the same levels as the past decade. Administrative actions are routine transactions and activities that are required to serve the public and to provide optimum management of resources, including but not limited to:

- Administrative access for BLM staff and authorized leases/permits/etc.

- Competitive and commercial recreation activities

- Special forest product collection permit issuance

- Lands and realty actions (including the issuance of grants, leases, and permits)

- Unauthorized use resolution

- Facility maintenance and improvements

- Road maintenance

- Hauling permit issuance

- Recreation site maintenance and improvement

- Hazardous materials or tree removal

- Law enforcement

- Legal land or mineral estate ownership surveys

- Engineering support assistance in mapping field visits for the design of projects, include clearance inventories

- Tree sampling

- Project implementation and plan effectiveness monitoring Incidental live or dead tree removal for safety or operational reasons Wildlife, fisheries, or plant population or habitat monitoring

## <u>RESOURCES</u>

## II.2.2 AIR QUALITY AND CLIMATE

**Goals**

AC-G-1. Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change.

**Objectives**

AC-OBJ-1. Protect air quality-related values in federal mandatory Class I areas. Ensure authorizations and management activities comply with federal and state-mandated air quality regulations and requirements. Class I areas or federal land manager-specified sensitive Class II areas.

AC-OBJ-2. Prevent exceedances of national, state, or local ambient air quality standards.

AC-OBJ-3. Follow the BLM's climate-related policies addressing greenhouse gas emissions and carbon storage.

**Management Actions and Allowable Uses**

AC-MA-1.  Actions would comply with the Clean Air Act requirements, including compliance with the National Ambient Air Quality Standards (NAAQS), Montana Ambient Air Quality Standards (MAAQS), and the Montana State Implementation Plan.

AC-MA-2.  For prescribed burns, continue to participate in the Montana Idaho Airshed Group to manage smoke impacts and coordinate with the Montana Department of Environmental Quality (MDEQ).

AC-MA-3.  Use BMPs to reduce dust from unpaved road surfaces during extended management operations, such as timber sales and wildfires (Appendix P).

AC-MA-4.  Follow the Air Resource Management Plan for activities that could negatively affect the status of air quality non-attainment or maintenance area.

## II.2.3  AQUATIC HABITAT AND SPECIAL STATUS AQUATIC SPECIES

The BLM developed many of the management goals, objectives, and actions in this section based on those defined in INFISH (abbreviations in parenthesis indicate INFISH standards and guidelines carried forward in this plan). The Aquatic Conservation Strategy is located in Appendix B.  Additional design features and best management practices are in Appendix P.

**Goals**

AQ-G-1.  Contribute to the conservation and recovery of species and their habitats that are Endangered Species Act (ESA)-listed, proposed, and sensitive species including candidate species.

AQ-G-2.  Provide healthy, functioning aquatic, riparian, and wetland areas that support native and desired non-native aquatic and terrestrial wildlife, and rare plant species populations and communities.

**Objectives**

AQ-OBJ-1.  Manage special status fish and other special status riparian-associated species in accordance with USFWS recovery plans, conservation agreements, and designated critical habitat.

AQ-OBJ-2.  Maintain and restore riparian areas, stream channels and wetlands by providing forest shade, sediment filtering, wood recruitment, stability of stream banks and channels, waters storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates.

**Management Actions and Allowable Uses**

AQ-MA-1.  Conduct habitat restoration projects to improve aquatic special status species in fish key watersheds as appropriate.

AQ-MA-2.  Apply project-level design features and BMPs as appropriate (Appendix P).

*Riparian habitat conservation areas*

AQ-MA-3.  Delineate riparian habitat conservation areas (RHCAs) at the project or activity level in response to potential issues for aquatic species and habitat; and develop site-specific riparian management objectives (RMOs) giving primary emphasis to riparian-dependent resources.

AQ-MA-4.  Design activities to maintain existing aquatic habitat; develop restoration projects when aquatic habitat is not meeting desired conditions.

AQ-MA-5.   Activities in an RHCA shall not result in long-term degradation to aquatic conditions although limited short-term effects from activities may be acceptable when outweighed by long-term benefits.

AQ-MA-6.   Apply project design features and best management practices as appropriate at the project level (Appendix P).

AQ-MA-7.   Apply chemical herbicides, pesticides and toxicants in a manner that avoids adverse biological effects and does not retard or prevent attainment of RMOs. (RA-3)

### Aquatic Invasive Species

AQ-MA-8.   Collaborate with partners to maintain aquatic habitats free of invasive species (zebra mussels, New Zealand mud snails, quagga mussels, etc.) and prevent expansion into water bodies.

AQ-MA-9.   Use BMPs for aquatic invasive species prevention and follow aquatic nuisance species management plans (appendix P).

### Minerals Management

AQ-MA-10. Prevent undue and unnecessary degradation to aquatic species and their habitat for locatable mineral exploration and development by determining RHCAs and the associated management objectives at the project level.

### Road and Infrastructure

AQ-MA-11. Maintain desired aquatic conditions to meet RMOs and avoid adverse effects to special status aquatic species for existing and planned roads. (RF-2)

AQ-MA-12. Manage for elimination, reduction, or minimize adverse effects from roads on aquatic resources, and address closure and rehabilitation of unneeded roads (RF-3c)

AQ-MA-13. Maintain or improve roads in a condition that will not contribute sediment to streams that will hinder spawning habitat for fish. This could include maintaining vegetated ditch lines, improving road surfaces and installing cross drains at appropriate spacing. (RF-3b)

### Vegetation and Wildland Fire Management

AQ-MA-14. Vegetation management activities (fuel treatments, wildland fire suppression, harvest, fuelwood cutting, salvage, etc.) within the RHCAs will not prevent attainment of RMOs and will be designed to minimize disturbance of riparian ground cover vegetation. (TM-1b)

AQ-MA-15. Immediately establish an emergency or BAER team and develop a rehabilitation treatment plan to attain RMOs whenever RHCAs have been substantially damaged by a wildfire. (FM-5)

### Lands and Rights-of-Way

AQ-MA-16. Issue land use authorizations (leases, permits, rights-of-way) to avoid effects that would retard or prevent attainment of desired RMOs and avoid adverse effects on special status aquatic species or critical habitats. Where the authority to do so was retained, adjust existing leases, permits, and rights-of-way to eliminate effects that would retard or prevent attainment of desired RMOs, and avoid adverse effects on special status aquatic species. Where the authority to do so was not retained, negotiate to make changes in existing leases, permits, and rights-of-way to eliminate effects that would retard or prevent attainment of desired RMOs and avoid adverse effects on special status aquatic species. (LH-3)

AQ-MA-17. Use land acquisition, exchange, and conservation easements to attain desired RMOs n and facilitate restoration of special status aquatic species habitat. (LH-4)

***Fish and Wildlife Habitat Restoration***

AQ-MA-18. Design and implement restoration projects in a manner that promotes the long-term ecological integrity of habitats, provides for the genetic integrity of native species, and contributes to attainment of RMOs. (FW-1, WR-1)

AQ-MA-19. Cooperate with federal, tribal, and state fish management agencies to identify and eliminate adverse effects on aquatic special status species associated with habitat manipulation, fish stocking, fish harvest, and poaching. (FW-4)

AQ-MA-20. Fish key watersheds would be a high priority for restoration when funding is available.

## II.2.4  CAVE AND KARST RESOURCES

**Goals**

CK-G-1.    Identify, protect, or restore significant cave and karst resource values, and ensure the resource is available for appropriate use by present and future generations.

**Objectives**

CK-OBJ-1.  Ensure that proposed land uses initiated or authorized by the BLM avoid damage to significant cave and karst resources. Inventory and survey cave and karst resources to identify significance in accordance with the Federal Cave Resources Protection Act.

CK-OBJ-2.  Provide opportunities for appropriate recreational use, scientific research, or educational study while protecting other significant resource values.

**Management Actions and Allowable Uses**

CK-MA-1.   When appropriate, develop cave management plans for significant cave and karst resources.

CK-MA-2.   Maintain a database of significant cave and karst features.

CK-MA-3.   Monitor significant cave and karst resources to assess potential adverse impacts and develop responses as appropriate.

## II.2.5  CULTURAL AND HERITAGE RESOURCES

**Goals**

CH-G-1.    Preserve, protect, and interpret cultural resources and ensure that they are available for appropriate uses by present and future generations.

**Objectives**

CH-OBJ-1.  Reduce imminent threats from natural or human-caused deterioration, and/or reduce potential conflict with other resources by ensuring that authorizations for land and resource use.

CH-OBJ-2.  Promote stewardship, conservation, and appreciation of cultural resources through education and public programs in accordance with the BLM Heritage Education Program.

CH-OBJ-3.  Manage important archeological and historic sites, or areas of concentration of cultural resources occur, for the use based on the nature of the cultural resource and relative preservation value.

**Management Actions and Allowable Uses**

CH-MA-1. Evaluate documented cultural resources for National Register of Historic Places eligibility. Protect National Register of Historic Places eligible or listed sites through avoidance or other protection measures.

CH-MA-2. Comply with Section 106 of the National Historic Preservation Act (NHPA) for actions that have the potential to affect historic properties. Managers shall consider prudent and feasible alternatives to avoid adverse effects on cultural resources or their uses.

CH-MA-3. Conduct Section 110 inventories as appropriate.

CH-MA-4. Manage cultural resources in a stewardship role for public benefit. The public benefit is to analyze the scientific and sociocultural values of cultural resources; to provide a basis for allocation of cultural resources; to make cultural resources an important part of the planning system; and to identify information needed when existing documentation is inadequate to support a reasonable cultural resource-based land use allocation.

CH-MA-5. Assign identified or recorded cultural resources to cultural resource use categories in accordance with BLM Manual 8110 into one of the use allocations in Table 4.

**Table 1. Cultural resource use allocations**

| Use Allocations | Desired Outcome | Management Action |
|---|---|---|
| Scientific use | Preserved until research potential is realized | Permit appropriate research including data recovery |
| Conservation for future use | Preserved until condition for use are met | Proposed protection measures/designations |
| Traditional use | Long-term preservation | Consult with Tribes; determine limitations; nomination priority is determined with consultation with appropriate cultural group |
| Public use | Long-term preservation, on-site interpretation | Determine limitations, permitted uses; high nomination priority |
| Experimental use | Protected until used | Determine nature of experiments; low nomination priority |
| Discharged from management | No use after recordation, not preserved | Remove protection measures |

## II.2.6 PALEONTOLOGICAL RESOURCES

**Goals**

PL-G-1. Identify, preserve, and protect paleontological resources, and ensure they are available for appropriate use by present and future generations.

**Objectives**

PL-OBJ-1. Ensure that proposed land uses initiated or authorized by the BLM avoid inadvertent damage to significant paleontological resources.

PL-OBJ-2. Identify and prioritize areas for inventory based on paleontological resource potential for occurrence and known fossil localities.

PL-OBJ-3. Promote the stewardship, conservation, and appreciation of paleontological resources through appropriate educational and public outreach programs.

**Management Actions and Allowable Uses**

PL-MA-1.   Require permits for individuals or institutions conducting paleontological investigations for scientifically significant fossils.

PL-MA-2.   Require appropriate BMPs or design features for paleontological resources for proposed land uses initiated or authorized by the BLM (Appendix P).

PL-MA-3.   Maintain a database of paleontological sites and localities.

PL-MA-4.   Monitor known paleontological locales to assess potential adverse impacts and develop design features as appropriate.

## II.2.7  SOIL, WATER, AND RIPARIAN-WETLAND VEGETATION

**Goals**

SWR-G-1.   Watersheds are in, or are making significant progress toward, properly functioning physical condition, including their upland, riparian-wetland, and aquatic components; soil and plant conditions support infiltration, soil moisture storage, and the release of water that are in balance with climate and landform and maintain or improve water quality, water quantity, and timing and duration of flow.

SWR-G-2.   Ecological processes, including the hydrologic cycle, nutrient cycle, and energy flow, are maintained, or there is significant progress toward their attainment, to support healthy biotic populations and communities.

SWR-G-3.   Water quality complies with federal and Montana State water quality standards and achieves or is making significant progress toward achieving BLM management objectives.

SWR-G-4.   Hydrologic function is retained within the NRV in coordination with management of basin vegetation.

SWR-G-5.   There are adequate water rights for support of multiple uses and state-designated beneficial uses.

SWR-G-6.   Riparian-wetland areas achieve, or make significant progress toward meeting, proper functioning condition, the minimum acceptable condition (USDI 2015).

**Objectives**

SWR-OBJ-1.   Maintain and secure water rights as needed for beneficial and multiple uses.

SWR-OBJ-2.   Manage water quality in cooperation with Montana DEQ for sampling, monitoring, and determinations according to terms of the Memorandum of Understanding.

SWR-OBJ-3.   Conduct soil rehabilitation and site restoration where feasible.

SWR-OBJ-4.   Manage public lands administered by BLM to not contribute to water quality impairment in 303d or TMDL waterbodies.

SWR-OBJ-5.   Inventory riparian-wetlands assess for condition and prioritize for management action; select and implement actions necessary to attain PFC objective(s); and conduct riparian-wetland restoration where feasible for areas deemed nonfunctional or functioning-at-risk.

SWR-OBJ-6.   Regulations and policy drive the general programmatic management of these resources, and is thus, common to all alternatives. See appendix G for the objectives and management actions relevant to soil, water, and riparian-wetland resources. The BLM will manage

riparian-wetlands with the minimum objective of proper functioning condition (PFC), or progress toward PFC, for riparian-wetlands with PFC potential.

**Management Actions and Allowable Uses**

SWR-MA-1.     Through assessment of PFC, identify those elements that are limiting PFC attainment and develop actions that move toward PFC. These actions could be restoration (planting, invasive species removal, streambank stabilization, beaver reintroduction, artificial structures) and/or changes in use (protective fencing, reduction in numbers or utilization).

SWR-MA-2.     Implement standards and guidelines for grazing administration as directed for soil and water resources.

SWR-MA-3.     Incorporate design features and best management practices in project design features, terms and conditions for activities such as livestock grazing, harvest, and others that may impact the soil, water, or riparian-wetlands (Appendix P). Develop site-specific BMPs when needed for project design to meet resource objectives.

SWR-MA-4.     Manage vegetation, soils, streams, and riparian-wetlands such that hydrologic function and character at multiple scales (basin, hillslope, stream reach, riparian/wetland site) is retained within the NRV. Identify site-specific management opportunities and priorities using a watershed approach and watershed assessment information.

*Riparian*

SWR-MA-5.     The BLM would provide for riparian-wetlands and those areas influencing aquatic habitat. The BLM would delineate RHCAs at the site-specific level including criteria related to water and land features and protect those values. This management approach is based upon INFISH.

SWR-MA-6.     Modify or relocate grazing practices that prevent attainment of desired aquatic habitat conditions or are likely to adversely affect special status aquatic species.

SWR-MA-7.     Manage riparian habitat conservation areas in coordination with upland vegetation and soils in consideration of overall watershed hydrologic function and NRV.

SWR-MA-8.     Manage all riparian habitat conservation areas to contribute to the support of state-designated beneficial uses, water quality, and habitat quality for aquatic and terrestrial fauna.

SWR-MA-9.     Manage BLM resource activities and uses such that riparian-wetland areas meet, or make significant progress toward meeting, proper functioning condition.

SWR-MA-10.   Use riparian assessment data to develop needed changes in resource management, as well as the design and implementation of monitoring efforts and restoration or enhancement projects.

SWR-MA-11.   Establish and maintain an inventory of riparian-wetland areas. Periodically assess the ecological status and functioning condition at no more than 10-year intervals.

SWR-MA-12.   Permit livestock grazing when compatible with meeting, or making significant progress toward meeting, proper functioning condition and attaining riparian management objectives.

*Soils*

SWR-MA-13.   Use soils and ecological site description information. Information is to be used (1) in conducting land health assessments to help achieve aquatic, riparian, and upland health; (2) to plan and implement emergency stabilization and land restoration affected by wildfire and other disturbances; (3) to evaluate and plan for potential effects of proposed land uses on system productivity and integrity; (4) to reduce, avoid or minimize potential adverse effects of BLM Chapter 2: Alternatives 40 Bureau of Land Management Missoula Resource Management Plan FEIS management actions; and, (5) to maintain the productivity of soil resources by minimizing physical, biological, and/or chemical degradation, and accelerated erosion.

SWR-MA-14.   Maintain soil productivity. Prioritize and develop activity plans to correct soil or water problems.

SWR-MA-15.   Use the Natural Resources Conservation Service Soil Survey to identify soil properties and limitations for silvicultural practices.

### Water Quality

SWR-MA-16.   Implement management actions to reduce non-point source pollution and improve water quality where BLM-managed public lands or authorized activities are contributing to impairment of waterbodies listed as impaired by the State of Montana.

SWR-MA-17.   Restore water quality and rehabilitate site productivity and stream stability through reclamation. Apply corrective measures where unsatisfactory watershed conditions are identified.

SWR-MA-18.   Manage water quality under the MOU with Montana DEQ.

SWR-MA-19.   Report biannually to Montana DEQ on actions taken to improve water quality. Identify site specific or basin specific BMPs and rehabilitation techniques to meet water quality requirements.

SWR-MA-20.   Manage uses in Source Water Protection Areas in compliance with the Montana DEQ Source Water Protection program.

## II.2.8 VEGETATION: FOREST VEG AND SPECIAL STATUS PLANT SPECIES

### Goals

FV-G-1.   Forest management emphasizes ecological integrity, terrestrial and aquatic wildlife species habitat needs, and properly functioning watersheds while simultaneously providing forest products and creating forests resilient to disturbances such as wildland fire and epidemic insect outbreaks.

FV-G-2.   Restore or maintain forests within the natural range of variability (NRV) for each habitat type group in terms of species composition, structure, density, and disturbance patterns. Emulate disturbance patterns in terms of intensity, frequency, and scale.

FV-G-3.   Create or maintain a mosaic of differing successional pathways across the landscape, consistent with natural disturbance regimes for each habitat type group over space and time as appropriate to create and maintain wildlife habitat.

FV-G-4.     Create, maintain, and restore vegetative communities that are resilient to changing disturbance regimes (e.g., drought, wildfire, insects, and pathogens), allowing for shifting of plant communities, structure, and ages across landscapes.

FV-G-5.     Maintain, monitor, and restore populations of vegetative species listed as threatened or endangered by the USFWS or listed as sensitive by BLM across the planning area.

FV-G-6.     Identify and maintain rare plant communities as appropriate within the BLM-lands.

**Objectives**

FV-OBJ-1.   Increase the number of acres in each habitat type group that are within the mid-range natural range of variability for that habitat type group to restore ecological conditions consistent with suitable disturbance regimes.

FV-OBJ-2.   Increase acres of treatment on the landscape where appropriate through management opportunities (mechanical, as well as prescribed fire) to emulate or restore natural disturbance patterns.

FV-OBJ-3.   Treat approximately 15,000 acres per decade, with a goal of moving 10 percent per decade of forest vegetation that is currently near the lower or upper bounds of the natural range of variability (NRV) toward the midrange of NRV by using mechanical means or prescribed fire, or both.

FV-OBJ-4.   Manage wildland fires based on the objectives for the relevant fire management zone.

FV-OBJ-5.   Manage vegetation structure, density, species composition, patch size, pattern, and distribution to reduce impacts of wildland fires and forest insect outbreaks that are outside the NRV.

FV-OBJ-6.   Identify and enhance BLM special status and native plant species

FV-OBJ-7.   Protect and maintain the genetic diversity of whitebark pine. Increase white pine blister rust resistance in future whitebark pine populations.

FV-OBJ-8.   Promote development of fire-resilient forests for public safety, wildland firefighter safety, and to reduce the risk of catastrophic wildland fire. Work collaboratively with all land management partners to manage public, private, and tribal lands. Apply prescribed burns and mechanical or hand fuels treatments to reduce the potential for uncharacteristic wildfires. Apply maintenance treatments at appropriate levels to retain fire resilient conditions.

FV-OBJ-9.   Partner with other agencies and NGOs to promote public awareness and understanding of rare plants and their habitats

FV-OBJ-10.  Implement BLM Special Status Species Management Manual 6840.

**Management Actions and Allowable Uses**

FV-MA-1.    Design treatments to emulate disturbance and move conditions toward stand density, species composition and structure, which are within NRV for all habitat types.

FV-MA-2.    Consider vegetation management treatments in warm dry habitat type groups a moderate to high priority based upon departure from NRV, and treatments in cool moist and cold habitat type groups a moderate to low priority based upon departure from NRV.

FV-MA-3.    Maintain and create mature forest conditions through active treatment and restoration activities. Design actions to develop stand structures that are relatively complex with

variable tree densities, diverse understory composition, and abundant snags and downed logs. Where deficient on the landscape, create snags and down woody material for wildlife habitat.

FV-MA-4.   Maintain adequate access for management activities and treatments including permanent or temporary roads as necessary. Determine road locations based on topography, drainage, soil type, and other natural features to minimize erosion. Rehabilitate skid trails and temporary roads by appropriate methods that disperse runoff, reduce erosion, and promote revegetation as needed.

FV-MA-5.   Apply site-specific treatments to emulate historic disturbance patterns within the historic range of variability in terms of intensity, frequency, and scale.

FV-MA-6.   Design vegetation manipulation projects to improve wildlife habitat when and where possible. For example, create early stand initiation and mature multi-story for Canada lynx or other species.

FV-MA-7.   To maintain nutrient cycling and provide for wildlife habitat features scatter materials not utilized as commercial forest products (seedlings, saplings, tops, branches, cull logs, and down woody material) on the forest floor where and when it would not contribute to fire hazard.

FV-MA-8.   Strive to maintain or create the quantity of mature (late-successional) forest structure that is consistent with NRV for a given habitat type group to maintain or enhance habitat for species dependent upon mature forest structures. Location of these stands would shift across the landscape over time.

FV-MA-9.   In the wildland-urban interface (WUI), prioritize fuels reduction to address site-specific conditions and objectives for public safety rather than moving vegetation toward NRV or managing for any other objectives.

FV-MA-10.  Prioritize stands with characteristics indicating a high risk of developing epidemic levels of forest insects and/or disease for treatments to reduce risk across all habitat type groups.

FV-MA-11.  Manage slash to be conducive to revegetation and advantageous to the passage of wildlife. Dispose of slash when necessary to reduce fire hazard in the WUI or to accomplish other resource objectives.

FV-MA-12.  Document conditions of current and potential whitebark pine habitats. Protect potential or known rust-resistant seed sources. Use silvicultural practices, including prescribed fire, outlined in the BLM technical reference Conservation and Management of Whitebark Ecosystems on Bureau of Land Management Lands in the Western United States to restore and maintain WBP populations.

FV-MA-13.  Refer to the Visual Resource section for management actions pertaining to forest vegetation management.

FV-MA-14.  Maintain or, where practical, enhance site productivity on lands available for harvest: (a) minimize insect and disease losses with harvesting and management practices; (b) precommercial thin stands to maximize growth on residual trees; and (c) participate in tree-improvement cooperatives and use genetically improved seedlings in reforestation of these lands.

FV-MA-15.  Maintain unique flora and provide opportunities for education and research, in particular the Chamberlain Meadows.

FV-MA-16.  Manage the Bear Creek Flats mature ponderosa pine trees (40 acres) to maintain the late successional, mature values.

FV-MA-17.  Apply project-level design features as appropriate (Appendix P).

## II.2.9 VEGETATION: GRASSLAND AND SHRUBLAND

**Goals**

GS-G-1.  Manage upland vegetation communities to move toward or remain in proper functioning condition, including a full range of herbaceous and shrub species.

**Objectives**

GS-OBJ-1.  Maintain or enhance plant communities, by managing for priority plant species and their habitats (including, but not limited to, bitterbrush, rough fescue, and bluebunch wheat grass) to achieve desired ecological functions and vegetative conditions.

GS-OBJ-2.  Manage upland vegetative communities to maintain or improve quality and quantity of domestic livestock and wildlife forage.

GS-OBJ-3.  Manage plant communities that reflect the desired plant community appropriate for the ecological site. Where appropriate, use fire as a management agent to achieve or maintain disturbance regimes supporting healthy functioning vegetation conditions.

GS-OBJ-4.  Improve or maintain the ecological status of BLM-managed land in the uplands to Standards for Rangeland Health (USDI-BLM 1997).

**Management Actions and Allowable Uses**

GS-MA-1.  Design vegetation treatments to enhance vegetative health and/or habitat diversity consistent with desired conditions for vegetation and wildlife habitat.

GS-MA-2.  Monitor rangeland conditions on a routine schedule (approximately 10 years) with an interdisciplinary team; monitoring data may include but not limited to Rangeland Health Assessments (USDI-BLM 1997), forage utilization, pace transects, photo point, etc.

## II.2.10     VEGETATION: NOXIOUS AND INVASIVE PLANTS

**Goals**

NX-G-1.  Prevent, reduce, and minimize the introduction of invasive species and the spread of existing invasive species infestations on BLM-managed lands.

**Objectives**

NX-OBJ-1.  Treat infested areas in partnership with adjacent land managers.

NX-OBJ-2.  Manage noxious weeds and invasive plants according to the principles of Integrated Weed Management.

NX-OBJ-3.  Treat 21,000 to 50,000 infested acres of noxious and invasive species over the life of the plan.

NX-OBJ-4.  Prioritize prevention and control on roads, trails, waterways, recreation sites, and disturbed sites due to other resource management projects; and prioritize prevention and control in special designation areas and cooperative weed management areas.

**Management Actions and Allowable Uses**

NX-MA-1.  Implement measures to prevent, detect, and rapidly control new infestation of noxious weeds in healthy plant communities (approximately 0 to 5 percent infestation) as a high priority.

NX-MA-2.  Emphasize Integrated Weed Management efforts on species identified on the Montana State Noxious Weed List, county noxious weed lists, and the BLM invasive species list where feasible.

NX-MA-3.  Prioritize Weed Management Areas (areas with agreement between landowners to manage for weeds) for treatments.

NX-MA-4.  Use manual, mechanical, cultural, chemical, and biological (includes classical and targeted grazing by cattle, goats) treatments to manage invasive species infestations.

NX-MA-5.  Treat invasive plants and host species for invasive forest pathogens in accordance with the most current vegetation treatment BLM EIS/amendment; implement the standard operating procedures described in the Record of Decision for the Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement.

NX-MA-6.  Provide opportunities for education and awareness.

NX-MA-7.  Use weed seed-free forage (hay, grains, cubes, pelletized feeds, straw, and mulch) on BLM-managed lands.

NX-MA-8.  Maintain an updated inventory of and monitor treatment of noxious weeds on BLM-managed lands in partnership with other federal, state, and county partners.

NX-MA-9.  Follow BMPs when conducting planned or permitted activities within BLM-managed lands whether conducted by BLM personnel or contractors. (See Appendix P.)

NX-MA-10. Continue cooperative agreements with county and state entities. Coordinate efforts, including education and outreach, with federal, state, county, and private landowners.


## II.2.11    VISUAL RESOURCES

**Goals**

VR-G-1.  Identify, preserve, and protect paleontological resources, and ensure they are available for appropriate use by present and future generations.

**Objectives**

VR-OBJ-1.  Manage visual resources in accordance with the objectives established for visual resource management classes.

A.  VRM Class I - Preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the landscape should be very low and must not attract attention.

B.  VRM Class II - Retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Management activities may be seen but should not attract the attention of the casual observer. Any changes must repeat the basic elements of

form, line, color, and texture found in the predominant natural features of the characteristic landscape.

C.  VRM Class III - Partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

D.  VRM Class IV - Provide for management activities that require major modifications of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

**Management Actions and Allowable Uses**

VR-MA-1.  Allow forest management activities in VRM Classes II, III, and IV. For forest activities in VRM Class II, design activities to maintain or improve visual qualities and retain the character of the landscape over the long term. Short-term impacts are allowed as long as there is a long-term scenic quality character attainment.

VR-MA-2.  Implement design features and best management practices for activities potentially impacting visual resources (Appendix P).

## II.2.12    WILDLIFE HABITAT AND SPECIAL STATUS WILDLIFE SPECIES

**Goals**

WL-G-1.  Manage habitat to conserve and recover species listed under the Endangered Species Act (ESA). Grizzly bear, Canada lynx, yellow-billed cuckoo, and red knot are listed threatened under the ESA. Wolverine are proposed for listing, candidate species are not represented, and Canada lynx critical habitat is designated. Missoula Field Office coordinates with United States Fish and Wildlife Service (USFWS) and Montana Fish, Wildlife, and Parks on ESA related issues.

WL-G-2.  The majority of terrestrial wildlife habitat management of ESA-listed species and Bureau-sensitive species is driven by law, regulation, and policy and common to action alternatives. Bureau manuals 6500, 6800, 1745, and secretarial orders pertaining to terrestrial wildlife habitat, and other direction would be followed.

WL-G-3.  Manage Bureau-sensitive species and their habitats to prevent listing under the ESA by improving, maintaining, and restoring sensitive species habitats.   Follow Bureau manuals 6500, 6800, 1745, and secretarial orders pertaining to terrestrial wildlife habitat, and other direction as updated.

WL-G-4.  Manage long-term goals for NRV by providing diverse and well-distributed plant communities across the landscape by implementing principles of ecological forestry; while also ensuring there is habitat for native wildlife in sufficient quantity and quality to enhance biological diversity and conservation, and to sustain ecological, economic, and social values.

WL-G-5.  Manage to provide diverse and well-distributed plant communities across the landscape. Implement sound ecological principles, focusing on ecological forestry, when designing vegetation treatments, to emulate natural disturbance and plant community development.

WL-G-6.  Manage wildlife habitat, including migration corridors, in cooperation and partnership with local, state, federal, tribal, and non-governmental organizations.

## Objectives – all wildlife

WL-OBJ-1. Contribute to the conservation and recovery of listed terrestrial wildlife species and their habitats through the current and future USFWS recovery plans or interagency strategies such as the Canada Lynx Conservation Assessment and Strategy, Canada lynx critical habitat designation, and the final NCDE Grizzly Bear Conservation Strategy in coordination with the USFWS through Section 7 consultation.

WL-OBJ-2. Reduce, minimize, or avoid fragmentation of large intact security habitat, important to special status species and other wildlife. Maintain functional blocks of security habitat for special status species and other wildlife across the landscape.

WL-OBJ-3. Manage travel corridors, such as ridges, saddles, and riparian areas, to link landscapes and geographic areas for wildlife movement, especially Canada lynx and grizzly bear. Avoid, minimize, or mitigate impacts to sensitive species travel habitats, travel corridors and linkages. Consider opportunities to avoid, minimize, or mitigate negative impacts to Montana species of concern.

WL-OBJ-4. Manage terrestrial special status species in a manner consistent with restoration, conservation, recovery plans, and conservation agreements; inventory and monitor in cooperation with USFWS; Forest Service; Montana Fish, Wildlife, and Parks; and Montana Natural Heritage Program.

WL-OBJ-5. BLM sensitive species are priority species and their habitats. Provide for priority terrestrial wildlife habitats including caves, cliffs, snags, down woody debris, sagebrush, and bitterbrush communities.

WL-OBJ-6. Improve, maintain, and restore habitat for terrestrial wildlife in warm/dry, cool/moist, and cold/ moist habitat type groups, also including upland vegetation. Mitigate (minimize or avoid) potential long-term adverse effects.

WL-OBJ-7. Improve, maintain, and restore important wildlife habitat such as rare or limited seasonal habitats, corridors, linkages, blocks of intact functional habitat across the landscape, areas of low open road density, foraging areas, seasonal habitat components, and riparian areas, and species from Montana's Comprehensive Fish and Wildlife Conservation Strategy (MFWP 2005a) as possible.

WL-OBJ-8. Improve, maintain, and restore wildlife corridors and linkages utilizing vegetation management and safe passages.

WL-OBJ-9. Provide habitat to maintain viable and diverse populations of native plant and animal species, including special status species. Comply with Rangeland Health Standards, Standard #5 (USDIBLM 1997).

WL-OBJ-10.    Retain dead and down woody material in amounts consistent with the NRV and habitat type groups, to the extent compatible with reforestation objectives, fire hazard reduction standards, and public health and safety.

WL-OBJ-11.    Follow the BLM manuals 6500, 6840, and 1745 or as amended.

WL-OBJ-12.    Where appropriate, use active management techniques consistent with Executive Order 13855 and Secretarial Orders 3362 and 3372.

## Objectives – Canada Lynx Specific

WL-OBJ-13.    Develop vegetation management projects in Canada lynx habitat within lynx analysis units, and lynx critical habitat, to enhance and create dense early stand initiation forage habitat and dense mature multistory foraging and denning habitat, in a mosaic pattern across the landscape over space and time.

WL-OBJ-14.    In Canada lynx habitat within lynx analysis units, and in lynx critical habitat, mitigate surface disturbing activities to avoid, minimize, or reduce long-term potential adverse effects.

WL-OBJ-15.    Maximize lynx and snowshoe hare habitat to provide for Canada lynx recovery over the long term when habitat conditions are consistent with vegetation goals described in FV-G-2.

WL-OBJ-16.    Create a mosaic of early stand initiation and mature multistory habitat within each lynx analysis unit and lynx critical habitat. The BLM would consider thinning methods, within lynx habitat and lynx critical habitat, in early stand initiation structure if treatments would result in short-term effects with long-term benefits to snowshoe hare, red squirrel, and lynx.

WL-OBJ-17.    Fuels treatment projects within the within the 1-mile wildland urban interface (WUI) buffer (approximately 7,648 acres) and Fire Management Zone 1 not meeting lynx conservation measures (due to protecting life, increasing the safety of firefighters, and protecting property, improvements, and infrastructure) may occur.

### Objectives – Grizzly Bear Specific

WL-OBJ-18.    Follow the final interagency NCDE Grizzly Bear Conservation Strategy and Bureau manuals 6500, 6840, and 1745 or as updated.

WL-OBJ-19.    Develop a monitoring plan for the life of mineral activity within zone 1, where it is determined there is potential for adverse effects to the grizzly bear or its habitat resulting from leasable or locatable mineral activities. The monitoring plan would outline how changes in habitat and/or disturbance to bears will be monitored and how efforts to reduce or minimize effects (e.g., monitoring of mining reclamation measures) will be identified and funded.

WL-OBJ-20.    Monitor the density of motorized routes open for public use during the non-denning season on BLM-managed lands and compare with the 2011 baseline.

WL-OBJ-21.    Manage BLM-managed lands within NCDE Zone 1 so there shall be no net increase above the 2011 baseline (1.70 mi/mi2) in open motorized route density (roads and trails) open to public during the non-denning season (April 1 to November 30). This does not apply to the following:

A.    Motorized use by agency personnel or others authorized by the appropriate agency personnel;

B.    Temporarily opening a road for a short period of time to allow for public firewood gathering and other authorized use;

C.    Updated or improved road data without an actual change on the ground;

D.    Changes in technology or projections that result in changed calculations without actual change on the ground (e.g., a switch in geodetic systems from the North American Datum of 1927 to the North American Datum of 1983);

E.    A road closure location is moved a short distance to a better location (e.g., to the nearest intersection or turnout) to allow a turn-around providing for public safety, to reduce vandalism, or to improve enforcement of the road closure;

F. The agency exchanges, acquires, buys, or sells lands with motorized routes;

G. A change in an open road necessary to comply with federal laws;

H. Motorized use for mining activities (as authorized under the Mining Law of 1872) conducted in accordance with valid existing rights and applicable standards and guidelines;

I. A change in a motorized route necessary to address grizzly bear-human conflicts, resource damage, or human safety concerns;

J. Use of motorized routes in emergency situations as defined by 43 CFR 8340; and,

K. Temporary roads (see glossary).

WL-OBJ-22.    Implement food storage order in accordance with BLM policy.

WL-OBJ-23.    Allow no new sheep allotments on BLM-managed lands in Zone 1. Allow no new livestock grazing allotments within Zone 1, except on acquired lands that had active cattle grazing at the time of the acquisition.

WL-OBJ-24.    Reduce, minimize, or avoid long impacts to habitat availability, such as foraging, denning, and cover, from surface-disturbing activities, with special emphasis given to spring and den habitat.

WL-OBJ-25.    Adjust livestock lease terms and conditions on grizzly bear spring habitat to prevent or avoid adverse impacts.

WL-OBJ-26.    Collaborate with MT FWP to improve or maintain grizzly bear travel corridors, and provide safe passages, especially in the Marcum area.

WL-OBJ-27.    Collaborate with local, state, federal, tribal and non-governmental organizations on education, awareness, and prevention of human/wildlife conflicts

**Management Actions and Allowable Uses**

WL-MA-1.  Implement measures to prevent detect, and rapidly control new infestation of noxious weeds in healthy plant communities (approximately 0 to 5 percent infestation) as a high priority.

WL-MA-2.  Identify timing and spatial restrictions at the project level for activities that might impact special status species and their habitats. Avoid, minimize, or mitigate human activities disrupting special status species habitats during their season of use, particularly during the breeding, and winter seasons. Minimize disturbance during crucial times for elk and big game (winter range, calving).

WL-MA-3.  Implement design features to restore habitats, and to avoid or reduce impacts to Bureau sensitive species, priority species, including elk and migratory birds (Appendix P); develop site-specific design features or best management practices as appropriate.

WL-MA-4.  Conduct wildlife habitat vegetation projects to:

A. Restore, maintain, or improve unsatisfactory or declining wildlife habitat;

B. Improve desired ecological conditions of plant communities for the purpose of maintaining or improving forage, nesting, breeding, security habitat, hiding and thermal cover, and travel corridors for a wide variety of terrestrial wildlife; and

C. Improve, maintain, and restore NRV within habitat type groups.

D.  Short-term effects with long-term benefits may occur during habitat improvement projects.

WL-MA-5.  Use project management techniques aimed at restoring, maintaining, or improving habitats that include but are not limited to prescribed fire and managed wildland fire, prescriptive livestock grazing, planning, exclusion to intense disturbance, timber harvest and other mechanical methods.

WL-MA-6.  Consider effects to native pollinators and appropriate BMPs or other design features for surface disturbing activities (Appendix P).

WL-MA-7.  Collaborate with USFWS and MFWP on pollinator data collection and management.

WL-MA-8.  Provide habitat of sufficient quantity and quality, including connectivity and wildlife movement corridors, habitat complexity, forest openings, edges, and ecotones, to enhance biological diversity and provide quality, sustainable habitat for native wildlife species.

WL-MA-9.  Create or maintain a mosaic of early, mid and late-succession forest conditions across the landscape consistent with natural disturbance regimes to create and maintain desired forest conditions for priority wildlife species.

WL-MA-10. Retain to the extent practicable, trees and snags with old-growth forest structure in grasslands/shrublands undergoing vegetation treatments, such as removal of conifer encroachment through mechanical thinning or prescribed burning.

WL-MA-11. Collaborate with Montana Department of Transportation and MFWP on wildlife crossings for forest carnivores, elk and other big game, and other wildlife as appropriate.

### Big Game Specific

WL-MA-12. Across cool/moist habitat type groups, provide hiding and thermal cover habitat components near quality elk summer and fall habitat (such as wallows, mineral licks, corridors, etc.).

WL-MA-13. Across warm/dry habitat type groups, provide areas with dense early to mid-successional conditions on aspects to provide elk thermal and hiding cover near quality elk forage in winter range.

WL-MA-14. Across all habitat type groups, provide mature and late-successional forest components for security habitat near harvest units, parks, meadows, and grasslands.

WL-MA-15. Base the size of harvest units, except single tree or group selection, and thinning units upon natural disturbance patterns and ensure that they will have irregular shapes or reserve blocks within units to increase edge effect and maintain proper sight distances.

WL-MA-16. Retain large blocks of big game security habitat.

WL-MA-17. Consider objectives to maintain or improve big game summer and fall habitat during forest management activities.

WL-MA-18. Limit timber sale activity in big game winter range to as short a period as possible to minimize disturbance.

WL-MA-19. Dispose of road right-of-way slash in such a way that it does not pose a barrier to big game travel.

### Livestock Grazing Specific

WL-MA-20. Manage livestock allotments to mitigate negative impacts to riparian vegetation, upland vegetation, and big game winter and summer range.

WL-MA-21. Improve wildlife habitat, where necessary, by adjusting livestock lease terms and conditions to prevent or avoid negative impacts. This could include changes to the AUMs, season of use, or removal of livestock for a period of time.

WL-MA-22. Build new fences to standard specifications to allow safe passage and/or to keep native wildlife out of an area (Appendix P).

WL-MA-23. Install wildlife escape ramps in new and old livestock water developments.

### Bats Specific

WL-MA-24. Restore special habitat components or features contributing to bat species productivity.

WL-MA-25. Survey and assess caves, abandoned mines, talus, and late-succession forest for bat use at the project level. BLM would determine the need for bat-friendly closures for activities affecting bat use (foraging and roosting), such as caves and abandoned mines.

WL-MA-26. Use bat gates or other suitable devices to maintain bat habitat when bat use of caves or abandoned mines is determined. Public health and safety would take precedence over bat habitat if hazardous mine openings cannot be remedied with bat gates.

WL-MA-27. Collaborate with state and federal agencies in response to the spread of white-nose syndrome in bats.

### Raptors Specific

WL-MA-28. New and existing powerlines and substations constructed on BLM lands would comply with the most current raptor protection standards developed by the Avian Power Line Interaction Committee (APLIC 2012). See the Visual Resource section for management actions pertaining to forest vegetation management. Comply with BMPs and project design features for raptors when designing projects, resource management, decisions, monitoring, and restoration or enhancement projects

## II.2.13    WILDLAND FIRE MANAGEMENT

### Goals

WF-G-1.    Emphasize firefighter and public safety as the first priority in every wildland fire and fuels management activity.

WF-G-2.    Restore and maintain desired ecological conditions consistent with appropriate fire regimes.

WF-G-3.    Manage wildland fire and fuels to reduce the risk of uncharacteristic wildland fires, as well as to protect, maintain, and enhance resources.

WF-G-4.    In partnership with local, state, and federal partners, conduct fire mitigation, education, and fire prevention activities to reduce human-caused wildfire ignition, and improve public safety.

WF-G-5.    Minimize the adverse effects of wildland fire and wildfire suppression activities on resources.

WF-G-6.    Promote seamless wildland fire management planning across jurisdictions within the boundaries of BLM.

WF-G-7.    Protect life and property by treating hazardous fuels on BLM-managed lands.

### Objectives

WF-OBJ-1. Use FMZs and WUI to guide and prioritize wildland fire and fuels management activities. FMZ1 and the WUI would be the highest priority, while FMZ3 the lowest. Treatments include wildland fire, mechanical, manual, biological, and chemical.

WF-OBJ-2. Manage approximately 43,600 acres as Fire Management Zone 1, 88,365 acres as Fire Management Zone 2, and 30,640 acres as Fire Management Zone 3 (see Appendix H, Fire Management Zones, Map)

WF-OBJ-3. Within the 1-mile wild and urban interface (WUI) buffer (approximately 7,648 acres) and Fire Management Zone 1, design and implement fuels treatments to protect life, increase the safety of firefighters, and protect property, improvements, and infrastructure. These treatments will be the highest priority on BLM administered lands and take precedence over other resources.

WF-OBJ-4. Use rehabilitation to mitigate the adverse effects of wildland fire to soil, vegetation, and water resources in a cost-effective manner.

**Management Actions and Allowable Uses**

WF-MA-1. In general, manage wildfires according to Fire Management Zone classification. Although the FMZ determination does not dictate exactly how every wildfire is to be managed, it will be used to guide and prioritize wildfire response and fuels management. Taking actions to limit fire growth is always an option for any wildfire in any FMZ. The strategy for any wildfire depends on many factors including the FMZ, current vegetation conditions, time of year, condition of fuels, risk management, resource availability, safety, protection agency, geographical area and national wildland fire activity, and smoke impacts.

    A. FMZ1: High values at risk, or areas at high risk of catastrophic fire due to current vegetation conditions, where an unplanned wildland fire is likely to cause negative effects. These lands would generally be under a full suppression strategy. These lands are adjacent to and close proximity to the WUI, intermingled with private and state lands, and contain important cultural, recreational, economic, or biological resources. Fuels treatments including mechanical and prescribed fire will play a major role in these areas.

    B. FMZ2: Wildland fire is desired to manage ecosystems, but there are constraints to using wildland fire. Constraints are many and vary greatly including current vegetation conditions, time of year, condition of fuels, risk management, resource availability, safety, protection agency, geographical area and national wildland fire activity, and smoke impacts. Prior vegetation treatments will aid in allowing wildland fire to be utilized to manage vegetative communities, and wildland fire is needed to maintain some of these prior vegetation treatments. The full range of fuels treatments including mechanical and prescribed fire on lands in this category will be important to the success of wildland fire management.

    C. FMZ3: Wildland fire is desired to manage ecosystems, and there are fewer constraints to using wildland fire. In these areas, wildland fire could be allowed to play its natural role on the landscape. These lands include wilderness study areas, protected lands with wilderness characteristics, areas geographically far from values at risk, and where current vegetation conditions are favorable to meet resource objectives by carefully managing wildfires. While fuels treatments can and could occur here, management of wildfire would be the preferred treatment method.

WF-MA-2. Minimum impact suppression tactics would be used for wildland fire management in Wales BCA, Hoodoos BCA, WSAs and, if WSAs released, in the Wales Creek ACEC, expanded Hoodoos BCA, and Wales BCA. Wildland fire management in WSAs will follow BLM Manual 6330-Management of BLM Wilderness Study Areas.

WF-MA-3. The use of heavy equipment for wildland fire management would not be allowed in WSAs, Hoodoos BCA, Wales BCA, Wales Creek ACEC, and historic or cultural sites eligible for the National Register of Historic Places unless approved by line officer.

WF-MA-4. Assist communities in developing, maintaining, and implementing community wildfire protection plans.

WF-MA-5. Coordinate and cooperate with local jurisdictions to prioritize fuels reduction in WUI areas in conjunction with completed community wildfire protection plans.

WF-MA-6. Use the BLM's Emergency Fire Rehabilitation Handbook (H-1742-1) and Appendix J for implementing emergency fire rehabilitation projects following wildland fires. Separate environmental analysis will only be completed for emergency fire rehabilitation projects that are outside the scope of activities described in Appendix J.

WF-MA-7. Locate incident bases, camps, helibases, staging areas, and other incident management activities outside of riparian areas. Exemptions will require line officer approval. 6. Avoid using retardant in WSAs, protected lands with wilderness characteristics, and ACECs. Exemptions will require line officer approval.

WF-MA-8. Select fire suppression methods to minimize or eliminate the impact on significant historic properties, ACEC values, and riparian areas.

WF-MA-9. Prescribed fire may be used to accomplish wildlife habitat and livestock forage objectives.

## RESOURCE USES

## II.2.14    FOREST PRODUCTS

**Goals**

FP-G-1. Manage forest resources to provide a sustainable flow of timber to support local economies through timber harvest.

FP-G-2. Manage forested lands for multiple uses including commercial timber and other forest products commodity production, wildland fire resiliency, terrestrial and aquatic wildlife habitat, recreational uses and cultural resources.

FP-G-3. Collaborate with all land management partners (federal, state, private, and tribal) to increase effectiveness and amount of lands treated to promote forest health.

FP-G-4. Provide sales opportunities for special forest products that maintain a balance between public demand and desired vegetation conditions. Examples of special forest product sales include but are not limited to firewood, Christmas trees, house logs, posts and poles, vegetative cuttings, and conifer boughs.

**Objectives**

FP-OBJ-1. Manage forest resources to provide a sustainable flow of timber to support local economies through timber harvest. Maintain and annually update a 5-year sale plan to facilitate planning

for and implementing timber sales. Establish a Probable Sale Quantity that will serve as a tool for sustainable flow of timber; the annual PSQ is not an upper limited as timber sale quantities will vary depending on fluctuations in timber market conditions, insect and disease epidemics, wildland fires, funding and staffing levels and other objectives.

FP-OBJ-2.   Collaborative planning with land manager partners and response to forest health conditions related to catastrophic wildland fire and insect and disease epidemics will be a priority.

FP-OBJ-3.   Offer approximately 79 MMBF of timber for sale per decade (annual quantities will vary from less than the long-term average of 3.6 MMbf to around 15 MMbf) through forest product sales on an available land base of approximately 101,669 acres. Pursue additional contributions to the Probable Sale Quantity (PSQ) from approximately 13,264 acres available for harvest with limitations within Canada lynx habitat and RHCAs. Approximately 33,377 acres would be unavailable for harvest operations.

FP-OBJ-4.   Build new permanent roads if necessary, to facilitate long-term management of areas to meet forest resource objectives, and close temporary roads upon completion of project implementation. Replacement, maintenance, and decommissioning of existing roads to meet transportation planning and management objectives could also occur during forest product management projects if deemed appropriate at the project level.

FP-OBJ-5.   Consider salvaging dead or dying trees resulting from wildland fire, forest insects and diseases, weather-induced or other forest mortality events, and salvage dead or dying merchantable timber in designated WUI or Fire Management Zone 1 areas within 2 years of when the tree mortality causing event started.

FP-OBJ-6.   The special forest products (SFP) sale program would maintain current types of activities as well as the development of treatment areas to help meet public demand for SFP sale forest products. SFP sales would only occur where sufficient physical access currently exists. No new permanent roads would be constructed to meet the demands of the SFP sale program.

FP-OBJ-7.   Cooperate with the Forest Service to continue offering personal use firewood permits valid for product collection from both the BLM and USFS lands in western Montana to the extent possible by following agency procedures such as a valid MOU.

**Management Actions and Allowable Uses**

FP-MA-1.   Implement project design features and best management practices to improve habitats for or to minimize effects to wildlife, aquatics, riparian areas, and other resources from forest management activities (Appendix P).

FP-MA-2.   Commercial harvest of forest products is typically associated with vegetative restoration to a NRV and would be designed to meet multiple objectives some of which would include; forest management, wildlife habitat management, hazardous fuels reduction, hazard tree removal, special status species management, visuals, recreation, and travel management. However, commercial harvest of forest products would be the primary objective of management activities in some instances to meet goals and objectives of supporting local economies.

FP-MA-3.   Timber salvage project areas would have some areas that are left untreated as retention patches to maintain wildlife habitat.

FP-MA-4.   In areas with dead and dying trees (including retention patches), tree cutting would be allowed for human safety, fire rehabilitation and stabilization, to benefit wildlife habitat and/or forest or stream restoration activities.

FP-MA-5.   Silvicultural prescriptions would be created and implemented for commercial harvest activities and would be consistent with professionally acceptable methods related to site, species, habitat types, and regeneration methods appropriate in a given area.

FP-MA-6.   Only dead and dying trees would be allowed to be taken as firewood unless live trees cutting area are designated. The BLM could designate specific areas for firewood cutting of live trees to meet resource objectives or BLM authorized uses such as leases and right-of-way.

FP-MA-7.   To protect snag habitat for wildlife, dead trees greater than 24 inches d.b.h. would not be permitted to be cut for firewood unless they are within two tree lengths of an open road. An exception to this management action is if there is a high density of dead trees creating a public safety hazard and the needs for snag dependent wildlife habitat have been met, dead trees greater than 24 inches d.b.h could be harvested.

FP-MA-8.   See Recreation section for firewood exception areas.

FP-MA-9.   Montana forestry BMPs would be followed during implementation of commercial timber harvest or special forest product sales activities.

FP-MA-10.  Insect and disease suppression treatments would be permitted to contain outbreaks and reduce the risk to other forest stands in the vicinity.

## II.2.15   LIVESTOCK GRAZING

### Goals

LG-G-1.   Manage the public rangelands to provide for a sustainable level of livestock grazing consistent with multiple use and sustained yield.

### Objective

LG-OBJ-1.  Manage allotments in compliance with Standards for Rangeland Health and Guidelines for Livestock Grazing Management for Public Lands in Montana/Dakotas (USDI-BLM 1997). The BLM would adjust grazing levels and management practices when needed to meet or make progress toward meeting the standards for rangeland health.

### Management Actions and Allowable Uses

LG-MA-1.   Manage approximately 145,558 acres as available for livestock grazing, and 17,027 acres as unavailable for livestock grazing; and would administer 6,660 animal use months (AUMs) across the BLM-managed lands. Forage levels for livestock may vary at the project level, based on the implementation of comprehensive grazing strategies necessary to maintain or achieve vegetation objectives (See Appendix H, Maps)

LG-MA-2.   Follow the BLM's 1997 Record of Decision for Standards for Rangeland Health and Guidelines for Livestock Grazing Management Final Environmental Impact Statement for Montana and North and South Dakota. The five standards include:

  a.   Uplands are in proper functioning condition;

  b.   Riparian areas and wetlands are in proper functioning condition

  c.   Water quality meets Montana State standards;

  d.   Air quality meets state standards; and

    e.   Provide habitat as necessary, to maintain a viable and diverse population of native plant and animal species, including special status species

LG-MA-3.   Allotments where Standards for Rangeland Health (USDI-BLM 1997) are not met and livestock grazing is a significant causal factor for non-achievement, then the BLM will take appropriate action to achieve or make progress toward achieving unmet rangeland health standards. Adjustments to the leases terms and conditions may include but is not limited to changes to animal unit months (AUMs), season of use, rest rotations, or removal of cattle from a portion or all of the allotment for a duration of time. Implementation or maintenance of range improvement projects may be required. Adjustments could occur at the project or activity-level.

LG-MA-4.   Issue grazing leases for domestic livestock upon request. Prior to authorizing leases for domestic sheep in bighorn sheep habitat, coordinate with MTFWP.

LG-MA-5.   Exclude developed recreation sites from livestock grazing, except where grazing is needed to maintain the desired plant community. Manage grazing by horses and other livestock used by recreationists in developed recreation sites through specific activity plans.

LG-MA-6.   Livestock grazing use could be suspended after wildfire, prescribed fire, or non-fire vegetative treatments until grazing could continue as Standards for Rangeland Health were met.

LG-MA-7.   Modify grazing schedules and livestock management practices as necessary during drought conditions according to Bureau policy/guidance.

LG-MA-8.   Rest, limited forage utilization, or deferring areas from livestock grazing following major disturbance as appropriate, depending on a variety of factors including, but not limited to, resource objectives, the type of fuel, burn severity, accessibility of the burned area to livestock and post-burning climatic factors.

LG-MA-9.   Newly acquired lands would be evaluated to determine if they should be allocated for grazing, or designated as unavailable for livestock grazing in consideration of the management needs and objectives for the acquisition

LG-MA-10.  At the time a lessee voluntarily relinquishes a lease, the BLM would consider either the public lands where that permitted use was authorized should remain available for livestock grazing or be used for other resource management objectives. Follow current BLM policy and guidance in relinquishment process.

LG-MA-11.  As allotments located within or adjacent to subdivisions on private lands become vacant, the BLM will evaluate the availability of livestock grazing on a case-by-case basis.

LG-MA-12.  Changes to categories of allotments (I, M, C) would occur through plan maintenance.

LG-MA-13.  Conduct site-specific NEPA for any prescribed grazing.

## II.2.16    RECREATION AND VISITOR SERVICES

**Goals**

RV-G-1.   Maintain and enhance a diverse array of quality recreation opportunities and benefits while providing educational opportunities, minimizing user conflicts, and promoting public safety.

RV-G-2.   Develop and maintain appropriate recreation facilities, balancing public demand, protection of Public Land resources, and fiscal responsibility.

RV-G-3.   Collaborate with partners on recreation and visitor service experiences including but not limited to national, state and local recreation providers, non-profit organizations, other federal, state and local agencies, historic preservation groups, tourism entities and local recreational groups.

RV-G-4.   Pursuant to Secretarial Orders 3347 and 3356, provide opportunities for outdoor recreation that add to the participants' quality of life while contributing to local economies.

**Objective**

RV-OBJ-1.   Continue existing partnerships, and develop and maintain additional cooperative relationships with national, state and local recreation providers, non-profit organizations, other federal and state agencies, historic preservation groups, tourism entities and local recreational groups.

RV-OBJ-2.   A variety of dispersed and water-based recreation activities are permitted and may be supported by the development of river access, trails, and trailhead facilities. Cooperative river management for recreation will be encouraged with appropriate BLM participation on the Clark Fork River, Blackfoot River, and Rock Creek.

**Management Actions and Allowable Uses**

RV-MA-1.   Manage lands designated as a SRMA, ERMA or BCA – see Appendix L Recreation Management Areas for specific management direction.

A.   Special Recreation Management Areas (SRMAs) are managed to protect and enhance a targeted set of activities, experiences, benefits and desired recreation setting characteristics. SRMAs may be subdivided into recreation management zones (RMZs) to further delineate specific recreation opportunities. Within an SRMA, recreation and visitor services management are a recognized and predominant land use plan focus, where specific recreation opportunities and recreation setting characteristics are managed to be protected on a long-term basis.

B.   Extensive Recreation Management Areas (RMAs) are administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor service program investments.

C.   Backcountry Conservation Areas (BCAs) are managed to protect and enhance wildlife-dependent recreation.

RV-MA-2.   Designate four areas as SRMAs (71,632 acres):

1   *Blackfoot SRMA,* approximately 19,543 acres will provide a wide array of outcome focused recreation opportunities for multiple skill levels and users while maintaining the scenic values. May include rafting, fishing, hiking, biking, hunting, scenic driving, motorized and non-motorized recreation. Continue working with partners to manage recreation and to develop recreation opportunities.

2   *Garnet SRMA,* approximately 28,183 acres in 2 recreation management zones: Garnet Ghost Town (424 acres); Garnet Trails (27,759 acres). Manage Garnet Ghost Town to provide day use activities to include guided and self-guided tours, interpretation and education, hiking, picnicking, and viewing the preservation of cultural resources. Also, manage winter cabin rental. Manage, maintain and expand the existing network of snowmobile trails in the Garnet Range, including the Garnet National Winter Recreation Trail and Garnet Winter Backcountry Byway.

3   *Chamberlain SRMA,* approximately 19,307 acres would continue to offer a quality, walk-in hunting experience for the public including the local community, continue working with MFWP and the landowners in support of this experience and allow snowmobile riding.

4   *Limestone Cliffs SRMA* (approximately 50 acres) would provide rock-climbing opportunities while maintaining educational and interpretative values of the limestone outcrops; provide educational and scientific interpretation opportunities.

RV-MA-3.   Designate three areas as BCAs

1.   *Hoodoos BCA* (approximately 12,533 acres) would provide dispersed wildlife-dependent recreation opportunities including but not limited to hunting, camping, wildlife viewing, and hiking. Provide for and enhance habitat for recreationally dependent wildlife species.

2.   *Ram Mountain BCA* (approximately 4,549 acres) would provide dispersed wildlife dependent recreation opportunities including but not limited to hunting, camping, wildlife viewing, and hiking. Provide for and enhance habitat for recreationally dependent wildlife species.

3.   *Wales BCA* (2,365 acres) managed similarly as Hoodoos BCA.

RV-MA-4.   Manage lands not designated a SRMA, ERMA or BCA to reduce user conflict and to provide visitor health and safety.

RV-MA-5.   No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands.

RV-MA-6.   If the BLM acquires lands that are adjacent to special recreation management areas (SRMA), the BLM would manage acquired lands in accordance to the designated SRMA.

## II.2.17    TRAVEL AND TRANSPORTATION MANAGEMENT

**Goals**

TM-G-1.   Provide a balanced approach to travel management that offers a sustained flow of local economic benefits and minimizes or mitigates user conflict, safety concerns, and resource effects while taking into consideration the unique attributes and values of the various travel management planning areas.

**Objective**

TM-OBJ-1.   Designate areas as Open, Closed, or Limited for motorized and non-motorized travel to minimize resource effects and conflicts of use. Motorized use includes snowmobiles and other off-highway vehicles.

A.   Open: Motorized vehicle travel is permitted yearlong anywhere within an area designated as "open" to OHV and snowmobile use. Open designations are used for intensive OHV use areas where there are no special restrictions or where there are no compelling resource protection needs, user conflicts, or public safety issues to warrant limiting cross-country travel (see 43 CFR 8340.05).

B.   Limited: Motorized vehicle travel within specified areas and/or on designated routes, roads, vehicle ways, or trails is subject to restrictions. The limited designation is used where OHV and snowmobile use must be restricted to meet specific resource management objectives. Examples of limitations include: number or type of vehicles; time or season of use; permitted or licensed use only; use limited to designated roads and trails; or other limitations if restrictions are necessary to meet resource

management objectives, including certain competitive or intensive use areas that have special limitations (see 43 CFR 8340.05).

C. Closed: Motorized vehicle travel is prohibited in the area. Access by means other than motorized vehicle is permitted. Areas are designated closed if closure to vehicular use is necessary to protect resources, promote visitor safety, or reduce use conflicts (see 43 CFR 8340.05).

TM-OBJ-2. Use an interdisciplinary approach to address resource and administrative access needs for completion of Comprehensive Travel and Transportation Management planning. Consider and address the full range of various modes of travel on public lands, motorized and non-motorized, including over-land, over-snow and fly-in access, as well as recreational opportunities and the demands for such uses.

TM-OBJ-3. Use a systematic process that considers the unique resource issues and social environments of each route-specific travel planning within Travel Management Areas. This preliminary set of criteria, at a minimum, to consider during comprehensive travel management planning must include the following:

   a. Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air or other resources of the public lands, and to prevent impairment of wilderness suitability;

   b. Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitat, special attention will be given to protect endangered and threatened species and their habitats;

   c. Areas and trails shall be located to minimize conflicts between off-road vehicles use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors; and

   d. Areas and trails shall not be located in officially designated Wilderness areas or primitive areas; areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural aesthetic scenic or other values for which such areas are established.

## Management Actions and Allowable Uses

TM-MA-1. Manage approximately 133,770 acres as Limited motorized travel (OHVs limited to designated routes and trails, and snowmobiles limited seasonally and designated areas). Manage approximately 28,844 acres as Closed to motorized travel (OHV and snowmobiles) within the Wilderness Study Areas and Ram Mountain (see Appendix H maps).

TM-MA-2. Maintain the current management of the Travel Management Plan until subsequent Travel Management Planning at the activity-level with appropriate public involvement and NEPA analysis.

TM-MA-3. Update and maintain the road and trail database to correct mapping errors and refine decisions.

TM-MA-4. Restrictions and closures will be established for specific roads, trails or areas based on consideration of the following criteria: the need to promote user enjoyment and minimize use conflicts; the need to minimize damage to soil, watershed, vegetation, road beds or other resource values; the need to minimize harassment of wildlife or significant degradation

of wildlife habitat; the need to promote user safety; and the need to cooperate with adjoining landowners.

TM-MA-5.   Promote the use of shared trails whenever possible. 5. Manage the road system and implement road infrastructure and design features and best management practices (Appendix P).

TM-MA-6.   Allow for temporarily opening a road for a short period of time to allow for public firewood gathering and other authorized uses.

TM-MA-7.   A road closure location is allowed to be moved a short distance (e.g., to the nearest intersection or turnout) to a better location to allow turn-arounds providing for public safety, to reduce vandalism, or to improve enforcement of the road closure

TM-MA-8.   Any land acquired by the BLM over the life of the resource management plan will be managed similarly to the existing OHV area designations of adjoining BLM lands or as stated, or implied, in the transfer. Where clarification is absent, the BLM will manage acquired lands under the OHV limited area designation. The types of limitation will be set by implementation-level decisions; until these decisions are made, use may continue in the same manner and degree consistent with the purposes for which the acquisition was made

TM-MA-9.   Cooperate with MFWP to adjust seasonal travel restrictions in accordance with big game hunting season extensions.

## II.2.18     LANDS & REALTY:  ACCESS

**Goals**

LA-G-1.   Address public and administrative access needs across nonfederal lands.

LA-G-2.   BLM-managed lands would have reasonable access, while providing a balance of use, enjoyment and protection of resource.

LA-G-3.   Continue working with all land management partners (federal, state, private, and tribal) and nonprofit organizations to maintain and improve access.

**Objective**

LA-OBJ-1.   Acquire and maintain access to BLM-managed lands to improve management efficiency in coordination with other federal agencies, state and local governments, and private landowners; or to improve public access for recreation.

**Management Actions and Allowable Uses**

LA-MA-1.   Legal public or administrative access would be pursued from willing landowners on a case-by-case basis as the need or opportunity arises. Acquisition efforts would be focused on Category 1 and 2 lands where no legal public or administrative access exists or where additional access is necessary to meet management objectives.

## II.2.19     LANDS AND REALTY:  LAND TENURE

**Goals**

LT-G-1.   Improve resource management efficiency and provide public benefit as opportunities arise.

LT-G-2.    Continue working with all land management partners (federal, state, private, and tribal) and nonprofit organizations to maintain and improve resource management.

**Objectives**

LT-OBJ-1.   Manage approximately 59,462 acres in Category 1, approximately 103,149 acres in Category 2, and 0 acres in Category 3 (see Appendix H, maps).

LT-OBJ-2.   Retain public lands with high resource values, adjust land ownership to consolidate public lands, acquire lands with high resource values, and meet public and community needs.

LT-OBJ-3.   Consistent with Secretary's Order 3373, ensure that public access and recreational opportunities are important consideration of any land tenure adjustment, and manage BLM lands according to its identified land tenure category: Category 1 (Retention), Category 2 (Limited Exchange), Category 3 (Disposal).  See Appendix Q for criteria and legal descriptions and Appendix H for maps.

**Management Actions and Allowable Uses**

LT-MA-1.   Manage lands based on category as described in Appendix H.  The BLM would retain Category 1 lands and disposal would not be permitted. The BLM would generally retain Category 2 lands, but exchanges and other conveyances would be permitted if in the public interest. FLPMA section 203 sales would not be permitted.

LT-MA-2.   Manage newly acquired lands similar to adjacent BLM lands and the following criteria:

    A.   Lands acquired within special management areas with specific Congressional mandates (such as NHT) will be managed in conformance with established guidelines for those areas.

    B.   Lands acquired adjacent to administratively designated management allocations (such as BCAs or SRMAs) will be managed the same as and become part of the adjacent allocation.

    C.   Lands acquired without special values or management goals will be managed in the same manner as comparable surrounding public lands.

    D.   To the extent possible, management direction would be extended to newly acquired lands through plan maintenance.

LT-MA-3.   Acquisitions and exchanges will adhere to law, regulation, and policy using appropriate and available funding sources including, but not limited to, the Land and Water Conservation Fund.

LT-MA-4.   Accomplish acquisition will primarily through purchase of land or interests in land from willing landowners using the Federal Land Transaction Facilitation Act (FLTFA) account if available, the Land and Water Conservation Fund (LWCF), or other funding sources. Acquisition of land may also be accomplished through donations to the BLM by nonfederal landowners. The BLM may acquire conservation easements to preserve open space, enhance public access, and protect important resource values.

LT-MA-5.   BLM would generally reserve access rights in conveyance of lands that contain public access routes. 6. Land Tenure actions can be initiated by public request or proposal. These requests or proposals are considered on a case-by-case basis. The land tenure categories identify where land acquisitions could move forward for consideration of whether they are in the public interest. Consistent with Secretarial Order 3373, ensure that public access and

recreational opportunities are an important consideration of any land tenure adjustment (see land tenure criteria listed in Appendix Q).

LT-MA-6.   Applications for R&PP, transfer of administrative jurisdiction to other federal agencies, Color-of-Title, Carey Act Grant, State Grant, Railroad Grants, and Airport Grants would be considered and reviewed on a case-by-case basis.

LT-MA-7.   Land tenure adjustments will be subject to environmental review including biological reports, cultural and paleontological inventories, and hazardous materials assessments, as well as water rights documentation and minerals appraisal, if the mineral estate is included in the proposal

LT-MA-8.   No BLM land in the Missoula Field Office is suitable for Desert Land Entry or Indian Allotments.


## II.2.20      LANDS & REALTY:  LAND USE AUTHORIZATIONS

### Goals

LU-G-1.      Consider requests for rights-of-way, land use permits, and leases.

### Objectives

LU-OBJ-1.  Designate transportation and utility corridors, as well as avoidance and/or exclusion areas.

LU-OBJ-2.  Designate lands as exclusion or avoidance areas as appropriate.

LU-OBJ-3.  Respond to public needs for use authorizations such as rights-of-way, leases, and land use permits while balancing for other resource use and protection.

### Management Actions and Allowable Uses

LU-MA-1.   Manage lands according to ROW Exclusion and Avoidance Areas:

   A.  ROW Exclusion Area: The BLM would manage ROW exclusion areas as unavailable for rights-of-way.

   B.  ROW Avoidance Areas: The BLM would manage ROW avoidance areas as generally not available for large-scale infrastructure; exceptions may be permitted based on type of and need for facility proposed; conflicts with other resource values and uses, including potential values and uses; and availability of alternatives and/or design features. ROWs may also be allowed if they support or promote management objectives for the area and/ or if the ROW does not impact the goals and objective of the area. For example, during site-specific planning, the BLM would allow a ROW only if compatible with riparian habitat conservation areas' RMOs, or if the historical and cultural values were not compromised.

LU-MA-2.   Manage approximately 46,988 acres as ROW avoidance areas for recreation management areas (5 SRMAs and 1BCAs), all ACECs, and the Lewis and Clark National Historic Trail corridor. Manage approximately 23,480 acres as ROW exclusion areas, and 236 acres as a ROW corridor (see Appendix H, maps)

LU-MA-3.   Consider ROWs outside of avoidance and exclusion areas on a case-by-case basis with appropriate stipulations.

LU-MA-4.   Locate new right-of-way facilities within or adjacent to existing rights-of-way, or corridors, to the extent practical, to minimize adverse environmental effects and the proliferation of separate rights-of-way.

LU-MA-5.   Allow nonfederal landowners who are surrounded by BLM land d a degree of access that will provide for the reasonable use and enjoyment of the nonfederal land (BLM Manual 2801).

LU-MA-6.   Analyze requests for land use authorizations (rights-of-way, leases, or permits) and apply design features on a case-by-case basis through the environmental review process with applicable terms and conditions (Appendix P).

LU-MA-7.   Manage ROW to the latest version of Suggested Practices for Avian Protection on Power Lines (APLIC 2006).

LU-MA-8.   *Communication Sites:* Consider communication sites on a case-by-case basis consistent with management objectives of the area. Group new communication site users into suitable existing sites to reduce impacts and expedite application processing. Complete communication site management plans before authorizing communication site uses in new areas.

LU-MA-9.   *ROW Corridor:* The Approved Resource Management Plan Amendments/Record of Decision (ROD) for Designation of Energy Corridors on Bureau of Land Management-Administered Lands in the 11 Western States (USDI-BLM 2009) was approved on January 14, 2009. The Garnet RMP designated corridor was for electric only (Corridor 229-254).

LU-MA-10.  *Revised State (R.S.) 2477:* Revised Statute (R.S.) 2477, which provided that "[t]he right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted," was repealed on October 21, 1976, by the Federal Land Policy and Management Act. FLPMA did not terminate valid rights-of-way established under R.S. 2477 prior to its repeal.

LU-MA-11.  *Revised State (R.S.) 2477:* Current guidance is contained in WO IM No. 2006-159: Non-Binding Determinations of R.S. 2477 Right-of-Way Claims. Briefly, this guidance states that the BLM does not have the authority to make binding determinations on the validity of R.S. 2477 right-of-way claims. The BLM may make informal, non-binding determinations for its own land use planning and management purposes. A non-binding determination that the right-of-way exists is required before completing consultation with states or counties on any proposed improvements to a claimed R.S. 2477 right-of-way (i.e., any work beyond routine maintenance). It may also be appropriate before taking action to close or otherwise restrict the use of a claimed R.S. 2477 right-of-way.

LU-MA-12.  *Unauthorized Use:* Attempt to reduce trespass through prevention, detection, and resolution. The priority for resolving trespass in an area is accorded to newly discovered ongoing uses, developments, or occupancies where resource damage is occurring and/or where there is a significant loss of revenue to the United States. In such cases, resolution is needed to halt and prevent further environmental degradation or revenue loss. Historic trespass cases where little or no resources damage is occurring are resolved as workloads permit.

## II.2.21      MINERALS

**Goals**

MI-G-1.     Provide land use opportunities to explore and develop locatable minerals while preventing undue or unnecessary degradation to other resources.

MI-G-2.     Provide land use opportunities to explore and develop solid leasable and salable minerals while preventing or minimizing impacts to other resources

**Objectives**

MI-OBJ-1.   Identify resource-specific or mining best management practices (BMP), required design features to help in preventing unnecessary or undue degradation from locatable mineral exploration and development (Appendix P).

MI-OBJ-2.   In accordance with 43 CFR 3809.2(a), review areas of interminable "temporary" segregation from the mining laws and restore these lands by opening to locatable mineral entry if a withdrawal is not recommended.

MI-OBJ-3.   For areas requiring special management, identify required design features for leasable and salable mineral projects to meet other resource goals and objectives.

**Management Actions and Allowable Uses**

MI-MA-1.    Recommend approximately 283 acres for withdrawal from mineral entry (Garnet Ghost Town, 263 acres; Limestone Cliffs, 20 acres), and recommend approximately 20,211 acres of interminable temporary segregation as open to mineral entry.

MI-MA-2.    Close approximately 716 acres to leasable and salable minerals—Garnet Ghost Town RMZ, 424 acres; conservation easements, 242 acres; and Limestone Cliffs SRMA, 50 acres.

MI-MA-3.    Apply design features as determined at the project level under energy and mineral exploration and development (see Appendix P).

MI-MA-4.    Coal: Under the first regulatory screening procedure at 43 CFR 3420.1-4(e), only the areas that have development potential may be identified as acceptable for further consideration for coal leasing; therefore, if a coal lease application is submitted to the BLM, the applicant must be able to adequately demonstrate development potential and the merit of their data. If the application is determined to be adequate and passes the remaining screening and unsuitability assessment procedures required by regulation, a land use plan amendment would be required before the BLM could issue a coal lease.

## II.2.22      WITHDRAWALS AND OTHER SEGREGATION

**Goals**

WS-G-1.     Protect significant resources or government investments.

**Objectives**

WS-OBJ-1.   Use withdrawal recommendations with the least restrictive measures and of the minimum size necessary to accomplish the required purpose.

**Management Actions and Allowable Uses**

WS-MA-1.  Approximately 1,193 acres of Powersite Reservations and Federal Energy Regulatory Commission withdrawals under the authority of the Federal Power Act would remain in effect.

WS-MA-2.  New withdrawal proposals that result in a transfer of jurisdiction to another federal agency will be considered on a case-by-case basis. Other agency requests for new withdrawals, or modification, extension, or revocation of existing withdrawals will be considered.

WS-MA-3.  Existing withdrawals will be reviewed prior to their expiration to determine if a need exists to extend and/or modify the withdrawal. Should the review indicate that the purpose for which the lands were withdrawn is no longer valid, the withdrawal would be allowed to expire. If the purpose remains valid for a portion of the withdrawn lands, the withdrawal would be modified and extended.

## II.2.23    ROADS AND FACILITIES

**Goals**

RF-G-1.  Manage facilities, including roads and trails, to provide for public access or administrative needs, while maintaining or protecting resource values and in coordination with other federal agencies, state and local governments, and private landowners.

**Objective**

RF-OBJ-1.  Provide and maintain a road transportation system that serves resource management needs (administrative/commercial) and public use needs (recreational/domestic) for BLM-managed lands while mitigating impacts to resources.

**Management Actions and Allowable Uses**

RF-MA-1.  Construct new permanent/temporary roads where needed to meet resource management objectives, including major culverts and bridges as necessary, to established BLM engineering design standards.

RF-MA-2.  Apply BMPs as needed to road location, design, and construction (Appendix P).

RF-MA-3.  Maintain existing roads to provide access for both resource management and casual use activities to established BLM maintenance standards while providing user safety, protecting water quality and facility investments, and in consideration of other resource issues.

RF-MA-4.  Manage for safety along BLM-managed roads including, but not limited to, hazard tree removal.

RF-MA-5.  Fully decommission and obliterate (permanent closure) roads with no future resource management need. Decommission (long-term closure) roads not currently needed for resource management but that will be operated and maintained again in the future. Apply as needed road closure BMPs. Close roads only with the approval of affected reciprocal right-of-way permittees.

RF-MA-6.  Close and rehabilitate nonessential roads if expenditure of funds is justified.

RF-MA-7.  Roads and trails on BLM-managed land under the jurisdiction of other entities will be maintained by the appropriate holder of rights within the provisions of the granting authority or right.

RF-MA-8.  Manage to eliminate, reduce, or minimize adverse effects from roads on aquatic resources, and address closure and rehabilitation of unneeded roads

RF-MA-9.   Provide and maintain fish passage at new, replacement, and reconstructed road crossings of existing and potential fish-bearing streams, unless barriers are determined beneficial for native fish and/or sensitive aquatic species conservation.

RF-MA-10. Maintain or improve roads within the RHCAs in a condition that will not contribute sediment to streams that will hinder spawning habitat for fish.

RF-MA-11. Avoid locating new roads or road-related facilities in RHCAs. Exceptions may be granted upon watershed or site-specific analysis focused on how road design features would minimize or avoid adverse effects to aquatic and riparian resources at site-specific, reach, and watershed scales.

RF-MA-12. Avoid or minimize sediment delivery to streams from the road surfaces to attain and maintain desired aquatic habitat conditions in riparian areas and wetlands.

RF-MA-13. Design new, replacement, and reconstructed stream crossings (culverts, bridges, and other crossings).

## SPECIAL DESIGNATIONS

## II.2.24   AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACECs)

### Goals

ACEC-G-1. Protect relevant and important values and apply special management where standard or routine management is not adequate to protect the values from risks or threats of damage/degradation or to provide for public safety from natural hazards. Objectives 1. Maintain or restore important relevant and important values in Areas of Critical Environmental Concern including Research Naturals Areas.

### Objectives

ACEC-OBJ-1.   Maintain or restore important relevant and important values in ACECs/RNAs.

### Management Actions and Allowable Uses

ACEC-MA-1.   Manage the Phil Wright Rock ACEC (640 acres) for its relevant and important values. Emphasize the wildlife, watershed, recreation, and scenic values of the area. Would be a ROW avoidance area; closed to motorized vehicles. Any other activities (livestock grazing, commercial timber harvest, mineral materials) must be compatible with ACEC values. Any locatable minerals would require a plan of operations. Management actions would protect, maintain, and enhance (where feasible): bighorn sheep lambing habitat; bighorn sheep, elk, and deer yearlong and winter habitat values; the scenic qualities of the cliffs; recreation uses compatible with the primary values of the tract; fisheries habitat of Rock Creek; riparian vegetation of Rock Creek; and raptor nesting habitat of the cliffs. Recreation use and opportunities would be oriented toward preserving and enjoying the wildlife, watershed, and scenic values of the tract – wildlife viewing, fishing, hunting, hiking and sightseeing are compatible with those values and would be emphasized, no developed recreation sites or opportunities are being considered. Roads will not be constructed unless needed to meet specific management goals.

ACEC-MA-2.   Manage the West Fork Buttes (950 acres) as Research Natural Areas (RNA).  Manage West Fork Buttes RNA to maintain the diverse native plants species (over 200); prioritize the area for invasive species and noxious weed treatments; and allow research and

education in partnership with other agencies, Tribes, and education groups. Livestock grazing would continue.

ACEC-MA-3.   If Congress were to release the Wales Creek WSA then approximately 5,602 acres would be managed as the Wales Creek ACEC for the pearlshell mussel population and unique geologic features in the area.

ACEC-MA-4.   Implement activities necessary to maintain or restore important and relevant values found in the Preliminary ACEC Report (USDI-BLM 2018)

ACEC-MA-5.   Manage ACECs/RNAs for the identified relevant and important values. Allow livestock grazing and other activities not prohibited so long as the activity does not degrade the relevant and important values and is compatible with preserving and enhancing the key values of the tract.

ACEC-MA-6.   Manage ACECs as land tenure Category 1 for retention.

ACEC-MA-7.   Review and update existing activity plan as needed; create new activity plans to manage relevant and important values as needed.

## II.2.25   NATIONAL TRAILS

### Goals

NT-G-1.   Safeguard the nature and purposes; and protect and restore the Garnet Winter National Recreation Trail and the Lewis and Clark National Historic Trail resources, qualities, values, and associated settings and the primary use or uses.

NT-G-2.   For the Lewis and Clark National Historic Trail, protect the values set forth in the enabling legislation/designation and cooperatively work with the trail administrator for current and future national trails.

### Objectives

NT-OBJ-1.   Designate a corridor on public lands that is one-half mile on either side of the centerline of the Lewis and Clark National Historic Trail. The BLM would manage the corridor as a ROW avoidance area, VRM Class II, and limited off-highway vehicle allocation. Recreation use and opportunities would be oriented toward preserving and enjoying the trail experience—wildlife viewing, floating, fishing, hunting, hiking, biking and sightseeing are compatible with those values and would be emphasized. For public safety, no grazing use would be allowed in the Lower Blackfoot Corridor portion of the trail corridor. Forest management, road building, and other activities may occur if compatible with preserving, restoring, and enhancing the key values of the Trail.

NT-OBJ-2.   Provide premier visitor experiences for public benefit for both national trails.

NT-OBJ-3.   Maximize opportunities for shared national trail stewardship for both national trails.

NT-OBJ-4.   For both national trails, avoid activities that are incompatible with the purposes for which each trail was established.

NT-OBJ-5.   Permit no uses that would substantially interfere with the nature and purposes of the Lewis and Clark National Historic Trail.

NT-OBJ-6.   Identify and manage the historical route and historical remnants and artifacts for public use, enjoyment, and vicarious trail experiences for the Lewis and Clark National Historic Trail.

NT-OBJ-7.  Identify and manage high potential historical sites or high potential route segments, including the recommendation of additional Federal Protection Components for the Lewis and Clark National Historic Trail.

**Management Actions and Allowable Uses**

NT-MA-1.  Designate a Lewis and Clark National Historic Trail corridor on public lands that is one-half mile on either side of the centerline of the Lewis and Clark National Historic Trail.  The trail corridor is a ROW avoidance area, VRM Class II, and limited off-highway vehicle allocation. Recreation use and opportunities will be oriented toward preserving and enjoying the trail experience—wildlife viewing, floating, fishing, hunting, hiking, biking and sightseeing are compatible with those values and would be emphasized. No grazing use would be allowed in the Lower Blackfoot Corridor portion of the trail corridor. Forest management, road building, and other activities may occur if compatible with preserving, restoring, and enhancing the key values of the Lewis and Clark National Historic Trail.

## II.2.26    WILD AND SCENIC RIVERS

**Goals**

WSR-G-1.  Conserve outstanding remarkable values (ORVs) for suitable or deferred suitable segments.

**Objective**

WSR-OBJ-1.    Manage segments suitable or deferred from suitability for the outstanding remarkable values (ORVs) until determination by Congress on inclusion in the National Wild and Scenic River System.

**Management Action and Allowable Uses**

WSR-MA-1.    Manage the Rock Creek segment (2.1 miles) on BLM-managed lands as eligible for its Fish, Geological, Recreation, Scenic outstanding remarkable values (ORVs) until the U.S. Forest Service evaluates suitability on the other 9 miles of Rock Creek.

## II.2.27    WILDERNESS STUDY AREAS

**Goals**

WSA-G-1.  Manage Hoodoo Mountain, Quigg West, and Wales Creek WSAs so as not to impair their suitability for preservation as wilderness, until Congress either designates them as wilderness or releases them from further study.

**Objective**

WSA-OBJ-1.    Manage the WSAs according to BLM Manual 6330 – Management of BLM Wilderness Study Areas – until Congress acts upon the recommendations.

**Management Actions and Allowable Uses**

WSA-MA-1.    Manage the WSAs according to BLM Manual 6330 – Management of BLM Wilderness Study Areas – until Congress acts upon the recommendations. Only Congress can designate or release lands.

WSA-MA-2.    Prepare a wilderness management plan for any areas Congress designates as wilderness.

WSA-MA-3.    If Congress releases the Wales Creek WSA, then the BLM would manage approximately 5,982 acres as part of the Wales Backcountry Conservation Area. The other 5,602 acres would be managed as the Wales Creek Area of Critical Environmental Concern.

WSA-MA-4.    If Congress releases the Hoodoo Mountain WSA, then the BLM would manage approximately 11,380 acres as a Hoodoos BCA.

WSA-MA-5.    If Congress releases the Quigg West WSA, the 520 acres would be managed as part of the Ram Mountain BCA.

## PUBLIC SAFETY AND TRIBAL INTERESTS

## II.2.28    PUBLIC SAFETY

**Goals**

PS-G-1.    Provide an appropriate management response to natural and human disturbances, emphasizing public and firefighter safety.

**Management Actions and Allowable Uses**

PS-MA-1.    Prioritize abandoned mine land reclamation to address immediate problem sites that pose a threat to public health and safety. Abandoned mine land features impacting water quality, or that are in the vicinity of recreational use by the public are also assigned a high priority for closure and mitigation.

PS-MA-2.    Conduct reclamation activities in accordance with land health standards and BMPs.

PS-MA-3.    Survey and assess abandoned mines for bat use. Determine the need for closures or seasonal closures for activities affecting bat populations in abandoned mines, if present.

PS-MA-4.    Monitor abandoned mine land sites after reclamation.

## II.2.29    TRIBAL INTERESTS

**Goals**

TI-G-1.    Accommodate treaty and legal rights, including the Hellgate Treaty of 1895, of federally recognized Native American groups in management of public lands including the Confederated Salish and Kootenai Tribes.

**Objective**

TI-OBJ-1.    Notify and consult with tribes on BLM actions. Conduct consultation and coordination on a government-to-government basis with federally recognized tribes.

## II.3   PUBLIC INVOLVEMENT

The BLM will continue to work with existing partners, to cultivate new partnerships, and to seek the views of the public during the implementation of this RMP. It will use such techniques as news releases and website postings to ask for participation and to inform the public of new and ongoing management actions and site-specific planning.

The BLM will also continue to coordinate, both formally and informally, with the numerous federal and state agencies, Native American tribes, local agencies, and officials interested and involved in the management of public lands in the Missoula FO.

## II.4   MANAGEMENT PLAN IMPLEMENTATION

The BLM will develop an implementation plan to identify actions to achieve the desired outcomes of the Approved RMP. The implementation plan will assist BLM managers and staff to prepare budget requests and to schedule work priorities.

The management actions and allowable uses outlined in Chapter 2 of the Proposed RMP/Final EIS that are now part of the Approve RMP (Section II.2).  Most management actions and allowable uses can be implemented through existing laws and regulations.  That is, these actions are enforceable.  In some cases, unique, and site-specific restrictions and prohibitions need to be clearly spelled out for ease of understanding and clarity. One of the BLM's tools to achieve this are supplementary rules.  The Final EIS, Volume II, Appendix O contained proposed supplementary rules.  The BLM prepared supplementary rules to provide full authority to BLM Law Enforcement to enforce management decisions made in the Approved RMP pursuant to BLM's authority under 43 CFR 8365.1-6.  Appendix O of this Approved RMP contain the supplementary rules.

The BLM will issue implementation decisions to fully implement the RMP. During implementation of the RMP, the BLM will prepare additional documentation for site-specific actions to comply with NEPA. This can vary from a simple statement of conformance with the RMP and adequacy of existing NEPA analysis to more complex EAs or EISs that analyze several alternatives.

## II.5   RMP IMPLEMENTATION, MONITORING, AND EVALUATION

Chapter 5 of the Final EIS outline the RMP implementation, monitoring, and evaluation processes.  The BLM will monitor and periodically evaluate implementation of the RMP based on guidance in the BLM's Land Use Planning Handbook, H-1601-1 (BLM 2005), as amended.

### II.5.1  RMP EVALUATION

Evaluation is the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and how effectively the plan is being implemented. In accordance with the BLM's Land Use Planning Handbook (H-1601-1; BLM 2005), the BLM will periodically evaluate an approved RMP to determine whether the land use plan

decisions and NEPA analysis are still valid and whether the plan is being implemented effectively. Land use plan evaluations determine whether:

- The decisions remain relevant to current issues.
- Decisions are effective in achieving or making progress toward achieving the desired outcomes specified in the RMP.
- Any decisions need revision, amendment, or deletion.
- Any new decisions are needed.

In making these determinations, the BLM's evaluation will consider whether mitigation measures such as those described in the Approved RMP are effective in mitigation impacts, whether there are significant changes in the related plans of other entities, or whether there is significant new information. In addition to periodic evaluations, special evaluations may also be required to review unexpected management actions or significant changes in the related plans of Native American tribes, other federal agencies, and state and local governments, or to evaluate legislation or litigation that has the potential to trigger an amendment or revision to the RMP. Evaluations may identify resource needs, as well as the means for correcting deficiencies and addressing issues through plan maintenance, amendments, or revisions. Evaluations should also identify where new and emerging issues and other values have surfaced.

## II.5.2  RMP Monitoring

Monitoring is the process of tracking and documenting the implementation (or the progress of implementation) of land use plan decisions. Land use plan decision monitoring is a continuous process occurring over the life of the RMP. The aim is to maintain a dynamic RMP. Monitoring data are collected, examined, and used to draw conclusions about 1) whether planned actions have been implemented in the manner prescribed by the RMP (implementation monitoring) identified in **Section 0**, , 2) whether RMP allowable use and management action decisions and the resultant implementation actions are effective in achieving program-specific objectives or desired outcomes (effectiveness monitoring), and 3) calculating the cost of delivering a service or product (efficiency monitoring by program elements). Implementation monitoring tracks the completion of land use plan decisions, whereas effectiveness monitoring helps determine whether completion of land use plan decisions achieves anticipated desired outcomes. If implementation of land use plans does not achieve anticipated desired outcomes, adaptive management may be necessary.

The BLM uses conclusions drawn from monitoring to make recommendations on whether to continue current management or to determine what changes need to be made to implementation practices to better achieve RMP goals. Indicators, methods, locations, units of measures, frequency, and action triggers can be established by national policy guidance, in RMPs, or by technical specialists in order to address specific issues.

Based on staffing and funding levels, monitoring is annually prioritized consistently with the goals and objectives of the RMP. The BLM may work in cooperation with local, state, and other federal agencies, or it may use data collected by other agencies and sources when appropriate and available.

## II.6   REFERENCES

All references to BLM manuals, handbooks, instruction memorandums and bulletins can be accessed with the following reference.

U.S. Department of Interior, Bureau of Land Management. [No date]. BLM Policy. USDI Bureau of Land Management Headquarters, Washington DC. https://www.blm.gov/policy.

**Air Quality and Climate**

EPA. 2009. Compilation of Air Pollutant Emission Factors (AP-42), Fifth Edition, Volume I, Chapter 14: Greenhouse Gas Biogenic Sources. Section 14.4 Enteric Fermentation. October 14.

Federal Register. 2017. Montana Second 10-year Carbon Monoxide Maintenance Plan for Missoula. 82 FR 43180, 43180-43184. Environmental Protection Agency, September 14, 2017. Available online at https://www.federalregister.gov/documents/2017/09/14/2017-19460/montana-second-10-year-carbon-monoxide-maintenance-plan-for-missoula

Halofsky, Jessica E.; Peterson, David L.; Ho, Joanne J.; Little, Natalie, J.; Joyce, Linda A., editors. 2018. Climate change vulnerability and adaptation in the Intermountain Region. Gen. Tech. Rep. RMRS-GTR20. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. Available online at http://adaptationpartners.org/iap/docs/Halofsky_etal_2018_inpressreader7.pdf

Intergovernmental Panel on Climate Change (IPCC). 2014. Climate Change 2014 Synthesis Report Summary for Policymakers. 32 p.

Keane, R. 2017. Fire Order Fire Effects Model (FOFEM). Version 6.4. USDA Forest Service Intermountain Fire Science Lab. https://www.firelab.org/project/fofem

MDEQ (Montana Department of Environmental Quality), Air Quality Bureau. 2017. Air Quality Monitoring Network Plan. Helena, MT: MTDEQ. 47 p.

Missoula, City of. 2010. Greenhouse Gas Emission Inventory. Missoula, MT: City of Missoula. 168 p.

Missoula, City of. 2012. Conservation and Climate Action Plan. Jones, Chase, and Andrew Valainis. Missoula, MT: City of Missoula. 87 p.

USDA Forest Service. 2009. Beaverhead-Deerlodge National Forest Land and Resource Management Plan Chapter 3 - Forestwide Direction.

USDA Forest Service. 2017. Final Environmental Impact Statement for the Forest Plan Amendments: Incorporating Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population. Helena-Lewis and Clark, Kootenai, and Lolo National Forests.

USDA. 2018. National Agricultural Statistics Service Quick Stats. https://quickstats.nass.usda.gov/#F40967BA-A828-3BCD-BF0C-3E595411195D.

USDI-BLM. 2010. Climate Change Supplementary Information Report: Montana, North Dakota, and South Dakota. U.S. Billings, MT: Department of Interior, Bureau of Land Management, Montana State Office.

USDI-BLM. 2016. Analysis of the Management Situation Missoula Resource Management Plan. August 31.

Western Regional Climate Center (WRCC). 2017. Period of Record Monthly Climate Summary. Available online at https://wrcc.dri.edu/

## Aquatics

Hastie, L.C., Cosgrove, P.G., Ellis, N., Gaywood, J.G. 2003. The threat of climate change in freshwater pearl mussel populations Ambio, Vol. 32: 40-46.

Lee, O.C., J.R Sedell, B.E. Rieman, R.F. Thurow, J.E. Williams and others. 1997. Chapter 4: Broadscale Assessment of Aquatic Species and Habitats. In T.M Quigley and S. J. Arbelbide, eds "An Assessment of Ecosystem Components in the Interior Columbia Basin and Portions of the Klamath and Great Basins Volume I. U.S. Department of Agriculture, Forest Service, and U.S. Department of Interior, Bureau of Land Management, Gen Tech Rep 18 PNW-GTR-405).

Maxell, B. 2000. Management of Montana's amphibians: a review of factors that may present a risk to population viability and accounts on the identification, distribution, taxonomy, habitat use, natural history, and the status and conservation of individual species. Report to USFS Region 1, University of Montana, Wildlife Biology Program. Missoula, Montana. 161 pp.

Maxell, B.A. 2005. Amphibian and aquatic reptile inventories conducted on and around lands administered by the Missoula Field Office of the Bureau of Land Management. Report to Missoula Field Office of the Bureau of Land Management. 53 pp.

Maxell, B.A., P. Hendricks, M.T. Gates, and S. Lenard. 2009. Montana amphibian and reptile status assessment, literature review, and conservation plan. Montana Natural Heritage Program, Helena, MT and Montana Cooperative Wildlife Research Unit and Wildlife Biology Program, University

Montana Fish Wildlife and Parks (MTFWP). 2007. Memorandum of understanding and conservation agreement for westslope cutthroat trout and Yellowstone cutthroat trout in Montana.

Muhlfeld C, Kalinowski S, McMahon T. 2009. Hybridization reduces fitness of cutthroat trout in the wild. Biology Letters. 5:328–331.

Reeves, G. H., and S. L. Duncan. 2009. Ecological history vs. social expectations: managing aquatic ecosystems. Ecology and Society 14(2): 8. Available online at http://www.ecologyandsociety.org/vol14/iss2/art8/

Rodgers, T.L., Jellison W.L. 1942. A collection of reptiles and amphibians from western Montana. Copeia, Vol. 1942, No. 1. pp. 10-13.

Stagliano, D. 2010. Freshwater Mussels in Montana: Comprehensive Results from 3 years of SWG Funded Surveys. Prepared for Montana Department of Fish Wildlife and Parks. 74 pp.

Stagliano, D. 2015. Re-evaluation and trend analysis of western pearlshell mussel (SWG Tier 1) populations across watersheds of western Montana. Prepared for Montana Department of Fish Wildlife and Parks. 39 pp.

USDA, Forest Service. 2009. Beaverhead-Deerlodge National Forest Land and Resource Management Plan, Final Environmental Impact Statement. Dillon, Montana.

USDA, Forest Service. 2013. Conservation Strategy for Bull Trout on USFS lands in Western Montana. USDA Forest Service, Northern Region.

ICBEMP. 2014. The Interior Columbia Basin Strategy: A strategy for applying the knowledge gained by the interior Columbia Basin ecosystem management project to the revision of land use plans and project implementation. Retrieved from https://www.blm.gov/download/file/fid/11171.

U.S. Fish and Wildlife Service (USFWS). 1998a. Biological opinion for the effects to bull trout from the continued implementation of land and resource management plans and resource management plans as amended by the interim strategies for managing fish producing watersheds in eastern Oregon and Washington, Idaho, western Montana and portions of Nevada (INFISH) and the interim strategy for managing anadromous fish-producing watersheds in eastern Oregon and Washington, Idaho and portions of California (PACFISH). U.S. Fish and Wildlife Service. Portland, Oregon.

USDI, Fish and Wildlife Service (USFWS). 1998b. A Framework to Assist in Making Endangered Species Act Determinations of Effect for Individual or Grouped Actions at the Bull Trout Subpopulation (substitute core area) Watershed Scale. Region 1, Portland, Oregon.

USDI, Fish and Wildlife Service (USFWS). 2010. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for Bull Trout in the Coterminous United States; Final Rule. Federal Register/ Vol. 75, No. 200: 63898-64070.

USDI, Fish and Wildlife Service. 2015. Recovery plan for the coterminous United States population of bull trout (Salvelinus confluentus). Portland, Oregon. 179 p.

Whitlock, C., Cross, W., Maxwell, B., Silverman, N., Wade, A.A. 2017. Executive Summary. 2017 Montana Climate Assessment. Bozeman and Missoula, Montana: Montana State University and University of Montana, Montana Institute on Ecosystems 318 p. doi:10.15788/m2ww8w.

## Cave and Karst Resources

Campbell, Newell P. 1978. Caves of Montana. Montana Bureau of Mines and Geology.

## Cultural and Heritage Resources

Tetra Tech. 2011. Landscape Overview of Missoula Resource Management Plan (RMP) Area Including Portions of Granite, Missoula and Powell Counties, Montana. Missoula, Montana.

USDI-BLM. 1986. Garnet Resource Area. Resource Management Plan. Butte, Montana.

Confederated Salish and Kootenai Tribal Historic Preservation Office. 2009. Ethnographic Overview of BLM Properties in Western Montana, Missoula and Butte Offices. Missoula, Montana.

## Energy and Minerals

Ecosystem Management Inc. (EMI). 2011. Final Mineral Assessment Report for the Missoula Field Office.

## Forest Vegetation, Forest Resources and Wildland Fire Management

Ager, A. A., N. M. Vaillant, and M. A. Finney. 2010. A comparison of landscape fuel treatment strategies to mitigate wildland fire risk in the urban interface and preserve old forest structure. Forest Ecology and Management 259:1556–1570.

Arno, Stephen F and Carl E. Fiedler. 2005. Mimicking Nature's Fire: Restoring Fire-Prone Forests in the West. Washington (DC): Island Press.

Barrett, S.W, S.F. Arno, and J.P. Menakis. 1997. Fire episodes in the Inland Northwest (1540-1940) based on fire history data. Gen. Tech. Rep. INT-GTR-370. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 17 p.

Bentz, Barbara J., Jacques Régnière, Christopher J. Fettig, E. Matthew Hansen, Jane L. Hayes, Jeffrey A. Hicke, Rick G. Kelsey, Jose F. Negrón, Steven J. Seybold. 2010. Climate Change and Bark Beetles of the Western United States and Canada: Direct and Indirect Effects, BioScience, Volume 60, Issue 8, 1 September 2010, Pages 602–613, https://doi.org/10.1525/bio.2010.60.8.6

Bollenbacher, B. 2010. Pattern of vegetation matters on the KIPZ. USDA Forest Service, Northern Region.

Brown, James K.; Smith, Jane Kapler. 2000. Wildland fire in ecosystems: effects of fire on flora. Gen. Tech. Rep. RMRS-GTR-42-vol. 2. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 257 p.

Byler, J. W., and Hagle, S. K. 2000. Succession functions of forest pathogens and insects: Ecosections M332a and M333d in northern Idaho and western Montana. United States: U.S. Dept. of Agriculture, Forest Service, State and Private Forestry, Forest Health Protection, Northern Region. Retrieved from https: ir.library.oregonstate.edu/concern/defaults/pr76f4587?locale=en.

Collins, B. M., Miller, J. D., Thode, A. E., Kelly, M., Wagtendonk, J. W., and Stephens, S. L. 2008. Interactions among wildland fires in a long-established Sierra Nevada natural fire area. Ecosystems, 12(1), 114-128.

Davis, K. M., Clayton, B. D., and Fischer, W. C. 1980. Fire ecology of Lolo National Forest habitat types. USDA For. Serv. Gen. Tech. Rep. INT-79, 77 p. Intermountain Forest and Range Experiment Station, Ogden, Utah 84401.

Duncan, S. L., B. C. McComb, and K. Johnson. 2010. Integrating ecological and social ranges of variability in conservation of biodiversity: past, present, and future. Ecology and Society 15(1): 5. [online] URL: http:// www.ecologyandsociety.org/vol15/iss1/art5/

Fettig C.J., Klepzig, K. D., Billings, R. F., Munson, A. S., Nebeker, T. E., Negron, J. F., and Nowak, J. T. 2007. The effectiveness of vegetation management practices for prevention and control of bark beetle infestations in coniferous forests of the western and southern United States. Forest Ecology and Management, 238(1-3), 24-53.

Finney, M. A., and Cohen, J. D. 2003. Expectation and evaluation of fuel management objectives. In P. N. Omi and L. A. Joyce (Eds.), Fire, fuel treatments, and ecological restoration: Conference proceedings, April 16-18, 2002, Fort Collins, CO. Proceedings RMRS-P-29 (pp. 353-366). Fort Collins, CO: USDA Forest Service, Rocky Mountain Research Station.

Finney, M. A. 2007. A computational method for optimising fuel treatment locations. International Journal of Wildland Fire, 16(6), 702-711.

Fischer, William C.; Bradley, Anne F. 1987. Fire ecology of western Montana forest habitat types. General Technical Report INT-223. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 95 p.

Haufler, J. B. 1999. Strategies for conserving terrestrial biological diversity. In R. K. Baydack, H. Campa III, and J. B. Haufler (Eds.), Practical approaches to the conservation of biological diversity. (pp. 17-30). Washington D.C.: Island Press.

Hessburg, P. F., Salter, R. B., and James, K. M. 2007. Re-examining fire severity relations in pre-management era mixed conifer forests: Inferences from landscape patterns of forest structure. Landscape Ecology, 22, 5-24.

Hood, Sharon M.; Baker, Stephen; Sala, Anna. 2016. Fortifying the forest: Thinning and burning increase resistance to a bark beetle outbreak and promote forest resilience. Ecological Applications. 26(7): 1984-2000.

Hudak, Andrew T.; Rickert, Ian; Morgan, Penelope; Strand, Eva; Lewis, Sarah A.; Robichaud, Peter R.;

Hoffman, Chad; Holden, Zachary A. 2011. Review of fuel treatment effectiveness in forests and rangelands and a case study from the 2007 megafires in central, Idaho, USA. Gen. Tech. Rep. RMRS GTR-252 Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 60 p.

Johnson, Charles G.; Clausnitzer, Rodrick R.; Mehringer, Peter J.; Oliver, Chadwick D. 1994. Biotic and abiotic processes in eastside ecosystems: the effects of management on plant and community ecology and on stand and landscape vegetation dynamics. Gen. Tech. Rep. PNW-GTR-322. Portland, OR: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 66 p.

Keane, R.E.; Loehman, R.; Clark, J.; [et al.]. 2015. Exploring interactions among multiple disturbance agents in forest landscapes: Simulating effects of fire, beetles, and disease under climate change. In: Ajith, H.; Perera, A.H.; Remmel, T.K.; [et al.], eds. Simulation modeling of forest landscape disturbances. New York: Springer

Landres, P.B., Penelope, Morgan, Swanson, F.J., 1999. Overview and use of natural variability concepts in managing ecological systems. Ecological Applications 9, 1179–1188.

Losensky, John B. 1997. Historical Vegetation of Montana. Montana: Department of Natural Resources

Montana Department of Natural Resources and Conservation (DNRC). 2007. Fire Protection Manual, Section 601, Forest Fire Protection in Montana. Available online at http://dnrc.mt.gov/divisions/forestry/docs/fire-and-aviation/manuals/600manual/601-current-ffprotection-2015.pdf

Montana Wood Products Association. 2015. Timber Industry in Focus, educational information regarding forestry and the forest products industry in Montana. Retrieved from http://www.montanaforests.com/catalogs/catalog142/section361/file2601.pdf

Morgan, P., G. H. Aplet, J. B. Haufler, H. C. Humphries, M. M. Moore, and W. D. Wilson. 1994. Historical range of variability: A useful tool for evaluating ecosystem change. Journal of Sustainable Forestry 2:87–111.

Mueggler, W.F. and W.L. Stewart. 1980. Grassland and shrubland habitat types of Western Montana. Ogden, UT: USDA Forest Service, Intermountain Research Station. Retrieved from https://www.fs.fed.us/rm/pubs_int/int_gtr066.pdf

Pfister, Robert D., Bernard L. Kovalchik, Stephen F. Arno, and Richard C. Presby. 1977. Forest habitat types of Montana. USDA Forest Service General Technical Report INT-34. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station. 174 p.

Pyne, Stephen J. 1982. Fire in America, A Cultural History of Wildland and Rural Fire. Seattle, Washington. Princeton University Press.

Safford, H. D., Schmidt, D. A., and Carlson, C. H. 2009. Effects of fuel treatments on fire severity in an area of wildland-urban interface, Angora Fire, Lake Tahoe Basin, California. Forest Ecology and Management, 258(5), 773-787.

Samman, S., and Logan, J. 2000. Assessment and response to bark beetle outbreaks in the Rocky Mountain area. General Technical Report RMRS-GTR-62. Ogden, UT: USDA Forest Service, Rocky Mountain Research Station. Retrieved from https://www.fs.fed.us/foresthealth/publications/rmrs_gtr62.pdf.

Sampson, R and Adams, D. 1994. Assessing forest ecosystem health in the Inland West. New York: Food Products Press.

Stephens, S. L., Moghaddas, J. J., Edminster, C., Fiedler, C. E., Haase, S., Harrington, M., Keeley, J.E., Knapp, E.E., McIver, J.D., Metlen, K., Skinner, C.N., and Youngblood, A. 2009. Fire treatment effects on vegetation structure, fuels, and potential fire severity in western US forests. Ecological Applications, 19(2), 305-320.

Swanson, F. J., J. A. Jones, D. A. Wallin, and J. H. Cissel. 1994. Natural variability—implications for ecosystem management. 85–99 M. E. Jensen and P. S. Bourgeron. Eastside forest ecosystem health assessment. Volume II. Ecosystem management: principles and applications. USDA Forest Service, Northern Region, Missoula, Montana, USA.

USDI -BLM. 2003a. Fire/fuels Management Environmental Assessment Plan for Montana and The Dakotas. U.S. Department of Interior, BLM. September 26. Pgs 10-12, 79-81.

**Grassland/shrubland/range**

Big Sagebrush Steppe – Inter-Mountain Basins Big Sagebrush Steppe. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=5454

Montane Sagebrush Steppe – Inter-Mountain Basins Sagebrush Steppe. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=5455

Mueggler, W. F. and W. L. Stewart. 1980. Grassland and shrubland habitat types of western Montana. USDA Forest Service Gen. Tech. Rep. INT-66, Intermountain Forest and Range Exp. Sta., Ogden, Utah. 154 pp.

Rocky Mountain Lower Montane, Foothill, and Valley Grassland – Northern Rocky Mountain Lower Montane, Foothill and Valley Grassland. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=7112

Rocky Mountain Montane-Foothill Deciduous Shrubland – Northern Rocky Mountain Montane-Foothill Deciduous Shrubland. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=5312

Rocky Mountain Subalpine-Upper Montane Grassland – Northern Rocky Mountain Subalpine-Upper Montane Grassland. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=7113

Rocky Mountain Subalpine Deciduous Shrubland – Northern Rocky Mountain Subalpine Deciduous
Shrubland. Montana Field Guide. Montana Natural Heritage Program Retrieved on February 21,
2018, from http://FieldGuide.mt.gov/display ES_Detail.aspx?ES=5326

Rocky Mountain Subalpine-Montane Mesic Meadow. Montana Field Guide. Montana Natural Heritage
Program Retrieved on February 21, 2018, from http://FieldGuide.mt.gov/display
ES_Detail.aspx?ES=7118

USDA-NRCS. 1997. National Range and Pasture Handbook.

U.S.D.I. Bureau of Land Management. 1997. Montana/Dakotas Standards for Rangeland Health and
Guidelines for Livestock Grazing Management.

## Lands and Realty

FLMPA - Federal Land Policy and Management Act of 1976 as amended: Sections 102, 203, 205-207, 209,
302 and 501-507.

LWCF- Lands and Water Conservation Fund Act of 1964

Mineral Leasing Act of 1920 (MLA) as amended (1973)

Recreation and Public Purposes (R&PP) Act of 1926, as amended (43 U.S.C. 869)

Energy Policy Act of 2005, PL 109-58 (HR 6), enacted August 8, 2005

Avian Power Line Interaction Committee (APLIC). 2006. Suggested Practices for Avian Protection on
Power Lines: The State of the Art in 2006. Edison Electric Institute, Final Project Report CEC-
500-2006-022. Available online at https://www.nrc.gov/docs/ML1224/ML12243A391.pdf

U.S. Department of the Interior, Bureau of Land Management (USDI-BLM). 2009. Approved Resource
Management Plan Amendments/Record of Decision (ROD) for Designation of Energy Corridors
on Bureau of Land Management-Administered Lands in the 11 Western States. BLM/WO-GI-09-
005-1800.

USDI-BLM. 2017. Scoping Report, Missoula Resource Management Plan, BLM Missoula Field Office,
Missoula. 47 p. Available online at https://eplanning.blm.gov/epl-front-
office/projects/lup/58107/116491/142168/Missoula_BLM_RMP_Scoping_Report.pdf

USDI-BLM. 2016. Analysis of the Management Situation, BLM Missoula Field Office, Missoula, Montana.
410 p.

USDI-BLM. 2018. Preliminary Area of Critical Environmental Concern Report. Missoula Resource
Management Plan, Missoula Field Office, 3255 Fort Missoula Road, Missoula, MT 59804-7204,
April 30, 2018. Available online at https://eplanning.blm.gov/epl-front-
office/projects/lup/58107/144093/177634/Missoula_BLM_RMP_Preliminary_ACEC_Report.pdf

## Paleontological Resources

Tetra Tech. 2011. Landscape Overview of Missoula Resource Management Plan Area Including Portions of Granite, Missoula, and Powell Counties, Montana.

**Socioeconomics**

U.S. Department of Commerce, Bureau of Economic Analysis (BEA). 2016a. Table CA25N: Total Full-Time and Part-Time Employment by NAICS Industry. Release date November 17, 2016.

U.S. Department of Commerce, Bureau of Economic Analysis (BEA). 2016b. Table CA05N: Personal Income by Major Components and Earnings by NAICS Industry. Release date November 17, 2016.

U.S. Department of Commerce, Bureau of Economic Analysis (BEA). 2014. Local Area Personal Income Methodology. Release date November 2014. Available at: http://www.bea.gov/regional/methods.cfm

BLM. 2013. IM 2013-131: Guidance on Estimating Nonmarket Environmental Values.

Brown, G and Reed, P. 2000. Validation of a forest values typology for use in national forest planning. For. Sci. 46(2):240-247.

MEA (Millennium Ecosystem Assessment). 2003. Ecosystems and Human Well-being: A Framework for Assessment. Washington, DC: Island Press. Also available online at http://www.maweb.org/en/Framework.aspx#download.

MIG (Minnesota IMPLAN Group). 2016. IMPLAN Professional Version 3.0.

U.S. Census Bureau. 2018. Table PEPAGESEX. Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States, States, Counties and Puerto Rico Commonwealth and Municipios: April 1, 2010 to July 1, 2017. U.S. Census Bureau, Population Division. Released June 2018.

U.S. Census Bureau. 2017. Cumulative Estimates of the Components of Resident Population Change for Counties of Montana: April 1, 2010 to July 1, 2016. Release date March 2017. https://factfinder.census.gov/

U.S. Department of the Interior. 2016. Payment in Lieu of Taxes (PILT). County Payments. https://www.nbc.gov/pilt/counties.cfm

U.S. Department of Labor, Bureau of Labor Statistics. 2016. 2016 Local Area Unemployment Statistics https://www.bls.gov/lau/#tables. Release date April 21, 2017.

**Soil, Water, and Riparian**

Heath, Ralph C. 1984. Groundwater Regions of the United States. U.S. Geological Survey Water Supply Paper No. 2242. U.S. Government Printing Office, Washington D.C.

Jackson, R.B., Kate Lajtha, Susan E. Crow, Gustaf Hugelius, Marc G. Kramer, and Gervasio Pineiro. 2017. The Ecology of Soil Carbon: Pools, Vulnerabilities, and Biotic and Abiotic Controls. Annual Review of Ecology, Evolution, and Systematics, 2017. 48:419–45.

Munshower, F.F. 1994. Practical Handbook of Disturbed Land Revegetation Lewis Publishers, Boca Raton, Florida, 288 p.

Montana Department of Natural Resources and Conservation (DNRC). 2015. Montana Forestry Best Management Practices. Montana Department of Natural Resources and Conservation, Forestry Division. 2015 revision. 64 p. Available online at http://dnrc.mt.gov/divisions/forestry/docs/assistance/practices/mt-forestry-management-best-practices-guide.pdf.

National Academy of Sciences. 2002. Riparian Areas: Functions and Strategies for Management. Committee on Riparian Zone Functioning and Strategies for Management, Water Science and Technology Board, National Research Council.

USDA. 2018. Web Soil Survey. Internet-based soil survey. USDA, Natural Resources Conservation Service.

U.S. Department of the Interior, Bureau of Land Management and Office of the Solicitor (editors). 2001. The Federal Land Policy and Management Act, as amended. U.S. Department of the Interior, Bureau of Land Management Office of Public Affairs, Washington, D.C. 69 pp.

U.S. Department of the Interior Bureau of Land Management (USDI-BLM). 1997. Montana/Dakotas Standards for Rangeland Health and Guidelines for Livestock Grazing Management. USDI-BLM-Montana State Office. August 1997. 22 p. Available online at: https://www.blm.gov/sites/blm.gov/files/Butte%20MT%20standards%20for%20rangeland%20health%20and%20guidlines%20for%20grazing.pdf (site last visited 10/2019)

USDI-BLM. 2005. Land Use Planning Handbook. BLM Manual H-1601-1, Release 1-1693. March 11, 2005.

USDI-BLM. 2007. Vegetation Treatments Using Herbicides on Bureau of Land management Lands in the 17 Western States, Programmatic Environmental Impact Statement, Chapter 2.

USDI-BLM. 2008. BLM Manual 7100 – Soil Resource Management, Release 7-108. USDI Bureau of Land Management, Sept. 15, 2008. 17 p.

USDI-BLM. 2010. Memorandum of Understanding Regarding Water Quality Management on Bureau of Land Management Land in Montana, between the Montana Department of Environmental Quality and the United States Department of the Interior Bureau of Land Management. BLM-MOU-MT923-1030. April 2010.

USDI-BLM. 2015. Riparian Area Management: Proper Functioning Condition Assessment for Lotic Areas. Technical Reference 1737-15, second edition. Bureau of Land Management, National Operations Center, Denver, CO.

U.S. Congress. 1972. Federal Water Pollution Control Act ("Clean Water Act"). 33 U.S.C. §§1251-1387.

U.S. Congress. 1974. Safe Drinking Water Act, as amended 1986. 42 U.S.C. § 300h-7-State Programs to establish wellhead protection areas (a) state programs 42 U.S.C. § 300j-13-source water quality assessment.

U.S. Congress. 1977a. Executive Order 11990 – Protection of Wetlands. May 24, 1977, 42 FR 26961, 3 CFR, 1977 Comp., p. 121.

U.S. Congress. 1977b. Executive Order 11988 – Floodplain Management. May 24, 1977; 42 FR 26951, 3 CFR, 1977 Comp., p. 117; Amended by Executive Order 12148, July 20, 1979; 44 FR 43239, 3 CFR, 1979 Comp., p. 412

Whitlock, C., Cross, W., Maxwell, B., Silverman, N., Wade, A.A. 2017. 2017 Montana Climate Assessment. Bozeman and Missoula MT: Montana State University and University of Montana, Montana Institute on Ecosystems. 318 p. doi:10.15788/m2ww8w.

Winward, Alma H. 2000. Monitoring the vegetation resources in riparian areas. Gen. Tech. Rep. RMRSGTR-47. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 49.

## Special Designations

Ecosystem Management Inc. (EMI). 2010. Final Wild and Scenic River Eligibility Report, Missoula Field Office, Montana. Available online at https://eplanning.blm.gov/epl-front-office/projects/lup/58107/130657/159468/WSR_Eligibility_Report.pdf

USDI-BLM. 1988. BLM Manual 1613 – Areas of Critical Environmental Concern.

USDI-BLM. 1991. Montana Statewide Wilderness Study Report – Volume I Statewide Overview and Volume II Wilderness Study Area Specific Recommendations.

USDI-BLM. 1993. Handbook 8357-1 Byways

USDI-BLM. 2012. BLM Manual 6330 - Management of Wilderness Study Areas

USDI – National Park Service. 1982. Lewis and Clark National Historic Trail, Comprehensive Plan for Management and Use

USDI – National Park Service. 2012. Foundation Document, Lewis and Clark National Historic Trail.

## Visual Resources

BLM 1984 Visual Resource Management Manual 8400 Wildlife and Special Status Species Habitat (WH)

BLM 1986 Visual Resource Inventory Handbook 8410-1

Lands with wilderness characteristics

USDI-BLM. 2012. Manual 6310 – Conducting Wilderness Characteristics Inventory of BLM lands

USDI-BLM. 2012 Manual 6320 - Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process

**<u>Wildlife</u>**

Brewer, Lorraine T., Renate Bush, Jodie E. Canfield, and Alan R. Dohmen. 2007. Northern goshawk Northern Region overview: Key findings and project considerations. May.

Bull, E.L., S.R. Peterson, and J.W. Thomas. 1986. Resource partitioning among woodpeckers in northeastern Oregon.

Buskirk, S.W., and L.F. Ruggerio. 1994. The Scientific Basis for Conserving Forest Carnivores: American Marten, Fisher, Lynx and Wolverine in the Western United States.

Clough, Lorraine T. 2000. Nesting habitat selection and productivity of northern goshawks in west-central Montana. Wildlife Biology M.S. thesis, The University of Montana, Missoula. December.

Craighead, L., R. Walker, and E. Roberts 2001. The American Wildlands US Northern Rockies Corridors of Life Model. Dec. 2002

Dixon, Rita D., and Victoria A. Saab. 2016. Black-backed woodpecker. In The birds of North America. Cornell, NY: Cornell Laboratory of Ornithology and the Academy of Natural Science.

Ecosystem Research Group (ERG). 2012. Wildlife habitat assessment for the Kootenai and Idaho Panhandle plan revision zone (KIPZ). December 19.

Ecosystem Research Group (ERG). 2016. Modeled wildlife habitat assessment. In Draft Environmental Impact Statement Volume 2: Revised Forest Plan. Kalispell, MT: USDA Forest Service.

Forristal, Christopher David. 2009. Influence of postfire salvage logging on black-backed woodpecker nest-site selection and nest survival. Fish and Wildlife Management M.S. thesis, Montana State University, Bozeman. April.

Franklin, Jerry F., Mitchell, Robert J., and Palik, Brian J. 2007. Natural disturbance and stand development principles for ecological forestry. Gen. Tech. rep. NRS-19. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 44 pp.

Goggans, R., R.D. Dixon, and C. Seminara. Oregon Department of Fish and Wildlife, USDA Deschutes National Forest. 1987. Habitat use by three-toed and black-backed woodpeckers, Deshcutes National Forest, Oregon. Nongame Project Number 87-3-02.

Greenwald, D. Noah, D. Coleman Crocker-Bedford, Len Broberg, Kieran F. Suckling, and Timothy Tibbitts. 2005. A review of northern goshawk habitat selection in the home range and implications for forest management in the western United States. Wildlife Society Bulletin 33, (1): 120-29.

Griffin, Paul C., and L. Scott Mills. 2007. Precommercial thinning reduces snowshoe hare abundance in the short term. Journal of Wildlife Management 71, (2): 559-64.

Halofsky, Jessica E., David L. Peterson, S. Karen Dante-Wood, Linh Hoang, Joanne J. Ho, and Linda A. Joyce. 2018. Climate Change Vulnerability and Adaptation in the Northern Rocky Mountains Part 2. Fort Collins, CO. March.

Hays, David W., and Elizabeth A. Rodrick. 2004. Flammulated owl (Otus flammeolus). In Management recommendations for Washington's priority species.24-1 – 24-5. Olympia, WA: Washington Department of Fish and Wildlife.

Hayward, Gregory D., and Jon Verner. 1994. Flammulated, boreal, and great gray owls in the United States: A technical conservation assessment. September.

Hejl, Sallie J., Mary McFadzen, and Thomas Martin. 2000. Maintaining fire-associated bird species across forest landscapes in the northern Rockies. August 4.

Hitchcox, Susan M. 1996. Abundance and nesting success of cavity-nesting birds in unlogged and salvage-logged burned forest in northwestern Montana. M.S. thesis, The University of Montana, Missoula.

Hoyt, Jeff S., and Susan J. Hannon. 2002. Habitat associations of black-backed and three-toed woodpeckers in the boreal forest of Alberta. Canadian Journal of Forestry Research 32: 1881-88.

Hutto, Richard L. 1995. Composition of bird communities following stand-replacement fires in northern Rocky Mountain (U.S.A.) conifer forests. Conservation Biology 9, (5): 1041-58.

Interagency Canada Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp.

Jonkel, J. A. 2018. Montana Department of Fish, Wildlife, and Parks, personal communication regarding grizzly bear distribution south of the NCDE.

Kendall, K.C., J.B. Stetz, J. Boulanger, A.C. Macleod, D. Paetkau, and G.C. White. 2009. Demography and genetic structure of a recovering grizzly bear population. Journal of Wildlife Management 73:3-17.

Kennedy, Patricia L. 2003. Northern goshawk (Accipiter gentilis atricapillus): A technical conservation assessment. January 3.

Koehler, G. M. 1990. Population and habitat characteristics of lynx and snowshoe hares in north central Washington. Canadian Journal of Zoology 68:845-51.

Koehler, G. M., K. B. Aubry. 1994. Lynx. Pages 74-98 In L. F. Ruggiero, K. B. Aubry, S. W. Buskirk, J. L. Lyon, W. J. Zielinski, tech. eds. The scientific basis for conserving forest carnivores: American marten, fisher, lynx and wolverine in the Western United States. Gen. Tech. Rep. RM-254. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Forest and Range Experiment Station.

Koehler, Gary M., and J. David Brittell. 1990. Managing spruce-fir habitat for lynx and snowshoe hares. Journal of Forestry 88: 10-14.

Linkhart, Brian D., R.T. Reynolds, and R.A. Ryder. 1998. Home range and habitat of breeding Flammulated Owls in Colorado. Wilson Bulletin 110: 342-51.

Lyon, L.J., T.N. Lonner, J.P. Weigand, C.L. Marcum, W.D. Edge, J.D. Jones, D. W> McCleerey, and L.L. Hicks. 1985. Coordinating elk and timber management: Final report of the Montana Cooperative Elk-Logging Study. Helena: Montana Department of Fish, Wildlife, and Parks. 55p.

Mace, R.D., J.S. Waller, T.L. Manley, L.J. Lyon, and H. Zuring. 1996. Relationships among grizzly bears, roads, and habitat use in the Swan Mountains, Montana. Journal of Applied Ecology 33:1395-1404

McCallum, D. Archibald. 1994. Review of technical knowledge: Flammulated owls. In Flammulated, boreal, and great gray owls in the United States: A technical conservation assessment. edited by Gregory D. Hayward and Jon Verner, 14-27.

McLellan, B.N., and D.M. Shackleton. 1989. Immediate reactions of grizzly bears to human activities. Wildlife Society Bulletin 17:269–274.

McGrath, Michael T., Stephen DeStefano, Robert A. Riggs, Larry L. Irwin, and Gary J. Roloff. 2003. Spatially explicit influences on northern goshawk nesting habit in the Interior Pacific Northwest. Wildlife Monographs 154: 1-63.

Milburn, Amanda, Barry Bollenbacher, Mary Manning, and Renate Bush. 2015. U.S. Forest Service Region 1 Vegetation Classification, Mapping, Inventory and Analysis Report 15-4 v1.0.

Montana Department of Fish, Wildlife, and Parks (MFWP). 2005a. Comprehensive Fish and Wildlife Conservation Strategy. Missoula, Montana. 658 p. Available online at http://fwp.mt.gov/fishAndWildlife/conservationInAction/fullplan.html

Montana Department of Fish, Wildlife, and Parks (MFWP). 2005b. Montana final elk management plan. Wildlife Division, Helena, MT. 397 p

Montana Natural Heritage Program. 2013. Animal species of concern. October 7.

Pierson, Jennifer Christy. 2009. Genetic population structure and dispersal of two North American woodpeckers in ephemeral habitats. PhD dissertation, The University of Montana, Missoula. December.

Proffitt, K. M., B. Jimenez, C. Jourdonnais, J. A. Gude, M. Thompson, M. Hebblewhite, and D. R. Eacker. 2015a. The Bitterroot elk study: Evaluating bottom-up and topdown effects on elk survival and recruitment in the southern Bitterroot Valley, Montana. Final Report, Montana Fish Wildlife and Parks, Helena, USA. Available online at http://fwp.mt.gov/fwpDoc.html?id¼73152.

Proffitt KM, Goldberg JF, Hebblewhite M, Russell R, Jimenez BS, Robinson HS, Pilgrim K, Schwartz MK. 2015b. Integrating resource selection into spatial capture-recapture models for large carnivores Ecosphere. 6. DOI: 10.1890/ES15-00001.1

Reynolds, R.T., and B.D. Linkhart. 1992. Flammulated owls in Ponderosa pine: Evidence of preference for old-growth. In Old-growth forests in the Southwest and Rocky Mountain Regions: Proceedings of a workshop. edited by M.R. Kaufmann, W.H. Moir and R.L. Bassett, 166-69.

Reynolds, Richard T., Russell T. Graham, and Douglas A. Boyce Jr. 2008. Northern goshawk habitat: an intersection of science, management, and conservation. Journal of Wildlife Management 72, (4): 1047-55.

Reynolds, Richard T., Russell T. Graham, M. Hildergard Reiser, Richard L. Bassett, Patricia L. Kennedy, Douglas A. Boyce, Greg Goodwin, Randall Smith, and E. Leon Fisher. 1992. Management recommendations for the northern goshawk in the southwestern United States.

Reynolds, Richard T., Suzanne M. Joy, and Douglas G. Leslie. 1994. Nest productivity, fidelity, and spacing of northern goshawks in Arizona. Studies in Avian Biology 16: 106-13.

Rowland, Mary & J. Wisdom, Michael & Johnson, Bruce & Kie, John. 2000. Elk Distribution and Modeling in Relation to Roads. The Journal of Wildlife Management. 64. 672. 10.2307/3802737.

Ruggiero, Leonard F., Keith B. Aubry, Steven W. Buskirk, L. Jack Lyon, and William J. Zielinski. 1994. The scientific basis for conserving forest carnivores American marten, fisher, lynx, and wolverine in the western United States.

Russell, R.E., J.A. Royle, V.A. Saab, John F Lehmkuhl, W.M. Block, and J.R. Sauer. 2009. Modeling the effects of environmental disturbance on wildlife communities: avian responses to prescribed fire. Ecological Applications 19: 1253-1263.

Saab, Victoria A., and Jonathan G. Dudley. 1998. Responses of cavity-nesting birds to stand-replacement fire and salvage logging in ponderosa pine/douglas-fir forest of southwestern Idaho.

Samson, Fred B. 2006a. A conservation assessment of the northern goshawk, black-backed woodpeckers, flammulated owl, and pileated woodpecker in the Northern Region.

Samson, Fred B. 2006b. Habitat estimates for maintaining viable populations of the northern goshawk, black-backed woodpecker, flammulated owl, pileated woodpecker, American marten, and fisher.

Squires, J. R. 2010. USDA Forest Service, Rocky Mountain Research Station, personal communication regarding Canada lynx presence in the Garnet Mountains, Missoula Field Office.

Squires, John R., Nicholas DeCesare, J., Jay A. Kolbe, and Leonard F. Ruggiero. 2008. Hierarchical den selection of Canada lynx in western Montana. Journal of Wildlife Management 72, (7): 1497-1506.

Squires, John R., and Leonard F. Ruggiero. 1996. Nest-site preference of northern goshawks in southcentral Wyoming. The Journal of Wildlife Management 60, (1): 170-77.

Tomson, Scott Dean. 1999. Ecology and summer/fall habitat selection of American Marten in northern Idaho. Wildlife Biology M.S. thesis, The University of Montana, Missoula. March.

U.S. Department of the Interior-FWS (USFWS). 1982. Grizzly Bear Recovery Plan, Draft Supplement: Habitat-based Recovery Criteria for the Northern Continental Divide Ecosystem. Grizzly Bear Recovery Office, U.S. Fish and Wildlife Service, University Hall #309, University of Montana, Missoula, MT 59812. Available online at https://www.fws.gov/mountain-prairie/es/species/mammals/grizzly/2017-10-05_SIGNED_DRAFT_HBRC_RP_Supplement_for_NCDE_Grizzly_Bear.pdf

USFWS. 1993. Grizzly Bear Recovery Plan, Draft Supplement: Habitat-based Recovery Criteria for the Northern Continental Divide Ecosystem. Original Approved: January 29, 1982, Revised Plan Approved: September 10, 1993. Grizzly Bear Recovery Office, U.S. Fish and Wildlife Service, University Hall #309, University of Montana, Missoula, MT 59812. Available online at https://www.fws.gov/mountain-prairie/es/species/mammals/grizzly/2017-10-05_SIGNED_DRAFT_HBRC_RP_Supplement_for_NCDE_Grizzly_Bear.pdf

USFWS. 2000. Endangered and threatened wildlife and plants, determinated for threatened status for the contiguous U.S. distinct population segments of the Canada lynx and related, rule, final rule. 35 pp.

USFWS. 2005. Recovery outline: contiguous United States Distinct Population Segment of Canada lynx. U.S. Fish and Wildlife Service region 6, Montana Field Office, Helena, Montana. 21 pp.

USFWS. 2012. Amended incidental take statement for the biological opinion on the effects of the Missoula BLM RMP on grizzly bears. U.S. Fish and Wildlife Service, Helena, MT. 12 pp.

USFWS. 2014. 50 CFR, Part 17, Endangered and threatened wildlife and plants; revised designation of critical habitat for the Contiguous United States distinct population segment of the Canada lynx; final rule. U.S. Fish and Wildlife Service. Pages 54782-54846.

USFWS. 2015, Threatened, Endangered, and Candidate Species in Montana, Endangered Species Act. Ecological Services, Montana Field Office, Helena, Montana. 8 pp.

USFWS. 2018a. Final Northern Continental Divide Ecosystem Grizzly Bear Conservation Strategy. U.S. Fish and Wildlife Service, Montana Field Office, Helena, MT. 276 pp.

Walker R.S. and Craighead L. 1997. Analyzing wildlife movement corridors in Montana using GIS. Proceedings of the 1997 International ESRI Users Conference. Environmental Sciences Research Institute, Redlands, California.

Wasserman, T.N., S.A. Cushman, M.K. Schwarts, and D.O. Wallin. 2010. Spatial scaling and multimodel inference in landscape genetics: Martes Americana in northern Idaho. Landscape Ecology 25: 1601-12.

Wright, Vita. 1996. Multi-scale analysis of flammulated owl habitat use: owl distribution, habitat, and conservation. Dissertation, University of Montana, Missoula.

Wright, Vita, Sallie J. Hejl, and Richard L. Hutto. 1997. Conservation implications of a multi-scale study of flammulated owl (Otus flammeolus) habitat use in the Northern Rocky Mountains, USA. In Biology and conservation of owls of the Northern Hemisphere: Second international symposium: General Technical Report NC-190. edited by James R. Duncan, David H. Johnson and Thomas H. Nicholls, Chap. General Technical Report NC-190, 506-16. USDA Forest Service.

## II.7  GLOSSARY

**Abandoned Mine Lands.** An abandoned hard rock mine on or affecting public lands administered by the BLM, at which exploration, development, mining, reclamation, maintenance, and inspection of facilities and equipment, and other operations ceased as of January 1, 1981 (the effective date of BLM's Surface Management regulations codified at 43 CFR 3809) with no evidence demonstrating that the miner intends to resume mining.

**Accelerated Erosion: S**oil loss above natural levels resulting directly from human activities. Because of the slow rate of soil formation, accelerated erosion can lead to a permanent reduction in plant productivity.

**Acquired Lands:** Lands in federal ownership that were obtained by the government through purchase, condemnation, gift, or exchange.

**Active Preference:** That portion of the total grazing preference for which grazing use may be authorized.

**Activity Plan:** Site-specific plan that precedes actual development. This is the most detailed level of BLM planning, and is also referred to as project level or implementation level planning.

**Actual Use:** The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Affected Environment:** Natural, physical and human-related environment that is sensitive to changes due to proposed actions.

**Air Quality:** Refers to standards for various classes of land as designated by the Clean Air Act of 1978.

**Air Quality Standards:** Primary standards are designed to protect human health, including sensitive populations, such as people with asthma and emphysema, children, and senior citizens. Primary standards were designed for the immediate protection of public health, with an adequate margin of safety, regardless of the cost.

Secondary standards are designed to protect public welfare, including soils, water, crops, vegetation, buildings, property, animals, wildlife, weather, visibility, and other economic, aesthetic, and ecological values, as well as personal comfort and well-being. Secondary standards were established to protect the public from known or anticipated effects of air pollution.

**Allotment:** An area of land where one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Categorization:** Grazing allotments and rangeland areas used for livestock grazing are assigned to an allotment category during resource management planning. Allotment categorization is

used to establish priorities for distributing available funds and personnel during plan implementation to achieve cost-effective improvement of rangeland resources. Categorization is also used to organize allotments into similar groups for purposes of developing multiple use prescriptions, analyzing site-specific and cumulative impacts, and determining trade-offs.

**Allotment Management Plan:** A written program of livestock grazing management, including supportive measures if required, designed to attain specific management goals in a grazing allotment.

**Alluvium:** Any sediment deposited by flowing water, as in a riverbed, floodplain, or delta.

**Analysis of Management Situation:** A comprehensive documentation of the present conditions of the resources, current management guidance, and opportunities for change.

**Animal Unit Month (AUM):** A standardized measurement of the amount of forage necessary for the sustenance of one cow unit or its equivalent for 1 month; approximately 800 pounds of forage. An AUM is the amount of forage needed to sustain one cow and her calf, one horse, or five sheep or goats for a month.

**Annual Sale Quantity (ASQ):** The maximum volume of timber that may be sold on a sustained-yield basis from the area of suitable land covered by the resource management plan for a time period specified in the plan. This volume is usually expressed on an annual basis as the average annual allowable sale quantity.

**Appropriate Management Response (AMR):** This term became obsolete in February 2009 when new interagency guidance was developed for implementing Federal Wildland Fire Management Policy. The definition was 'any specific action suitable to meet Fire Management Unit (FMU) objectives. Typically, the AMR ranges across a spectrum of tactical options (from monitoring to intensive management actions). The AMR is developed by using Fire Management Unit strategies and objectives identified in the Fire Management Plan.'

**Appropriation:** Public lands covered by an entry, settlement, claim, location, withdrawal, or reservation that sets the land apart for some particular use or land tenure action.

**Aquatic:** Living or growing in or on the water.

**Aquifer:** A water-bearing bed or layer of permeable rock, sand, or gravel capable of yielding large amounts of water.

**Archaeological Resource/Remains:** A term with legal definition and application, meaning any material remains of human life or activities that are at least 100 years of age, and that are of archaeological interest.

**Area of Critical Environmental Concern (ACEC):** Areas within the public lands where special management attention is required to: (1) protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or (2) protect life and safety from natural hazards.

**Assessment:** The act of evaluating and interpreting data and information for a defined purpose.

**Authorized Officer:** The federal employee who has the delegated authority to make a specific decision.

**Authorized Use:** Uses of public land that may be authorized include agriculture development, residential use (under certain conditions), business, industrial, and commercial uses, advertising; research projects, State National Guard maneuvers, and motion picture filming. Recreational concessions are considered business uses and may be authorized by lease. Timber harvest, livestock grazing, mineral extraction and special recreation events, among other uses, are authorized under other regulations and not under Section 302 of the Federal Land Policy Management Act (FLPMA).

**Avoidance Areas:** Areas to be avoided but may be available for location of rights-of-way with special stipulations. (BLM Land Use Planning Handbook, Appendix C)

**Back Country Byways:** Vehicle routes that traverse scenic corridors utilizing secondary or back country road systems. National back country byways are designated by the type of road and vehicle needed to travel the byway.

**Backcountry Conservation Area:** are defined as BLM-managed lands in a specific planning area which promote public access to support wildlife-dependent recreation and hunting opportunities and facilitate the long-term maintenance of big game wildlife populations. These areas are primarily contiguous and intact. Management of BCAs may include activities such as active forest and rangeland management, grazing, motorized access on designated routes and other areas for game retrieval, fluid and solids leasable minerals, and other actions consistent with the BLM's multiple use, sustained yield mission. Further management actions and allowable uses are described further in Appendix L.

**Basin:** A depressed area having no surface outlet (topographic basin); a physiographic feature or subsurface structure that is capable of collecting, storing, or discharging water by reason of its shape and the characteristics of its confining material (water); a depression in the earth's surface, the lowest part often filled by a lake or pond (lake basin); a part of a river or canal widened (drainage, river, stream basin).

**Beneficial or Positive Effect:** An effect promoting a favorable result for a specific resource of resource use. Could be used in short-term, long-term, or both short- and long-term contexts.

**Best Management Practices (BMPs):** A suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes. Best management practices are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory. They may be updated or modified without a plan amendment if they are not mandatory.

**Big Game:** Large species of wildlife that are hunted, such as elk, deer, bighorn sheep, mountain lion, black bear, and pronghorn antelope.

**Big Game Analysis Unit:** Logical locations across the landscape to conduct analysis of big game winter range. These areas were broken out based on a combination of Elk Management Units from Montana's Elk Management Plan (MFWP 2004) and watershed boundaries.

**Biodiversity**: The diversity of living organisms considered at multiple levels of organization including genetics, species, and higher taxonomic levels, and the variety of habitats and ecosystems, as well as the processes occurring therein.

**Biological Assessment:** The gathering and evaluation of information on proposed endangered and threatened species and critical habitat and proposed critical habitat. Required when a management action potentially conflicts with endangered or threatened species, the biological assessment is the way federal agencies enter into formal consultation with the U.S. Fish and Wildlife Service and describe a proposed action and the consequences to the species the action would affect**.**

**Biological Weed Treatment:** Treatments that involve living creatures, such as insects, sheep and goat grazing, plant pathogens, and biopesticides.

**Biomass:** Woody biomass is defined as the trees and woody plants, including limbs, tops, needles, leaves, and other woody parts, grown in a forest, woodland, or rangeland environment, that are the by-products of forest management.

**Board Feet:** A unit of solid wood one-foot square and one inch thick (BF - board foot, MBF - thousand board feet, MMBF - million board feet).

**Browse:** To browse (verb) is to graze a plant; also, browse (noun) is the tender shoots, twigs and leaves of trees and shrubs often used as food by livestock and wildlife.

**Bunchgrass:** Individual grasses that have the characteristic growth habit of forming a "bunch" as opposed to having stolens or rhizomes or single annual habit.

**Burn Plan:** A plan required for every fire application ignited by management. Plans are documents prepared by qualified personnel, approved by the agency administrator, and include criteria for the conditions under which the fire will be conducted (a prescription). Same as Prescribed Fire Burn Plan.

**Burn Severity:** A qualitative assessment of the heat pulse directed toward the ground during a fire. Burn severity relates to soil heating, large fuel and duff consumption, consumption of the litter and organic layer beneath trees and isolated shrubs, and mortality of buried plant parts. See also Fire Severity.

**Candidate Species:** Any species included in the Federal Register notice of review that are being considered for listing as threatened or endangered by the U.S. Fish and Wildlife Service.

**Canopy:** Foliar layer(s) consisting of the crowns of trees or shrubs in a forest or woodland.

**Carrying Capacity:** The maximum stocking rate possible without damaging vegetation or related resources.

**Channel:** An open conduit either naturally or artificially created which periodically or continuously contains moving water or forms a connecting link between two bodies of water.

**Chemical Weed Treatment:** These are treatments using additives, such as applying herbicides or changing soil nutrient ratios.

**Classification:** The authority of the Secretary of the Interior to examine land to see whether it is proper for entry, selection, or location.

**Classification of Lands:** The process of determining whether lands are more valuable or suitable for transfer or use under particular or various public land laws than for retention in federal ownership for management purposes.

**Clean Air Act (CAA):** Federal legislation governing air pollution.

**Climax Vegetation:** The ecological vegetation community that represents the culminating stage or highest development of natural vegetative succession. The climax community often can perpetuate itself indefinitely unless disturbed by outside forces.

**Closed:** Generally, denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.

**Closed Road:** Closed to motorized public access and subject to administrative or permitted uses based on case-specific exceptions (such as for mining claimants with existing claims accessed by existing routes). Routes identified as closed would have a route bed left intact in case, they are needed for valid existing rights only, or in the extended future for administrative purposes. Closed routes would be open to non-motorized use.

**Code of Federal Regulations (CFR):** The official, legal tabulation or regulations directing federal government activities.

**Collaboration:** A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands.

**Commercial Forest Land:** Forest land that is producing, or has a site capable of producing, at least 20 cubic feet/acre/year of a commercial tree species.

**Common Variety Minerals:** Stone, gravel, pumice, and cinders that, though possibly having value for trade, manufacture, the sciences, or the mechanical or ornamental arts, do not have a distinct, special value for such use beyond normal uses. On the public lands such minerals are considered salable and are disposed of by sales or by special permits to local governments.

**Community:** An assemblage of plant and animal populations in a common spatial arrangement.

**Composition (of Forest Vegetation):** The proportion of each tree species in a stand, expressed as a percentage of the total number, basal area, or volume of all tree species in the stand.

**Condition Class:** A classification of the degree of departure from historical fire regimes, possibly resulting in alternations of key ecosystem components. These classes categorize and describe vegetation composition and structure conditions that currently exist inside the Fire Regime Groups. The risk of loss of key ecosystem components from wildfires increases from Condition Class 1 (lowest risk) to Condition Class 3 (highest risk). Synonymous with Fire Regime Condition Class (FRCC).

**Conformance:** That a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conifer:** A tree or shrub of the order Coniferae with cones and needle-shaped or scale-like leaves.

**Coniferous:** Pertaining to conifers, which bear woody cones containing naked seeds.

**Connectivity:** The degree to which similar but separated vegetation components of a landscape are connected.

**Conservation Agreement:** A formal signed agreement between the U.S. Fish and Wildlife Service or National Marine Fisheries Service and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and federal level, as well as tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required prior to signing the conservation agreement, or subsequently in order to implement the conservation agreement.

**Conservation Strategy**: A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be federal candidates under the Endangered Species Act.

**Contiguous:** Lands or legal subdivisions having a common boundary; lands having only a common corner are not contiguous.

**Cooperating Agency:** Assists the lead federal agency in developing an environmental analysis or environmental impact statement. The Council on Environmental Quality regulations implementing NEPA define a cooperating agency as any other federal agency that has jurisdiction by law or special expertise for proposals covered by NEPA. Any tribe or federal, state, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor:** A designated right-of-way corridor is a parcel of land with specific boundaries identified by law, Secretarial order, the land-use planning process, or other management decision, as being a preferred location for existing and future rights-of-way and facilities. The corridor may be suitable to accommodate more than one type of right-of-way use or facility or one or more right-of-way uses or facilities that are similar, identical, or compatible. (43 CFR 2801.5(b)(9))

**Council of Environmental Quality (CEQ):** An Executive Office advisory council established by the National Environmental Policy Act of 1969 for review of federal program effects on the environment. The council conducts environmental studies and advises the President on environmental matters.

**Cover:** Any form of environmental protection that helps an animal stay alive (mainly shelter from weather and concealment from predators).

**Cover Type:** The present vegetation composition of an area, described by the dominant plant species.

**Critical Habitat:** An area occupied by a threatened or endangered species "on which are found those physical and biological features (1) essential to the conservation of the species, and (2) which may require special management considerations or protection."

**Cultural Resource / Cultural Property:** A definite location of human activity, occupation, or use identifiable through field inventory (survey), historical documentation, or oral evidence. The term includes archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and may include definite locations (sites or places) or traditional cultural or religious importance to specified social and/or cultural groups. Cultural resources are concrete, material places and things that are located, classified, ranked, and managed through the system of identifying, protecting, and utilizing for public benefit.

**Cultural Resource Inventory Classes: Cl**ass I – Existing data inventory: a study of published and unpublished documents, records, files, registers, and other sources, resulting in analysis and synthesis of all reasonably available data. Class I inventories encompass prehistoric, historic, and ethnological/sociological elements, and are in large part chronicles of past land uses. They may have major relevance to current land use decisions. Class II – Sampling field inventory: a statistically based sample survey designed to help characterize the probable density, diversity, and distribution of archaeological properties in a large area by interpreting the results of surveying limited and discontinuous portions of the target area. Class III – Intensive field inventory: a continuous, intensive survey of an entire target area, aimed at locating and recording all archaeological properties that have surface indications, by walking close-interval parallel transects (generally at 30 m intervals) until the area has been thoroughly examined.

**Cultural Weed Treatment:** These are treatments which involve human behavior, such as using quarantine, closure, or relocation of a particular activity to reduce weed spread, selective timing and choice of stock for grazing, containing livestock after they have grazed in a weed infested area, revegetation seed mix choices for rehabilitating new soil disturbances, land use choices, and public outreach methods.

**Cumulative Impact:** The impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**Decommissioned Road:** Route is closed and rehabilitated to eliminate resource impacts (for example, to eliminate erosion or to restore a riparian area if route is located within a riparian area) and is no longer useable for public or administrative uses.

**Deep Soils:** Soils that are 40 to 60 inches deep to bedrock.

**Denning Habitat:** Habitat used during parturition and rearing of young until they are mobile. The common component appears to be large amounts of coarse woody debris, either down logs or root wads. Coarse woody debris provides escape and thermal cover for kittens. Denning habitat may be found either in older mature forest of conifer or mixed conifer/deciduous types, or in regenerating stands (over 20 years since disturbance). Denning habitat must be located within daily travel distance of foraging habitat (typical maximum daily distance for females is 3-6 miles).

**Designated Roads and Trails:** Specific roads and trails where some type of motorized vehicle use is allowed either seasonally or yearlong.

**Design Features:** Methods or procedures that reduce or lessen the impacts of an action. Part of the suite of mitigation measures and conservation actions, which includes Best Management Practices (BMPs), operating procedures, or design features that have been developed to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts associated with surface-disturbing or disruptive activities.

**Desired Future Condition:** Outcomes representing the long-term vision of BLM with regard to the resources managed on BLM land.

**Developed Recreation:** Recreation that requires facilities and might result in concentrated use of an area; for example, a campground.

**Dispersed Recreation:** Recreation activities of an unstructured type that are not confined to specific locations such as recreation sites. Example of these activities may be hunting, fishing, off-road vehicle use, hiking, and sightseeing.

**Disturbance**: Events that alter the structure, composition, or function of terrestrial or aquatic habitats. Natural disturbances include drought, floods, wind, fires, wildlife grazing, and insects and pathogens. Human-caused disturbances include actions such as timber harvest, fire, livestock grazing, road construction, and the introduction of exotic species.

**Diversity:** The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Easement:** A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Ecological Function:** The process through which the constituent living, and nonliving elements of ecosystems change and interact, including biogeochemical processes and succession.

**Economics:** The study of allocation of limited resources, goods, and services among competing uses.

**Ecosystem:** A complete, interacting system of living organisms and the land and water that make up their environment; the home places of all living things, including humans.

**Eligibility (for Wild and Scenic Rivers):** A river is eligible for inclusion in the National Wild and Scenic River System if it is free flowing and has at least one river-related value that is considered outstandingly remarkable.

**Elk Management Unit:** Designated by Montana Fish Wildlife and Parks, establishes statewide elk management population objectives and divides Montana's elk habitat into 35 management units, each with its own elk management objectives and elk population targets.

**Emergent Vegetation:** Aquatic plant species that are rooted in wetlands but extend above the water's surface.

**Encroach:** Plant succession in the absence of disturbance, in areas the plant type is not desired. Often associated with vegetative type conversion such as conifer colonization of grass or shrub meadows.

**Endangered Species:** Any plant or animal species that is in danger of extinction throughout all or a significant portion of its range.

**Entry:** An application to acquire title to public lands.

**Environmental Assessment:** A concise public document that analyzes the environmental impacts of a proposed federal action and provides sufficient evidence to determine the level of significance of the impacts.

**Environmental Impact Statement:** A detailed written statement required by the National Environmental Policy Act when an agency proposes a major federal action significantly affecting the quality of the human environment.

**Environmental Justice:** Refers to the fair treatment and meaningful involvement of people of all races, cultures and incomes with respect to the development, implementation and enforcement of environmental laws, regulations, programs and policies. Fair treatment means that no group of people, including racial, ethnic, or socioeconomic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal state, local and tribal programs and policies.

**Ephemeral Area:** Watershed land area that delivers surface water flow during spring runoff, rain, and snowstorms to intermittent and perennial streams.

**Ephemeral Stream:** A stream or part of a stream that flows only in direct response to precipitation; it receives little or no water from springs, melting snow, or other sources; its channel is at all times above the water table.

**Erosion:** The wearing away of the land surface by running water, wind, ice, or other geological agents.

**Exchange:** A trading of public lands (surface and/or subsurface estates) that usually do not have high public value, for lands in other ownerships that do have value for public use, management, and enjoyment. The exchange may be for the benefit of other federal agencies as well as for BLM.

**Exclusion Areas:** Areas that are not available for location of rights-of-way under any conditions (BLM Land Use Planning Handbook, Appendix C).

**Exploration:** The work of investigating a mineral deposit to determine by geological surveys, geophysical surveys, geochemical surveys, boreholes, pits, and underground workings if it is feasible to mine.

**Extensive Recreation Management Area (ERMA):** An identified area of BLM land managed to provide stewardship of resources and visitor use. Investments are limited to stewardship actions only within ERMAs.

**Federal Land Policy and Management Act of 1976:** Public Law 94-579, October 21, 1976, often referred to as the BLM' s "Organic Act," which provides the majority of the BLM's legislated authority, direction, policy, and basic management guidance.

**Federal Land Transaction Facilitation Act (FLTFA):** FLTFA monies accrue from disposal of BLM lands by sale and the monies stay within the state where the disposal parcels are located. The BLM is entitled to 60 percent of the fund, while the Forest Service, National Park Service, and Fish and Wildlife Service are each entitled to 10 percent. The remaining 10 percent covers administrative costs. A proposal to use the fund for a specific acquisition must be presented to and agreed upon by all four agencies.

**Federal Power Project Reservation:** A reservation of public lands for use in a project developed under the jurisdiction of the Federal Power Commission.

**Federal Register:** A daily publication that reports Presidential and federal agency documents.

**Fire Frequency**: How often fire burns a given area; often expressed in terms of fire return intervals. For example, a site might burn every 5 to 15 years.

**Fire Intensity:** The rate of energy released per unit length of the fire front; loosely, how hot the fire is burning.

**Fire Management Category:** A classification for landscape-level fire and fuels management strategies and options based on consideration of fire history, land status, issues, concerns, hazardous fuels, and other resource objectives. There are four categories which range from Category A where wild and prescribed fire are not desired due to reasons other than ecological; to Category D where fire may be desired and there are no constraints associated with the resource condition, or social, economic, or political considerations.

**Fire Management Plan:** A strategic plan that defines a program to manage wildland fire (*wildfire* and *prescribed fire*) and documents the fire management program in the approved land use plan; the plan is supplemented by operational procedures such as preparedness plans, preplanned dispatch plans, prescribed fire plans, and prevention plans.

**Fire Management Unit:** A land management area definable by objectives, management constraints, topographic features, access, values to be protected, political boundaries, fuel types, major fire regime

groups, etc. that set it apart from the characteristics of an adjacent FMU. The FMU may have dominant management objectives and pre-selected strategies assigned to accomplish these objectives.

**Fire Management Zone:** Administrative unit for wildland fire suppression, for the execution of all logistical, aviation, and support activities within this geographical area.

**Fire Preparedness:** Activities that lead to a safe, efficient, and cost-effective fire management program in support of land and resource management objectives through appropriate planning and coordination.

**Fire Regimes:** Descriptions of the patterns of fire occurrence, frequency, size, and severity in a given area or ecosystem. A fire regime is a generalization based on fire histories at individual sites. Fire regimes can often be described as cycles because some parts of the histories usually are repeated, and the repetitions can be counted and measured, such as fire return interval.

**Fire Regime Condition Class:** A classification describing the degree of departure from historical fire regimes, possibly resulting in alternations of key ecosystem components. These classes categorize and describe vegetation composition and structure conditions that currently exist inside the Fire Regime Groups. The risk of loss of key ecosystem components from wildfires increases from Condition Class 1 (lowest risk) to Condition Class 3 (highest risk). *See also* Condition Class.

**Fire Regime Groups:** A classification of fire regimes into groups based on frequency and severity. The national classification includes five groups: **I** - frequent (0 to 35 years), low severity; **II** - frequent (0 to 35 years), stand replacement severity; **III** – 35 to 100+ years, mixed severity; **IV** – 35 to 100+ years, stand replacement severity; and **V** - 200+ years, stand replacement severity.

**Fire Severity:** The degree to which a site is altered by fire; a product of fire intensity and residence time. *See also* Burn Severity.

**Fishery:** Habitat that supports the propagation and maintenance of fish.

**Fish key watersheds:** Watersheds containing strongholds of aquatic species populations that will be the highest aquatic habitat restoration priority areas.

**Flood plain:** The relatively flat area or lowlands adjoining a body of standing or flowing water which has been or might be covered by floodwater.

**Fluvial:** Pertaining to streams or produced by stream action.

**Forage:** All browse and herbaceous foods available to grazing animals, which may be grazed or harvested for feeding.

**Forb:** An herbaceous plant that is not a grass, sedge, or rush.

**Forest Health:** The perceived condition of a forest derived from concerns about such factors as its age, structure, composition, function, vigor, presence, or unusual levels of insects and disease, and resilience to disturbance.

**Forest Health Treatments:** Treatments that restore forest ecosystems or stands to a condition that sustains their complexity, function and/or productivity while providing for human needs, fish and wildlife populations, and will be the highest aquatic habitat restoration priority areas.

**Forest Resilience** The capacity of a forest to absorb disturbance, retain ecosystem function and return, over time, to its pre-disturbance state.

**Forest Land:** Land that is now, or has the potential of being, at least 10 percent stocked by forest trees (based on crown closure) or 16.7 percent stocked (based on tree stocking).

**Forestry BMPs:** Standard operating procedures incorporated into project design for forest management activities such as timber harvest, roads, hazardous materials, stream crossings, post-fire salvage, and restoration. The practice is aimed at the protection of soils and site productivity, water quality, stream crossings and fish passage

**Fossil:** Mineralized or petrified form from a past geologic age, especially from previously living things.

**Fragmentation:** The splitting or isolating of patches of similar habitat. Habitat can be fragmented by natural events or development activities.

**Free-Flowing River:** Existing or flowing in a natural condition without impoundment, diversion, straightening, rip- rapping, or other modification of the waterway.

**Fuel Loading:** Relative to flammable vegetation and natural debris, the amount of fuel present expressed quantitatively in terms of weight of fuel per unit area (ex: tons per acre).

**Fuel Management:** The act or practice of controlling flammability of vegetation and reducing resistance to control of wildland fires through mechanical, prescribed fire, chemical, or biological means, in support of land management objectives.

**Fuel Treatment:** The manipulation or removal of fuels to reduce the likelihood of ignition and/or to lessen potential damage and resistance to fire control (e.g., lopping, chipping, crushing, piling and burning).

**Fuel Type:** An identifiable association of fuel elements of a distinctive plant species, form, size, arrangement, or other characteristics that will cause a predictable rate of fire spread or difficulty of control under specified weather conditions.

**Game Species:** Any species of wildlife or fish for which seasons and bag limits have been prescribed, and which are normally harvested by hunters, trappers, and fisherman under state or federal laws, codes, and regulations.

**Geographic Information System (GIS):** A system of computer hardware, software, data, people and applications that capture, store, edit, analyze and graphically display a potentially wide array of geospatial information.

**Goal:** A broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

**Grazing Relinquishment:**  A grazing "relinquishment" is the voluntary and permanent surrender by an existing permittee or lessee, (with concurrence of any base property lienholder(s)), of their priority for a livestock forage allocation on public land (their preference) as well as their permission to use this forage (their grazing permit or lease), in whole or in part.

**Grazing lease.** A document that authorizes grazing use of public lands under Taylor Grazing Act Section 15; it specifies grazing preference and the terms and conditions under which lessees make grazing use during the lease term. Public lands outside grazing district boundaries are administered under Taylor Grazing Act Section 15.

**Grazing System (domestic):** Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation. Include, but are not limited to, developing pastures, utilization levels, grazing rotations, timing and duration of use periods, and necessary range improvements.

**Groundwater:** Water contained in pore spaces of consolidated and unconsolidated surface material.

**Guidelines:** Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory.

**Habitat: (**a) Species-specific environment or environmental conditions suitable for occupancy by that species. (b) particular land cover type that provides an environment or environmental conditions suitable for occupancy by many species.

**Habitat Connectivity:** Vegetative cover in sufficient quantity and arrangement to allow for the movement of wildlife.

**Habitat Diversity:** The variation in types, sizes, and shapes of landscape elements or vegetation types.

**Habitat Type Group (HTG)** An ecologically based stratification system that defines site potential and historic fire regimes and enables land managers to predict responses to vegetation management activities (Pfister et al. 1977). Current species composition in a given habitat type group depends upon where an area is in terms of disturbance, stand development phase, succession and a number of additional factors. Forested lands within the analysis area were stratified into habitat type groups.

**Hazardous Fuel:** Excessive live or dead wildland fuel accumulations that increase the potential for uncharacteristically intense wildland fire and decrease the capability to protect life, property, and natural resources.

**Healthy Forest Initiative of 2002:** Presidential direction to the Departments of Agriculture and the Interior to improve regulatory processes and management efficiency in reducing the threat of destructive wildfires while upholding environmental standards and encouraging early public input during review and planning processes. The initiative is based on sound science and helps care for forests and

rangelands, reduce the risk of catastrophic fire to communities, help save the lives of firefighters and citizens, and protect threatened and endangered species.

**Heavy Metal:** Any of the metals that react readily with dithizone, including zinc, copper, cobalt, lead, bismuth, gold, cadmium, iron, manganese, nickel, tantalum, tellurium, platinum, and silver.

**Herbaceous:** Pertaining to or characteristic of an herb (fleshy-stem plant) as distinguished from the woody tissue of shrubs and trees.

**Historic:** Period wherein nonnative cultural activities took place, based primarily upon European roots, having no origin in the traditional Native American culture(s).

**Historic property or Historic Resource:** "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register. The term includes, for purposes of these regulations, artifacts, records, and remains that are related to and located within such properties. The term 'eligible for inclusion in the National Register' includes both properties formally determined as such by the Secretary of the Interior and all other properties that meet National Register listing criteria." (quoted from 36 CFR 900.2(e)).

**Home Range:** The area in which an animal travels in the scope of natural activities.

**Hydrologic Condition:** The current state of the processes controlling the yield, timing, and quality of water in a watershed. Each physical and biologic process that regulates or influences stream flow and groundwater character have a range of variability associated with the rate or magnitude of energy and mass exchange. At any point in time, each of these processes can be defined by their current rate or magnitude relative to the range of variability associated with each process. Integration of all processes at one time represents hydrologic condition.

**Hydrologic Unit Code (HUC):** A coding system developed by the U.S. Geological Survey to map geographic boundaries of watersheds by size.

**Impact Analysis for Planning (IMPLAN):** The IMPLAN Model is the most flexible, detailed and widely used input-output impact model system in the U.S. It provides users with the ability to define industries, economic relationships and projects to be analyzed. It can be customized for any county, region, or state, and used to assess "multiplier effects" caused by increasing or decreasing spending in various parts of the economy. This can be used to assess the economic impacts of resource management decisions, facilities, industries, or changes in their level of activity in a given area.

**Implementation Decisions:** Decisions that take action to implement land use plan decisions. They are generally appealable to Interior Board of Land Appeals.

**Implementation Plan:** A site-specific plan written to implement decisions made in a land use plan. An implementation plans usually selects and applies best management practices to meet land use plan objectives. Implementation plans include both activity plans and project plans.

**Indian Tribe:** Any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status.

**Initial Fire (Attack):** An aggressive fire suppression action consistent with firefighter and public safety and values to be protected.

**Integrated Weed Management:** This is a decision support system involving deliberate selection, integration, and implementation of effective weed management tactics. It utilizes cost/benefit analysis and takes into consideration public interests and social, economic, and ecological impacts in the decision-making process.

**Interdisciplinary Team:** A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembled to solve a problem or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more discipline or Bureau program interest.

**Interim Management Policy:** Policy that guides management of the BLM's Wilderness Study Areas. The policy balances the various uses of Wilderness Study Areas with the requirement to protect the lands wilderness values.

**Interior Board of Land Appeals:** The Department of the Interior, Office of Hearings and Appeals board that acts for the Secretary of the Interior in responding to appeals of decisions on the use and disposition of public lands and resources. Because the Interior Board of Land Appeals acts for and on behalf of the Secretary of the Interior, its decisions usually represent the Department's final decision but are subject to the courts.

**Intermittent Stream:** A stream that flows only when it receives water from rainfall runoff or springs, or from some surface source such as melting snow.

**Invasive Plants**: Plants that are invasive species.

**Invasive Species:** Organisms that have been introduced into an environment where they did not evolve. Executive Order 13112 focuses on organisms whose presence is likely to cause economic harm, environmental harm, or harms human health.

**Inversion:** The state of the atmosphere in which a layer of cool air is trapped near the Earth's surface by an overlying layer of warm air so that the lower layer cannot rise. Serious air pollution problems may result from air pollutants being emitted into the limited mixing depth below the inversion.

**Land and Water Conservation Fund (LWCF):** Most LWCF monies comes from Outer Continental Shelf oil and gas leasing, and are used for the purchase of land, waters and wetlands with an emphasis on special management areas. Congress allocates the money based on competing proposals submitted by various BLM offices.

**Land Use Allocation:** The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan:** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process, regardless of the scale at which the decisions were developed.

**Leasable Minerals:** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, asphalt, sulphur, potassium, and sodium minerals, and oil, gas, and geothermal.

**Lessee (Grazing):** Holder of a valid lease that authorizes grazing use of the public lands outside the grazing district.

**Lentic:** Standing water.

**Lentic Riparian:** Standing water habitat such as lakes, ponds, seeps, bogs and meadows.

**Lentic Riparian-Wetland Resources:** Resources whose capabilities and potentials are defined by the interaction of three physical components: 1) vegetation, 2) landform/soils, and 3) hydrology.

**Limited Areas or Trails:** Designated areas or trails where the use of off-road vehicles is subject to restrictions, such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads, primitive roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year.

**Livestock grazing standards and guidelines:** Practices applied to the terms and conditions of grazing leases to avoid or lessen grazing impacts to streams, soils, water quality, riparian function, and aquatic habitat.

**Locatable Minerals:** Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Lode Mining:** Mining of a mineral deposit in solid rock.

**Long-term:** Effects lasting more than 10 years.

**Lotic:** Moving water.

**Lotic Riparian:** Running water habitat such as rivers, streams and springs.

**Lotic Riparian-Wetland Resources:** Resources whose capabilities and potentials are defined by the interaction of three physical components: 1) vegetation, 2) landform/soils, and 3) hydrology.

**Lynx Habitat:** Lynx occur in mesic coniferous forest that have cold, snowy winters and provide a prey base of snowshoe hare. In the Rocky Mountains primary vegetation that contributes to lynx habitat is

lodgepole pine, subalpine fir, and Englemann spruce. Secondary vegetation that, when interspersed within subalpine forests, may also contribute to lynx habitat, includes cool, moist Douglas-fir, grand fir, western larch, and aspen forest. Dry forest types (ponderosa pine, climax lodgepole pine) do not provide lynx habitat. Primary elevations for lynx habitat are between 1500-2000 m. (4,920 – 6,560 ft.) elevation zones in the northern Rockies.

**Mechanized Travel:** Moving by means of mechanical devices such as a bicycle; not powered by a motor (source: Washington Office Instruction Memorandum No. 2010-056 and Draft Travel and Transportation Management Manual to replace Manual 8342, Release 8-20).

**Mine:** An opening or excavation in the earth for extracting minerals.

**Mineral:** Any solid or fluid inorganic substance that can be extracted from the earth for profit.

**Mineral Entry:** The filing of a claim on public land to obtain the right to any minerals it may contain.

**Mineral Estate:** The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials:** Materials such as common varieties of sand, stone, gravel, pumice, pumicite, and clay, that are not obtainable under the mining or leasing laws but that can be acquired under the Mineral Materials Act of 1947, as amended.

**Mineral Withdrawal:** A formal order that withholds federal lands and minerals from entry under the Mining Law of 1872 and closes the area to mineral location (staking mining claims) and development.

**Mining Claim:** A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A single mining claim may contain as many adjoining locations as the locator may make or buy. The four categories of mining claims are: lode, placer, millsite, and tunnel site.

**Monitoring Plan:** The process of tracking the implementation of land use plan decisions and collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions.

**Motorized Travel:** Moving by means of vehicles that are propelled by motors, such as cars, trucks, off-highway vehicles (OHV), motorcycles, snowmobiles, and boats (source: Washington Office Instruction Memorandum No. 2010- 056 and Draft Travel and Transportation Management Manual to replace Manual 8342, Release 8-20).

**Motorized Vehicles:** Synonymous with off-highway vehicle (OHV). Examples of this type of vehicle include all- terrain vehicle (ATV), utility type vehicle (UTV), sport utility vehicle (SUV), motorcycle, and snowmobile. (source: BLM Travel and Transportation Management Handbook 8342-1.).

- **All-Terrain Vehicle (ATV):** A wheeled vehicle other than a snowmobile, which is defined as having a wheelbase and chassis of fifty (50) inches in width or less, steered with handlebars, generally having a dry weight of 800 pounds or less, travels on three or more low-pressure tires, and with a seat designed to be straddled by the operator.

- **Motorcycle:** Motorized vehicles with two tires and with a seat designed to be straddled by the operator.
- **Off-Highway Vehicle (OHV):** OHV is synonymous with Off-Road Vehicles (ORV). ORV is defined in 43 CFR 8340.0-5 (a): Off-road vehicle means any motorized vehicle capable or, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: 1) Any non-amphibious registered motorboat; 2) Any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; 3) Any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; 4) Vehicles in official use; and 5) Any combat or combat support vehicle when used in times of national defense emergencies. OHVs generally include dirt motorcycles, dune buggies, jeeps, 4-wheel drive vehicles, SUVs, over-the-snow vehicles, UTVs and ATVs.
- **Over-the-Snow Vehicle:** An over-snow vehicle is defined as a motor vehicle that is designed for use over snow that runs on a track or tracks and/or a ski or skis, while in use over snow. An over-snow vehicle does not include machinery used strictly for the grooming of non-motorized trails.
- **Sport Utility Vehicle (SUV):** A street legal, high clearance vehicle used primarily on-highway but designed to be capable of off-highway travel.
- **Utility Type (or Terrain) Vehicle (UTV):** Any recreational motor vehicle other than an ATV, motorbike or snowmobile designed for and capable of travel over designated unpaved roads, traveling on 4 or more low-pressure tires, maximum width less than 74 inches, usually a maximum weight less than 2,000 pounds, or having a wheelbase of 94 inches or less. Utility type vehicle does not include vehicles specially designed to carry a person with disabilities.

**MTFWP:** Montana Department of Fish, Wildlife, and Parks

**Multiple Use:** Under the Federal Land Policy and Management Act of 1976, the term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." (43 U.S.C. 1702, Sec. 103(c))

**Multiple-indicator monitoring:** Uses streambank alterations, woody browse, and stubble heights for analyzing impacts to riparian habitat.

**National Ambient Air Quality Standards (NAAQS):** The allowable concentrations of air pollutants in the ambient (public outdoor) air. National ambient air quality standards are based on the air quality criteria and divided into primary standards (allowing an adequate margin of safety to protect the public health) and secondary standards (allowing an adequate margin of safety to protect the public

welfare). Welfare is defined as including (but not limited to) effects on soils, water, crops, vegetation, human-made materials, animals, wildlife, weather, visibility, climate, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.

**National Environment Policy Act (NEPA) of 1969:** An Act that encourages productive and enjoyable harmony between man and his environment and promotes efforts to prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; enriches the understanding or the ecological systems and natural resources important to the Nation, and establishes the Council on Environmental Quality.

**National Register of Historical Places:** A register of districts, sites, buildings, structures, and objects, significant in American history, architecture, archaeology and culture, established by the "Historic Preservation Act" of 1966 and maintained by the Secretary of the Interior.

**National Wild and Scenic Rivers System:** A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of streams: (1) recreation—rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) scenic—rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) wild—rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**Natural range of variability (NRV):** A spectrum of ecological vegetative states and the spatial and temporal variation in these states. Modeling was used to develop a quantified estimate of the NRV for this RMP and knowledge of historical conditions helped corroborate the model results.

**Noxious Weeds:** A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the United States.

**Nutrient Cycling:** The circulation of chemical elements such as nitrogen, oxygen, carbon, and phosphorus in specific pathways from the abiotic (not involving or produced by organisms) portions of the environment into organic substances in plants and animals and then back into abiotic forms.

**Objective:** A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

**Obligate:** Essential, necessary, unable to exist in any other state, mode, or relationship.

**Off-Highway Vehicle (OHV):** Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) Any non-amphibious registered motorboat; (2) Any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) Any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) Vehicles in official use; and (5) Any combat or combat support vehicle

when used in times of national defense emergencies. OHVs generally include dirt motorcycles, dune buggies, jeeps, four-wheel drive vehicles, snowmobiles, and ATVs.

**Operator:** Any person who has taken formal responsibility for the operations conducted on the leased lands.

**Open:** Generally, denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.

**Outstandingly Remarkable (River) Values:** Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act are "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values. . . ." Other similar values that may be considered include botanical, hydrological, paleontological, or scientific. Professional judgment is used to determine whether values exist to an outstandingly remarkable degree.

**Over-Snow Vehicle:** An over-snow vehicle is defined as a motor vehicle that is designed for use over snow that runs on a track or tracks and/or a ski or skis, while in use over snow. An over-snow vehicle does not include machinery used strictly for the grooming of non-motorized trails.

**Overstory:** The layer of foliage in a forest canopy, often the uppermost layer(s) consisting of the crowns of trees or shrubs.

**Paleontological Resources (Fossils)**: The physical remains of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for understanding past environments, environmental change, and the evolution of life.

**Paleontology:** A science dealing with the life forms of past geological periods as known from fossil remains.

**Patent:** The instrument by which the federal government conveys title to the public lands.

**Perennial Stream:** A stream that normally has water in its channel at all times.

**Permit:** For grazing authorizations issued under 43 CFR 4100, permits are normally issued for 10 years.

**Permitted Use:** The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease. Expressed in AUMs.

**Perpetual Exclusive Easement:** A perpetual exclusive easement acquired by the United States to use land of another owner for a particular purpose. An exclusive road easement grants control to the United States and may allow it to authorize third party use and set road use rules. When obtaining a road easement, the BLM's preferred option is to gain an exclusive easement to obtain the right for the general public to use and access the road.

**Petroglyph:** A figure, design, or indentation carved, abraded, or pecked into a rock.

**Physical Weed Treatment:** Treatments that use manual labor, mechanical equipment, or fire, such as hand pulling, mowing or tilling, and prescribed burning.

**Pictograph:** A figure or design painted on a rock.

**Placer:** An alluvial deposit of sand and gravel containing valuable minerals, such as gold.

**Placer Mining:** A method of mining in which the overburden is removed to expose gold-bearing gravel deposits beneath. The gravel is then sluiced to separate the gold. The Placer Mining BMPS are for placer mining operations (including reclamation, hazardous materials, weed control, roads, diversions, crossings) for the protection of water quality.

**Planning Criteria:** The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

**Planning Decision (Land Use Plan Decision):** Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the BLM planning process. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Population:** Within a species, a distinct group of individuals that tend to mate only with members of the group. Because of generations of inbreeding, members of a population tend to have similar genetic characteristics.

**Potential Natural Community (PNC):** The biotic community that would become established if all successional sequences were completed without human interference, under the present environmental conditions (Winward 2000).

**Power Site Classification:** A classification made by the Federal Power Commission that is a segregation against the operation of the public land laws for lands that are needed or have potential for power projects and associated transmission lines. Lands classified to benefit transmission lines are open to the operation of the public land laws subject to their use for transmission lines.

**Power Site Reserve:** A reservation of public lands that have potential value for power development.

**Precious Metals:** A general term for gold, silver, or any of the minerals of the platinum group.

**Precommercial Thinning:** A thinning that does not yield trees of commercial value, usually designed to reduce stocking in order to concentrate growth on the more desirable trees or to meet desired vegetation and/or fuel loading conditions.

**Prehistoric:** Refers to the period wherein Native American cultural activities took place and were not yet influenced by contact with historic nonnative culture(s).

**Prescribed Fire:** The planned ignition of fire in a planned area; implementation must occur under specified conditions to meet specific management objectives.

**Prescribed Fire Burn Plan:** A plan required for each fire application ignited by management. Plans are documents prepared by qualified personnel, approved by the agency administrator, and include criteria for the conditions under which the fire will be conducted (a prescription).

**Prescriptive Grazing:** Prescribed grazing is the application of domestic livestock grazing at a specified location and intensity to accomplish specific vegetation management objectives. For example, authorizing sheep and goats to graze a piece of land as a biological control agent to treat noxious weeds. Prescription grazing would normally be authorized on a temporary nonrenewable basis and is subject to site-specific NEPA analysis.

**Primitive and Unconfined Recreation:** Non-motorized, non-mechanized and undeveloped types of recreational activities.

**Priority Habitats:** Priority habitats would include habitat for all special status species as well as riparian areas, dry savannah forest, special habitats including caves, cliffs, snags, and down woody material, sagebrush, bitterbrush communities and mountain mahogany communities.

**Priority Species:** Priority species are those wildlife, fish or plant species that the BLM has determined to be unique or significant based on at least one of the following factors: density, diversity, population size, public interest, remnant character, or age.

**Probable Sale Quantity (PSQ):** A best assessment of the average amount of timber likely to be available for sale annually in a planning area over the next 10 years.

**Project Plan:** A type of implementation plan. A project plan typically addresses individual projects or several related projects. Examples of project plans include prescribed burn plans, trail plans, and recreation site plans.

**Project Area (Vegetation):** An area of land within some type of management activity would occur and encompasses a region defined by logical boundaries such as: watersheds, ridges, highways, or ownership blocks of BLM lands. The project area can be both the analysis area and a starting point to determine where treatments or activities should occur, and includes the area needed for supporting structures and activities such as roads, transmission lines, or pipelines.

**Proper Functioning Condition (PFC):** Ecosystems are in PFC when they function within their historic range of variability. Proper functioning condition (PFC): adequate vegetation, landform, or woody material is present to dissipate high streamflow energy, capture sediment, aid floodplain development, improve floodwater retention and groundwater recharge, develop root masses that stabilize streambanks, and maintain channel characteristics. Riparian areas that have limited functioning condition and have hydrologic, vegetative, or geomorphic attributes that make them susceptible to impairment are considered **functioning-at-risk (FAR).** Riparian areas that do not have adequate vegetation, landform, or woody material present are considered **nonfunctional (NF).**

**Protest:** Application for review by a higher administrative level.

**Public Lands:** Under the Federal Land Policy and Management Act of 1976, the term "public lands" means any land and interest in land owned by the United States within the several States and

administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership" (43 U.S.C.1702, Sec. 103(e)).

**Public Land Laws:** A body of laws that regulates the administration of the public lands and the resources thereon.

**Public Land Order:** Creating, continuing, modifying, or revoking a withdrawal or reservation that has been issued by the Secretary of the Interior pursuant to his delegations of authority.

**Quarry:** An open or surface working, usually for the extraction of stone, slate, limestone, etc.

**Rangeland:** Land used for grazing by livestock and big game animals on which vegetation is dominated by grasses, grass-like plants, forbs, or shrubs.

**Raptor:** Bird of prey with sharp talons and strongly curved beaks such as hawks, owls, vultures, and eagles.

**Reach:** A segment of stream.

**Reclamation:** Reclamation is the reconstruction of topographic, soil, and plant conditions after disturbance, which may not be identical to the predisturbance site, but which permits the degraded land mass to function adequately in the ecosystem of which it was and is a part (Munshower 1994).

**Reclamation Project:** A water development and irrigation project of the Bureau of Reclamation.

**Reclamation Withdrawals:**

- First Form: A reclamation withdrawal of public lands that are or may be needed for the building and maintaining a reclamation project.

- Second Form: A reclamation withdrawal of public lands susceptible to irrigation form a reclamation project.

- The distinction between the first and second forms of withdrawals has been eliminated, and all such withdrawals are called reclamation withdrawals

**Record of Decision:** A document signed by a responsible official recording a decision that was preceded by the preparing of an environmental impact statement.

**Recreation and Public Purposes (R&PP) Act:** Authorizes the sale or lease of BLM lands for recreational or public purposes to State and local governments and to qualified nonprofit organizations. Examples of typical uses under the act are historic monument sites, campgrounds, schools, fire houses, law enforcement facilities, municipal facilities, landfills, hospitals, parks, and fairgrounds. Department of the Interior regulations for the Recreation and Public Purposes Act are found in Title 43 of the Code of Federal Regulations (43 CFR), Parts 2740 (Sales) and 2912 (Leases).

**Relinquished Allotment (Grazing):** An allotment where an existing permittee or lessee gives up his or her permit or lease causing the allotment to become unleased.

**Reservation:** A "setting aside" or dedication of lands for the federal government for a specific public purpose. "Reserved" land is not necessarily withdrawn. A permanent withdrawal dedicated to a specific public purpose.

**Resource Advisory Council (RAC):** A council established by the Secretary of the Interior to provide advice or recommendations to BLM management.

**Resource Management Plan (RMP):** A land use plan as prescribed by the Federal Land Policy and Management Act which establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives and actions to be achieved.

**Retirement of Grazing Privileges:** Ending livestock grazing on a specific area of land. *See also* Grazing Relinquishment.

**Right-of-Way:** A permit or an easement which authorizes the use of public lands for certain specified purposes, commonly for pipelines, roads, telephone lines, electric lines, reservoirs, etc.; also, the lands covered by such an easement or permit.

**Right-of-way Corridor:** A parcel of land that has been identified by law, Secretarial order, through a land use plan or by other management decision as being the preferred location for existing and future right-of-way grants and suitable to accommodate one type of right-of-way or one or more rights-of-way which are similar, identical or compatible.

**Riparian Area:** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas are transitional between terrestrial and aquatic ecosystems and are distinguished by gradients in biophysical conditions, ecological processes, and biota. They are areas through which surface and subsurface hydrology connect waterbodies with their adjacent uplands. They include those portions of terrestrial ecosystems that significantly influence exchanges of energy and matter with aquatic ecosystems (i.e., a zone of influence). Riparian areas are adjacent to perennial, intermittent, and ephemeral streams, lakes, and estuarine-marine shorelines. (National Academy of Sciences 2002).

**Riparian habitat conservations area (RHCA):** the area around a waterbody, wetland, or landslide-prone area where riparian-dependent resources (primarily aquatic habitat and species) receive management emphasis and for which Riparian Management Objectives are developed.

**Riparian management objective (RMO):** developed for specific areas for shade (temperature), pools (channel function), barriers, and sediment (erosion and channel function) for protecting aquatic habitat and species.

**River Designation**: The process whereby rivers are added to the National Wild and Scenic Rivers System by an act of Congress or by administrative action of the Secretary of the Interior with regard to state-designated rivers under Section 2(a)(ii) of the Wild and Scenic Rivers Act.

**Road:** A linear route more than 50 inches wide declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use; unless identified and managed as a trail.

- ***Decommissioned Road***: The stabilization and restoration of an unneeded road to a more natural state.
- ***Impassable Road***: A road that has been treated in such a manner that the road is blocked and there is little resource risk if road maintenance is not performed on a regular basis (self-maintaining). Roads may become impassable as a result of a variety of means, including but not limited to one or more of the following: natural vegetation growth, road entrance obliteration, scarified ground, fallen trees, boulders, culvert or bridge removal, etc. Impassable roads may remain on the inventoried road system if use of the road is anticipated at some point in the future;
- ***Temporary Road:*** A transportation linear feature authorized or acquired for the development, construction, or staging of a project or event that has a finite lifespan. A temporary route is not intended to be part of the permanent transportation system but may be part of the travel network. Temporary routes must be reclaimed by the project proponent (or their representative) when its intended purpose(s) has been fulfilled, unless through a separate review and decision making process the BLM incorporates and appropriately designates the route as part of its transportation system. Unless a temporary route is specifically intended to accommodate public use, it should not be made available for that use
- ***Open Road:*** Open year-round to public
- ***Open Road with Restriction:*** Open to the public with seasonal and/or vehicle type limitations.
- **Road Density:** Number of miles of open road per square mile.
- **Open Motorized Road Density**: Roads and motorized trails that are open to wheeled motor vehicle use by the public for any part of the non-denning season
- **Open Motorized Road Density in NDCE Zone 1:** The baseline for open road density on BLM lands in NCDE Zone 1 is 1.70 mi/mi$^2$ defined as conditions on existing BLM-administered public lands as of 12/31/2011, as modified by changes in numbers that were evaluated and found to be acceptable through the Endangered Species Act Section 7 consultation with the USFWS while the grizzly bear was listed as threatened. This does not include future land acquisitions.

**Runoff:** The water that flows on the land surface from an area in response to rainfall or snowmelt.

**Salable Minerals:** Common variety minerals on the public lands, such as sand and gravel, which are used mainly for construction and are disposed of by sales or special permits to local governments.

**Scenic Quality**: The degree of harmony, contrast and variety within a landscape.

**Scenic River:** A river or section of a river that is free of impoundments, and whose shorelines are largely undeveloped but accessible by roads in places.

**Seasonal Restriction:** A fluid minerals leasing constraint that prohibits surface use during specified time periods to protect identified resource values. The constraint does not apply to the operation and maintenance of production facilities unless analysis demonstrates that such constraints are needed and that less stringent, project-specific constraints would be insufficient.

**Section 7 Consultations:** The requirement of Section 7 of the Endangered Species Act that all federal agencies consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service if a proposed action might affect a federally listed species or its critical habitat.

**Section 106 Compliance:** The requirement of Section 106 of the National Historic Preservation Act that any project funded, licensed, permitted, or assisted by the federal government be reviewed for impacts to significant historic properties and that the State Historic Preservation Officer and the Advisory Council on Historic Preservation be allowed to comment on a project.

**Security Habitat**: Refers to the protection inherent in any situation that allows elk to remain in a defined area despite an increase in stress or disturbance associated with hunting or other human activities.

**Sediment:** Soil, rock particles, and organic or other debris carried from one place to another by wind, water or gravity.

**Sedimentation:** The process or action of depositing sediment.

**Segregation:** Any action, such as a withdrawal or allowed application (exchange) that suspends the operation of the general public land laws; removing lands from the operation of part or all the public land mineral laws.

**Sensitive Species:** Species designated by the State Director, usually in cooperation with the State agency responsible for managing the species and State Natural heritage programs, as sensitive. They are those species that: (1) could become endangered in or extirpated from a State, or within a significant portion of its distribution; (2) are under status review by the USFWS; (3) are undergoing significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution; (4) are undergoing significant current or predicted downward trends in population or density such that federal listed, proposed, candidate, or State listed status may become necessary; (5) typically have small and widely dispersed populations; (6) inhabit ecological refugia or other specialized or unique habitats; or (7) are state-listed but which may be better conserved through application of BLM sensitive species status.

**Seral:** A temporal and intermediate condition pertaining to the successional stages of biotic communities.

**Shrub:** A low, woody plant, usually with several stems, that may provide food and/or cover for animals.

**Significant Paleontological Resource (syn. Significant Fossil Resource):** Any paleontological resource considered to be of scientific interest, including most vertebrate fossil remains and traces, and certain rare or unusual invertebrate and plant fossils. A significant paleontological resource is considered scientifically important because it is a rare or previously unknown species, of high quality and well-preserved, preserves a previously unknown anatomical or other characteristic, provides new information about the history of life on Earth, or has identified educational or recreational value. Paleontological resources that may be considered to not have paleontological significance include those that lack provenience or context, lack physical integrity because of decay or natural erosion, or are overly redundant or otherwise not useful for research.

**Silviculture:** The art and science of controlling the establishment, growth, composition, health, and quality of forests to meet desired outcomes.

**Slash:** Forest residues such as branches, bark, tops, cull logs, broken or uprooted trees, and/or stumps that can be left on the ground or in piles after logging, vegetative or fuels treatments, or land use activities such as road construction.

**Slope:** The degree of deviation of a surface from the horizontal.

**Soil Compaction:** A layer of dense soil caused by repeated impacts on or disturbances of the soil surface. Compaction becomes a problem when it begins to limit plant growth, water infiltration, or nutrient cycling processes.

**Soil Productivity:** The capacity of a soil to produce a plant or sequence of plants under a system of management. Maintaining soil productivity encompasses and infers all aspects including biological processes and mycorrhizal relationships.

**Solitude:** (1) the state of being alone or remote from others; isolation; (2) a lonely or secluded place.

**Source Water Protection Plan:** A management plan, usually developed by local communities, that addresses public water system concerns based on information contained within Source Water Delineation and Assessment Reports.

**Special Recreation Management Area (SRMA):** An identified area of BLM land managed to provide entire recreation products (i.e., services, settings, and activity and outcome opportunities) in response to identifiable significant customer desires. Investments in facilities and/or visitor assistance are authorized within SRMAs.

**Special Status Species:** Includes proposed species, listed species, and candidate species under the Endangered Species Act; state-listed species; and BLM State Director-designated sensitive species.

**Species:** A unit of classification of plants and animals consisting of the largest and most inclusive array of sexually reproducing and cross-fertilizing individuals that share a common gene pool.

**Species Diversity:** The number, different kinds of, and relative abundances of species present in a given area.

**Split Estate:** Split estate is a land status term that applies when the surface is patented or deeded into non-federal ownership, while the federal government retains the mineral rights. Reverse split estate applies when the federal government transferred both the surface and mineral estate into non-federal ownership, but the surface estate was subsequently returned while the minerals, or a portion of them, were retained by the private landowner.

**Stand:** A community of trees or other vegetation uniform in composition, constitution, spatial arrangement, or condition to be distinguishable from adjacent communities.

**Stand Composition**: The proportion of each tree species in a stand expressed as a percentage of all trees, basal area or volume.

**Streamside management zone (SMZ):** the area along each side of a stream, lake, or other waterbody where certain forest practices applied under a timber sale are prohibited or limited for protecting water quality.

**Steep Slopes:** Slopes with a gradient between 20 and 60 percent (USDA-SCS 1993).

**Stipulations:** Requirements that are part of the terms of a mineral lease. Some stipulations are standard on all federal leases. Other stipulations may be applied to the lease at the discretion of the surface management agency to protect valuable surface resources and uses.

**Stream Reach:** A specified length of a stream or channel.

**Structure (Stream Channel):** Any object, usually large, in a stream channel that controls water movement.

**Structure (of Forest Vegetation):** The horizontal and vertical distribution of plants in a stand, including height, diameter, crown layers, and stems of trees, shrubs, herbaceous understory, snags and coarse woody debris.

**Succession:** The replacement in time of one plant community with another. The prior plant community (or successional stage) creates conditions that area favorable for the establishment of the next stage.

**Suitability (for Wild and Scenic Rivers):** Evaluation of eligible rivers for inclusion into the national Wild and Scenic River System by Determining the best use of the river corridor and the best method to protect the outstandingly remarkable values within the river corridor.

**Surface-Disturbing or Disruptive Activities:** For the purposes of applying project design features, BMPs or other features to reduce or minimize effects, surface-disturbing and disruptive activities are defined below.

> **Surface-Disturbing Activities:** The physical disturbance or removal of land surface and vegetation. Some examples of surface-disturbing activities include, but are not limited to, construction of roads, well pads, pipelines, powerlines, pits/reservoirs, facilities, recreation sites, and mining. Vegetation renovation treatments that involve soil penetration and/or substantial mechanical damage to plants (plowing, chiseling, chopping, etc.) are also surface- disturbing activities.

> **Disruptive Activities:** Those resource uses and activities that are likely to alter the behavior of, displace, or cause excessive stress to wildlife populations occurring at a specific location and/or time. In this context, disruptive activity(ies) refers to those actions that alter behavior or cause the displacement of wildlife such that reproductive success is negatively affected, or the physiological ability to cope with environmental stress is compromised. This term does not apply to the physical disturbance of the land surface, vegetation, or features. Examples of disruptive activities may include noise, vehicle traffic, or other human presence regardless of the activity. The term is used in conjunction with protecting wildlife during crucial life stages (e.g., breeding, nesting, birthing, etc.), although it could apply to any resource value. This definition is not intended to prohibit all activities or authorized uses. For example, emergency activities (e.g., fire

suppression, search and rescue), rangeland monitoring, routine maintenance associated with an approved authorization, dispersed recreational activities (e.g., hunting, hiking) and livestock grazing are not considered surface-disturbing or disruptive activities.

**Sustainability:** The ability of an ecosystem to maintain ecological processes and functions, biological diversity, and productivity over time.

**Sustained Yield:** Maintenance of an annual or regular periodic output of a renewable resource from public land consistent with the principles of multiple use.

**Terms and Conditions:** Measures contained in livestock grazing permits and leases that are determined by the authorized officer to be appropriate to achieve management and resource condition objectives for the public lands and other lands administered by the BLM, and to ensure conformance with Fundamentals of rangeland health and Standards and guidelines for grazing administration.

**Terrestrial Species:** Ground-dwelling plants and animals.

**Thermal Cover:** Vegetation or topography that prevents radiational heat loss, reduces wind chill during cold weather, and intercepts solar radiation during warm weather.

**Threatened Species:** Any plant or animal species defined under the Endangered Species Act as likely to become endangered within the foreseeable future throughout all or a significant portion of its range; listings are published in the Federal Register.

**Tools:** Something that helps to accomplish the stated goal or action for a resource/resource use or program. Tools include timing, duration of grazing, forage utilization, grazing rotation, deferment of grazing, stubble height, bank alteration, and structural features.

**Total Maximum Daily Load:** An estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Trail:** Linear routes managed for human-powered, stock, or off-road vehicle forms of transportation, or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Travel Management Areas:** Polygons or delineated areas where a rational approach has been taken to classify areas open, closed, or limited, and have identified and/or designated network of roads, trails, ways, and other routes that provide for public access and travel across the planning area. All designed travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations.

**Treatment Area:** The specific area of land where the actual management activity, such as timber harvest, prescribed burning, construction, or other activity would occur. One or more treatment areas can be included in a project area, which usually includes adjacent and/or surrounding areas that are not treated, and multiple activities could occur within a single treatment area, concurrently or over time.

**Unauthorized Occupancy:** Activities that result in full or part-time human occupancy or use. An example would be the construction, placement, occupancy, or assertion of ownership of a facility or structure (cabin, house, natural shelter, trailer, etc.) on BLM land.

**Unauthorized Use:** Activities that do not appreciably alter the physical character of BLM land or vegetative resources. Some examples of unauthorized use include the abandonment of property or trash, enclosures, and use of existing roads, primitive roads and trails for purposes that require a use fee or right-of-way.

**Understory:** Vegetation (e.g., trees or shrubs) growing under the canopy formed by taller trees.

**Ungulates:** Hoofed animals, including ruminants but also horses, tapirs, elephants, rhinoceroses, and swine.

**Unleased Allotments (Grazing):** Areas of land designated and managed for livestock grazing that are currently not leased or permitted by a qualified applicant.

**Unreserved Public Lands:** Public lands not covered by a reservation or a withdrawal except by the federal orders of withdrawal.

**Uplands:** Lands at higher elevations than alluvial plains or low stream terraces; all lands outside the riparian-wetland and aquatic zones.

**Use Authorization:** Approval of a proposed use for land or resources on the prescribed form or document designated for such use; a document showing permission to use land or the resources thereon; a formalized grant pursuant to a request to use land or resources.

**User Day:** Any calendar day, or portion thereof, for each individual accompanied or serviced by an operator or permittee on the public lands or related waters; synonymous with passenger day or participant day.

**Utility Type (or Terrain) Vehicle (UTV):** Any recreational motor vehicle other than an all-terrain vehicle, motorbike, or snowmobile designed for and capable of travel over unpaved roads, traveling on four or more low-pressure tires, maximum width is less than 74 inches, usually a maximum weight less than 2,000 pounds, or having a wheelbase of 94 inches or less. Utility type vehicles do not include vehicles specially designed to carry a person with disabilities.

**Utilization (Rangeland):** The proportion of the current year's forage production that is consumed or destroyed by grazing animals. Utilization is usually expressed as a percentage.

**Vacant Available Lands (Grazing):** Areas of land designated for livestock grazing that are not segregated into allotments. These lands may be formed into allotments if a qualified applicant applies for a lease or permit.

**Vacant Public Lands:** Public lands that are unappropriated and unreserved and not within a withdrawal; lands that are not reserved except by the general orders of withdrawal.

**Valid Existing Rights:** Locatable mineral development rights that existed when the Federal Land Policy and Management Act was enacted on October 21, 1976. Some areas are segregated from entry and location under the Mining Law to protect certain values or allow certain uses. Mining claims that existed as of the effective date of the segregation may still be valid if they can meet the test of discovery of a valuable mineral required under the Mining Law. Determining the validity of mining claims located in segregated lands requires BLM to conduct a validity examination and is called a "valid existing rights" determination.

**Vegetation Community:** An assemblage of plant populations in a common spatial arrangement.

**Vegetation Manipulation:** Alteration of vegetation by using fire, plowing, cutting, powered mechanical, or other means.

**Vegetation Type:** A plant community with distinguishable characteristics described by the dominant vegetation present.

**Viable:** Capable of sustaining a healthy, productive, and reproducing population over a long period of time.

**Visual Resource Management (VRM) Classes:** Categories assigned to public lands based on scenic quality, sensitivity level, and distance zones. There are four classes. Each class has an objective that prescribes the amount of change allowed in the characteristic landscape.

**Water Quality:** The chemical, physical, and biological characteristics of water with respect to its suitability for a particular use.

**Water Quality Restoration Plans:** A comprehensive plan developed in conjunction with Montana Department of Environmental Quality, local watershed groups, and numerous agencies and entities to address and establish water quality goals, Total Maximum Daily Loads, restoration strategies, and monitoring.

**Water Table:** The surface in a groundwater body where the water pressure is atmospheric. It is the level at which water stands in a well that penetrates the water body just far enough to hold standing water.

**Watershed:** A geomorphic area of land and water within the confines of a drainage divide. The total area above a given point on a stream that contributes flow at that point.

**Watershed Approach**: A framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed. The framework considers both ground and surface water flow within a hydrologically defined geographical area.

**Watershed Assessment:** An analysis and interpretation of the physical and landscape characteristics of a watershed using scientific principles to describe watershed conditions as they affect water quality and aquatic resources.

**Weed Management Area:** These are distinguishable zones based on similar geography, weed problems, climate, or human-use patterns with agreements between landowners to cooperatively manage noxious weeds.

**Wetland Vegetation:** The outer extent of the obligate and facultative wetland species that grows on land that is inundated or saturated by surface water or groundwater.

**Wetlands:** Areas that are inundated or saturated by surface or ground water often and long enough to support and under normal circumstances do support a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands include marshes, shallows, swamps, bogs, muskegs, wet meadows, estuaries and riparian areas. (USDI 2015) Similarly, Executive Order 11990, Sec 7(c) (U.S. Congress, 1977a) defines wetlands as areas that are inundated by surface or ground water with a frequency sufficient to support and under normal circumstances does or would support a prevalence of vegetative or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs, and similar areas such as sloughs, potholes, wet meadows, river overflows, mud flats, and natural ponds.

Certain riparian areas and wetlands may be classified as jurisdictional wetlands under Section 404 of the Clean Water Act (U.S. Congress 1972). These fall under regulatory purview of the Environmental Protection Agency and certain activities are subject to permitting through the U.S. Army Corps of Engineers. Jurisdictional wetlands are areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

**Wild River:** Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

**Wild, Scenic or Recreational River:** The three classes of what is traditionally referred to as a "Wild and Scenic River." Designated river segments are classified as wild, scenic and/or recreational, but the segments cannot overlap.

**Wild and Scenic River Study:** Rivers identified in Section 5 of the Wild and Scenic Rivers Act for study as potential additions to the National Wild and Scenic Rivers System. The rivers shall be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

**Wilderness:** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value.

**Wilderness Characteristics:** Key characteristics of a wilderness listed in section 2(c) of the "Wilderness Act" of 1964 and used by BLM in its wilderness inventory. These characteristics include size, naturalness, outstanding opportunities for solitude, outstanding opportunities for primitive and unconfined type of recreation, and special features.

**Wilderness Study Area**: A designation made through the land use planning process of a roadless area found to have wilderness characteristics as described in Section 2 (c) of the Wilderness Act of 1964.

**Wildfire:** An unplanned, unwanted wildland fire, including unauthorized human-caused fires, escaped prescribed fire projects, and all other wildland fires where the objective is to put the fire out.

**Wildland Fire:** Any non-structure fire that occurs in the wildland. This term was updated in February 2009 to include two (rather than three) types of wildland fire:

- *Wildfire:* An unplanned, unwanted wildland fire, including unauthorized human-caused fires and escaped prescribed fire projects.
- *Prescribed Fire:* A planned fire; planned ignitions.

**Wildland Fire Use:** This term became obsolete in February 2009, when new interagency guidance was developed for implementing Federal Wildland Fire Management Policy. The definition was '*application of the appropriate management response to naturally-ignited wildland fires to accomplish specific resource management objectives in pre-defined designated areas outlined in Fire Management Plans*.' There is no new term to replace this, but the concept remains available as a planned management option. Prior to 2009, this term was the third type of **Wildland Fire**.

**Wildland-Urban Interface (WUI):** The line, area, or zone, where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuel.

**Wildlife Corridor:** Landscape elements that connect similar patches of habitat through an area with different characteristics. Wildlife corridors are also segments of land that create a link between critical habitats. For example, streamside vegetation may create a corridor of willows and hardwoods between meadows or through a forest. These linkage zones are where species migrate and intermingle ensuring genetic interchange and consequently long-term survival.

**Winter Range:** An area where specific wildlife species (primarily deer, antelope and elk) congregate during winter time periods. These areas are often composed of topographic or vegetative features that enhance survival for these species when conditions such as snow accumulation and temperature place increased energetic demands on individual animals.

**Withdrawal:** Removal or withholding of public lands by statute or secretarial order, from the operation of some or all of the public land laws.

**Woodland:** A forest community occupied primarily by noncommercial species such as juniper, mountain mahogany, or quaking aspen groves. All western juniper or limber pine are classified as woodlands, since juniper and limber pine are classified as noncommercial species.

## II.8   APPENDICES

The following appendices are part of the Missoula ROD/Approved RMP:

Appendix A.   Air Quality and Climate (see Missoula PRMP/Final EIS)
**Appendix B.   Aquatic and Riparian Habitat Conservation Strategy**
Appendix C.   Forest Vegetation (see Missoula PRMP/Final EIS)
Appendix D.   Impaired Waters (see Missoula PRMP/Final EIS)
Appendix E.   Locatable Minerals Reasonable Foreseeable Development Scenario (see Missoula PRMP/ Final EIS)
Appendix F.   Major Laws (see Missoula PRMP/Final EIS)
Appendix G.   Wild and Scenic River Suitability Report (see Missoula PRMP/Final EIS)
**Appendix H.   Maps (updated!)**
Appendix I.   Noxious and Invasive Species List (see Missoula PRMP/Final EIS)
Appendix J.   Post-Wildfire Emergency Stabilization and Rehabilitation Procedures
Appendix K.   Probable Sale Quantity Determinations and Calculations (see Missoula PRMP/Final EIS)
**Appendix L.   Recreation Management Areas**
Appendix M.   Socioeconomic Report (see Missoula PRMP/Final EIS)
Appendix N.   Summary of No Action Alternative Management (see Missoula PRMP/Final EIS)
**Appendix O.   Supplemental Rules**
**Appendix P.   Design Features and Best Management Practices**
**Appendix Q.   Lands and Realty**
Appendix R.   Rangeland Health
Appendix S.   Public Comments
**Appendix T.   Summary of USFWS Biological Opinions**

Appendices B, H, L, O, P, and Q and included in Section III below.  The other appendices, as mentioned above, can be found in the Missoula PRMP/Final EIS located here:  https://eplanning.blm.gov

# III. APPENDICES

This page intentionally left blank.

Appendices B, H, L, O, P, and T are included in this section below.  The other appendices, as mentioned above, can be found in the Missoula PRMP/Final EIS located here:  https://eplanning.blm.gov

The following appendices are part of the Missoula ROD/Approved RMP:

<div style="margin-left:2em">

Appendix A.   Air Quality and Climate (see Missoula PRMP/Final EIS)

Appendix B.   Approved Aquatic and Riparian Habitat Conservation Strategy

Appendix C.   Forest Vegetation (see Missoula PRMP/Final EIS)

Appendix D.   Impaired Waters (see Missoula PRMP/Final EIS)

Appendix E.   Locatable Minerals Reasonable Foreseeable Development Scenario (see Missoula PRMP/ Final EIS)

Appendix F.   Major Laws (see Missoula PRMP/Final EIS)

Appendix G.   Wild and Scenic River Suitability Report (see Missoula PRMP/Final EIS)

Appendix H.   Maps/Figures

Appendix I.   Noxious and Invasive Species List (see Missoula PRMP/Final EIS)

Appendix J.   Post-Wildfire Emergency Stabilization and Rehabilitation Procedures (see Missoula PRMP/Final EIS)

Appendix K.   Probable Sale Quantity Determinations and Calculations (see Missoula PRMP/Final EIS)

Appendix L.   Approved Recreation Management Areas

Appendix M.   Socioeconomic Report (see Missoula PRMP/Final EIS)

Appendix N.   Summary of No Action Alternative Management (see Missoula PRMP/Final EIS)

Appendix O.   Approved Supplemental Rules

Appendix P.   Approved Design Features and Best Management Practices

Appendix Q.   Lands and Realty (see Missoula PRMP/Final EIS)

Appendix R.   Rangeland Health (see Missoula PRMP/Final EIS)

Appendix S.   Summarized Public Comments (see Missoula PRMP/Final EIS)

Appendix T.   Summary of USFWS Biological Opinions

</div>

# APPENDIX B. AQUATIC AND RIPARIAN HABITAT CONSERVATION STRATEGY

This Strategy consolidates programmatic direction and guidance for riparian and aquatic conservation and restoration and conforms to the direction issued on April 18, 2014, for implementation of the Aquatic and Riparian Habitat component of the Interior Columbia Basin Strategy and Aquatic Framework (USFS et al. 2014). Conservation of aquatic wildlife, plants, and habitats are considered together with broader-scale ecosystem components including landscape dynamics, terrestrial source habitats, and riparian and hydrologic processes. The proposed Resource Management Plan balances short-term risks with long-term benefits through goals, objectives, and management actions designed to move aquatic resources toward desired conditions. "A Framework for Incorporating the Aquatic and Riparian Habitat Component of the Interior Columbia Basin Strategy into BLM and Forest Service Plan Revision" (USFS et al. 2014) provided the basis for this strategy.

This strategy contains the following key components:

- Utilizing Riparian Conservation Areas and Riparian Management Objectives
- Specific goals, objectives and standards

- protection for population strongholds of aquatic Special Status Species and their habitat;
- provisions for multi-scale analysis and how it will be used in project-level decisions;
- identification of priority restoration of aquatic and riparian habitats;
- monitoring and adaptive management for determining if the plan is being implemented and is achieving desired results.

The BLM adopted the Inland Native Fish Strategy (INFISH) (USDA, 1995) in bull trout occupied watersheds in an Instruction Memorandum (IM-ID-96-010). The justification for BLM to apply the strategy to watersheds containing other special status aquatic species, such as westslope cutthroat trout and western toad, is included in BLM Policy Manual 6840 and the BLM Land Use Planning Handbook (H-1610-1, Appendix C).

## RIPARIAN CONSERVATIONS AREAS (RCAS) AND RIPARIAN MANAGEMENT OBJECTIVES (RMOS)

RCAs are portions of watersheds where localized processes influence aquatic habitat condition and where proper ecological function is essential for maintenance. RCAs are defined for all permanent and intermittent flowing streams, lakes, wetlands, seeps, springs and unstable sites that may influence these areas. RCAs may extend into tributaries that contain special status species or habitat and may also extend outside the actual riparian zone when considering sources of stream shading, woody debris and organic matter, and delivery paths of sediment and nutrients. Riparian-dependent resources receive management emphasis within RCAs. RCA management aims to maintain and restore riparian structure and function, benefit fish and other aquatic species, enhance conservation of organisms dependent on the transition zone between upslope and instream habitats, and improve connectivity of travel and dispersal corridors for terrestrial animals, plants, and aquatic organisms.

A key aspect of RCA management is the development of RMOs, using watershed or site-specific analyses at a site-specific scale, in response to project-specific concerns, and in consideration of: (1) inherent site capability, (2) specific circumstances such as spawning or overwintering habitat, and (3) the condition and trend of the riparian area and instream habitat. Establishing RMOs based on site-specific conditions and desired ecological characteristics replaces the default numeric standards of INFISH and allows for the incorporation of additional indicators, such as those defined in the USFWS bull trout matrix (1998).

Riparian Management Objectives (RMOs) provide criteria to measure the attainment of, or progress toward attainment of, riparian goals. These indicators represent standards for ecosystem health and are a good starting point to describe the desired condition for fish habitat. RMOs described by INFISH are pool frequency, water temperature, large woody debris, bank stability, lower bank angle, and width/depth ratio. These RMOs apply when watershed analysis has not been completed. Components of good habitat can vary across geographic area and land managers are encouraged to establish site specific RMOs through watershed analysis or site-specific analysis. Furthermore, the U.S. Fish and Wildlife Service developed a matrix describing RMOs for bull trout (USFWS 1998). The indicators used to assess bull trout habitat include: water temperature, sediment, chemical contaminants and nutrients, physical barriers, substrate embeddedness, large woody debris, pool frequency and quality, large pools, off-channel habitat, refugia, stream channel width/maximum depth ratio, streambank condition, floodplain

connectivity, change in peak/base flow, increases in drainage networks, road density and location, disturbance history, riparian conservation areas and disturbance regimes.

RCAs are not regarded as "no management zones." Some treatments to vegetation or soils may be essential to achieving or maintaining desired RMOs and riparian conditions.

Determination of RCA widths is made at an appropriate scale determined by project-specific planning and analysis, and in response to proposed or ongoing management activities that may affect attainment of desired conditions. Determination is supported by knowledge of riparian and aquatic ecology, geomorphic processes, resource values, cause-effect relationships, and the hazard-risk scenario of proposed activities.

RCA widths are to be adequate to provide stream shade and streambank stability, protect the stream from non-channelized sediment inputs, and provide organic matter and woody debris. Therefore, RMOs are developed to focus on those key elements.

In the absence of a watershed or site-specific analysis to develop RMOs and specific RCA widths, the 'default' widths recommended in INFISH (USDA 1995) and the Interior Columbia Basin Science Assessment or as amended, and literature review (Quigley and Arbelbide 1997) would be applied as follows:

> Fish-bearing streams: RCAs shall consist of the stream and the area on each side of the stream extending from the edges of the active stream channel to the top of the inner gorge, or to the outer edges of the 100-year floodplain, or to the outer edges of riparian vegetation, or to a distance equal to the height of two site-potential trees, or 300 feet slope distance (600 feet including both sides of the stream), whichever is greatest.

> Permanently flowing, non-fish-bearing streams: RCAs shall consist of the stream and the area on each side of the stream extending from the edges of the active stream channel to the top of the inner gorge, or to the outer edges of the 100-year floodplain, or to the outer edges of riparian vegetation, or to a distance equal to the height of one site-potential tree, or 150 feet slope distance (600 feet including both sides of the stream), whichever is greatest.

> Seasonally flowing or intermittent streams, ponds, lakes, reservoirs, wetlands, and landslide prone areas: RCAs shall consist of the body of water or wetland and the area to the outer edges of the riparian vegetation, or to the extent of seasonally saturated soil, or the extent unstable areas, or to a distance equal to the height of one site-potential tree, Or 150 feet slope distance from the edge of the maximum pool elevation of constructed ponds and reservoirs or from the edge of the stream channel, wetland, pond or lake, whichever is greatest.

## SPECIFIC GOALS, OBJECTIVES AND STANDARDS

This plan incorporates the riparian goals of INFISH. Standards and guidelines have also been developed based on those defined by INFISH. Any modifications to standards and guidelines are intended to help clarify the intent of INFISH. Standards and guidelines apply to all RCAs and projects and activities in areas outside of RCAs that are identified through NEPA analysis as potentially degrading to RCAs.

Standards and guidelines for RCAs are used in combination with BMPs, design features, and other management actions to achieve desired outcomes for the conservation of aquatic and riparian resources. Management goals, objectives and actions can be found in Appendix G (abbreviations in parenthesis indicate INFISH standards and guidelines carried forward in this plan). Design features and best management practices are in Appendix P.

## PROTECTING AQUATIC SPECIAL STATUS SPECIES POPULATION STRONGHOLDS

Fish key watersheds are listed and depicted in the table.  Fish Key watersheds are also displayed in *Appendix H, Figure A-4, Aquatics*. Key watersheds emphasize protection of imperiled aquatic species populations and identify habitat networks of existing strongholds with robust populations and high-quality habitat that will support expansion and recolonization to adjacent watersheds. Key watersheds may receive priority over non-key watersheds for restoration work.

| Watershed | Watershed Aquatic resource values | BT prob. Occur 2040 (0 EBT) | Geographic area | Comments |
|---|---|---|---|---|
| Arrastra Creek | BT, WT | 86% | Marcum | Flows directly into BTCH (Blackfoot R) |
| Middle Upper Willow Creek | BT, WCT, WPM | 16-46% | Pburg West | BT and WPM in Upper Willow Cr. And WCT in Scotchman and Miner gulch |
| Wales Creek | WCT, WPM | 19% | North Garnets | Very strong population of WPM and solid ownership of upper portion of watershed |
| Chamberlain Creek | WCT, WPM | 14% | North Garnets | Solid ownership of upper portion of watershed; BT and WPM (translocated) just downstream from BLM, WCT 97% in 1998 |
| Belmont | BT, BTCH, WCT | Less than 3% on BLM; 6% way up | LBC | Solid ownership of lower portion of watershed |
| Blackfoot River-Buck Creek | BT, BTCH, WCT | Less than 3% | LBC | Solid ownership of portion of watershed |
| Cottonwood Creek | WCT | 27% | Hoodoos | Solid ownerships of upper portion of watershed |

BT = bull trout; BTCH = bull trout critical habitat; WCT = westslope cutthroat trout; WPM = western pearlshell mussel

## Methods for selecting Fish Key Watersheds

Management of Fish Key Watersheds emphasizes conservation of westslope cutthroat trout, bull trout, and western pearlshell mussel by providing quality habitat, and focusing on the strongest populations across the Analysis Area. The primary indicator for population strength was the length of stream occupied by a population. Higher consideration was given to watersheds with cutthroat populations which are (or nearly) genetically pure. Some key watersheds have less robust populations than others

but were selected in order to achieve an adequate distribution and maintaining migratory life histories and connectivity. *See Appendix H, Figure A-4, Aquatics.*

## Management considerations for Fish Key Watersheds

- Coordination with adjacent land managers in describing the strongholds and management objectives for their riparian areas and streams.

- Fish key watersheds may be added or deleted based on new information.

- Management activities should emphasize achieving or maintaining riparian and aquatic habitat values and processes.

## MULTI-SCALE ANALYSIS

Generally, no single assessment will adequately address the complex issues facing resource managers today. Fine-scale assessments provide context for management and project planning, but they cannot adequately address broad patterns and processes, such as habitat conditions for wide-ranging species. Broad-scale assessments provide context for policy formulation and for mid- and fine-scale assessment, but they cannot by themselves provide detailed information, such as site-specific habitat conditions. Together, multi-scale assessments provide comprehensive information for land management.

Multiple scales of review and assessment provide the context to implement broad-scale decisions within individual BLM District and Field Offices. As needed, multi-scale analysis may be used for future plan amendments or revisions and for subsequent project-level decisions. Analysis at the appropriate scale is generally recognized to provide the needed context for decision making. The four levels of review or assessment that may be used for multi-scale analysis are:

- Broad-scale (e.g., analysis at the basin scale, such as the Interior Columbia River Basin);

- Mid-scale (e.g., analysis at the subbasin scale, such as the Snake River subbasin);

- Fine-scale (e.g., analysis at the watershed scale, such as the Salmon Falls Creek Watershed); and

- Site-scale (e.g., analysis at the stream reach or project scale, such as China Creek).

Management considerations for multi-scale analysis include the following:

- Land Use Plans are generally developed and analyzed at the scale of the land management unit, normally analogous to a subbasin (or group of subbasins) scale.

- Subsequent finer-scale analysis, such as to support restoration prioritization and monitoring strategy development, should include interagency coordination.

- Assessments should include evaluation of existing conditions, factors limiting aquatic species populations, resource risks, management needs, and restoration opportunities.

- Information developed at the finer scale should be considered in implementing aquatic conservation or restoration measures and used to make adjustments or modifications to appropriate management actions, as warranted.

- Multi-scale analysis provides a basis for integrating and prioritizing conservation measures for wide ranging species

## Bull Trout

In July 1998, bull trout was listed as threatened under the Endangered Species Act. In 1999, the listing was applied to one distinct population segment (DPS) of bull trout within the coterminous United States by including bull trout in the Coastal-Puget Sound populations and Saint Mary-Belly River populations with previous listings of three separate distinct population segments of bull trout in the Columbia River, Klamath River, and Jarbidge River basins. In 2015, the USFWS published the Recovery Plan for the Coterminous United States Population of Bull Trout (USFWS 2015). The Recovery Plan is organized with multi-scale analysis in mind.

In the Recovery Plan, the scale of the entire DPS for bull trout is discussed, and the ultimate goal of the recovery strategy is to manage threats and ensure sufficient distribution and abundance to improve the status of bull trout throughout their extant range in the coterminous United States. The distinct population segment covers parts of 5 western states. The Plan then tiers down to six recovery units. Each recovery unit has its own recovery unit implementation plan. This is analogous to broad-scale analysis at the basin scale.

The recovery unit scale is approximate to the basin scale, such as the upper Columbia River Recovery Unit. This is larger than a typical Field Office within a BLM district, as such multiple BLM resource management plans could fall under one recovery unit. Within each recovery unit are multiple core areas. There are 35 within the Columbia Headwaters Recovery Unit. The Blackfoot River, the Upper Clark Fork River, and Rock Creek are core areas with Missoula Field Office BLM managed lands within the recovery unit.

## Bull Trout Critical Habitat

On January 14, 2010, the USFWS revised its 2005 designation of critical habitat for bull trout (USFWS 2010). The designation of critical habitat intends to provide sufficient habitat to allow for genetic and life history diversity, ensure bull trout are well distributed across habitats, ensure sufficient connectivity among populations, and allow for the ability to address threats facing the species. In the planning area, critical habitat includes the Upper Clark Fork River, Flint Creek, Rock Creek, and the Blackfoot River (to include the lower portions of Belmont and Gold creeks).

An interagency Memorandum of Understanding for westslope cutthroat trout management (MCTSC 2007) and the bull trout recovery plan (USFWS 2015) have been developed for the coordinated management of these aquatic special-status species.

## MONITORING AND ADAPTIVE MANAGEMENT

Implementation and effectiveness monitoring, in addition to current scientific information such as stream temperature modeling, will be used to determine if the RMP is achieving desired watershed, riparian and aquatic conditions. Monitoring efforts and data sharing is coordinated with federal, state, and tribal agencies when possible. Current/relevant monitoring programs are summarized below. Additional monitoring will be conducted on a project level/site specific basis as needed to inform decision making and allow adjustments to the plan.

## Special Status Fish Species Habitat Monitoring

Areas considered high priority for current status and trend monitoring include fish key watersheds and fish bearing stream reaches accessible by livestock. Habitat conditions are determined by monitoring the most appropriate of the INFISH RMOs and/or the 18 in-channel indicators identified in the NMFS matrix of pathways and indicators (1996) and the USFWS bull trout matrix (1998). Of these, 4 main indicators (pools, barriers, temperature, and sediment), are deemed most important for assessing habitat condition for bull trout other sensitive aquatic species. The Conservation Strategy for Bull Trout on USFS lands in Western Montana (USDA 2013) provides baseline data for these 4 indicators in bull trout core areas adjacent to lands managed by the Missoula BLM. Though the BLM manages a small land base compared to adjacent USFS lands, there is a need to compile baseline data for local populations within the Blackfoot River, the Upper Clark Fork River, and Rock Creek core areas that align with Missoula Field Office BLM managed lands. Baseline data will give the Missoula BLM a better understanding of the current status of aquatic resources and provide for a detailed restoration strategy.

## PACFISH/INFISH/Biological Opinions (PIBO) Effectiveness and Implementation Monitoring

The Missoula BLM has 8 designated monitoring areas (DMAs) which are sampled using the Multiple Indicator Monitoring (MIM) protocol to gauge implementation of management actions. These sites are located where stream reaches are accessible by livestock and are monitored annually for grazing indicators (streambank alteration, stubble height, streambank stability and cover and woody browse) and every 5 years for long term indicators (greenline composition, greenline-to-greenline width, woody species height and age class, substrate, residual pool depth and pool frequency, streambank stability and cover). There are also 2 reference DMAs that are sampled once every 5 years. MIM monitoring is used to identify non-compliance with livestock grazing standards and adjust grazing use. Additional DMAs will be established as needed.

There are two PIBO effectiveness monitoring sites on Missoula BLM lands (Chamberlain and McElwain Creeks). These sites are sampled every 5 years by PIBO personnel. Continued PIBO effectiveness monitoring is used to evaluate effectiveness of objective implementation in achieving or maintaining desired riparian conditions. The PIBO monitoring protocol uses many of the indicators identified in the USFWS bull trout matrix (1998b), including data collected on the 4 important indicators mentioned above. Further, the PIBO database is expansive and can be used to compare managed and referenced conditions in the same geophysical area. This is of particular importance to the Missoula BLM in evaluation of broad scale priority watershed monitoring because of the small percent of BLM land ownership in the Upper Clark Fork, Flint-Rock and Blackfoot 8-digit HUCs.

## Amphibian Monitoring

The 1986 Garnet RMP did not include mention of amphibians or aquatic reptiles, so a new list of attributes important in defining habitat conditions for these species reflecting recent science and current agency guidelines must be developed. In general, amphibians have complex life cycles with life history stages that require specific breeding, foraging, and overwintering habitats that may be spatially separate (Maxell 2000). Loss or degradation of any one of these components is could result in the decline or local extirpation of a species. Impacts for these species will be addressed as appropriate through examining changes to the environment that fulfill the habitat needs for each life stage.

Breeding, foraging, and aquatic overwintering habitat requirements and known migration distances are summarized for each of Montana's amphibian species in Maxell (2000). Thus, regular monitoring of amphibian populations on Missoula BLM lands and the habitat requirements summarized in Maxell (2000) can be used to identify likely impacts from a variety of anthropogenic activities so that appropriate measures can be taken to ensure the persistence of species in this region. Specifically, analysis of these impacts need to be included during project level planning.

In 2005, a report, in conjunction with other federal and private entities in the region, inventorying on the herpetofauna in the Missoula BLM planning area was completed (Maxell 2005). This report provides important baseline amphibian presence data as well as surveying methods and habitat measurements. In addition, the Montana Heritage Program's Point Observation Database is a great resource for baseline amphibian presence data across Montana. It is important that the BLM continue monitoring known amphibian sites on Missoula BLM lands in regular intervals and survey new sites as they become known to determine trends in amphibian populations. Observations are uploaded to the Montana Heritage Database to assist regional land managers and contribute to regional population data.

# APPENDIX H. APPROVED RMP MAPS

| Figure Number | Title |
|---|---|
| ARMP A-1 | Areas of critical environmental concern |
| ARMP A-2 | Phil Wright Rock ACEC |
| ARMP A-3 | West Fork Butte RNA |
| ARMP A-4 | Aquatics habitat |
| ARMP A-5 | Wildland fire management |
| ARMP A-6 | Livestock grazing |
| ARMP A-7 | Mineral Restriction |
| ARMP A-8 | Off-highway vehicle and snowmobile allocations |
| ARMP A-9 | Recreation management areas |
| ARMP A-10 | Rights-of-way |
| ARMP A-11 | Terrestrial wildlife |
| ARMP A-12 | Visual resource management |
| ARMP A-13 | WSA If Released |
| ARMP A-14 | Land tenure |
| ARMP A-15 | Lewis and Clark National Historic Trail |





Bureau of Land Management
Missoula Field Office
Resource Management Plan
Area of Critical Environmental Concern
ARMP
ARMP_A-1_ACECs
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
ACEC - ARMP
ACEC
Research Natural Area
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
June 2020
Miles
0 2.5 5 10
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Clinton
Garnet
Ovando
Lincoln
Helmville
Drummond
Philipsburg
Deer Lodge

**Bureau of Land Management**
**Missoula Field Office**
**Resource Management Plan**
Phil Wright Rock ACEC
**ARMP**                                    **ARMP_A-2-PhilWright**

BLM | State | Interstate
Forest Service | State- Lubrecht | U.S. Hwy
National Park Service | TNC | State Hwy
Indian Reservation | Private | County Seat
US FWS | County Boundary | Town
**ACEC** | | WSA
Phil Wright Rock

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.

Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020

Miles
0  0.5  1  2

**Montana / Dakotas BLM**
**Missoula Field Office**

Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership



























Bureau of Land Management
Missoula Field Office
Resource Management Plan
West Fork Buttes RNA
ARMP
ARMP_A-3-WestFork
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
County Seat
Indian Reservation
Private
Town
US FWS
County Boundary
WSA
ACEC
West Form Buttes RNA
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 0.125 0.25 0.5
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
23
24
19
20
26
29
35
36
31
32

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Aquatics
ARMP
ARMP_A-4_Aquatics
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
W. Pearlshell (observations)
W. Toad (observations)
Westslope Cutthroat Trout
Bull Trout Critical Habitat
Fish Key Watersheds
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Clinton
Garnet
Ovando
Lincoln
Helmville
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Wildland Fire Management
ARMP
ARMP_A-5_Fire
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
Wildland Urban Interface - All Alts
1 mile
3 mile
4 mile
Fire Management Zones - ARMP
Zone 1
Zone 2
Zone 3
Miles
0 2.5 5 10
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
N
W
E
S
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Clinton
Garnet
Ovando
Lincoln
Helmville
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Livestock Grazing
ARMP
ARMP_A-6_Grazing
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
County Seat
Indian Reservation
Private
Town
US FWS
County Boundary
WSA
Grazing - ARMP
Unavailable
Current Allotment
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Ovando
Lincoln
Missoula
Bonner
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Mineral Restriction
ARMP
ARMP_A-7_Mineral
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
Withdrawals - ARMP
Withdrawn
Withdrawal (Recommend)
Closed (leasable / saleable)
Closed (leasable)
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
N
S
E
W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
OHV Allocations
ARMP
ARMP_A-8_OHV
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
County Seat
Indian Reservation
Private
Town
US FWS
County Boundary
WSA
OHV Allocations - ARMP
Limited
Closed
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Ovando
Lincoln
Missoula
Bonner
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Recreation Management Areas
ARMP
ARMP_A-9_Rec
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
Recreation - ARMP
SRMA
BCA
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office. GIS
May 2020
Miles
0 2.5 5 10
N
S
E
W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Rights-of-Way
ARMP
ARMP_A-10_ROW
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
ROW - ARMP
Exclusion
Avoid
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Terrestrial Wildlife
ARMP
ARMP_A-11_Wildlife
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
Indian Reservation
Private
County Seat
Town
US FWS
County Boundary
WSA
Northern Contl. Divide Ecosystem Grizzly Bear Conservation Strategy
Primary Conservation Area
Zone 1
Zone 2
Canada Lynx Cons. Assmt. and Strat.
Lynx Analysis Units (BLM)
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
N
S
E
W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Philipsburg
Deer Lodge
CHAMBERLAIN COMPLEX
ELK CREEK
UNION CREEK
MCELWAIN COMPLEX
BEAR CREEK
GALLAGHER COMPLEX
Grizzly Zone 1
Grizzly Zone 2

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Visual Resource Management
ARMP
ARMP_A-12_VRM
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
County Seat
Indian Reservation
Private
Town
US FWS
County Boundary
WSA
Visual Resource Management - ARMP
Class I
Class II
Class III
Class IV
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2.5 5 10
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Wilderness Study Area management (If released from designation) ARMP_A-13_IfReleased
ARMP
BLM
State
Interstate
Forest Service
State- Lubrecht
U.S. Hwy
National Park Service
TNC
State Hwy
County Seat
Indian Reservation
Private
Town
US FWS
County Boundary
WSA
WSA released - ARMP
ACEC
BCA
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
June 2020
Miles
0 2.5 5 10
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Land Tenure
ARMP
ARMP_A-14_LandTenure
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
Land Tenure - ARMP
Category 1
Category 2
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
BLM-managed lands not shown on map are managed as Category 2
Miles
0 2.5 5 10
N
W
E
S
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Lincoln
Helmville
Garnet
Clinton
Drummond
Deer Lodge
Philipsburg

Bureau of Land Management
Missoula Field Office
Resource Management Plan
Lewis and Clark National Historic Trail
ARMP
ARMP_A-15_LCNHT
BLM
Forest Service
National Park Service
Indian Reservation
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
Interstate
U.S. Hwy
State Hwy
County Seat
Town
WSA
ARMP Cooridor
Corridor
LCNHT Trail (BLM)
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers
Projection: Albers
Datum: North American 1983
Missoula Field Office, GIS
May 2020
Miles
0 2 4 8
N S E W
Montana / Dakotas BLM
Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Missoula
Bonner
Ovando
Helmville
Garnet
Clinton
Drummond

# APPENDIX L. APPROVED RECREATION MANAGEMENT AREAS

This appendix provides the supporting information, recreation character setting, and the management direction that would apply to Special Recreation Management Areas and Backcountry Conservation Areas.

*Special Recreation Management Areas* are an identified area of BLM land managed to provide entire recreation products (i.e., services, settings, and activity and outcome opportunities) in response to identifiable significant customer desires. Investments in facilities and/or visitor assistance are authorized within SRMAs. These areas place priority on the identified recreation values above other resource uses.

*Backcountry Conservation Areas* are defined as BLM-managed lands in a specific planning area which promote public access to support wildlife-dependent recreation and hunting opportunities and facilitate the long-term maintenance of big game wildlife populations. These areas are primarily contiguous and intact. Management of BCAs may include activities such as active forest and rangeland management, grazing, motorized access on designated routes and other areas for game retrieval, fluid and solids leasable minerals, and other actions consistent with the BLM's multiple use, sustained yield mission.

In considering what qualified as generally intact and undeveloped lands, the BLM considered the presence of large development features (livestock grazing infrastructure was not included in the criteria) and road density both total and open-motorized. The Total Road density is calculated by taking the total miles of known roads and dividing by the total miles within the specific area. Open Road density is calculated by taking the number of miles of open roads and dividing by the number of square miles within the area. For this analysis, "Open Road" is any road that is open during the Grizzly bear non-denning season; April 1 thru November 30th.

| Allocation | Approved RMP Recreation Areas |
|---|---|
| SRMAs | 4 SRMAs totally approximately 67,083 acres:<br><br>1) Blackfoot SRMA (19,543 acres)<br>2) Chamberlain SRMA (18,145 acres)<br>3) Garnet SRMA (28,183 acres) – includes Garnet Ghost Town RMZ and Garnet Winter Trails RMZ<br>4) Limestone Cliffs SRMA (50 acres) |
| BCAs | 3 BCAs totally approximately 13,014 acres:<br><br>1) Hoodoos (6,100 acres)<br>2) Ram Mountain (4,559 acres)<br>3) Wales Creek (2,365 acres) |

This section describes the supporting information, management direction for SRMAs and BCAs in the Approved RMP.

## BLACKFOOT SRMA

## SUPPORTING INFORMATION

The Blackfoot area contains outstanding opportunities for river related and land-based recreation as well as high scenic values. Over 40,000 visitors frequent this area to enjoy the camping, boating, rafting, kayaking, and other river-related opportunities in addition to the hunting, mountain biking, and hiking. Visitors can also experience the Lewis and Clark National Historic Trail in this area.

## RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Backcountry, middle country, and front country
- Naturalness: Backcountry and middle country
- Facilities: Backcountry and rural

**Social Components**
- Contacts: Backcountry and front country
- Group size: Primitive, backcountry and middle country
- Evidence of use: Backcountry and middle country

**Operational Components**
- Access: Backcountry, middle country, and front country
- Visitor service: Backcountry and middle country
- Management controls: Front country

## OBJECTIVE(S)

*Objective Statement:*  Provide a wide array of outcome focused recreation opportunities for all skill levels and users while maintaining the scenic values. May include but not limited to rafting, fishing, hiking, mountain biking, hunting, scenic driving, and snowmobiling.

*Visitor's targeted:* local and regional

*Activities:* Rafting, fishing, camping, hiking, biking, hunting, scenic driving, and snowmobiling.

*Experiences:* Developing skills and abilities, enjoying the closeness of friends and family, enjoying easy access to natural landscapes, enjoying access to close-to-home outdoor amenities

*Benefits:* Restore mind from unwanted stress, greater sensitivity to/awareness of outdoor aesthetics, nature's art and its elegance, a more outdoor oriented lifestyle, more positive contributions to local and regional economy.

## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Continue working with partners to manage recreation and to develop recreation opportunities; continue working with landowners in management of the River Recreation Corridor;
- Continue support of Block Management with MT FWP;
- Consider developing a Scenic Driving loop;
- Work with partners to develop a regional connecting trail or trails; work with partners to develop biking trails; Consider developing float in camp sites;
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive, and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need. Water based SRPs continue working with MFWP to administer the SRP program including determining numbers and group sizes

**Other Programs:**

- VRM Class: Class II and III
- Lands and Realty: avoidance area, consider whether the function or suitability of the recreation experience and benefits will be impaired
- Minerals: Leasable – Open; Locatable – Open;
- Mineral Materials – Open, consider whether the function or suitability of the recreation experience and benefits will be impaired
- TTM: Limited Motorized
- Forestry – Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish SRMA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Determine timing restrictions as the project level if needed to accomplish SRMA goals and objectives.
- Grazing – To provide visitors with a quality recreation experience and for public safety, no grazing within the River Recreation Corridor.

**Implementation decisions** are actions to achieve or implement land use plan decisions. •

- Continue existing supplementary rules and no jumping off of bridges;
- No collection of firewood for other than on site use with the River Recreation Corridor and only dead and down wood can be burned; In the River Recreation Corridor, no discharging of firearms or projectiles (except for legal game hunting purposes as established by MFWP) or engaging in other recreational shooting including, but not limited to, plinking, target shooting, or shooting varmints, etc.;
- Outside of the River Recreation Corridor, no firearm restrictions; Improve access to the river at the day use sites.
- *Administration*: Supported by MFWP, pursue partnerships to develop and maintain trails

- *Information and Education*: Post rules and regulations
- *Monitoring*: Supported by MFWP, local community, law enforcement, BLM law enforcement and staff
- *Camping Restrictions*: In the River Recreation Corridor camping in designated areas only – see Supplementary rules; outside of the River Recreation Corridor dispersed camping limits set by supplementary rules of the Montana/Dakotas State Office, Western District or local office
-



## Chamberlain SRMA

### SUPPORTING INFORMATION

The Chamberlain Area is part of the broader Blackfoot Block Management Area, which is a community based, multi-landowner, walk-in hunting area established in the 1970s. It provides a unique and quality hunting experience for multiple big game species. This area provides high quality opportunities for winter recreation including snowmobiling and backcountry cross-country skiing.

### RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

Physical Components
- Remoteness: Backcountry and middle country
- Naturalness: Middle and front country
- Facilities: Primitive and backcountry

Social Components
- Social:  Primitive and backcountry
- Group Size: Primitive and backcountry
- Evidence of use:  Backcountry and middle country

Operational Components
- Access: Primitive and backcountry
- Visitor service: Primitive and backcountry
- Management controls: Backcountry and middle country

### OBJECTIVE(S)

*Objective Statement:*  Continue to offer a quality walk-in hunting experience for the public including the local community, continue working with MFWP and the landowners in support of this experience and allow for snowmobile riding.

*Visitor's targeted:* local and regional

*Activities:* Walk-in hunting, camping, wildlife viewing, snowmobile riding

*Experiences:* Developing skills and abilities, testing endurance, family/friend's togetherness, enjoying ability to frequently participate in desired activities in preferred settings, feeling good about the way our cultural heritage is being protected

*Benefits*: Greater self-reliance, improved outdoor skills, more outdoor oriented lifestyle, greater respect for private property and local lifestyles, greater community ownership and stewardship.

## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Work with partners to manage for dispersed and unstructured recreation, continue use of snowmobile trails and possibly expand trail.
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class II and III
- Lands and Realty: avoidance area, consider whether the function or suitability of the recreation experience and benefits will be impaired, reduce user conflicts. Retain public access.
- Minerals: Leasable – Open; Minerals: Locatable – Open; Mineral materials – Open
- TTM: Limited Motorized except Closed to Motorized on the DuPont property and Bear Creek Flats
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish SRMA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Determine timing restrictions at the project level if needed to accomplish SRMA goals and objectives

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management:* Continue working with MFWP and landowners to support the Block Management area; manage for projects to maintain and improve big game habitat; restrict construction of new improved permanent roads within designated area
- Pursue opportunities to expand the snowmobile trail system
- Administration: continue existing partnership with MFWP to support hunting opportunities, manage issues with public safety and user conflicts
- *Information and Education:* continue existing partnership with MFWP to provide Block Management maps and other information
- *Monitoring*: supported by BLM law enforcement and field staff, in conjunction with collaborating partnerships and agencies
- *Camping Restrictions*: overnight use, limits set by supplemental rules of the Montana/Dakotas State Office, Western District or local office
    - o   DuPont Property – no overnight camping
    - o   Bear Creek Flats – See Supplementary Rule (Appendix O)



Bureau of Land Management
Missoula Field Office
ARMP
Chamberlain SRMA
BLM
US FWS
Forest Service
State
National Park Service
State- Lubrecht
TNC
Indian Reservation
Private
Interstate
County Boundary
U.S. Hwy
WSA
State Hwy
County Seat
Town
Chamberlain SRMA
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers Projection: Albers Datum: North American 1983 Missoula Field Office, GIS May 2020
Miles
0 0.5 1 2
N
W
E
S
Montana / Dakotas BLM Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
83
200

# GARNET SRMA (2 RMZS)

## GARNET GHOST TOWN RECREATION MANAGEMENT ZONE

### SUPPORTING INFORMATION

The Garnet Ghost Town is a historic (1860s – 1940s) mining town with over 25 historic buildings provides unique experience for visitors all over the world. Approximately 20,000 visitors frequent Garnet Ghost town every year to experience a glimpse of this historic experience.

### RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Front Country and Rural
- Naturalness: Front Country
- Facilities: Front Country

**Social Components**
- Contacts: Front Country and Rural
- Group size: Backcountry and middle country
- Evidence of use: Front Country

**Operational Components**
- Access: Front country
- Visitor service: Rural
- Management controls: Front country and Rural

### OBJECTIVE(S)

*Objective Statement:* Enable visitors to step back in time and learn about the history of the area and western Montana.

*Visitor's targeted:* local, regional, national and international

*Activities:* day use, guided and self-guided tours, interpretation and education, hiking, picnicking, viewing preservation of cultural resources, cabin rental in the winter only

*Experiences:* Learning more about a specific area, bringing back the past, feeling good about the way our cultural heritage is being protected, sharing our cultural heritage with people.

*Benefits*: Enhanced awareness and understanding of cultural resources, greater freedom from urban living, stronger ties with family and friends, more positive contributions to local-regional economy,

greater protection of area historic structures and archaeological sites, reduced looting/vandalism of historic sites.

## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Allow compatible uses that do not detract from the Garnet Experience; Continue working with Partners for recreation opportunities and historic preservation;

- Continue in cooperation with Garnet Preservation Association in implementing the Garnet Ghost Town Management Plan; Update Garnet Ghost Town Management Plan, as needed;

- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class: Class III

- Lands and Realty: avoidance area, consider whether the function or suitability of the recreation experience and benefits will be impaired; film permits for educational, interpretation only and consider whether the recreation experience and benefits will be impaired

- Minerals: Leasable- Closed, Locatable – recommend withdrawal, Mineral Materials - Closed

- TTM: Limited Motorized

- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish SRMA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Continue fuel reduction efforts.

- Grazing: To preserve the historic buildings and features and for public safety, no livestock grazing allowed.

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management*: No digging for, removing, destroying, damaging, or possessing artifacts, or other cultural resources, or using any device for detecting metal, except when allowed by permit; Firewood collection will not be authorized unless compatible with management goals; No discharging or using firearms, other weapons, or fireworks; No lighting or maintaining a fire except in designated areas or established by government fire rings; and animals must be on a leash not longer than 6 feet and secured to an object or under control of a person or is otherwise physically restricted at all times.

- *Administration*: Staffed by BLM Park Ranger, BLM seasonal employees, and volunteers. Continue working with partners.

- *Information and Education*: Posted signs, Guided tours, self-guided brochures, interpretive panels, Visitor Center

- *Monitoring*: BLM Law Enforcement, Recreation staff, seasonal employees, volunteers

- *Camping*: No camping ½ mile around Garnet – see Supplementary Rules

## GARNET TRAILS RECREATION MANAGEMENT ZONE (RMZ)

### SUPPORTING INFORMATION

This area includes the National Winter Recreation Trail (32 miles) and the Backcountry Byway (12 miles). This trail system includes over 80 miles of snowmobile trails, 60 of which are groomed with help from partners, with a destination point of Garnet Ghost Town and two warming shelters.

### RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Middle country
- Naturalness: Middle country
- Facilities: Middle country

**Social Components**
- Contacts: Primitive and backcountry
- Group size: Primitive and backcountry
- Evidence of use: Middle country

**Operational Components**
- Access: Middle country
- Visitor service: Backcountry
- Management controls: Middle country

### OBJECTIVE(S)

*Objective Statement:*: Manage, maintain and expand the existing network of snowmobile trails (approximately 80 miles) in the Garnet Range, including the Garnet National Winter Recreation Trail (32 miles) and Garnet Winter Backcountry Byway (12 miles) to provide opportunities for visitors to get outdoors.

*Visitor's targeted:* local and regional

*Activities:* cross country skiing, dog sledding, snowmobiling, snowshoeing

*Experiences:* enjoying natural surroundings, scenery and solitude, reducing stress, enjoying the closeness of family/friends.

*Benefits:* Developing a closer relationship with the natural world, improving/maintaining health and fitness, reducing stress/tension/anxiety, stronger ties with family, recreation opportunities for family.

### MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**
- Maintain the existing network of snowmobile trails in the Garnet Range, including the Garnet National Winter Recreation Trail as described in the Garnet Range Winter Trails Management

Plan. Continue working with Partners to expand recreation opportunities, keep the existing trails and develop more trails. Pursue road/trail use agreements and/or easements;

- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**
- VRM Class: Class III and IV
- Lands and Realty: rights-of-way - consider whether compatible with the recreation experience and benefits. Pursue road/trail use agreements or/or easements
- Minerals: Leasable - open, Locatable – open, Mineral materials - open
- TTM: Limited Motorized to roads and trails, snowmobiles may be an exception
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish SRMA goals and objectives related to vegetation management and to maintain the recreation setting characteristics.

**Implementation decisions** are actions to achieve or implement land use plan decisions.
- *Management*: Continue working with partners to groom trails, create maps and information about the trail system; Continue and possibly expand trail opportunities; maintain warming shelters; Winter cabin rental program at Garnet Ghost Town;
- *Administration*: Continue working with partners including supporting grant opportunities for trail grooming;
- *Information and Education*: Trail maps, trail markers
- *Monitoring*: Supported by BLM law enforcement and Recreation Staff
- *Camping*: dispersed camping limits set by supplemental rules of the Montana/Dakotas State Office, Western District or local office; cabins available for rent in Garnet from December through April.





Bureau of Land Management
Missoula Field Office
ARMP
Garnets Area SRMA
BLM
Forest Service
National Park Service
Indian Reservation
Interstate
U.S. Hwy
State Hwy
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
WSA
County Seat
Town
Garnet Ghost Town RMZ
Garnet Trails RMZ
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers Projection: Albers Datum: North American 1983 Missoula Field Office, GIS May 2020
Miles
0 0.5 1 2
N
W
E
S
Montana / Dakotas BLM Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
Garnet
83
200
90

Bureau of Land Management
Missoula Field Office
ARMP
Garnets Area SRMA
BLM
Forest Service
National Park Service
Indian Reservation
Interstate
U.S. Hwy
State Hwy
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
WSA
County Seat
Town
Garnet Ghost Town RMZ
Garnet
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers Projection: Albers Datum: North American 1983 Missoula Field Office, GIS May 2020
Miles
0 0.25 0.5 1
N
W
E
S
Montana / Dakotas BLM Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership

## Garnet Limestone Cliffs SRMA

### SUPPORTING INFORMATION

This area contains outstanding opportunities for rock climbing and associated partnerships interested in recreational climbing. This area also contains important education opportunities in partnership with universities and local schools for geological interpretation and education.

### RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Front country
- Naturalness: Middle country
- Facilities: Backcountry

**Social Components**
- Contacts: Primitive to backcountry
- Group size: Primitive
- Evidence of use: Backcountry and middle country

**Operational Components**
- Access: Front country
- Visitor service: Backcountry and middle country
- Management controls: Front country

### OBJECTIVE(S)

*Objective Statement:*
- Provide rock climbing opportunities while maintaining the educational and interpretive value of the cliffs.
- Provide educational opportunities and scientific interpretation for the Limestone Cliffs area.

*Visitor's targeted:* local and regional

*Activities:* Rock climbing, Geology education and interpretation

*Experiences:* Developing skills and abilities, experiencing a sense of greater independence, enjoying needed physical exercise. Enhance understanding of geology, and further skills in mapping and scientific interpretation.

*Benefits:* Greater self-reliance, improved outdoor recreation skills, a more outdoor-oriented lifestyle, improve physical fitness, health maintenance.

**MANAGEMENT ACTIONS AND ALLOWABLE USES**

**Recreation and Visitor Services Program:**

- Work with partners to manage access trails and climbing routes;
- Provide opportunities for universities, local schools, and other groups for education and scientific interpretation;
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class: Class III
- Lands and Realty: avoidance area
- Minerals: Leasable - close 50 acres, Locatable – continue existing withdrawal of 20 acres; Mineral materials - close 50 acres;
- TTM: Limited Motorized to roads and trails
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish SRMA goals and objectives related to vegetation management and to maintain the recreation setting characteristics.

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management*:
    - Supplementary rules – Within the SRMA boundary you must not: Install new, permanent climbing hardware for new or existing routes unless approved by the authorized officer; Discharge a firearm or projectile (except for legal game hunting purposes as established by the Montana Fish and Wildlife and Parks) or engage in other recreational shooting including but not limited to plinking, target shooting, or shooting varmints etc.; and bring an animal into such an area unless the animal is on a leash not longer than 6 feet and secured to an object or under control of a person or is otherwise physically restricted at all times.
- *Administration*: Pursue partnerships to develop and maintain trails to climbing areas
- *Information and Education*: Provide information about climbing ethics including staying away from raptors and raptor nesting
- *Monitoring*: Supported by BLM law enforcement, field staff and partners



Bureau of Land Management
Missoula Field Office
ARMP
Limestone Cliffs SRMA
BLM
Forest Service
National Park Service
Indian Reservation
Interstate
U.S. Hwy
State Hwy
US FWS
State
State- Lubrecht
TNC
Private
County Boundary
WSA
County Seat
Town
Limestone Cliffs SRMA
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.
Coordinate System: NAD 1983 Albers Projection: Albers Datum: North American 1983 Missoula Field Office, GIS May 2020
Miles
0 0.125 0.25 0.5
N E S W
Montana / Dakotas BLM Missoula Field Office
Missoula Field Office Admin Boundary
Tri County Primary Surface Ownership
32
33
34
35
05
04
03
02
08
09
10
11
17
16
15
14

# Hoodoos BCA

## SUPPORTING INFORMATION

*Habitat and high-quality recreation:*  This area contains high quality habitat for elk, moose, and black bear. This area provides walk-in hunting opportunities since the 1970's and in the 1986 Garnet RMP for elk and moose. This area is adjacent BLM Hoodoos WSA and State lands.

*Generally, in-tact and undeveloped:*

| Total Road Density | Open motorized road density | Major develop |
|---|---|---|
| 1.24 | 0.47 | None |

## RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Backcountry and middle country
- Naturalness: Middle country
- Facilities: Backcountry

**Social Components**
- Contacts: Primitive and backcountry
- Group size: Primitive and backcountry
- Evidence of use: Primitive and backcountry

**Operational Components**
- Access: Primitive, backcountry and middle country
- Visitor service: Primitive
- Management controls: Middle country

## OBJECTIVE(S)

*Objective Statement:* Provide dispersed wildlife-dependent recreation opportunities including but not limited to hunting, camping, wildlife viewing, and hiking. Conserve, restore and enhance habitat for recreationally important wildlife species.

*Visitor's targeted:* local and regional

*Activities:* Hunting, camping, wildlife viewing, and other wildlife dependent recreation

*Experiences:* Developing skills and abilities, testing endurance, family/friends togetherness, enjoying ability to frequently participate in desired activities in preferred settings, feeling good about the way our cultural heritage is being protected; enjoying being outdoors in nature interacting with wildlife.

*Benefits*: Greater self-reliance, improved outdoor skills, more outdoor oriented lifestyle, greater respect for private property and local lifestyles, greater community ownership and stewardship, greater respect for wildlife.


## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Continue working with MFWP to provide hunting opportunities;
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class: Class III
- Lands and Realty: avoidance area, consider whether the function or suitability of the wildlife dependent recreation experience will be impaired. Retain public access. And see Implementation Decisions – Management below.
- Minerals:
  - Leasable Materials – case by case basis if compatible with BCA objectives
  - Locatable - Open, determine timing restrictions and mitigation measures to reduce user conflicts
  - Mineral Materials – case by case basis if compatible with BCA objectives
- TTM: Limited Motorized to roads and trails
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish BCA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Wildlife habitat objectives will be included in forest management planning and determined at the project level.
- Wildland Fire – Minimum impact suppression tactics would be use for wildland fire management. However, the use of heavy equipment would be allowed on a case-by-case basis.
- Grazing: allow for grazing management practices and maintenance of improvements

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management*: Evaluate road system to determine access needs, pursue easements to ensure access, evaluate north eastern portion of BCA for developing additional motorized access during hunting season, manage for projects to maintain and improve big game habitat, manage for projects to restore riparian and stream functions, minimize construction of new permanent roads, utilize forest management to create or maintain a mosaic of differing successional

pathways across the landscape consistent with natural disturbance regimes that shift over space and time to create and maintain wildlife habitat, hunting and fishing opportunities.

- *Administration*: continue existing partnership with MFWP to support hunting opportunities, manage issues with public safety and user conflicts.

- *Monitoring*: supported by BLM field staff, in conjunction with collaborating partnerships and agencies.

- *Camping*: overnight use, limits set by supplemental rules of the Montana/Dakotas State Office, Western District or local office.



-

## Ram Mountain BCA

### SUPPORTING INFORMATION

*Habitat and high-quality recreation:*  This area contains high quality habitat for bighorn sheep including lambing areas and habitat, and elk winter range. This area provides walk-in hunting for primarily elk and bighorn sheep.

*Generally, in-tact and undeveloped:*

| Total Road Density | Open motorized road density | Major develop |
|---|---|---|
| 2.59 | 0.51 | Minor ROWs |

### RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Backcountry and middle country
- Naturalness: Middle country
- Facilities: Primitive and backcountry

**Social Components**
- Contacts: Primitive and backcountry
- Group size: Primitive and backcountry
- Evidence of use: Primitive and backcountry

**Operational Components**
- Access: Primitive and backcountry
- Visitor service: Primitive
- Management controls: Backcountry

### OBJECTIVE(S)

*Objective Statement:* Provide dispersed walk-in recreational opportunities including but not limited to hunting, fishing, camping, and hiking adjacent to USFS roadless area. Conserve, maintain, restore and enhance high quality habitat for recreationally dependent fish and wildlife species.

*Visitor's targeted:* local and regional

*Activities:* Hunting, fishing, camping, wildlife viewing, hiking, horseback riding

*Experiences:* Developing skills and abilities, testing endurance, family/friends togetherness, enjoying ability to frequently participate in desired activities in preferred settings, feeling good about the way our cultural heritage is being protected, enjoying being outdoors in nature interacting with wildlife.

*Benefits:* Greater self-reliance, improved outdoor skills, more outdoor oriented lifestyle, greater respect for private property and local lifestyles, greater community ownership and stewardship, greater respect for wildlife.

## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Manage for dispersed recreation
- Continue working with MFWP to provide hunting opportunities;
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class: Class II, III and IV
- Lands and Realty: avoidance area, consider whether the function or suitability of the wildlife-dependent recreation experience and benefits will be impaired. Retain public access.
- Minerals:
  - o Leasable Materials – Open, determine timing restrictions and mitigation measures to reduce user conflicts
  - o Locatable - Open, determine timing restrictions and mitigation measures to reduce user conflicts
  - o Mineral Materials – case by case basis if compatible with BCA objectives
- TTM: Limited Motorized to roads and trails in some areas and closed to motorized vehicles in others.
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish BCA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Wildlife habitat objectives will be included in forest management planning and determined at the project level.
- Grazing: allow for grazing management practices and maintenance of improvements

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management:* Manage primarily for non-motorized activities, manage for projects to maintain and improve big game habitat, manage for projects to restore riparian and stream functions, minimize construction of new permanent roads, utilize forest management to create or maintain a mosaic of differing successional pathways across the landscape consistent with natural disturbance regimes that shift over space and time to create and maintain wildlife habitat, hunting and fishing opportunities.

- *Administration*: manage issues with public safety and user conflicts.
- *Information and Education*:  Post signs
- *Monitoring*: supported by BLM field staff and BLM law enforcement
- *Camping*: overnight use, limits set by supplemental rules of the Montana/Dakotas State Office, Western District or local office.



# WALES CREEK BCA

## SUPPORTING INFORMATION

*Habitat and high-quality recreation:*  This area contains high quality habitat for multiple big game species including elk, moose, black bear & mountain lion. This area is mostly unroaded tracts of land adjacent to the Wales Creek WSA. This area provides walk-in hunting opportunities for multiple big-game species.

*Generally, in-tact and undeveloped:*

| Total Road Density | Open motorized road density | Major develop |
|---|---|---|
| 1.21 | 0.44 | Minor ROWs |

## RECREATION SETTING CHARACTERISTIC DESCRIPTIONS

The following physical, social, and operational recreation setting qualities will be maintained or enhanced:

**Physical Components**
- Remoteness: Backcountry and middle country
- Naturalness: Backcountry, middle country and front country
- Facilities: Backcountry

**Social Components**
- Contacts: Primitive and backcountry
- Group size: Primitive and backcountry
- Evidence of use: Backcountry to middle country

**Operational Components**
- Access: Primitive, backcountry and middle country
- Visitor service: Primitive to backcountry
- Management controls: Backcountry to middle country

## OBJECTIVE(S)

*Objective Statement:* Provide dispersed wildlife-dependent recreation opportunities including but not limited to hunting, camping, wildlife viewing and hiking. Conserve, maintain, restore and enhance high quality habitat for recreationally dependent fish and wildlife species.

*Visitor's targeted:* local and regional

*Activities:* Hunting, fishing, camping, wildlife viewing, hiking, horseback riding

*Experiences:* Developing skills and abilities, testing endurance, family/friends togetherness, enjoying ability to frequently participate in desired activities in preferred settings, feeling good about the way our cultural heritage is being protected, enjoying being outdoors in nature interacting with wildlife.

*Benefits:* Greater self-reliance, improved outdoor skills, more outdoor oriented lifestyle, greater community ownership and stewardship, greater respect for wildlife.

## MANAGEMENT ACTIONS AND ALLOWABLE USES

**Recreation and Visitor Services Program:**

- Manage for dispersed recreation including but not limited to hunting, wildlife viewing
- SRPs: No outfitter and guide permits will be issued for hunting except in conjunction with adjoining Forest Service lands. Otherwise, issue special recreation permits, as appropriate and on a case by case basis, for commercial, competitive and special events subject to guidelines in BLM Handbook 2930, resource capabilities, social conflict concerns, professional qualifications, public safety and public need.

**Other Programs:**

- VRM Class: Class II, III and IV
- Lands and Realty: avoidance area, consider whether the function or suitability of the wildlife-dependent recreation experience and benefits will be impaired. Retain public access.
- Minerals:
    - Leasable Materials – Open, determine timing restrictions and mitigation measures to reduce user conflicts
    - Locatable - Open, determine timing restrictions and mitigation measures to reduce user conflicts
    - Mineral Materials – case by case basis if compatible with BCA objectives
- TTM: Limited Motorized to roads and trails
- Forestry: Utilize forest management practices including but not limited to commercial timber harvest, prescribed burning, pre-commercial thinning, and planting to accomplish BCA goals and objectives related to vegetation management and to maintain the recreation setting characteristics. Wildlife habitat objectives will be included in forest management planning and determined at the project level.
- Wildland Fire – Minimum impact suppression tactics would be use for wildland fire management. The use of heavy equipment would not be allowed unless approved by a line officer.
- Grazing: allow for grazing management practices and maintenance of improvements

**Implementation decisions** are actions to achieve or implement land use plan decisions.

- *Management:* Manage for projects to maintain and improve big game habitat, manage for projects to restore riparian and stream functions, minimize construction of new permanent roads, utilize forest management to create or maintain a mosaic of differing successional pathways across the landscape consistent with natural disturbance regimes that shift over space and time to create and maintain wildlife habitat, hunting and fishing opportunities.
- *Administration:* manage issues with public safety and user conflicts.

- *Information and Education:* Post signs
- *Monitoring*: supported by BLM field staff and BLM law enforcement
- *Camping*: overnight use, limits set by supplemental rules of the Montana/Dakotas State Office, Western District or local office.



# APPENDIX O. SUPPLEMENTAL RULES

Appendix O of the Proposed RMP/FEIS contains the summary, authority, process, public process, and the rule creation.   These are located: https://go.usa.gov/xmyyG   This appendix includes the Supplemental Rules also included in the Proposed RMP/FEIS.

The following constitute the supplementary rules, closures, and restriction orders and special rules to be enacted concurrently with the ROD/Approved RMP. For clarity and ease of understanding, the rules are broken down into subsections by geographic area. Definitions used throughout the rules are provided first.

## DEFINITIONS

a) Public lands mean any lands owned by the United States and administered by the Secretary of the Interior through the Bureau of Land Management without regard to how the United States acquired ownership. This includes paved or unpaved parking lot or other paved or unpaved area where vehicles are parked or areas where the public may drive a motorized vehicle, paved or unpaved roads, roads, routes, or trails.

b) Firearms means any weapon capable of firing a projectile, including but not limited to a rifle, shotgun, handgun, BB-gun, pellet gun, or paintball gun.

c) Airsoft and Paintball activities mean any recreational activity that involves the use of replica firearms to fire non-lethal, plastic or form pellets, or paint-laden capsule, through the use of compressed gas or electric and/or spring driven pistons. Activities may include shooting targets or games/combat situations involving multiple people

## PROHIBITED ACTS ON ALL BLM-ADMINISTERED LANDS IN THE PLANNING AREA

On all public lands, you must not:

a) Burn treated lumber and woody materials containing hardware (nails and screws) on public lands unless approved by the authorized officer.

b) Use Airsoft and paintball across any designated route of travel or across any body of water, including flowing rivers and streams, lakes, and ponds; Use Airsoft and paintball within 150 yards of any man-made object, structure, camp, or dwelling, unless such structure is specifically designed and permitted for use in those activities; Use anything other than Biodegradable ammunition; leave materials associated with air-soft and paintball after completion of the activities.

c) Establish, erect, or define a memorial site on public lands without prior written authorization from the BLM. Memorial sites include the erection of religious symbols, creation of shrines, the placement of placards or other items identifying persons, events, animals, or other things that may be memorialized.

d) Leave personal property unattended without prior authorization for 72 hours or longer. At that time, it is deemed abandoned and can be duly removed and disposed of by the United States Government, the Bureau of Land Management, or any person acting on its behalf.

## SEASONAL CLOSURE AT SPERRY GRADE AREA

In union with the rules Montana Fish and Wildlife and Parks in which have been established for the Blackfoot-Clearwater Game Range, the public lands in T. 15 N., R. 13 W., P.M.M., sec. 30, lots 1 to 6, inclusive, N½NE½, NE¼NW¼, E½SW¼, N½SE¼, SE¼SE¼, SW¼SE¼, Less that portion conveyed in 56 Deeds, at page 448: Less SE¼NE¼(Lot 7) and NE¼SE¼ conveyed in 57 Deeds at page 404: and less that portion conveyed in 81 Deeds, at page 79 (COS No. 331), P.M.M.,

    A)  Are closed to all public use from November 11 to May 14.

## PROHIBITED ACTS WITHIN THE DUPONT ACQUIRED LANDS

On public lands in Government Lots 3 and 4, S ½ NW ¼ of Section 1, Township 14 North, Range 14 West, P.M.M., of Missoula County, Montana and Tract A of Certificate of Survey No. 3396 located in the SW ¼ of Section 1, Township 14 North, Range 14 West, P.M.M., you must not:

    a)  Camp within the described area.
    b)  Light or maintain a warming fire or campfire.
    c)  Operate a motor vehicle within the described area unless for administrative purposes.
    d)  Collect firewood except for predetermined authorized use established by the authorizing officer.
    e)  Discharge a firearm or projectile (except for legal game hunting purposes as established by the Montana Fish and Wildlife and Parks) or engage in other recreational shooting including but not limited to plinking, target shooting, or shooting varmints etc.

## PROHIBITED ACTS WITHIN BEAR CREEK FLATS

On public lands in Sec 1, 2 and 11 T. 14N., R.14W., P.M.M., that are within one-quarter mile on the south side of the Blackfoot River, you must not:
    a)  Camp outside of designated sites or areas.
    b)  Light or maintain a fire except in designated areas or established by government fire rings.
    c)  Collection of firewood except for other than onsite use. You may only burn dead and down wood.
    d)  Discharge a firearm or projectile (except for legal game hunting purposes as established by the Montana Fish and Wildlife and Parks) or engage in other recreational shooting including but not limited to plinking, target shooting, or shooting varmints etc.
    e)  Violate a posted regulation pertaining to the protection of natural resources or public safety

## PROHIBITED ACTS WITHIN GARNET GHOST TOWN

On public lands in Secs. 2 and 3 of T. 12 N., R. 14W., P.M.M., within one-half of a mile of the town site, you must not:
    a)  Dig for, remove, destroy, damage, disturb, or possess artifacts, or other cultural resources, or use any device for detecting metal, except when allowed by permit.
    b)  Camp unless permitted by an authorized officer.
    c)  Discharge of firearms, other weapons and fireworks.
    d)  Bring an animal into such an area unless the animal is on a leash not longer than 6 feet and secured to an object or under control of a person or is otherwise physically restricted at all times.

e) Light or maintain a fire except in designated areas or established by government fire rings
f) Smoke in the buildings

## PROHIBITED ACTS WITHIN BLACKFOOT RIVER RECREATION CORRIDOR

On public lands in Secs. 18 and 19 of T. 14N., R. 15W., Secs. 4, 5 and 6 of T. 13N., R. 16W., and Secs. 13 and 14, 20 to 29, inclusive, 32 and 33 of T. 14N., R.16W., P.M.M, that are within one-quarter mile on either side of the Blackfoot River or McNamara Road, or both, you must not:

a) Occupy Daigles Eddy Day Use Site from the hours of 10:00 pm to 5:00 am
b) Occupy Sheep Flats Day Use Site from the hours of 10:00 pm to 5:00 am
c) Occupy Thibodeau Rapids Day Use Site from the hours of 10:00 pm to 5:00 am
d) Occupy Whitaker Bridge Day Use Site from the hours of 10:00 pm to 5:00 am
e) Occupy Red Rock Day Use Site from the hours of 10:00 pm to 5:00 am
f) Occupy Belmont Day Use Site from the hours of 10:00 pm to 5:00 am
g) Occupy River Bend Day Use Site from the hours of 10:00 pm to 5:00 am
h) Jump from any bridge over the Blackfoot River

## PROHIBITED ACTS WITHIN LIMESTONE CLIFFS AREA

On public lands in Sec. 9 of T. 11N., R. 13W., P.M.M. within the Limestone Cliffs area, you must not:
a) Install new, permanent climbing hardware for new or existing routes unless approved by the authorized officer.
b) Discharge a firearm or projectile (except for legal game hunting purposes as established by the Montana Fish and Wildlife and Parks) or engage in other recreational shooting including but not limited to plinking, target shooting, or shooting varmints etc.
c) Bring an animal into such an area unless the animal is on a leash not longer than 6 feet and secured to an object or under control of a person or is otherwise physically restricted at all times.

## PENALTIES

Under the Federal Land Policy and Management Act of 1976, 43 U.S.C., 1733(a), if you violate or fail to comply with these supplementary rules, you may be subjected to imprisonment for not more than 12 months, or a fine in accordance with 18 U.S.C. 3571, other penalties in accordance with 43 U.S.C., 1733, or both.

# APPENDIX P. PROJECT DESIGN FEATURES AND BEST MANAGEMENT PRACTICES

## INTRODUCTION

The following Design Features and Conservation Actions are a compilation of design features, Best Management Practices (BMPs), and/or operating procedures used by the BLM to meet statutory requirements for environmental protection and comply with resource specific Goals and Objectives set forward in this land use plan. The BLM will apply design features, mitigation measures, and conservation actions to modify the operations of authorized lands uses or activities to meet these obligations.

These measures and actions will be applied to avoid, minimize, rectify, reduce, and compensate for impacts if an evaluation of the authorization area indicates the presence of resources of concern which include, but are not limited to air, water, soils, cultural resources, national historic trails, recreation values and important wildlife habitat in order to reduce impacts associated with authorized land uses or activities such as road, pipeline, or powerline construction, mineral development, range improvements, and recreational activities. The mitigation measures and conservation actions for authorizations will be identified as part of the National Environmental Policy Act (NEPA) process, through interdisciplinary analysis involving resource specialists, project proponents, government entities, landowners or other Surface Management Agencies. Those measures selected for implementation will be identified in the Record of Decision (ROD) or Decision Record (DR) for those authorizations and will inform a potential lessee, permittee, or operator of the requirements that must be met when using BLM-administered public lands and minerals to mitigate impacts from those authorizations. Because these actions create a clear obligation for the BLM to ensure any proposed mitigation action adopted in the environmental review process is performed, there is assurance that mitigation will lead to a reduction of environmental impacts in the implementation stage and include binding mechanisms for enforcement (CEQ Memorandum for Heads of Federal Departments and Agencies 2011).

Because of site-specific circumstances and localized resource conditions, some mitigation measures and conservation actions may not apply to some or all activities (e.g., a resource or conflict is not present on a given site) and/or may require slight variations from what is described in this appendix. The BLM may add additional measures as deemed necessary through the environmental analysis and as developed through coordination with other federal, state, and local regulatory and resource agencies. Application of mitigation measures and conservation actions is subject to valid existing rights, technical and economic feasibility.

Implementation and effectiveness of design features and conservation actions would be monitored to determine whether the practices are achieving resource objectives and accomplishing desired goals. Timely adjustments would be made as necessary to meet the resource goals and objectives.

The list included in this appendix is not limiting but references the most frequently used sources. The BLM may add additional site-specific restrictions as deemed necessary by further environmental analysis and as developed through coordination with other federal, state, and local regulatory and resource agencies. Because mitigation measures and conservation actions change or are modified, based on new information, the guidelines will be updated periodically. As new publications are developed; the BLM may consider those BMPs. In addition, many BLM handbooks (such as BLM Manual 9113-Roads and 9213-Interagency Standards for Fire and Aviation Operation) also contain BMP-type measures for minimizing impacts. These BLM-specific guidance and direction documents are not referenced in this appendix. The EIS for this RMP does not decide or dictate the exact wording or inclusion of these mitigation measures and conservation actions. Rather, they are used in the RMP and EIS process as a

tool to help demonstrate at the land use plan scale how they will be applied in considering subsequent activity plans and site-specific authorizations. These mitigation measures and conservation actions and their wording are matters of policy. As such, specific wording is subject to change, primarily through administrative review, not through the RMP and EIS process. Any further changes that may be made in the continuing refinement of these mitigation measures and conservation actions and any development of program-specific standard procedures will be handled in another forum, including appropriate public involvement and input.

**Table I: Implementation level design features**

| Resource | Design Features | Objective |
|---|---|---|
| Source Water Protection | DF-1.   For any surface-disturbing activities located in State-designated source water protection areas, the BLM will complete a Source Water Protection Plan. | To protect human health by minimizing the potential contamination of public water systems. Source water is untreated water from streams, rivers, lakes, or aquifers used to supply public water systems. Ensuring that source water is protected from contamination can reduce the costs of treatment and risks to public health. This practice would protect the State designated source water protection areas that protect public water systems from potential contamination. |
| WSAs | DF-2.   Avoid using retardant in WSAs, protected lands with wilderness characteristics, Exemptions will require line officer approval. | To avoid impacts to wilderness values from wildfire suppression impacts |
| Historic Sites | DF-3.   The use of heavy equipment for wildland fire management would not be allowed in historic properties eligible for the National Register of Historic Places unless approved by line officer due to extraordinary circumstances (e.g. wildfire imminent in Garnet Ghost Town or Coloma).<br><br>DF-4.   Select fire suppression methods to minimize or eliminate the impact on historical site values. | To protect historic properties eligible for the National Register of Historic Places from wildfire suppression impacts. |
| ACECs | DF-5.   Avoid using retardant in ACECs. Exemptions will require line officer approval.<br><br>DF-6.   Select fire suppression methods to minimize or eliminate the impact on ACEC values. | To protect relevant and important values of the ACECs. |
| Forest Products | DF-7.   Timber salvage project areas would have some areas that are left untreated as retention patches to maintain wildlife habitat. | To provide important habitat components and features for wildlife. |

|  | Only standing dead and dying trees would be allowed to be taken as firewood unless live trees cutting area are designated. The BLM could designate specific areas for firewood cutting of live trees to meet resource objectives or BLM authorized uses such as leases and right-of-way.<br><br>DF-8.   To protect snag habitat for wildlife, dead trees greater than 24 inches d.b.h. would not be permitted to be cut for firewood unless they are within two tree lengths of an open road. An exception to this is if there is a high density of dead trees creating a public safety hazard and the needs for snag dependent wildlife habitat have been met, dead trees greater than 24 inches d.b.h can be harvested. |  |
|---|---|---|
| Special Status Species, Aquatics | DF-9.   Management actions within Riparian Conservation Areas will not retard or prevent the attainment of Riparian Management Objectives<br><br>DF-10.  Fish key watersheds receive restoration priority | To ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration. |
| Special Status Species, Aquatics & Riparian - Grazing | DF-11.  Design livestock grazing management (allotments, animal unit months (AUMs), suspension, etc.) to minimize negative impacts to and retain resiliency of riparian vegetation and aquatic habitat (GM-1)<br><br>DF-12.  Develop and implement grazing practices to avoid or restrict trampling of developing young (eggs or individuals) in areas of known or suspected aquatic special status species breeding habitat. (GM-1)<br><br>DF-13.  Locate livestock handling and/or management facilities (corrals, etc.) outside of RCAs if they are preventing the attainment of RMOs (GM-2) | To ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration |
| Special Status Species, Aquatics & Riparian - Minerals | DF-14.  Management actions within Riparian Conservation Areas will not retard or prevent the attainment of Riparian Management Objectives<br>DF-15.  Avoid locating mineral project-related infrastructure within the RCAs Where no | To ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration. |

| | | |
|---|---|---|
| | alternative to placing facilities in RCAs exists, locate and construct facilities in ways that avoid impacts to RCAs and streams and adverse effects on native fish and sensitive aquatic species. Where no alternative to road construction exists, keep roads to the minimum necessary for the approved mineral activity. Close, revegetate, and obliterate any roads within the RCAs that are no longer required for mineral or land management activities. (MM-1, MM-2)<br><br>DF-16.  Solid and sanitary waste facilities in RCAs are prohibited. If no alternative to locating mine waste (waste rock, spent ore, tailings) facilities in RCAs exists, prevent releases, and ensure stability, then apply BMPs and project design features, and make adjustments based on site-specific information and riparian management objectives. (MM-3)<br><br>DF-17.  Maintain, protect, and rehabilitate aquatic habitat affected by mineral activity within an RCA. Final reclamation will meet the objectives of the RCA. If the proposed activity and reclamation cannot meet the RMOs of the RCA, BLM Missoula Field Office will not recommend the project. (MM-1) | |
| Special Status Species, Aquatics & Riparian – Recreation | DF-18.  Design, construct, and operate recreation facilities, including trails and dispersed sites, in a manner that does not retard or prevent attainment of the desired RMOs and avoids adverse effects on aquatic special status species. (RM-1, RM-2)<br><br>DF-19.  Avoid placing new facilities or infrastructure within an RCA to extent practicable. Where new facilities must occur in an RCA (e.g., road stream crossings, boat ramps, docks, trails), complete watershed or site-specific analysis so as to assure location does not retard or prevent attainment of RMOs. (RM-1) | To protect riparian conservation areas and riparian management objectives. And to ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration. |
| Special Status Species, Aquatics & Riparian – Roads | DF-20.  Provide and maintain fish passage at new, replacement, and reconstructed road crossings of existing and potential fish-bearing streams, unless barriers are determined beneficial for native fish and/or sensitive aquatic species conservation. | To protect riparian conservation areas and riparian management objectives. And to ensure healthy aquatic and riparian habitats are maintained in and along streams with the |

| | | |
|---|---|---|
| | DF-21.  Avoid locating new roads or road-related facilities in RCAs. Exceptions may be granted upon watershed or site-specific analysis focused on how road design features would minimize or avoid adverse effects to aquatic and riparian resources at site-specific, reach, and watershed scales. (RF-2a, b, c)<br><br>DF-22.  Avoid side-casting of road surface material into areas where it may reach RHCAs. | potential for native fish reintroductions and restoration. |
| Special Status Species, Aquatics & Riparian – Fire | DF-23.  Apply silvicultural practices in RHCAs to acquire desired vegetation characteristics where needed to attain RMOs. Apply practices in a way that does not retard attainment of RMOs and avoids adverse effects to native fish. (TM-1b)<br><br>DF-24.  Design prescribed burns to contribute to the attainment of RMOs. (FM-4) DF-24. \Avoid placing wildland fire operations within the RHCAs to the extent practicable. Exceptions may be granted following a review and recommendation by a resource advisor, and the line officer will prescribe the location, use conditions, and rehabilitation requirements with avoidance of adverse effects to native fish and sensitive aquatic species as a primary goal. (FM-1, FM-2)<br><br>DF-25.  Avoid delivery of chemical retardant, foam, or additives to surface waters. If an exception is granted by resource advisor or fishery biologist or a misapplication occurs, monitor water quality and aquatic resources as soon as possible. (FM-3)<br><br>DF-26.  Immediately establish an emergency or BAER team and develop a rehabilitation treatment plan to attain RMOs whenever RHCAs have been significantly damaged by a wildfire. (FM-5) | To protect riparian conservation areas and riparian management objectives. And to ensure healthy aquatic and riparian habitats are maintained in and along streams with the potential for native fish reintroductions and restoration. |
| Terrestrial wildlife: Big Game, Sensitive species | DF-27.  Retain snags at a level appropriate for multiple species and create large-diameter snags for cavity nesters, if feasible.<br><br>DF-28.  Identify maintenance or replacement of features that maintain continuous representation of mature forest components. | To improve wildlife habitat and specific habitat components for priority wildlife habitat (big game, T&E species, Bureau sensitive species, raptors) |

| | | |
|---|---|---|
| | Examples of features that should be retained include dead trees (snags), downed wood (coarse woody debris), and diverse stand structures located across landscapes that shift in location over time.<br><br>DF-29.  Scatter fine materials not utilized (seedlings, saplings, tops, branches, cull logs, and some down woody material) on the forest floor where and when it would not contribute to fire hazard in order to maintain nutrient cycling, provide for wildlife features, and discourage cross-country motorized travel.<br><br>DF-30.  Whenever possible, plant openings larger than 20 acres in size resulting from forest treatment or large-scale events in forested habitats when natural regeneration does not become established to desired levels within 15 years or cannot be reasonably expected in 15 years.<br><br>DF-31.  Design treatments to maintain wildlife corridors within home ranges, between seasonal home ranges, and for dispersal. Wildlife travel corridors typically follow ridges, saddles, and riparian corridors. | |
| Migratory Birds | DF-32.  If migratory birds are present, implement project design features to avoid or minimize impacts from ground disturbing activities. | To avoid or minimize impacts to migratory bird nesting. |
| Soils – all programs | DF-33.  Implement these measures at project-level planning and through stipulations in leases, permits, and other authorizations.<br><br>DF-34.  Revegetate disturbed soils to stabilize and reduce the introduction or spread of invasive or noxious weed species.<br><br>DF-35.  Provide for conservation and protection of soil and vegetation during periods of drought.<br><br>DF-36.  Consider the intensity of the disturbance for activities proposed on unstable slopes or soils.<br><br>DF-37.  Evaluate hazard and risk and apply special BMPs or design features to avoid or lessen hazard and risk. | To minimize and reduce potential soil erosion, and to provide for soil stability. |

| | | |
|---|---|---|
| | DF-38.  Apply seasonal or other criteria-based restrictions on activities authorized by BLM in areas with higher soil compaction or erosion hazards.<br><br>DF-39.  Manage activities and uses to maintain normal surface infiltration, with normal ranges of organic matter and water-holding capacity based on site-specific conditions and capability.<br><br>DF-40.  Manage BLM resource activities and uses to minimize soil erosion, mass wasting, and compaction from multiple-use management activities.<br><br>DF-41.  For general planning purposes, use riparian-wetland inventories and mapping products.<br><br>DF-42.  For project-level planning:<br><br>Identify potentially affected riparian-wetland areas.<br><br>Develop riparian management objectives for desired riparian, stream channel, and habitat characteristics.<br><br>Define RCAs wherein riparian-dependent species receive primary emphasis, and maintenance and/or enhancement of riparian values will be emphasized as per 43 CFR 4180. | |
| Visual Resources – Forest Management | DF-43.  Design forest management activities in undeveloped and developed recreation areas to maintain or improve visual qualities.<br><br>DF-44.  Disposal of thinning and timber harvest slash will be required in accordance with scenic quality and recreation opportunities. | To maintain or reduce impacts from forest management to visual resources and recreation experience. |

## GENERAL MITIGATION MEASURES AND CONSERVATION ACTIONS

### AIR RESOURCE BMPS

*Developed by:* Bureau of Land Management

*Publication reference*: BLM/WO

*Updated* May 9, 2011

*Available from:* Online at:
http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/technical_information.html

*Description*: Identifies a range of typical Best Management Practices for protecting air resources during oil and gas development and production operations. Missoula Resource Management Plan FEIS P-7
  -   See WLF

### EROSION AND SEDIMENT CONTROL BMPS

**Field Manual**
*Developed by:* Prepared for the Montana Department of Transportation

*Publication reference:* FHWA/MT-030003/8165

*Available from:* National Technical Information Service, Springfield, VA 21161

*Description:* The Erosion and Sediment Control Best Management Practices Construction Field Manual was developed to assist in design, construction, and post-construction phases of MDT projects. This manual provides background to concepts of Erosion and Sediment Control. Most of MDTs Best Management Practices are listed within the manual based on application categories. Each BMP is described; its applications and limitations are listed, as well as its design criteria. Construction phase and post-construction phase BMPs are described. This manual is a field guide and condensed version of the Erosion and Sediment Control Design Construction Best Management Practices Manual. For more detailed discussion on topic found within, refer to the Erosion and Sediment Control Construction Best Management Practices Manual.

**Reference Manual**
*Developed by:* Prepared for the Montana Department of Transportation

*Publication reference:* FHWA/MT-030003/8165 Available from: National Technical Information Service, Springfield, VA 21161

*Description*: The Erosion and Sediment Control Construction Best Management Practices Manual was developed to assist in the design, construction, and post-construction phases of Montana Department of Transportation (MDT) projects. This manual provides background to State and Federal regulations associated with erosion and sediment control practices including a general overview of the erosion and sediment processes. Best management practices are listed within the manual based on application categories. Each BMP is described; its applications and limitations are listed, as well as its design criteria. The design phase includes development of construction plans, notice of intent (NOI), and stormwater

pollution prevention plan (SWPPP). Construction phase includes the finalization of the SWPPP, NOI, and the implementation of BMPs. Post-construction phase includes monitoring, maintenance, and removal activities.

## MONTANA GUIDE TO THE STREAMSIDE MANAGEMENT ZONE LAW

*Developed by:* Montana Department of Natural Resources and Conservation Service Forestry Bureau, in cooperation with Montana Department of Environmental Quality, Montana Logging Association, Montana Wood Products Association, Plum Creek Timber LP, USDA Forest Service, USDI Bureau of Land Management

*Publication reference*: Revised November 2006 Available from: Montana Department of Natural Resources and Conservation, 2705 Spurgin Road, Missoula MT 59801-3199, (406)542-4300, or local MT DNRC field office.

*Description:* The Montana Guide to the Streamside Management Zone Law is a field guide to compliance with State of Montana Law 77-5-301[1] MCA.) Complementary BMPs are found in the Water Quality BMPs for Montana Forests (also referenced in this appendix). Provides definitions, stream classifications, and guidelines on the seven forest practices prohibited by Montana law in SMZs (broadcast burning, operation of wheeled or tracked vehicles except on established roads, the forest practice of clearcutting, the construction of roads except when necessary to cross a stream or wetland; the handling, storage, application, or disposal of hazardous or toxic materials in a manner that pollutes streams, lakes, or wetlands, or that may cause damage or injury to humans, land, animals, or plants; the side casting of road material into a stream, lake, wetland, or watercourse; and the deposit of slash in streams, lakes, or other water bodies.

## MONTANA NON-POINT SOURCE MANAGEMENT PLAN

*Developed by:* Montana Department of Environmental Quality, Water Quality Planning Bureau, Watershed Protection Section Publication reference: 2012

*Available from:* Montana Department of Environmental Quality, Water Quality Planning Bureau, Watershed Protection Section, P.O. Box 200901, Helena, MT 59620-0901.

*Online at:*
http://deq.mt.gov/Portals/112/Water/WPB/Nonpoint/Publications/NPSPlan_Complete_07162012.pdf

*Description*: This document describes the Montana Department of Environmental Quality's (DEQ) updated strategy for controlling nonpoint source (NPS) water pollution, which is the state's single largest source of water quality impairment. NPS pollution is contaminated runoff from the land surface that can be generated by most land use activities, including agriculture, forestry, urban and suburban development, mining, and others. Common NPS pollutants include sediment, nutrients, temperature, heavy metals, pesticides, pathogens, and salt. The purpose of the Montana NPS Pollution Management Plan (Plan) is: 1) to inform the state's citizens about NPS pollution problems; and 2) to establish goals, objectives, and both long-term and short-term strategies for controlling NPS pollution on a statewide basis. The goal of Montana's NPS Management Program is to protect and restore water quality from the impacts of nonpoint sources of pollution in order to provide a clean and healthy environment.

## MONTANA PLACER MINING BMPS

*Developed by:* Montana Bureau of Mines and Geology

*Publication reference:* Special Publication 106, October 1993

*Available from:* Montana Bureau of Mines and Geology, Main Hall, Montana College of Mineral Science and Technology, Butte MT 59701

*Description*: Provides guidelines for planning, erosion control, and reclamation in arid to semi-arid, alpine, and subalpine environments, to prevent or decrease environmental damage and degradation of water quality.

## MONTANA FORESTRY BEST MANAGEMENT PRACTICES

*Developed by:* Montana Department of Natural Resources and Conservation

*Publication reference:* Montana DNRC, 2015. Montana Forestry Best Management Practices. 2015. Montana Department of Natural Resources and Conservation, Forestry Division. Montana 64 p.

*Available from:* MSU Extension Forestry, 32 Campus Dr., Missoula MT 59812, OR MSU Extension Publications, PO Box 172040 Bozeman MT 59717 OR Montana Department of Natural Resources and Conservation http://dnrc.mt.gov/divisions/forestry/docs/assistance/practices/mt-forestry-managementbest-practices-guide.pdf

*Description*: Discusses methods for managing forest land while protecting water quality and forest soils. Intended for all forest land in Montana, including non-industrial private, forest industry, and state or federally owned forests. These are preferred (but voluntary) methods that go beyond Montana State Law (Streamside Management Zones). Includes definitions, basic biological information, and BMPs for Streamside Management Zones; road design, use, planning and locating, construction, drainage, and closure; stream crossings, soil, timber harvesting methods, reforestation, winter planning, and clean-up.

## BLM BMPS

The website below provides an introduction to BLM BMPs with links to BLM contacts, General BMP Information, BMP Frequently Asked Questions, BMP Technical Information, Oil and Gas Exploration— The Gold Book, Specific Resource BMPs, and, other BLM links.

- http://www.blm.gov/bmp/

## COMMUNICATION TOWER BMPS

*Developed by:* United States Fish and Wildlife Service

*Publication reference:* Service Guidance on the Siting, Construction, Operation and Decommissioning of Communications Towers

*Available from:* http://www.fws.gov/habitatconservation/com_tow_guidelines.pdf

*Description*: These guidelines were developed by Service personnel from research conducted in several eastern, midwestern, and southern States, and have been refined through Regional review. They are based on the best information available at this time and are the most prudent and effective measures for avoiding bird strikes at towers.

- Any company/applicant/licensee proposing to construct a new communications tower should be strongly encouraged to collocate the communications equipment on an existing communication tower or other structure (e.g., billboard, water tower, or building mount). Depending on tower load factors, from 6 to 10 providers may collocate on an existing tower.

- If collocation is not feasible and a new tower or towers are to be constructed, communications service providers should be strongly encouraged to construct towers no more than 199 feet above ground level, using construction techniques which do not require guy wires (e.g., use a lattice structure, monopole, etc.). Such towers should be unlighted if Federal Aviation Administration regulations permit.

- If constructing multiple towers, providers should consider the cumulative impacts of all of those towers to migratory birds and threatened and endangered species as well as the impacts of each individual tower.

- If at all possible, new towers should be sited within existing "antenna farms" (clusters of towers). Towers should not be sited in or near wetlands, other known bird concentration areas (e.g., State or Federal refuges, staging areas, rookeries), in known migratory or daily movement flyways, or in habitat of threatened or endangered species. Towers should not be sited in areas with a high incidence of fog, mist, and low ceilings.

- If taller (>199 feet AGL) towers requiring lights for aviation safety must be constructed, the minimum amount of pilot warning and obstruction avoidance lighting required by the FAA should be used. Unless otherwise required by the FAA, only white (preferable) or red strobe lights should be used at night, and these should be the minimum number, minimum intensity, and minimum number of flashes per minute (longest duration between flashes) allowable by the FAA. The use of solid red or pulsating red warning lights at night should be avoided. Current research indicates that solid or pulsating (beacon) red lights attract night-migrating birds at a much higher rate than white strobe lights. Red strobe lights have not yet been studied.

- Tower designs using guy wires for support which are proposed to be located in known raptor or water bird concentration areas or daily movement routes, or in major diurnal migratory bird movement routes or stopover sites, should have daytime visual markers on the wires to prevent collisions by these diurnally moving species. (For guidance on markers, see Avian Power Line Interaction Committee (APLIC). 1994. Mitigating Bird Collisions with Power Lines: The State of the Art in 1994. Edison Electric Institute, Washington, D.C., 78 pp, and Avian Power Line Interaction Committee (APLIC). 1996. Suggested Practices/or Raptor Protection on Power Lines. Edison Electric Institute by Raptor Research Foundation, Washington, D.C; 128 pp. Copies can be obtained via the Internet at http://www.eei.org/resources/pubcat/enviro/ or by calling 1-800/334- 5453).

- Towers and appendant facilities should be sited, designed and constructed so as to avoid or minimize habitat loss within and adjacent to the tower "footprint." However, a larger tower footprint is preferable to the use of guy wires in construction. Road access and fencing should be minimized to reduce or prevent habitat fragmentation and disturbance, and to reduce above ground obstacles to birds in flight.

- If significant numbers of breeding, feeding, or roosting birds are known to habitually use the proposed tower construction area, relocation to an alternate site should be recommended. If this is not an option, seasonal restrictions on construction may be advisable in order to avoid disturbance during periods of high bird activity.

- In order to reduce the number of towers needed in the future, providers should be encouraged to design new towers structurally and electrically to accommodate the applicant/licensee's antennas and comparable antennas for at least two additional users (minimum of three users for each tower structure), unless this design would require the addition of lights or guy wires to an otherwise unlighted and/or unguyed tower.

- Security lighting for on-ground facilities and equipment should be down-shielded to keep light within the boundaries of the site.

- If a tower is constructed or proposed for construction, Service personnel or researchers from the Communication Tower Working Group should be allowed access to the site to evaluate bird use, conduct dead-bird searches, to place net catchments below the towers but above the ground, and to place radar, Global Positioning System, infrared, thermal imagery, and acoustical monitoring equipment as necessary to assess and verify bird movements and to gain information on the impacts of various tower sizes, configurations, and lighting systems.

- Towers no longer in use or determined to be obsolete should be removed within 12 months of cessation of use.

## GRAZING MANAGEMENT

Guidelines for grazing management are the types of grazing management methods and practices determined to be appropriate to ensure that rangeland health standards can be met, or significant progress can be made toward meeting the standards.  Guidelines are best management practices (BMP), treatments, and techniques and implementation of range improvements that will help achieve rangeland health standards. Guidelines are flexible and are applied on site specific situations.

Montana/Dakotas Standards for Rangeland Health and Guidelines for Livestock Grazing Management. USDI BLM, Montana State Office. August 1997. 22 pp.

## STORM WATER BMPS

The website below provides BMPs designed to meet the minimum requirements for six control measures specified by the EPA's Phase II Stormwater Program.
- http://cfpub.epa.gov/npdes/stormwater/menuofbmps/index.cfm

## NATIONAL RANGE AND PASTURE HANDBOOK

The website below provides procedures in support of NRCS policy for the inventory, analysis, treatment, and management of grazing land resources.
- http://www.nrcs.usda.gov/wps/portal/nrcs/detailfull/national/landuse/rangepasture/?cid=stelprdb1043084

## MONTANA NONPOINT SOURCE MANAGEMENT PROGRAM

The website below provides links to information on funding for implementing nonpoint source controls, examples of control projects, and Montana's current Nonpoint Source Management Plan. This plan identifies and provides details for BMPs to improve and maintain water quality.

- http://www.deq.mt.gov/wqinfo/nonpoint/nonpointsourceprogram.mcpx

The following would be applied, if warranted, to any BLM authorized activity.

- The total disturbance area would be minimized and to the extent possible.
- Surface disturbances would be co-located in areas of previous or existing disturbance to the extent technically feasible.
- Linear facilities would be located in the same trenches (or immediately parallel to) and when possible, installed during the same period of time.
- Plans of development would be required for major ROWs, renewable energy and minerals development. Such plans would identify measures for reducing impacts.
- Where the federal government owns the surface and the mineral estate is in nonfederal ownership, the BLM would apply appropriate fluid mineral BMPs to surface development.
- Remove facilities and infrastructure when use is completed.
- Vegetation would be removed only when necessary. Mowing would be preferred. If mowed, when possible work would be performed when vegetation is dormant.
- Two-track (primitive) roads would be used when possible.
- Utilization of the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (i.e., The Gold Book) shall be utilized for the design of roads, utilities, and oil and gas operations. • Directional drilling, drilling multiple wells from the same pad, co-mingling, recompletion, or the use of existing well pads would be employed to the extent technically feasible to minimize surface impacts from oil and gas development.
- Utilities would be ripped or wheel-trenched whenever practical.
- Remote telemetry would be used to reduce vehicle traffic to the extent technically feasible (e.g., monitoring oil and gas operations).
- Perennial streams would be crossed using bore crossing (directional drill) or other environmentally sound method.
- For activities resulting in major surface-disturbance as determined by the AO, a mitigation monitoring and reporting strategy would be developed and implemented (see the Reclamation Appendix for further guidance).
- Operations would avoid sensitive resources including riparian areas, wetlands, floodplains, waterbodies and areas subject to erosion and soil degradation. • The BLM would, on a case-by-case basis, use temporary or permanent enclosures (e.g., in woody draw or riparian areas) to promote species diversity, recruitment, and structure.
- Accelerated erosion, soil loss, and impacts to water quality would be reduced by diverting stormwater and trapping sediment during activity.
- Pitless or aboveground closed-loop drilling technology would be used to the extent technically feasible. Recycle drilling mud and completion fluids for use in future drilling activities.
- Where needed, pits would be lined with an impermeable liner. Pits would not be placed in fill material or natural watercourses, and pits may not be cut or trenched.
- Fertilizer would not be applied within 500 feet of wetlands and waterbodies.
- Vehicle and equipment servicing and refueling activities would take place 500 feet from the outer edge of riparian areas, wet areas, and drainages.
- Activity may be restricted during wet conditions. Mechanized equipment use would be avoided if the equipment causes rutting to a depth of 4 inches or greater.

- Vehicle wash stations would be used prior to entering or leaving disturbance to reduce the transport and establishment of invasive species.
- Invasive species plant parts would not be transported off site without appropriate disposal measures.
- Use alternative energy (solar or wind power) to power new water source developments.
- Overhead power lines, where authorized would follow the recommendations in the most recent guidance from the Avian Power Line Interaction Committee (1994, as amended 2006, 2012).
- Weed management prescriptions would be included in all new treatment projects and incorporated into existing contracts, agreements, task forces, designated weed-free management areas, and land use authorizations that resulted in ground-disturbing activities.
- Whenever possible, ROWs would be constructed within or next to compatible ROWs, such as roads, pipelines, communications sites, and railroads.
- The operator shall be responsible for locating and protecting existing pipelines, power lines, communication lines, and other related infrastructure.
- Potential changes in climate would be considered when proposing restoration seedings when using native plants. Collection from the warmer component of the species current range would be considered when selecting native species.

## WILDLAND FIRE MANAGEMENT

- When Minimum Impacts Suppression Tactics (MIST) are used during wildfire suppression operations, follow guidance on pages 97-98 in the 2018 Incident Response Pocket Guide (IRPG) (PMS 461/NFES 001077) or most current version of the IRPG.
- BLM is a member and participates in the Montana Idaho Airshed Group, which through the Airshed Management System, manages smoke impacts from prescribed fires.

# APPENDIX Q. LANDS AND REALTY

## RMP Land Tenure Allocation Categories

To provide transparency and assist with discussion and analysis in this land use planning effort, the BLM has identified three land tenure categories:

## Category 1(Retention):

- BLM managed lands identified for retention and include lands with high resource values.

- These lands tend to be fairly blocked in terms of land pattern.

- Included are areas such as WSAs, NHTs, ACEC's., and Lands acquired with LWCF funding.

- These lands do not meet the FLPMA Section 203 sales criteria and are not suitable for exchange out of Federal ownership under section 206 of FLPMA.

- Acquisition of lands or interest in lands will receive priority if located within and /or adjacent to BLM managed lands in Category 1 provided such acquisition is consistent with one or more of the criteria in the *Criteria for Land Tenure Adjustment* listed below for criteria.

## Category 2 (Limited Exchange):

- These lands are generally identified for retention in public ownership and are not available for sale under section 203 FLPMA.  However, BLM-administered lands within Category 2 may be exchanged for lands or interests in lands under limited circumstances.

- Exchanges consistent with section 206 of FLPMA are permitted only when such exchange would enhance public resource values, improve management capabilities, or reduce the potential for land use conflict.

- In addition, parcels of BLM-administered land within Category 2 are available to be identified for transfer under the R&PP Act, or for transfer of administrative jurisdiction to another Federal agency, on a case-by-case basis.

- BLM-administered lands in Category 2 may contain significant resource values protected by law or policy, and any exchange or transfer action is contingent upon prior review and approval.  If actions cannot be taken to adequately manage impacts from exchange or transfer of those lands, the parcels would be retained.

- The BLM would consider exchanges or land tenure actions on a case-by-case basis consistent with Section 206 of FLPMA and the *Criteria of Land Tenure Adjustments* listed below.

## Category 3 (Disposal):

- No acres are identified in Category 3; see Missoula Proposed RMP/Final EIS for a description of this category.

## Criteria for Land Tenure Adjustments

Criteria listed herein are not in order or priority and all land tenure decisions must be in the public's interest to proceed. The BLM shall prioritize the retention or acquisition of lands that contain or provide one or more of the following:

## Areas of National Significance

- Areas that have national environmental significance include wilderness, wilderness study areas, former wilderness studied for protective management

- ACECs

- Areas that have national cultural and recreational significance include lands nominated or eligible for the National Register of Historic Places or designated as National Scenic and Historic Trails.

- Areas that have important wildlife features such as threatened and endangered species habitat, prime fisheries habitat, big game seasonal habitat, waterfowl and upland game bird habitat and habitat for sensitive species including raptors and other nongame species.

- Areas that have important watershed features such as strategic tracts along rivers, streams, lakes, ponds, and springs.

## Areas Important to BLM Programs

- Areas that have important recreational and cultural features such as hunting and fishing sites, snowmobile trails, and areas that contribute significantly to the interpretive potential of cultural resources already in public ownership.

- Areas include tracts of public land that are consolidated enough to make management of their resources cost effective and have physical and legal access.

- Access generally should allow for public use but, at the least, should allow administrative access to manage the resources.

- Provides access to other public lands with high resource values (including but not limited to recreation activities such as hunting, biking, and snowmobiling).

- Areas usually contain a combination of multiple use values and have characteristics that facilitate BLM priorities on the national, state, and local level.

- Areas may have improvements that represent public investments; be encumbered by R&PP leases, withdrawals, mining claims, etc.; or be managed by cooperative agreements with other agencies.

## Areas Important to the Economy

- These areas include tracts having mineral potential, forestlands, rangelands and others that contribute to the stability of the local economy by virtue of federal ownership and preservation of working lands.

## Other Criteria

- Federal minerals underlying nonfederal surface would generally be retained in federal ownership. However, an exchange of this type of mineral estate may be considered on a case-by-case basis if found to be in the public interest.  The sale of this type of mineral interest under section 209(b) of FLPMA could be considered only if the requirements of this same section were met.  Conversely, the acquisition of patented mining claims would also be addressed on a case-by-case basis.

- Difficulty or cost of administration (manageability)

- Suitability of the land for management by another federal agency

- Significance of the decision in stabilizing business, social and economic conditions, and/or lifestyles

- Encumbrances, including but not limited to,
    - o R&PP and small tract leases
    - o Other leases and permits
    - o Consistency of the decision with cooperative agreements and plans or policies of other agencies
    - o Suitability need for change in land ownership or use for purposes including but not limited to: community expansion or economic development, such as industrial, residential or agricultural (other than grazing) developments

# APPENDIX T. SUMMARY OF USFWS BIOLOGICAL OPINIONS

## INTRODUCTION

The U.S. Fish and Wildlife Service (USFWS) prepared and analyzed the effects of the revised Missoula Resource Management Plan (revised RMP) for the BLM on grizzly bears (*Ursus arctos horribilis*), Canada lynx (*Lynx canadensis*), and lynx critical habitat. A separate biological opinion has concurrently been prepared for bull trout (*Salvelinus confluentus*) and bull trout critical habitat. Formal consultation was initiated on October 16, 2019; the date the Service received the biological assessments (BLM 2019).

Section 7(b)(3)(A) of the Endangered Species Act of 1973, as amended (Act) requires that the Secretary of Interior issue biological opinions on federal agency actions that may adversely affect listed species or critical habitat. Biological opinions determine if the action proposed by the action agency is likely to jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. Section 7(b)(3)(A) of the Act also requires the Secretary to suggest reasonable and prudent alternatives to any action that is found likely to result in jeopardy or adverse modification of critical habitat, if any has been designated. If the Secretary determines no jeopardy, then regulations implementing the Act further require the Director to specify reasonable and prudent measures and terms and conditions necessary or appropriate to minimize the impact of any incidental take resulting from the action(s). This biological opinion addresses only impacts to federally listed species.

The Biological Opinion on the Effects of the BLM Missoula revised RMP on Grizzly Bears, Canada Lynx, and Designated Lynx Critical Habitat and the Biological Opinion on the Effects of the BLM Missoula revised RMP on Bull Trout and designated Bull Trout Critical Habitat are incorporated by reference into the Approved RMP and are available here: https://eplanning.blm.gov.

## USFWS CONCLUSION

In the Biological Opinions on the Effects of the BLM Missoula revised RMP on Grizzly Bears, Canada Lynx, and Designated Lynx Critical Habitat, the USFWS concluded that the BLM's proposed action is not likely to jeopardize the continued existence of the Canada lynx or the grizzly bear; and is not likely to result in the destruction or adverse modification of designated Canada lynx critical habitat.  The Biological Opinions are located here: https://eplanning.blm.gov.  Key provisions of the Biological Opinions are summarized below:

## USFWS INCIDENTAL TAKE STATEMENTS

Section 9 of the Act, and Federal regulations pursuant to section 4(d) of the Act, prohibit the take of endangered and threatened species, respectively without special exemption. Take is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by the Service as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms

of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement.

Subsequence consultation and reporting requirements are described below.

## USFWS Reporting Requirements

**Bull Trout** - Subsequent consultation, as appropriate, on the specific actions developed pursuant to the Revised Resource Management Plan will serve as the basis for determining if an exemption from the section 9 take prohibitions is warranted. If so, the Service will provide Reasonable and Prudent Measures, Terms and Conditions, and reporting requirements as appropriate, to minimize the impacts of the take on bull trout in accordance with 50 CFR 402.14(i).

**Grizzly bears, Canada Lynx, Canada Lynx Critical Habitat:**

To demonstrate that the revised RMP is adequately reducing the potential for and minimizing the effect of any incidental take that may result, the Missoula FO shall complete a report with the information listed below and submit it to the Service's Montana FO by May 1 of each year for the preceding calendar year for the life of the revised RMP. The report shall include:

1.   In relation to the first surrogate measure of incidental take of grizzly bears, an up to date record of the existing, ongoing access conditions including the existing miles of open motorized routes and the open and total linear motorized route density within the five geographic areas of the action area (reference Table 4 in this incidental take statement).

2.   In relation to the second surrogate measure of incidental take of grizzly bears, an up-to-date record of the amount and duration of new temporary roads constructed and used within NCDE zone 1, NCDE zone 2, and the remaining portion of the action area (outside of NCDE zones 1 and 2).

3.   In relation to the third surrogate measure of incidental take of grizzly bears, an up to date record of grizzly bear/livestock conflicts and management removals of grizzly bears related to livestock grazing in the action area. The MiFO shall notify the U.S. Fish and Wildlife Service's Montana Field Office within 72 hours of any livestock depredation by grizzly bears.

4.   The MiFO shall notify the U.S. Fish and Wildlife Service's Montana Field Office if a change in the status of sheep grazing in the action area is being considered.

5.   In relation to the surrogate measure of incidental take of Canada lynx, an up to date record of the total amount of snowshoe hare habitat treated within FMZ1 and the WUI 1-mile buffer.

## USFWS Conservation Recommendations

Sections 7(a)(1) of the Act directs federal agencies to use their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans or to develop information. The recommendations provided here relate only to the proposed action and do not necessarily represent complete fulfillment of the agency's section 7(a)(1) responsibilities. This biological opinion identifies the following conservation recommendations that, in addition to the proposed action and other ongoing conservation actions, will support recovery of listed species. These conservation

recommendations are discretionary agency activities meant to minimize or avoid adverse effects to listed species. The conservation recommendations are listed below:

**Grizzly Bear, Canada Lynx, and Canada Lynx Critical Habitat**

1. Continue to manage access on the MiFO to achieve lower road densities. By managing motorized access, several grizzly bear management objectives could be met including: (1) minimizing human interaction and potential grizzly bear mortality; (2) minimizing displacement from important habitats; (3) minimizing habituation to humans; and (4) providing relatively secure habitat where energetic requirements can be met (Interagency Grizzly Bear Committee 1998). Additionally, lower road densities would also benefit other wildlife and public resources.

2. Motorized access management is only one of several factors influencing grizzly bear habitat and grizzly bear security. The presence of attractants is a major factor leading to the food conditioning and habituation, and the eventual direct mortality or management removal of grizzly bears. The Service supports the MiFO's continued efforts to manage food storage. Management of garbage, food and livestock feed storage, to prevent access to bears, benefits grizzly bears as well as black bears and other carnivores. Human/carnivore interactions would also be reduced, leading to a public safety benefit.

3. Grizzly bears concentrate in certain areas during specific time periods to take advantage of concentrated food sources or because the area provides a high seasonal food value due to diversity in vegetation and plant phenology (e.g., important spring for fall range). Where grizzly bear use is known or likely to occur and where practicable, delay disturbing activities during the spring in spring habitats to minimize displacement of grizzly bears.

4. Winter is the most constraining season for lynx and snowshoe hares. Dense horizontal cover of conifers above the snow level is critical to support snowshoe hares in winter. Vegetation management should be designed to provide for winter snowshoe hare habitat as forest stands develop successionally over time.

5. Provide a mosaic of lynx habitat that includes dense early-successional coniferous and mixed-coniferous-deciduous stands, along with a component of mature multistory coniferous stands to produce the desired snowshoe hare density within each LAU.

6. Use fire and mechanical vegetation treatments as tools to maintain a mosaic of lynx habitat, in varying successional stages, distributed across the LAU in a landscape pattern that is consistent with historical disturbance processes.

7. Provide for continuing availability of lynx foraging habitat (snowshoe hare habitat) in proximity to denning habitat and retain patches of untreated areas of dense horizontal cover within treated areas where possible.

**Conservation Recommendations – Bull Trout**

1. When planning future projects, consider actions designed to improve the functional condition of habitat baseline conditions (e.g., FUR to FAR) for bull trout.

2. Work cooperatively with private landowners on all MiFO BLM adjacent lands to (1) minimize (to the extent practicable) the take of water via diversion structures in FMO and SR habitat; (2) identify water diversion structures in need of fish screens and aid in the installation of said fish screens to eliminate entrainment of bull trout.

3. Work cooperatively with other state and federal agencies to address the potential impacts of non-native fish species (e.g., brook trout and brown trout) in the Upper Clark Fork River, Blackfoot River, Rock Creek and Clearwater River and Lakes core areas. Consider actions that include suppression and removal of non-native fish species.

4. Consider implementation of recovery actions identified in the Service's Bull Trout Recovery Plan and the associated Columbia River Headwaters Recovery Unit Implementation Plan (USFWS 2015, 2015b)

## USFWS REINITIATION NOTICE

As provided in 50 C.F.R. § 402.16, reinitiation of consultation is required and shall be requested by the federal agency or by the Service where discretionary federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking specified in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) if a new species is listed or critical habitat designated that may be affected by the identified action.

# Exhibit H



*Bureau of Land Management Director's Summary Protest Resolution Report*

# Lewistown Resource Management Plan

June 9, 2020

This page intentionally left blank.

# TABLE OF CONTENTS

Section            Page

ACRONYMS AND ABBREVIATIONS ........................................................................................... II

INTRODUCTION ............................................................................................................................ 1

PROTESTING PARTY INDEX TABLE............................................................................................... 2

PROTEST ISSUE BY TOPIC AREA .................................................................................................. 5

     Air Resources, Including Greenhouse Gases........................................................................... 5

     Areas of Critical Environmental Concern/Special Designations ........................................... 9

     Baseline Information ................................................................................................................. 15

     Best Available Science............................................................................................................... 16

     Endangered Species Act ........................................................................................................... 19

     Fish, Wildlife, and Special Status Species................................................................................ 20

     General (Includes FLPMA, NEPA, Monitoring and Adaptive Management, Multiple Use, and Unnecessary and Undue Degradation)........................................................................ 24

     Lands with Wilderness Characteristics ................................................................................... 28

     Livestock Grazing ...................................................................................................................... 31

     Minerals and Energy ................................................................................................................. 34

     Public Participation ................................................................................................................... 36

     Public Safety .............................................................................................................................. 38

     Purpose and Need..................................................................................................................... 40

     Range of Alternatives................................................................................................................ 41

     Recreation and Visitor Services (Including Backcountry Conservation Areas)..................... 44

     Social and Economic Conditions............................................................................................. 48

     Soil, Water, and Vegetation...................................................................................................... 49

     Travel, Transportation, and Access......................................................................................... 51

     Wild and Scenic Rivers............................................................................................................. 52

     Wildfire Ecology and Management......................................................................................... 53

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **ACEC** | Area of critical environmental concern |
| **AMS** | analsyis of the managment situation |
| **APD** | application for permit to drill |
| **ARTSD** | Air Resource Technical Support Document |
| **AUM** | animal unit month |
| | |
| **BCA** | backcountry conservation area |
| **BLM** | Bureau of Land Management |
| | |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **CO$_2$** | carbon dioxide |
| | |
| **EIS** | environmental impact statement |
| **ESA** | Endangered Species Act |
| **EPA** | Environmental Protection Agency |
| | |
| **FEIS** | Final Environmental Impact Statement |
| **FLPMA** | Federal Land Policy and Management Act of 1976 |
| | |
| **GHMA** | general habitat management area |
| **GHG** | greenhouse gas |
| **GRSG** | greater sage-grouse |
| **GWP** | global warming potential |
| | |
| **IMPLAN** | Impact Analysis for Planning |
| **IPCC** | Intergovernmental Panel on Climate Change |
| | |
| **LFO** | Lewiston Field Office |
| | |
| **NEPA** | National Environmental Policy Act |
| **NSO** | no surface occupancy |
| | |
| **ORV** | oustandingly remarkable value |
| | |
| **PHMA** | priority habitat management area |
| **PRMP** | Proposed Resource Management Plan |
| | |
| **RDF** | required design feature |
| **RMP** | resource management plan |
| **ROW** | right-of-way |
| | |
| **SRMA** | special recreation management area |
| | |
| **US** | United States |
| **USFWS** | US Fish and Wildlife Service |
| **VCC** | vegetation condition class |
| | |
| **WSCT** | westslope cutthroat trout |

# INTRODUCTION

Upon release of the Lewistown Final Environmental Impact Statement (FEIS) and Proposed Resource Management Plan (PRMP), a 30-day protest period began on February 14, 2020, at which time any person who previously participated in the planning process and had an interest that is, or may be, adversely affected by the Proposed Plan could submit a protest on the Proposed Plan. A protest could raise only those issues that were submitted for the record during the planning process.

All protests had to be in writing and filed with the State Director, either as a hard copy or electronically via the Bureau of Land Management's (BLM) ePlanning website, by the close of the protest period, which was March 16, 2020. All protest letters sent to the BLM via fax or email were considered invalid unless a properly filed protest was also submitted.

The ePlanning webpage contained a tool for submitting a valid protest electronically. The link to the project page where a protest could be filed was included in the Notice of Availability for the FEIS and PRMP, and in related news releases, newsletters, and a Dear Reader letter.

The following items must have been included to constitute a valid protest (see 43 Code of Federal Regulations [CFR] 1610.5-2):

- The name, mailing address, telephone number, and interest of the person filing the protest (in other words, how the protestor will be adversely affected by the approval or amendment of the plan)
- A statement of the issue or issues being protested
- A statement of the part or parts of the plan or amendment being protested
- A copy of all documents addressing the issue or issues that were submitted during the planning process by the protesting party, or an indication of the date the issue or issues were discussed for the record
- A concise statement explaining why the State Director's decision is believed to be wrong

It must be in the record that the protest issue has been raised in the planning process before, or that the issue provides significant new information (in other words, it came to light near the end of the draft resource management plan [RMP] or RMP amendment comment period).

The protest must relate to a planning issue, not an implementation issue. The protest should clearly state what law/regulation/policy the BLM is violating (i.e., names the law/regulation/policy), and explain why the PRMP or RMP amendment violates the stated law/regulation/policy.

The BLM informed protestors that before including their personal identifying information in their protests, their entire protest—including personal identifying information—may be made publicly available at any time. The BLM cannot guarantee that personal identifying information will be withheld upon request.

The protesting party index table, below, is a list of the letters received during the protest period, and the determination of the protest validity and how it was addressed.

# PROTESTING PARTY INDEX TABLE

| Letter Number (PP-MT-LEW-20-) | Protester | Organization | Determination |
|---|---|---|---|
| 30 | Amnotte, David | N/A | Dismissed – Incomplete* |
| 132 | Angstead, Zachary | Northern Rocky Mountain Grotto | Issues and Comments |
| 66 | Armstrong, Daniel | N/A | Dismissed – Incomplete* |
| 63 | Balasky, Cathy | N/A | Dismissed – Incomplete* |
| 76 | Barkley, Steven | N/A | Dismissed – Incomplete* |
| 110 | Becker, Chad | N/A | Dismissed – Comments only |
| 21 | Benson, Steven | N/A | Dismissed – Incomplete* |
| 133 | Bertram, Aubrey | N/A | Issues and Comments |
| 25 | Boschert, John | N/A | Dismissed – Incomplete* |
| 41 | Brooks, Ellen | N/A | Dismissed – Incomplete* |
| 4 | Brown, James | Montana Wool Growers Association | Dismissed – No Standing |
| 94 | Brownlee, Peg | N/A | Dismissed – Incomplete* |
| 86 | Cannon, Julie | N/A | Dismissed – Incomplete* |
| 113 | Carson, Millie | N/A | Dismissed – Incomplete* |
| 75 | Cassidy, Katharine | N/A | Dismissed – Incomplete* |
| 31 | Center, Dean | N/A | Dismissed – Incomplete* |
| 91 | Church, Michael | N/A | Dismissed – Incomplete* |
| 27 | Clawson, William | N/A | Dismissed – Incomplete* |
| 109 | Consolvo, Camille | N/A | Dismissed – Comments only |
| 36 | Crawford, Del | N/A | Dismissed – Incomplete* |
| 83 | Crichton, Mel | N/A | Dismissed – Incomplete* |
| 48 | Cumin, Cal | N/A | Dismissed – Comments only |
| 112 | Dahl, Jill | N/A | Dismissed – Incomplete* |
| 50 | Davis, John | N/A | Dismissed – Incomplete* |
| 47 | DeGroot, Richard | N/A | Dismissed – Incomplete* |
| 12 | Demeler, Borries | N/A | Dismissed – Incomplete* |
| 37 | Denney, Teresa | N/A | Dismissed – Incomplete* |
| 92 | Dent, Debbie | N/A | Dismissed – Incomplete* |
| 99 | Divoky, Dennis | N/A | Dismissed – Incomplete* |
| 138 | Doughty, Paul | N/A | Issues and Comments |
| 7 | Eldredge, Bonnie | N/A | Dismissed – Incomplete* |
| 8 | Engell, Kezia | N/A | Dismissed – Incomplete* |
| 120 | Enk, Michael | N/A | Issues and Comments |
| 85 | Ferguson, Jennifer | N/A | Dismissed – Incomplete* |
| 24 | Fleckman, Adrienne | N/A | Dismissed – Incomplete* |
| 69 | Friend, Joshua | N/A | Dismissed – Incomplete* |
| 111 | Gallagher, Amy | N/A | Dismissed – Incomplete* |
| 143 | Gary Bertellotti | Montana Fish, Wildlife and Parks | Issues and Comments |
| 93 | Gaul, William | N/A | Dismissed – Incomplete* |
| 6 | Geery, Emily | N/A | Dismissed – Incomplete* |
| 34 | Gies, Toni | N/A | Dismissed – Incomplete* |
| 70 | Goeltz, Paul | N/A | Dismissed – Incomplete* |
| 130 | Good, Mark | N/A | Issues and Comments |
| 88 | Goudy, James | N/A | Dismissed – Incomplete* |
| 28 | Gravance, Rochelle | N/A | Dismissed – Incomplete* |
| 46 | Guynn, Dwight | N/A | Dismissed – Incomplete* |

*Protest Resolution Report for*
*Lewistown Resource Management Plan*

| Letter Number (PP-MT-LEW-20-) | Protester | Organization | Determination |
|---|---|---|---|
| 147,148 | Hanley, Jerry | N/A | Issues and Comments |
| 149 | Hauser, Calvin | N/A | Issues and Comments |
| 17 | Hagel, Matt | N/A | Dismissed – Incomplete* |
| 55 | Hammond, Kristine | N/A | Dismissed – Incomplete* |
| 87 | Hanson, Mark | N/A | Dismissed – Incomplete* |
| 9 | Hayes, Emily | N/A | Dismissed – Incomplete* |
| 13 | Healy, Josh | N/A | Dismissed – Incomplete* |
| 71 | Heffernan, Katherine | N/A | Dismissed – Incomplete* |
| 38 | Helvey, Isaac | N/A | Dismissed – Incomplete* |
| 64 | Hess, Sarah | N/A | Dismissed – Incomplete* |
| 58 | Hill, Marilyn | N/A | Dismissed – Incomplete* |
| 114 | Hoehn, Nathan | N/A | Dismissed– Comments only |
| 134 | Hornbein, Melissa | Western Environmental Law Center, Montana Environmental Information Center, WildEarth Guardians | Issues and Comments |
| 29 | Hudson, William | N/A | Dismissed – Incomplete* |
| 78 | Hurley, Patrick | N/A | Dismissed – Incomplete* |
| 129 | Jennings, Charles | N/A | Issues and Comments |
| 137 | Jennings, Gerry | N/A | Dismissed – Incomplete* |
| 95 | Jochem, Nancy | N/A | Dismissed – Incomplete* |
| 139 | Juel, Jeff | N/A | Issues and Comments |
| 131 | Juel, Jeffrey | Alliance for the Wild Rockies | Issues and Comments |
| 135 | Kerr, Rick | N/A | Issues and Comments |
| 60 | Kilmer, Thomas | N/A | Dismissed – Comments only |
| 104 | Kotynski, Tom | N/A | Issues and Comments |
| 23 | Krebill, Kerry | N/A | Dismissed – Incomplete* |
| 96 | Kreidler, Jeffrey | N/A | Dismissed – Incomplete* |
| 77 | Lannen, Shuddhabha | N/A | Dismissed – Incomplete* |
| 40 | Latterell, Kim | N/A | Dismissed – Incomplete* |
| 121 | Leroux, Jocelyn | Western Watersheds Project | Issues and Comments |
| 122-128 | Leroux, Jocelyn (Attachments) | Western Watersheds Project | Issues and Comments |
| 54 | Loutit, Debra | N/A | Dismissed – Incomplete* |
| 72 | Lunde, Eric | N/A | Dismissed – Incomplete* |
| 73 | Lunde, Eric | N/A | Dismissed – Incomplete* |
| 108 | Lydon, Sally | N/A | Dismissed – Incomplete* |
| 79 | Mabbott, Charles | N/A | Dismissed – Incomplete* |
| 80 | Mabbott, Charles | N/A | Dismissed – Incomplete* |
| 97 | Mackin, Robert | N/A | Dismissed – Incomplete* |
| 118 | Madden, Elizabeth | N/A | Dismissed – Comments Only |
| 141 | Mari, David | N/A | Issues and Comments |
| 59 | Marty, Leslie | N/A | Dismissed – Incomplete* |
| 42 | McFadden, Beth | N/A | Dismissed – Incomplete* |
| 149 | Mercenier, Jacqueline | N/A | Dismissed – Comments only |
| 53 | Morani, Robert | N/A | Dismissed – Incomplete* |

| Letter Number (PP-MT-LEW-20-) | Protester | Organization | Determination |
|---|---|---|---|
| 62 | Mueller, Lisa | N/A | Dismissed – Incomplete* |
| 150 | Murnion, David | N/A | Dismissed – Comments only |
| 142 | Neal, Clay and Kelsey | | Dismissed – Standing |
| 81 | Oakland, Martin | N/A | Dismissed – Incomplete* |
| 90 | O'Bannon, John | N/A | Dismissed – Incomplete* |
| 65 | OConnell, Jerry | N/A | Dismissed – Incomplete* |
| 140 | Otto, Chuck | Anaconda Sportsmen's Club | Issues and Comments |
| 43 | Parks, Littlebird | N/A | Dismissed – Incomplete* |
| 1 | Parsons, Tom | N/A | Dismissed – Incomplete* |
| 82 | Perryman, Toddy | N/A | Dismissed – Incomplete* |
| 33 | Phillips, Patrick | N/A | Dismissed – Incomplete* |
| 144 | Poertner, Ron | Missouri River Stewards | Issues and Comments |
| 89 | Rasch-Hall, Maryellen | N/A | Dismissed – Incomplete* |
| 52 | Rhoades, Martha | N/A | Dismissed – Incomplete* |
| 51 | Rhodes, Douglas | N/A | Dismissed – Incomplete* |
| 100 | Rillema, Gary | N/A | Dismissed – Incomplete* |
| 74 | Robertson, David | N/A | Dismissed – Incomplete* |
| 106 | Robinson, Linda | N/A | Dismissed – Incomplete* |
| 98 | Saile, Kipp | N/A | Dismissed – Incomplete* |
| 61 | Schatz, Deborah | N/A | Dismissed – Incomplete* |
| 84 | Schmit, Paul | N/A | Dismissed – Incomplete* |
| 107 | Shapiro, Sheila | N/A | Dismissed – Incomplete* |
| 45 | Showen, Kathryn | N/A | Dismissed – Comments only |
| 35 | Sikorski, Wade | N/A | Dismissed – Incomplete* |
| 102 | Simmons, John | N/A | Dismissed – Incomplete* |
| 101 | Simmons, Marilyn | N/A | Dismissed – Incomplete* |
| 115 | Simons, James | N/A | Issues and Comments |
| 116 | Simons, James (Attachment) | N/A | Issues and Comments |
| 117 | Simons, James (Attachment) | N/A | Issues and Comments |
| 14 | Smith, Douglas | N/A | Dismissed – Incomplete* |
| 11 | Southworth, Mary | N/A | Dismissed – Incomplete* |
| 105 | Starshine, Dorothy | N/A | Dismissed – Incomplete* |
| 119 | Steinmuller, Patti | N/A | Issues and Comments |
| 39 | Stewart, Sarah | N/A | Dismissed – Incomplete* |
| 67 | Stewart, Sarah | N/A | Dismissed – Incomplete* |
| 146 | Taylor, Nolan | N/A | Dismissed – Standing |
| 10 | Tomkiewicz, Jeremy | N/A | Dismissed – Incomplete* |
| 44 | Tompkins, Ed | N/A | Dismissed – Incomplete* |
| 56 | Trousdale, David | N/A | Dismissed – Incomplete* |
| 57 | Trousdale, David | N/A | Dismissed – Incomplete* |
| 145 | Van Setten, Keith | Office of the Teton County Sheriff | Dismissed– Comments only |
| 26 | Von Stutterheim, Klaus | N/A | Dismissed – Incomplete* |
| 5 | Waldby, Gail | N/A | Dismissed – Comments only |
| 18 | Wall, William | N/A | Dismissed – Incomplete* |

| Letter Number (PP-MT-LEW-20-) | Protester | Organization | Determination |
|---|---|---|---|
| 103 | Welch, Toby | N/A | Dismissed – Standing |
| 3 | Whirry, Gordon | Montana Wilderness Association | Issues and Comments |
| 20 | Wiley, Sam | N/A | Dismissed – Incomplete* |
| 16 | Williams, Jacob | N/A | Dismissed – Incomplete* |
| 136 | Wilsey, David | N/A | Dismissed – Comments only |
| 49 | Winestine, Zack | N/A | Dismissed – Incomplete* |
| 19 | Young, Carol | N/A | Dismissed – Incomplete* |
| 32 | Zaideman, Julie | N/A | Dismissed – Incomplete* |
| 68 | Zephyrs, Jessica | N/A | Dismissed – Incomplete* |
| 22 | Zimney, Raymond | N/A | Dismissed – Incomplete* |
| 15 | Zimny, Carol | N/A | Dismissed – Incomplete* |

*The protesting party did not include one or more of the requirements at 43 CFR 1610.5-2(a)(2)(i)–(v) with their submission:*
- *The name, mailing address, telephone number, and interest of the person filing the protest*
- *A statement of the issue(s) being protested*
- *A statement of the part(s) of the Proposed Plan or amendment being protested*
- *A copy of all documents addressing the issue(s) that were submitted during the planning process by the protesting party or an indication of the date the issue or issues were discussed for the record during the planning process (at a minimum, the protesting party must indicate how they participated in the planning process)*
- *A concise statement explaining why the State Director's decision is believed to be wrong*

# PROTEST ISSUE BY TOPIC AREA

## AIR RESOURCES, INCLUDING GREENHOUSE GASES

### Enk, Michael

Issue Text Excerpt: *(The FEIS fails..) to fully address climate change from the burning of oil and gas extracted from leased lands. The BLM has an obligation to consider the effects of oil and gas leasing on our climate using the best available science. This is undeniably an issue of cumulative effects.*

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The FEIS does not adequately analyze existing and reasonably foreseeable climate change impacts as part of the affected environment, does not assess them as part of the analysis of impacts, and fails to integrate them into each of the alternatives. The BLM did not consider the cumulative impacts likely to result from road activities and climate change.*

Issue Text Excerpt: *The BLM fails to provide anything like a comprehensive estimate of the total amount of carbon dioxide (CO2) and other greenhouse gas emissions from BLM management actions and policies-at the Field Office level, regionally, or nationally.*

Issue Text Excerpt: *The FEIS fails to analyze and disclose the full extent of climate change direct, indirect, and cumulative effects the RMP alternatives would cause, in violation of NEPA. The FEIS fails to consider best available science on the subject, in violation of NEPA.*

Issue Text Excerpt: *FEIS Appendix X (Response to Comments) states, "Appendix C of the Air Resources Technical Support Document (ARTSD) contains information on emissions related to forestry, oil and gas, livestock grazing, fire management and Coal Bed natural gas and has been posted to the website (ePlanning)." This version of the ARTSD is dated October 2019. The earlier version dated 2016 had little on this subject other than estimates of greenhouse gas (GHG) emissions by alternative. So the public and other government agencies had not opportunity to comment on the climate change analysis included in the 2019 ARTSD.  Still, the 2019 ARTSD*

*is hardly an analysis of climate change and carbon sequestration, and fails completely to address the scientific and social issues we raised in our comments on the Draft RMP/DEIS.*

### Good, Mark/Kerr, Rick

Issue Text Excerpt: *By encouraging more fossil fuel development at a time when we should be reducing fossil fuel use, the plan also fails to address this serious environmental issue. The BLM has an obligation to consider the effects of oil and gas leasing on our climate using the best available science and acting on that information. This is undeniably an issue of the failure of the BLM to address cumulative effects.*

### Leroux, Jocelyn (Western Watersheds Project)

Issue Text Excerpt: *BLM acknowledges that "climate variability is occurring and would continue to occur for many years due to the longevity of GHGs that are already in the atmosphere," yet only offers one alternative that would reduce the number of GHGs released. BLM also states that "effects from GHG emissions would be long-term effects that would contribute to climate variability for beyond the life of the plan. Climate variability also poses challenges for many resource uses on BLM-administered land. Increased temperatures, drought, and evaporation may reduce seasonal water supplies for livestock and could affect forage availability." (Sec 4.2.1 p. 4-7) Yet, the proposed alternative (C2) fails to reduce GHG emissions over the life of the plan. In fact, Alternative C2 would increase total emissions of CO2 and CO2e.*

### Summary:

The BLM does not utilize the best available science regarding climate change impacts in the FEIS. Additionally, the BLM fails to adequately analyze existing and reasonably foreseeable climate change impacts at multiple levels or consider these impacts as it designed the alternatives. Furthermore, the proposed alternative (C2) fails to reduce GHG emissions over the life of the plan. In fact, Alternative C2 would increase total emissions of $CO_2$ and carbon dioxide equivalent.

### Response:

The National Environmental Policy Act (NEPA) directs that data and analyses in an environmental impact statement (EIS) must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at the potential environmental impacts of adopting the PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decisions or actions (e.g., the BLM is not approving an application for permit to drill [APD] to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

Appendix W of the PRMP/FEIS (Table W-1) estimates the number of wells, by alternative, through 2033. There is only a difference of six wells on federal mineral estate between the Proposed Plan and Alternative B. The Lewistown PRMP/FEIS incorporates the ARTSD, which provides comprehensive emission estimates for oil and gas operations at three types of wells: oil, Coalbed natural gas (CBNG), and conventional natural gas. A draft ARTSD was released to support the Lewistown Draft RMP/Draft EIS. The ARTSD was modified and finalized in 2019 to support the Lewistown PRMP/FEIS.

Table 2 (ARTSD 2019) summarizes estimates of new oil, CBNG, and gas wells that could potentially be developed under each of the alternatives. Table 25 (ARTSD 2019) shows a comparison of GHG emissions using the 20-year and 100-year time horizon using current global warming potential (GWP) for each alternative. Indirect emissions are listed in Appendix W (PRMP/FEIS). Emission estimates provide an estimate of the GHGs released into the atmosphere in the future from initial well site construction, well drilling and completion, production, and end use. The ARTSD presents quantified estimates of potential direct and indirect GHG emissions associated with the future predicted oil and gas development on the leases. However, it must be emphasized that GHG emission estimates disclose uncertainties, including:

- Drilling time and equipment improvements; for example, deeper wells require engines with a greater horsepower and take longer to drill, but they may produce for shorter or longer periods of time.
- Inherent uncertainty factor in GWPs, currently estimated to be +35 percent, that change with new scientific evidence and laboratory results
- Unknown factors about actual production rates that may change with time
- How produced substances are used
- Regulation of GHG parameters by delegated agencies
- Control technologies that are utilized at the upstream or downstream activity location(s)

In order to measure and assess the reasonably foreseeable potential for climate change, and the resultant effects of climate change, the Lewistown PRMP/FEIS analysis approach was to measure and predict emissions of GHGs. Each GHG has a GWP that accounts for the intensity of each GHG's heat-trapping effect and its longevity in the atmosphere. GWPs have been developed for several GHGs over different time horizons, including 20 years, 100 years, and 500 years. The choice of the emission metric and time horizon depends on the type of application and policy context; hence, no single metric is optimal for all policy goals. Because the GWP of a given GHG depends in part on the atmospheric lifetime of the GHG, GWP values depend on the time interval for which they are estimated. The GWP for a relatively short-lived GHG, such as methane, is larger over a short time period (for example, 20 years) as compared with a much longer time period (such as 100 years). This is because most of the methane will have reacted away well before 100 years have passed. Conversely, long-lived GHGs have a 20-year GWP that is lower than the 100-year GWP because the time-integrated radiative forcing is less (relative to $CO_2$) over the shorter time interval.

In the ARTSD, the BLM uses GWPs and time horizons consistent with the United States (US) Environmental Protection Agency to reflect the current state of science for GHG emission calculations associated with the Proposed Action. The Lewistown PRMP would result in indirect GHG emissions when the proposed leases are purchased and developed, and the product is combusted elsewhere.

The Lewistown FEIS used the Climate Change Baselines section of the BLM's 2015 Annual Report for an updated and comprehensive overview of the topography and climate for the region and a current understanding of the changes to global GHG emissions and climate that have occurred for the last few

centuries. The information for the annual report section was obtained primarily from the latest Intergovernmental Panel on Climate Change (IPCC) study (Fifth Assessment Report). Climate change and climate science were refined for the Lewistown Planning Area using the Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota, Bureau of Land Management (BLM 2010a). In addition to quantifying GHG emissions, the Lewistown PRMP/FEIS provides a discussion on the physical manifestations of climate change and climate change projections at regional and state scales (Analysis of the Management Situation [AMS] November 2019). The AMS is incorporated by reference in the Lewistown PRMP/FEIS (Vol. I, page 3-1).

For the PRMP/FEIS, the BLM developed projected total downstream GHG emissions estimates from the combustion of produced oil and gas for comparison across the alternatives. Table W-10 in the PRMP/FEIS shows BLM fossil fuel combustion GHG emissions by alternative. These estimates were developed using RMP-specific information for the alternatives.

For the analysis, operational, production, and construction activity data used to estimate emissions for proposed emission sources were obtained from Lewiston Field Office (LFO) staff, the reasonably foreseeable development scenario for oil and gas, and information about proposed projects in the Planning Area. A baseline summary of annual GHG emissions by county is included in the Revised Area Profile (AMS 2019, Table 7, page 18).

The BLM must also discuss the cumulative effects of the Proposed Action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The Council on Environmental Quality (CEQ) regulations (40 CFR 1508.7) define cumulative effects as ". . . the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions." Appendix W discusses past, present, and reasonably foreseeable projects, plans, and actions as well as the complete cumulative effects scenario for each resource and resource use in the Lewistown PRMP/FEIS.

According to the IPCC Special Report, "uncertainties in the size of these estimated remaining carbon budgets are substantial." The IPCC Special Report estimates the budget for a 50/50 chance of exceeding 1.5 degrees Celsius at 580 gigatons of $CO_2$, with an uncertainty of ±400 gigatons of $CO_2$. This uncertainty is nearly 70 percent of the budget and results from the precise meaning of the 1.5 degrees Celsius target, the definitions of "surface temperature" and "pre-industrial" period, the choice in observational temperature datasets, the uncertainty in non-$CO_2$ factors that influence warming, and if earth-system feedbacks should be taken into account. With the large uncertainty in estimating carbon budgets, it is not a useful tool for assigning a GHG emissions significance level at this time.

Furthermore, the IPCC Special Report states that proposed actions across many sectors and spatial scales are needed to reduce emissions and limit warming. There is no requirement or mechanism to apply a worldwide carbon budget to a management plan in this EIS. Evaluations of such proposed actions are beyond the scope of this EIS. Based on the disclosed GHG emissions in the EIS and the substantial uncertainties in the size of carbon budgets, including carbon budgets would not provide additional useful information to the decision-maker or the public.

The BLM's approach recognizes that there are adverse environmental impacts associated with the development and use of fossil fuels on climate change; it quantifies potential GHG emissions estimates and discusses potential climate change impacts qualitatively, thus effectively informing the decision-maker and the public of the potential for GHG emissions and the potential implications of climate change. This approach presents the data and information in a manner that follows many of the guidelines for effective

climate change communication developed by the National Academy of Sciences (National Research Council 2010).

The BLM goes through a three-step process to lease lands for oil and gas activities. The first is the RMP, a programmatic phase, which assesses multiple alternatives. The second step is a lease sale action when lease sale parcels are offered. The third step occurs when actual development is proposed when an APD is submitted and additional environmental analyses are conducted.

It can take up to 10 years from the time of an RMP issuance to the lease sale offering. During this period, the oil and gas development landscape could be much different from the time when the RMP was analyzed. During the lease sale, a comprehensive analysis of parcels offered and stipulations, and a rigorous examination of current air resources, including GHG and climate change, are performed. During the APD process, current technology and direct, indirect, and cumulative air emission impacts are again addressed. The three-step process allows the BLM to consider new scientific data on air resources, new emission control technologies, improvements to modeling, and GHG and climate change at the regional and global level.

The BLM considers GHG as a proxy for climate change. GHG GWPs are updated by the IPCC and EPA with continuing scientific research about the complex atmospheric interaction of GHGs in the atmosphere. As new information is available, the BLM Montana Dakotas incorporates the latest information in lease sales. For example, the March 2020 lease sales considered December 2019 regional data from the Energy Research Information to assess regional GHG impacts from wells spudded (BLM ePlanning. DOI-BLM-MT-0000-2020-0001-EA).

The three-step process used by the BLM results in an up-to-date depiction of the current status of oil and gas development and presents a unified approach to assessing the impact of oil and gas development on GHGs and climate change. In summary, if the Lewistown leases are offered for sale in the future, individual parcels would be analyzed individually and include a comprehensive current air resource analysis.

The BLM developed the Lewistown PRMP/FEIS applying the principles of "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012). Please see response in section heading *Best Available Science* for a detailed description.

The BLM complied with the NEPA's requirement to analyze the relevant direct, indirect, and cumulative impacts on air resources and climate in the PRMP/FEIS. While the Lewistown PRMP would increase GHG emissions, NEPA provides a process for agencies to follow for decision-making, but it does not impose a particular outcome. Accordingly, this protest is denied.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN/SPECIAL DESIGNATIONS

### Angstead, Zachary (Northern Rocky Mountain Grotto)

Issue Text Excerpt: *The BLM is mandated to protect significant cave resources and acknowledgement that removal of ACEC status may result in damage to caves is unacceptable. The ACEC designation should not be removed from Collar Gulch. "Management to preserve ACEC values would reduce the potential for caves to lose special resource integrity or biological communities."*

Issue Text Excerpt: *The claim that follows from the RMP is not accurate. "While surface-disturbing activities are unlikely to directly affect the cave resource, because the BLM would not have to consider the resource when permitting activities, there could be some indirect effects."*

## Bertram, Aubrey (Montana Wilderness Association)

Issue Excerpt Text: *We protest BLM's failure to prioritize the designation and protection of ACECs within the Lewistown Resource Area, and other failures to take a "hard look" at the direct, indirect and cumulative impacts of removing ACEC designation and protection for six ACECs within the field office.*

Issue Excerpt Text: *The management stipulations outlined for the SRMAs do not adequately protect the resources for which Collar Gulch and the Scenic area were designated as ACECs, and there is absolutely no analysis nor discussion about how the agency plans to prioritize and protect those resources to fulfil its statutory duty towards these ACECs.*

Issue Excerpt Text: *The agency here fails to provide an accounting of how managing the Collar Gulch watershed as part of the larger SRMA will maintain or move these important aquatic resources towards properly functioning conditions.*

Issue Except Text: *Alternative C2 proposes to eliminate every other existing ACEC in the planning area (Judith Mountains Scenic, Collar Gulch, Blind Horse, Chute Mountain, Deep Creek/Battle Creek, and Ear Mountain), with no discussion as to why the elimination of ACEC protections is in the best interest of land management, and how the very resources for which the ACECs were first designated will be protected in the future.*

Issue Excerpt Text: *It is important to note that none of the existing ACECs were recommended for elimination in the ACEC Report (Appendix T). In fact, that report recommended, based on field studies and resource analysis, expansions to several existing ACECs, as well as the designation of two more. The agency's own analysis in the ACEC report does not support its decisions in various alternatives to eliminate ACECs and dilute management prescriptions across the planning area.*

Issue Excerpt Text: *We Protest the Unexplained Diluting of Protections for Acid Shale Pine Forest and Square Butte ACECs. Acid Shale Pine Forest: Acid Shale-Pine Forest, under current management, is also a Research Natural Area (RNA) under the No Action Alternative and current management plan because of its unique plant communities on the prairie: rare soils found in this ACEC support unique communities of plants not found elsewhere in Montana.*

Issue Excerpt Text: *Alternative C2, Acid Shale Pine Forest remains an ACEC, but loses its status as an RNA with absolutely no discussion. Likewise, the ACEC becomes open to mineral materials and non-energy mineral leasing with no discussion of how that leasing will specifically impact the unique soil and flora qualities for which this area is retained as an ACEC.*

Issue Excerpt Text: *While the agency retains an ACEC in the Square Butte landscape in Alternative C2, that proposed unit is a scant 900 acres, compared to the 1,900 existing ACEC that overlaps with the WSA. Pgs. 4-185 - 4-187. There is no discussion as to how this reduction in size benefits the resources or comports with the agency's duty to protect ACEC values. Conservation Groups struggle to offer any analysis on the agency's proposed action here because there is absolutely no discussion from the agency. Failure to take a hard look at the direct, indirect, and cumulative effects of this drastic management change is an arbitrary and capricious agency action.*

Issue Excerpt Text: *Specifically, the SRMA management and elimination of ACEC status for Collar Gulch offers no analysis of protection for critical aquatic resources and sensitive aquatic species.*

Issue Excerpt Text: *The agency fails to adequately explain the impacts eliminating ACEC management will have on Judith Scenic and Collar Gulch, and how the agency plans to protect those prioritized resources under its proposed SRMA. Again, the agency offers only assertions that amount to an arbitrary and capricious agency action.*

Issue Excerpt Text: *The changes in management from Alternative A, the status quo, and Alternative C2, which the agency concedes will put Acid Shale Pine Forests important resources at risk, and without discussion as to why the changes are necessary to fulfil the agency's statutory duty to this ACEC and the identified relevant resources to which the agency has a statutory duty to protect, is arbitrary and capricious.*

Issue Excerpt Text: *These two ACECs in the Judith Mountains are proposed to be eliminated under Alternative C2. Instead, Alternative C2 proposes to manage the range entirely as a Special Recreation Management Area (SRMA), with no layered or site-specific management for the resources of Judith Scenic and Collar Gulch, where the emphasized use of the entire mountain range would be recreation, access, and built facilities like staging areas and parking lots to facilitate increased access and use of the area.*

Issue Excerpt Text: *On Pg. 4-160, the BLM asserts: "The management of ACECs under all alternatives would protect relevant and important resource values." This is blatantly factually incorrect. The agency itself admits that losing or degrading protections for ACECs will result in damage to the relevant and important resource values. This FEIS contradicts itself, a clear demonstration of inadequate analysis and discussion.*

Issue Excerpt Text: *SRMAs are not equivalent to nor interchangeable with ACECs. The emphasis of SMRAs is specifically to provide recreational access and facilities, whereas ACECs is specifically to protect unique resources. Recreation and protection are not inherently at odds or incompatible, but the management proposals for the Judith Mountains SRMA that increase access and pressure and eliminate protections to the scenic area and the water resources that these two ACECs were designated for.*

Issue Excerpt Text: *Alternative C2 proposes to eliminate ACEC and ONA management protections for the Blind Horse, Chute Mountain, Deep Creek/Battle Creek, and Ear Mountain units. Alternative C2 asserts these units "will be managed as Conservation Management Areas, which are congressional designations and have protection under the Rocky Mountain Front Heritage Act." It is unclear exactly what the agency is trying to do here. These ACECs are included in the congressionally designated Conservation Management Area (CMA) that was established by the Act. The agency cannot establish, by administrative action, a statutory status. This statement implies that the management prescriptions for areas managed by statutory decree are inherently stronger or more robust than any management an agency could choose to provide or is obligated to provide. However, the agency fails at any point in the FEIS to directly analyze and discuss the resources and management needs.*

Issue Excerpt Text: *The agency has a statutory duty under FLMPA to identify and designate ACECs, and a duty to prioritize the protection of the resources for which ACECs are designated. There is no discussion or analysis for how the BLM intends to prioritize the protection of the important resources for which the various ACECs proposed to be eliminated under Alternative C2.*

Issue Excerpt Text: *Furthermore, these units were designated within the CMA because of the wilderness characteristics and outstanding scenic values that qualified them as ACECs/ONAs in the first place. The CMA designation was made for these areas in the Rocky Mountain Front Heritage Act not as a replacement for ACEC and ONA administrative designations, but as a compliment to them…The BLM concedes that CMA status is complementary to ACEC management, but does not entirely displace the need for ACEC management, and that CMA management alone is not enough to protect the values of these landscapes. Concluding, without adequate analysis, that impacts of allowed disturbing activities are "unlikely" "due to the area's rugged topography is inadequate. To remove the agency's complimentary ACEC designation to these landscapes, without a full discussion of exactly how the important and unique resources in these units will be preserved and protected, or how they will be impacted, is arbitrary and capricious.*

**Enk, Micheal/ Kerr, Rick**

Issue Excerpt Text: *I am protesting the BLMs failure to provide meaningful substantive explanations for removing designated Areas of Critical Environmental Concern in the planning area.*

Issue Excerpt Text: *The BLM is a multiple use agency and under the Federal Land Management Policy Act, managing for multiple uses means managing resources so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources . . .[and] the use of some land for less than all of the resources with consideration being given to the relative value of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit of output…Under the proposed alternative C2, the BLM is proposing to manage zero acres for wilderness characteristics. In addition, the plan eliminates two Areas of Critical Environmental Concern and fails to manage even one out of the 27 eligible stream segments, as suitable for inclusion in the National Wild and Scenic Rivers System. The plan is heavily skewed in favor of allowing any potential energy development that may arise in the future.*

## Good, Mark

Issue Excerpt Text: *The BLM has not provided a rationale for eliminating the two ACECs in the Judith Mountains. While the plan does provide setbacks for cutthroat trout and for the creation of a management plan for the Tate-Potter Cave, the Special Recreation Management Area provides no protection for these values or any other. According to the EIS, major threats to this EIS are ROW development, vegetation treatments, invasive weeds, OHV travel, recreation, and fire suppression activities. No protection is provided to the popular non-motorized Collar Peak Trail and the area is open to all forms of mineral development. Even VRM classification was downgraded from Class II to Class III.*

## Hornbein, Melissa (Western Environmental Law Center, Montana Environmental Information Center, WildEarth Guardians)

Issue Excerpt Text: *BLM gives no analysis in connection with the required FLPMA standards as to why only two ACECs are carried forward in its Preferred Alternative. Where a management decision about the designation of ACECs "[gives] no analysis in connection with the required FLMPA standards" but rather "appears to be based on political concerns," that decision is arbitrary and capricious. Accordingly, BLM's management of ACECs is unlawful. See S. Utah Wilderness All. v. Burke, 981 F. Supp. 2d at 1114.*

Issue Excerpt Text: *There is no justification from the reduction from the status quo. Under the other alternatives, either 8 or 10 of these ACECs would be carried forward. The Preferred Alternative's decision to designate only two ACECs does not meet the goal articulated in the RMP: to "[m]anage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards." RMP at 2-51. It represents a small percentage of the currently managed ACEC's that would be retained under other alternatives (approximately 15%), and neither the RMP nor the EIS contains adequate justification for the reduction.*

## Mari, David

Issue Excerpt Text: *BLM has given no reasons as to why they would eliminate the current ACEC designations for both Collar Gulch and the Judith Mountains; It Is Just presented as a fait accompli without any stated rationale other than an apparent desire to open almost the entire planning area to commercial development without regard for the resources that are present. There also is no explanation why the areas should not continue to be managed as ACECs.*

Issue Excerpt Text: *As stated in the EIS, a major threat to this ACEC Is degradation of water quality due to surface disturbances on the geologic formations in the Collar and Chicago Gulch watersheds and its resultant Impact on westslope cutthroat trout. According to the EIS, the area would be open or available to such surface disturbing activities as commercial timber harvest, energy and mineral leasing and development, and ROW location. Given the steep topography of the area, these types of activities would cause soil erosion and Impair water quality and very possibly destroy the habitat for westslope cutthroat trout in the area. The current commitment of BLM to the Collar Gulch ACEC is demonstrated in a 2007 Memorandum of Understanding and*

*Conservation Agreement (MOU/CA) for Westslope Cutthroat Trout and Yellowstone Cutthroat Trout in Montana. As a signatory to the document, former State Director Gene Terland expressed the BLM's intention to adopt the Goals and Objectives of the MOU/CA. Quote: "By signing this Agreement, the signatories accept the goals and objectives contained herein, will incorporate them into their respective planning and budgeting processes, and will strive to accomplish the goals and objectives as defined by the criteria below." Opening this area to commercial development is totally counterproductive to meeting those goals and objectives.*

### Otto, Chuck (Anaconda Sportsmen's Club)

*We protest the ACEC decisions and refer BLM to FLPMA Title II Section 202 (c) (3) which requires BLM to give "priority to the designation and protection of areas of critical environmental concern." In addition, BLM's planning regs at 43CFR 1610.7-2(a) use relevance and importance as the criteria used to identify ACEC's. BLM references the January 2015 report on ACEC's in the document. Thus, Congress has constrained BLM's discretion in this matter and BLM must give "priority" to designating areas that meet relevance and importance. Anaconda Sportsmen protest the elimination or reduction of existing ACEC's and the non-designation of new ACEC's listed on pages 2-51 and 2-52.*

### Whirry, Gordon (Montana Wilderness Association)

<u>Issue Excerpt Text:</u> *All but 2 of the ACES's have been removed with no legitimate justification.*

### Summary:

The BLM violated the Federal Land Policy and Management Act of 1976 (FLPMA) by failing to give priority to the designation and protection of areas of critical environmental concern (ACECs). Additionally, BLM management actions are inadequate to protect relevant and important values, and the BLM failed to 1) adequately analyze the impacts of removing special designations, 2) provide a rationale for not designating these areas, 3) justify its decision to un-designate existing ACECs, and 4) abide by the recommendations in the ACEC report prepared by BLM staff.

The BLM is mandated to protect significant cave resources, and to acknowledge that the removal of ACEC status from Collar Gulch may result in damage to caves.

### Response:

In FLPMA Section 103(a), an ACEC is defined as "an area on BLM-administered lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values; fish and wildlife resources; or other natural systems or processes, or to protect life and ensure safety from natural hazards." This special designation is used to delineate areas for special management to protect important and relevant resource values. Furthermore, FLPMA Section 202(c)(3) requires that, in the development and revision of land use plans, the BLM give priority to the designation and protection of ACECs. The implementing regulations at 43 CFR 1610.78-2 provide the agency with guidance for the identification and consideration of ACECs for designation and protection during the resource management planning process; however, there is no statutory or regulatory requirement that the BLM designate any or all ACECs identified or considered during the planning process.

In accordance with BLM Manual 1613, Areas of Critical Environmental Concern (1988), the BLM interdisciplinary team reviewed BLM-administered lands in the Planning Area to determine whether new areas should be considered for designation as ACECs, and whether existing ACECs should continue to be managed as ACECs or if they should be expanded or reduced/undesignated. Appendix T contains the results of the interdisciplinary team's evaluation of relevance and importance for each potential ACEC. The evaluation contains a list of areas recommended for analysis. Each of those potential ACECs was fully analyzed within the range of alternatives in accordance with BLM Manual 1613.

Although the BLM must give priority to designating ACECs under FLPMA, the BLM has discretion to designate all, some, or none of the potential ACECs that were evaluated during the planning process; there is no requirement that the agency carry forward potential ACECs into the PRMP (see BLM Manual 1613.33.E). A comparison of estimated effects and trade-offs associated with the alternatives led to development and selection of the Proposed Plan (see Lewistown PRMP/FEIS, pp. 4-176 to 4-183). For example, the Lewistown PRMP/FEIS acknowledges impacts on ACEC values from activities such as mineral entry, mineral materials disposal, off-highway vehicle travel, and rights-of-way (ROWs); however, the FEIS also compares these effects with other protective measures, such as fluid mineral stipulations and required design features (RDFs), which will minimize surface disturbances, thereby reducing impacts regardless of ACEC designation. Additional analysis is described for each management action associated with ACECs by alternative in Appendix U.6 of the PRMP/FEIS.

The BLM determined that management actions, as applied under the proposed Alternative C2, are adequate to protect the relevant and important values of those potential ACECs that were not carried forward for designation. For example, during the planning process, Montana Fish, Wildlife and Parks identified additional westslope cutthroat trout (WSCT) fisheries outside Collar Gulch that warrant management attention. As a result, the Lewistown Proposed Plan was modified from the draft EIS/draft RMP to include a RDF when authorizing surface-disturbing activities within 0.5 miles from centerline of any stream containing known populations of 90–100 percent genetically pure WSCT. This would provide protections for WSCT in Collar Gulch, as well as Alpine Gulch, and extend to future restoration sites and populations outside the Judith Mountains.

Management actions for conservation management areas are consistent with the existing outstanding natural area designations and proposed ACECs (Alternatives B and D). See Appendix U (p. U-40) for a complete list of those management actions. Similarly, management actions for Square Butte and Acid Pine Shale Forest are similar to existing management with some modifications and refinements for clarification and to address management of relevant and important values. Appendix Q (Sections Q.2 and Q.3) includes management actions for the Judith SRMA, which contains Collar Gulch and the Judith Peak Scenic Area.

Additional stipulations and RDFs that protect relevant and important features of ACECs (such as conservation measures for riparian areas, WSCT, and bat hibernaculum) are contained in Appendix L and Appendix F of the PRMP/FEIS.

All alternatives described in the FEIS, including the Proposed Plan, maintain the goals and objectives of the memorandum of understanding/conservation agreement (July 2007), which states: "1) Ensure the long-term, self-sustaining persistence of each subspecies distributed across their historical ranges; 2) maintain the genetic integrity and diversity of non-introgressed populations; 3) protect the ecological, recreational, and economic values associated with each subspecies."

The Lewistown PRMP/FEIS contains goals, objectives, and management actions to manage all cave resources as mandated by the Federal Cave Resources Protection Act of 1988. Cave and karst resources would be managed, regardless of ACEC status, to protect significant cave resources for scientific research, educational study, and recreational experiences that are compatible and consistent with protection of resources associated with caves and karst landforms. Site-specific management of cave and karst resources will be addressed through subsequent cave management plans, as specified on page 2-31 of the Lewistown PRMP/FEIS. The stated goal of the Lewistown PRMP is: "Manage all cave resources as mandated by Federal Cave Resource Protection Act of 1988 (FCPRA) to protect unique, nonrenewable, and fragile biological, geological, hydrological, cultural, paleontological, scientific and recreational values for present and future users" (p. 2-31).

The BLM complied with FLPMA by considering the designation and protection of ACECs during land use planning. Additionally, BLM management actions are adequate to protect resource values, and the BLM analyzed the impacts of removing special designations (pp. 4-176 to 4-189). The record of decision will provide rationale for selection of the Approved RMP. Although these protest issues are denied, the Approved Plan for the Judith SRMA will be modified in the record of decision to include a requirement that future management activities be designed to emphasize the protection and enhancement of relevant and important values, such as wildlife habitat, fisheries, and cave and karst resources, and emphasize nonmotorized and mechanized travel in watersheds containing populations of WSCT in the Judith Mountains SRMA.

## BASELINE INFORMATION

### Bertram, Aubrey (Montana Wilderness Association)

Issue Excerpt Text: *A protest on these RMPs, though, has prevented oil and gas leases being issued in key wildlife habitat, resulting in most of the planning area and specifically these identified LWC units from seeing any oil and gas leasing, exploration, or development over the last several decades. The field office did not actively manage for wilderness character under the existing RMPs, but the effect of the protest prevented activities that could adversely affect those qualities. This protest, however, will end with the RMP revision and not be carried forward. Because it is an administrative protest and not part of the RMP, any analysis by the BLM that rests on the No Action Alternative A's protection of wilderness character is faulty.*

### Leroux, Jocelyn (Western Watersheds Project)

Issue Excerpt Text: *BLM failed to establish an accurate environmental baseline in regard to the current state of soil, water, and vegetation resources in the plan area. Without this baseline data the public is unable to assess the full extent of impacts outlined in the PRMP/FEIS.  First, BLM clearly states in Appendix W that "soil condition inventories were not completed" (W-28), "water condition inventories were not completed specifically for this analysis, but existing data from multiple sources are included. Although this is believed to be the best available data, there is still inherent uncertainty in some of the estimates, and there may be data gaps" (W-34), and "vegetation composition inventories were not completed" (W-41). This clearly shows that BLM does not have an adequate baseline and thus cannot effectively evaluate the proposed impacts to these resources within the plan area.  As WWP said in our comments "if the BLM cannot already effectively manage the lands currently authorized for grazing, it certainly has no business expanding the program" (p. 17). Because BLM does not have accurate baseline data, it is necessary as WWP previously commented, for BLM to "analyze a monitoring plan for grazing allotments in the planning area" and "propose a monitoring schedule that will be adhered to" (p.20).*

### Summary:

The BLM failed to establish an accurate environmental baseline in regard to the current state of resources in the Planning Area. The No Action Alternative failed to include the environmental effects of a November 1988 protest of the issuance of oil and gas leases by the BLM in Montana that has effectively deferred leasing since that time in the Lewistown Planning Area.

### Response:

The CEQ's regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). These regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

A land use planning-level decision is broad in scope. For this reason, the analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions. NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40

CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

The BLM consulted with, and collected and incorporated data from, other agencies and sources, including but not limited to the US Fish and Wildlife Service (USFWS) and Montana Fish, Wildlife and Parks, and relied on numerous data sources and scientific literature to support its description of baseline conditions (PRMP/FEIS, Chapter 3; AMS 2019) and impact analysis (PRMP/FEIS, Chapter 4). A list of information and literature used is contained in the references section found in Volume 1 beginning on page 4-233 of the PRMP/FEIS.

As a result of these actions, the BLM gathered the necessary data essential to make a reasoned choice among the alternatives analyzed in detail in the PRMP/FEIS, and provided an adequate analysis that led to an adequate disclosure of the potential environmental consequences of the alternatives (PRMP/FEIS, Chapter 4). As a result, the BLM has taken a "hard look," as required by NEPA, at the environmental consequences of the alternatives in the PRMP/FEIS to enable the decision-maker to make an informed decision. Finally, the BLM has made a reasonable effort to collect and analyze all available data.

The existing protest resolution decision (November 1988) affecting federal mineral estate in the LFO (whereby leasing parcels that require a special stipulation to protect important wildlife values is deferred) is included in the baseline information and described in Alternative A (No Action Alternative; Volume 1, pp. ES-3 and 2-2 of the PRMP/FEIS). Effects of this protest resolution are included in the evaluation of impacts for each alternative compared with the No Action Alternative.

The BLM established an accurate environmental baseline in regard to the current state of resources in the Planning Area and included the existing protest resolution that defers oil and gas leasing as part of the baseline information used to compare the effects of each alternative. Accordingly, this protest is denied.

## BEST AVAILABLE SCIENCE

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The BLM fails to consider the best available science and the opinions and recommendations of other independent experts in the design of Objectives and other RMP direction (Chapter 2), formulation of alternatives (Id.) and disclosure of impacts (Chapters 3 and 4), in violation of NEPA. We cited scientific information indicating climate change will be exacerbated by the management actions sanctioned by the RMP. We explained that the draft EIS failed to disclose, consider, and fully discuss the published scientific papers discussing climate change in proper contexts.*

### Hauser, Calvin

Issue Text Excerpt: *Twenty five years after the 1994 JVP RMP, the BLM, MT DEQ, and Montana Universities have performed environmental (scientific) research with summaries (see Calvin Hauser's comment period comments listing professional reports and summaries) confirms the Lewistown District and State Directors LPRMP proposed decisions, that the best 2020 LPRMP (plan) for the Collar Gulch Tributary is the Alternative C1 (Preferred) and second the Alternative C2 (Proposed), all-the-while maintaining and keeping the BLM's multiple-use mission.*

## Hanley, Jerry

Issue Text Excerpt: *The BLM repeatedly failed to properly identify, review, evaluate, and reach a best information-based conclusion with respect to the 1,618-acre CG ACEC which the LPRMP erroneously asserts is 1,500-acres. The regulations implementing NEPA state that information must be "high quality" and use "accurate scientific analysis." 40 C.F.R. §1500.1(b).*

Issue Text Excerpt: *…I, adjoining property owners, and the public are adversely affected because BLM does not know the interfacing boundary to avoid trespass; encroachment; the boundaries of fish habitat; and, locations of restrictions of surface and groundwater withdrawal and ROW boundaries*

Issue Excerpt Text: *The BLM failed to properly identify, review, evaluate, and reach a best information based conclusion as to the limitations on the BLM imposed withdrawal of water based on a volume of 3 cubic feet and at exactly what location.*

Issue Excerpt Text: *BLM repeatedly failed to properly identify, review, evaluate, and reach a scientifically based conclusion both in the original assertion and its recent errata corrected assertion. If BLM had done so it would have become evident and thus determined that any surface disturbances resulting from human activity would be regulated under existing state and federal environmental regulations/laws including stringent non-degradation policies and thus eliminate or mitigate threats and most certainly, "the major threat."…. BLM has completely failed to meet such requirements by asserting, "The major threat to this ACEC is degradation of water quality due to surface disturbances in the Collar Gulch and Chicago Gulch watershed."*

## Leroux, Jocelyn (Western Watersheds Project)

Issue Text Excerpt: *The best available science is clear as detailed in WWP's scoping comments: livestock grazing exacerbates the negative impacts of climate change on soils, vegetation, water quality, water temperature, stream function and thus the host of associated aquatic and terrestrial wildlife species. For BLM to ignore these impacts by expanding livestock grazing is directly opposing issue number one which prompted the need for this RMP revision:*

## Summary:

The BLM failed to consider the best available science and the opinions and recommendations of other independent experts during the formulation of the PRMP/FEIS specific to the following topics:

- Analyzing impacts on soils, vegetation, water quality, and other resource values from grazing
- Using correct acreages for the analysis and properly identifying property boundaries
- Considering actions to limit water withdrawals based on a volume of 3 cubic feet in Collar Gulch
- Reaching a scientific-based conclusion regarding threats to Collar Gulch

## Response:

CEQ regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

The Lewistown PRMP/FEIS includes a bibliography (see the references section in Volume I of the PRMP/FEIS), which lists information considered by the BLM in preparation of the Lewistown PRMP/FEIS. The BLM reviewed existing literature and considered literature submitted during the comment period for the Lewistown Draft RMP/Draft EIS, and determined there was no new additional information that would result in changes to management direction related to actions described above in the Lewistown PRMP/FEIS. The BLM relied on high-quality information, professional knowledge, and the best available data in preparation of the Lewistown PRMP/FEIS.

The BLM consulted with, and collected and incorporated data from, interdisciplinary staff and other agencies and sources, including but not limited to the USFWS and Montana Fish, Wildlife and Parks, and relied on numerous data sources and scientific literature to support its description of baseline conditions (PRMP/FEIS, Chapter 3; AMS 2019) and impact analysis (PRMP/FEIS, Chapter 4). A list of information and literature used is contained in the references section found in Volume I beginning on page 4-233 of the PRMP/FEIS.

Data from geographic information systems were used in developing acreage calculations and for generating many of the figures. Most calculations in this RMP are rounded, including those for Collar Gulch. Given the scale of the analysis, the compatibility constraints between datasets, and the lack of data for some resources, all calculations are approximate and were used to serve for comparison and analytic purposes only. Cadastral surveys are not practical to determine property boundaries at the land use planning scale.

Environmental consequences described in Chapter 4 and errata specific to Collar Gulch were based on scientific literature, as well as professional knowledge of interdisciplinary staff and other agencies. In addition to the referenced *Applied Geochemistry* (2015) publication, the BLM also considered a number of other sources that describe threats to WSCT. For example, one additional source cited in the reference section (Bear et al. 2007) suggests WSCT are particularly susceptible to stream temperature increases associated with anthropogenic habitat disturbance (Lewistown PRMP, page R-10). Montana Fish, Wildlife and Parks and the Montana Natural Heritage Program currently list sedimentation and warming water temperatures due to poor grazing practices, logging, mining, agriculture, and residential development as one of four primary threats to WSCT.[1] The glossary (G-25) contains a definition of surface disturbance and surface-disturbing activities, which would include impacts from fire and other sources.

The BLM properly evaluated and appropriately reached a conclusion as to BLM-imposed limitations of water withdrawals in Collar Gulch. This action is considered as part of the No Action Alternative because it is an existing decision described verbatim from the Judith RMP (1994), page 31. The action is clearly defined on page U-34 in Alternative A. A range of alternative actions was developed and considered to best manage all relevant and important resource values within Collar Gulch, including withdrawal of water. Analysis of this management action is compared (pp. 4-182–184). The Lewistown PRMP does not contain this management action.

The Lewistown PRMP establishes continuation of the current stocking rates. Any allowances for increased stocking rates would be based on a site-specific analysis conducted at the allotment scale. It would include an analysis, where present, of the impacts of climate change on soils, vegetation, water quality, water temperature, and stream function and, thus, the host of associated aquatic and terrestrial wildlife species. An alternative to reduce the stocking rate across the Planning Area was also considered in Alternative B. The Lewistown PRMP does not increase acreage available to grazing.

---

[1] Westslope Cutthroat Trout, Montana Field Guide. Montana Natural Heritage Program and Montana Fish, Wildlife and Parks. April 29, 2020. Online: http://FieldGuide.mt.gov/speciesDetail.aspx?elcode=AFCHA02088.

As a result of these actions, the BLM gathered the necessary data essential to make a reasoned choice among the alternatives analyzed in detail in the PRMP/FEIS, and provided a sufficient analysis that led to an adequate disclosure of the potential environmental consequences of the alternatives (PRMP/FEIS, Chapter 4). Consequently, the BLM has taken a "hard look," as required by NEPA, at the environmental consequences of the alternatives in the PRMP/FEIS to enable the decision-maker to make an informed decision. Finally, the BLM has made a reasonable effort to collect and analyze all available data at the appropriate scale required for a land use planning effort.

The BLM considered and appropriately applied the best available science and the opinions and recommendations of internal and other independent experts during the formulation of the PRMP/FEIS. Accordingly, this protest is denied.

## ENDANGERED SPECIES ACT

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The RMP approves of management actions which adversely affect species listed or proposed for listing under the Endangered Species Act (ESA) in violation of that Act-and without undertaking consultation with the U.S. Fish and Wildlife Service as required under the ESA. Violation of that Act-and without undertaking consultation with the U.S. Fish and Wildlife Service as required under the ESA.*

### Summary:

The BLM failed to adequately complete consultation under the ESA for the Lewistown PRMP/FEIS.

### Response:

Section 7(a)(2) of the ESA requires federal agencies to ensure that their proposed actions will not be "likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of the critical habitat of such species" (16 United States Code 1336(a)(2)).

In determining whether a proposed action "may affect" a listed species, or, conversely, whether there will be "no effect," a federal agency must determine what activities are encompassed by its proposed action, what the effects of those activities are likely to be on the environment, and whether those effects will "pose any effect" on a listed species or critical habitat. Only those proposed actions that "may affect" a listed species or critical habitat are subject to the ESA's Section 7 consultation requirements.

Consistent with Section 7 of the ESA, when an action agency determines that a federal action will have no effect on listed species or critical habitat, the agency will make a "no effect" determination. In that case, the ESA regulations do not require concurrence from the USFWS, and the agency's obligations under Section 7 are complete. On May 20, 2020, the USFWS acknowledged the BLM's "no-effect" determination for Canada lynx critical habitat based on the analysis contained in the biological assessment.

The Lewistown PRMP/FEIS includes a description of the BLM's compliance with Section 7 of the ESA in Section 1.5.4, USFWS Consultation. The BLM conducted informal consultation with the USFWS under Section 7(a)(2) of the ESA throughout the planning process. On May 20, 2020, the BLM received concurrence from the USFWS that the Lewistown PRMP *may affect but is not likely to adversely affect* the threatened grizzly bear, threatened Canada lynx, threatened piping plover, and endangered pallid sturgeon. The concurrence concluded informal consultation pursuant to the regulations implementing Section 7(a)(2) of the ESA (50 CFR 402.13).

Additionally, land use planning-level decisions are broad in scope and do not result in on-the-ground actions, such as approving an application to drill or plan of operations. Consequently, future

environmental analysis and Section 7 consultation for such projects will occur on a project-by-project basis.

The BLM developed the Lewistown Proposed RMP and FEIS in full compliance with the ESA. Accordingly, this protest is denied.

## FISH, WILDLIFE, AND SPECIAL STATUS SPECIES

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects on wildlife, in violation of NEPA. The RMP fails to sufficiently prioritize protection of habitat to maintain viable populations of wildlife species, ignores important biological science on species and ecological relationships in violation of NEPA, fails to recognize and protect the unique values of old-growth forests, and does not present the balanced approach FLPMA requires for consideration of the ecological and social values of wildlife.*

### Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *The Agency Fails To Protect Sage Grouse Habitat from Undue Degradation by Allowing Future Oil and Gas Leasing in Priority and General Habitat. In order to meet NEPA's scientific integrity standards, the requirements of BLM's Sensitive Species policy, and address the "inadequacy of regulatory mechanisms identified by the USFWS in their 2010 listing rule for the greater sage grouse, federal agencies need to adopt in its plan amendments and revisions conservation measures that are biologically effective according to the best available science. Adopting conservation standards that are inconsistent with the recommendations of the agencies' own experts will reveal the final decision to be arbitrary and capricious and an abuse of discretion.*

Issue Text Excerpt: *Overall, BLM must prioritize leasing outside of sage-grouse habitat, as required by the 2015 sage grouse plans. Under the 2015 Rocky Mountain ROD, BLM must: prioritize oil and gas leasing and development outside of identified Priority Habitat Management Areas (PHMA) and General Habitat Management Areas {GHMAs). This is to further limit future surface disturbance and encourage new development in areas that would not conflict with GRSG. This objective is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.*

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Excerpt Text: *NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically-based cumulative effects analysis area. The FEIS (Chapters 3 and 4) does not analyze or disclose cumulative impacts on (multiple species*), in violation of NEPA.*

*\*Grizzly Bear, pileated woodpecker/cavity nesting denning species, northern goshawk, pine marten, Canada lynx, wolverine,*

Issue Excerpt Text: *The FEIS (Chapters 3 and 4) fails to consider best available science concerning the pileated woodpecker and other cavity nesting/denning species, in violation of FLPMA and NEPA.*

Issue Excerpt Text: *The FEIS (Chapters 3 and 4) fails to consider best available science concerning elk, in violation of FLPMA and NEPA. NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically-based cumulative effects analysis area. The FEIS (Chapters 3 and 4) does not sufficiently analyze or disclose cumulative impacts on the elk, in violation of NEPA.*

Issue Excerpt Text: *NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically-based cumulative effects analysis area. The FEIS (Chapters 3 and 4) does not analyze or disclose cumulative impacts on the black-backed woodpecker, in violation of NEPA.*

Issue Excerpt Text: *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects on aquatic and riparian dependent species in violation of NEPA. The RMP fails to sufficiently prioritize protection of habitat to maintain viable populations of aquatic and riparian dependent species, ignores important biological science on species and ecological relationships in violation of NEPA, and does not present the balanced approach FLPMA requires for consideration of the ecological and social values of aquatic and riparian dependent species. In addition, the RMP approves of actions adversely affecting bull trout-a species listed the Endangered Species Act (ESA) in violation of that Act-and without undertaking consultation with the U.S. Fish and Wildlife Service as required under the ESA.*

Issue Excerpt Text: *NEPA requires analysis of the impacts on wildlife of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically-based cumulative effects analysis area. The FEIS (Chapters 3 and 4) does not analyze or disclose such cumulative impacts. Schultz (2010) concludes that "the lack of management thresholds allows small portions of habitat to be eliminated incrementally without any signal when the loss of habitat might constitute a significant cumulative impact." The RMP fails to recognize thresholds for population viability.*

Issue Excerpt Text: *The FEIS (Chapters 3 and 4) fails to consider best available science concerning the grizzly bear. The RMP (Chapter 2) does not provide sufficient direction to protect aspects of grizzly bear habitat to in order to maintain and restore population viability.*

Issue Excerpt Text: *The FEIS (Chapters 3 and 4) fails to consider best available science concerning wolverine. The RMP (Chapter 2) does not provide sufficient direction to protect aspects of wolverine habitat to in order to maintain and restore population viability.  Since the FEIS/RMP is inconsistent with the best available science, it violates the ESA, FLPMA and NEPA.*

Issue Excerpt Text: *NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically-based cumulative effects analysis area. The FEIS (Chapters 3 and 4) does not analyze or disclose cumulative impacts on the fisher, in violation of NEPA.*

## Leroux, Jocelyn (Western Watersheds Project)

Issue Excerpt Text: *BLM fails to adequately protect habitat for greater sage-grouse in the PRMP/FEIS. BLM should rely on best available science rather than an inadequate sage-grouse plan if they intend to avoid unnecessary and undue degradation. Greater sage-grouse are indicator species for the sagebrush ecosystems, and their declining numbers tell us that BLM has not been managing the plan area in a manner consistent with protecting and conserving natural resources, and thus a PRMP that increases impacts from livestock grazing and energy development is a violation under FLPMA.*

Issue Text Excerpt: *BLM failed to include any specific management objectives and actions for predators and carnivores in the plan area. However, as WWP pointed out in our comments "wolves are a native species that is still recovering in the LBLM planning area" (p. 22). These populations are expanding eastward and "wolves are often killed as a result of management actions and in some cases relating to depredation of livestock on public lands" (p. 22). Yet, BLM failed to include any mention of wolves.  In addition, BLM fails to comprehensively address how grizzly bears will be managed when it comes to livestock grazing.*

**Summary:**

The BLM fails:

- To protect greater sage-grouse (GRSG) habitat from undue degradation by allowing future oil and gas leasing in priority and general habitat, which is necessary in order to meet NEPA's scientific integrity standards, meet the requirements of the BLM's sensitive species policy, and address the inadequacy of regulatory mechanisms identified by the USFWS in its 2010 listing rule for the greater sage-grouse.

- To consider best available science concerning fish and wildlife species. The RMP (Chapter 2) does not provide sufficient direction to protect aspects of fish and wildlife habitat to maintain and restore population viability. Since the PRMP/FEIS is inconsistent with the best available science, it violates the ESA, FLPMA, and NEPA. NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions on land of all ownerships in a scientifically based cumulative effects analysis area.

- To analyze or disclose cumulative impacts on fish and wildlife habitat, in violation of NEPA.

**Response:**

*Protection of Greater Sage-Grouse Habitat:*

The BLM is protecting GRSG habitat from undue degradation by carrying forward conservation measures to address the inadequacy of regulatory mechanisms identified by the USFWS in its 2010 listing rule for the GRSG and is considering best available science concerning fish and wildlife species.

A primary objective of the BLM's special status species policy is to initiate proactive conservation measures that reduce or eliminate threats to BLM sensitive species and minimize the likelihood of and the need for listing of the species under the ESA (Manual 6840.02.B). Manual 6840 directs the BLM to "address Bureau sensitive species and their habitats in land use plans and associated NEPA documents" when engaged in land use planning with the purpose of managing for the conservation (Manual 6840.2.B). This policy, however, acknowledges that the implementation of such management must be accomplished in compliance with existing laws, including the BLM multiple-use mission, as specific in the FLPMA (Manual 6840.2).

Since fluid mineral development was not addressed in the 2015 Approved Plan Amendment for Lewistown, the Lewistown PRMP includes a no surface occupancy (NSO) stipulation for oil and gas leasing within PHMA and a NSO stipulation near leks in GHMA, and a controlled surface use stipulation for all areas outside of lek buffers in GHMA habitats. These further prevent unnecessary or undue degradation to habitats associated with GRSG. Stipulations in PHMA and GHMA further encourage lessees to acquire leases outside of GRSG PHMA due to fewer restrictions in those areas than in higher priority habitat management areas. In addition, the BLM will continue to work with parties who file expressions of interest and potential lessees to voluntarily prioritize leasing in less-sensitive areas. Consistent with the GRSG plans, however, parcels may be leased within GRSG habitat management areas without first leasing parcels in non-habitat areas.

The BLM's Land Use Planning Handbook (Handbook 1601-1) also provides guidance for developing the management decisions for sensitive species that "result in a reasonable conservation strategy for these species," and "should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans" (Handbook 1601-1, Appendix C, p. 4). The handbook indicates that management decisions "may include identifying

stipulations or criteria that would be applied to implementation actions" (Handbook 1601-1, Appendix C, p. 4).

*Best Available Science for Greater Sage-Grouse*

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewiston RMP.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

CEQ regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The Lewistown PRMP/FEIS incorporates relevant baseline information and studies about GRSG, including the National Technical team (NTT) report, and conservation measures to address GRSG and its habitat for all alternatives. A complete list of all past, present, and reasonably foreseeable management actions is included in Appendix W, Table W-2.

The BLM developed the Lewistown PRMP/FEIS applying the principles of "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012). Please see response in section heading *Best Available Science*.

*Cumulative Impacts for Wildlife*

The BLM must discuss the cumulative effects of the proposed action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The CEQ regulations define cumulative effects as ". . . the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions, the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. Appendix W: Analysis Assumptions and Cumulative Effects Scenario (Volume III of the PRMP/FEIS) provides a list of past, present, and reasonably foreseeable projects, plans, or actions that comprise the cumulative effects scenario. Projects and activities identified as having the greatest likelihood to generate potential cumulative effects on fish and wildlife species when added to RMP alternatives are displayed in Table W.2 (pp. W-9 to W-14 of the PRMP/FEIS).

The FEIS/RMP is consistent with the best available science, and does not violate the ESA or FLPMA. The FEIS also complies with NEPA by analyzing the impacts of past, ongoing, and foreseeable management

actions on lands of all ownerships in a scientifically based cumulative effects analysis area. Accordingly, this protest is denied.

## GENERAL (INCLUDES FLPMA, NEPA, MONITORING AND ADAPTIVE MANAGEMENT, MULTIPLE USE, AND UNNECESSARY AND UNDUE DEGRADATION)

### Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *The FEIS violates FLPMA because it fails to prevent unnecessary or undue degradation of the PHMA and GHMA lands being offered for lease. One of the key requirements of the 2015 Sage-grouse Plans was that the BLM "when authorizing third-party actions that result in GRSG habitat loss and degradation, the SLM will require and ensure mitigation that provides a net conservation gain... to the species." The FEIS states that under Alternatives CI and C2, "PHMA would be open to new mineral material sales for both free and commercial use...effects could result in greater level of sage-grouse avoidance and disturbance, and habitat fragmentation or removal than the other alternatives." …The Plan expressly required such mitigation when oil and gas development is authorized In PHMA and GHMA, and the FEIS, contrary to established law, fails to adequately protect PHMA and GHMA.*

### Enk, Micheal/Kerr, Rick

Issue Text Excerpt: *In accordance with this multiple use management mandate, it is the statutory duty of BLM to prepare a management plan that provides and maintains opportunities for a variety of uses. The BLMs mandate to manage our public lands for multiple use and sustained yield requires consideration of a host of natural and cultural resources. This means that while some areas may be set aside for oil and gas development and associated infrastructure, other areas must be managed for other resources, including wilderness characteristics. Under the proposed alternative C2, the BLM is proposing to manage zero acres for wilderness characteristics.*

Issue Text Excerpt: *The plan is heavily skewed in favor of allowing any potential energy development that may arise in the future.... By any reasonable measure, Alternative C2 cannot be construed as a balanced management plan because it gives energy development priority over all other uses. While most leases in low-potential areas are not likely to be developed, their presence impedes meaningful conservation of other important resources. Whether areas are leased in the hope that energy prices will rise, or developers believe new ways to extract marginal energy will be found, or because they want to make their portfolios appear more valuable, speculative leasing skews multiple use management.*

Issue Text Excerpt: *The Lewistown RMP needs to be modified to restore some semblance of balance to its proposed management direction. That requires that a significant portion of the over 200,000 wilderness-quality acres be managed for their wilderness characteristics. This decision to manage zero acres in the planning area for their wilderness characteristics was made in the context of a landscape that has no designated Wilderness areas on any BLM lands in central and eastern Montana. The BLM failed its multiple use mandate by not proposing to manage any of the 200,000 acres identified as Lands with Wilderness Characteristics for those wilderness values. Instead, the BLM opened over 90 percent of the planning area and all the lands identified as having wilderness characteristics to energy development and associated infrastructure. In doing so, it precludes for all practical purposes, managing these lands for their wilderness characteristics with the option of applying designations to protect those characteristics.*

### Leroux, Jocelyn (Western Watersheds Project)

Issue Excerpt Text: *The RMP does not explain how it complies with provisions of FLPMA or its implementing regulations. The Objectives, Goals, Management Actions and other RMP components are not well-defined, do not properly restrain ecologically damaging management, and do not provide accountability mechanisms for managers-violating NEPA and FLPMA.*

Issue Excerpt Text: *The RMP fails to include a monitoring program, in violation of FLPMA.*

Issue Excerpt Text: *FLPMA Requires the BLM Take Any Action Necessary to Prevent Unnecessary or Undue Degradation  The FLPMA declares that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. §1701(a)(8).  The FLPMA further mandates that the Secretary of Interior shall take any action necessary to prevent "unnecessary or undue degradation" of public lands. 43 U.S.C. § 1732(b).1….The FLPMA definition of "multiple use" calls for "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." See 43 U.S.C. § 1702(c)(emphasis added). If a particular use is incompatible with the productivity of the land and quality of the environment, the BLM is required to exclude such use.  This prohibition on permanent impairment of the environment in FLPMA's definition of multiple-use is unique and purposeful… BLM has not taken the necessary steps to avoid unnecessary and undue degradation as is outlined by resource below. BLM fails to comply with FLPMA in reducing unnecessary and undue degradation for all resources.*

## Jennings, Charles

Issue Text Excerpt: *I am protesting BLM's failure to comply with it's Multiple Use mandate. In contrast to to the Lewistown Administrative Draft RMP - Alternative D (preferred) which allowed oil and gas leasing on some lands while proposing that over 100,00 acres of these lands be protected to preserve wilderness characteristic, this new plan runs roughshod over the original plan which was developed with regional public comment and local expertise within this region. Please reconsider this top down plan and return to the original draft RMP, alternative D, which complies with your Multiple Use Mandate.*

## Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The BLM Failed to Provide a "Hard Look" at the Actions for the LFO and BFO Plan Area The fundamental purpose of NEPA is to ensure that federal actions receive appropriately detailed environmental review. 42 U.S.C. § 4332.  Here, the BLM did not provide a hard look at the impacts of the proposed action on the various natural and cultural resources in the plan area, even where public comments during the planning process revealed the agency's failure. In the PRMP/FEIS, significant issues were not disclosed, conclusions about rangeland health are unsupported, and, to a large degree, the current and site- specific conditions of the ecosystems and species in the plan area are not available.  The FEIS did not adequately consider and discuss all relevant information or respond to opposing scientific viewpoints.*

Issue Text Excerpt: *However the RMP/FEIS fails to describe any monitoring activities. This violates planning regulations at 43 CFR §?1610.4-9  In failing to provide any details of what exactly is to be monitored, or how it is to be monitored, the RMP violates FLPMA.*

Issue Text Excerpt: *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects of management actions on soil productivity and integrity, in violation of NEPA. The RMP does not present the balanced approach FLPMA requires for consideration of protecting soils.*

## Kotysinski, Tom

Issue Text Excerpt: *My concern is that the plan does not adequately recognize wilderness values, as was the case in the draft plan. It appears as though the plan opens nearly all lands to resource development. I would object to that. The law requires BLM exercise multiple use in its management and I don't see where wildlands, roadless areas and wilderness values are adequately addressed.*

**Steinmuller, Patti**

Issue Text Excerpt: *Omission of Wilderness Characteristics. Additionally, although wilderness is a multiple use, no areas with wilderness characteristics were noted in this RMP even though in 2016 the BLM's Lewistown Field Office identified 200,000 acres as having wilderness characteristics, places that include West Crooked Creek, Dovetail, Cottonwood, Carter Coulee, Horse Camp Trail, and many others. Thus, the RMP has failed to meet the multiple-use requirement.*

Issue Text Excerpt: *Economic and Environmental Concerns. With oil at record low prices, the return on investment for oil and gas drilling is no match for the loss to the public of these irreplaceable intact prairie grasslands and their value of hunting, wildlife habitat, and public recreation. The Lewistown RMP demonstrates that the BLM has abandoned its multiple-use mandate, jeopardized the local economy, and disregarded public stakeholder input and values of public land ownership. I advocate for rejection of this RMP and return to the multiple use mandate by the BLM and Lewistown Field Office.*

**Summary:**

- The BLM does not explain how the PRMP/FEIS complies with the provisions of FLPMA or its implementing regulations.

- The PRMP/FEIS fails to include a monitoring program, in violation of FLPMA and monitoring and evaluation requirements outlined in 43 CFR 1610.4-9.

- The BLM failed to comply with its multiple-use mandate and its statutory duty to prepare a management plan that provides and maintains opportunities for a variety of uses on BLM-administered lands.

- Management actions in the Lewistown Proposed RMP and FEIS (BLM 2020) would result in unnecessary or undue degradation of public lands, which violates FLPMA.

**Response:**

Section 302(b) of FLPMA requires that "in managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." In developing the PRMP/FEIS, the BLM complied with its planning regulations (43 CFR 1610), the requirements of NEPA, and other statutes, regulations, and executive orders related to environmental quality. For example, the PRMP incorporates provisions from Standards and Guidelines for Rangeland Health that prevent unnecessary and undue degradation specific to livestock grazing. The PRMP/FEIS further identifies appropriate allowable uses, management actions, and other mitigation measures that prevent the unnecessary or undue degradation of public lands. Congress recognized that through the BLM's multiple-use mandate, there would be conflicting uses and impacts on the public land. Because the PRMP/FEIS would not specifically authorize any uses of public lands, and the alternatives evaluated in the FEIS comply with all applicable statutes, regulations, and policies, the PRMP/FEIS will not result in "unnecessary or undue degradation of the lands" under Section 302(b) of FLPMA.

The BLM is a multiple-use agency and under FLPMA, managing for multiple uses means managing resources so that they are "utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources . . . [and] the use of some land for less than all of the resources . . . with consideration being given to the relative value of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit of output." It is simply a recognition that not all uses are compatible and should be separated and managed accordingly.

Through the land use planning process, the BLM evaluates and chooses an appropriate balance of resource uses, which involves trade-offs between competing uses. The BLM has wide latitude to allocate the public lands to particular uses, including conservation values, and to employ the mechanism of land use allocation to protect for certain resource values, or, conversely, develop some resource values to the detriment of others, short of unnecessary or undue degradation. Likewise, the Lewistown PRMP/FEIS is not inconsistent with the statement of congressional policy contained in FLPMA Section 102(a)(12), simply recognizing that minerals, food, timber, and fiber are part of the BLM's multiple-use mission. All alternatives considered in the Lewistown PRMP/FEIS, as described in Chapter 2 (Volume 1, pp. 2-8 to 2-56), provide an appropriate balance of uses on the public lands. All alternatives allow some level of all uses present in the Planning Area, in a manner that is consistent with applicable statutes, regulations, and BLM policy. Consequently, the Lewistown PRMP/FEIS is consistent with the multiple-use and sustained yield management requirement in FLPMA Section 302(a), which provides "[t]he Secretary shall manage the public lands under the principles of multiple use and sustained yield, in accordance with the land use plans . . . except that where a tract of such public land has been dedicated to specific uses according to any other provision of law it shall be managed in accordance with such law."

The Lewistown Proposed RMP and FEIS (BLM 2020) provides for the balanced management of the public lands in the Planning Area, as discussed below. In developing the Lewistown PRMP and FEIS, the BLM fully complied with its planning regulations (43 CFR 1610), the requirements of NEPA, and other statutes, regulations, and executive orders related to environmental quality.

BLM policy directs offices to identify land use plan implementation priorities within 1 year of signing the record of decision (BLM Instruction Memorandum 2013-14). As stated in Appendix D, this policy will be used to monitor implementation of the revised Lewistown RMP unless directed otherwise by new guidance in the future. "Establishing Implementation Priorities for Land Use Plans" involves a three-step process. The first step is identifying the work associated with implementing the land use plan, the geographic location of work in the Planning Area, and the accompanying program elements that measure that work. During the second step, the priority of the work identified in step one is recorded in a plan implementation worksheet, which is updated annually. In step three, the field office schedules work into the out-years in the relevant columns of the plan implementation worksheet.

Regulations at 43 CFR 1610.4-9 direct that the Proposed Plan establish intervals and standards, as appropriate, for monitoring and evaluating the plan, based on the sensitivity of the resource decisions involved. The BLM periodically reviews the progress in meeting the plan objectives and adhering to the management framework established by the plan. CEQ regulations implementing NEPA state that agencies may provide for monitoring to ensure that their decisions are carried out, and they should do so in important cases (40 CFR 1505.2(c)).

Appendix D of the Lewistown PRMP and FEIS describes activities intended to assist the BLM to monitor implementation and effectiveness of RMP decisions. Implementation and effectiveness monitoring must be carried out as part of land use planning (43 CFR 1610.4-9), but this kind of monitoring relates to the intervals and general standards for monitoring, not detailed information for guiding adaptive management activities under the plan. The BLM will address monitoring and adaptive management of resources through adaptive management strategies on a project-level/site-specific basis as needed to inform decision-making and allow adjustments to the plan (see FEIS, Appendix D). The record of decision will also include a section on monitoring.

Accordingly, this protest is denied.

# LANDS WITH WILDERNESS CHARACTERISTICS

## Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *This statement asserts, rather than meaningfully analyzes, that the different activities allowed under each alternative would not actually differ in terms of potential future direct, indirect, and cumulative impacts on the wilderness resources in the planning area. There are indeed differences in proposed management between the alternatives with regard to VMR classes and OHV travel. First, in regards to VRM restrictions, the BLM's assertion here is misleading at best, and incorrect at worst, both of which violate NEPA. The proposed plan, Alternative C2, does not comport with the stated conclusion because it does not manage all LWC units with VRM Class I or II protections. While the agency may argue that its Backcountry Conservation Area (BCA) designation for the Crooked Creek complex and its VRM Class II management for those units - including Horse Camp Trail, Spear Coulee, and the Chain Buttes - satisfies here, the agency fails to actually explain how BCA management and its VRM will protect the wilderness characteristics, especially because Alternative C2 specifically does not manage to protect wilderness character at all.*

Issue Text Excerpt: *The direct, indirect, and cumulative impacts of allowing motorized travel and potential expansion of such travel in LWC identified units is much greater than under Alternative B, but the BLM fails entirely to discuss these reasonably foreseeable future impacts. (The agency's commitment to roadwork on routes that have not received adequate NEPA analysis is also deeply troubling.}*

Issue Text Excerpt:  *BLM fails entirely to discuss impacts of unit boundary roads, and analyze any negative impacts of road spurs and associated OHV travel impacts on wilderness characteristics specifically. BLM errs in categorically asserting that the topography of the LWCs will limit access and therefore impacts on wilderness character.*

Issue Text Excerpt: *In short, FLPMA and BLM's own manuals obligate BLM to undertake a robust, consistent, coordinated and transparent analysis of the impacts of its land use plans on Lands with Wilderness Characteristics. Unfortunately, BLM's Final EIS and Proposed RMP fails to adhere to these standards.  In addition, the National Environmental Policy Act (NEPA) requires BLM take a "hard look" at the direct, indirect, and cumulative environmental impacts of its Lewistown Resource Management Plan Amendments, and disclose those impacts to the public. 42 U.S.C. § 4332(2)((); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 {1989) . Taking a "hard look" requires "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." California v. Block, 690 F. 2d 7 53, 761 {9th Cir. 1982}. The hard look doctrine bars "[g]eneral statements about 'possible effects' and 'some risk' ...  absent a justification regarding why more definitive information could not be provided." Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998).*

Issue Text Excerpt: *Finally, Conservation Groups protest the unlawful cumulative impacts analysis found on page 4-126. The FEIS states: "[Cumulative] Effects would depend on the amount of minerals, renewable energy, vegetation treatments, and ROW development in lands being managed to protect wilderness characteristics." pg. 4-126. This statement, which summarizes the presented analysis, fails entirely to quantify all of the potential impacts of anthropogenic sources in the identified LWC units.*

Issue Text Excerpt: *In terms of impacts on wilderness characteristics specifically, the analysis for the proposed Alternative C2 reads: "Of the areas open, 42,600 acres would be subject to fluid minerals NSO stipulations, which would prohibit surface occupancy and surface disturbance. This would protect the wilderness characteristics in these areas." Pg. 4-123. This statement implies that the 42,600 acres subject to NSO stipulations are all areas with identified wilderness character. This is patently untrue. Only a few LWC units - including the small Dog Creek South - would have NSO protections. While NSO stipulations may protect the wilderness characteristics of those few units, the vast majority of identified LWC units - including key connected landscapes adjacent to the Charles M. Russell National Wildlife Refuge like Carter Coulee, Horse Camp Trail,*

*Spear Coulee, the Chain Buttes, Dunn Ridge, Dovetail, Armells Creek, Drag Creek, Blood Creek, Biggett, and Cottonwood - would not be managed with NSO stipulations, and the agency fails to accurately and meaningfully account for the impacts to those units.*

## Enk, Micheal

Issue Text Excerpt: *I am protesting the BLMs failure to seriously consider predominant public comment that sought greater protection of units having wilderness characteristics.*

Issue Text Excerpt: *The BLM failed its multiple use mandate by not proposing to manage any of the 200,000 acres identified as Lands with Wilderness Characteristics for those wilderness values. Instead, the BLM opened over 90 percent of the planning area and all the lands identified as having wilderness characteristics to energy development and associated infrastructure. In doing so, it precludes for all practical purposes, managing these lands for their wilderness characteristics with the option of applying designations to protect those characteristics. The Lewistown RMP needs to be modified to restore some semblance of balance to its proposed management direction. That requires that a significant portion of the over 200,000 wilderness-quality acres be managed for their wilderness characteristics. The designation of Recreation Management Areas and Backcountry Conservation Areas is inadequate and provides only superficial protection of their value as undeveloped wildlands.*

## Good, Mark

Issue Text Excerpt: *The 2016 Lewistown Administrative Draft RMP - Alternative D (Preferred Alternative), also allowed oil and gas leasing on most of the planning area, but at least this draft plan prepared by local Lewistown staff, proposed that over 100,000 acres of the 200,000 acres of land identified as LWCs, be managed to protect wilderness characteristics. This draft plan applies protective stipulations that would prevent energy development and associated infrastructure on these lands, therefore making speculative leasing much less attractive and allowing the BLM to manage these lands to protect their wilderness values. .No rationale was provided in either the 2019 Draft EIS RMP or 2020 Final EIS RMP as to why the BLM made the extreme decision to not manage any acres in the plan identified as LWCs to protect wilderness characteristics.*

Issue Text Excerpt: *The BLM has a statutory duty to prepare a management plan that provides and maintains opportunities for a variety of uses on BLM lands. That includes managing some lands for their wilderness characteristics. The BLM failed its multiple use mandate by not managing a single acre of the 200,000 acres identified as Lands with Wilderness Characteristics, for their wilderness characteristics. Instead, the BLM made over 90 percent of the planning area and all the lands identified as having wilderness characteristics open to energy development and associated infrastructure. In doing so, it precludes, for all practical purposes, managing these lands for their wilderness characteristics and the option of applying protective designations to protect wilderness characteristics. The Lewistown RMP needs to be modified so it is more balanced. That means managing a significant portion of the over 200,000 acres of land identified LWCs, for wilderness characteristics.*

## Kerr, Rick

Issue Text Excerpt: *As proposed, over 90 percent of the surface management area will be managed to allow oil and gas leasing even though there are almost no areas within the planning area with high potential for oil and gas development. The potential for recovery in areas with high wilderness and wildlife values such as the areas identified as having wilderness characteristics ranges from very low or non-existent. By any reasonable measure, Alternative C2 cannot be construed as a balanced management plan.*

Issue Text Excerpt: *The BLMs mandate to manage our public lands for multiple use and sustained yield requires consideration of a host of natural and cultural resources. This means that while some areas may be set aside for oil and gas development and associated infrastructure, other areas must be managed for other resources, including wilderness characteristics. Under the proposed alternative C2, the BLM is proposing to manage zero acres for wilderness characteristics.*

Issue Text Excerpt: *The BLM has a statutory duty to prepare a management plan that provides and maintains opportunities for a variety of uses on BLM lands. That includes managing some lands for their wilderness characteristics. The BLM failed its multiple use mandate by not managing a single acre of the 200,000 acres identified as Lands with Wilderness Characteristics, for their wilderness characteristics. Instead, the BLM made over 90 percent of the planning area and all the lands identified as having wilderness characteristics open to energy development and associated infrastructure. In doing so, it precludes, for all practical purposes, managing these lands for their wilderness characteristics and the option of applying protective designations to protect wilderness characteristics. The Lewistown RMP needs to be modified so it is more balanced.*

**Summary:**

In regards to lands with wilderness characteristics, the BLM failed to:

- Consider the effects on lands with wilderness characteristics
- Protect lands with wilderness characteristics
- Follow its policy when determining whether to manage lands with wilderness characteristics for wilderness character

**Response:**

Section 102(a)(7) of FLPMA declares that it is the policy of the US that management of the public lands be on the basis of "multiple use" and "sustained yield." Section 103(c) of FLPMA defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. Congress recognized that through the BLM's multiple-use mandate, there would be conflicting uses and impacts on the public lands.

FLPMA clarifies that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary of the Interior can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use . . ." (FLPMA, Section 103(c)). Further, FLPMA directs that the public lands be managed in a manner "that, where appropriate, will preserve and protect certain public lands in their natural condition" (FLPMA, Section 102(a)). FLPMA authorizes the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, among the various resources in a way that provides for current and future generations. BLM Manuals 6310 and 6320 provide guidance in maintaining information regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under NEPA. Specifically, BLM Manual 6320 requires the BLM to ensure that "wilderness characteristics inventories are considered and that, as warranted, lands with wilderness characteristics are protected in a manner consistent with this manual in BLM planning processes" (Manual 6320, Section .04(c)(2)).

The BLM conducted the analysis of lands with wilderness characteristics in the PRMP/FEIS in accordance with BLM Manual 6320, including analysis of both the benefits to and negative impacts on wilderness characteristics from a variety of planning decisions across all alternatives (see Section 4.2.10). Considering wilderness characteristics in the land use planning process may result in several outcomes, including, but not limited to, (1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses, while applying management restrictions (e.g., conditions of use and mitigation measures) to reduce impacts on wilderness characteristics; or (3) prioritizing the protection of wilderness characteristics over other multiple uses (BLM Manual 6320).

Appendix M and the Revised Area Profile (AMS 2019) of the Lewistown PRMP and FEIS (BLM 2020) describes the methodology used for determining lands with wilderness characteristics, which includes consideration of guidance from BLM Manuals 6310 and 6320 (see FEIS, pp. 202 and 203). As discussed in that section, 202,400 acres on BLM-administered lands in the Planning Area met the criteria for lands with wilderness characteristics. The Lewistown PRMP/FEIS fully analyzed an alternative (Alternative B) that would manage and protect wilderness characteristics on all 202,400 acres that were identified as meeting the criteria for lands containing wilderness characteristics. A comparison of estimated effects and trade-offs associated with the alternatives led to development and selection of the Proposed Plan (see Lewistown PRMP/FEIS, Section 4.2.10, pp. 4-119 to 4-126). Additional analysis is described for each management action associated with wilderness characteristics by alternative in Appendix U (pp. U-26 and U-27) of the PRMP/FEIS.

Many areas with wilderness characteristics would still be managed to maintain the intact and undeveloped nature of these areas, particularly areas that are used for wildlife-dependent recreation. For example, under Alternative C2, 93,400 acres of lands with wilderness characteristics in the Crooked Creek Area would be managed as a BCA. BCA management includes visual resource management Class II, ROW avoidance, RDFs (p. F-12), and fluid mineral stipulations (p. L-40) that address structural developments, surface disturbance, and surface-disturbing activities that are all indicators of impacts on lands with wilderness characteristics. Impacts on lands with wilderness characteristics, such as surface disturbance, structural developments, and human activity, are further described in Section 4.2.10 of the Lewistown PRMP/FEIS (see FEIS, pp. 4-119 to 4-126) and Appendix W (pp. W-69 to W-72).

Under Alternative C2 of the PRMP, the BLM would not manage lands to protect wilderness characteristics; instead, it would manage to prioritize other multiple uses, while applying some management restrictions to minimize impacts on wilderness characteristics, when and where possible.

FLPMA does not require that all uses be allowed on all areas of the public lands. Through the land use planning process, the BLM evaluates and chooses an appropriate balance of resource uses, which involves trade-offs between competing uses.

The BLM followed its regulations and policies when determining what lands to consider for lands with wilderness characteristics classification in the PRMP/FEIS. The BLM properly analyzed the effects of the Proposed Plan on lands with wilderness characteristics and fully complied with FLPMA in the Lewistown PRMP/FEIS. Accordingly, this protest is denied.

## LIVESTOCK GRAZING

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The FEIS fails to utilize the science concerning noxious weed spread from livestock grazing. The FEIS highly downplays the clear implication in scientific literature that livestock are a major vector for noxious weed spread. Historically, soil crusts occurred on almost all soil types in grasslands and shrublands. There is no RMP direction which actually protects and restores these critical biological crusts. The FEIS (Chapters 3 and 4) doesn't analyze or disclose the degree of noxious weed spread due to livestock grazing. It doesn't quantitatively estimate soil damage due to livestock grazing. It doesn't quantitatively estimate riparian habitat damage due to livestock grazing. It doesn't analyze or disclose the interaction between upland vegetation changes due to livestock grazing, fire behavior, and forest composition. The FEIS doesn't analyze or disclose the expected annual infrastructure maintenance and installation costs paid for by taxpayers for the benefit of livestock grazing.*

Issue Text Excerpt: *The FEIS fails to consider the environmental implications of recently proposed new grazing regulations, fails to consider best available science on the impacts of livestock grazing in violation of NEPA, and fails to adequately analyze and disclose direct, indirect, and cumulative environmental impacts of livestock*

*grazing on other resources and values, in violation of NEPA. The RMP does not present the balanced approach FLPMA requires for protection of other resources and values in consideration of the ecological and economic costs of livestock grazing….The FEIS (Chapters 3 and 4) fails to consider that the federal government has proposed new grazing regulations, which would weaken already inadequate protections for natural values on public lands.*

Issue Text Excerpt: *Appropriations for BLM and Forest Service grazing programs have exceeded grazing receipts by at least $120 million annually since 2002, according to the study.  This federal subsidy goes well beyond the direct costs and fees. There are vast indirect costs of grazing on public lands, including government killing of native carnivores and other wildlife. The FEIS doesn't analyze or disclose the costs and impacts of Wildlife Services destruction of wildlife species at the behest of grazing interests.*

## Leroux, Jocelyn (Western Watersheds Project)

Issue Text Excerpt: *Per WWP's previous comments regarding objectives and monitoring BLM was silent in the PRMP/FEIS. WWP stated that "in terms of livestock grazing, there is no information provided about how the BLM will ensure that riparian objectives are being met, how utilization standards are being met, how soils are being impacted by permitted grazing, etc. The DEIS should analyze a monitoring plan for grazing allotments in the planning area and the DRMP should propose a monitoring schedule that will be adhered to." (p.20). Instead, BLM stated that "to meet these requirements, the BLM will prepare periodic reports on the implementation of the RMP," and that grazing allotment monitoring occurs at the "allotment and watershed planning scale." (Appendix X. X-302).  This ignores the rapidly changing environment that BLM itself recognizes due to climate variability and relies on "periodic" reports. A schedule with ensure BLM is held accountable for reviewing impacts on grazing allotments to that management can be adjusted according to the adaptive management strategies outlined in Appendix D.*

Issue Text Excerpt: *The PRMP/FEIS analysis of livestock grazing is minimal and ignores the degraded conditions that already exist and are certain to be exacerbated.*

Issue Text Excerpt: *BLM has failed to include a reduction in livestock grazing for the preferred alternative. Although BLM states a climate goal as "reduce greenhouse gas (GHG) emissions from authorized activities to the lowest practical levels that are technically and economically feasible based on current technologies" (Se 2.9 p. 2-8), they fail to include an action related to livestock grazing even though livestock grazing has been identified as a contributor to GHG emissions. BLM additionally failed to consider the cumulative impacts of management activities and climate variability. Climate variability will exacerbate impacts from wildfires, exacerbate the spread of invasive species (which WWP included analysis of in our comments and BLM chose to ignore), and exacerbate the impacts of livestock grazing. By failing to consider the large impacts of livestock to the air and atmospheric resources of the plan area, BLM is violating FLPMA by proposing to continue management of the plan area that provides for unnecessary and undue degradation. By ignoring the science and instead proposing a proposed alternative that continues to allow livestock grazing on 280,300 acres of overlapping sensitive soils (Table 4-11), BLM is clearly skirting their duty to avoid unnecessary and undue degradation…The combined impacts of climate change, soil resource degradation, and vegetation impacts under alternative C2 clearly fails to comply with the requirements to avoid unnecessary and undue degradation under FLPMA.*

Issue Text Excerpt: *The failure of BLM to consider the broad impacts of livestock grazing to the plan area and increase acreage available for livestock grazing rather than reduce it, is a blatant violation of FLPMA and thus renders the RMP and FEIS invalid.  Although WWP clearly expressed concern that reliance on the Montana Standards and Guidelines for the Lewistown Field Office is simply not sufficient to achieve improvement in resource conditions, BLM failed to analyze the effectiveness or ineffectiveness of the existing standards and guidelines as requested. The FEIS should include an analysis of whether the Standards and Guidelines are effective in improving conditions, adapting to a changing climate, and addressing the persistence and spread of invasive species. Instead, BLM chose to ignore this comment and continue to rely on Standards and Guidelines that have not been reviewed for effectiveness.*

**Summary:**

In the Lewistown PRMP/FEIS, the BLM failed to:

- Analyze or disclose relevant information regarding the economic effects of livestock grazing
- Consider the environmental implications of recently proposed new grazing regulations
- Consider best available science of the impacts of livestock grazing, in violation of NEPA
- Adequately analyze and disclose direct, indirect, and cumulative environmental impacts of livestock grazing on other resources and values, in violation of NEPA

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewistown PRMP and FEIS (BLM 2020).

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions. As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not constructing range improvement projects or modifying grazing permits), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources or uses, regardless of whether that change is beneficial or adverse.

Under all alternatives, the Montana/Dakotas Standards for Rangeland Health and Guidelines for Livestock Grazing provides guidance for protection of soil, water quality, and riparian function (see Appendix N). As described above, the Lewistown Proposed RMP and FEIS (BLM 2020) scope of analysis is at a regional, programmatic level. Impacts from planning-level decisions and management actions relating to livestock grazing are discussed throughout the Lewistown Proposed RMP and FEIS, including *Livestock Grazing* (Section 4.3.2), *Vegetation* (Section 4.2.4), *Air Quality and Climate Change* (Section 4.2.1), *Soil Resources* (Section 4.2.2), *Water Resources* (Section 4.2.3), and *Fish and Wildlife* (Section 4.2.5).

The BLM fully analyzed eliminating livestock grazing in the LFO Greater Sage-Grouse Proposed RMP Amendment/Final EIS (BLM 2015b). The analysis was done for PHMA and GHMA. These areas constitute 337,165 acres of BLM-administered lands occurring throughout Chouteau, Fergus, Judith Basin, Meagher, and Petroleum Counties, with 69,408 associated animal unit months (AUMs), all of which are in this Planning Area. Recently proposed changes in the grazing regulations were not considered as part of the analysis. This is because the proposed rule has not been issued and is not expected to be issued until summer 2020.

The Lewistown Proposed RMP/FEIS includes management actions for the BLM to meet the Standards for Rangeland Health, which were incorporated by reference into the RMP (see Appendix N). Grazing

leases are generally reviewed on a 10-year schedule to determine whether standards are being met. At the site-specific review of the lease renewals, the BLM may adjust grazing levels, management practices, and range improvements when needed to meet or make progress toward meeting the standards for rangeland health.

Because the Lewistown Proposed RMP and FEIS would not authorize any uses of the public lands, and the alternatives evaluated in the FEIS comply with all applicable statutes, regulations, and policy, including Standards for Rangeland Health, the RMP will not result in unnecessary or undue degradation of the lands under Section 302(b) of FLPMA.

At the allotment level, the BLM would conduct a site-specific NEPA analysis to determine if there is a need to adjust lease terms and conditions, including changes to AUMs, the season of use, rest rotations, or removal of cattle from a portion or all of the allotment for a duration of time. Maintaining riparian, soil, and habitat conditions will be considered in making those adjustments. The Lewistown Proposed RMP establishes continuation of the current area-wide livestock levels. Any allowances for increases would be based on forage availability of site-specific allotments. As described on p. 2-36 of the Lewistown PRMP and FEIS, allotments where standards for rangeland health are not met and livestock grazing is a significant causal factor for non-achievement, the BLM will take appropriate action to achieve or make progress toward achieving unmet rangeland health standards, which includes suspending use all, or in part.

The methodology used to determine the economic impacts from management actions of the Lewistown PRMP and FEIS are discussed in *Socioeconomics* (Section 4.5) and *Livestock Grazing* (Section 4.3.2). As stated in those sections, the economic impacts analysis used the Impact Analysis for Planning (IMPLAN) modeling system, which uses BLM expenditures and resource uses to estimate the economic consequences of project implementation. Quantitative inputs (such as AUMs, recreation visits, and Department of the Interior payments to counties) were obtained from various program areas for this analysis. IMPLAN not only examines the direct contributions from the BLM but also indirect and induced effects.

Related to cost trade-offs specific to the BLM's grazing program, NEPA does not require an economic cost-benefit analysis, and the Lewistown PRMP/FEIS NEPA process did not conduct an economic cost-benefit analysis. The PRMP/FEIS did not consider changes to the grazing regulations or increases to grazing fees because those changes are outside the scope of a land-use plan. Proposals to change the grazing regulations are currently still in draft stages and will be subject to a subsequent NEPA process.

The BLM complied with FLPMA. The Lewistown PRMP/FEIS does not result in unnecessary and undue degradation. It fulfills NEPA's requirement to analyze the environmental consequences and impacts from livestock grazing in the Lewistown Proposed RMP and FEIS by disclosing the direct, indirect, and cumulative environmental impacts of livestock grazing on other resources and values. Accordingly, this protest is denied.

## MINERALS AND ENERGY

### Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *This CSU setbacks for slopes, rivers/streams/floodplains, water/wetlands are significantly different than the EPA's recommended NSO setback for these same resources. The agency failed to articulate precisely why its chosen setback differs so drastically from those of the EPA. Furthermore, the BLM fails to take a meaningfully hard look anywhere in this FEIS on the direct, indirect, and cumulative impacts of its chosen NSO and CSU setback stipulations.*

**Doughty, Paul**

Issue Text Excerpt: *As stated in my comments on the proposed RMP, the BLM methodology that resulted in the no surface occupancy for over 400,000 acres of land available for fluid mineral leasing is FLAWED. The BLM's answer to the original comments did not address the methodology used or the scientific basis. To wit: the average size of an oil and gas pad is about 2 acres, but the BLM has decided to make 400,000 acres NSO without studying the 400,000 acres as the correct scale. THIS A FLAWED METHODOLOGY. The BLM cannot designate the entire 400,000 acres NSO without studying them at the scale of a well pad because the surface of the land and its inhabitants are not uniformly distributed across the entire 400,000 acres and the could be areas within the 400,000 acres that could be appropriate for surface disturbance at the scale of a well pad. Without doing the study at the correct scale, it is not scientifically possible to determine if ALL of the lands within the 400,000 acres should be NSO. Therefore the BLM's analysis and NSO decision is arbitrary and not supported by any rational scientific methodology.*

**Summary:**

The BLM failed to take a meaningfully hard look in the PRMP/FEIS at the direct, indirect, and cumulative impacts of its chosen NSO and controlled surface use setback stipulations and used flawed methodology in its application of leasing stipulations.

**Response:**

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions.

Stipulations were developed in coordination with the State of Montana and evaluated for consistency with existing stipulations currently in use in the Montana/Dakotas BLM. Because stipulation decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an APD to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. Appendix W discusses fluid mineral leasing constraints and describes under what conditions development could occur (p. W-75). Each resource listed in Appendix W contains its own specific analysis assumptions and nature and types of impacts specific to disturbances associated with this type of development. Volume 1, Chapter 4 contains a comparison of acreage by alternative for each resource based on the discussion of the nature and type of impacts in Appendix W. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

Appendix W also presents the cumulative effects scenario. Appendix L contains a complete list of stipulations with varying degrees and distances for setbacks by alternative. When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used (Land Use Planning Handbook, Appendix C, p. 24).

Land use management plans serve as the primary vehicle for determining the need to apply lease stipulations on the fluid mineral estate underlying BLM-administered lands, privately owned lands, and state-owned lands (BLM Handbook 1624-1). All future site-specific determinations must conform with the RMP and will be used in the process of approving notices of intent, APDs, geothermal drilling permits, field development plans, utilization plans and permits, sundry notices, and reclamation plans. Based on the AMS, the interdisciplinary team formulated a reasonable range of alternatives that responded to identified issues and concerns, resolving conflicts and considering opportunities for enhancing or expanding resources or resource uses. The interdisciplinary team identified any surface or subsurface management constraints or mitigating measures that were required to take advantage of

opportunities and to resolve any problems. These mitigating measures or constraints were translated into lease stipulations in accordance with BLM Handbook H-1624-1. In identifying constraints on fluid minerals activities, the team considered the least restrictive stipulation to accomplish resource objectives and the potential effects of overlapping constraints (see Appendix L).

The Lewistown PRMP establishes guidelines by which future waivers, exceptions, or modifications may be granted. Application of stipulations is based on best available science, which may include BLM data or data from other federal, state, and local agencies; professional publications; or site visits at the project planning stage. The district or area manager establishes the site-specific conditions under which exploration, development, and abandonment will be permitted on specific leases, and determines if stipulation waivers, exceptions, or modifications are warranted. A description of these conditions is located in Appendix L and further described in Section L.3 (p. L-4).

Lease stipulations would be applied, as applicable, to all new leases and to expired leases that are reissued. The BLM Authorized Officer could modify, make exceptions to, or waive stipulations and restrictions depending on the allowances for waivers, exemptions, and modifications listed on the individual stipulations in Appendix L, and evaluation of a site-specific assessment of those resources at the time a parcel is nominated for leasing. These actions provide a viable and effective means of applying adaptive management techniques at the project scale to development of fluid minerals leases. Accordingly, this protest is denied.

## PUBLIC PARTICIPATION

### Enk, Micheal

Issue Text Excerpt: *I am protesting the BLMs failure to seriously consider predominant public comment that sought greater protection of units having wilderness characteristics.*

### Hanley, Jerry

Issue Text Excerpt: *BLM failed to consider best available and scientific information I submitted in HANLEY COMMENTS…. This failure by BLM to use best available science and supporting studies which have been at BLM's immediate disposal, some, for nearly 10 years and furthermore brought to BLM's attention through the public participation and commenting process, has resulted in the erroneous assertions and potential actions found in LPRMP, Vol I, 4-182 and Vol III, U-34, Alt B & D*

Issue Text Excerpt: *The LFO failed to include HANLEY COMMENTS in the record until 2/26/20 – over 6 months after I submitted them. Two weeks after the LPRMP public release and 13 days into the 30-day Protest period! Therefore, LFO failed to properly consider my HANLEY COMMENTS in a timely and prudent manner*

### Juel, Jeffrey (Alliance for the Wild Rockies)

Text Excerpt: *The RMP Chapter 2 emphasizes certain "Management Actions" are to occur without ever defining that category of RMP guidance. In response to this comment, FEIS Appendix X states, "Change made. The term "Management Actions" has been updated for clarity in the glossary." This is completely false-no definition appears.*

Issue Text Excerpt: *The BLM fails to respond to environmental issues we and others raised in previous comments. The FEIS fails to consider scientific information we submitted as supporting our comments. And the BLM also squelches public participation by simultaneous scheduling of the protest period for two RMPs. FLPMA requires that Resource Management Plans (RMPs) be developed with "public involvement" and then used in managing the public lands. See 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts of areas for the use of the public lands."). NEPA requires the BLM to respond in writing to*

*comments the public and other agencies submit on the Draft EIS.... In failing to provide enough information (FEIS Appendix X: Responses to Public Comments), the BLM places an undue burden on members of the public, who are forced to make extra efforts in an attempt understand the government's management and its likely environmental impacts. We protest that the BLM ignored so many comments, including AWR's, in violation of NEPA… The agency's failure to respond appropriately and transparently engenders lack of public confidence in its land management capabilities, and violates NEPA.  Scientific information is a major component of AWR's previous comments. ..We questioned in detail the scientific basis for the draft RMP, and the scientific veracity of analyses.  A public concern found in the BLM Missoula Field Office proposed RMP FEIS is, "Releasing two Draft EIS/Draft RMPs in Montana does not give sufficient time to analyze both documents; the process creates disincentive for public engagement and public discourse and disregards the BLM's FLPMA responsibilities for balanced management…" So what does the BLM do in response to that concern? It now releases both FEISs simultaneously, forcing concerned members of the public to write protests of both in an even shorter time frame- 30 days! BLM contempt for public participation is resounding.*

<u>Issue Text Excerpt:</u> *FEIS Appendix X states, "A Biological Assessment will be prepared for Threatened and Endangered species on the proposed action for consultation with the US Fish and Wildlife Service. …Preparation of the Biological Assessment for the Lewistown RMP is being prepared separately outside the RMP process. BLM is not required to make the Biological Assessment available to the public." This thwarts NEPA's intent for government agencies to involve the public at the appropriate stage of the process.*

<u>Issue Text Excerpt:</u> *There is no draft RMP direction which actually protects and restores these critical biological crusts. A Management Action is: "Avoid and mitigate disturbance to biologic soil crusts that are determined to be key in sustaining PFC of upland soil health" (Emphasis added). Which biologic crusts can be sacrificed, and what is your criteria for determining they are not "key"?  The BLM failed to respond.*

<u>Issue Text Excerpt:</u> *Our comments on the Draft RMP included: We ask that all Best Available Scientific Information (BASI) the BLM relies upon for this planning process be placed on the RMP website as soon as possible, and maintained there as a matter of public record and access as long as the revised land management plan is being designed and implemented. We also request that all scientific references and other documents submitted as part of comments during this and previous revision comment periods be placed on the website. This is important because science is an ever-evolving process, and fully informed decisions and sound management are only possible when managers, agency specialists, and the public are kept up to date.  We request that the references cited in these comments be included as BASI for this revision process. If the BLM does not agree with any of these references being BASI, we ask that you provide an explanation.  Our previous comments also requested the BLM conduct a Science Consistency Review for this revision process, and this comment was ignored.*

## Summary:

The BLM failed to consider and respond to public comments to the level required by NEPA.

## Response:

The BLM is required to assess, consider, and respond to all substantive comments received (40 CFR 1503.4). Substantive comments are those that reveal new information, missing information, or flawed analysis that would substantially change conclusions (BLM Handbook H-1601-1, pp. 23–24).

In compliance with NEPA, the BLM considered and responded to all substantive public comments submitted on the draft RMP/EIS. The BLM complied with 40 CFR 1503.4 by performing a detailed comment analysis. Appendix X of the FEIS and in the Lewistown PRMP/FEIS Errata (February 2020) presents the BLM's responses to substantive comments, including biological crusts. The BLM evaluated suggested references and new information identified in the public comment period and concluded that

they did not substantially change the analysis and that use of a science consistency review tool was not warranted (Lewistown PRMP/FEIS, Appendix X, p. X-88).

The BLM summarized the issues raised by each comment letter and provided a meaningful response. The BLM's response identifies any modifications to the alternatives, improvements to the impacts analysis, or factual corrections made as a result of public comment, where necessary. The BLM's response also explains why certain public comments did not warrant further agency response. Associated documents addressing public comments can be viewed on the ePlanning website at https://go.usa.gov/xUPsP.

The BLM gave careful consideration to comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals. Public scoping efforts enabled the BLM to identify and shape significant issues pertaining to recreation opportunities, wildlife habitat, mineral exploration and development, cultural resources, grazing, land tenure, potential ACECs, public land access, and other program areas. Cooperating agencies provided comments at critical intervals during the alternative development process. Appendix X (Comment Summary and Response Report) of the Lewistown PRMP/FEIS describes the public comment and response process to finalize the EIS.

The BLM developed the Lewistown PRMP/FEIS applying the principles of "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012). The Lewistown PRMP also properly applied CEQ regulations (40 CFR 1500.1(b)). Please see the response, above, in the section heading *Best Available Science*.

Accordingly, this protest is denied.

## PUBLIC SAFETY

### Bertolloti, Gary (Department Montana, Fish, Wildlife and Parks)

Issue Text Excerpt: *At this time Montana Fish, Wildlife and Parks (FWP) is officially submitting this letter of protest regarding RMP: DOI-BLM-MT-L060-2014-0015-RMP-EIS (Lewistown Resource Management Plan). Specifically, Montana Fish, Wildlife and Parks is protesting the proposed no firearms restriction outside of developed recreation area found on page Q-12 in appendix Q.4 Lowry Bridge Special Recreation Area. Montana Fish, Wildlife and Parks has historically worked with local BLM staff to assure public safety is addressed while providing diverse and ample recreational opportunities. FWP believes the current weapons restriction of shotgun and archery only equipment for hunting is more then adequate for the size of the property (72.98 acres). The current weapons restrictions allow for waterfowl, upland bird and deer hunting in a safe and prudent manner. The property has a developed campground and is bordered by private residences on three sides and does not lend itself for the use of high velocity rifles. The current weapons restrictions have allowed for a quality hunting experience with limited conflict with other users and the surrounding landowners. Montana Fish, Wildlife and Parks believes that lifting these restrictions may lead to increased conflicts that their enforcement staff (Wardens) will have to respond to. This increased response will negatively effect Montana Fish, Wildlife and Parks in that it will take away limited and valuable enforcement time that could be used to protect the resources in other areas.*

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *Implicit in the RMP/FEIS is the assumption that fire risk can be mitigated to a significant degree by reacting in opposition to natural processes-namely the growth of various species of native vegetation propagandized as "fuels." The BLM oversells the ability of land managers to make conditions safe for landowners and firefighters. This could lead to landowner complacency- thereby increasing rather that decreasing risk. Many likely fire scenarios involve weather conditions when firefighters can't react quickly enough, or when it's too unsafe to attempt suppression. With climate change, this is likely to occur more frequently. Other likely scenarios*

*include situations where firefighting might be feasible but resources are stretched thin because of priorities elsewhere.*

## Simons, James

Issue Text Excerpt: *We Protest the removal of weapons restrictions. Allowing the discharge of projectiles that can travel more than a mile would create a real safety threat for the general public at the developed campsite, hunters in the field, fisherman and floaters, and the neighboring landowners. The Lowry area outside the developed campsite is approximately 500 yards North/South and 500 yards East/West, less than 1/3 of a mile. It is bordered on the West by an actively used country road. The inability to control the downrange impact of high-powered projectiles within and outside Lowry, compared to the lethal range of such, would create a significant safety hazard for the public and neighbors. Of the four residences, the closest to a Lowry fence line is 330 yards (our home) and the others range from 500 to 600 yards, well within range of a rifle. Given the lethal ranges of rifles, the safety issue is real and troubling.*

*In addition to safety concerns to the public and neighbors, we believe that removing weapon restrictions would represent a safety issue to livestock on surrounding properties. Given the distance from Lewistown and the limited frequency of LEO patrol (and length of time to even respond), the balance at Lowry is largely managed by the public, Montana FWP Wardens, county LEOs, and the neighbors. While there are occasional issues, the current status quo is largely working.*

## Summary:

The BLM used incorrect assumptions and an incomplete analysis in the PRMP/FEIS that fire risk can be mitigated to a significant degree by reacting in opposition to natural processes, namely the growth of various species of native vegetation propagandized as "fuels."

The BLM's removal of the weapons restriction at Lowry Bridge would result in a public safety hazard.

## Response:

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewiston PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving fuels reduction projects), the scope of the analysis was conducted at a regional, programmatic level. Implementation decisions generally constitute the BLM's final approval allowing on-the-ground actions to proceed. Unlike land use plan decisions, implementation decisions are not subject to protest under the planning regulations. Instead, implementation decisions are subject to other administrative remedies, particularly appeals to the Office of Hearing and Appeals (Interior Board of Land Appeals). Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review, as prescribed by the specific resource program regulations, after the BLM

resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP. Appendix Q (p. Q-14) of the Lewistown PRMP/Final EIS describes implementation actions for the Lowry Bridge SRMA, which includes designation of additional campsites and shooting restrictions.

In Appendix W, the BLM describes the impacts and analysis assumptions from proposed management actions of wildfire ecology and management (pages W-52 to W-54). Here, the BLM included goals, objectives, and actions to reduce public safety risks from wildfire.

The BLM addresses public safety concerns on BLM-administered lands as they are identified regardless of the alternative selected (Lewistown PRMP/FEIS, Section 3.5.3). Specific to the BLM's removal of the weapons restriction at Lowry Bridge, Appendix Q (p. Q-14) clearly identifies this as an implementation decision; therefore, it is not subject to protest under the planning regulations. Instead, implementation decisions are subject to other administrative remedies, particularly appeals to the Office of Hearing and Appeals (Interior Board of Land Appeals). This implementation decision action item will not be included in the Approved Plan, and the BLM will maintain the status quo for the discharge of firearms (limited to shotgun and archery only) at the Lowry Bridge SRMA. The BLM will continue supporting the Department of the Interior Supplemental Rule published in the *Federal Register* on Wednesday, September 1, 1999 (Volume 64. No 169; 47860).

Accordingly, this protest is denied.

## PURPOSE AND NEED

### Leroux, Jocelyn (Western Watersheds Project)

Issue Text Excerpt: *BLM states the need of the proposed amendment (sic) is to address new policies and resource issues that have arisen since the implementation of the previous RMPs including the need to maintain and improve terrestrial and aquatic habitats-yet the Proposed Alternative (C2) fails to do this. Additionally, the Purpose and Need for the Resource Management Plan Section fails to mention adaptation to climate change as a changed circumstance that requires action, even after WWP provided significant evidence for this need in both scoping and comments.*

Issue Text Excerpt: *BLM Failed to Express a Need for Action Based on the Failure of the Previous RMPs to Significantly Improve Degraded Conditions on BLM Lands  The Council on Environmental Quality (CEQ) regulations direct an EIS "...shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action" (40 CFR 1502.13). The CEQ regulations also direct that EAs "...shall include brief discussions of the need for the proposal..." (40 CFR 1508.9(b)).  By defining the need improperly, the basis of the PRMP/FEIS analysis is flawed.  BLM fails to express a need for action based on the failure of the previous RMPs to significantly improve degraded conditions on BLM lands, despite WWP's previous comments that the Purpose and Need for Action must acknowledge the previous failures to improve degraded conditions and to include adaptation to climate change as a changed circumstance that requires action.*

### Summary:

The BLM failed to express a need for action based on the failure of the previous RMPs to significantly improve degraded conditions on BLM-administered lands. The purpose of and need for action must acknowledge the previous failures to improve degraded conditions and to include adaptation to climate change as a changed circumstance that requires action.

**Response:**

In accordance with NEPA, the BLM has discretion to establish the purpose of and need for a proposed action (40 CFR 1502.13). The BLM must construct its purpose and need to conform to existing decisions, policies, regulations, or laws (BLM Handbook H-1790-1, Section 6.2).

Agencies have considerable discretion to define the purpose of and need for a project.

The purpose of the Lewistown PRMP/FEIS is to respond to the requirement that BLM-administered lands and minerals in the Planning Area are managed in accordance with the multiple-use and sustained yield principles stated in FLPMA (Lewistown PRMP/FEIS, p. 1-1). A plan revision was necessary because new policies and resource issues have arisen since the adoption of the previous RMPs. Evaluations of existing decisions in the Judith and Headwaters RMPs indicated that there was a need for a plan revision. The AMS provides a detailed description of previous planning decisions and describes opportunities for change. The current condition of all resources and resource uses is provided in Chapter 3 (Volume 1, pp. 3-1 to 3-8) and the revised AMS (2018) available at https://go.usa.gov/xUPsP. The purpose and need statement for the Lewistown PRMP/FEIS planning process provides the appropriate scope to allow the BLM to analyze a reasonable number of alternatives that represent alternative approaches for managing the public lands in the Planning Area. Accordingly, this protest is denied.

## RANGE OF ALTERNATIVES

### Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *This alternative "emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses." Pg. ES-4. Alternative B proposes to manage the 202,400 identified LWC units "to emphasize other multiple uses while applying management restrictions to reduce effects on wilderness characteristics." Pg. 2-28. This alternative does not actually seek to manage wilderness character as a valid multiple use, but instead seeks to mitigate or reduce impacts of other uses that are incompatible with or damaging to wilderness character. Nonetheless, this alternative offers, among other stipulations, VRM Class II, closed to motorized and mechanized travel, ROW exclusion, and no energy leasing whatsoever, all of which would significantly retain and preserve the wilderness characteristics of these 202,400 acres.*

### Leroux, Jocelyn (Western Watersheds Project)

Issue Text Excerpt: *This range of alternatives has several major flaws as we pointed out in our previous comments, (p. 12) "BLM has not conducted a thorough capability and suitability analysis for the planning area and certainly has not done so in light of the changing climatic conditions that are occurring and are predicted to occur." BLM's alternatives do not provide adequate analysis to the impacts of land use changes with the inevitability of climate impacts. Additionally, BLM ignores the science provided by WWP in previous comments. WWP explained why the BLM should study reasonable alternatives that incorporate the impacts of climate change that were left out of the RMP/DEIS the first time around. BLM fails to respond to WWP's continued request to include a thorough evaluation of climate change impacts and the compounded impacts of livestock grazing… The proposed alternative (C2) fails to address these issues and even opposes them, stating that "the appropriate development scenarios for allowable uses would emphasize maximizing resource production in an environmentally responsible manner, similar to Alternative C1" (ES.4.4 p. ES-4). However, based on all of the evidence provided above, and in WWP's comments, Alternative C2 fails to protect the environment from degradation. In addition, BLM failed to analyze an alternative that allows for the permanent retirement of grazing allotments that are waived by the permittee for the purpose of permanently ending grazing on that allotment.*

**Juel, Jeffrey (Alliance for the Wild Rockies)**

Issue Text Excerpt: *The BLM failed to fully analyze and consider a reasonable range of alternative plans, in consideration of the issues we and others presented in comments and supported by sound scientific information- in violation of NEPA and FLPMA.  AWR's comments on the Draft RMP/DEIS plan revision stated: We propose, for full analysis in a Supplemental Draft EIS, an Ecological/Biocentric RMP informed by sound scientific principles and sets a positive future for these lands-one which emphasize the outstanding wild, natural and appropriate recreational values. It would also take advantage of the opportunity to create economic benefits through citizen appreciation of nature while providing genuine restoration work such as road decommissioning.*

Issue Text Excerpt: *Although the RMP now includes two versions of the draft's Alternative C, it still fails to encompass a wide enough range to incorporate the vision and science we submitted in our comments. The BLM failed to properly consider AWR's comments concerning alternatives to the BLM's. This violates the Planning regulations at 43 CFR §?1610.4-5, which state:  At the direction of the Field Manager, in collaboration with any cooperating agencies, BLM will consider all reasonable resource management alternatives and develop several complete alternatives for detailed study. Nonetheless, the decision to designate alternatives for further development and analysis remains the exclusive responsibility of the BLM. The alternatives developed shall reflect the variety of issues and guidance applicable to the resource uses. In order to limit the total number of alternatives analyzed in detail to a manageable number for presentation and analysis, all reasonable variations shall be treated as sub-alternatives. One alternative shall be for no action, which means continuation of present level or systems of resource use. The plan shall note any alternatives identified and eliminated from detailed study and shall briefly discuss the reasons for their elimination.*

## Summary:

The BLM failed to analyze an adequate range of alternatives for grazing in the Lewistown Proposed RMP and FEIS (BLM 2020), including an alternative that included permanent grazing permit retirements, climate, and an ecological/biocentric alternative. Additionally, the BLM's No Action Alternative is not an accurate baseline to compare the other alternatives against, as it does not take into account newer policies requiring identifying and inventorying wilderness characteristics and complete information regarding climate change.

## Response:

When preparing an EIS, an agency should rigorously explore and objectively evaluate all reasonable alternatives; for alternatives that are eliminated from detailed study, the agency should briefly discuss the reasons for eliminating them (40 CFR 1502.14(a)). When there are potentially a large number of alternatives, the BLM may elect only to analyze a reasonable number to cover the full spectrum of alternatives (BLM Handbook H-1790-1, Section 6.6.1 quoting Question 1b, CEQ, Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981).

The BLM must evaluate a range of reasonable alternatives, but not every possible alternative to a proposed action: "In determining the alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative. 'Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant'" (BLM NEPA Handbook, H-1790-1, p. 50 [citing Question 2a, CEQ, Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981]); see also 40 CFR 1502.14.

The BLM analyzed a range of reasonable alternatives that meet the purpose of and need for the Lewistown Proposed RMP and FEIS (BLM 2020) and that address resource issues identified during the scoping period. The Lewistown Proposed RMP and FEIS analyzed five alternatives, including the proposed alternative, which is described in Chapter 2 (see Lewistown PRMP/FEIS pp. 2-1 to 2-56). The

alternatives analyzed in the Lewistown Proposed RMP and FEIS cover the full spectrum by varying in 1) degrees of protection for each resource and use; 2) approaches to management for each resource and use; 3) mixes of allowable, conditional, and prohibited uses in various geographic areas; and 4) levels and methods for restoration.

Agencies are allowed to dismiss an alternative from detailed analysis (40 CFR 1502.14). The agency must briefly discuss the reasons for having dismissed the alternative from detailed analysis (40 CFR 1502.14). An alternative may be eliminated from detailed study if it is determined not to meet the proposed action's purpose and need; it is determined to be unreasonable given the BLM mandates, policies, and programs; it is substantially similar in design to an alternative that is analyzed; its implementation is speculative or remote; or it is technically or economically infeasible (BLM Handbook, H-1790-1, Section 6.6.3).

The FEIS states that the Proposed RMP meets the purpose and need with an emphasis on providing an appropriate mix of uses on BLM-administered lands and mineral estate. The BLM did consider other alternatives, including an alternative that made the entire decision area unavailable to livestock grazing; however, the BLM did not analyze these alternatives in detail because they did not meet the purpose and need (see FEIS, Section 2.8). As stated in that section, the overarching purpose of and need for the Lewistown PRMP and FEIS is to ensure public lands are managed in accordance with the FLPMA under the principles of multiple use and sustained yield. The complete exclusion of any resource use—recreation, livestock grazing, etc.—from the Planning Area does not meet the RMP's stated purpose and need. The range of alternatives aims to resolve conflicts among all resources and to meet the purpose and need and other goals.

An ecological/biocentric alternative was not specifically analyzed in the Lewistown Proposed RMP and FEIS because Alternative B contains goals and objectives that focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes, and natural and cultural resource values for current and future generations. The Final EIS also considered, but eliminated from detailed analysis, eliminating livestock grazing in the LFO Greater Sage-Grouse Proposed RMP Amendment/Final EIS (see Lewistown PRMP/FEIS, pp. 2-3 to 2-4 for more detail). The BLM considered a reasonable range of alternatives in the Lewistown Proposed RMP and FEIS in full compliance with NEPA.

An alternative that included permanent grazing permit retirements was evaluated in the Lewistown PRMP/FEIS. The Lewistown Proposed RMP/FEIS incorporates greater sage-grouse decisions made in 2015: ". . . the RMP/EIS will incorporate, by reference . . . the ROD and Approved RMP Amendments for the Rocky Mountain Region, including the Greater Sage-Grouse Sub-Region of Lewistown" (pp. 1-7 and 2-31 of the PRMP/FEIS). The RMP amendment specifically addresses the relinquishment of grazing permits: "At the time a permittee or lessee voluntarily relinquishes a grazing permit or lease, the BLM will consider whether the public lands where that permitted use was authorized shall remain available for livestock grazing or be used for other resource management objectives, such as reserve common allotments or fire breaks. This does not apply to or impact grazing preference transfers, which are addressed in 43 CFR, 4110.2-3."

The range of alternatives offers strategies for resolving deficiencies in existing management and addresses issues identified through internal assessment and public scoping.

Each alternative analyzed in detail allowed for varying degrees of protection, or use of resources, in the Planning Area. In some instances, the alternatives analyzed in detail included various considerations for eliminating or maximizing individual resource values or uses in specific areas, where conflicts existed.

The BLM considered alternatives proposed by the public, including the alternative for evaluation of master leasing plans, as suggested in public scoping comments, and documented reasons for dismissing alternatives from detailed study in Section 2.8 (pp. 2-3 through 2-6).

For the 651,200 surface acres of the Lewistown BLM-administered lands, the BLM included the No Action Alternative and formulated three action alternatives. The BLM adjusted alternatives in response to public comments on the draft EIS and modified the Preferred Alternative. These examinations provide the responsible official with information that is useful for both fully understanding the alternatives and for informing the development of the Proposed RMP. The range of alternatives aims to resolve conflicts among all resources and to meet the purpose and need and other goals. These goals are consistent with NEPA regulations at 40 CFR 1501(c).

The BLM properly considered all alternatives, including an ecological/biocentric alternative and an alternative that addressed relinquishment of grazing privileges, submitted by the public; consistent with 40 CFR 1502.14, the BLM properly analyzed a range of alternatives or considered alternatives dismissed from further analysis.

Accordingly, this protest is denied.

## RECREATION AND VISITOR SERVICES (INCLUDING BACKCOUNTRY CONSERVATION AREAS)

### Poertner, Ron (Missouri River Stewards)

Issue Text Excerpt: *The proposed Arrow Creek BCA fails to meet the purpose and criteria established by BLM Instruction Memo 2017—039 (sic)... The Arrow Creek BCA fails to meet both the "'larger area of generally intact land,. and "unfragmented criteria of IM 2017-039. The BCA is neither intact nor large.. The BLM fails to provide criteria or definition of "'larger areas'" that qualifies an area for management as a BCA. Because both tracts of the proposed Arrow Creek BCA are essentially bounded by private land, permanent access to the area is extremely limited and negates justification for creation of the BCA. Only two permanent access points exist.*

Issue Text Excerpt: *The proposed Arrow Creek BCA is situated in extremely rough, steep terrain that only the hardiest of sportsmen are able to navigate. Because the proposed BCA is walk-in only, retrieval of big game species back to limited access points quickly becomes problematic and can result in only minimal parts of the game animal being retrieved. Clearly, the proposed Arrow Creek BCA does not represent a high quality hunting experience for the average or older age hunter; rather, only those in good physical shape will be able to navigate the steep terrain and enjoy a successful hunt. One should expect a significant number of hunters who plan to hunt to the area find the area untenable for a quality hunt because of access limitations, rough terrain, game retrieval challenges and overcrowding.*

Issue Text Excerpt: *Failure of BLM to comply with BLM Instruction Memorandum No. 2017-036 pertaining to BCA management, criteria and guidance. * Failure to provide a supplemental EIS and afford the public the opportunity to comment on BLM's decision to change the draft preferred alternatives to the revised proposed alternatives, which is an arbitrary and capricious decision and in violation of NEPA. * Failure to analyze impacts of the BCA decision on the human environment, including ancillary issues provided below in the Basis for Protest narrative.*

Issue Text Excerpt: *The proposed Arrow Creek BCA fails to comply with the provisions of 43 CFR 1610.1-2. For each geographic area under consideration for BCA status, the CFR requires BLM to define specific, measurable, out-come focused objectives that describe the desired habitat conditions for the recreationally-important fish and/or wildlife species. Additionally, BLM should consider and incorporate corresponding fish and wildlife objectives of the relevant state agencies. BLM failed to comply with these provisions. BLM is required by*

*CFR to identify land tenure decisions (retention, acquisition, exchange) that support the backcountry conservation goals, objectives and designations. BLM failed to comply with this provision. BLM is required by CFR to identify indicators and intervals for monitoring and evaluation to ensure that the fish/wildlife and recreation objectives are being met. BLM failed to comply with this provision.*

Issue Text Excerpt: *BLM fails to consider or analyze the hard risks and cumulative effects of the proposed Arrow Creek BCA on the human environment and the impacts on local area emergency services and the search and rescue burdens placed on the local communities… BLM fails to consider or analyze the real prospect of an overwhelming surge of hunters on small tracks of public land like the proposed Arrow Creek BCA.*

Issue Text Excerpt: *The primary issues that comprise the basis for this protest include: Wrongful decision by State BLM Director to create the Arrow Creek Backcountry Conservation Area (BCA) because of the failure to present data and peer reviewed science used to qualify portions of the Arrow Creek drainage as a BCA.*

Issue Text Excerpt: *BLM fails to present any science or data that a 10-12 mile reach of Arrow Creek represents an important migration/movement corridor for game species…. BLM fails to present any science or data that recreationally-important species of fish exist in the 10-12 mile upper reach of Arrow Creek. It is very doubtful that few if any recreationally-important fish species exist because Arrow Creek frequently runs dry or becomes extremely low during late summer, making it a dubious conclusion that desirable fish species exist in any number….The proposed BCA fails to meet the BLM's high-quality" recreation mandate for fishing.*

Issue Text Excerpt: *BLM's proposed decision to approve the Arrow Creek BCA by special interest groups is arbitrary and capricious because such a decision tans to give deference to private landowner's concerns and is devoid of any analysis of the impacts to area landowners and their communities. Area landowners will undoubtedly experience impacts with the Arrow Creek BCA in terms of trespass, expected federal leveraging of access through private land to the BCA and requests for assistance to retrieve stuck vehicles from primitive access roads, and taking of game on private land without permission because the majority of game animals will be found in close proximity to private grain fields and pasture lands along Arrow Creek.*

Issue Text Excerpt: *BLM fails to take into account that FWP Is the sole manager for hunting and fishing in Montana, including hunting and fishing seasons, hunting harvest quotas. trapping criteria, etc. BLM presents no discussion on the interaction between FWP and the BLM or how a BCA designation could independently protect, conserve, and restore recreationally-important fish and wildlife habitat" when management of those species is relegated exclusively to FWP and the majority of these animal species in the proposed Arrow Creek BCA are found on private land, not BLM land. Again, BLM fails to address or analyze this important issue in the LRMP.*

Issue Text Excerpt: *One of the two pillars that must be considered in BCA decision making is whether the area contains a high quality recreational opportunity for fishing. Clearly, Arrow Creek is NOT a quality fishing stream.*

Issue Text Excerpt: *BLM falls to develop a supplemental EIS to enable the public to comment on BLM decision to change the draft preferred alternatives to the revised proposed alternative as required by NEPA… Because the public was unaware of the revision to the preferred alternative, there was no opportunity for the public to comment on that revision, except to file a protest. BLM should have filed a supplemental EIS with the public as required by NEPA.*

## Summary:

In the PRMP/FEIS, the BLM failed to:

- Comply with BLM Instruction Memorandum No. 2017-036 pertaining to BCA management, criteria, and guidance and with the provisions of 43 CFR 1610.1-2 that require the BLM to define specific, measurable, outcome-focused objectives that describe the desired habitat conditions for the recreationally important fish or wildlife species, or both

- Provide a supplemental EIS, specific to BCAs, and afford the public the opportunity to comment on the BLM's decision to change the draft preferred alternatives to the revised proposed alternatives, which is an arbitrary and capricious decision and in violation of NEPA
- Analyze impacts of the BCA decision on the human environment, including ancillary issues
- Address or analyze the relationship between Montana Department of Fish, Wildlife & Parks (MFWP) and the BLM specific to the management of wildlife

**Response:**

*BLM Instruction Memorandum No. 2017-036 and 43 CFR 1610.1-2*

BLM Instruction Memorandum 2017-036 directs the BLM to consider BCAs in land use planning based on public proposals in multiple land use planning efforts and to be consistent with multiple use and sustained yield. The BLM recognizes the value of protecting certain backcountry areas in order to preserve generally intact, undeveloped public lands that contain priority habitats for recreationally important wildlife species and that provide high-quality wildlife-dependent recreation opportunities afforded by those species. Instruction Memorandum (IM-2017-036) summarizes the criteria and process for considering management of these habitats and recreation opportunities through the application of land use planning components, including establishing BCAs, during the land use planning process.

Consistent with the criteria outlined in Instruction Memorandum 2017-036, the Arrow Creek BCA proposal was evaluated for backcountry conservation management and determined to meet the required criteria based on a number of factors, including, but not limited to, lack of development features, low road density, and recreationally important wildlife-dependent recreation opportunities afforded by big game hunting (Lewistown PRMP/FEIS, p. 4-151).

Appendix Q of the Lewistown PRMP/Final EIS (Sections Q.7 and Q.9) contain objectives and specific, measurable, outcome-focused targeted experiences and management actions to achieve those objectives.

*Supplemental EIS*

"Supplementation" has a particular meaning in the NEPA context. In the case of a land use plan, a supplemental EIS is only required if there are new significant circumstances or information relevant to bearing on the Proposed Plan, or if there are changes outside of the alternatives already analyzed. BCAs were considered in detail within the spectrum of alternatives for the Lewistown PRMP.

NEPA requires agencies to prepare supplements to either a draft or final EIS if the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9(c)). "Substantial changes" in the proposed action relevant to environmental concerns are changes that would result in significant effects outside the range of effects analyzed in the draft or final EIS (BLM Handbook H-1790-1, p. 29). A supplemental EIS may also be required when a new alternative is added that is outside the spectrum of alternatives already analyzed and not a variation of an alternative already analyzed, or a combination of alternatives already analyzed (BLM Handbook H-1790-1, p. 29).

The BLM has made no substantial changes to the Proposed Plan that are relevant to environmental concerns in the Lewistown RMP Planning Area. The BLM has determined that there are no new significant circumstances or information relevant to environmental concerns bearing on the Proposed Plan or its impacts. The BLM is not required to prepare a supplemental EIS.

*Analysis of BCAs*

Appendix Q of the Lewistown PRMP/FEIS includes appropriate use determinations and a description of goals, objectives, and actions for each geographic area under consideration as a BCA.

The Lewistown Proposed RMP further identifies lands within proposed BCAs as Category 2 under the land tenure section (p. 2-46 and corresponding map sections in Appendix A, Figures 2-55 through 2-57). Category 2 appropriately supports backcountry conservation goal(s), objective(s), and designation(s).

In accordance with Appendix C of BLM Manual 1613 Recreation and Visitor Services (1983), the BLM interdisciplinary team reviewed nominated BLM-administered lands in the Planning Area to determine whether new areas should be considered for designation as BCAs. The BLM identified distinct, primary recreation opportunities, as well as corresponding recreation management strategies. The range of alternatives offers strategies for resolving deficiencies in existing management and addresses issues identified through internal assessment and public scoping. The BLM gave careful consideration to comments specific to BCAs submitted by other government agencies, public organizations, state and tribal entities, and interested individuals (see the *Public Participation* section for additional details regarding public input). BCAs with a range of management actions were included within the spectrum of alternatives analyzed in the Lewistown Draft RMP that was released in May 2019.

The BLM has discretion to designate all, some, or none of the potential recreation management areas that were evaluated during the planning process. A comparison of estimated effects and trade-offs associated with the alternatives led to development and selection of the Proposed Plan (see Lewistown PRMP/FEIS Section 4.3.3).

*Evaluation of Human and Wildlife Impacts, Including Interagency Coordination*

CEQ regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012). See comment above regarding *Best Available Science.*

The BLM consulted with, and collected and incorporated data from, other agencies and sources, including but not limited to the USFWS and Montana Fish, Wildlife and Parks, and relied on numerous data sources and scientific literature to support its description of baseline conditions (PRMP/FEIS, Chapter 3; AMS 2019) and impact analysis (PRMP/FEIS, Chapter 4). A list of information and literature used is contained in the references section found in Volume 1 beginning on page 4-233. The Lewistown PRMP considered criteria found in Instruction Manual 2017-036 and appropriately developed goals, objectives, designations, resource use determinations, land tenure decisions, and monitoring standards for each BCA.

As a result of these actions, the BLM gathered the necessary data essential to make a reasoned choice among the alternatives analyzed in detail in the PRMP/FEIS, and provided an adequate analysis that led to an adequate disclosure of the potential environmental consequences of the alternatives (PRMP/FEIS, Chapter 4). As a result, the BLM has taken a "hard look," as required by NEPA, at the environmental consequences of the alternatives in the PRMP/FEIS to enable the decision-maker to make an informed decision. Finally, the BLM has made a reasonable effort to collect and analyze all available data.

Accordingly, this protest is denied.

## SOCIAL AND ECONOMIC CONDITIONS

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The BLM fails to consider the wide body of research revealing that counties adjacent to Wilderness areas and National Parks show better economic sustainability than counties heavily reliant upon resource extraction. The BLM's biased use of science violates NEPA.*

Issue Text Excerpt: *The FEIS fails to adequately analyze and disclose the direct, indirect, and cumulative economic impacts of management actions in violation of NEPA. The RMP direction fails to present the balanced approach FLPMA requires for consideration of economics considerations for resources and values other than resource extraction and exploitation. The FEIS does not consider best available economics research in violation of NEPA. The economics analysis is mostly about justifying management by expounding upon benefits to the local economy. The costs to U.S. taxpayers for the local focus benefits are not analyzed or disclosed. The externalized costs of the existing and subsequent environmental damage due to management actions and other human activities are also not considered.*

### Summary:

The BLM fails to consider contributions of WSAs and National Parks contribution to local economies. The FEIS fails to adequately analyze and disclose the direct, indirect, and cumulative economic impacts of management actions in violation of NEPA. The RMP direction fails to present the balanced approach FLPMA requires for consideration of economics considerations for resources and values other than resource extraction and exploitation. The FEIS does not consider best available economics research in violation of NEPA.

### Response:

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewistown PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an APD to start drilling), the scope of the analysis was conducted at a regional, programmatic level. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

The analysis of socioeconomics for the Lewistown PRMP/FEIS (Section 4.5, pp. 4-206 to 4-224 and Appendix W) provides both qualitative and quantitative analyses of the Proposed Plan and Alternatives A through D on the conditions of the entire area of all counties that occur partially or wholly within the

Lewistown Planning Area. The value of nonmarket and market goods and services was evaluated under each alternative. All impacts from actions were measured relative to activity levels in Alternative A. Impacts of management actions were measured and reported in dollars where possible. The indirect and induced impacts of a management action were assessed using an input-output model called IMPLAN Pro Software and Data that mimics the economic links between different sectors of the counties' economies.

Nonmarket values and services are discussed in Section W.3.25 of the Lewistown PRMP/FEIS. The BLM will conduct subsequent project-specific NEPA analyses for projects proposed for implementation under the Lewistown PRMP. The subsequent NEPA analyses for project-specific actions will tier to the land-use planning analysis and evaluate project impacts at the appropriate site-specific level (40 CFR 1502.20 and 1508.28). Section 4.4.5 further describes effects common to all alternatives and cumulative effects from wilderness study areas within the Planning Area.

The BLM complied with NEPA's requirement to analyze the environmental consequences on socioeconomics in the Lewistown PRMP/FEIS. Accordingly, this protest is denied.

## SOIL, WATER, AND VEGETATION

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects of management actions on the spread of noxious weeds and other invasive species in violation of NEPA. The RMP does not present the balanced approach FLPMA requires for consideration of protecting native vegetation communities from invasive weeds.*

Issue Text Excerpt: *The FEIS (Chapters 3 and 4) fails to disclose the degree to which the productivity of the land and soil has been affected over the Lewistown Field Office due to livestock grazing and noxious weed infestations, and how that situation is expected to change in the coming years and decades. NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions. The FEIS (Chapters 3 and 4) does not analyze or disclose such cumulative impacts on soil productivity.*

Issue Text Excerpt: *The RMP's vegetation direction fails to present the balanced approach FLPMA requires for consideration of protecting other resources and values. The FEIS does not consider best available science on natural processes maintaining vegetation diversity as compared to its claims of manipulating vegetation to achieve vague "resilience" goals and objectives, in violation of NEPA.*

### Summary:

In the PRMP/FEIS, the BLM failed to analyze and disclose the direct, indirect, and cumulative effects of management actions on the spread of noxious weeds and other invasive species in violation of NEPA. The PRMP/FEIS (Chapters 3 and 4) fails to disclose the degree to which the productivity of the land and soil has been affected in the Lewistown Field Office due to livestock grazing and noxious weed infestations, and how that situation is expected to change in the coming years and decades. The BLM also failed to analyze or disclose such cumulative impacts on soil productivity in the PRMP/FEIS (Chapters 3 and 4).

The RMP's vegetation direction fails to present the balanced approach FLPMA requires for consideration of protecting other resources and values. The FEIS does not consider best available science on natural processes maintaining vegetation diversity as compared with its claims of manipulating vegetation to achieve vague "resilience" goals and objectives, in violation of NEPA. See Livesock Grazing Section (p. 31-34) for additional details.

**Response:**

The BLM's Land Use Planning Handbook (Handbook 1601-1) provides guidance for developing the management decisions for soils, water, and vegetation that result in identification of desired outcomes. The BLM is further directed to "identify watersheds or specific soils that may need special protection from the standpoint of human health concerns, ecosystem health, or other public uses."

The Lewistown PRMP/FEIS includes a reasonable range of conservation strategies to meet soil, water, and vegetation desired outcomes. These include meeting or achieving standards and guidelines for rangeland health, maintaining beneficial uses of groundwater, and meeting state water quality standards. Goals, objectives, and actions for invasive species, as described on pages 2-15 and 2-16, include an analysis of impacts specific to soils, water, and vegetation (Sections 4.2.2, 4.2.3, and 4.2.4).

The Lewistown PRMP/FEIS incorporates relevant baseline information and studies about soils, water, and vegetation. NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewistown RMP. NEPA requires analysis of the impacts of past, ongoing, and foreseeable management actions.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

CEQ regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

The BLM must discuss the cumulative effects of the proposed action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The CEQ regulations define cumulative effects as ". . . the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan-level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions, the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. Appendix W: Analysis Assumptions and Cumulative Effects Scenario (Volume III) provides a list of past, present, and reasonably foreseeable projects, plans, or actions that comprise the cumulative effects scenario. Table W.2 (pp. W-9 to W-14) displays projects

and activities identified as having the greatest likelihood to generate potential cumulative effects on vegetation, water, and soils when added to RMP alternatives.

Accordingly, this protest is denied.

## TRAVEL, TRANSPORTATION, AND ACCESS

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The RMP allocates BLM-managed lands in the planning area as open to motorized travel, closed to motorized travel, or limited to motorized travel. However this fails to comply with Executive Orders 11644 and 11989. The Executive Orders require the BLM to locate areas and trails to: minimize damage to soil, watershed, vegetation, or other resources of the public lands; minimize harassment of wildlife or significant disruption of wildlife habitats; minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.*

Issue Text Excerpt: *The RMP and FEIS punt the analysis of Field Office-wide travel planning, to "be analyzed in the travel management process." Note to BLM: since you state intent to conduct analysis of impacts of specific travel routes in some theoretical, non-mandated Field Office-wide "travel management process"2 then the time to do so is now, during this Field Office-wide land management planning process. The BLM is obligated to undertake this analysis at the RMP level. In failing to do so, it violates Executive Orders 11644 and 11989 FLPMA and NEPA.*

Issue Text Excerpt: *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects of motorized access facilities on wildlife, aquatic and riparian dependent species in violation of NEPA. The FEIS fails to demonstrate consistency with Executive Orders 11644 and 11989. The FEIS fails to consider the economic implications of maintaining roads and motorized trails, in violation of NEPA. The RMP does not present the balanced approach FLPMA requires for consideration of  the ecological and social values impacted by motorized travel. The FEIS does not consider best available science on the impacts of motorized travel on other resource values and it fails to take a hard look on the adequacy of Best Management Practices and other design features and mitigations.*

### Summary:

The Lewistown PRMP/FEIS violates Executive Orders 11644 and 11989 because it failed to incorporate step-down travel management planning. The FEIS fails to consider the economic implications of maintaining roads and motorized trails, in violation of NEPA. The RMP does not present the balanced approach FLPMA requires for consideration of the ecological and social values affected by motorized travel. The FEIS does not consider best available science on the impacts of motorized travel on other resource values, and it fails to take a hard look at the adequacy of best management practices, other design features, and mitigations.

### Response:

BLM land use planning requirements are established by Sections 201 and 202 of FLPMA (43 United States Code 1711–1712) and the regulations in 43 CFR 1600. As noted previously, land use planning-level decisions are broad in scope and guide future land management implementation actions; land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). The BLM's travel management guidance is provided in BLM Manual MS-1626 Travel and Transportation Management. Section 1.3, Authority in MS-1626 includes a list of major legal authorities relevant to the BLM land use and implementation planning processes relative to travel and transportation management.

Executive Orders 11644 and 11989 are both included under the authorities, providing policies and procedures to ensure the control of off-road vehicle use to protect public lands. These authorities will help guide the future site-specific-level travel management planning.

As defined in the BLM Land Use Planning Handbook (H-1601-1), Appendix C, Section II, D. Comprehensive Trails and Travel Management (p. 17), land use plan decisions for travel management direct the BLM to "delineate travel management areas and designate off-highway vehicle management areas" (p. 17). The RMP-level decisions include motorized and nonmotorized allocations for an area—open, limited, and closed. These allocations are in accordance with the RMP's purpose and need in Chapter 1, and travel, transportation, and access goals and objectives as described in Chapter 2. Specific route designations for off-highway vehicle and nonmotorized use will be analyzed and identified during step-down travel management planning at the site-specific level within the open, limited, and closed areas (see FEIS Volume 1, Chapter 2, pp. 2-41 and 2-42).

Also, see discussions under *Best Available Science* and the *General* sections for a complete discussion of FLPMA, NEPA, and best available science.

Accordingly, this protest is denied.

## WILD AND SCENIC RIVERS

### Bertram, Aubrey (Montana Wilderness Association)

Issue Text Excerpt: *Conservation Groups note that many rivers are disqualified because of 'other management' schemes available to the BLM when those discretionary designations are all withdrawn in the preferred alternative. For example, Collar Gulch is excluded in part because the analysis asserts that the existing ACEC would adequately protect the values, but the preferred alternative proposes to do away with the ACEC. Likewise, the agency seems to assert that managing the eligible lands Sacagawea Creek flows through for their wilderness character (ie Horse Camp Trail, West Crooked Creek, and Chain Buttes) will protect the river's values, but in four of the five alternatives, wilderness character is not adequately managed for. The agency cannot simultaneously propose to do away with protections in one part of its analysis while also relying on those protections for other decisions. This is tantamount to doublespeak, profoundly misleading, and is also arbitrary, capricious, and an abuse of agency discretion.*

Issue Text Excerpt: *The agency's reliance on the CMAs along the Rocky Mountain Front to disqualify eligible river segments is confounding. In its analyses for rivers within the CMA, the agency consistently concludes that WSR suitability recommendation and designation would comport with the values and management of the CMA, and even enhance the scenic and ecological values of the landscape, but yet uses CMA management as a concluding reason to not recommend any river for designation. It's clear that in many cases with regards to WSR values, the agency's analysis does not support its conclusion. This amounts to an utter failure to take the required hard look, and accurately analyze the direct, indirect, and cumulative impacts of the agency's proposed action.*

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The RMP fails to maintain Wild & Scenic river characteristics in accord with best available science and in violation of NEPA, and does not present a balanced approach to protecting the resource values best represented by Wild & Scenic rivers and streams, characteristics required by FLPMA. The BLM's evaluation process is not consistent with the national policy envisioned in the Wild and Scenic Rivers Act. The RMP bias and imbalance toward resource extraction is reflected in the fact that under the RMP all river segments are considered unsuitable for Wild & Scenic status. The RMP does not prohibit uses in Wild and Scenic Rivers, potential Wild and Scenic Rivers, and their river corridors that are nonconforming under the Wild and Scenic Rivers Act, in violation of FLPMA.*

**Summary:**

The Lewistown Proposed RMP and FEIS (BLM 2020) fails to maintain wild and scenic river characteristics in accordance with best available science and in violation of NEPA; it does not present a balanced approach to protecting the resource values best represented by wild and scenic rivers and streams, as required by FLPMA. The BLM's evaluation process is not consistent with Wild and Scenic Rivers Act policy.

**Response:**

To the extent possible under existing legal authorities, the BLM's policy goal for eligible and suitable rivers is to manage their free-flowing condition, water quality, tentative classification, and any outstandingly remarkable values (ORVs) to assure a decision on suitability can be made for eligible rivers; or in the case of suitable rivers, until Congress designates the river or releases it for other uses (BLM Manual Section 6400.3.5). During the land use planning process, the BLM assesses all eligible river segments and determines which are suitable or non-suitable for inclusion in the National Wild and Scenic Rivers System (BLM Handbook H-1601-1, Appendix C, p. 27).

In the Lewistown PRMP/FEIS, the BLM identified all segments eligible for inclusion in the National Wild and Scenic Rivers System, and determined which of those eligible segments are suitable for inclusion in the National Wild and Scenic Rivers System (see FEIS, p. 2-53 and Appendix V). In determining the suitability of the segments, the BLM applied the 13 suitability criteria factors identified in BLM Manual 6400. The BLM interdisciplinary team considered data from other agencies and the public, as well as input provided by cooperating agencies when determining which sources would be effective as defining criteria.

In order to be assessed as outstandingly remarkable, a river-related value must be a unique, rare, or exemplary feature that is exceptional at a comparative regional or national scale (BLM Manual Section 6400.3.1.D.1). The determination of whether an area contains an ORV is a professional judgment on the part of the agency's study team (USDI-USDA Final Revised Guidelines for Eligibility, Classification, and Management of River Areas, 47 *Federal Register* 39457; BLM Manual Section 6400.3.1.D).

The BLM identified ORVs for wild and scenic rivers in the Lewistown Proposed RMP and FEIS (BLM 2020) through a study process to determine what values or characteristics make the wild and scenic rivers worthy of special protection. The BLM documented the study process for identifying ORVs and the rationale for ORV identifications in Section 2.2.2 of the Lewistown Proposed RMP and FEIS (see Volume III, Appendix V, Section 2.2.2 and Table 2-2). Scenic, recreational, geological, fish, wildlife, historic, and cultural ORVs are addressed to varying degrees in each alternative in the Lewistown PRMP. Consideration of these values is achieved through evaluations of a variety of management prescriptions, such as wild and scenic river suitability, ACEC or recreation designations, visual resource management, wilderness characteristics, stipulations and RDFs, and ROW determinations. For example, the Lewistown PRMP contains RDFs (Appendix F) and stipulations (Appendix L) to protect floodplains, riparian and wetland values, fisheries, wildlife, and scenery regardless of wild and scenic river suitability.

The Lewistown PRMP/FEIS appropriately identifies ORVs and follows the process for evaluating stream segments consistent with policy. Accordingly, this protest is denied.

## WILDFIRE ECOLOGY AND MANAGEMENT

### Juel, Jeffrey (Alliance for the Wild Rockies)

Issue Text Excerpt: *The RMP (Chapter 2 does not provide management direction effectively reducing management incentives to authorize as much fire suppression as available resources could allow. So the FEIS*

*(Chapters 3 and 4) fails to acknowledge what would really happen-perpetual "fuel treatment" via industrial logging and "fuel treatments" to mitigate perpetual fire suppression.*

<u>Issue Text Excerpt:</u> *The FEIS fails to analyze and disclose the direct, indirect, and cumulative effects of BLM fire suppression policies, in violation of NEPA. The FEIS fails to consider best available science on fire and fire ecology, in violation of NEPA. The RMP fails to include direction representing a science-informed comprehension of the natural role of fire on the landscape, in violation of FLPMA.*

## Summary:

In the PRMP/FEIS, the BLM failed to analyze and disclose the direct, indirect, and cumulative effects of BLM fire suppression policies, in violation of NEPA. Additionally, the BLM failed to consider best available science on fire and fire ecology in the PRMP/FEIS, in violation of NEPA. Lastly, the BLM failed to include direction representing a science-informed comprehension of the natural role of fire on the landscape, in violation of FLPMA.

## Response:

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the Lewiston PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

CEQ regulations implementing NEPA require that agencies use "high-quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM developed the Lewistown PRMP/FEIS applying the principles of "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012). The Lewistown PRMP also properly applied CEQ regulations (40 CFR 1500.1(b)). Please see response, above, in section heading *Best Available Science.*

The Lewistown PRMP/FEIS (pp. 2-22 to 2-24) contains management actions that address the BLM's response to wildland fire through fire management unit categories using such factors as fuel types, vegetation condition class (VCC), and current levels of development and infrastructure. Goals, objectives, and management actions for site-specific fuel treatments are described in the woodland products (2-49, 2-50, 2-51) and the vegetation sections (Ponderosa Pine Breaks/Badlands p. 2-1). Future treatments would be designed to reduce the occurrence of severe wildfires by implementing selective treatments that mimic natural disturbance regimes to enhance resiliency to wildfire. Treatments would be focused in areas to maintain VCC I classifications and to improve areas of high and moderate departure (VCC 2 and 3). The Lewistown PRMP/FEIS analyzes the relationship of fuel treatments, fuel loading, and ecological condition from proposed management actions in Appendix W (pp. W-52 to W-54) and in Sections 4.3.8 and 4.2.4.

The Lewistown PRMP/FEIS describes the ecological condition of forest and woodland resources in relation to wildland fire (Revised AMS 2019 pp. 83–88). It includes goals, objectives, and actions as described above to adequately address management activities as they relate to fuels loading and the

potential for wildland fire and related suppression activities. Considering this, the Lewistown PRMP/FEIS did analyze and disclose the direct, indirect, and cumulative effects of fuel treatments, wildland fire, and suppression activities. Accordingly, this protest is denied.

# Exhibit I

https://missoulian.com/opinion/columnists/trump-administration-establishes-backcountry-conservation-areas-in-montana/article_e7bfd958-b41c-532d-bd71-c46f53446f96.html

Guest column

# Trump Administration establishes backcountry conservation areas in Montana

WILLIAM PERRY PENDLEY

Jul 30, 2020

SALE! Subscribe for $1/mo.

The United States has long been at the vanguard of conservation, and the Trump Administration has furthered these ideals more than any administration in generations, investing in public lands more than the Obama Administration and calling on Congress to fix our crumbling infrastructure through the Great American Outdoors

Case 4:20-cv-00062-BMM　Document 10-5　Filed 08/20/20　Page 630 of 663

Trump Administration establishes backcountry conservation areas

Act. Notching yet another breakthrough in the President's growing list of conservation accomplishments is the world's first Backcountry Conservation Areas, or BCAs, which will be designated in the great state of Montana.

BCAs draw their inspiration from the direction of President Trump and Secretary Bernhardt's mandate to conserve habitat and enhance recreational opportunities, namely multiple Orders that have been signed by Secretary Bernhardt to ensure conservation stewardship and outdoor recreation is preserved and expanded upon.

Montanans deeply care about being able to access their public lands, especially when it comes to the diverse recreational opportunities available throughout the state. These newly designated areas underscore the Trump Administration's commitment to protecting and enhancing opportunities for public hunting and other wildlife-dependent recreation across these unique landscapes.

Within BCAs, the Bureau of Land Management (BLM) promotes public access to support wildlife-dependent recreation and hunting opportunities and facilitate the long-term maintenance of big game wildlife populations. The BLM will be able to restore riparian areas and streams, eliminate invasive species, manage vegetation, improve fish passage, reduce the risk of wildfires, and increase forage.

These innovative designations are a reality now with the approval of BLM's final

Resource Management Plans (RMPs) for the Lewistown and Missoula areas. These RMPs, covering a combined total of 814,200 surface acres, are being updated for the first time in over 30 years. Designated with enthusiastic public support, as well as the participation and encouragement of over 100 conservation and sportsmen's groups such as the Theodore Roosevelt Conservation Partnership (TRCP), BCAs represent the epitome of the BLM's multiple-use mandate.

The Lewistown RMP establishes two BCAs of over 106,000 acres, which are equivalent to about 80,000 football fields and encompass one of the best big-game hunting areas in North America, as well as undeveloped grasslands and mountain ranges.

The Missoula RMP establishes three additional BCAs totaling 13,014 acres and includes lands that encompass the last remaining intact wildlife habitat in the Garnet Range important to westslope cutthroat trout, elk, white-tailed deer, moose, forest grouse, grizzly bears, lynx and wolverines. These BCAs include intact forest habitat for big game and wet meadows along Wales Creek that support beaver and moose. They also incorporate important habitat for bull trout, moose, grouse and deer in an intact area adjoining the Lolo National Forest.

The BLM has an obligation to facilitate multiple uses in the lands it manages for the American people. BCAs are a straightforward management tool that ensures the BLM can meet its multiple-use mission and provides flexibility, while encouraging

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 632 of 663

management of habitat for big game species and recreational access.

**Trump Administration establishes backcountry conservation areas**

These incredible backcountry areas are the first in Montana, America, and the world, representing a significant step forward in our efforts to manage public lands for the benefit of all. President Teddy Roosevelt used to hunt big game in these areas, and I imagine he would be proud to know that we preserved the area for the same purposes. President Trump, who pursues a conservation ethic second only to the Rough Rider himself, continues to build upon his conservation legacy. We hope Montanans will get out and enjoy these incredible places; after all, hunting season is just around the corner.



William Perry Pendley

William Perry Pendley is Deputy Director for Policy and Programs for the Bureau of Land Management

# Exhibit J

Case 4:20-cv-00062-BMM    Document 10-5    Filed 08/20/20    Page 634 of 663



**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND**
**MANAGEMENT (/)**
**(/)**

# BLM RELEASES RESOURCE MANAGEMENT PLANS FOR LEWISTOWN, MISSOULA

Plans establish nation's first Backcountry Conservation Areas

**BILLINGS, Mont**. – The Bureau of Land Management today approved revised Resource Management Plans that will guide agency land management decisions on more than 800,000 acres of public lands and nearly 1.4 million acres of subsurface mineral estate in western and central Montana for the next 20 years. The revised plans are responsive to public input and reflect changing resource conditions as well as new issues and policies that have arisen since the previous management documents were completed in the 1980s and early 1990s.

The two Records of Decision published today in the Federal Register cover the Resource Management Plans (RMPs) and associated Final Environmental Impact Statement (EISs) for the Lewistown and Missoula field offices. The Lewistown RMP/EIS encompasses 651,200 acres of BLM-administered surface and 1.2 million acres of federal mineral estate in central Montana. The Missoula RMP/EIS addresses the management of about 163,000 surface acres and 268,000 acres of federal mineral interests in northwestern Montana.

"Public lands in Montana support thousands of jobs and contribute to local communities, while sustaining the wildlife and outdoor recreation opportunities that make living in the West so special. These management plans represent a significant step forward in our efforts to protect and enhance public lands for the benefit of current and future generations of Americans," **said William Perry Pendley, the BLM's Deputy Director for Policy and Programs**.

Backcountry Conservation Areas (BCAs) promote public access to support wildlife-dependent recreation and hunting opportunities and facilitate the long-term maintenance of big game wildlife populations, while also permitting other activities consistent with the BLM's multiple use, sustained yield mission. The Lewistown RMP has two BCAs: the Arrow Creek BCA which is 12,800 acres, and the Crooked

Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 635 of 663

Creek BCA which covers 93,400 acres. The Missoula RMP contains three BCAs: the 6,100-acre Hoodoos BCA, the 4,539-acre Ram Mountain BCA and the 2,365-acre Wales BCA.

"We greatly appreciate this commitment from the Department of the Interior and the Bureau of Land Management to conserve world-class hunting opportunities using the multiple-use focused Backcountry Conservation Area management tool," **said President and CEO of the Theodore Roosevelt Conservation Partnership Whit Fosburgh.** "From Crooked Creek to Ram Mountain, the Lewistown and Missoula planning areas offer some of the finest big game habitat and hunting in North America, and the BLM has listened to the input of sportsmen and women to strengthen these plans. Throughout his time at Interior, Secretary Bernhardt has remained dedicated to working with our community to see the first Backcountry Conservation Areas established on some of our most-celebrated public lands. We look forward to working with the BLM to see hunting and fishing destinations managed under this unique framework in additional land-use plans, including the forthcoming Eastern Colorado RMP."

Designation of these BCAs aligns with **Secretary's Order 3356 (https://www.doi.gov/sites/doi.gov/files/uploads/signed_so_3356.pdf)**: *Hunting, Fishing, Recreational Shooting and Wildlife Conservation Opportunities and Coordination with States, Tribes and Territories*, which directs Department of the Interior bureaus to incorporate analysis of the impacts of Federal land and water management actions on hunting, fishing, and recreational shooting access in planning and decision-making; as well as **Secretary's Order 3362 (https://www.doi.gov/sites/doi.gov/files/uploads/so_3362_migration.pdf)**: *Improving Habitat Quality in Western Big Game Winter Range and Migration Corridors*.

"The Congressional Sportsmen's Foundation commends Secretary Bernhardt and the BLM for using available planning tools to increase access for sportsmen and women and provide quality fish and wildlife habitat on multiple-use public lands," **said Congressional Sportsmen's Foundation President Jeff Crane.** "The establishment of Backcountry Conservation Areas in the Lewistown RMP represents targeted resource management to meet the needs of wildlife and America's hunters, anglers, and recreational shooters as they enjoy our nation's treasured public lands."

"The Mule Deer Foundation commends the Department of the Interior and the Bureau of Land Management on the Records of Decision for the Lewistown and Missoula Montana Resource Management Plans. As a result of these plans, MDF will be able to more effectively create, restore and protect mule deer populations and habitat on the BLM lands subject to the plans," **said President and CEO of the Mule Deer Foundation Miles Moretti.** "Additionally, MDF would like to extend its sincere appreciation to Interior Secretary David Bernhardt for his personal

commitment to including Backcountry Conservation Area management tools in the RMP's. These Backcountry Areas, which are among the first of their kind, will elevate the prioritization of management for wildlife habitat and hunting and fishing access without violating BLM's multiple use mandate. Doing so will serve to benefit sportsmen and women conservationists and wildlife in a manner that bolsters the economic wellbeing of surrounding communities."

"We appreciate the professionalism and inclusiveness process implemented by the BLM in drafting their Resource Management Plans and their outreach through public meetings which included representatives of their various staff," **said Gordy Sanders, Resource Manager of Pyramid Mountain Lumber, Inc. in Seeley Lake.** "As a stakeholder, we are pleased with both RMPs' focus on active management while recognizing other public values."

The final Lewistown and Missoula RMP documents, as well as the BLM's Records of Decision, will be published in the ***Federal Register*** in the near future. BLM will announce the availability of these documents, as well as where to access them, when a publication date is finalized.

The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. In fiscal year 2018, the diverse activities authorized on BLM-managed lands generated $105 billion in economic output across the country. This economic activity supported 471,000 jobs and contributed substantial revenue to the U.S. Treasury and state governments, mostly through royalties on minerals.

## RELEASE DATE

Thursday, July 30, 2020

## ORGANIZATION

Bureau of Land Management

## CONTACTS

**Name:** Al Nash
**Email:** **knash@blm.gov (mailto:knash@blm.gov)**
**Phone:** 406-896-5260

# Exhibit K



THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO. 3345 Amendment No. *28 (**Amended material bold and italicized**)*

Subject:  Temporary Redelegation of Authority for Certain Vacant Non-Career
Senate-Confirmed Positions

Sec. 1 **Purpose**.  The purpose of this Order is to temporarily redelegate authority for the
following vacant non-career Presidentially appointed and Senate-confirmed positions for which
there is no Principal Deputy that would automatically become acting by operation of law:

    a.  Deputy Secretary
    b.  Solicitor
    c.  Director, Bureau of Land Management
    d.  Special Trustee for American Indians
    e.  Director, National Park Service
    f.  Director, Office of Surface Mining Reclamation and Enforcement
    g.  Director, U.S. Fish and Wildlife Service

This Order is intended to ensure uninterrupted management and execution of the duties of these
vacant non-career positions during the Presidential transition pending Senate-confirmation of
new non-career officials.  In conjunction with the officials who will be acting under the
Vacancies Reform Act, this Order will provide necessary decision making authority to
Presidentially appointed and Senate-confirmed positions across the Department of the Interior.
The delegations made by this Order will only be in effect until each vacant non-career position is
filled by Senate-confirmed appointees, upon the subsequent designation of acting officials, or a
subsequent delegation to alternate officials.

Sec. 2 **Authority**.  This Order is issued under the authority of Section 2 of Reorganization Plan
No. 3 of 1950 (64 Stat. 1262), as amended, and in compliance with the Vacancies Reform Act.

Sec. 3 **Delegation**.  All functions, duties, and responsibilities of the following positions are
hereby delegated to the specified employees:

    a.  Deputy Secretary to Kate MacGregor, Deputy Chief of Staff
    b.  Solicitor to Daniel Jorjani, Principal Deputy Solicitor
    c.  Director, Bureau of Land Management to ***William Perry Pendley, Deputy Director,
        Policy and Programs, Bureau of Land Management***
    d.  Special Trustee for American Indians to Jerold Gidner, Principal Deputy
        Special Trustee for American Indians
    e.  Director, National Park Service to P. Daniel Smith, Deputy Director,
        National Park Service

    f.  Director, Office of Surface Mining Reclamation and Enforcement to Glenda Owens,
        Deputy Director, Office of Surface Mining Reclamation and Enforcement
    g.  Director, U.S. Fish and Wildlife Service to Margaret Everson, Principal
        Deputy Director, U.S. Fish and Wildlife Service

The authority delegated herein may be further delegated by the designee as necessary, consistent with 200 DM 1 and all applicable statutes and regulations.

Sec. 4  **Limitation**.  This delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  The Secretary must perform any functions or duties required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  This redelegation does not supersede existing delegations of authority to or from the various vacant non-career positions to subordinate officials.

Sec. 5  **Expiration Date**.  This Order is effective immediately. It will automatically expire for each vacant non-career position when filled by a Senate-confirmed appointee, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials. In the absence of the foregoing actions, it will terminate on ***September 30, 2019***, unless extended, modified, or revoked.

Secretary of the Interior

Date: JUL 2 9 2019

# Exhibit L



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3345 Amendment No. *29 (Amended material bold and italicized)*

Subject:  Temporary Redelegation of Authority for Certain Vacant Non-Career
Senate-Confirmed Positions

Sec. 1  **Purpose.**  The purpose of this Order is to temporarily redelegate authority for the
following vacant non-career Presidentially appointed and Senate-confirmed positions for which
there is no Principal Deputy that would automatically become acting by operation of law:

   a. Deputy Secretary
   b. Solicitor
   c. Director, Bureau of Land Management
   d. Special Trustee for American Indians
   e. Director, National Park Service
   f. Director, Office of Surface Mining Reclamation and Enforcement
   g. Director, U.S. Fish and Wildlife Service

This Order is intended to ensure uninterrupted management and execution of the duties of these
vacant non-career positions during the Presidential transition pending Senate-confirmation of
new non-career officials. In conjunction with the officials who will be acting under the
Vacancies Reform Act, this Order will provide necessary decision making authority to
Presidentially appointed and Senate-confirmed positions across the Department of the Interior.
The delegations made by this Order will only be in effect until each vacant non-career position is
filled by Senate-confirmed appointees, upon the subsequent designation of acting officials, or a
subsequent delegation to alternate officials.

Sec. 2  **Authority**.  This Order is issued under the authority of Section 2 of Reorganization Plan
No. 3 of 1950 (64 Stat. 1262), as amended, and in compliance with the Vacancies Reform Act.

Sec. 3  **Delegation**.  All functions, duties, and responsibilities of the following positions are
hereby delegated to the specified employees:

   a. Deputy Secretary to Kate MacGregor, Deputy Chief of Staff
   b. Solicitor to Daniel Jorjani, Principal Deputy Solicitor
   c. Director, Bureau of Land Management to William Perry Pendley, Deputy Director,
       Policy and Programs, Bureau of Land Management
   d. Special Trustee for American Indians to Jerold Gidner, Principal Deputy
       Special Trustee for American Indians
   e. Director, National Park Service to *David Vela, Deputy Director for Operations,*
       National Park Service

    f.  Director, Office of Surface Mining Reclamation and Enforcement to ***Lanny Erdos, Principal Deputy Director,*** Office of Surface Mining Reclamation and Enforcement

    g.  Director, U.S. Fish and Wildlife Service to Margaret Everson, Principal Deputy Director, U.S. Fish and Wildlife Service

The authority delegated herein may be further delegated by the designee as necessary, consistent with 200 DM 1 and all applicable statutes and regulations.

Sec. 4  **Limitation**.  This delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  The Secretary must perform any functions or duties required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  This redelegation does not supersede existing delegations of authority to or from the various vacant non-career positions to subordinate officials.

Sec. 5  **Expiration Date**.  This Order is effective immediately. It will automatically expire for each vacant non-career position when filled by a Senate-confirmed appointee, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials.
In the absence of the foregoing actions, it will terminate on ***January 3, 2020***, unless extended, modified, or revoked.

Secretary of the Interior

Date: SEP 3 0 2019

# Exhibit M



THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO.  3345 Amendment No. *30 (**Amended material bold and italicized**)*

Subject:  Temporary Redelegation of Authority for Certain Vacant Non-Career
Senate-Confirmed Positions

Sec. 1 **Purpose**.  The purpose of this Order is to temporarily redelegate authority for the following vacant non-career Presidentially appointed and Senate-confirmed positions for which there is no Principal Deputy that would automatically become acting by operation of law:

    a. Deputy Secretary
        b. Director, Bureau of Land Management
    c. Special Trustee for American Indians
    d. Director, National Park Service
    e. Director, Office of Surface Mining Reclamation and Enforcement

This Order is intended to ensure uninterrupted management and execution of the duties of these vacant non-career positions during the Presidential transition pending Senate-confirmation of new non-career officials.  In conjunction with the officials who will be acting under the Vacancies Reform Act, this Order will provide necessary decision making authority to Presidentially appointed and Senate-confirmed positions across the Department of the Interior. The delegations made by this Order will only be in effect until each vacant non-career position is filled by Senate-confirmed appointees, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials.

Sec. 2 **Authority**.  This Order is issued under the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, and in compliance with the Vacancies Reform Act.

Sec. 3 **Delegation**.  All functions, duties, and responsibilities of the following positions are hereby delegated to the specified employees:

    a. Deputy Secretary to Kate MacGregor, Deputy Chief of Staff
    b. Director, Bureau of Land Management to William Perry Pendley, Deputy Director,
Policy and Programs, Bureau of Land Management
    c. Special Trustee for American Indians to Jerold Gidner, Principal Deputy
Special Trustee for American Indians
    d. Director, National Park Service to David Vela, Deputy Director for Operations,
National Park Service
    e. Director, Office of Surface Mining Reclamation and Enforcement to Lanny Erdos,
Principal Deputy Director, Office of Surface Mining Reclamation and
Enforcement

The authority delegated herein may be further delegated by the designee as necessary, consistent with 200 DM 1 and all applicable statutes and regulations.

Sec. 4 **Limitation**.  This delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  The Secretary must perform any functions or duties required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  This redelegation does not supersede existing delegations of authority to or from the various vacant non-career positions to subordinate officials.

Sec. 5 **Expiration Date**.  This Order is effective immediately. It will automatically expire for each vacant non-career position when filled by a Senate-confirmed appointee, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials. In the absence of the foregoing actions, it will terminate on *April 3, 2020*, unless extended, modified, or revoked.

Secretary of the Interior

Date:     JAN 0 2 2020

# Exhibit N

THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO.  3345 Amendment No. *31 (**Amended material bold and italicized**)*

Subject:  Temporary Redelegation of Authority for Certain Vacant Non-Career
         Senate-Confirmed Positions

Sec. 1 **Purpose**.  The purpose of this Order is to temporarily redelegate authority for the following vacant non-career Presidentially appointed and Senate-confirmed positions for which there is no Principal Deputy that would automatically become acting by operation of law:

    a.  Director, Bureau of Land Management
    b.  Special Trustee for American Indians
    c.  Director, National Park Service
    d.  Director, Office of Surface Mining Reclamation and Enforcement

This Order is intended to ensure uninterrupted management and execution of the duties of these vacant non-career positions during the Presidential transition pending Senate-confirmation of new non-career officials.  In conjunction with the officials who will be acting under the Vacancies Reform Act, this Order will provide necessary decision making authority to Presidentially appointed and Senate-confirmed positions across the Department of the Interior. The delegations made by this Order will only be in effect until each vacant non-career position is filled by Senate-confirmed appointees, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials.

Sec. 2 **Authority**.  This Order is issued under the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, and in compliance with the Vacancies Reform Act.

Sec. 3 **Delegation**.  All functions, duties, and responsibilities of the following positions are hereby delegated to the specified employees:

    a.  Director, Bureau of Land Management to William Perry Pendley, Deputy Director, Policy and Programs, Bureau of Land Management.
    b.  Special Trustee for American Indians to Jerold Gidner, Principal Deputy Special Trustee for American Indians.
    c.  Director, National Park Service to David Vela, Deputy Director for Operations, National Park Service.
    d.  Director, Office of Surface Mining Reclamation and Enforcement to Lanny Erdos, Principal Deputy Director, Office of Surface Mining Reclamation and Enforcement.

The authority delegated herein may be further delegated by the designee as necessary, consistent with 200 DM 1 and all applicable statutes and regulations.

Sec. 4 **Limitation**.  This delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  The Secretary must perform any functions or duties required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  This redelegation does not supersede existing delegations of authority to or from the various vacant non-career positions to subordinate officials.

Sec. 5 **Expiration Date**.  This Order is effective immediately.  It will automatically expire for each vacant non-career position when filled by a Senate-confirmed appointee, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials. In the absence of the foregoing actions, it will terminate on *May 5, 2020*, unless extended, modified, or revoked.

Secretary of the Interior

Date:   APR 0 3 2020

# Exhibit O



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO.  3345 Amendment No. *32 (**Amended material bold and italicized**)*

Subject:  Temporary Redelegation of Authority for Certain Vacant Non-Career
          Senate-Confirmed Positions

Sec. 1  **Purpose**.  The purpose of this Order is to temporarily redelegate authority for the
following vacant non-career Presidentially appointed and Senate-confirmed positions for which
there is no Principal Deputy that would automatically become acting by operation of law:

        a. ***Assistant Secretary – Land and Minerals Management***
        b.  Director, Bureau of Land Management
        c.  Special Trustee for American Indians
        d.  Director, National Park Service
        e.  Director, Office of Surface Mining Reclamation and Enforcement

This Order is intended to ensure uninterrupted management and execution of the duties of these
vacant non-career positions during the Presidential transition pending Senate-confirmation of
new non-career officials.  In conjunction with the officials who will be acting under the
Vacancies Reform Act, this Order will provide necessary decision making authority to
Presidentially appointed and Senate-confirmed positions across the Department of the Interior.
The delegations made by this Order will only be in effect until each vacant non-career position is
filled by Senate-confirmed appointees, upon the subsequent designation of acting officials, or a
subsequent delegation to alternate officials.

Sec. 2  **Authority**.  This Order is issued under the authority of Section 2 of Reorganization Plan
No. 3 of 1950 (64 Stat. 1262), as amended, and in compliance with the Vacancies Reform Act.

Sec. 3  **Delegation**.  All functions, duties, and responsibilities of the following positions are
hereby delegated to the specified employees:

        a. ***Assistant Secretary – Land and Minerals Management to Casey Hammond,
Principal Deputy Assistant Secretary – Land and Minerals Management***.
        b.  Director, Bureau of Land Management to William Perry Pendley, Deputy Director,
Policy and Programs, Bureau of Land Management.
        c.  Special Trustee for American Indians to Jerold Gidner, Principal Deputy
Special Trustee for American Indians.
        d.  Director, National Park Service to David Vela, Deputy Director for Operations,
National Park Service.
        e.  Director, Office of Surface Mining Reclamation and Enforcement to Lanny Erdos,
Principal Deputy Director, Office of Surface Mining Reclamation and Enforcement.

The authority delegated herein may be further delegated by the designee as necessary, consistent with 200 DM 1 and all applicable statutes and regulations.

Sec. 4  **Limitation**.  This delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  The Secretary must perform any functions or duties required by statute or regulation to be performed only by the Senate-confirmed official occupying the position.  This redelegation does not supersede existing delegations of authority to or from the various vacant non-career positions to subordinate officials.

Sec. 5  **Expiration Date**.  This Order is effective immediately.  It will automatically expire for each vacant non-career position when filled by a Senate-confirmed appointee, upon the subsequent designation of acting officials, or a subsequent delegation to alternate officials. In the absence of the foregoing actions, it will terminate on *June 5, 2020,* unless extended, modified, or revoked.

Secretary of the Interior

Date:  MAY 0 5 2020

# Exhibit P





U.S. DEPARTMENT OF THE INTERIOR

# BUREAU OF LAND MANAGEMENT (/)

**(/).**

## LEADERSHIP                                                    +

# WILLIAM PERRY PENDLEY



### *Deputy Director, Policy And Programs*

William Perry Pendley serves as the Bureau of Land Management's Deputy Director for Policy and Programs, exercising authority of the director. Pendley, an attorney, has decades of experience in federal land management policy.

Born and raised in Cheyenne, Wyoming, Pendley received B.A. and M.A. degrees in Economics and Political Science from George Washington University in Washington, D.C. He was a captain in the U.S. Marine Corps, after which he received his J.D. from the University of Wyoming College of Law, where he was Senior Editor on *Land and Water Law Review*.

Pendley served as an attorney to former Senator Clifford P. Hansen (R-Wyoming) and to the House Interior and Insular Affairs Committee. During the Reagan Administration, he served as Deputy Assistant Secretary for Energy and Minerals of the Department of Interior, where he authored President Reagan's National Minerals Policy and Exclusive Economic Zone proclamation. Pendley was a consultant to former Secretary of the Navy John F. Lehman, Jr., and was engaged in the private practice of law in the Washington, D.C., area before his return to the West in 1989 to become President of the Mountain States Legal Foundation for nearly 30 years.

# Exhibit Q





# Subject: In-town pool report no. 3



**poolreports**
8/04/20 10:49AM

243    1



From: "Bidgood, Jess"

Date: August 4, 2020 at 10:47:05 AM EDT
Subject: In-town pool report no. 3

The White House sends this along on today's bill signing ceremony, which is being live-streamed by the White House.

Today, President Donald J. Trump will give remarks and sign H.R. 1957 – The Great American Outdoors Act, one of the greatest conservation acts in decades, into law.

The Great American Outdoors Act requires full, mandatory funding of the Land and Water Conservation Fund and addresses the maintenance backlog facing America's national parks and public lands.

ADVERTISEMENT

8/17/2020
Subject: In-town pool report no. 3
Case 4:20-cv-00062-BMM   Document 10-5   Filed 08/20/20   Page 658 of 663

The following individuals are expected to attend:

The White House

President Donald J. Trump

The Vice President

Mark Meadows, Assistant to the President and Chief of Staff

Ivanka Trump, Advisor to the President

Jared Kushner, Assistant to the President and Senior Advisor

Marc Short, Assistant to the President and Chief of Staff to the Vice President

Amy Swonger, Assistant to the President and Acting Director of Legislative Affairs

Mary Neumayr, Chairman of the Council on Environmental Quality

---

ADVERTISEMENT

---

Trump Administration

Secretary David Bernhardt, Department of the Interior

Secretary Sonny Perdue, Department of Agriculture

Aurelia Skipwith, Director, U.S. Fish and Wild Service, Department of the Interior

William Perry Pendley, Acting Director of Bureau of Land Management, Department of the Interior

Chris French, Deputy Chief, U.S. Forest Service

Doug Crandall, Director of Legislative Affairs, U.S. Forest Service

Tara Sweeney, Assistant Secretary for Bureau of Indian Affairs

Cole Rojewski, Director of Congressional and Legislative Affairs, DOI

Members of Congress

Senator Lamar Alexander (R–TN)

Senator Steve Daines (R–MT)

Senator Cory Gardner (R–CO)

Senator John Hoeven (R–ND)

Senator Martha McSally (R–AZ)

Senator Rob Portman (R–OH)

Rep. Jeff Fortenberry (R–LA)

Rep. Tom Reed (R–NY)

Rep. Don Young (R–AK)

ADVERTISEMENT

External Participants

K.C. Walsh, Founder Simms Fishing, Property and Environment Research Center and Theodore Roosevelt Conservation Partnership Board Member

Tim Cors , Director of Lands, The Nature Conservancy

Lesley Kane Szynal, Director, Outdoors America

Alan Front , Chief Executive Officer, Conservation Pathways

Jay Leutze, Director of Government Relations, Southern Appalachian Highlands Conservancy

Whit Fosburgh, Theodore Roosevelt Conservation Partnership

Jeff Crane, Congressional Sportsmen's Foundation

John Nau, Board Member, National Park Foundation

Johnny Morris, Founder and Chief Executive Officer, Bass Pro Shop

Rob Keck, Director of Conservation, Bass Pro Shop

Joe Bartozzi, President and Chief Executive Officer, National Shooting Sports
Foundation

Laird Hamberlain, Chief Executive Officer, Safari Club International

--

Jess Bidgood

National Political Reporter

The Boston Globe

o. 202-xxx-xxxx

m. 202-xxx-xxxx

@jessbidgood


===========================================================


---

*Public Pool is an automated feed of* <u>White House press pool reports</u>. *For live updates, follow*
<u>@WHPublicPool</u> *on Twitter.*

**SHARE THIS STORY**



**GET OUR NEWSLETTER**

✉ Subscribe

This discussion is closed

# Exhibit R



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
### Washington, D.C. 20240
### https://www.blm.gov



To:         Casey Hammond
            Principal Deputy Assistant Secretary, exercising the delegated authority of the
            Assistant Secretary – Land and Minerals Management

From:       William Perry Pendley
            Deputy Director, Policy and Programs, exercising the delegated authority of the
            Director, Bureau of Land Management

Subject:    Designation of Successors for Presidentially-Appointed, Senate-Confirmed
            Positions

Pursuant to the Vacancies Reform Act (Act), the following positions in the Bureau of Land
Management shall automatically succeed the Director of the Bureau of Land Management
(Director) in the absence of the incumbent and in the order listed.

The incumbent of Position One shall be the First Assistant for the purposes of the Act.
Incumbents in all of the positions listed are hereby delegated the authority to perform all duties
and responsibilities of the Director when required to ensure continued, uninterrupted direction
and supervision to perform essential functions and activities of the office.  The authority of the
Director may be exercised only when an official in one of the following positions is reasonably
certain that no preceding official on the list is able to exercise that authority, and when the nature
of the situation requires immediate action.

Individuals exercising the authority of the Director will be relieved of this responsibility as soon
as a preceding official on the list is available, or when an official with the requisite authority
designates a permanent or Acting Director.  Individuals exercising the authority of the Director
will keep a record of important actions taken and the period during which the authority was
exercised.

The Director has the option to designate anyone on the list as Acting Director, in no particular
order, when the Director is on leave or otherwise unavailable.

The Office of the Director shall promptly inform the Office of the Assistant Secretary – Land
and Minerals Management of the persons holding the positions listed below (and update that list
as necessary) or of any changes to the order of succession.

Position One:   Deputy Director, Policy and Programs
Position Two:   Deputy Director, Operations

Position Three:   Assistant Director, Energy, Minerals and Realty Management
Position Four:    Idaho State Director
Position Five:    Arizona State Director

Signature  WILLIAM PENDLEY    Digitally signed by WILLIAM PENDLEY Date: 2020.05.22 11:53:21 -06'00'    Date May 22, 2020

Concur     CASEY HAMMOND    Digitally signed by CASEY HAMMOND Date: 2020.05.22 17:18:22 -04'00'    Date 5/22/20