# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana; *et al.,* | Case No. 4:20-cv-00062-BMM |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| BUREAU OF LAND MANAGEMENT; *et al.,* | |
| Defendants. | |

JEFFREY B. CLARK
*Acting Assistant Attorney General*
CHRISTOPHER R. HALL
*Assistant Branch Director*
Federal Programs Branch
M. ANDREW ZEE
Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Phone: (415) 436-6646
E-mail: m.andrew.zee@usdoj.gov

KURT G. ALME
United States Attorney
MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 2nd Avenue North, Suite 3200
Billings, MT 59101

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND................................................................................................3

I.      The Bureau of Land Management ..........................................................3

II.     Relevant Factual Background ................................................................4

LEGAL STANDARD ........................................................................................7

ARGUMENT ....................................................................................................7

I.      Plaintiffs Lack Standing to Assert Their Appointments Clause Claim ................9

        A.      Plaintiffs' allegations of potential future injury from a hypothetical
                ESA sage grouse listing are inadequate to confer standing.......................10

        B.      Plaintiffs allege no cognizable Article III injury from two draft
                resource management plans, nor any alleged injury fairly traceable
                to the challenged conduct............................................................13

II.     Plaintiffs Are Not Entitled to Summary Judgment on Their
        Appointments Clause Claim ................................................................15

        A.      Plaintiffs' faulty factual premise precludes summary judgment ...............16

        B.      Performance of the BLM Director's functions by an individual
                who has not been confirmed by the Senate does not violate the
                Appointments Clause. ..............................................................17

        C.      The duration of Mr. Pendley's performance of the Director's
                functions, even after he has been nominated to the position, does
                not violate the Appointments Clause. ...........................................20

III.    Plaintiffs' FVRA Argument is Misplaced and Need Not Be Addressed ...........23

CONCLUSION ................................................................................................24

i

# TABLE OF AUTHORITIES

## CASES

*Alfred L. Snapp & Son, Inc., v. Puerto Rico,*
  458 U.S. 592 (1982) ................................................................................10

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................................7

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................................................21

*Barr v. Matteo,*
  360 U.S. 564 (1959) ..................................................................................1

*Bhatti v. Fed. Housing Fin. Agency,*
  332 F. Supp. 3d 1206 (D. Minn. 2018) ..............................................21, 22

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ..................................................................................7

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 ...............................................................................7, 11, 12, 13

*Edmond v. United States,*
  520 U.S. 651 (1997) ......................................................................18, 19, 20

*Frankl v. HTH Corp.,*
  650 F.3d 1334 (9th Cir. 2011) ................................................................16

*Freytag v. Commissioner,*
  501 U.S. 868 (1991) ................................................................................18

*Guedes v. Barr,*
  920 F.3d 1 (D.C. Cir. 2019) ......................................................................8

*In re Grand Jury Investigation,*
  916 F.3d 1047 (D.C. Cir. 2019) ..............................................................19

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976) ................................................................15

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................11

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................10

*Morrison .v Olson,*
    487 U.S. 654 (1988) ................................................................18

*Nevada v. Burford,*
    918 F.2d 854 (9th Cir. 1990) ................................................10

*Otter v. Jewell,*
    227 F. Supp. 3d 117 (D.D.C. 2017) ....................................15

*Raines v. Byrd,*
    521 U.S. 811 (1997) ..................................................................9

*Schaghticoke Tribal Nation v. Kempthorne,*
    587 F. Supp. 2d 389 (D. Conn. 2008) ................................16

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ..................................................................11

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................ 9, 13

*Stand up for California! v. U.S. Dep't of Interior,*
    298 F. Supp. 3d 136 (D.D.C. 2018) ....................................16

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998)............................................................. 2, 24

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004)..............................................16

*United States v. Eaton*,
  169 U.S. 331 (1898) ..................................................................................*passim*

*Weiss v. United States*,
  510 U.S. 163 (1994) ...............................................................................19

*Western Exploration, LLC v. U.S. Dep't of the Interior*,
  250 F. Supp. 3d 718 (D. Nev. 2017) ..................................................15

**STATUTES**

5 U.S.C. § 3345..............................................................................................6

43 U.S.C. § 1731 ...............................................................................3, 4, 19

Pub. L. No. 94-579 (1976) (codified at 43 U.S.C., Ch. 35) ..................3

Pub. L. No. 110-161 (Dec. 26, 2007) .....................................................22

Pub. L. No. 111-8 (Mar. 11, 2009)..........................................................23

**RULES**

Fed. R. Civ. P. 12..................................................................................... 2, 8

Fed. R. Civ. P. 56..................................................................................... 7, 17

**UNITED STATES CONSTITUTION**

U.S. Const., art. II, § 2 ........................................................................17, 19

U.S. Const., art. III, § 2.............................................................................9

**OTHER AUTHORITIES**

ATF Industry Newsletter (Aug. 2015)
  https://www.atf.gov/explosives/docs/newsletter/explosives-industry-newsletter-
  august-2015/download ...........................................................................21

Eleven Nominations and Three Withdrawals Sent to the Senate (Sept. 8, 2020),
    https://www.whitehouse.gov/presidential-actions/eleven-nominations-three-
    withdrawals-sent-senate/ ...................................................................................6

FFL Newsletter (2019)
    https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-
    newsletter/2019/download .............................................................................21

Organization Chart, https://www.blm.gov/about/organization-chart .........................4

PN2076 (116th Cong.).................................................................................................6

## INTRODUCTION

Under expressly delegated authority from the Secretary of the Interior, William Perry Pendley exercises the duties, functions, and responsibilities of the Director of the Bureau of Land Management ("BLM").  Plaintiffs misunderstand that fact, arguing— and moving for early summary judgment on the notion—that Mr. Pendley is BLM's "Acting Director" under the Federal Vacancies Reform Act ("FVRA").  Pls.' Expedited Motion for Summary Judgment, ECF Nos 10, 10-1 ("Mot.").  Whether Plaintiffs appreciate the difference or not, Mr. Pendley is not BLM's Acting Director, but rather the official performing the Director's duties under the Secretary's delegation. Such an arrangement represents a necessary feature of the modern administrative state, in which "[t]he complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions."  *Barr v. Matteo*, 360 U.S. 564, 573 (1959).  Plaintiffs' misunderstanding undermines the legal basis of their Appointments Clause claim, and thus supports denial of their early summary judgment motion.

First, though: the Court should not even reach the merits of that motion because Plaintiffs' claims fall outside its subject-matter jurisdiction; at minimum, the Court should not do so now.  Plaintiffs' summary judgment motion—filed only three days after they served the Complaint on August 17, 2020—cannot obscure the fundamental jurisdictional problems they face.  As explained below, Plaintiffs' inability even to allege the injury-in-fact necessary to establish Article III standing provides basis enough to dismiss the case outright.  In particular, Plaintiffs allege only vague prospective

1

harms to the State of Montana's interests, nearly all of which would in Plaintiffs' own telling accrue only under some hypothetical future event, an entirely conjectural listing of the sage grouse under the Endangered Species Act ("ESA").   But beyond that lack of standing, Defendants anticipate moving to dismiss on additional jurisdictional grounds when their Rule 12 response to the Complaint is actually due.   Plaintiffs' efforts to head that outcome off by moving for summary judgment just three days after service does nothing to obviate the Court's obligation to determine its subject-matter jurisdiction under *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), prior to taking any other action—including deciding an early summary judgment motion.

Still, if the Court concludes that *Steel Co.* does not prohibit it from resolving Plaintiffs' early summary judgment motion (or at least deferring decision until a Rule 12 motion is also before it), the result should be denial on the merits.   The Supreme Court has long held that an individual who has not been appointed through Presidential nomination and Senate confirmation may permissibly perform the duties of a higher-level official, even if such confirmation would be required to occupy that office on a permanent basis.   *United States v. Eaton*, 169 U.S. 331 (1898).   Plaintiffs' contention that Mr. Pendley cannot perform the BLM Director's functions without Senate confirmation founders in the face of this longstanding precedent.

Plaintiffs' attempt to anticipate a counterargument under the FVRA, meanwhile, is misplaced.   Mr. Pendley is carrying out the Director's duties under delegated authority—not under the FVRA.   Because the FVRA is not the basis for Mr. Pendley's

2

service, Plaintiffs' anticipatory counterargument is of no moment, and can be safely ignored for purpose of deciding early summary judgment.

Mr. Pendley was duly appointed to his position as BLM's Deputy Director for Policy and Programs ("DDPP"), and has been exercising the functions of the Director for little over a year.   Far from the unprecedented constitutional crisis Plaintiffs make it out to be, this is an unremarkable inevitability of the Federal Government's administrative state.   Plaintiffs' Complaint should be dismissed for lack of standing, but even if it is not, summary judgment should be denied.

## BACKGROUND

### I.   The Bureau of Land Management

A component of the U.S. Department of the Interior, the Bureau of Land Management serves as custodian of the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations.   Under the Federal Land Policy and Management Act of 1976, Congress has tasked the BLM with a mandate of managing public lands for a variety of uses such as energy development, livestock grazing, recreation, and timber harvesting while ensuring natural, cultural, and historic resources are maintained for present and future use.   *See generally* Federal Land Policy and Management Act, Pub. L. No. 94-579, 90 Stat. 2743 (1976) (codified at 43 U.S.C., Ch. 35).

Congress provided for a Director to be the head of BLM, to be appointed "by the President, by and with the advice and consent of the Senate."   43 U.S.C. § 1731(a). The Director is charged with "carry[ing] out such functions and . . . perform[ing] such

duties as the Secretary [of the Interior] may prescribe with respect to the management of lands and resources under his jurisdiction according to the applicable provisions of [the FLPMA] and any other applicable law."   *Id.*   Directly beneath the Director position on BLM's organizational chart are two Deputy Director positions, the Deputy Director, Policy and Programs, and the Deputy Director, Operations.   *See* Organization Chart,   https://www.blm.gov/about/organization-chart.   These positions were created in 2011 pursuant to authority granted by Congress.   *See* 43 U.S.C. § 1731(c) (providing that "there shall be an Associate Director of the Bureau and so many Assistant Directors, and other employees, as may be necessary, who shall be appointed by the Secretary "); attached Declaration of Amanda E. Kaster ("Kaster Decl.") ¶ 6.   These are the three senior-most offices within BLM.

## II.    Relevant Factual Background

The most recent Senate-confirmed BLM Director, Neil Kornze, resigned effective January 19, 2017.   Kaster Decl. ¶ 4.   That day, the Secretary of the Interior issued Order No. 3345, which delegated the nonexclusive functions, duties, and responsibilities of the Director of BLM to the person who at that time was the Assistant Director, Office of National Conservation Lands and Community Partnerships.   *Id.* ¶ 4 & Ex. A.   Order No. 3345 was later amended multiple times, on each occasion re-delegating the Director's duties to a particular individual.   *Id.* ¶¶ 4-6.   Between January 2017 and July 2019, four individuals exercised the functions, duties, and responsibilities of the Director under those delegation orders: Kristin Bail, Mike Nedd, Brian Steed, and Casey Hammond.   *Id.*

4

On July 15, 2019, William Perry Pendley was appointed by the Secretary to be the Deputy Director, Policy and Programs (DDPP).   *Id.* ¶ 6.   The DDPP addresses policy concerns associated with the Bureau's wide variety of multiple use activities; works closely with external stakeholders including State and local governments; and facilitates efforts to coordinate the Bureau's work within the Department and with other Federal agencies and Congress.   *Id.* ¶ 6.   On July 29, 2019, by Order No. 3345, Amendment No. 28, the Secretary delegated the non-exclusive functions, duties, and responsibilities of the BLM Director to Mr. Pendley.[1]   *Id.* ¶ 7 & Ex. C.   Following that Order, Mr. Pendley continued to serve as the DDPP, while also exercising the functions of the Director.   The Secretary extended the delegation of authority to Mr. Pendley four additional times, culminating in Order No. 3345, Amendment No. 32, which expired on June 5, 2020.   *Id.* ¶ 7 & Ex. D.

On May 22, 2020, Mr. Pendley, as the DDPP exercising the delegated authority of the Director, submitted to the Principal Deputy Assistant Secretary of the Interior (who was himself exercising the delegated authority of the Assistant Secretary, Land and Minerals Management) a memorandum entitled "Designation of Successors for Presidentially-Appointed, Senate-Confirmed Positions" (the "Succession Order")   *Id.* ¶ 8 & Ex. E.   Later that day, the Principal Deputy Assistant Secretary concurred in the Succession Order, ratifying its effect.   *Id.* ¶ 8 & Ex. E.   This Succession Order was

_____

[1] For brevity, when this memorandum refers to the Director's duties, functions, responsibilities, or authority, it is referring to those which are not exclusive to the Director, i.*e.*, those which can be delegated to a subordinate official.

part of a larger Department-wide effort to have in place current and operative succession orders for positions requiring Presidential appointment after Senate confirmation"). *Id.* ¶ 9.

The Succession Order has two primary features.  First, it provides that the DDPP "shall be the First Assistant [to the BLM Director] for the purposes of the [FVRA]."  Succession Order at 1.  Second, the Order delegates to the incumbent of five positions "the authority to perform all duties and responsibilities of the Director when required to ensure continued, uninterrupted direction and supervision to perform essential functions and activities of the office."  *Id.*  The Succession Order lists the five positions in successive order and provides that an incumbent of a lower-listed position may exercise the authority of the Director only if that lower-listed official "is reasonably certain that no preceding official on the list is able to exercise that authority, and when the nature of the situation requires immediate action."  *Id.*  On June 5, 2020, following the expiration of Order No. 3345, Amendment 32, Mr. Pendley began performing the duties of the Director under the Succession Order.  Kaster Decl. ¶ 10.

On June 30, 2020, the President nominated Mr. Pendley to be the Director of BLM.  *See* PN2076 (116th Cong.).  That nomination was referred to the Senate Committee on Energy and Natural Resources.  *Id.*  On September 8, 2020, the President withdrew the nomination.  Kaster Decl. ¶ 13.[2]

---

[2] *See also* Eleven Nominations and Three Withdrawals Sent to the Senate (Sept. 8, 2020), https://www.whitehouse.gov/presidential-actions/eleven-nominations-three-withdrawals-sent-senate/.

Thus, since July 29, 2019, Mr. Pendley has performed the duties of the BLM Director under delegated authority, while remaining the DDPP of BLM.   *Id.* ¶¶ 7, 10. He is not now, and has never been, the Acting Director of BLM.   *Id.* ¶ 11; *see* 5 U.S.C. § 3345(a).   Although Mr. Pendley has on occasion been referred to by BLM documents or publications as the "Acting Director" or "Director' of BLM, those references were inadvertent and not intended to effectuate any change in the nature of Mr. Pendley's delegated authority.   Kaster Decl. ¶ 12.

## LEGAL STANDARD

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The moving party bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323.   Summary judgment is to be denied if the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial."   *Id.* at 324.   The court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

Summary judgment should be denied, first, because Plaintiffs lack the requisite standing to sue.   Article III requires them to establish a concrete and particularized

injury that is "*certainly* impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), yet Plaintiffs' asserted injuries—the future effects of a hypothetical ESA listing—not only fail that standard, they may never occur at all.   Nor are Plaintiffs' generalized assertions of harm to the State of Montana's interests from BLM land-use plans of sufficient particularity.   Dismissal, not summary judgment, is thus warranted. In addition, Defendants anticipate moving to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) on these (and possibly additional) threshold grounds; at minimum, the Court should therefore defer a summary judgment ruling until after it has had the opportunity to consider these defenses.[3]

As for the merits of the Appointments Clause claim—the lone claim on which they seek summary judgment—Plaintiffs show no entitlement to judgment in their favor.   First, their claim is premised on a factual mistake.   Mr. Pendley does not serve as the Acting Director as Plaintiffs believe; rather, he is performing the Director's functions under delegated authority.   That arrangement is not unlawful.   Setting aside Plaintiffs' factual misunderstanding, the Supreme Court long ago made clear that an

---

[3] Plaintiffs notably make no claim of irreparable harm that would necessitate expedited review and decision.   Instead, they claim "ongoing" harm from Mr. Pendley's service, Mot. 21, but cite no authority for the proposition that an assertion of "ongoing" harm warrants expedited relief well before Defendants' time to respond to the Complaint under Rule 12 has arisen.   The lone decision on which Plaintiffs rely in requesting expedited review involved a motion for preliminary injunction where the movant expressly asserted *irreparable* harm from an agency rule approved by an agency head whose service was allegedly unlawful.   *See* Mot. 21 (citing *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 6 (D.C. Cir. 2019)).   But Plaintiffs here make no claim of irreparable harm.

individual not confirmed by the Senate may perform the functions of an office which, if permanently occupied, would require Presidential appointment after Senate confirmation.  *See United States v. Eaton*, 169 U.S. 331, 343 (1898).   And Mr. Pendley's appointment to his own DDPP position is unquestionably proper, since the Appointments Clause grants Congress the power to vest appointment authority in a Department head such as the Secretary.   Nor can Plaintiffs obtain judgment with their suggestion that Mr. Pendley's service is unconstitutional because it has gone on too long.   Federal courts are not equipped to assess the propriety of the nomination choices made by the political branches, and the political question doctrine thus bars the argument.

Finally, Plaintiffs' attempt to preempt a defense under the FVRA need not be addressed at all.   Because Defendants advance no argument seeking to justify Mr. Pendley's service under the FVRA, this rebuttal is wholly misplaced.   For all of these reasons, even if does not dismiss the Complaint outright on standing grounds of its own accord, the Court should deny summary judgment on Plaintiffs' Appointments Clause claim.

## I.   Plaintiffs Lack Standing to Assert Their Appointments Clause Claim

Article III restricts the jurisdiction of federal courts to "cases" and "controversies," which in turn requires that a plaintiff have standing to sue.   U.S. Const., art. III, § 2, cl. 1; *e.g.*, *Spokeo, Inc. v. Robins*, 136 S. C.t 1540, 1547 (2016).   To establish standing, plaintiffs bear the burden of clearly demonstrating that they have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547.   Where, as here, "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the standing inquiry is particular rigorous.   *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

Plaintiffs allege that BLM's "departures from its obligations and commitments" under particular Resource Management Plans ("RMPs") "threaten Montana's economic and environmental interests."   Compl. ¶ 33.[4]   According to Plaintiffs, various alleged actions by BLM under these RMPs "create a significant risk" that a different federal agency—not party to this suit—will at some unspecified time in the future take action to list the sage grouse as endangered under the ESA.   Compl. ¶¶ 34, 37.   Plaintiffs also allege that BLM's land-management policies "undercut the State's ability to preserve and protect areas that have special fish and wildlife, archaeological, and recreational values."   Compl. ¶ 35.

### A.   Plaintiffs' allegations of potential future injury from a hypothetical ESA sage grouse listing are inadequate to confer standing.

The bulk of Plaintiffs' alleged injuries are attributable to the prospect—at this juncture hypothetical—that a non-party, the U.S. Fish and Wildlife Service ("FWS"),

---

[4] Because Plaintiffs are asserting claims on behalf of the State of Montana, they may not proceed against the Federal Government on a *parens patriae* theory of standing to protect Montana's citizens, *see Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982); *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990), and must instead establish harms to either the State's proprietary or sovereign interests, *see, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

might someday list the sage grouse under the ESA.   Compl. ¶ 38 ("If the sage grouse were listed as endangered, the Montana government as well as citizens and businesses throughout Montana would be required to adopt costly measures to protect the sage grouse from risks arising during the routine development and use of state and private property."); Declaration of John E. Tubbs ("Tubbs Decl.") ¶ 8, ECF No. 10-3 (asserting "Montana was very concerned" that BLM "directives and new policies" increased chances of sage grouse listing) *id.* ¶ 7 (chiding BLM for "calling into question the efficacy of the BLM Plans for purposes of adequately reducing threats").   At bottom, Plaintiffs complain that BLM is creating a "substantial risk" that the sage grouse will be listed.   Compl. ¶ 63; *see also* Declaration of Martha Williams ("Williams Decl.") ¶ 12, ECF No. 10-4 (asserting an "increase[d] potential for future listing of the Greater Sage Grouse").

But whatever actions Plaintiffs allege BLM to have taken, *see* Compl. ¶¶ 47-48, those actions cannot themselves confer Article III standing.   That is because Plaintiffs' alleged injury is not FWS's prospective listing of the sage grouse, but rather the subsequent downstream effects that such a listing might in the future have on "Montana's economic and environmental interest."   *Id.* ¶ 33.   Those alleged injuries are at least one step removed from the sage grouse's hypothetical listing, which in any event the Supreme Court has made clear would not suffice since it is "th[e] result [of] the independent action of some third party not before the court."   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

11

Plaintiffs do not even assert that FWS is aware of BLM's allegedly problematic "departures," Compl. ¶ 33, let alone that FWS is poised to list the sage grouse in the immediate near term,[5] which even then would not establish "certainly impending" injury to the State, since their asserted injuries concededly arise only *after* that listing occurs (if it occurs at all), Compl. ¶ 38 (describing "costly measures" to the State "*[i]f the sage grouse were listed*" (emphasis added)).

Plaintiffs effectively concede a lack of Article III injury based on the hypothetical nature of their alleged future injuries.  For example, they acknowledge that BLM's "issuing leases does not immediately impact habitat."   Compl. ¶ 54; *see Clapper*, 568 U.S. at 409 ("threatened injury must be *certainly impending* to constitute injury in fact" (citation omitted)).  Their abstract allusion to hypothetical future events that could occur as "eventual impacts" likewise cannot satisfy Article III.  Compl. ¶ 54 (citing possible construction of "power lines," "tank farms," and other "[n]ew infrastructure").  Nor do Plaintiffs connect alleged procedural violations of federal land-use and environmental statutes with any "actual or imminent" injury that might at some future time flow from a listing of the sage grouse.  Compl. ¶ 58 (alleging that BLM has not

_____

[5] Plaintiffs' allegation that the "risk of listing under the [ESA] is imminent," Compl. ¶ 64, underscores the insufficiency of their claim to standing.  Under *Clapper*, it is the injury itself that must be "imminent," not merely the risk of such an injury. 568 U.S. at 409.  And, as noted above, Plaintiffs' alleged injury is not the mere listing of the sage grouse, but is rather the speculative downstream effects that such a hypothetical future listing will allegedly have on the "routine development and use of state and private property."   Compl. ¶ 38.

"go[ne] through the procedures required" under FLPMA and NEPA).   As the Supreme Court has made clear, Article III standing that "relies on a highly attenuated chain of possibilities . . . does not satisfy the requirement that threatened injury must be certainly impending."   *Clapper*, 568 U.S. at 410.

Likewise insufficient is Plaintiffs' allegation that, owing to BLM's actions, the State has devoted resources to "increased study and management of threats to the sage grouse."   Compl. ¶ 62.   Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402.

### B.   Plaintiffs allege no cognizable Article III injury from two draft resource management plans, nor any alleged injury fairly traceable to the challenged conduct.

Plaintiffs appear to make an alternative claim to standing, premised on two draft resource management plans prepared by two BLM field offices in Montana and returned by BLM headquarters.   Compl. ¶¶ 65-73.   If these allegations describe some injury separate from the future effects of a hypothetical sage grouse listing (which is far from clear), this standing theory fares no better.   Plaintiffs recite a lengthy history of these plans, asserting a variety of procedural violations along the way.   *See, e.g.*, Compl. ¶¶ 67, 70, 73 (generally objecting to policy and procedural choices by BLM and alleging that BLM "failed meaningfully to engage" with Governor Bullock's objections).   But, while they point to these alleged violations of claimed procedural obligations, Plaintiffs never articulate any particularized, concrete injury caused by any BLM action involving the two draft field office RMPs.   *See Spokeo*, 136 S. Ct. at 1548 (injury must be "concrete

and particularized").   Indeed, the only BLM action identified by Plaintiffs that was taken by Mr. Pendley is that he "oversaw the comment period as well as the state director's response to the Governor's consistency review."   Compl. ¶ 74.

If paragraph 35 is intended to state an injury attributable to the two draft RMPs, it fails to do so.   Initially, Plaintiffs' reference to "the last three years of [BLM] actions and omissions," Compl. ¶ 35, is overbroad when their challenge is exclusively to action taken by Mr. Pendley under their legal theory of improper service.   Further, the alleged injury—"undercut[ting] the State's ability to preserve and protect areas" with specific values, *id.*—is not "fairly traceable" to the lone activities that Plaintiffs allege Mr. Pendley to have taken—overseeing two isolated phases of a years-long RMP process. Plaintiffs fail to establish how their vague assertion of diminished ability to protect certain areas is in any way connected to the RMP comment period and the back-and-forth between a BLM field office and the State, Compl. ¶¶ 72-73, which BLM in any event considered in its final RMPs, Kaster Decl. ¶¶ 17-24.   Tellingly, Plaintiffs' declarants do not even mention this alleged "oversight" by Mr. Pendley, referring instead to what appear to be policy disagreements with the two RMPs.   *See* Williams Decl. ¶ 9 (complaining that RMPs "make available 95 percent of federal public land in Montana to oil and gas development").

In their summary judgment papers, Plaintiffs go beyond the Complaint and reference BLM's issuance of final RMPs and its resolution of public protests.   Mot. 11; Pls.' Statement of Undisputed Facts ¶¶ 13-14, ECF No. 10-2 ("Pls.' SUF").   Disposition of these protests, however, was done by a BLM State Director, even if

formally approved by Mr. Pendley.   Kaster Decl. ¶¶ 15-16.   Yet, other than the fact that Mr. Pendley may have formally resolved these protests, it is unclear what ramifications they have for Plaintiffs' alleged injury—Plaintiffs do not highlight or focus on any particular protest as having some dispositive impact.   Nor do Plaintiffs articulate how resolution of any of these protests might have specifically impeded them from pursuing a preservation agenda.

Ultimately, Plaintiffs' allegations surrounding the RMPs appear to boil down to the contention that the State of Montana disagrees with the policy prescriptions of these plans.   But because the RMPs concern BLM decisions over how best to manage *federal* lands, the asserted injuries must yield to the authority of BLM to manage federal lands under the Property Clause of the Constitution.   *See, e.g.*, *Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976); *Otter v. Jewell*, 227 F. Supp. 3d 117, 125 (D.D.C. 2017) (rejecting standing based on failure to assert particularized injury from a BLM land-use plan), *appeal filed*, No. 17-5050 (D.C. Cir. Mar. 28, 2017); *W. Exploration, LLC v. Dep't of the Interior*, 250 F. Supp. 3d 718, 731-32 (D. Nev. 2017) (rejecting standing based on Nevada's claim that RMP amendments "interfere with land-use planning on state land" because Nevada provided no "specific facts showing exactly how these [RMP] provisions cause [it] concrete harm"), *appeal filed*, No. 17-16220 (9th Cir. June 13, 2017).

## II.   Plaintiffs Are Not Entitled to Summary Judgment on Their Appointments Clause Claim

In their request for summary judgment on their Appointments Clause claim (Count Two of the Complaint), Plaintiffs argue that by exercising the authority of the

Director, Mr. Pendley's service violates the Appointments Clause.   Mot. 14-16.
According to Plaintiffs, Mr. Pendley is "an unlawful acting director of [BLM]," Mot. 16,
and must be enjoined from making any decisions that affect the State of Montana while
exercising the Director's authority, Mot. 2.   Plaintiffs, however, ignore longstanding
Supreme Court precedent that permits a lower-level official to perform the duties of a
higher office when the latter office is vacant or the incumbent is not available.
Moreover, insofar as Plaintiffs' claim is predicated on the duration of Mr. Pendley's
service and, relatedly, the duration of the vacant Director position, summary judgment
is not warranted.   If there is a justiciable outer bound for how long an official may
exercise delegated authority, Mr. Pendley has not approached it.   Summary judgment
on the Appointments Clause claim should be denied.

### A.   Plaintiffs' faulty factual premise precludes summary judgment.

Initially, summary judgment should be denied because Plaintiffs' claim rests on
the faulty factual premise that Mr. Pendley is the "acting director of the Bureau of Land
Management."   Mot. 14, 16; *see also* Pls.' SUF ¶¶ 3-4, 6-7, 9.   Mr. Pendley is not the
"Acting Director," but rather is the DDPP who has been delegated authority of the
Director.   Kaster Decl. ¶ 11.   A Department head's delegation of authority to a
subordinate is entirely lawful, and Plaintiffs do not contend otherwise.   *See, e.g., Frankl
v. HTH Corp.*, 650 F.3d 1334, 1350 (9th Cir. 2011); *U.S. Telecom Ass'n v. FCC*, 359 F.3d
554, 565 (D.C. Cir. 2004); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389,
420 (D. Conn. 2008) ("[A]ny functions or duties not required by statute or regulation
to be performed by the official occupying [an advice-and-consent] position [where

Presidential nomination and Senate confirmation are required] may be reassigned to another official within the agency or department."), *aff'd*, 587 F.3d 132 (2d Cir. 2009); *Stand up for California! v. U.S. Dep't of Interior*, 298 F. Supp. 3d 136, 150 (D.D.C. 2018) (same).   Plaintiffs accordingly fail the basic test of summary judgment to show "that there is no genuine dispute as to any material fact."   Fed. R. Civ. P. 56(a).   Summary judgment should be denied in this basis alone.

> **B.    Performance of the BLM Director's functions by an individual who has not been confirmed by the Senate does not violate the Appointments Clause.**

Even accepting Plaintiffs' erroneous premise that Mr. Pendley is the "Acting Director," however, there is no basis to hold his performance of the Director's duties unconstitutional.   The Appointments Clause of the Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."   U.S. Const., art. II, § 2, cl. 2.

In *United States v. Eaton*, the Supreme Court over a century ago held that a lower-level official may exercise the powers belonging to a higher office without offending the Appointments Clause.   169 U.S. at 343.   In *Eaton*, the Court upheld the service of an individual who had been temporarily appointed as a "vice consul" to perform the

duties of the absent "consul," when the latter was an officer subject to the Appointments Clause's requirement of Presidential nomination and Senate confirmation.   *Id.* at 333.   "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions," the Court explained, that subordinate officer "is not thereby transformed into the superior and permanent official," such that the subordinate must have been nominated by the President and confirmed by the Senate.   *Id.* at 343.   "To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered."   *Id.* (quoted with approval in *Morrison v. Olson*, 487 U.S. 654, 672 (1988); *Edmond v. United States*, 520 U.S. 651, 661 (1997)).   This decision is enough to dispose of Plaintiffs' contrary contention that Mr. Pendley's service is a violation of the Appointments Clause.

Plaintiffs, however, rely on *Freytag v. Commissioner* for the proposition that an individual who "exercis[es] significant authority pursuant to the laws of the United States" must be appointed consistent with the Appointments Clause.   501 U.S. 868, 881 (1991); *see* Mot. 14.   Yet in arguing that Mr. Pendley has not been confirmed by the Senate to the Director position, Plaintiffs conflate two distinct issues: (1) whether Mr. Pendley was appointed pursuant to the Appointments Clause; and (2) whether his performance of the Director's duties requires a separate appointment under that Clause. *Eaton* clearly answer the second question in the negative.

As to the first question, Mr. Pendley has been appointed to only one position—the DDPP—and Plaintiffs make no claim that this appointment was improper, let alone in violation of the Appointments Clause.  Even had they attempted to do so (or are deemed to have done so), they would be incorrect.  The Secretary appointed Mr. Pendley as DDPP in July 2019 pursuant to his authority under 43 U.S.C. § 1731(c). Kaster Decl. ¶ 6.  That appointment is well within the scope of the Secretary's congressionally-conferred authority to make appointments of BLM personnel.  *See* 43 U.S.C. § 1731(c) (providing that "there shall be an Associate Director of the Bureau and so many Assistant Directors, and other employees, as may be necessary, who shall be appointed by the Secretary").   And no separate appointment under the Appointments Clause is required for the Secretary's assignment to Mr. Pendley of additional duties germane to those he already performs as the DDPP.  *See Weiss v. United States*, 510 U.S. 163, 174-76 (1994), As the concluding language of the Appointments Clause provides: "[T]he Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, *or in the Heads of Departments*." U.S. Const., art. II, § 2, cl. 2 (emphasis added); *see also, e.g.*, *Edmond v. United States*, 520 U.S. 651, 666 (1997) (upholding appointments of Coast Guard judges by the Secretary of Transportation against Appointments Clause challenge); *In re Grand Jury Investigation*, 916 F.3d 1047, 1056 (D.C. Cir. 2019) (upholding appointment of Special Counsel by the Acting Attorney General).

In sum, there is no constitutional infirmity in Mr. Pendley's exercise of the duties of the Director to ensure continuity of operations pending appointment of a Director

or Acting Director.   *See Eaton*, 169 U.S. at 343.   And—although not squarely challenged by Plaintiffs—Mr. Pendley's own appointment by the Secretary to be the DDPP is wholly consistent with the Appointments Clause.   *Edmond*, 520 U.S. at 666.

### C. The duration of Mr. Pendley's performance of the Director's functions, even after he has been nominated to the position, does not violate the Appointments Clause.

As for Plaintiffs' suggestions of a constitutional violation based on the duration of Mr. Pendley's service or on the fact that he has already been nominated to be Director, those too lack merit.   Mot. 9 (criticizing Mr. Pendley's service "for more than a year"); *id.* at 14 (criticizing the "continued exercise of the Director's authority"); *id.* at 18, 19 (same); *id.* at 18 (asserting that "[f]ollowing Pendley's withdrawal, the Administration has made clear that no change is planned in the Bureau's existing leadership").   Plaintiffs cite no decision invalidating a federal official's performance of delegated duties on durational grounds, let alone one doing so when the official has exercised delegated authority for just over a year.   Nor do Plaintiffs cite any decision or statute that would invalidate the service of an official exercising delegated authority simply because that person has also been nominated to the permanent office.   The Constitution does not impose any fixed durational limit on an official's exercise of delegated authority, which would support their Appointments Clause claim.

Instead, Plaintiffs' concerns over the duration of Mr. Pendley's service, and their related concern that the Senate has not confirmed any nominee from the President, stem necessarily from the President's and the Senate's nomination and confirmation efforts, which raise non-justiciable political questions that bar the claim.   *See Bhatti v.*

*Fed. Housing Fin. Agency*, 332 F. Supp. 3d 1206, 1221 (D. Minn. 2018) (dismissing Appointments Clause claim based on duration of service by acting director of FHFA that plaintiff alleged was "too long"), *appeal filed*, No. 18-2506 (8th Cir. July 16, 2018). By empowering the President and Congress to determine who serves as an "Officer of the United States" in a permanent capacity, the Appointments Clause reflects a "textually demonstrable constitutional commitment of the issue to a coordinate political department," and leaves no "judicially discoverable and manageable standards" for a court to apply. *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Even assuming the Court could discern a manageable standard, Mr. Pendley's service for little more than a year is not the extraordinary event Plaintiffs make it out to be. For example, one individual (Thomas Brandon) served as the top official of the Bureau of Alcohol, Tobacco, Firearms and Explosives, either as Acting Director or exercising delegated authority in his capacity as Deputy Director, for over *four* years from 2015 to 2017.[6] Plaintiffs' request that the Court craft, and then impose, a tenure limit of constitutional dimension would entail reviewing matters—such as the degree to which who leads BLM should figure into the President's priorities, or the complicated dynamics of Senate deliberations—that "are not normally the subject of judicial inquiry." *Bhatti*, 332 F. Supp. 3d at 1218.

---

[6] *See* ATF Industry Newsletter (Aug. 2015), https://www.atf.gov/explosives/docs/newsletter/explosives-industry-newsletter-august-2015/download; FFL Newsletter (2019), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-newsletter-2019/download.

Plaintiffs' theory would moreover raise significant practical problems, owing to an inability to identify when a given official's service became unconstitutionally overdue.  *Id.* at 1219 ("Nor would it even be possible-as conditions fluctuate from day to day, week to week, month to month-to contemporaneously identify the moment at which the acting officer's tenure became too long.").  That uncertainty, coupled with the prospect of subsequent judicial invalidation of BLM decisions made by an official whose service had allegedly gone on too long, would sow substantial confusion amidst the regulated community and the public, and undermine important reliance interests.

Congressional action concerning officials exercising delegated authority also cuts sharply against Plaintiffs' suggestion that Mr. Pendley cannot perform the Director's functions after his nomination to be Director.  While Congress has sought to restrict *salary payments* to, as Plaintiffs put it, "failed nomin[ees]," Mot. 16, it has not similarly done so with respect to the *continued service* itself.   Even those restrictions that Congress has enacted, moreover, do not apply to Mr. Pendley's particular situation, further evidence that his continued service is permissible.

An appropriations rider enacted into permanent law in 2007 provides that appropriated funds may not be paid "to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person."  Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, ¶ 709, 121 Stat. 1844 (2007).  And, in a subsequent appropriations rider made permanent in 2009, Congress provided that "[e]ffective January 20, 2009, and for each fiscal year thereafter," appropriated funds may not be used "for the payment of services

to any individual carrying out the responsibilities of any position requiring Senate advice and consent in an acting or temporary capacity after the second submission of a nomination for that individual to that position has been withdrawn or returned to the President."  Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, ¶ 749, 123 Stat. 524 (2009).

As both of these provisions show, Congress plainly knows how to restrict the continued exercise of delegated authority by nominees whose nominations have not succeeded in particular ways.   Yet neither of these provisions applies to Mr. Pendley's situation—the full Senate has never "voted not to approve" his nomination; nor has there been any "second submission" of his nomination to be BLM Director, let alone one that "has been withdrawn or returned to the President."   Plaintiffs' overall complaint that BLM "has had no Senate-confirmed official in charge for over three years," Mot. 7, is not one susceptible to judicial inquiry, let alone any conceivable judicial remedy.

## III.   Plaintiffs' FVRA Argument is Misplaced and Need Not Be Addressed

Finally, the Court need not address Plaintiffs' attempt to preemptively rebut an anticipated counterargument from Defendants that Mr. Pendley's service is authorized by the FVRA.   *See* Mot. 16-20.   Plaintiffs suggest that "[a]ny argument that the FVRA permits Pendley's unlawful exercise of authority would fail for two independent reasons."   Mot. 18.   But Defendants do not maintain that it is the FVRA that authorizes Mr. Pendley's service, and thereby "saves" his service from some perceived

constitutional infirmity.   Because Defendants do not raise such a defense, there is no need for the Court to consider Plaintiffs' anticipatory argument.

## CONCLUSION

Plaintiffs' early motion for summary judgment cannot mask the fundamental jurisdictional problems they face in bringing this suit.   A lack of injury-in-fact makes clear that Plaintiffs have failed to meet their burden for establishing Article III standing. The Court should thus dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction of its own accord, or, at bare minimum, defer any ruling on their premature summary judgment motion until Defendants have had the opportunity to move to dismiss for lack of jurisdiction under Rule 12, consistent with the Supreme Court's admonition in *Steel Co.*, 523 U.S. 83.   Should the Court determine it proper to move forward on Plaintiffs' motion, however, their Appointments Clause fails to persuade. Accordingly, Plaintiffs' Expedited Motion for Summary Judgment should be denied.


DATED this 9th day of September, 2020.



JEFFREY B. CLARK
Acting Assistant Attorney General

KURT G. ALME
United States Attorney

MARK STEGER SMITH
Assistant U.S. Attorney

24

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

/s/ M. Andrew Zee
M. ANDREW ZEE (CA Bar No. 272510)
Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Phone: (415) 436-6646
E-mail: m.andrew.zee@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of September, 2020, a copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 6,438 words, excluding the caption, certificate of compliance, table of contents and authorities, exhibit index, and certificate of service.

*/s/ M. Andrew Zee*
M. ANDREW ZEE