IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana; MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION,<br><br>*Plaintiffs*,<br><br>vs.<br><br>BUREAU OF LAND MANAGEMENT; WILLIAM PENDLEY, in his official capacity as the person exercising the authority of the Director of the Bureau of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Department of the Interior,<br><br>*Defendants*. | Case No. 20-cv-00062<br><br>The Honorable Brian Morris, Chief Judge |

**REPLY IN SUPPORT OF PLAINTIFFS'
EXPEDITED MOTION FOR SUMMARY JUDGMENT**

There has been no Senate-confirmed Director of the Bureau of Land Management for nearly four years. In that time, the Bureau has been run by a changing cast of unconfirmed acting directors, culminating in the tenure of William Perry Pendley. But there is no reason to believe that these appointments—supposedly intended to ensure continuity during the "Presidential transition" that ended years ago—are temporary. "At some point, courts can and must play a role

1

in policing 'acting' appointments that are effectively permanent." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 153 (D.D.C. 2019). In the case of the Bureau of Land Management, that time has come.

The federal government contends that this Court's intervention is unnecessary because the Secretary of the Interior has repeatedly "delegated" the Bureau Director's powers to Pendley. But this argument, if accepted by the courts, would amount to nothing less than a nullification of the Appointments Clause. It would allow the Executive Branch to sideline the Senate for the entirety of a president's term by issuing a series of delegation orders, aggrandizing its power at the expense of Congress. This caricature of our separation of powers cannot stand. Nor can the government's cramped view of Article III. The Supreme Court has held time and again that affected parties have standing to challenge an agency's disregard of the Constitution's structural safeguards. That is particularly true here, where Pendley has taken unlawful actions that directly and adversely harm Montana's interests in protecting the land, environment, and wildlife within its territory.

**I.     The plaintiffs have Article III standing to challenge Pendley's continued service in violation of the Appointments Clause.**

"At bottom, the gist of the question of standing is whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007). There is

2

no question that the Governor of Montana and the Department of Natural Resources have such a "stake" in the controversy here: Whether the Constitution permits Pendley—an official who controls nearly one-third of Montana's land and has approved actions that will have long-term, adverse consequences for the State—to exercise the Bureau Director's power for more than a year without ever having been confirmed by the Senate.

In resisting this conclusion, the government makes a key analytical error. For purposes of Article III standing, the government seeks to transform this action into an ordinary environmental case in which a typical private plaintiff, such as an advocacy group, must show how an agency's specific action has caused injury to itself or its members. But this is not an environmental case targeting a specific action—it is a constitutional challenge under the Appointments Clause, a "critical structural safeguard" of our democracy. *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017). Nor does this case involve a typical plaintiff. The Governor of Montana has brought this action because Pendley's unlawful actions have caused injury to Montana's "environment and wildlife . . . as well as to [its] sovereign interests in enforcing [its] environmental laws." *California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020). The state therefore is "entitled to special solicitude in [this Court's] standing analysis." *Massachusetts*, 549 U.S. at 520. Under binding precedent, the plaintiffs have Article III standing to pursue their Appointments Clause challenge.

**1.** "[T]he doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). The Supreme Court has therefore held that "a separation-of-powers violation may create a 'here-and-now' injury that can be remedied by a court." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010). When challenging such violations, it is "sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2196 (2020).

Moreover, "[t]he required injury to challenge agency action is minimal: The Supreme Court has 'allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax.'" *Collins v. Mnuchin*, 938 F.3d 553, 586 (5th Cir. 2019), *cert. granted*, 2020 WL 3865248 (U.S. July 9, 2020) (quoting *U.S. v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). That is particularly so when the Appointments Clause is involved, because any action taken by an improperly appointed agency official is "void ab initio." *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 493 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014). Indeed, in *Free Enterprise v. Public Company Accounting Oversight Board*, the Supreme Court held that the petitioners had standing to bring their Appointments Clause claim even though the agency had

merely "*beg[u]n* a formal investigation" into the petitioners' auditing procedures. 561 U.S. at 487, 512 n.12 (emphasis added).

The Article III injury here is far more substantial. Pendley has already taken actions that have directly impacted Montana's environmental, conservation, and wildlife-management interests—including, most recently, his approval of two final resource-management plans. *See* Pls. Br. 10-12. These plans "prioritize fluid mineral leasing for oil and gas development over other uses of public lands"—the Lewiston plan, for example, sets aside 95% of the planning area for oil-and-gas leasing—over the Governor's objections. Holmes Dec. ¶¶ 6-7 (Ex. A). And they will impose direct, concrete costs on the State and its agencies; indeed, a similar "errant leasing decision" in the past resulted in "a decades-long processes to ensure protection of natural and cultural resource values in Montana." *Id.* ¶ 5.

Reading the government's opposition, one could be forgiven for believing that the plans were never finalized. *See* Opp. 13-14 (referring to the plans as "draft[s]"). But the government cannot wish away the facts. Nor can it deny that the final plans will "guide and control future management actions," 43 C.F.R. § 1601.0–2, affecting Montana's long-term ability to "plan[] and regulat[e] the uses of non-Federal lands in proximity of [the federal] lands," 43 U.S.C. § 1711(b); Holmes Dec. ¶ 9.

The government's only response to these facts is that Montana's injuries are not "fairly traceable" to Pendley's actions. Opp. 14-15. In particular, it complains

5

that the plaintiffs have not "articulat[ed] how resolution of any of these protests might have specifically impeded them from pursuing a preservation agenda." *Id.* But, once again, the government's argument fails to appreciate the nature of the proper Article III inquiry in a separation-of-powers case. Under that inquiry, the Supreme Court explained earlier this year, "a litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila*, 140 S. Ct. at 2196.

This principle carries particular weight in the Appointments Clause context. As the D.C. Circuit has instructed, "judicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated." *Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000). Indeed, "demand for a clear causal link to a party's harm will likely make the Clause no wall at all." *Id.*; *see also Collins*, 938 F.3d at 586 ("[S]tanding does not require proof that an officer would have acted differently in the 'counterfactual world' where he was properly authorized.").

*Free Enterprise* again demonstrates that the plaintiffs need not show that a properly appointed Bureau Director would have taken a different action. There, the Supreme Court "allowed the investigation—the injury-in-fact—to continue, even if it was now pursued by a properly subordinate agency, and the Court did not remedy

6

any past harm suffered." Kent Barnett, *Standing for (and Up to) Separation of Powers*, 91 Ind. L.J. 665, 679 (2016). That the petitioners may well have suffered similar harms even before a "constitutional agency accountable to the Executive" did not affect the Court's standing analysis. *Free Enterprise*, 561 U.S. at 513. So too here: Montana has been injured by Pendley's unconstitutional appointment, and that injury will be redressed by this Court's decision on the merits.

**2.** In its standing argument, the government overlooks another critical aspect of this case—the "special position and interest" of Montana and its government. *Massachusetts*, 549 U.S. at 518. "States are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* That is because, "[a]s a quasi-sovereign, a state 'has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.'" *California*, 963 F.3d at 936.

Thus, the Supreme Court held that "Massachusetts' well-founded desire to preserve its sovereign territory" gave the state a "sufficiently concrete" stake to challenge the EPA's refusal to regulate greenhouse-gas emissions. *Massachusetts*, 549 U.S. at 519-22. Similarly, the Ninth Circuit held that California and New Mexico had standing to bring a separation-of-powers challenge to the Administration's funding of border-wall construction. *California*, 953 F.3d at 936. In particular, as Judge Thomas explained, the states had shown that the Executive Branch's actions would "cause particularized and concrete injuries in fact to the environment and

wildlife of their respective states as well as to their sovereign interests in enforcing their environmental laws." *Id.* at 936-40.

The same principles apply with even more force here. Massachusetts had standing even though many of the climate-change-related harms it alleged were "remote" and "yet to come." *Massachusetts*, 549 U.S. at 521, 526. Likewise, California and New Mexico had standing despite the fact that no border-wall construction had yet begun. *See California*, 963 F.3d at 935. Here, by contrast, the plaintiffs have demonstrated that Pendley has *already* taken unlawful actions that have harmed— and will continue to harm—Montana's interests in its land and environment. Holmes Dec. ¶¶ 4, 6, 9. These harms are more than enough under the case law to establish the plaintiffs' Article III standing.[1]

---

[1] Confusing this case for an ordinary environmental action, the government describes (at 10-13) the injuries here as "hypothetical." But that's wrong even on its own terms. "Causation may be found even if there are multiple links in the chain . . . and there's no requirement that the defendant's conduct comprise the last link in the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014). "[W]hat matters is not the length of the chain of causation, but rather the plausibility of the links." *Id.* Pendley's actions plausibly will contribute to listing the sage grouse as endangered, which will result in substantial costs to Montana and its agencies. *See* Pls. Br. 12-13. These injuries are sufficiently concrete under Ninth Circuit case law. *See Pub. Watchdogs v. S. Cal. Edison Co.*, 2019 WL 6497886, at *7 (S.D. Cal. Dec. 3, 2019) ("[T]he Ninth Circuit has consistently held that an injury is actual or imminent where there is a credible threat that a probabilistic harm will materialize.").

## II. The government's argument on the merits, if accepted by the courts, would nullify both the Appointments Clause and the Federal Vacancies Reform Act.

The government does not dispute that "[t]he Appointments Clause prescribes the exclusive process by which the President may appoint 'officers of the United States.'" *SW Gen.*, 137 S. Ct. at 945 (Thomas, J., concurring). Nor does it question that "[t]he Senate's advice and consent power is a critical structural safeguard [ ] of the constitutional scheme," *id.* at 935—one that prevents the Executive Branch from "aggrandizing its power at the expense of" Congress, *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991).

Yet the logic of the government's position, if accepted, would all but delete the Appointments Clause from the Constitution. In its view, an unconfirmed agency official like Pendley may serve in an office requiring Senate advice and consent for years—even indefinitely—so long as that official purports to exercise the powers of that office "under delegated authority." Opp. 8. To get there, the government stretches the Supreme Court's decision in *United States v. Eaton*, 169 U.S. 331 (1898), beyond recognition. And it disregards Congress's intentional decision, through the FVRA, to "give[] the President *limited* authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval." *SW Gen.*, 137 S. Ct. at 935 (emphasis added). This enervated understanding of the Appointment Clause should be rejected.

**1.** Initially, the government argues that summary judgment is inappropriate because Pendley is not the acting director because he "has been delegated authority of the Director." Opp. 16. But this characterization of Pendley founders on the undisputed facts. The government cannot contest that the White House has publicly identified Pendley as the "Acting Director of the Bureau of Land Management"; the Bureau's official Twitter account repeatedly describes him as the acting director; and Pendley himself has claimed that he's the acting Bureau Director in public statements. SUF ¶¶ 5, 16; Compl.¶ 29. The government's self-serving, mid-litigation excuses that these references were "inadvertent" and "not accurate" carry no weight. *See* Opp. 7; Kaster Decl. ¶ 12.

Regardless of how it chooses to describe Pendley's role, the government effectively admits that Pendley's exercise of the Director's authority is unlawful. Congress has provided that "any functions or duties not required by statute or regulation to be performed by the official occupying that position may be reassigned to another official within the agency or department." *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 420 (D. Conn. 2008); *see* 5 U.S.C. § 3348(a)(2). By contrast, any functions or duties exclusively assigned to an agency head "must be performed by the agency head" (or a properly appointed acting agency head)—this authority cannot be delegated. *Id.*

Here, it is undisputed that Pendley has performed duties assigned solely to the Bureau Director. For example, the Director has the exclusive authority to "render a decision on [any] protest[s]" to proposed resource-management plans, and "the decision of the Director shall be the final decision of the Department." 43 C.F.R. § 1610.5-2(a)(3), (b). The government concedes that Pendley "formally resolved these protests" before he approved the final plans. Opp. 14-15; SUF ¶ 13. So Pendley is either exercising the Director's exclusive functions in violation of the agency's regulations, or he is serving as acting director in violation of the Federal Vacancies Reform Act. Either way, his exercise of authority is unlawful. The government offers no way out of this dilemma.

**2.** The government next contends that, even if Pendley is the acting director, his continued service does not violate the Appointments Clause. Opp. 17-20. On the government's view, nothing prevents the Executive Branch from sidestepping Congress's requirement that an agency head be confirmed by the Senate so long as it strings together a series of "temporary" delegations of authority—here, for the entirety of the presidential term. This logic disregards the Senate's constitutionally mandated role in the appointment process and does violence to our Constitution's separation of powers.

The sole authority that the government cites for its maximalist position is *Eaton*. But that decision only confirms that Pendley's indefinite service is

unconstitutional. The government's quote (at 18) shows why: "Because the subordinate officer is charged with the performance of the duty of the superior for *a limited time*, and under *special and temporary condition*s, he is not thereby transformed into the superior and permanent official." *Eaton*, 169 U.S. at 343 (emphasis added). Neither of *Eaton*'s two factors apply here. The Secretary's assignment of the Director's powers is not "limited"—the vacancy has persisted for almost four years, and Pendley himself has served for more than a year with no end date in sight. SUF ¶¶ 1-8; *see SW Gen.*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring). Nor is Pendley's appointment subject to "special and temporary conditions" set by Congress, as for the vice consul in *Eaton*. The purported reason for Pendley's continued service is to ensure continuity "during the Presidential transition"—which ended more than three years ago. SUF ¶¶ 2-4.

More fundamentally, *Eaton* makes clear that the Appointments Clause gives Congress—not the Executive Branch—the power to determine who gets to exercise the authority of an office that otherwise requires Senate confirmation. The Court stressed that the vice consul's appointment accorded with "[t]he manifest purpose of congress" set out in the governing statute. *Eaton*, 169 U.S. at 343. Indeed, it rejected "[t]he claim that *congress* was without power to vest in the president the appointment of a subordinate officer called a 'vice consul,' to be charged with the duty of temporarily performing the functions of the consular office." *Id.* (emphasis added);

*see Guedes*, 356 F. Supp. 3d at 147 ("the core feature that made vice consuls inferior officers" in *Eaton* "was the fact that *Congress* had chosen to 'limit' their 'period of duty'" (emphasis added)).

This case is *Eaton*'s mirror image. Congress has made clear that there are only two ways to exercise the Bureau Director's exclusive duties and functions—either the Senate confirms a Director nominated by the President, 43 U.S.C. § 1731(a), or the President appoints an acting director under the Federal Vacancies Reform Act, 5 U.S.C. § 3345. But here, unlike in *Eaton*, the Executive Branch has thwarted "the manifest purpose of [C]ongress," 169 U.S. at 343, by giving Pendley the Bureau Director's power through a series of actions designed precisely to evade the carefully calibrated statutory framework for appointing acting officials. No court has ever blessed such brazen circumvention of the Appointments Clause.

The government's last-ditch plea that this case presents a non-justiciable political question also fails. There's an obvious "manageable standard," Opp. 21, for determining when an unconfirmed acting director's tenure becomes unconstitutional—the time limits that Congress set out in the Federal Vacancies Reform Act. *See* 5 U.S.C. § 3346.[2]

---

[2] This Court should not follow *Bhatti v. Federal Housing Finance Agency*, the sole decision the government cites. The court's conclusion there was based on President Obama *properly* exercising his "*limited statutory* power . . . to choose an acting director from among FHFA's three deputy directors." 332 F. Supp. 3d 1206, 1221 (D. Minn. 2018) (emphasis added). And *Bhatti* acknowledged that Recess Appointments

13

If accepted, the government's theory would turn the Appointments Clause and the Federal Vacancies Reform Act into toothless formalisms, which the Executive Branch could disregard whenever inconvenient. But "the Appointments Clause of Article II is more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). Indeed, "[t]he Clause is a bulwark against one branch aggrandizing its power at the expense of another branch." *Ryder v. United States*, 515 U.S. 177, 182 (1995). This Court should enforce this critical safeguard and hold Pendley's continued service as acting Bureau Director unconstitutional.

## CONCLUSION

This Court should grant the motion for summary judgment.

Respectfully submitted,

*/s/ Deepak Gupta*

DEEPAK GUPTA*
JONATHAN E. TAYLOR*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

NEIL K. SAWHNEY*
GUPTA WESSLER PLLC

---

challenges are justiciable in light of the President's "unlimited authority [to] appoint anyone of his choosing with no oversight whatsoever." *Id.* Otherwise, there would be no "limit on this extraordinary authority." *Id.* Yet that's what the government seeks here—no limit on the President's authority to appoint acting directors.

                      100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-FLANAGAN
Deputy Legal Counsel
Office of the Governor
PO Box 200801
Helena, MT 59620-0801
Phone: (406) 444-3179

**\*** *pro hac vice*

September 18, 2020          *Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This brief in support complies with the type-volume limitation of Local Rule 7.1(d)(2) because this brief contains 3,241 words. This brief also complies with Local Rule 1.5 because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2020, I electronically filed this brief in support of the plaintiffs' motion for summary judgment through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*
Deepak Gupta