## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana; MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, | **4:20-cv-00062-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| UNITED STATES BUREAU OF LAND MANAGEMENT, an agency within the United States Department of the Interior; WILLIAM PERRY PENDLEY, in his official capacity as the person exercising authority of the Director of the Bureau of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior, | |
| Defendants. | |

## INTRODUCTION

The Governor of Montana and the Montana Department of Natural

Resources and Conservation ("Plaintiffs") bring this action against the U.S. Bureau

of Land Management ("BLM"), William Perry Pendley in his official capacity, and

various government agencies and agents in their official capacities (together,

"Federal Defendants"). Plaintiffs allege that Pendley unlawfully served as Acting BLM Director in violation of the Appointments Clause of the U.S. Constitution, the Federal Vacancies Reform Act of 1998 ("FVRA"), and the Administrative Procedure Act ("APA"). (Doc. 1).

Plaintiffs seek declaratory and injunctive relief. (Doc. 1 at 29). Specifically, Plaintiffs seek an order and judgment declaring Pendley's service as Acting Director of BLM unlawful; enjoining Pendley from exercising the authority of the Director; enjoining Department of the Interior ("Interior") Secretary David Bernhardt from directing Pendley to exercise the authority of the Director; and granting any other relief deemed appropriate. *Id.* Plaintiffs filed what they fashioned as an Expedited Motion for Summary Judgment on August 20, 2020. (Doc. 10). Federal Defendants argue that Plaintiffs lack standing to bring their claims. (Doc. 17 at 1–2). Federal Defendants argue, in the alternative, that Pendley exercises the authority of BLM Director through lawful delegation. *Id.* at 2–3.

## BACKGROUND

### *Factual Background*

BLM manages the use and maintenance of 245 million acres of federal public lands (around 12 percent of the nation's landmass) and 700 million acres of subsurface acreage (around 30 percent of the nation's minerals).  The Federal Land Management and Policy Act ("FLPMA") charges BLM with administering those

lands and subsurface acres. FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). Congress established the office of Director to lead BLM. By statute, the Director of the BLM must be filled "by the President, by and with the advice and consent of the Senate." *Id*. § 1731(a).

BLM has operated without a Senate-confirmed Director since Neil Kornze left the position on January 19, 2017. That day, the outgoing Secretary of the Interior, Sally Jewell, issued a Secretarial Order to delegate temporarily the "functions, duties, and responsibilities" of the BLM Director to Kristin Bail, the Assistant Director for the Office of National Conservation Lands and Community Partnerships. Secretary Sally Jewell, Order No. 3345 (Jan. 19, 2017). The Order covered nine other positions across the Interior Department, including the Deputy Secretary and the Solicitor. *Id.* Acting Secretary of the Interior Kevin Haugrud amended the Order the following day to change select designations. Acting Secretary Kevin Haugrud, Order No. 3345 Amendment 1 (Jan. 20, 2017).

Amendments became a pattern of practice. Secretaries of the Interior (both Acting and Senate-confirmed) amended Order No. 3345 thirty-two times over the next three years. These thirty-two amendments expanded and contracted the

3

number of delegated positions covered, delayed the expiration for delegated authority, and altered who wielded delegated authority.

Five people—none of whom had been approved by the Senate—would exercise the "functions, duties, and responsibilities" of BLM Director: 1) Kristin Bail, the Assistant Director for the Office of National Conservation Lands and Community Partnerships, Secretary Sally Jewell, Order No. 3345 (Jan. 19, 2017); 2) Michael D. Nedd, Assistant Director of Minerals and Realty Management, Secretary Ryan Zinke, Order No. 3345 Amendment 2 (Mar. 15, 2017); 3) Brian Steed, Deputy Director of Policy and Programs, Secretary Ryan Zinke, Order No. 3345 Amendment 12 (Nov. 14, 2017); 4) Casey Hammond, Principal Deputy Assistant Secretary for Land and Minerals Management, Secretary David Bernhardt, Order No. 3345 Amendment 26 (May 11, 2019); and 5) William Perry Pendley, Deputy Director of Policy and Programs, Secretary David Bernhardt, Order No. 3345 Amendment 28 (July 29, 2019). These "temporary" authorizations ostensibly were motivated by a desire to fill vacancies "*during the Presidential transition* pending Senate confirmation of [a] new [Director]," even *three years* into the presidential administration. Secretary David Bernhardt, Order No. 3345 Amendment 32 (May 5, 2020) (emphasis added).

Secretary Bernhardt extended Pendley's tenure four times by amendment. *See* Secretary David Bernhardt, Order No. 3345 Amendment 29 (Sept. 30, 2019)

(extending Pendley's appointment to January 3, 2020); Secretary David Bernhardt,
Order No. 3345 Amendment 30 (Jan. 2, 2020) (extending Pendley's appointment
to April 3, 2020); Secretary David Bernhardt, Order No. 3345 Amendment 31
(Apr. 3, 2020) (extending Pendley's appointment to May 5, 2020); Secretary David
Bernhardt, Order No. 3345 Amendment 32 (May 5, 2020) (extending Pendley's
appointment to June 5, 2020).

Following the fourth and final extension, Pendley, "exercising the delegated
authority" of BLM Director, issued a memorandum ("Succession Memo")
clarifying BLM's "order of succession" for "Vacancies Reform Act" [sic]
purposes. Memorandum from William Perry Pendley on Designation of Successors
for Presidentially-Appointed, Senate-Confirmed Positions (May 22, 2020). Casey
Hammond, who previously exercised the delegated authority of BLM Director, but
now "exercising the delegated authority" of the Assistant Secretary of Land and
Minerals Management, approved this memorandum. *See id.* The Succession Memo
claimed to designate Pendley as the "First Assistant for the purposes of the
[FVRA]" and delegated Pendley "the authority to perform all duties and
responsibilities of the Director." *See id.* Pendley has exercised the authority of
BLM Director under color of this self-delegation since June 5, 2020.

Pendley exercised BLM Director authority for 337 days under a combination
of Order amendments and the Succession Memo. President Donald J. Trump

5

nominated Pendley for the position of BLM Director on July 30, 2020. PN2076
(116th Congress). Pendley continued to exercise BLM Director authority for 40
days while his nomination remained pending. President Trump withdrew Pendley's
nomination on September 8, 2020.

Federal Defendants assert that Pendley continues to exercise BLM Director
authority under the Succession Memo. (Doc. 17 at 5–7).

*Procedural History*

Plaintiffs filed this action on July 20, 2020, to challenge Pendley's use of
BLM Director authority. (Doc. 1). Plaintiffs allege that Pendley unlawfully has
served as Acting BLM Director in violation of the Appointments Clause of the
U.S. Constitution, FVRA, and APA. *See id.* Plaintiffs filed what they termed an
Expedited Motion for Summary Judgment on August 20, 2020. (Doc. 10). The
Court set a hearing on Plaintiffs' Motion for Summary Judgment for September 21,
2020, without having ruled on the need for expedited proceedings. (Doc. 12). This
date provided more than the 21 days allowed for Federal Defendants to respond to
the Motion. *See* L. R. 7.1(d)(1)(B).

Federal Defendants filed their Opposition to Plaintiffs' Motion for Summary
Judgment 20 days later, on September 9, 2020. (Doc. 17). Federal Defendants'
response focuses on their claim that Plaintiffs lack standing and that Pendley's

service does not violate the Appointments Clause. *See id*. The Court held a hearing on the Motion for Summary Judgment as scheduled on September 21, 2020.

## Legal Standard

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

## ANALYSIS

## I.   Article III Standing

Plaintiffs must establish that they possess standing to invoke the Court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). Standing represents an "indispensable part of [a] plaintiff's case." *Id.* at 561. The "irreducible constitutional minimum of standing" contains three elements: injury-in-fact, causation, and redressability. *Id.* at 560; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Federal Defendants assert that Plaintiffs have failed to identify a sufficiently concrete or traceable injury to maintain standing. (Doc. 17 at 9–15).

Plaintiffs rely primarily on three separate theories to support their standing claims. BLM manages 27 million acres of land in Montana. Plaintiffs allege that Pendley's unlawful leadership at BLM and his management decisions regarding these lands has a significant and harmful effect on the environmental, economic, and regulatory interests of Montana. Plaintiffs point to two policies, in particular, that BLM adopted under Pendley's direction and supervision to establish standing.

Plaintiffs first cite departures from commitments made by BLM to protect sagebrush habitat on BLM lands, including the now-vacated sale of oil and gas leases that covered land in Montana designated for protection as greater sage-grouse habitat. *See Montana Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM (D. Mont. May 22, 2020) (vacating these leases). Plaintiffs argue, in effect, that BLM's decisions to renege on these commitments could cause injury in the future to those lands in Montana that had been designated for protection as greater sage-grouse habitat. These allegations raise concerns regarding a lack of necessary specificity to support standing. The Court notes that Montana, with land within its borders managed by BLM, likely would have standing under this analysis in the same way that a bank had standing to challenge the recess appointment of the Director of the Consumer Financial Protection Bureau. *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015). Then-Circuit Judge Brett Kavanaugh determined that the Bureau's regulation of the bank afforded standing

to the bank under *Lujan* to challenge the constitutionality of the Bureau. *See id.* (citing *Lujan*, 504 U.S. at 560–61). The Court need not finally resolve this issue, however, as Plaintiffs' other claims clearly support Article III standing.

Plaintiffs next cite two finalized Resource Management Plans ("RMPs") that they allege would reduce protections for fish and wildlife habitat, cultural resources, and recreational uses on federal lands in Montana. *See* BLM, Record of Decision and Approved Lewistown Resource Management Plan (July 2020); BLM, Record of Decision and Approved Missoula Resource Management Plan (July 2020). Montana provided BLM with feedback on both RMPs as a part of the State consultation procedure and joined members of the public who submitted protest letters. (Doc. 1 at 24–25; Doc. 10-5 at Exhibits A–E, H).  BLM approved the RMPs following review by "the BLM Director" as well as resolution of protest letters by the "BLM Director." (Doc. 10-1 at 11–12).

Every case must satisfy the elements of standing, but a plaintiff asserting a procedural right "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. For example, someone "living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and

9

even though the dam will not be completed for many years." *Id.* The U.S. Supreme Court emphasized that such a case differs completely from a case in which the plaintiff does not live near the proposed dam. *Id.* As explained below, Plaintiffs satisfy the standing requirements for a party asserting a procedural right.

Plaintiffs argue finally that they hold a "special position and interest" as a State. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Standing requirements universally apply to plaintiffs. A court must give "considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual." *Id*. The U.S. Supreme Court has recognized that States do not come before the courts as "normal litigants for the purposes of invoking federal jurisdiction." *Id*. Courts grant States "special solicitude" in standing analysis to recognize their quasi-sovereign status. *Id.* Montana has alleged "an injury to it in its capacity of quasi-sovereign." *Id*. (quoting *Georgia v. Tennessee Copper Co*., 206 U.S. 230, 237 (1907)). When Montana acts in that capacity, it "has an interest independent of and behind the titles of its citizens[.]" *Massachusetts*, 549 U.S. at 519 (quoting *Tennessee Copper*, 206 U.S. at 237). Application of these standing principles to Plaintiffs' claims under this standard removes any doubt as to Montana's right to bring these claims.

### a.  Injury-in-Fact

To demonstrate injury-in-fact, Plaintiffs must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, ___ U.S. ___, ___, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). In a procedural standing case, a plaintiff must show that the procedures at issue are designed to protect some "threatened concrete interest" to satisfy the injury-in-fact requirement. *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). A plaintiff must show "a geographical nexus between the individual asserting the claim and the location suffering an environmental impact" to demonstrate a concrete interest. *Id.* (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).

FLPMA requires that BLM manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). BLM accomplishes this directive by developing, maintaining, and revising RMPs for particular areas of public land. *Id.* § 1712(a)-(b); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs designate "[l]and areas for limited, restricted or exclusive use"

and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." *Id.* § 1601.0-5(n)(1)–(2).

Both FLPMA and the RMP regulatory guidelines provide significant procedural opportunities for State and local input on public land management decisions. FLPMA requires "meaningful public involvement" in the management process. *See* 43 U.S.C. § 1732(c)(9). RMP regulations provide an opportunity for a State to file recommendations on draft RMPs to ensure that any federal management plans comport with State land management priorities. 43 C.F.R. § 1610.3–2(e). The initial consultation takes place between the State and the relevant BLM State Director; however, the BLM Director ultimately considers, rules on, and responds in writing to the State's recommendations if BLM or the State identifies any inconsistencies. *See id.*

Regulations also provide a protest procedure for draft RMPs. Any person, including State agencies, may submit a written protest to a draft RMP directly to the BLM Director. *See id.* § 1610.5-2(a). The BLM Director "shall promptly render a decision on the protest." *Id.* § 1610.5-2(a)(3). "The decision shall be in writing and shall set forth the reasons for the decision." *Id.* And the "decision of the Director shall be the final decision of the Department of the Interior." *Id.* § 1610.5-2(b). The Director's protest ruling finalizes the RMP. *See Or. Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1097 (9th Cir. 2010)

("Once the Director of the BLM has ruled on any protest, the decision is final and the plan may be adopted.").

Plaintiffs have proven sufficiently the injury-in-fact requirement of standing. Plaintiffs' alleged procedural injury stems from the risk that takes place "when governmental decisionmakers make up their minds without having before them an analysis of the likely effects of their decision on the environment." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). Specifically, the procedural injury that arises when the *wrong official* considered their comments, and so those comments do not reach those officials lawfully empowered to make the decision at hand. *See generally Morgan v. United States (Morgan I)*, 298 U.S. 468, 481 (1936) (declaring the foundational administrative law principle that "[t]he one who decides must hear."). In a separation-of-powers violation case, it is "sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority." *Seila Law LLC v. C.F.P.B.*, ___ U.S. ___, ___, 140 S. Ct. 2183, 2196 (2020). *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010) (providing that "a separation-of-powers violation may create a 'here-and-now' injury that can be remedied by a court").

Montana possesses a procedural right to submit recommendations and protest on the RMPs. Montana availed itself of those opportunities. (Doc. 10-5 at

13

Exhibits A–D, H). The Montana State BLM Director found no inconsistencies between the RMPs and the recommendations filed by Montana. (Doc. 10-5 at Exhibit E). The State BLM Director referred any disagreement to the BLM Director. *Id*. BLM received 150 protest letters on the Lewistown RMP and 72 protest letters on the Missoula RMP. (Doc. 10-1 at 11). The "BLM Director reviewed all protest issues for the proposed planning decisions . . . concluded that the BLM Montana State Director followed the applicable laws. . . . The BLM Director denied the protests, and that decision is the final decision of the US Department of the Interior." *Id*. BLM further published in the Federal Register that "[a]ll protests have been resolved and/or dismissed by the BLM Director." Notice of Availability of the Record of Decision and Approved Resource Management Plan for the Lewistown Field Office, Montana, 85 Fed. Reg. 47,239, 47,239 (Aug. 4, 2020). Pendley, acting as BLM Director, reviewed and resolved protests received in the development of the RMPs.

Montana sought adequate and lawful consideration of its views as required by statute and regulation. Montana did not receive such consideration if Pendley unlawfully was exercising the authority of the BLM Director. Plaintiffs' alleged harm also proves sufficiently concrete because it occurs in the relevant geographic boundary. *See W. Watersheds Project*, 632 F.3d at 485. The harms to fish and wildlife habitat, cultural resources, and recreational uses on federal lands and

14

State-owned/managed lands nearby those lands will take place within Montana's
geographic boundaries. Such injuries present a potent concern for Montana as a
quasi-sovereign with traditional State interests over its land, water, air, and
wildlife. *See Tennessee Copper*, 206 U.S. at 237; *California v. Trump*, 963 F.3d
926, 936–40 (9th Cir. 2020). Plaintiffs have satisfied the injury-in-fact requirement
of standing through their demonstrated "actual or imminent" "invasion of a legally
protected right" that is "concrete and particularized." *Spokeo*, ___ U.S. at ___, 136
S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

**b. Causal Connection and Redressability**

To establish a causal connection, a plaintiff generally must establish a "more
than attenuated" line of causation between the challenged action and the alleged
harm. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). Once plaintiffs
have established a procedural injury-in-fact, they must demonstrate "only that they
have a procedural right that, if exercised, could protect their concrete interests." *W.
Watersheds Project*, 632 F.3d at 485. The plaintiffs do not have to provide "proof
that an officer would have acted differently in the 'counterfactual world' where he
was properly authorized." *Collins v. Mnuchin*, 938 F.3d 553, 586 (5th Cir. 2019),
*cert. granted*, __ S. Ct. __ (U.S. July 9, 2020) (No. 19-563).

Plaintiffs have alleged a procedural right under FLPMA. Plaintiffs allege
that preparation of the RMPs requires the BLM Director to consider comments and

protests received from Montana. *See* 43 U.S.C. § 1701(a)(8); 43 C.F.R. §§ 1610.3-2(e), 1610.5-2(a)(3). Pendley considered the protests when exercising the authority of BLM Director. If Pendley unlawfully had been exercising the authority of the BLM Director, then those protests were unlawfully addressed. *See generally Morgan I*, 298 U.S. at 481. The finalization of the RMPs without proper consideration threatens the State's concrete interest as a quasi-sovereign in protecting its land, water, air, and wildlife. *See Tennessee Copper*, 206 U.S. at 237. BLM's alleged procedural failure directly threatens Montana's concrete interests.

The Court remains convinced that it can redress the unlawful exercise of authority through a combination of equitable and legal remedies available to correct statutory and constitutional violations. It is "likely, as opposed to merely speculative" that the relief sought would resolve Montana's injury-in-fact. *Lujan* 504 U.S. at 561 (internal quotation marks omitted).  Plaintiffs have satisfied the injury-in-fact, causation, and redressability requirements of standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

### c.  "Special Solicitude"

Plaintiffs have satisfied the requirements of standing based on their procedural claims. Plaintiffs also satisfy the requirements of standing on the independent basis of their "special position and interest" as a State. *Massachusetts*,

549 U.S. at 518. Montana does not come before the Court as a "normal litigant[]
for the purposes of invoking federal jurisdiction." *Id.* A State holds an independent
and concrete interest "in all the earth and air within its domain." *Tennessee
Copper*, 206 U.S. at 237. A State has the "last word as to whether its mountains
shall be stripped of their forests and its inhabitants shall breathe pure air." *Id.* A
State can protect its "sovereign territory" from greenhouse-gas emissions.
*Massachusetts*, 549 U.S. at 519–22. A State can shield its "environment and
wildlife" from harm and claim its "sovereign interests in enforcing their
environmental laws." *California*, 963 F.3d at 936–40.

Montana has alleged "an injury to it in its capacity of quasi-sovereign."
*Massachusetts*, 549 U.S. at 518 (quoting *Tennessee Copper*, 206 U.S. at 237).
BLM manages 27 million acres of land in Montana—nearly one-third of the
State's landmass. Pendley's allegedly unlawful management of that land harms
concretely Montana's interests in land, water, air, and wildlife within its domain.
His allegedly unlawful actions further harm Montana's interest in enforcing its
own environmental laws. The "special solicitude" granted to States, independent of
the concrete procedural harms alleged, reinforces the fact that Plaintiffs possess
standing to bring their claims. *Massachusetts*, 549 U.S. at 518.

17

## II.   Pendley's Appointment

### a.  Legal Framework

Article II of the U.S. Constitution requires that the President obtain the

"Advice and Consent of the Senate" before appointing "Officers of the United

States." U.S. Const. art. II, § 2, cl. 2. Offices requiring Presidential appointment

and Senate confirmation ("PAS offices") wield critical responsibilities in the

federal government. They lead departments and agencies, set priorities for the

bureaucracy, and direct the conduct of civil servants. The Framers split

responsibility over PAS offices between the Executive and Legislative Branches to

put a "check upon a spirit of favoritism in the President," "prevent the appointment

of unfit characters," and provide a "source of stability in the administration." The

Federalist No. 76 (A. Hamilton). The requirement represents a "significant

structural safeguard[] of the constitutional scheme." *Edmond v. United States*, 520

U.S. 651, 659 (1997).

Disagreement between the President and the Senate over nominee

qualifications may leave vacant positions unfilled—and their responsibilities

unperformed—for a time. *See N.L.R.B. v. SW General, Inc.*, ___ U.S. ___, ___,

137 S. Ct. 929, 934–35 (2017). Congress has accounted for this reality throughout

our nation's history by providing the President with limited authority to "direct

certain officials to temporarily carry out the duties of a vacant PAS office in an

acting capacity, without Senate confirmation." *Id.* at 934, 935–37 (describing the history of temporary nomination statutes going back to "Washington's first term").

The FVRA, 5 U.S.C. § 3345 *et seq.*, represents the most recent temporary appointment authority from Congress. The FVRA prescribes the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties" of a vacant PAS office. 5 U.S.C. § 3347 (emphasis added). Congress adopted the FVRA after significant inter-branch conflict in the 1970s and 1980s where the President used "temporary designees . . . without presidential submissions of nominations" to fill high-level positions. *N.L.R.B. v. SW General, Inc.*, ___ U.S. at ___, 137 S. Ct. at 935–36 (quoting M. Rosenberg, Congressional Research Service Report for Congress, New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative 2–4 (1998)). In 1998 "approximately 20 percent of PAS offices in executive agencies were occupied by temporary designees." *Id.* at 936. These "acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes. One, for instance, was brought in . . . to serve as Acting Assistant Attorney General for the Civil Rights Division of the Justice Department, immediately after the Senate refused to confirm him for that very office." *Id.*

Congress enacted the FVRA to protect the Senate's Advice and Consent power and to prevent the President from engaging in similar evasive temporary

appointment practices in the future. *See id.* As a result, the Act severely limits the ways that a President may temporarily fill PAS offices. *See id.*

The Act authorizes only three classes of government officials to become acting officers. 5 U.S.C. § 3345(a). As a default rule, the first assistant to a vacant office shall become the acting officer. *Id.* § 3345(a)(1). The President, and *only* the President, may override that default rule by directing either a person serving in a different PAS office or a senior employee within the relevant agency to become the acting officer. *Id.* § 3345(a)(1)-(2). The FVRA further prohibits persons from serving as acting officers if they have been nominated to hold permanently the position, or if they have held the acting role for more than 210 days. *Id.* §§ 3345(b), 3346(a).

Unless the President uses the procedures of the FVRA to fill temporarily the open position, the "office shall remain vacant," and in the case of a sub-cabinet agency, "only the head of [the] Executive agency" can perform the functions or duties of the vacant office. *Id.* § 3348(b). Any "action taken by any person" who serves as an acting officer in violation of the FVRA "shall have no force or effect" and "may not be ratified." *Id.* § 3348(d)(1)-(2). The FVRA defines "function or duty" as one "established by statute" or "by regulation" and "required by statute" or "by such regulation to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A)–(B).

20

Congress established the office of Director to lead BLM—an office that must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a). As a result, the designation of an Acting BLM Director remains subject to the exclusive methods set out in the FVRA. *See* 5 U.S.C. § 3347.

### b.  Pendley serves as the Acting BLM Director

Federal Defendants argue that whether one "appreciate[s] the difference or not" Pendley "is not BLM's Acting Director, but rather the official performing the Director's duties under the Secretary's delegation." (Doc. 17 at 1). Under Federal Defendants' theory, a President could ignore their constitutional appointment responsibility indefinitely and instead delegate authority directly or through Cabinet Secretaries to unconfirmed appointed officials. Such an arrangement could last for an entire presidential administration. In fact, the case before the Court presents that scenario.

Federal Defendants' argument attempting to distinguish an "Acting Director" from an "official performing the Director's duties under the Secretary's delegation" represents a distinction without a difference. Such arguments prove evasive and undermine the constitutional system of checks and balances. Federal Defendants' theory flies in the face of the constitutional design, the clear text of the FVRA that provides the "exclusive" means for temporary appointment, and the

21

history of Executive Branch evasion of the Appointments Clause that led Congress to pass the FVRA in the first place.

This case does not present the only recent improper exercise of acting authority in the Executive Branch. *See, e.g.*, *Casa de Maryland, Inc. v. Chad F. Wolf*, Case No. 8:20-cv-022118-PX (D. Md. Sept. 11, 2020) (invalidating the appointment of Acting Secretary of Homeland Security Chad F. Wolf under the FVRA); *L.M.-M. v. Kenneth T. Cuccinelli II*, Case No. 1:19-cv-02676-RDM (D.D.C. Mar. 1, 2020) (invalidating the appointment of Acting Director of the United States Citizenship and Immigration Services Kenneth Cuccinelli II under the FVRA). This case does present, however, a unique method to evade proper FVRA acting appointment procedures. The President cannot shelter unconstitutional "temporary" appointments for the duration of his presidency through a matryoshka doll of delegated authorities.

### i.   Secretarial Order 3345

A series of Secretarial Order Amendments first empowered Pendley as Acting BLM Director. The amendments do not describe Pendley as the "Acting BLM Director." Rather, they purport to "temporarily redelegate authority for . . . vacant non-career Presidentially appointed and Senate-confirmed positions." Secretary David Bernhardt, Order No. 3345 Amendment 28 (July 29, 2019). The Secretarial Order Amendments go on to "delegate[]" all "functions, duties, and

responsibilities" of the BLM Director position to Pendley. *Id.* The amendments also provide a limitation, that the "delegation covers only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position." *Id*. This boilerplate limitation appears to be an attempt to avoid running afoul of the FVRA. *Cf.* 5 U.S.C. § 3348(a)–(d) (requiring that any "action taken by any person" who serves as an acting officer in violation of the FVRA "shall have no force or effect" and "may not be ratified," and defining a "function or duty" as one "established by statute" or "by regulation" and "required by statute" or "by such regulation to be performed by the applicable officer (and only that officer)"). The Order provides no mechanism to enforce or track its limitation of authority. Pendley served under Secretarial Order delegations from July 29, 2019, until June 5, 2020.

### ii.   Succession Memo

After the fourth extension of Pendley's service under the Secretarial Order, Pendley, "exercising the delegated authority" of BLM Director, issued a Succession Memo clarifying BLM's "order of succession" for "Vacancies Reform Act" [sic] purposes. Memorandum from William Perry Pendley on Designation of Successors for Presidentially-Appointed, Senate-Confirmed Positions (May 22, 2020). Casey Hammond, who previously exercised the delegated authority of BLM Director, but now "exercising the delegated authority" of the Assistant Secretary of

Land and Minerals Management, approved this memo. *Id.* The Succession Memo purported to designate Pendley as the "First Assistant for the purposes of the [FVRA]" and delegated to Pendley "the authority to perform all duties and responsibilities of the Director." *Id.* Unlike the Secretarial Order, the Succession Memo imposes no limitation of authority to only those duties that remain not exclusive to the BLM Director. Federal Defendants asserted at the Motion for Summary Judgment hearing for the first time that Reorganization Plan Number 3 of 1950 authorized the Succession Memo delegation. Reorganization Plan No. 3 of 1950, 15 Fed. Reg. 3174 (May 24, 1950). Pendley has served under this Succession Memo self-delegation of authority since June 5, 2020.

### iii.   Acting Director Analysis

Secretarial Order 3345 and the Succession Memo both represent unlawful attempts to avoid the constitutional requirements of the Appointments Clause and the statutory requirements of the FVRA. Each delegation improperly empowered Pendley as the Acting BLM Director.

The Interior Secretary carefully crafted the Secretarial Order to avoid designation of Pendley as "Acting BLM Director," but the Executive Branch cannot use wordplay to avoid constitutional and statutory requirements. No legal authority exists for this kind of delegation from the Secretary.

Federal Defendants attempt to justify the Secretarial Order by first pointing out that the Secretary properly appointed Pendley as Deputy Director of Policy and Programs at BLM under 43 U.S.C. § 1731(c). (Doc. 17 at 19). That is true. Federal Defendants go on to argue that a subsequent Secretarial delegation of authority to that lower-level official would be proper. Federal Defendants rely on *United States v. Eaton*, 169 U.S. 331 (1898), for the principle that a lower-level official may exercise the powers belonging to a higher office without offending the Appointments Clause. (Doc. 17 at 19 (citing *Eaton*, 169 U.S. at 343)). Federal Defendants misunderstand that case.

*Eaton* centered on whether Congress can provide a statutory process by which the President can designate a temporary appointee, or if such an arrangement would violate the Appointments Clause. *Eaton*, 169 U.S. at 336–37. The U.S. Supreme Court declared that the process enacted by Congress that allowed the President to appoint vice consuls temporarily without Senate approval was constitutional. *See id.* at 343–44 (citing Rev. St. §§ 1695, 1703). Read correctly, *Eaton* bolsters the fact that Congress can set parameters for temporary appointments of PAS officers. Congress did exactly that when it adopted the FVRA. The FVRA represents the only method by which a temporary designee can exercise the authority of a PAS office.

25

Similarly, no legitimate authority exists for the delegation described in the Succession Memo, and the memorandum cites to none. Federal Defendants asserted at the Motion for Summary Judgment hearing for the first time that Reorganization Plan Number 3 of 1950 authorized the Succession Memo delegation. Reorganization Plan No. 3 of 1950, 15 Fed. Reg. 3174 (May 24, 1950). The Reorganization Plan provides authority for the Secretary of the Interior to "from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of the Interior of any function of the Secretary." *Id.*

On its face this Plan does not authorize the Succession Memo. Casey Hammond "exercising the delegated authority" of the Assistant Secretary of Land and Minerals Management, approved this memorandum delegating authority to Pendley who was himself "exercising the delegated authority" of BLM Director. Memorandum from William Perry Pendley on Designation of Successors for Presidentially-Appointed, Senate-Confirmed Positions (May 22, 2020). Nothing in the Reorganization Plan authorizes someone to exercise temporary authority via memorandum signed by two officials purportedly "exercising the delegated authority" of their respective PAS offices without proper appointment and confirmation. The FVRA does not authorize this arrangement either.

26

Two more factors demonstrate that Pendley operated as the Acting BLM Director. First, Pendley actually exercised powers reserved to the BLM Director. Pendley analyzed the comments and protests submitted regarding the Lewistown RMP and Missoula RMP. Regulations require the BLM Director alone to consider and resolve recommendations and protests on RMPs. *See* 43 U.S.C. § 1701(a)(8); 43 C.F.R. §§ 1610.3-2(e), 1610.5-2(a)(3). Following Pendley's review, BLM published in the Federal Register that the "BLM Director reviewed all protest issues for the proposed planning decisions . . . concluded that the BLM Montana State Director followed the applicable laws. . . . The BLM Director denied the protests, and that decision is the final decision of the US Department of the Interior." (Doc. 10-1 at 11). BLM further asserted in its Federal Register notice regarding the RMPs that "[a]ll protests have been resolved and/or dismissed by the BLM Director." Notice of Availability of the Record of Decision and Approved Resource Management Plan for the Lewistown Field Office, Montana, 85 Fed. Reg. 47,239, 47,239 (Aug. 4, 2020).

Second, the Executive Branch repeatedly presented Pendley as Acting BLM Director. The White House listed Pendley's official title as the "Acting Director of Bureau of Land Management" in a pool report on the same day that BLM published the RMPs. (Doc. 10-1 at 12). Citing the declaration of yet another Acting official, Federal Defendants argue that those "references were inadvertent."

(Doc. 17 at 7). Though not conclusive, this pattern of reference affirms what was already established through delegation and practice: Pendley operated as the Acting BLM Director. Whether Pendley operated as Acting BLM Director presents a matter of law, not a matter of disputed fact, as Federal Defendants asserted at the Motion for Summary Judgment hearing in a last-ditch effort to avoid summary judgment. The only question that remains is whether the FVRA permitted Pendley's service.

### c. Pendley's Service as Acting Director Violates the Appointments Clause and the FVRA

The Appointments Clause "is not an empty formality." *N.L.R.B. v. SW General, Inc.*, ___ U.S. at ___, 137 S. Ct. at 948. Presidents cannot avoid their constitutional obligation to appoint Officers on advice and consent of the Senate by making "temporary" delegations with evasive titles and delegations. Pendley's past and continued service trivializes the import of the FVRA and the Appointments Clause. Presidents possess significant authority over the Executive Departments, but even where the President has broad discretion, "that discretion is not boundless" and "may not transgress constitutional limitations." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986). It remains "the duty of the courts, in cases properly before them, to say where th[e] . . . constitutional boundaries lie." *Id.* "At some point, courts can and must play a role in policing 'acting' appointments that are effectively permanent." *Guedes v. Bureau of Alcohol,*

28

*Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 153 (D.D.C. 2019), *aff'd on other grounds*, 920 F.3d 1, 12 (D.C. Cir. 2019) (per curiam).

Congress established the BLM Director as an office that must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a). The agency's statute provides no independent means to temporarily fill the role. *See, e.g.*, *Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016); *Guedes*, 356 F. Supp. 3d at 143 ("Agency-specific statutes like the AG Act were expected to operate alongside the FVRA, not to displace it"), *aff'd on other grounds*, 920 F.3d 1, 12 (D.C. Cir. 2019) (per curiam). As a result, the designation of an Acting BLM Director remains subject to the exclusive methods for temporary appointment set out in the FVRA. *See* 5 U.S.C. § 3347. A delegation that does not follow those procedures would violate both the FVRA and the Appointments Clause of the U.S. Constitution.

Pendley has served and continues to serve unlawfully as the Acting BLM Director. His ascent to Acting BLM Director did not follow any of the permissible paths set forth by the U.S. Constitution or the FVRA. Pendley has not been nominated by the President and has not been confirmed by the Senate to serve as BLM Director. Pendley is not a member of the permitted category of individuals who can serve in an acting capacity in a PAS office under the FVRA. Secretary Bernhardt lacked the authority to appoint Pendley as an Acting BLM Director

under the FVRA. Pendley unlawfully took the temporary position beyond the 210-day maximum allowed by the FVRA. Pendley unlawfully served as Acting BLM Director after the President submitted his permanent appointment to the Senate for confirmation—another violation of the FVRA. And Pendley unlawfully serves as Acting BLM Director today, under color of the Succession Memo.

The Executive's delegation arrangement threatens "a gradual concentration of the several powers in the same department." The Federalist No. 51 (J. Madison). It does not take "careful and perceptive analysis" to understand such a threat because "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). Pendley's previous and ongoing service as Acting BLM Director violates the Appointments Clause of the U.S. Constitution and the FVRA.

The Court's conclusions of law rely on a clear administrative record and do not involve a genuine dispute as to any material fact. Federal Defendants noted at oral argument that Plaintiffs had filed their Motion for Summary Judgment before the expiration of the 60 days allowed under Rule 12(a)(2) to file their Answer to Plaintiffs' Complaint and of the 60 days allowed under Rule 12(b) to raise defenses to Plaintiffs' Complaint. Fed. R. Civ. P. 12(a)(2), 12(b). As a result, Federal Defendants contend that they reserved the right to raise any genuine issues of material fact that would defeat summary judgment under Rule 56 and to raise any defenses allowed under Rule 12(b).

Federal Defendants must do more than allege that genuine issues of material fact may exist or claim to preserve defenses. Federal Defendants identified no facts in dispute or facts that would be unavailable as of the September 21, 2020 hearing date that would justify a delay. Rule 56(d) requires the non-moving party to show by "affidavit or declaration" that it cannot present "facts essential to justify its opposition" to summary judgment. *Id.*, Rule 56(d). Federal Defendants filed no affidavits or declarations. Federal Defendants filed no motion pursuant to Rule 56(d).

Rule 56(d) requires the party opposing summary judgment, regardless of when raised during the litigation, to explain "why, at that timepoint, it cannot present by affidavit facts needed to defeat the motion" for summary judgment. *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989) (citing *Londrigan v. F.B.I.*, 670 F.2d 1164, 1175 (D.C. Cir.1981)). Federal Defendants failed to meet this standard when they announced at oral argument an intent to preserve the right to identify, at some unspecified later date, potential genuine issues of material fact that would defeat summary judgment. Therefore, summary judgment proves appropriate. *Pit River Tribe*, 469 F.3d at 778.

## III. Relief

Plaintiffs seek both declaratory and injunctive relief. Specifically, Plaintiffs seek an order and judgment declaring William Perry Pendley's service as Acting

Director of BLM unlawful; enjoining Pendley from exercising the authority of the Director; enjoining Secretary Bernhardt from directing Pendley to exercise the authority of the Director; and granting any other relief deemed appropriate.

The Court deems appropriate the requested declaratory and injunctive relief. The Court determines, however, that further relief likely should be granted under the FVRA and APA. *See, e.g.*, *Casa de Maryland, Inc. v. Chad F. Wolf*, Case No. 8:20-cv-022118-PX (D. Md. Sept. 11, 2020) (enjoining enforcement of rules changed by an unlawfully serving acting official); *L.M.-M. v. Kenneth T. Cuccinelli II*, Case No. 1:19-cv-02676-RDM (D.D.C. Mar. 1, 2020) (invalidating the reduced-time-to-consult and prohibition-on-extension directives under the FVRA and APA issued by an unlawfully serving acting official). Congress prescribed an additional form of relief for violations of the FVRA: that "any function or duty of a vacant office" performed by a person not properly serving under the statute "shall have no force or effect." 5 U.S.C. § 3348(d). Unless the President uses the procedures of the FVRA to temporarily fill the open position, the "office shall remain vacant," and in the case of a sub-cabinet agency, "only the head of [the] Executive agency" can perform the functions or duties of the vacant office. *Id.* § 3348(b). Only the Secretary of the Interior can perform functions or duties of the BLM Director.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A court cannot "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A court instead must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). The Secretary's failure to perform the functions and duties of BLM Director as required under the FVRA and instead delegate those decisions to an improperly appointed Acting BLM Director would render any decisions issued by that Acting BLM Director arbitrary and capricious as not issued "in accordance with law." 5 U.S.C. § 706(2)(A). *See also SW General, Inc. v. N.L.R.B.*, 796 F.3d 67, 79 (D.C. Cir. 2015), *aff'd on other grounds*, ___ U.S. at ___, 137 S. Ct. at 938 n.2 ("The Board did not seek certiorari on this issue, so we do not consider it.").

The Court recognizes that any "function or duty" of the BLM Director that has been performed by Pendley would have no force and effect and must be set aside as arbitrary and capricious. *See* 5 U.S.C. §§ 3348(d), 706(2)(A). These acts appear to include, but not be limited to, the Missoula RMP and the Lewistown RMP. The Court will direct the parties to provide further briefing on these actions

33

and any other BLM Director exclusive functions or duties that Pendley may have performed.

## ORDER

Accordingly, **IT IS ORDERED** that the Motion for Summary Judgment (Doc. 10) is **GRANTED**:

- The Court declares that William Perry Pendley served unlawfully as the Acting BLM Director for 424 days;

- The Court enjoins William Perry Pendley from exercising authority of BLM Director;

- The Court enjoins Interior Secretary David Bernhardt from unlawfully delegating the authority of the BLM Director;

- The Court directs the Parties to file simultaneous briefs within 10 days of this Order, not to exceed 5,000 words, to address what acts of Pendley, including but not limited to the Lewiston RMP and the Missoula RMP, should be set aside under 5 U.S.C. § 3348(d)(1) and 5 U.S.C. §706(2)(A).

Dated the 25th day of September, 2020.

Brian Morris, Chief District Judge
United States District Court