IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana, et al., | ) ) ) |
| | ) ) Civil Docket |
| Plaintiff, | ) No. CV-20-62-GF-BMM |
| | ) |
| vs. | ) |
| | ) Court of Appeals |
| BUREAU OF LAND MANAGEMENT, et al., | ) No. 20-36129 ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

Transcript of Motion Hearing

Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Monday, September 21, 2020
1:30 p.m. to 2:50 p.m.


BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE


Yvette Heinze, RPR, CSR
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings remotely recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFFS,

3                    Deepak Gupta (via video)
                     Neil Sawhney
4                    GUPTA WESSLER, PLLC
                     1900 L Street, NW
5                    Suite 312
                     Washington, DC 20036
6
                     Raphael Graybill (via video)
7                    Rylee Sommers-Flanagan
                     OFFICE OF GOVERNOR STEVE BULLOCK
8                    PO Box 200801
                     Helena, MT 59620-0801
9

10  PRESENT ON BEHALF OF THE DEFENDANTS:

11                   Michael Andrew Zee (via video)
12                   U.S. Department of Justice
                     450 Golden Gate Ave., #7-5395
13                   San Francisco, CA 94102

14

15  ALSO PRESENT:
16                   Patrick Holmes (via video)
                     Unidentified member of the public (via video)
17

18

19

20

21

22

23

24

25

PROCEEDINGS

1
2      (Open court.)

3              THE COURT:  Please be seated.

4              Madam Clerk, please call the next case on the Court's
5    calendar.

6              THE CLERK:  This Court will now conduct a motion
7    hearing in Cause Number CV-20-62-GF-BMM, Bullock, et al. versus
8    Bureau of Land Management, et al.

9              THE COURT:  Good afternoon, Mr. Gupta.

10             MR. GUPTA:  Yes, Your Honor.  Deepak Gupta for
11   Governor Bullock and the Montana Department of Natural
12   Resources and Conservation.  I'm joined by my colleagues Ralph
13   Graybill, Rylee Sommer-Flanagan, and Neil Sawhney.  And I will
14   be speaking as well as my colleague Mr. Sawhney.  I believe
15   Mr. Graybill will start out with an introduction.

16             THE COURT:  All right.  And good afternoon, Mr. Zee.

17             MR. ZEE:  Good afternoon, Your Honor, Andrew Zee from
18   civil division of the Department of -- (video distortion.)

19             THE COURT:  I'm sorry, Mr. Zee.  You cut out at the
20   end, sir.  Mr. Zee?

21             MR. ZEE:  I'm sorry, Your Honor.

22             THE COURT:  You cut out at the end.  You just made
23   your appearance, I assume.  Correct?

24             MR. ZEE:  Yes, Your Honor.

25             THE COURT:  Okay.  And who else is on the screen

1  here, Mr. Gupta?

2          MR. GUPTA:   Mr. Sawhney from my firm, Neil Sawhney,

3  who will be speaking.

4          THE COURT:   All right.  So we're conducting this

5  hearing by Zoom, and there's a great deal of interest in some

6  circles.  I know people are listening in.  I'd ask anyone who

7  is not involved in the case directly to please mute their

8  microphones at this point.

9          I'd also ask -- Mr. Zee, if you wouldn't mind muting

10  for now, and I'll unmute you in a few minutes when it's your

11  turn to speak.

12          Mr. Gupta, are you going to handle the whole

13  argument?

14          MR. GUPTA:   If it's okay with Your Honor, we'd like

15  to divide the presentation.  I would be dealing with the

16  Article III standing issues, and my colleague, Mr. Sawhney,

17  will address the remaining issues, the merits issues.

18          THE COURT:   All right.  And Mr. Graybill will do the

19  introduction?

20          MR. GRAYBILL:   Your Honor --

21          THE COURT:   Hold on.

22          Mr. Gupta, is Mr. Graybill going to do introductions?

23          MR. GUPTA:   I think I basically said what

24  Mr. Graybill was going to say.  He was just going to introduce

25  all of us and explain the division of labor to Your Honor.

1          THE COURT:  All right.  Can everyone hear me okay
2     before we get started?
3          (Simultaneous affirmative response.)
4          THE COURT:  Sometimes there's a transition delay.  So
5     if I'm going to ask a question, I'll just interject your name
6     and pause.  If your hear your name being called, please stop
7     speaking, and then I will pose the question after you've
8     stopped speaking.  That way we can avoid speaking over each
9     other.
10         We have a court reporter making a transcript of this
11    proceeding.  Like any other in-person hearing, you will have a
12    written record of what happened, assuming we follow the rules
13    and speak one person at a time.  We will not have any copy of
14    the video transmission of this proceeding.
15         So if you are not speaking now, please mute your
16    microphones, and we'll recognize Mr. Gupta on behalf of
17    Governor Bullock.
18         MR. GUPTA:  Thank you, Your Honor.  Deepak Gupta for
19    the governor.  As I said, I will be addressing just the
20    Article III standing issues.  And we believe the Justice
21    Department's challenge to our Article III standing suffers from
22    three basic errors.
23         First, the DOJ fundamentally misunderstands how
24    Article III standing analysis works in the Appointments Clause
25    and separation of powers context, as reflected in the most

1   recent and applicable Supreme Court and Ninth Circuit

2   precedent.  And I particularly call your attention to the *Seila*

3   law case, the *Free Enterprise* case, and the Ninth Circuit's

4   decision in *California v Trump*.

5          Second, we believe the DOJ ignores the special

6   solicitude that the Supreme Court and the Ninth Circuit have

7   accorded states in the standing analysis, particularly in this

8   precise context in challenges to federal government action or

9   inaction that has an impact on the state's land or environment.

10  And I particularly call the Court's attention to *Massachusetts*

11  *v EPA*, and, again, the recent decision in *California v Trump*.

12         And, third, last but not least, DOJ all but ignores

13  the significance of the most important facts, including the

14  fact that on August 4th, after this lawsuit was filed,

15  Mr. Pendley himself, exercising authority that only the BLM

16  director lawfully possesses, provided the necessary formal

17  approval for two long-term Resource Management Plans for

18  Montana.  These plans are part of a long term ongoing process

19  in which Montana by statute has a recognized stake, and they

20  govern land management decisions on more than 800,000 acres of

21  surface public lands in Montana and more than 1.4 million acres

22  of sub-surface mineral estates in Western and Central Montana

23  for the next 20 years.

24         So I'd like to start with the first point, but I'm

25  happy to answer any specific questions that the Court has.  And

1  that has to do with -- the first point is how Article III
2  standing analysis works in the separation of powers context.
3  And I think if I had to characterize the DOJ's arguments in a
4  nutshell, the problem is that they approached this case as if
5  it were a conventional environmental case, an APA case, where
6  someone is coming forward and, let's say, a private plaintiff,
7  and is changing some specific action because of a
8  garden-variety violation of federal law.

9          That's not what this case is.  This case falls into
10 the kind of framework that the Supreme Court has addressed in
11 most recently in *Seila Law v Consumer Financial Protection*
12 *Bureau*, and then a few years before that, the *Free Enterprise*
13 case, where what the plaintiff is alleging is that the
14 decision-maker, the governmental decision-maker, lacks lawful
15 authority to make any decisions as part of a process or where,
16 as it was the case in the *Seila Law* case, the argument is that
17 the agency itself is unlawfully structured.  In those kinds of
18 cases, the standing analysis works differently.

19         And what the Supreme Court made very clear in *Seila*
20 *Law* is that we don't put the plaintiff in a case like that to
21 the impossible burden of trying to show a counterfactual, that
22 but for this improperly appointed official or improperly
23 constituted agency, that the policy outcome or the process that
24 the litigant is being subjected to would come out differently.
25 Because, first of all, that's going to be an impossible

1   showing, and because the real injury in a case like this is
2   being subjected to a process in which you have a stake and in
3   which the decision-maker doesn't have authority.

4           So we think the injuries here are quite substantial
5   in concrete terms, and I'm happy to get to those.  But I first
6   think, just by way of comparison, it's worth looking at the
7   Supreme Court's decision in *Free Enterprise*.   There, there was
8   an Appointments Clause challenge to this public accounting
9   board, and the accounting firm that brought the challenge where
10  the Supreme Court held that there was standing was at the very
11  beginning of a process.  Nothing had happened to them other
12  than the initialization of an investigation.

13          Now, normally, you can't challenge the initiation of
14  an investigation.  You challenge a particular final agency
15  action at the end of the process.  So that shows you that the
16  framework for these kinds of challenges is different.

17          Now, here, we actually do have a substantial ongoing
18  process that has produced final agency action, but that's not
19  the end of it.  The process is ongoing.  And so if you look at
20  the Holmes and Williams declarations, what they explain is that
21  there's an -- and I know Your Honor has some familiarity with
22  the background from previous litigation in this Court about
23  Resource Management Plans regarding Sage-Grouse.  But this is a
24  very important issue that affects land management in the state
25  of Montana.  And the statutory scheme recognizes that the

1   states that are affected have a stake in that process, and

2   that's why the governor of the state can perform what's called

3   a consistency review and raise objections.  The states have

4   special status in that process.  And that's precisely what

5   Governor Bullock did.  He objected to the proposed oil and gas

6   leasing availability in his consistency review in April.  He

7   called for additional protective stipulations.  And this is

8   very important.  He requested full consultation with the

9   Montana Fish and Wildlife agency as part of BLM's authorization

10  of any surface-disturbing activities.

11          And as the Williams declaration explains -- I'd just

12  call your attention to paragraph 12 -- under Bureau's new

13  plans, that's not going to happen.  The Bureau is going to

14  approve any surface disturbance or occupancy plan with mere

15  notification to the state rather than consultation with the

16  state.

17          So that shows you that the approval of this plan sets

18  in motion a years' long process with direct concrete effects to

19  Montana's land and its ability to protect wildlife in the

20  state, and it's an ongoing process.  And it's an ongoing

21  process that therefore works ongoing harm to the state in the

22  form of Montana having to interface with the decision-maker who

23  does not have the lawful authority and --

24          THE COURT:  Mr. Gupta.

25          MR. GUPTA:  -- standing he'd assume merit.

1          THE COURT:  Mr. Gupta, how do you distinguish the
2   notification from consultation?  Are those terms of art, or is
3   that just everyday meaning?
4          MR. GUPTA:  Yeah, I mean, I think it's not different
5   from the everyday meaning.  So if I tell you, you know, I'm
6   going to do something, that's notification.  Consultation
7   requires more than that.  It requires input from you.  If I say
8   I'm going to consult with you, I'm not just telling you what
9   I'm going to do.  I at least -- you know, presumably, I'm going
10   to ask you what you think and take that into account, and
11   there's a process for that.
12          And so I think that shows that, you know, this is an
13   ongoing process.  The declarations bear that out.  There are
14   officials in the State of Montana and these departments that
15   are interfacing with BLM on a daily -- certainly weekly basis,
16   and I believe daily basis, on these issues that are critical to
17   management of land in Montana.  BLM controls a third of the
18   land in Montana.  And as I was discussing earlier, there are
19   millions of acres that are affected by these plans.
20          So even if you just take the ordinary standing
21   analysis that would apply to a private party, we have far more
22   Article III injury, far more at stake than in cases where the
23   Supreme Court has recently recognized standing in separation of
24   powers challenges, but there's --
25          THE COURT:  Mr. Gupta, so are you alleging more than

1    a procedural injury?  Is there an injury in fact to an interest
2    of Montana here?  Or is this speculation of what could happen
3    down the road if, for example, the change in the Sage-Grouse
4    leasing results in destruction of Sage-Grouse habitat that
5    could result in more attention to Sage-Grouse in the future and
6    possibly ESA listing?  Is that concrete injury or speculative?

7         MR. GUPTA:  Well, certainly not just speculative
8    injury.  It's concrete injury.

9         And I just -- I want to you -- you asked if it was
10   procedural injury, and I think the courts haven't quite called
11   it procedural injury.  But if you look at the separation of
12   powers and Appointments Clause cases, it's very analogous.
13   What those cases are saying is if you have a stake in the
14   process and you're alleging that the decision-maker is
15   unlawfully appointed, shouldn't even be allowed to make those
16   decisions, so long as you can show an article of stake in the
17   process -- you still have to show that you have a concrete
18   stake -- then that is sufficient for Article III injury.  You
19   don't have to prove that the process would have produced some
20   different outcome.

21        But, here, we have a lot more than a mere procedural
22   injury because Montana has actually been engaging in this
23   process for quite some time and laid the objections that I
24   described.  Those objections have been rejected, and Montana is
25   now going to have to continue to engage with the BLM, with an

1    improperly constituted official at the helm.

2              And it's very important to emphasis -- and I know my

3    colleague, Mr. Sawhney, will be talking more about this when we

4    get to the merits.  It's important to emphasis that the

5    particular decision at issue here, the decision to reject a

6    protest when it comes to these Resource Management Plans is a

7    decision that is vested in solely by law in the BLM director.

8    The director has to perform that action, and the director

9    performed that action here, with the acting director.

10             And if the process were reopened, if Montana were to

11   say, "Look, we don't like the way you're going with this.  We

12   have additional protests.  We want you to decide that."  The

13   problem is that this is an ongoing issue.  It's an ongoing

14   issue that the person who will be making that decision doesn't

15   have the lawful authority to do so.

16             Just as it would be in the *Free Enterprise* case, that

17   was an ongoing process where the allegation was that the agency

18   officials were not properly appointed under the Constitution,

19   and the process was, therefore, flawed.  And any decision made

20   by a decision-maker who's been unlawfully appointed in

21   violation of the Appointments Clause is void *ab initio*.  And so

22   that's why you have this kind of framework for these

23   challenges.

24             I hope I'm answering your question, Your Honor.  It's

25   that it is akin to a kind of procedural injury.  We also have

1   concrete injuries that have occurred and that are ongoing.  But

2   I would not describe what's going on here as merely

3   speculative.  And I think to the extent that my friend on the

4   other side is saying it's speculative because you can't show

5   what would happen in a counterfactual world, that's precisely

6   what the Supreme Court has said you don't have to do in a

7   separation of powers challenge.

8         THE COURT:  Mr. Gupta, in the recent decisions in

9   *Cuccinelli* and *Wolf*, Court focused on injury to particular

10  people who were parties to the case.  I think it's in

11  *Cuccinelli* that said there was no organizational standing but

12  the individuals had standing.  How do you apply that reasoning

13  to this case, the reasoning of those two courts?

14        MR. GUPTA:  Well, I mean, those cases are not at all

15  inconsistent.  I think in the Cuccinelli case, if I recall

16  correctly, it was an individual immigrant.  I don't remember

17  the particular situation, but it was a more conventional kind

18  of challenge where you just have a particular person who is

19  aggrieved in a specific way.  And, certainly, that can suffice

20  in an Appointments Clause challenge, and that's the way that

21  case was set up.

22        Here, if this were -- if you were to assess this case

23  using the -- if you were to throw out what the Supreme Court

24  has said about the specifics about how standing works in

25  separation of powers cases, we'd still have standing, I think,

1    because we have submitted ourselves, and we have a stake in

2    this process.  It affects millions of acres of our land, and

3    the decision-maker has rendered an adverse decision, and we're

4    going to continue to have to be part of that process.

5          You know, I think it's useful to compare the injuries

6    here with the injury in *Massachusetts v EPA*, because I think

7    the comparison is quite favorable for us.  In *Massachusetts v*

8    *EPA*, the EPA hadn't done anything yet.  What Massachusetts was

9    complaining about was that the EPA hadn't initiated a

10   rulemaking on greenhouse gases.  And the Supreme Court

11   acknowledged that any harm there was remote.  The harm would

12   have been the harm once the levels rise as a result of

13   greenhouse gasses to Massachusetts's coastline, to its land.

14         But the Supreme Court said particularly because we

15   afford special solicitude to the states when they're protecting

16   their land and air and their domain, we're going to allow the

17   states to bring a challenge like this.  Because the injury,

18   while remote, is significant, and there's a causal connection,

19   and it would be redressable.

20         Well, here, you don't have to speculate.  The injury

21   is not remote.  We have identified in our protests what the

22   problems are with the BLM's approach, and the BLM has taken a

23   180-degree approach in its management to public lands from what

24   was reflected just a few years ago in the BLM's plans.  And so

25   the harm to Montana's land management and wildlife and to its

1  public lands is much more acute -- much more imminent than it
2  was in *Massachusetts v EPA*.

3          And I think the same thing is true if you look at the
4  Ninth Circuit's decision in *California v Trump*.  That was a
5  decision by Judge Thomas for the Ninth Circuit, a recent
6  decision, in which California and New Mexico were challenging
7  the funding for the border wall.  And so you did have a kind of
8  separation of powers aspect to the challenge, which the Court
9  acknowledged.  It acknowledged the special role of the states
10 in vindicating the separation of powers.

11          But it also leaned heavily on *Massachusetts v EPA* and
12 the special solicitude that the states have in protecting their
13 environment.  And, there, there were particular species, just
14 as here you have the Sage-Grouse.  There, there were particular
15 species that California and New Mexico identified whose
16 habitats would be disrupted if the administration were allowed
17 to continue with this wall and effectively separate those
18 animals that were on the Mexican side or the US side of the
19 border.  And that interest was deemed sufficient to show
20 Article III standing there.

21          Again, I think that the situation here is more acute
22 and a lot less remote than it was in those two cases.

23          THE COURT:  Mr. Gupta, so setting aside for the
24 moment the special solicitude for states, what's your strongest
25 argument for standing in a case to support that?

1        MR. GUPTA:  I think if you set aside the special
2   solicitude, I think our strongest -- first of all, I think
3   *California v Trump* is important even if you set aside special
4   solicitude.  But I would say -- I would take a look at *Seila*
5   *Law*, the CFPB case.  And what the Court said there is a
6   litigant challenging governmental action as a void on the basis
7   of separation of powers is not required to prove that the
8   government's course of conduct would have been different in a
9   counterfactual world in which the government had acted with
10  constitutional authority.

11        And the Court there, the Supreme Court, cited *Free*
12  *Enterprise*.  And, again, I've already discussed *Free*
13  *Enterprise*.  The discussion at this point in *Free Enterprise* is
14  not lengthy.  The DC Circuit decision discusses it more, but
15  the facts were pretty simple.  You had an accounting firm that
16  the mere fact that they were at the initial stages of an
17  investigation, that an investigation was open, was considered
18  sufficient by the Supreme Court because of the nature of the
19  challenge.  Because you're subjected to a decision-maker that
20  you allege is unlawful.

21        And our reply brief sets out, I think, a long line of
22  cases going back to the Supreme Court's decision in *Freytag*.
23  It also commended the DC Circuit's decision in *Landry* to you,
24  where the Court makes clear that standing works a little bit
25  differently in a case like this.  In a way you can think of it

1   as the right that we are asserting is the right to have any

2   decisions made with respect to us made by somebody who actually

3   has the authority to make that decision.  And so every day that

4   we are being subjected to a process that is in our view

5   unconstitutional, it's tainted with the unconstitutionality of

6   this appointment, is the harm to Montana and its sovereign

7   interests and its ability to protect its wildlife.  And this is

8   not a small matter.  It's a matter that affects millions of

9   acres.  It affects oil and gas leasing throughout the state and

10  affects the ability of the state to protect its air, its

11  wildlife, and the use of its public lands.

12          THE COURT:  Anything else, Mr. Gupta?

13          MR. GUPTA:  No.  Thank you, Your Honor.  I'm happy to

14  turn it over to --

15          THE COURT:  All right.  Thank you for your time.

16          So now we'll hear from Mr. -- is it "Sawhney"?  Did I

17  say that correctly?

18          MR. SAWHNEY:  Yes, Your Honor.

19          THE COURT:  -- Mr. Sawhney regarding the merits of

20  the state claim.

21          MR. SAWHNEY:  Yes, Your Honor, Neil Sawhney, also on

22  behalf of Governor Bullock and the Department of Natural

23  Resources.

24          Your Honor, on the merits, it's hard to imagine a

25  more stark violation of the Appointments Clause.  There has

1  been no confirmed bureau director since January of 2017.
2  Instead, the individuals exercising that -- occupying that roll
3  have served as a result of unilateral appointments made wholly
4  within the executive branch and not in compliance with the
5  requirements and procedures set out by Congress in the federal
6  Vacancy Reform Act.
7          Mr. Pendley's continued service is even more
8  egregious than his predecessors.  He has served for more than a
9  year, and he currently derives his authority from a succession
10  order that he himself authored and that has no expiration date.
11  Even more, he has continued to serve even though his name was
12  submitted to the Senate and then withdrawn by the President in
13  light of bipartisan opposition.
14          What you have here, Your Honor, is exactly the case
15  that presents the concern that Justice Thomas raised in his
16  concurrence in *Southwest General*, and that is that the
17  executive branch will use temporary appointments as a, quote,
18  "end run" around the Appointments Clause.  And the government's
19  position, if accepted by the courts, creates a template for the
20  executive branch to effectively sideline the Senate's advice
21  and consent for the entirety of a presidential term moving
22  forward.
23          And so, Your Honor, I was going to start with, you
24  know, a recognition that both the Supreme Court and Congress
25  have evidenced that even though the Appointment Clause requires

1   individuals serving as agency heads to be confirmed by the
2   Senate, there's always been a recognition that that has to be
3   balanced with some practical necessity of functioning
4   government in the case of vacancies when they arise.
5           But the way that the political branches have achieved
6   that balance is since the founding of the republic, Congress
7   has enacted specific legislation that sets out specific
8   requirements and procedures by which the executive branch must
9   undertake in order to fill these temporary vacancies.  And so
10  long as the government's -- the executive branch's appointment
11  of such temporary officials is only constitutional when they
12  follow those requirements and procedures.
13          But remarkably here, the federal government does not
14  even attempt to argue that Mr. Pendley's appointment complies
15  or in any other way kind of adheres to the requirements set out
16  in the FVRA.  In fact, they fault us for bringing up the FVRA
17  in the first place.
18          And even though we're only bringing -- we're bringing
19  a sole constitutional claim under the Appointments Clause, the
20  FVRA is critical to understanding kind of the interrelationship
21  between Congress and the Executive branch in this area.  And,
22  here, I think we agree with the federal government that *Eaton*,
23  the Supreme Court's decision in the late 1800s, is a useful
24  place to start, though we quite disagree with their
25  interpretation of the language in *Eaton*.

1    So I think the key sentence in *Eaton* is that -- is
2    this sentence by the Court at 343 of the opinion, the Court
3    said, "Because the subordinate officer is charged with the
4    performance of the duty of the supervisor for a limited time
5    and under special and temporary conditions, he is not thereby
6    transformed into the supervisor and permanent official."

7    And so both of those clauses are critical to
8    understanding what allows a temporary appointment to be
9    constitutional.  It's that it's for a limited time and that the
10   temporary official is serving under special and temporary
11   conditions.  And in that case, the those conditions were set
12   out by Congress itself in a statute governing the appointment
13   of consuls, vice consuls, and delegating some authority to the
14   President in the event of a vacancy.

15   And that is exactly what Congress did in the FVRA.
16   They created a carefully calibrated statutory scheme that
17   allows for temporary appointments under, you know, certain
18   timelines that are set out in 3346, and under certain
19   conditions.  Right?  Only certain people may be appointed for
20   these temporary acting roles.

21   But Mr. Pendley's appointment satisfies neither of
22   those elements.  Right?  Mr. Pendley's appointment is
23   essentially indefinite.  It would continue until the end of
24   this presidential term or beyond.  There is no end date on
25   Mr. Pendley's service.  Moreover, Mr. Pendley is not serving

1  subject to any conditions set by Congress.

2  THE COURT:  Mr. Sawhney, what effect does the

3  withdrawal of the President of Mr. Pendley's name as the

4  director have on this case?

5  MR. SAWHNEY:  Your Honor, the withdraw makes only

6  more clear how egregious Mr. Pendley's appointment is and how

7  much it is -- it is violating or aggrandizing the power from

8  the Senate.

9  And I think here, the Supreme Court's decision in

10  *Southwest General* is quite instructive.  So in describing the

11  history of the Vacancies Act, the Supreme Court discussed how

12  in the 1970s and '80s the Department of Justice had the view

13  that the Executive branch had independent authority without

14  Congress's involvement to appoint temporary officers when

15  vacancies arose.

16  And the Supreme Court pointed particularly to a

17  specific incident when the Department of Justice had nominated

18  an individual for Acting Assistant Attorney General and that

19  nominee was rejected by the Senate, and then the Department of

20  Justice installed this person as director, you know -- sorry --

21  as Acting Assistant Attorney General despite the Senate's

22  rejection.  And the Supreme Court made clear in *Southwest*

23  *General* that Congress passed the Federal Vacancies Reform Act

24  to make clear to the Executive branch that that was not

25  permissible under the Appointments Clause; that that was, in

1   fact, the most egregious action under the Appointments Clause
2   because it was not only disregarding the Senate's advice and
3   consent role, but it was actually flouting it.  Right?  The
4   Senate had not given its advice and consent to a nominee, and
5   yet the Executive branch continued to instill that acting
6   official.

7            Now, here, you know, Mr. Pendley was not rejected by
8   the Senate because the government withdrew his name before it
9   reached the floor.  But the same constitutional values are
10  present in this case.  Because the withdrawal of Mr. Pendley's
11  name makes only more clear that the government is not intending
12  to go through the regular process of confirming him through the
13  Senate.  And his service is just kind of illustrative of what
14  could happen if the courts accepted the Executive branch's
15  expansive theory of their power to make appointments without
16  Congress's involvement.

17           And, Your Honor, I think another thing I think is
18  important to recognize about *Eaton*, is that in *Eaton* the
19  vacancy arose because the consul became ill, and that was very
20  central to the Supreme Court's decision and has been kind of
21  animating a lot of the Congress's legislation on vacancies.
22  That the idea that a vacancy arising and because of the
23  extrinsicies of government, the Executive branch needs someone
24  who can temporarily fill that position to continue the agency's
25  functioning.

1           But, here, we have the opposite of that circumstance.

2    Right?  From the beginning of this presidential term, there has

3    been no confirmed director, and the vacancy has been maintained

4    by the Executive branch.  There is no sight of the vacancy

5    ending absent this Court's intervention.

6           Your Honor, unless you have further questions on

7    *Eaton* or the intersection between the Appointments Clause and

8    the FVRA, I did want to address the federal government's

9    argument that there is some sort of factual dispute here about

10   Mr. Pendley's role, and we would submit that there's simply no

11   genuine factual dispute at all, and there's three reasons for

12   that.

13          So, first of all, the federal government does not

14   contest and they could not contest that the White House, the

15   Bureau, and even Mr. Pendley himself in public statements have

16   described Mr. Pendley as the acting agency head and the leader

17   of the Bureau.  And in their brief, the government says that

18   those were mistakes or made in error.  But this has happened

19   numerous times in public statements, and I would submit it is

20   the clearest evidence to the Court that this is how both the

21   agency, the Executive branch, and Mr. Pendley himself view

22   Mr. Pendley's role at the Bureau.

23          Second, even though the federal government says that

24   these statements were made in error, they provide no contrary

25   evidence suggesting that Mr. Pendley has any other role except

1   for acting director.  They did not file a Rule 66(d) motion

2   suggesting they need more time to develop the evidence.  What

3   they call a factual dispute is really a dispute about the label

4   for Mr. Pendley's service.  So they argue he's not the acting

5   director because we have never used those terms in the

6   documents that gave him his authority.  We didn't use the magic

7   words of "acting director."

8           But neither the Appointments Clause nor the FVRA

9   turns on the label that the Executive branch puts on an acting

10  official because, otherwise, the Executive branch could

11  completely evade the Appointments Clause just by not using the

12  specific word "acting."

13          What matters is is Mr. Pendley exercising the power

14  of the director of the Bureau of Land Management?  And there's

15  no question that he is.  And I think the best evidence to that

16  is, Your Honor, in the Department of Justice's brief, they

17  concede at pages 14 to 15 of their opposition that Mr. Pendley

18  formally resolved the protests to the Resource Management

19  Plans.  And as my colleague Mr. Gupta mentioned, that

20  resolution of the protests is a critical step and a necessary

21  step -- (video disruption) -- management plans, and it is a

22  step and power that the statute and the regulations assign only

23  to the director.  So only the director or an acting director

24  appointed lawfully may exercise that power to approve or deny

25  or otherwise resolve protests to Resource Management Plans.

1    And there's just no dispute in this case that that's what
2    Mr. Pendley did here.  And so that on its own is a kind of
3    undisputed evidence of Mr. Pendley's servicing as acting
4    director.
5            And so I think for those three reasons, there's no
6    need to even -- there's no reason to believe there's any
7    factual dispute about Mr. Pendley's role.
8            And then, finally, Your Honor, I just want to briefly
9    touch on the political question point.  And, you know, we would
10   submit that there's no merit to the argument that this case is
11   nonjudicial.  And so the argument is somewhat in tension with
12   their reading of *Eaton* because the government itself admits
13   that *Eaton* lays out a standard.  Right?  The standard is that
14   the appointment must be for a limited time and under special
15   and temporary conditions.
16           And so that language makes clear that the judiciary
17   is equipped to evaluate when an appointment is trying to evade
18   the time limits set out by the FVRA.  And the FVRA's own time
19   limits, which are set out in 3346, serve as a manageable
20   standard by which the Court can view whether the appointment is
21   constitutional or not.
22           So, Your Honor, unless you have any additional
23   questions, we would ask that you grant the motion for summary
24   judgment and issue the order that we proposed, along with the
25   summary judgment motion.

1          THE COURT:  All right.  Thank you, Mr. Sawhney.  I
2   will allow you and Mr. Gupta to provide a brief rebuttal after
3   Mr. Zee is finished.  And if you'd mute your microphone for
4   now.
5          MR. SAWHNEY:  Thank you.
6          THE COURT:  All right.  Mr. Zee, are you ready to go,
7   sir?
8          MR. ZEE:  Yes, Your Honor.  Thank you.  Andrew Zee --
9          THE COURT:  Whenever you are ready.  I'm sorry.
10          MR. ZEE:  Thank you, Your Honor.  Andrew Zee from the
11   Civil Division of the Department of Justice.
12          I would -- I will go ahead and proceed and respond to
13   the arguments in the order that plaintiffs counsel presented
14   them.  But, first, I would just like to, at the outset, state
15   that we are here on a quite unusual posture as the plaintiffs
16   have brought a -- what they -- on an expedited motion for
17   summary judgment with no claim of the typical -- (video
18   disruption) -- harm that ordinarily accompanies a request for
19   -- (video disruption).
20          THE COURT:  Mr. Zee, we're having some difficulty
21   hearing you, sir.  Could you turn up your microphone perhaps,
22   and can everyone else please mute your microphones if you are
23   not speaking.
24          (Complying.)
25          THE COURT:  All right.  Whenever you are ready,

1  Mr. Zee.

2          MR. ZEE:  I apologize, Your Honor.  Is this clearer?

3          THE COURT:  It is, yes.  Thank you.

4          MR. ZEE:  Okay.  I'll endeavor to speak more loudly

5  and clearly.

6          What I was saying, Your Honor, is that we are -- at

7  the outset I would just like to point out that we are here in a

8  quite unusual posture that plaintiffs served barely one month

9  ago.  Plaintiffs have brought what they have called an

10  expedited motion for summary judgment yet have made no claim of

11  the typical type of irreparable and imminent harm that must

12  indeed accompany, as Your Honor is well aware, a request for

13  expedited -- (video disruption) -- preliminary injunction.

14  Indeed, we are here before the government has even had an

15  opportunity to respond to the complaint under Rule 12 of the

16  Rules of Civil Procedure.

17          So insofar as we have sought to respond to the

18  standing deficiency in the complaint, we of course reserve our

19  right -- (video disruption) -- additional argument if possible

20  when the time comes for our -- (video disruption.)

21          (Court reporter requests Mr. Zee to speak into the

22          microphone.)

23          MR. ZEE:  With Your Honor's indulgence, let me

24  attempt to use a headset.

25          THE COURT:  Whatever works, Mr. Zee.  Take a moment.

1          MR. ZEE:  Thank you.

2      (Complying.)

3          MR. ZEE:  Is that any better?

4          THE REPORTER:  Yes.  Thank you.

5          THE COURT:  And, Mr. Zee, if we have difficulty in

6  the future, I will interrupt so we can try to figure something

7  out.

8          MR. ZEE:  Thank you, Your Honor.

9          So I'm not sure how much of that the Court did or did

10  not catch, but my basic point was that we are in a highly

11  unusual posture in that the government has not yet had its time

12  run to respond to the complaint, which was served barely a

13  month ago, yet we are being made to respond to claims of mere

14  ongoing harm, which, of course, do not rise -- plaintiffs make

15  no claim to the sort of irreparable or imminent harm that must

16  accompany a preliminary injunction motion.

17          So in our view, as we've presented in our papers,

18  Your Honor, the reports -- the sound reports for this Court,

19  given the posture that we find ourselves in, would be to defer

20  ruling on the summary judgment until after the government has

21  had an opportunity, under Rule 12, to present its threshold

22  argument, which I believe, Your Honor, comes in a little under

23  30 days.

24          To respond to the arguments that plaintiffs' counsel

25  have raised, I will take them in the sequence in which they

1    were presented and in which they were presented in the paper.

2          I think it's important, first, Your Honor, to note

3    that the plaintiffs rely heavily on the special set of issues

4    to which states are entitled, based on *Massachusetts v EPA* for

5    this proposition, yet it's also important to note that the

6    state here is not a plaintiff.  The governor is a plaintiff.

7    *Massachusetts v EPA*, *California v Trump*, none of these cases

8    involve allegations for party plaintiffs that were the official

9    in lieu of the state itself.

10         THE COURT:  Mr. Zee, what's your understanding as to

11   the difference?  The caption says, "Steve Bullock, in his

12   official capacity as governor of Montana."  How is that

13   different than the State of Montana?

14         MR. ZEE:  Your Honor, I think -- well, I think it is

15   different in the fact that the state is positioned to assert

16   the interest of the state.  I think that -- and I don't want to

17   get too far ahead of a Rule 12 motion that might --

18         THE COURT:  Mr. Zee, who would assert the interest of

19   the state if not for the governor?

20         MR. ZEE:  Your Honor, it may be that under provisions

21   of state law the attorney general may be in a position to do

22   that and authorized to do that.  We're not saying that the

23   governor cannot bring suit on his own behalf.  What we are

24   pointing out at this stage is that the governor's interest and

25   the interest of the state --

1        THE COURT:  Mr. Zee, under Montana's system of

2  government, the attorney general and the governor are both

3  elected officials.  It's not uncommon that they come from

4  different political parties, as is the case now.  And,

5  therefore, the attorney general oftentimes appears on behalf of

6  the state.  If the legislature passes a law that gets

7  challenged, the attorney general typically defends.  But in the

8  event that the attorney general declines, the governor can step

9  forward and defend the law on behalf of the state as well.

10       So I guess I'm not sure of the difference here you

11  are trying to draw between *Massachusetts v EPA* and Steve

12  Bullock in his official capacity as the governor of Montana.

13       MR. ZEE:  Your Honor, all I'm merely pointing out is

14  that state -- as the state is not the plaintiff.  I certainly

15  will defer to this Court's expertise on Montana state law, of

16  course, over my own.  We merely are pointing out the

17  distinction between the party's plaintiff in this case and the

18  parties in the cases on which they rely.

19       THE COURT:  Okay.  Mr. Zee, finish up on that point.

20  Are you aware of a Court's decision that is distinguished

21  between the state as a party receiving special solicitude and

22  the governor acting in the official capacity not receiving

23  special solicitude?  I'm not aware of any cases.  Can you point

24  me to any?

25       MR. ZEE:  At this time, Your Honor, I'm not aware of

1  any, but I'd reserve the right to present any to the extent we

2  locate them in our Rule 12 reply.

3          THE COURT:  All right.

4          MR. ZEE:  So, Your Honor, responding to the standing

5  argument first, the plaintiffs here, as we have construed the

6  complaint and the evidence that has been submitted on summary

7  judgment, cannot satisfy the fundamental injury in fact

8  requirements of Article III.  Their injuries are premised on a

9  hypothetical injury that could flow from a future decision by a

10 third-party agency that's not before the Court, that is, the

11 listing of the Sage-Grouse under the Endangered Species Act.

12 Blackletter law that such third-party intervening action are

13 not sufficient to confer standing.  It's -- plaintiffs don't

14 even contest the proposition that the Bureau of Land Management

15 itself has no power to list Sage-Grouse.

16          Further, Your Honor, we would point out that it's not

17 even the listing of the Sage-Grouse that plaintiffs

18 are alleging has caused them injury.  It's the downstream

19 effects of a listing of the Sage-Grouse.  And there's a sort of

20 double hypothetical contingency imbedded in the theory of

21 injury that the plaintiffs are presenting here.  Under the

22 standard articulated in *Clapper*, the injury must be certainly

23 impending, I think that this theory plainly fails.

24          Your Honor, there's also an additional injury that

25 plaintiffs attempted to spell out in their summary judgment

1   papers which is the land use plan.  Just at the outset, Your
2   Honor, I would refute and contest counsel's suggestion that the
3   government has ignored facts and ignored the finality.  The
4   fact is that when the plaintiffs pled the -- filed the
5   complaint, those Resource Management Plans were not final.  By
6   the time they had filed their expedited motion for summary
7   judgment, they were final.  We acknowledged in our opposition
8   brief, at pages 14 and 15, that the Resource Management Plans
9   had in fact been final.  So the suggestion in the reply brief
10   that the government is somehow trying to ignore the finality of
11   those plans is simply misplaced.
12          But, fundamentally, Your Honor, the plaintiffs have
13   failed to articulate any concrete harm -- any viable state
14   interest, propriety or otherwise, that is traceable to any
15   particular provision or act in relation to the Resource
16   Management Plan.
17          We heard today that -- we heard today Mr. Gupta point
18   to certain unspecified protest resolution by the Bureau.  But
19   we still don't know, so far as we can tell, which particular
20   protests have not been resolved to plaintiffs' satisfaction,
21   and, moreover, what effect those protests resolutions have on
22   what particular land interest or other sovereign interest that
23   the plaintiffs allege.  It's simply not identified.
24          Here, I direct the Court to the *Otter v Zinke* case or
25   the *Western Exploration* case, which is cited in our opposition

papers that the proposition that even when the plaintiff is
able to allege particular provisions of a Resource Management
Plan -- which, again, there's no specific protest resolution.
There's no specific provision of the plans that has been
identified.  Even when plaintiff does do so, that still is
insufficient unless it's sufficiently linked to a cognizable
and concrete injury to one of the state's propriety interest.

THE COURT:  Mr. Zee, if a state didn't elect standing
to challenge an acting director under the Appointments Clause,
who would have standing?

MR. ZEE:  Well, I think -- I think -- here, I would
liken the -- I would liken the cases that plaintiffs counsel
presented.  So for instance in -- well, first of all, let's
back up and answer Your Honor's question.  We're not saying
that the state cannot necessarily, as a matter of law, have
standing.  Our argument is that we cannot discern from
plaintiffs' papers a cognizable, concrete, or certainly
impending injury.  That is a relevant fact.  I want to make
that point clear.

I would also like to distinguish the *Seila Law* and
the *Free Enterprise Fund* decision that plaintiffs rely upon in
the reply briefing.  Those decisions -- in both of those
decisions, Your Honor, the plaintiff was a direct target of
either a government investigation or a government civil
investigative demand from the defendant agency.  Here, there's

1  no allegation that there is any investigation or direct

2  regulation of a state of the same nature that was at issue in

3  those cases.  So I would submit, Your Honor, that the standing

4  analysis is quite different.

5          Here, the plaintiffs, the governor, and the state

6  agency are alleging -- are alleging not that they are being

7  regulated by BLM, not that they are being investigated by BLM,

8  or even that the BLM Resource Management Plans have some direct

9  and immediate impact on them.  Instead, they are alleging some

10 further downstream contingent of fact on unspecified

11 proprietary interest, economic interest, and so forth.

12         To the extent that the plaintiffs can articulate a

13 connection between any particular provision of a plan and any

14 sufficiently concrete interest, we would evaluate that under

15 the relevant standard, Your Honor.  But I think that on the

16 current -- on the current and operative pleading, there's

17 simply -- current and operative papers before the Court on

18 summary judgment, there's simply not enough for the Court to

19 identify what it is that the agency is alleged to have done --

20 how what the agency is alleged to have done has affected a

21 concrete and particularized interest of plaintiff.

22         Your Honor, one brief point in addition as to the

23 *Seila Law* decision, we are not -- plaintiffs brought up in

24 their reply brief the counterfactual.  I think that's a bit of

25 a red herring and a misplaced argument.  The government is not

1  demanding that plaintiffs somehow prove a counterfactual; i.e.,
2  that a different BLM director would have taken the same action.
3  That is not the argument that we're -- we are presenting or
4  that we have presented.  So I don't think that counterfactual
5  analysis really has any part in the Court standing inquiry
6  here.
7         With respect to the *Cuccinelli and Wolf* decision that
8  your Honor raised, I think those tend to be readily liken and
9  readily distinguished from this case and much more readily
10 liken to the situation in *Free Enterprise Funds* or *Seila Law* in
11 that, as the Court pointed out, the plaintiffs in those cases
12 were the direct object of the regulation for the government
13 policy at issue by -- issued by the government official that
14 was challenged in those cases.
15        Your Honor, unless the Court has any questions
16 regarding standing, I would like to move on to respond to the
17 merits argument.
18        THE COURT:  Go ahead, please.
19        MR. ZEE:  Your Honor, I think that there's just a
20 fundamental misunderstanding on the part of the plaintiffs as
21 to the nature of Mr. Pendley's service.
22        THE COURT:  Mr. Zee.
23        MR. ZEE:  I believe as plaintiffs recognized today,
24 Mr. Pendley serves under a lawful delegation of authority.
25        THE COURT:  Mr. Zee, what role does Mr. Pendley

1  serve?

2        MR. ZEE:  Mr. Pendley is the Deputy Director of
3  Policy and Planning, Your Honor.  He is, pursuant to a
4  delegation, exercising by --

5        THE COURT:  By whom?

6        MR. ZEE:  Of the director of the Bureau.

7        THE COURT:  Who delegated his authority?

8        MR. ZEE:  The current delegation of authority was
9  ratified by that Assistant Secretary of the Department of the
10  Interior in a May 2020 memo.

11        THE COURT:  The Succession Memo?

12        MR. ZEE:  That is the Succession Memo, Your Honor,
13  yes.  Prior to the Succession Memo, Mr. Pendley exercised
14  authority pursuant to a different delegation of authority from
15  the Secretary.

16        THE COURT:  So the Succession Memo delegates
17  authority to the BLM director.  Is that what you are telling
18  me?

19        MR. ZEE:  It delegates authority to five individuals,
20  and it creates a succession of those five -- well, I should
21  say, five positions, Your Honor, who are -- which are occupied
22  by individuals, and it creates a hierarchy succession of
23  authority in the event that the director -- (video disruption.)

24        THE COURT:  And the authority for that Succession
25  Memo comes from where?

1        MR. ZEE:  The authority of that Succession Memo, Your

2  Honor, is rooted in the Reorganization Plan Number 3, which is

3  a 1950 provision.  It's Section 2 of the reorganization plan,

4  which is a 1950 provision enacted by Congress.

5        THE COURT:  You said that the Assistant Secretary of

6  the Interior authorized the Succession Memo?

7        MR. ZEE:  The Assistant Secretary of the Interior

8  ratified and concurred --

9        THE COURT:  Ratified?

10        MR. ZEE:  Correct.

11        THE COURT:  All right.  And has the Assistant

12  Secretary been nominated by the President and confirmed by the

13  Senate?

14        MR. ZEE:  Your Honor, I should say -- it was -- I

15  need to back up.  It was -- he has not.  That position is

16  currently occupied by a -- is not -- the duties of that

17  position are being performed by an official who is himself

18  operating under a delegation of authority.  That's Mr. Hammond.

19        THE COURT:  And Mr. Hammond then delegated authority

20  to Mr. Pendley?

21        MR. ZEE:  Correct.  It's incurred in the delegation

22  and ratified.

23        THE COURT:  Okay.

24        MR. ZEE:  So as I was saying, Your Honor, the

25  plaintiffs have sought to fit this case into what we think is a

1  bit of square -- a round hole for a square peg, and they
2  continue to insist that this is an FVRA case, yet we have made
3  no attempt and do not maintain and do not intend to maintain
4  that Mr. Pendley's service is justified by the FVRA; that he is
5  somehow serving as the acting director under the FVRA.

6          Plaintiffs have attempted, I think, to argue that the
7  incidentally erroneous marking and labeling of Mr. Pendley as
8  the acting director somehow transmutes to actually having some
9  legal effect under the FVRA.  But I think what's crucially
10 missing --

11         THE COURT:  Mr. Zee.

12         MR. ZEE:  -- from plaintiffs' argument is how -- if
13 he is indeed serving under the FVRA -- which, again, our
14 position is he's not -- which provision is he serving under and
15 how -- and by which provision is he the acting director that
16 plaintiffs continue, it appears, to maintain that Mr. Pendley
17 did?

18         Our position, just to be crystal clear, Your Honor,
19 is that FVRA really has no role to play in this case.  This
20 is -- Mr. Pendley is exercising the powers and duties of the
21 director pursuant to a delegation.  He is not the acting
22 director of the FVRA.

23         THE COURT:  Mr. Zee, with all due respect, sir, we're
24 almost at the end of the presidential term, and we've never had
25 a director of the BLM approved by the Senate.  And this is all

1   authorized how?

2           MR. ZEE:  This is authorized, Your Honor, by the --
3   well, the delegation in the first instance.  We do not
4   understand the plaintiffs' challenge to the delegation itself.
5   That has been authorized by Congress, the Organization Plan
6   Number 3 in 1950, the power of the Secretary to delegate
7   authority within the department.

8           THE COURT:  The power of the Secretary of the
9   Interior?

10          MR. ZEE:  Correct.  And that -- correct.

11          THE COURT:  All right.  But what power has the
12  Secretary delegated in this case?

13          MR. ZEE:  The Secretary of the Interior has
14  delegated -- first of all, he has delegated the power to make
15  the delegation to the official who is performing the duties of
16  the Assistant Secretary.  And in the Succession Memo, the
17  authority of the Secretary to control the tasks and duties of
18  the BLM director, that's more of 43 USC 1731(a).

19          THE COURT:  Mr. Zee.

20          MR. ZEE:  Yes?

21          THE COURT:  Is there any time limitation on the
22  Succession Memo or any limitation on the scope of authority
23  granted under the Succession Memo?

24          MR. ZEE:  Yes, Your Honor.  There is a time
25  limitation on the Succession Memo.  Plaintiffs have attempted

1   to characterize it as an indefinite one, but on its face -- and
2   I can read from it.  It expires, by its own terms, Your Honor,
3   whenever there is a permanent director appointed to the
4   director position or an official is appointed to that position
5   pursuant to the FVRA itself.  So to the extent that --

6          THE COURT:  But that's not really a limit of time.
7   That's just a contingency.

8          MR. ZEE:  There is no expressed time limit on the
9   succession order, Your Honor.  But our position is that there
10  need not be for Mr. Pendley's service or indeed any delegee's
11  service to be constitutional.  I would refer the Court to the
12  congressional appropriation riders.  Congress has spoken to
13  this issue.  These are cited in our opposition briefs in
14  Subsection 2C, in which Congress identifies the potential for
15  delegees to exercise authority.  It sets forth not service --
16  not durational limit on such delegated authority, but it
17  instead sets forth only salary restriction.  The ability of a
18  delegated official to receive a salary.  And even in those
19  circumstances where a salary prohibition would arise, Your
20  Honor, Mr. Pendley has not met it.  I think it's --

21         THE COURT:  Mr. Zee, has any other President at any
22  time relied upon this delegating authority and, as you
23  discussed, the Succession Memo, to fill a vacancy set for a
24  position --

25         MR. ZEE:  Your Honor --

1          THE COURT:  Hold on.  Let me finish my question,
2  please.
3          MR. ZEE:  Sorry.  I apologize.
4          THE COURT:  -- for a position that requires a
5  presidential appointment with Senate confirmation?
6          MR. ZEE:  Your Honor, to be clear, the Succession
7  Memo is not a feature of -- is not approved by the President.
8  The President does not have a role in the succession.  That's
9  purely a creature of the Department of the Interior.
10          THE COURT:  That wasn't my question.
11          MR. ZEE:  I apologize.
12          THE COURT:  Can you point to any other official in
13  this administration or prior administrations who are serving in
14  a position that requires a presidential appointment subject to
15  Senate confirmation, but instead are serving pursuant to a
16  delegated authority outlined in a Succession Memo?
17          MR. ZEE:  I can't -- I can't today, Your Honor, point
18  to a specific instance where there is pursuant to a Succession
19  Memo.  We have appointed, to the extent the Court would find it
20  helpful, the service of an official in the Bureau of Alcohol,
21  Tobacco, and Firearms, to serve as both the acting director of
22  ATF, and then following the expiration of the relevant time
23  limit under the statute, he served as the deputy director but
24  exercising the function of the director for a considerable
25  amount of time.  I believe the time was approximately four

1  years, 2015 to 2019.

2          To be clear, Your Honor, that's not a -- that was not

3  served, as I understand it, pursuant to a Succession Memo of

4  precisely the same nature that's at issue here.  But it was

5  under a delegation of authority which is what the -- what

6  Mr. Pendley is serving under, that is a feature of the

7  Succession Memo.

8          THE COURT:  As I understand, Mr. Zee, the Succession

9  Memo designates Mr. Pendley as a first assistant.  Is that

10  correct?

11          MR. ZEE:  That is correct, Your Honor.

12          THE COURT:  Okay.  And, again, can you give me any

13  other examples -- you gave me the Bureau of ATF -- of a person

14  who becomes first assistant to an office after it becomes

15  vacant, an office that requires presidential appointment and

16  Senate approval?

17          MR. ZEE:  Well, I think, Your Honor, to be clear, the

18  aspect of the Succession Memo, which designates the Deputy

19  Director of Policy and Planning, of which Mr. Pendley is as the

20  first assistant, that is not the delegation of authority.  That

21  is the designation of the -- of the default official under the

22  FVRA, who in the event of a vacancy, as defined in the statute,

23  would become the acting director.  And that type of designation

24  is relatively common throughout the federal bureaucracy.

25          Your Honor, I would just like to, if I may, say a few

1  more words about the durational issue that plaintiffs have

2  raised.  We don't think that there's simply any manageable

3  standard by which the Court could evaluate when there is -- if

4  there is a durational limit, when the durational limit has been

5  met, whether it's three months, nine months, a few years, eight

6  years.  It's unclear how the Court would weigh in on a question

7  of that nature when that is committed to by the Constitution,

8  to the political branches explicitly.  The nomination and

9  advisory consent process is directly committed to the President

10  and the Senate under the Appointments Clause, of course.

11  That's the conclusion of the *Bhati* decision, Minnesota.

12          Further, Your Honor, the example that I eluded to

13  early, the ATF deputy director, we don't think that

14  Mr. Pendley's service is -- in any way approaches the highly

15  unusual and extraordinary circumstances that plaintiffs make it

16  out to be.  He served as the -- he's been with the Bureau for

17  slightly over one year.  I believe it's approximately 14 months

18  as of this time.  He served as the director -- excuse me --

19  he's exercised the director function for slightly less than his

20  time at this Bureau.

21          In so far as plaintiffs attempt to impose some sort

22  of durational limit, it is not even clear what that limit or

23  what that standard would be.  They seem to suggest that it is

24  the 210-day limit in the FVRA itself, yet I think the

25  congressional provisions that I eluded to earlier, which

1  recognize the possibility of delegated service for periods of
2  unspecified durations, are contrary.

3          One final point, Your Honor, I think, on the matter
4  of political question and just separation of powers, generally,
5  this is a matter which Congress, if it saw aggrandizement to
6  its detriment by the Executive, is in position to address at
7  any time and --

8          THE COURT:  Mr. Zee, didn't Congress attempt to
9  direct the enactment of the FVRA?

10         MR. ZEE:  I think it's fair that the FVRA set forth a
11 framework under which an acting official could serve, but that
12 the FVRA in no way prohibits the arrangement that we have
13 before us and as the Court is aware.

14         THE COURT:  What's the difference between an acting
15 official and a first assistant serving as a delegation?  I
16 don't see much difference.  Is there?

17         MR. ZEE:  Your Honor, I think it's -- there's a
18 difference insofar as the acting official occupies the actual
19 office of the director in this instance.  By contrast here,
20 Mr. Pendley -- that office remains vacant.  Mr. Pendley is the
21 deputy director.  He's -- he can only exercise the powers that
22 are -- that may be delegated to another individual.  The
23 director's power may be delegated.  In the instance of an
24 acting official, he is generally entitled to exercise all the
25 powers of the official were he that official.

1          Unless Your Honor has any further questions regarding

2   the Appointments Clause claim, I would simply urge the Court to

3   either defer ruling on plaintiffs' expedited motion for summary

4   judgment until we have an opportunity to present our arguments

5   under Rule 12, as is our right, or, in the alternative, Your

6   Honor, to deny the motion for summary judgment.  Thank you.

7          THE COURT:  Thank you, Mr. Zee.  All right.  Mr. Zee,

8   if you would mute your microphone again, please.  Thank you,

9   sir.

10          All right.  Mr. Gupta, Mr. Sawhney, I'll give you a

11   brief rebuttal.  Who is ready to go first?

12          MR. GUPTA:  Your Honor, I can go first on standing,

13   and I'll try to be really quick.

14          THE COURT:  All right.  Go ahead, please.

15          MR. GUPTA:  First, Mr. Zee asked that the Court defer

16   a ruling, but I'm a little mystified on what he's saying

17   because, as I understand it, what he's saying is defer ruling

18   on this motion so that we can file a Rule 12 motion that makes

19   some other arguments that we haven't identified.  But all of

20   those arguments could have been made in opposition to summary

21   judgment.  And indeed, you know, the Justice Department

22   typically raises standing.  They've raised standing, and the

23   threshold we have to satisfy at summary judgment under *Lujan* is

24   higher than it would be at the Rule 12 stage.  So I'm not

25   really sure what he is saying or what basis there would be not

1    to rule on the summary judgment motion.

2          And really the Court has already granted the relief
3    we've asked for with respect to expedition.  What we wanted was
4    a quick briefing schedule and to get a hearing and not have
5    this drag out.  In cases like this, time really is of the
6    essence.  That's reflected in the short time frames in the FVRA
7    and of these kinds of Appointment Clause challenges.  If
8    there's no judicial relief, then the problem can simply go away
9    and then be repeated.

10         And as we've pointed out in the declarations,
11   Williams and Tubbs declarations, time really is of the essence
12   here.  Montana is subject to a process that involves a whole
13   lot of land in Montana with serious impacts.  There's an
14   ongoing process.  And Montana has to face the uncertainty of
15   dealing with someone who doesn't have the lawful authority to
16   supervise that process.

17         The second point that Mr. Zee raised is that the
18   state is, in his view, not a plaintiff.  But as Your Honor's
19   questioning points out, the state often operates through its
20   governor or its agencies, and that's not unusual.  In the
21   *Bullock v IRS* case, the Justice Department made a similar
22   argument in its papers, and this Court, I think, implicitly
23   rejected that argument and held that *Massachusetts v EPA* and
24   its concept of special solicitude applied in that case where
25   the plaintiffs were the governor and a state agency, and the

1   attorney general wasn't there.

2          And, as Your Honor pointed out, it's really an
3   antecedent question of state law whether the governor has the
4   authority to bring these cases, and the Justice Department is
5   not challenging his authority.

6          Mr. Zee talked a lot about the harm from Sage-Grouse
7   and suggested that the chain of causation is broken simply
8   because some other agency lists the Sage-Grouse.  But I think
9   as *Massachusetts v EPA* shows, there, the chain of causation was
10  a lot more attenuated.  What you have to show, we have shown,
11  is that these actions contribute to environmental harm to the
12  state.

13         And Mr. Zee's arguments danced around the real harm,
14  which is the harm that's reflected by this approval by Pendley
15  of protests made by the state.  He tried to distinguish the
16  separation of powers cases by saying that in those other cases,
17  the plaintiff was the direct target of the federal government's
18  action.  I'm kind of mystified by that argument because these
19  plans that we're talking about are all about Montana.  They
20  reflect two field offices in Montana, and they control a huge
21  amount of land in Montana and have direct impact for Montana.
22  They authorized oil and gas leasing in 95 percent of the
23  available affected land in Montana.

24         And so he says they are not direct targets, but we
25  are.  And he says he's not insisting on a counterfactual.  But

1  I think by telling us that he wants us to identify some
2  specific action that we're complaining about that causes the
3  concrete injury, he's really insisting on the kind of
4  counterfactual the Supreme Court said you don't need.
5          And, here, if you had to show the counterfactual we
6  have it.  The agency has flipped 180 degrees.  It has rejected
7  requests by the governor.  And there's a direct impact on
8  Montana's land and its wildlife, and that impact is ongoing.
9  And so I think we've done more than enough to satisfy
10 Article III standing on multiple alternative grounds.
11         And so if the Court doesn't have any further
12 questions on standing, I'll turn it over to my colleague,
13 Mr. Sawhney.
14         THE COURT:  Thank you, Mr. Gupta.
15         Mr. Sawhney.
16         MR. SAWHNEY:  Thanks, Your Honor.  I'll be brief.
17         THE COURT:  Mr. Sawhney, first address the
18 government's argument that the FVRA really has no relevance to
19 your Appointments Clause challenge.
20         MR. SAWHNEY:  Yes, Your Honor.  And I think Mr. Zee's
21 argument there was clarifying in that, you know, I think the
22 government has made clear that their position is that so long
23 as they string together a series of purported delegations that
24 give, you know, the acting official in all but name the same
25 power as an acting official, they can completely evade the

1  FVRA.

2          And I think on this point, Your Honor, the *Cuccinelli*
3  decision, Judge Moss's decision there, makes clear what's wrong
4  with the government's position.  And as Judge Moss stated, he
5  said every cabinet level department has some version of a
6  vesting and delegation statute.  It was the pervasive use of
7  those vesting and delegation statutes, along with the lack of
8  an effective enforcement process, that convinced Congress of
9  the need to enact the FVRA.  Yet if defendants were correct
10  that the mere existence of these delegation statutes were
11  sufficient to negate the mechanisms Congress included in the
12  FVRA, Congress would have done little to restore
13  constitutionally mandated procedures that must be satisfied
14  before acting officials may serve in positions that require
15  Senate confirmation.

16          In other words, the government's argument is
17  essentially that the FVRA and, therefore, Congress's role in
18  appointments can be completely evaded simply by using these
19  delegations.  And that cannot be correct because it would mean
20  that the Senate would have no role at all, ever.  Frankly, the
21  government's --

22          The other point I want to make is that I think Your
23  Honor's questions to Mr. Zee illuminated the unusual and almost
24  baffling situation we are in.  Mr. Pendley is the Deputy
25  Director of Policy and Projects, who is serving in the role of

the director exercising authority delegated to him by the
Secretary, but then who has created a succession order
delegating -- putting himself as first assistant in the event
of a vacancy.  That vacancy has persisted for the entire time
of the presidential term.  And then that was ratified by
another acting Secretary, who also is not confirmed nor
appointed in compliance with the FVRA but also is delegated
authority from someone up higher in the chain.

So you have numerous officials, none of whom have
been confirmed by the Senate or have complied with the FVRA,
exercising the entire authority of the agency, and, in fact,
even setting up how the agency should operate in the event of a
vacancy without acknowledging that there has been a vacancy the
entire term.  And so I just don't think that this kind of, you
know, absurd and circular steps can be tolerated if we want to
give the Appointments Clause any real weight.  And the
Appointments Clause, as the Supreme Court has made clear, is
not some minor or marginal clause in the Constitution.  It's
one of the most critical structural safeguards of our
Constitution, and it delineates the power between the Executive
and the Legislative branch in a way that's very important for
-- you know, the Supreme Court said for individual liberty and
for separation of powers.

And so I think that the position that the government
has set out here, it's a bit confusing, but it boils down to

1  the idea that the Executive branch can, through a variety of

2  somewhat complicated actions, just get out of the Appointments

3  Clause.  And I think that this case is perhaps the clearest

4  example of why that can't be tolerated.

5        And so, you know, for those reasons we think that the

6  motion for summary judgment should be granted.

7        THE COURT:  Thank you, Mr. Sawhney.

8        Mr. Zee, I'll give you a very brief surrebuttal if

9  you'd like.

10        MR. ZEE:  Thank you, Your Honor.  I will be very

11  brief, two quick points.  First, in response to Mr. Gupta's

12  rebuttal about -- he again invoked the approval of the protests

13  by the Bureau.  Again, we don't know which protests, as far as

14  I can tell, are being referred to there, nor do we know what

15  effects that approval for non-specified protests may have had

16  on any cognizable -- (video disruption.)  To the extent that

17  that is plaintiffs' position, we submit that they have been

18  inadequately pled it or evinced it at summary judgment.

19        Second, Your Honor, briefly, Mr. Sawhney recited an

20  argument about the delegation order and the succession order

21  and delegation orders generally.  Two quick responses, Your

22  Honor, this does not at all carve Congress or the Senate out of

23  the process as was argued.  If Congress does not like the

24  extent to which delegations are being used, it can restrict the

25  authority of the Executive branch to delegate authority in

1  whatever matter it sees fit, subject to whatever Article II

2  powers exist in that area.

3          Second, very briefly, to the extent that plaintiffs

4  wish to actually challenge the succession order as an unlawful

5  delegation, that also needs to be pled.  My reading of the

6  papers, Your Honor, is that's really first brought up in the

7  reply on summary judgment and during today's argument.  To the

8  extent that plaintiffs wish to challenge that, they can attempt

9  to plead it.

10          Thank you, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Zee.

12          Thank you, Counsel.  This matter is submitted.  I

13  will issue an order forthwith.  Thank you for your time today.

14          MR. SAWHNEY:  Thank you, Your Honor.

15          MR. GUPTA:  Thank you, Your Honor.

16          MR. ZEE:  Thank you.

17      (The proceedings concluded at 2:49 p.m.)

18

19                      --o0o--

20

21

22

23

24

25

REPORTER'S CERTIFICATE

REPORTER'S CERTIFICATE

1

2    I, Yvette Heinze, a Registered Professional

3 Reporter and Certified Shorthand Reporter, certify that the

4 foregoing transcript is a true and correct record of the

5 proceedings given at the time and place hereinbefore mentioned;

6 that the proceedings were reported by me in machine shorthand

7 and thereafter reduced to typewriting using computer-assisted

8 transcription; that after being reduced to typewriting, a

9 certified copy of this transcript will be filed electronically

10 with the Court.

11    I further certify that I am not attorney for, nor employed

12 by, nor related to any of the parties or attorneys to this

13 action, nor financially interested in this action.

14    IN WITNESS WHEREOF, I have set my hand at Great Falls,

15 Montana, this 5th day of February, 2021.

16

17                              /s/ *Yvette Heinze*

18                              _____
                                Yvette Heinze
19                              United States Court Reporter

20

21

22

23

24

25